1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

8
9

| | |
|---|---|
| TRAVIS MICKELSON, DANIELLE H. MICKELSON, and the marital community thereof | |
| | NO.  2:11-cv-01445 |
| Plaintiffs, | |
| vs. | COMPLAINT FOR RECISSION OF TRUSTEE'S DEED, QUIET TITLE, DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF |
| CHASE HOME FINANCE LLC, an unknown entity; JPMORGAN CHASE BANK, N.A., a foreign corporation; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a foreign corporation; NORTHWEST TRUSTEE SERVICES, INC., a domestic corporation; JOHN DOES, unknown entities; MORTGAGEIT, INC., a foreign corporation, GMAC MORTGAGE CORPORATION, a foreign corporation; CHICAGO TITLE, an unknown corporation; ROUTH CRABTREE OLSEN, P.S., a domestic Personal Services Corporation, and FEDERAL HOME LOAN MORTGAGE CORPORATION, a corporation; | |
| Defendants. | |

COMPLAINT - 1

## I.   INTRODUCTION

On March 25, 2011, Plaintiffs Travis and Danielle Mickelson ("Mickelsons") were told they lost their family home on Camano Island to a non-judicial foreclosure perpetrated by the defendants Chase Home Finance, LLC, ("Chase"), Northwest Trustee Services and Federal Home Loan Mortgage Corporation. This happened after years of being misled by banks and their servicing agents who purported to be entitled to the Mickelson's obligation payments, and coerced them to take actions against their interest under the threat of foreclosure.

These defendants were not entitled to foreclose, or threaten to foreclosure. Washington requires the beneficiary "hold" the instrument, and plaintiffs allege the defendants did not hold the original note, produced false and misleading documents, and did not follow the required procedures under Washington's Deed of Trust Act. The original lender also "broke" the Mickelson's note from its underlying security agreement by failing to transfer possession of it to a "beneficiary", Mortgage Electronic Registration System (MERS)[1], in order effectuate a particular scheme of maximizing profit, avoiding taxes, and concealing or disguising its activities from governments, investors, and borrowers. Plaintiff alleges that this bifurcation renders the note unenforceable against the collateral, and violates Washington's Deed of Trust statute, as was found in some, but not all, other jurisdictions.[2] The defendants

---

[1] The legality of the MERS System is currently on review in our State Supreme Court. *Bain v. Metropolitan Mortgage Group Inc., et al.* Supreme Court No. 86206-1; *Selkowitz v. Litton Loan Servicing, LP, et al.*, Supreme Court No. 86207-9.

[2] While still working its way through our courts, bifurcation of the note or obligation instrument from mortgage or deed of trust interest has been elaborated upon by other jurisdictions:

> The practical effect of splitting the deed of trust from the promissory note is to make it impossible for the holder of the note to foreclose, unless the holder of the deed of trust is the agent of the holder of the note. [Citation omitted.] Without the agency relationship, the person holding only the note lacks the power to foreclose in the event of default. The person holding

COMPLAINT - 2

do not wish to accept the consequences of breaking the note from its secured collateral; and have chosen instead to falsify or misrepresent documents to cause a trustee's sale and payment from the plaintiffs.

Chase and its servicers, also abused a loss mitigation process, utilizing "dual tracking" a process by which the servicer assures the homeowner that the trustee's sale will not take place while the modification is being considered, while the trustee and servicer, conducts the sale. These sorts of activities belie Chase, and its agents, professed goals of making foreclosure the last resort, and giving homeowners every reasonable opportunity to remain in their homes.

This action is brought to enjoin unlawful detainer of the Mickelsons; recognize their superior interest in property, declare the trustee's sale invalid, quiet or rescind the trustee's deed, declare the rights of the parties, and seek damages.

## II.    PARTIES, JURISDICTION AND VENUE

1.1.    Plaintiffs TRAVIS MICKELSON and DANIELLE H. MICKELSON ("Mickelsons") are married couple and residents of Camano Island, Washington.

---

only the deed of trust will never experience default because only the holder of the note is entitled to payment of the underlying obligation. [Citation omitted.] The mortgage loan becomes ineffectual when the note holder did not also hold the deed of trust.

*Landmark National Bank v. Kesler*, 216 P.3d 158, 289 Kan. 528 (Kan. 2009) (*Citing Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623-24 (Mo. App. 2009)). *Bellistri* found that because MERS never held the promissory note, its assignment of the deed of trust to Ocwen separate from the note had no force. *Bellistri*, 284 S.W.3d at 623-24; *see e.g., U.S. Bank National Association v. Christine Kimball*, 2011 Vt. 81 (Vt. 2011); *c.f., Mortgage Electronic Registration Systems, Inc. v. Nebraska Dep't of Banking and Finance*, 704 N.W.2d 784, 270 Neb. 529 (Neb. 2005); *see also, U.S. Bank Natl. Assn. v. Ibanez*, 458 Mass. 637, 941 N.E. 40 (2011); In re Schwartz, No. 06-42476-MSH (U.S. Bankruptcy Ct. D. Mass. Central Division, April 7, 2011)("the fact that it had possession of the mortgage instrument did not render Deutsche the mortgagee and thus it lacked the power to sell the property"); *MERS v. Saunders*, 2010 ME 79 (Maine 2010)(MERS is not in fact a mortgagee).

1.2.    The Mickelsons reside in the property located at: 426 Ezduzit Lane, Camano Island, WA 98282 (hereafter referred to as the "Mickelson Property").[3]

**i.    Trustee or alleged trustees**

1.3.    Defendant NORTHWEST TRUSTEE SERVICES, INC ("new" or "alleged" trustee) is incorporated under the laws of the State of Washington and is doing business in Island County, State of Washington. NORTHWEST TRUSTEE SERVICES, INC purported to be a Trustee authorized under Ch. 61.24 RCW, and recorded in the office of the Auditor of Island County, Washington, a "Notice of Trustee Sale" of the Property under Auditor's File No. 4280389; sold the Mickelson Property at public auction on March 25, 2011; and, granted or conveyed a "Trustees Deed" to FEDERAL HOME LOAN MORTGAGE CORPORATION. On information and belief plaintiff alleges Defendant NORTHWEST TRUSTEE SERVICES, INC, was not a proper successor trustee under the terms of the Mickelson's Deed of Trust and/or RCW 61.24.010, on or before Sept. 6, 2010.

---

[3] PARCEL A: THAT PORTION OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 25, TOWNSHIP 32 NORTH, RANGE 2 EAST OF WILLAMETTE MERIDIAN, DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 25: THENCE SOUTH 89 DEGREES 54'20" EAST ALONG THE SOUTH LINE OF SAID SECTION 25, 329.60 FEET; THENCE NORTH 0 DEGREES 27'18" WEST 30.00 FEET TO NORTHERLY MARGIN OF THE CROSS ISLAND COUNTY ROAD; THENCE CONTINUE NORTH 0 DEGREES 27'18" WEST 316.45 FEET TO THE TRUE POINT OF BEGININNG; THENCE CONTINUE NORTH 0 DEGREES 27'18" WEST 158.22 FEET; THENCE SOUTH 89 DEGREES 55'15" EAST 329.98 FEET TO THE EAST LINE OF SAID SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER THENCE SOUTH 0 DEGREES 24'37" EAST ALONG SAID EAST LINE, 158.25 FEET TO A POINT THAT IS SOUTH 89 DEGREES 54'56" EAST FROM THAT TRUE POINT OF BEGINNING; THENCE NORTH 89 DEGREES 54'56 WEST 329.86 FEET TO THE TRUE POINT OF BEGINNING. PARCEL B: AN EASEMENT FOR A ROAD INGRESS AND EGRESS AND PUBLIC AND PRIVATE UTILITIES BEING 60 FEET IN WIDTH FROM THE NORTHERLY MARGIN OF THE CROSS ISLAND COUNTY ROAD TO THE NORTH LINE OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 25, TOWNSHIP 32, RANGE 2 EAST OF THE WILLAMETTE MERIDIAN, THE CENTERLINE OF SAID 60 FOOT EASEMENT IS DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF SAID SECTION 25; THENCE SOUTH 89 DEGREES 54'20" EAST ALONG THE SOUTH LINE OF SAID SECTION 25, 329.60 FEET; THENCE NORTH 0 DEGREES 27'18" WEST 30.00 FEET SAID NORTHERLY MARGIN OF THE CROSS ISLAND COUNTY ROAD AND THE TRUE POINT OF BEGINNING OF SAID CENTERLINE; THENCE CONTINUE NORTH 0 DEGREES 27'18 WEST 632.89 FEET TO THE NORTH LINE OF SAID SUBDIVISION AND THE TERMINUS OF SAID CENTERLINE. SITUATED IN ISLAND COUNTY, WASHINGTON.

1.4.     Defendant CHICAGO TITLE is either a foreign or domestic corporation doing business in Island County, State of Washington. CHICAGO TITLE is the Trustee identified in the original deed of trust (hereafter referred to as "Original Trustee").  Based on information and belief, defendant original trustee has never been legally relieved of his duties under the original promissory note.

## ii.     Alleged Beneficiaries

1.5.     Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") is and was at all times material hereto, a corporation, incorporated under the laws of Delaware.[4] Defendant MERS is alleged to be a valid "nominee" and "beneficiary" under the Mickelson's deed of trust which is the subject of this complaint. On information and belief MERS never possessed or was assigned the note instrument which is the subject of this action. On information and belief MERS's database system was used by one or more unknown parties to assign or transfer a beneficial right or interest in the Mickelson's Deed of

---

[4] What is MERS?

> MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, **MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS**. MERS is listed as the grantee in the official records maintained at county register of deeds offices. The **lenders retain the promissory notes, as well as the servicing rights to the mortgages**. The lenders can then sell these interests to investors without having to record the transaction in the public record. MERS is compensated for its services through fees charged to participating MERS members. [...it has been argued that] In attempting to circumvent the statutory registration requirement for notice, MERS creates a system in which the public has no notice of who holds the obligation on a mortgage.

*Mortgage Elec. Reg. Sys., Inc. v. Nebraska Depart. of Banking*, 270 Neb. 529, 530, 704 N.W.2d 784 (2005). MERS is in essence a provider of online databases which purports to "eliminate paper assignments". At the time this complaint was filed, the legality of MERS's is currently on review in our State Supreme Court. *See Bain v. Metropolitan Mortgage Group Inc., et al.* Supreme Court No. 86206-1; *Selkowitz v. Litton Loan Servicing, LP, et al.*, Supreme Court No. 86207-9.

Trust to one or more unknown parties without recordation in the Island County Assessor's office. MERS is not authorized to do business in the State of Washington.

1.6.     Defendant CHASE HOME FINANCE LLC, purported to be the assigned or successive "beneficiary" of the Mickelson's deed of trust from MERS and/or alleges to be the "holder" or "owner" of the Mickelson's note which are the subject of this action (hereafter referred to solely as "Chase" or "Alleged Beneficiary"). Chase is a foreign limited liability company whose principal location is purported to be Columbus, Ohio. On information and belief, Chase is doing business in Island County, State of Washington, without registering as a foreign limited liability company with Washington's Secretary of State. On information and belief, Chase is wholly-owned by, and an indirect subsidiary of, JPMORGAN CHASE BANK, N.A.

1.7.     Defendant JPMORGAN CHASE BANK, N.A., is a national banking association, a wholly-owned bank subsidiary of JPMorgan Chase & Co., a Delaware corporation, and doing business in Island County, State of Washington. At various times, JPMORGAN CHASE BANK, N.A, was purported to be at times: the servicer, the assigned or successive beneficiary of a deed of trust and/or holder of the note which are the subject of this action.

1.8.     On information and belief, Defendants JOHN DOES are unidentified nominees, successors, investors, or assigns of the Mickelson's mortgage. On information and belief, some JOHN DOES are Real Estate Mortgage Investment Conduits (REMICs) or other mortgage backed certificate issuing entities that securitized the Mickelson's mortgage.

1.9.     Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION, commonly known as "Freddie Mac" is the alleged grantee of the Mickelson Property by Grantor/New Trustee. Freddie Mac is a corporation chartered by Congress under 12 U.S.C. § 1452; and

COMPLAINT - 6

under section (c)(7) of the same may sue and be sued, complain and defend, in any State, Federal, or other court and is doing business in Island County, State of Washington. Freddie Mac purchases and holds mortgages and mortgage-related securities. On information and belief Freddie Mac encourages or promotes the MERS system. Investors in Freddie Mac's debt securities include investment managers, insurance companies, commercial and central banks, and pension funds. On information and belief Freddie Mac claimed to have possession or an interest in either, and or both, the Mickelson's note or mortgage.

### iii.  Servicers and Agents

1.10.      On June 3, 2006, Defendant Chase, claimed they were the "servicing" the Mickelson's obligations held by Defendant JPMORGAN CHASE BANK, N.A. On information and belief, Chase, was only a servicer for Freddie Mac, who purported to hold the Mickelson's note or a beneficial interest in the Mickelson's Deed of Trust when the alleged trustee sent Notices of Trustee's Sale to the Plaintiffs.

1.11.      Defendant MORTGAGEIT, INC. alleged they were "servicer" of the loan and purported agent of either MHL Funding Corp. or one or more unknown entities between: December 7, 2005 until April 17, 2006. MORTGAGEIT, INC is a foreign corporation doing business in Island County, State of Washington. At various times the servicer collected and/or requested payments from the Mickelsons.   On information and belief, the principal of MORTGAGEIT, INC was not the "beneficiary" and/or the Mickelson's note holder under the deed of trust or the note which are the subject of this action.

1.12.      Defendant GMAC MORTGAGE CORPORATION alleged they were "servicer" of the loan and purported agent of MHL Funding Corp. or one or more unknown

entities, between: April 17, 2006, until June 16, 2006. GMAC MORTGAGE CORPORATION is a foreign corporation doing business in Island County, State of Washington. At various times the servicer collected and/or requested payments from the Mickelsons. On information and belief, the principal of GMAC MORTGAGE CORPORATION was not the "beneficiary" and/or the Mickelson's note holder.

1.13.     Defendant ROUTH CRABTREE OLSEN, P.S. is a law firm and Professional Services Corporation, principally based in Bellevue, Washington, and doing business in Island County. Beginning on August 25, 2008, the ROUTH CRABTREE OLSEN, P.S. claimed they were a debt collector for Chase. At various times, the servicer requested payments from the Mickelsons on behalf of Chase, offered to assist them in modifications, and/or represented they could foreclose. On information and belief, the principal of ROUTH CRABTREE OLSEN, P.S. was not the "beneficiary" and/or the Mickelson's note holder.

iv.   **Jurisdiction and Venue**

1.14.     This court has jurisdiction under 28 U.S.C. 1331 because this complaint alleges civil actions arising under 15 U.S.C. 1692(a)(5); and ancillary jurisdiction under 28 U.S.C. § 1367 as the federal claim and ancillary claims form the same case or controversy as to the rights of Chase and its agents to foreclose and transfer title to the Mickelson Property. Mickelson's reside in Island County, Washington, and at all material times to this complaint, the Defendants were doing business in Island County, Washington.

## III.  FACTS

2.1.      The Mickelsons' purchased the Mickelson Property on or about November 22, 2005, and as of the filing of this complaint, reside therein with their two daughters.

2.2.      On November 22, 2005, the Mickelsons executed an Adjustable Rate Note (the "note") for $403,500.00 to be paid to lender MHL Funding Corp.  Up through 2008, periodic payments on the adjustable note were roughly $2,600. The Mickelsons also executed a Deed of Trust, which, in event of default, agreed to transfer rights in the Mickelson property, by Chicago Titles' power of sale, to the beneficiary MERS.  Under RCW 61.24.005, "Beneficiary" means "the holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation."

2.3.      In naming MERS as the beneficiary under the Deed of Trust, but not transferring possession of the note, the lender bifurcated the note from the beneficial interest in the collateral granted by the deed of trust. These beneficial interests were purported to be sold to unknown entities who maintain equitable interest in the Mickelson's collateral.

2.4.      Plaintiff Travis Mickelson had numerous medical procedures which caused significant expense and interruption of work. On June 3, 2008, he had an on-the-job accident which resulted in significant harm to shoulders and knees. Mr. Mickelson also suffers from super ventricular tachycardia, a condition which results in rapid heartbeats. On August 11, 2008, Travis Mickelson was nearly killed by a botched heart ablation procedure to mitigate this heart condition. Since October of 2008, he had three different joint surgeries with periods of extensive physical therapy.

2.5.    The costs of medical procedures and temporary loss of a wage earner caused the Mickelsons to fall behind on their payments on the obligation. Their monthly income in August of 2008 was approximately $7,000 which declined to $3,000 to 4,000 due to Mr. Mickelson's injuries.

2.6.    Starting in August of 2008, the Mickelsons were threatened with foreclosure.

    2.6.1.    The Mickelsons' received letters dated, August 25, 2008. The first was from Alice Moulton with defendant Chase, notifying them that they will commence with a foreclosure unless a foreclosure alternative is agreed upon. A second letter was from defendant Routh Crabtree Olsen, P.S. which stated in bold all caps "WE WANT YOU TO BE ABLE TO KEEP YOUR HOME!" and stating they may be eligible for certain opportunities to stay in their home. A notice of default, notice of foreclosure, and notice of trustee's sale were sent by NORTHWEST TRUSTEE SERVICES, INC.'s Vonnie McElligott. The letters allege "...the beneficial interest in which was assigned by [MERS] to [Chase], under an Assignment/Successive Assignments recorded under Auditor's File No. 4236910." A copy of the Trustee's letters in 2008 are attached hereto as Exhibit A and incorporated by reference.

2.7.    The Mickelsons made multiple attempts to enter into a homeowner's assistance "program" with Chase, and staved off the initial non-judicial foreclosure by signing a modification agreement. A copy of the modification agreement is attached hereto as Exhibit B and incorporated by reference.

2.8.    While the Mickelsons continued to seek an affordable program, a second non-judicial foreclosure was initiated by the Trustee on or about September 6, 2010. A copy of the

COMPLAINT - 10

2010 Notice of Trustee's Sale, Notice of Foreclosure, and attached copies of the alleged Note and Deed of Trust are attached hereto as Exhibit C and incorporated by reference.

2.9.    On March 25, 2011, Northwest Trustee Services conducted the trustee's sale, despite repeated assurances from Chase, not to worry about the sale and that the Mickelsons were under active consideration for a modification. The Trustee's Deed was issued on March 30, 2011, and is attached hereto as Exhibit D and incorporated by reference

2.10.    The Plaintiffs have no knowledge of whether Freddie Mac was a third party buyer; but, on information and belief, allege that Freddie Mac claimed to be a beneficiary who could utilize, "all or any part of the monetary obligations secured by the deed of trust" to purchase the deed. *See* RCW 61.24.070

2.11.    Beginning on April 7, 2011, Routh Crabtree Olsen, P.S., now allegedly representing Freddie Mac as its attorney, stated they would be moving for an unlawful detainer action under Freddie Mac's Trustee's Deed. A copy of the action is attached hereto as Exhibit E and incorporated by reference (as of the date of this filing, the Plaintiff believes the unlawful detainer actions has not been filed).


A.    FACTS RELATED TO "BROKEN" MORTGAGE

i.    MERS

3.1.    MERS is a private corporation that administers the MERS System, a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Through the MERS System, MERS becomes the mortgagee of record for participating members through assignment of the members' interests to MERS.

3.2.	MERS is compensated for its services through fees charged to participating MERS members.

3.3.	MERS was never assigned or received the Mickelson's promissory note. *See* MERSCORP, INC. Rules of Membership, at *25-27 (effective July 22, 2011) (available online at: http://www.mersinc.org/files/filedownload.aspx?id=172&table=ProductFile).

3.4.	By design, MERS creates a system in which the public has no notice of who holds the obligation on a mortgage.

3.5.	MERS is listed as the "nominee" and "beneficiary" in the official records maintained at the Island County Auditor; but MERS retains no control over the security interest (i.e., beneficiary interest under the Deed of Trust). MERS defines a "beneficial rights transfer" as the transfer of the security interest held under a mortgage or deed of trust for a loan or group of loans to a new owner or investor. Attached as Exhibit F, and incorporated herein, are excerpts of the MERS user manual. Of note:

3.5.1.	Transfers of beneficiary rights to other active members are performed electronically, without indorsement on deed or note, or recording at the Island County Assessor, or assessment of additional fees, taxes or costs of said actions.

3.5.2.	The MERS system does not maintain a physical copy of the promissory note or deed of trust; and the data entered represents portions of the deed of trust.

3.5.3.	Transfers in the MERS system do not transfer physical possession of a promissory note or deed of trust. Transfers may occur in batches.

3.6.	At the time this complaint was filed, the legality of MERS system is currently under review in the Washington State Supreme Court. *See Bain v. Metropolitan Mortgage*

*Group Inc., et al.* Supreme Court No. 86206-1 (June 24, 2011); *Selkowitz v. Litton Loan Servicing, LP, et al., Supreme Court* No. 86207-9 (July 27, 2010).

## ii.   Servicing Rights

3.7.      On information and belief, banks, including the defendants, formed associations-in-fact and purchased servicing companies to act as their agents and to distance themselves from the actions of their agents.

3.8.      On information and belief, the servicing right was initially sold to Mortgageit, Inc.

3.9.      Between November 2005 and June 2006, three different entities: Mortgageit, Inc., GMAC Mortgage Corporation, and Chase claimed to be the servicers of their mortgage.

3.10.     On information and belief, and on more than one occasion, the Mickelson's servicing rights were bought, sold or transferred through the MERS system.

## iii.   Beneficial Interest Transfers

3.13.     Using MERS, or other transactions, the defendants bought or sold the beneficial interests, likely to John Doe bank controlled "Real Estate Mortgage Investment Conduits" ("REMIC"s) who enjoy tax-free status under the I.R.S. Code, who in turn sold to investors "Mortgage Pass-Through Certificates" or "Asset-Backed Certificates" (collectively, the "Certificates") that entitle the certificate holders to receive Plaintiffs' monthly payments.

3.14.     The mortgage notes were never assigned to the entities that purchased them, for several reasons: (a) to do so would invite audits by the investors of the quality of the mortgages, and they are of much lower quality than what the banks represented to the investors. (*See e.g.,* Complaint in *NECA-IBEW Health & Welfare Fund v. Goldman, Sachs &*

*Co.*, 08 Civ 10783 S.D.N.Y. Jan. 28, 2010)) (b) to do so would prevent the banks from selling the same mortgage Notes to multiple REMIC's at the same time. (*See* Plaintiffs" Exhibit "G" Yves Smith, "How Did the Banks Get Away with Pledging Mortgages to Multiple Buyers?," *Naked Capitalism* (October 26, 2010) at \*3); or, (c) to do so would threaten the tax-exempt status of the REMIC's.

**iv.   Fraud and Note Replica**

3.15.      A copy of the Adjustable Rate Note signed by the Mickelsons for $400,500.00 is attached to the Notice of Trustee's sale and Foreclosure, that Note was made by the Mickelsons to lender "MHL Funding Corp." The copy of the note contains no indorsements to Chase, MERS, or holders of beneficial interest obtained using the MERS system. On information and belief, the copy attached was an older copy and Chase does not have possession of the original instrument when it requested the new trustee initiate non-judicial foreclosure either in 2008 or 2010, or both; or did not have possession until March 25, 2011.

3.16.      On May 18, 2010, in the "Deposition of Beth Ann Cottrell" in Chase Home *Finance, LLC, v. Fleming* (Circuit Court of the Fifteenth Judicial District, Palm Beach County, Florida, Case No. 50-2009-CA-026599) (available at: http://www.icelegal.com/files/17may10cottrellb.pdf), Ms. Cottrell, a professional document-signer, also known as a "robo-signer" used by Defendant JP Morgan-Chase, admitted in a deposition to signing off on about 18,000 (necessarily false) documents each month in mortgage-foreclosure cases for Defendant J.P. Morgan-Chase, admitted that she falsely stated in affidavits that she was an employee of Chase, and testified that she was one of eight signers who did the same.

3.17.    On information and belief, declarations or affidavits offered in support of either the recording or trustee's sale were fraudulently prepared by a robo-signer who falsely stated they were an employee of Chase, and had insufficient knowledge to form the truth in of their declaration or affidavit.

3.18.    On information and belief, the assignment/successive assignment recorded under Auditor's File No. 4236910, was a copy made of the deed of trust on which did not list the assignment or transfers of beneficial interests.

## B. FACTS RELATED TO DUAL TRACKING

4.1.    Beginning August of 2008, the Mickelson's actively and persistently sought and followed Chase's recommendations to obtain assistance due to Travis's medical problems and temporary loss of income. The Mickelson's were advised by Chase to pursue several "programs", and to not actively make payments in order to qualify for certain "programs".

4.2.    A representative sample of the Mickelsons attempts to obtain assistance and qualify for a helpful program is located in Appendix 1 to this complaint. Appendix 1 is attached hereto and incorporated specifically herein.

4.3.    On March 29, Mickelson's attorney, Greg Gilday, wrote a letter to Chase stating the Mickelson's property was sold by mistake and sent two cashiers checks totaling $1315.00 per Chase's rate change letter effective Jan. 1, 2011.

4.4.    On April 20, 2011, Chase stated they received the inquiry, and were looking into what had occurred.

4.5.    On April 29, 2011, Chase stated they needed 15 more days to look into what had occurred.

4.6.     On May 7, 2011, the Mickelsons received a letter from Chase, attached hereto as Exhibit L and incorporated by reference, stating that effective June 1, 2011 from Dec. 1, 2011, the new payment would be $1,272.97.

4.7.     On May 16, 2011, the Mickelsons were told by Chase they needed another 15 days to look into what had occurred.

4.8.     On May 19, 2011, the Mickelsons went to the Stanwood Chase branch and were given a copy of the screen which showed their new rate and new payment amount of $1,272.97, effective 1/1/2011 would expire on 1/1/2016. A copy of that screenshot is attached hereto as exhibit M, and incorporated by reference.

4.9.     On May 25, 2011, Chase sent a letter stating the documents the Mickelsons received were a rate change, Chase would not honor it, and that the home was sold. A copy of that letter is attached hereto as exhibit N and incorporated by reference.

## IV. CAUSES OF ACTION

### A.    QUIET TITLE

5.1.     Plaintiffs re-allege paragraphs 1.1 through 4.9 above as if set forth more fully herein.

5.2.     The interests of Defendant, FEDERAL HOME LOAN MORTGAGE CORPORATION are subordinate to the interests of Plaintiffs and title should be quieted in Plaintiffs as to all Defendants herein.

5.3.     Plaintiffs, TRAVIS MICKELSON and DANIELLE H. MICKELSON, are entitled to judgment quieting title as to the ownership of the above described property set forth in paragraph 1.2 above.

B.    DEED OF TRUST ACT (Ch. 61.24 RCW)

6.1.    Plaintiffs re-allege paragraphs 1.1 through 5.3 above as if set forth more fully herein.

**i. MERS was not a "Beneficiary" under Washington's Deed of Trust Act.**

6.2.    Under Washington law, a deed of trust is a security instrument involving three parties: (i) the borrower or grantor; (ii) the lender or beneficiary; and (iii) the trustee. *See* RCW 61.24.005(2), (3), (6), & (13).

6.3.    Pursuant to a deed of trust, the trustee holds, on behalf of the beneficiary, a legal interest in the title to the grantor's real property.

6.4.    The term "beneficiary" is statutorily defined as "the holder of the instrument or document evidencing the obligations secured by the deed of trust." RCW 61.24.005(2).

6.5.    MERS was not intended to be, a holder or assignee of the promissory note for which the Deed of Trust secured.

6.6.    MERS never possessed the Mickelson's promissory note.

6.7.    Any assignment of the beneficial interest to Chase, or other Alleged Beneficiary from MERS was invalid *ab initio* under Washington law.

6.8.    Because MERS never possessed the document to constitute a "beneficiary" under Washington's definition, it did not comply with the statute. To assert otherwise under an assignment/successive assignment recorded under Auditors file no. 4236910 constitutes fraud and misrepresentation.

**ii. Alleged Beneficiaries do not enjoy "beneficiary" status under Washington Law.**

6.9.     On information and belief, Chase, or other alleged beneficiaries, or their agents, did not possess the original promissory note endorsed in blank; nor did they have a promissory note when:

    6.9.1.     they elected Northwest Trustee Services as the new trustee; or,

    6.9.2.     they declared under perjury or otherwise supplied proof to the trustee that they hold the note.

**iii.   Trustees violated duty of good faith**

6.10.     The trustee or successor trustee has a duty of good faith to the borrower, beneficiary, and grantor.

6.11.     On information and belief, Chicago Title, had not been relieved from its duty as trustee at the time either of the trustee sales had been initiated.

6.12.     On information and belief, Northwest Trustee Services did not succeed as trustee under RCW 61.24.010 or was otherwise properly appointed trustee of the Mickelson's power of sale.

6.13.     On information and belief, Defendant Northwest Trustee Services willfully, knowingly, or intentionally initiated a non-judicial foreclosure for a party who was not a valid beneficiary under Washington law.

    6.13.1.     The proof provided to Northwest Trustee Services was insufficient to initiate a foreclosure proceeding.

6.14.     Defendant Northwest Trustee Services or Chicago Title breached its duty of good faith to the borrower, and the actual beneficiary by initiating a non-judicial foreclosure proceeding for alleged beneficiaries or their agents.

**iv. Sale was improper**

6.15.   The trustee did not satisfy the prerequisites for a trustee's sale under Ch. 64.14. RCW.

6.16.   The trustee's sale was void.


## C.   INJUNCTIVE RELIEF

7.1.   Plaintiffs re-allege paragraphs 1.1 through 6.16 above as if set forth more fully herein.

7.2.   Defendants claim that a default occurred on the note, that the Defendants recorded a Notice of Default and initiated an unlawful non-judicial foreclosure. After the sale occurred, FEDERAL HOME LOAN MORTGAGE CORPORATION, took over the title of the subject property.

7.3.   Plaintiffs dispute the validity of the trustee's sale, truthfulness of the contents of all of the recorded documents.

7.4.   Under RCW 61.24.060, a trustee's sale purchaser may seek the summary proceedings, an unlawful detainer action, to obtain possession of real property provided in chapter 59.12 RCW.

7.5.   Plaintiffs' attorneys were served with a copy of an unfiled summons and complaint for unlawful detainer, which is attached hereto as Exhibit E. The sole evidence that would be offered by FEDERAL HOME LOAN MORTGAGE CORPORATION, is the Trustee's Deed, which is inadmissible evidence, because Defendants cannot and have not laid the proper foundational proof that it was ever maintained a secured interest in this particular property.

7.6.     Plaintiffs have a clear legal right to seek temporary and permanent injunctive relief as plaintiff resides at the Property and as the FEDERAL HOME LOAN MORTGAGE CORPORATION is seeking, without satisfying the necessary legal standing requirements, to take possession, custody, and control of the Mickelson Property and ultimately remove the plaintiff from his home based on a Trustee's Deed and Trustee's Sale, which conflicts with Washington's Deed of Trust Act.

7.7.     Plaintiffs have no adequate remedy at law to redress the harm complained of, and the loss of their home, under the circumstances of record, is contrary to equity and good conscience in that such a summary proceeding, being based on a sale illegally instituted and deed recorded by parties who have no legal standing to institute or maintain the foreclosure *ab initio*. Moreover, plaintiffs allege that defendants continuing attempts to collect a debt they are not owed by plaintiff violates RCW 9A.82.010 (4) (e), (k), (m), (o), (p) and (s).

7.8.     The specific facts set forth in this Complaint demonstrate that unless an emergency temporary injunction against the issuance of a writ of restitution is granted the plaintiffs will suffer the irreparable injury, loss, and damage of the loss of their home.

7.9.     The granting of the relief requested herein is in the public interest, as the consuming public, including the plaintiffs, will continue to be harmed by the illegal and unlawful conduct of the defendants if the relief requested herein is not granted.

7.10.    Because plaintiff demonstrated that they will likely to prevail on his criminal profiteering claims against defendants (*see* infra.), this Court should exercise its discretion so as not to require any posting of a bond. *See Bowcutt v. Delta North Star Corp.*, 95 Wn. App. 311, 976 P.2d 643 (1999); *see also, Pizan v. HSBC Bank USA, N.A.*, 2011 U.S. Dist. LEXIS 66861 (U.S. Dist. W.D. Wash., June 23, 2011).

7.11.    To the extent the Court requires a bond, Plaintiffs are prepared to pay into the Court registry those funds which are for the use and occupation of the said premises, together with all damages the plaintiff may sustain by reason of the defendant occupying or keeping possession of said premises; i.e., reasonable rental value.

WHEREFORE, Plaintiff respectfully request that this Court immediately take jurisdiction of this matter and enter an Order granting temporary and permanent injunctive relief expressly precluding or cancelling an unlawful detainer action based on the Trustee's Deed, for the reasons set forth herein, and for any other and further relief which is just and proper.


## D.    DECLARATORY RELIEF

8.1.    Plaintiff re-alleges paragraphs 1.1 through 7.11 above as if set forth more fully herein.

8.2.    This is an action for declaratory relief which is being brought pursuant to applicable law to declare that:

8.2.1.    the Alleged Beneficiary had no legal or equitable rights in the Note or Deed of Trust for purposes of foreclosure and that said defendant has no legal standing to institute or maintain foreclosure on the Property.

8.2.2.    the Trustee's sale or auction did not conform to the legal requirements under Ch. 61.24 RCW.

8.2.3.    the Trustee's deed was improperly created and recorded.

8.2.4.    Freddie Mac lacks standing to bring an unlawful detainer action, to take possession, custody, and control of the Mickelson Property.

8.3.     Plaintiff has no adequate or alternative remedy at law with reference to the relief requested herein.

8.4.     As set forth above, defendant Alleged Beneficiary has provided no evidence that it has full legal interest in a security agreement that complies with the Deed of Trust Act. Further the alleged beneficiary has provided no evidence of the chain of title to the Note, which MERS never owned and therefore could not assign to the alleged beneficiary.

8.5.     The declaration by this Court that the Deed of Trust is void and/or that Alleged Beneficiary has no legal right and cannot satisfy the legal standing requirements to institute, maintain  or complete a foreclosure is proper subject matter for declaratory relief.

8.6.     The Deed of Trust is invalid on its face because it contemplates the beneficiary will be an entity other than the holder of the note securing the deed of trust.

8.7.     As set forth above, defendant Alleged Beneficiary, as the alleged foreclosing party, failed to demonstrate a valid assignment of either the Deed of Trust or Note, and is thus legally precluded from completing a foreclosure.

8.8.     As set forth above, defendant Freddie Mac, cannot and has not laid proper foundational proof that it was ever maintained a secured interest in the Mickelson Property.

WHEREFORE, Plaintiff demands that the court adjudge:

that Defendant Alleged Beneficiary has no legal standing or the proper legal or equitable interest in either the Note or Mortgage to institute or maintain a foreclosure;

AND,

Defendant Alleged Beneficiary, and Defendant New Trustee' auction of the Mickelson's Property was legally defective and void;

AND,

Defendant Freddie Mac was not a bona fide purchaser of the Mickelson's property;

AND,

that the Plaintiffs recover their costs as provided by law.

## E. DAMAGES

9.1.      Plaintiff re-alleges paragraphs 1.1 through 8.8 above as if set forth more fully herein.

### i. DUAL TRACKING

9.2.      Defendants misrepresented whether and on what terms their modification requests had been approved.

9.3.      Defendants told the Plaintiffs that their modifications and forbearances had been approved, but then notified them that they had never received modifications or proper documents.

9.4.      Defendants use of dual tracking to suspend trustee's foreclosures for servicer's modifications, which are not affordable, constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.5.      Defendants failure or refusal to honor promises of modification constituted a deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.6.      Defendants instructions to forego to qualify for a program, thus increasing arrears, rather than addressing a permanent solution as required by Homesaver Program guidelines constituted a deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.7.     Defendants violated guidelines by moving the Mickelsons into foreclosure process prematurely, while still evaluating their modification applications constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.8.     Assuring the Mickelsons, in writing and verbally, that they should not worry about the foreclosure sale date, and that they were still being considered for a modification, when they had not postponed the trustee's sale, constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.9.     Informing the Mickelsons that their application was complete and under consideration, when in fact it was being denied, constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.10.    Providing conflicting or inaccurate information to the Mickelsons at numerous critical points over more than two years constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.11.    Having a communication system, which: delays, impedes or prevents contact and frustrates the plaintiff's good faith attempts to seek modification or forbearance constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

9.12.    Non-disclosure of the actual person or interest with authority to make the decision on modification or forbearance; or obligations, duties, and responsibilities to unknown third parties who had no interest in allowing the Mickelson's participation in such programs, constituted an unfair or deceptive practice, and/or one or more violations and/or anticipated violations of RCW 9A.82.010(4).

## ii. PATTERN OF CRIMINAL PROFITEERING ACTIVITY

9.13.     Each defendant herein constitutes an "enterprise" as that term is defined pursuant to RCW 9A.82.010 (8).

9.14        The Defendants' threats to foreclose on plaintiff's home, and other homes, unless plaintiff and others make payments on a promissory note which defendants do not own and have no rights to enforce constitute a "pattern of criminal profiteering activity" as that term is defined by RCW 9A.82.010 (28).

9.15.       Based on information and belief, plaintiff alleges that defendants have engaged in many more than three predicate acts, within the last three years.  These predicate acts constitute and threaten long term criminal activity by defendants against the plaintiff and others.

9.16.       Defendants work together on making threats to foreclose on plaintiff's home, and other homes owned by persons similarly situated to plaintiff, and actually foreclose on homes based on promissory notes and/or beneficial interests which defendants do not own and have no rights to enforce.  This conduct constitutes "criminal profiteering" within the meaning of RCW 9A.82.010 (4).   Defendants conduct involves a "pattern of criminal profiteering" involving the performance of more than three predicate acts within the statutory time frame. In carrying out their "pattern of racketeering" defendants perform predicate acts, which include, but are not limited to, violations and/or anticipated violations of:

A.) RCW 9A.82.010 (4) (d):    Forgery, as defined in RCW 9A.60.020 and 9A.60.030;

B.) RCW 9A.82.010 (4) (e):  Theft, as defined in RCW 9A.56.030, 9A.56.040, 9A.56.060, 9A.56.080, and 9A.56.083;

COMPLAINT - 25

C.) RCW 9A.82.010 (4) (k):  Extortion, as defined in RCW 9A.56.120 and 9A.56.130;

D.) RCW 9A.82.010 (4) (l):  Unlawful production of payment instruments, unlawful possession of payment instruments, unlawful possession of a personal identification device, unlawful possession of fictitious identification, or unlawful possession of instruments of financial fraud, as defined in RCW 9A.56.320;

E.) RCW 9A.82.010 (4) (m): Extortionate extension of credit, as defined in RCW 9A.82.020;

F.) RCW 9A.82.010 (4) (n): Advancing money for use in an extortionate extension of credit, as defined in RCW 9A.82.030;

G.) RCW 9A.82.010 (4) (o): Collection of an extortionate extension of credit, as defined in RCW 9A.82.040;

H.) RCW 9A.82.010 (4) (s): Leading organized crime, as defined in RCW 9A.82.060; and/or,

I.) RCW 9A.82.010 (4) (qq):  Mortgage fraud, as defined in RCW 19.144.080.

9.17.     RCW 9A.82.100 (1) (a) provides:

> (1)(a) A person who sustains injury to his or her person, business, or property by an act of criminal profiteering that is part of a pattern of criminal profiteering activity, or by an offense defined in RCW 9A.40.100, or by a violation of RCW 9A.82.060 or 9A.82.080 may file an action in superior court for the recovery of damages and the costs of the suit, including reasonable investigative and attorney's fees.

### iii. CONSUMER PROTECTION ACT

9.18.     The original non-note beneficiary and all subsequent non-note holder beneficiaries as well as the original Trustee and subsequent Trustees committed unfair and deceptive practices by contractually defining MERS as a beneficiary under the

Washington Deed of Trust Act, when by statute the beneficiary of a Deed of Trust is statutorily defined to be the hold the note.

9.19.    The unfair and deceptive practices by the original and all subsequent "non-note holder" beneficiaries and original and all subsequent trustees occurred in trade or commerce.

9.20.    The unfair and deceptive trade practices described above violated the public interest for the reasons stated in the attached decision by Judge Coughenour attached hereto as Exhibit J and incorporated by reference. *See Bain v. OneWest Bank, F.S.B.*, 2011 U.S. Dist. LEXIS 26318 (U.S. Dist. W.D. Wash., Mar. 15, 2011).

9.21.    Because MERS was contractually defined as a beneficiary  in a manner that was contrary to the statutory definition of "beneficiary", RCW 61.24.050 (2), the instant deed of trust is void and any attempt to foreclose thereon constitutes a per se violation of the Consumer Protection Act. *See* RCW 61.24.135.

9.22.    Plaintiffs have been damaged because these practices have required plaintiffs to expend resources to avert an unlawful foreclosure and prevented plaintiffs from identifying the real beneficiary note holder and negotiating a new arrangement to avoid foreclosure.

9.23.    The new trustee's conducting of the trustee's sale when its close relationship to Chase, is likely to affects its impartiality and ability to fulfill its duty of good faith per RCW 61.24.010(4) constituted an unfair and deceptive acts and practices in violation of RCW 19.86.020.

9.24.    Plaintiff will prove the extent of its damages under the CPA at trial.

iv. NEGLIGENCE

9.25.      Defendants Old Trustee and New Trustee owe a duty of good faith to plaintiffs.

9.26.      Based on information and belief Defendants Old Trustee and New Trustee violated their duty of good faith to plaintiffs by participating with Defendant Servicer and Defendant Alleged Beneficiary in a scheme to foreclose upon a home pursuant to a promissory note which is secured by a deed of trust where the promissory note is not owned by the defendant Alleged Beneficiary.

9.27.      The breach of the duties owed by defendant trustees to plaintiff has caused such damages as will be proved at trial.

v. FAIR DEBT COLLECTION PRACTICE ACT [15 U.S.C. 1692f(6)

9.28.      Under the Fair Debt Collection Practices Act a debt is "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5).

9.29.      Northwest Trustees, and Routh, Crabtree and Olsen, and on information and belief, Chase, are debt collectors within the meaning of the Fair Debt Collection Act and were not the holders of note in September 2010, when the second non-judicial foreclosure was instituted.

9.30.      Defendants committed an 15 U.S.C. § 1692 f (6).

WHEREFORE, Plaintiff pray for all such legal and equitable remedies to which they may be entitled, including but not limited to:  compensatory damages, exemplary damages, civil penalties, damages under 15 U.S.C 1692k, attorney fees and costs allowed pursuant to statutes

1    and/or contracts, statutory attorney fees and costs, and injunctive relief to restrain defendants'

2    pattern of criminal profiteering activity.

3    DATED this 31st day of August, 2011.

4

5

6

7

8                                                        Respectfully submitted,

9

10            By:___/s/ Scott E. Stafne _____
              By:___/s/ Andrew Krawczyk _____
11                                      Scott E. Stafne, WSBA 6964
                                   Andrew Krawczyk, WSBA 42982
12                                              Stafne Law Firm
                                          239 N. Olympic Avenue
13                                            Arlington, WA 98223
                                        Telephone: (360) 403-8700
14                                              Fax: (360) 386-4005
15                              scott.stafne@stafnelawfirm.com
                                   Andrew@stafnelawfirm.com
16                     Attorneys for Plaintiffs the Mickelsons

17

18

19

20

21

22

23

24

25

**APPENDIX I**

4.2.1.    On September 5, 2008, the Mickelsons faxed a letter and forms for "help for homeowners" which explained their hardship, and included taxes, expenses and forms to secure a modification.

4.2.2.    On October, 20, 2008, the Mickelsons called Chase, whose representative "Craig" suggested also asking for a "special forbearance."

4.2.3.    On October 21, 2008, the Mickelsons faxed ten pages requesting a special forbearance.

4.2.4.    On October 30, 2008, the Mickelsons called Chase, whose representative "Alex" stated the fax machine is "backed up" and would take 5-10 days to get their faxes.

4.2.5.    Between October 30, 2008, and March of 2009, the Mickelsons were not advised as to their request for special forbearance.

4.2.6.    On November 18, 2008, the Mickelsons called Chase, whose representative "Carmen" told "Ricky Rolfston" was assigned their file on November 11, 2008 and the Mickelsons would have to work with him exclusively to get help.

4.2.7.    On December 9, 2008, the Mickelsons called Chase whose representative "Ken" informed them the auction was postponed from December 26, 2008 to January 16, 2009.

4.2.8.    On December 24, 2008, the Mickelsons called Chase whose representative "Anthony" gave them the direct extension of Ricky Rolfston

4.2.9.     On January 14, 2009, the Mickelsons attempted to call Chase's Representative "Ricky Rolfston" but his mailbox was full. The Mickelson's then called Chase Customer Service, and representative "Allen" said he would have "Ricky Rolfston" email them. To their knowledge, Ricky never emailed the Mickelsons.

4.2.10.     On the eve of an auction, January 15, 2009, the Mickelson's placed three calls to NORTHWEST TRUSTEE SERVICES, INC, Chase's Customer Service department, and Chase's Foreclosure department to postpone the auction and determine the status of being placed into a special program. On information and belief, due solely to the Mickelsons' efforts, the auction was postponed until February 6, 2009.

4.2.11.     On January 23, 2009, Mickelsons placed a call to the foreclosure department's representative "Daniel." The Mickelsons offered to make substantial payments, but Daniel indicated that Chase would not accept any money, except a complete payment, until Ricky Rolfson put them into a program, which would take another 30-45 days. Daniel gave the Mickelsons the understanding that Ricky Rolfston would contact them soon. He never did.

4.2.12.     On the eve of the auction, February 5, 2009, the Mickelsons placed seven calls to Chase, ROUTH CRABTREE OLSEN, P.S., and NORTHWEST TRUSTEE SERVICES, INC to find out their status for a program and postponing the auction. They learned from a customer representative named "Deborah" they had a new representative, "Da Nei Clark" and were approved for a modification program, but the auction date had not been postponed. Deborah claimed she could not open file which contained their paperwork and promised to find out why the auction had not been postponed.

4.2.13.   On February 13, 2009, the Mickelsons received modification paperwork dated February 5, 2009, which had been delayed in the mail due to the President's Day weekend. The paperwork indicated the Mickelsons were approved for a loan modification with a monthly payment of $2,949.02. The letter requested the Mickelsons forward a cashier's check or money order in the amount of $3,400 for a fee, closing cost and first month payment and stated there will not be another opportunity to modify your loan. The letter and attached agreement purported that the Mickelsons had accumulated $29,304.83 in added indebtedness since August of 2008.

4.2.14.   On February 17, 2009, the Mickelsons called Da Nei Clark and left a message to see if they could lower their interest rate on the modification.

4.2.15.   On February 18, 2009, the Mickelson's called Da Nei Clark twice without being able to reach her. The Mickelsons than called "Frankie" at Customer Service who gave them Da Nei Clark's supervisor "Ryan Reitmeyer." The Mickelson's called Ryan Reitmeyer whose mailbox was full and gave "Ryan Reid" as an alternative contact. The Mickelson's then called Ryan Reid whose mailbox was full and gave Ryan Reitmeyer as the contact. Unable to reach Da Nei Clark or her supervisors to ask questions about the loan modification, the Mickelson's called Chase Customer Service again and talked to "Chris" who gave them fax numbers for Da Nei Clark and Home Modification, and they wrote and faxed their questions to both.

4.2.16.   On February 25, 2009, the Mickelsons received a letter, dated February 20, 2011, from Chase indicating they had until February 26, 2009 to sign the modification. The Mickelsons called Da Nei Clark, whose mailbox was full, then Ryan Reitmeyer whose mailbox was full and indicated he was out of the office until March 10,

2009, then to Ryan Reid, whose mailbox was full, then to Chase Switchboard who transferred them to "Scott" who said he would email Da Nei Clark and her supervisor a note to call the Mickelsons.

4.2.17.    Facing the deadline and having made many attempts to contact Chase to determine whether they could get a lower rate. The Mickelsons sent some of the loan modification documents and a letter trying to get a hold of them and sent a Cashier Check for $3,400 to Chase.

4.2.18.    Defendants do not recall the specific date in late February or early March of 2009, but they received a brief early morning phone message from Da Nei Clark confirming receipt of a prior call, and if they still had questions to give her a call.

4.2.19.    Between February 27, 2009 and March 10, 2009, the Mickelson's placed over fourteen calls to Ricky Rolfston, Ryan Reitmeyer, Ryan Reid and Da Nei Clark to discuss options on getting a lower rate. Each time they were unable to speak with these representatives or leave a message in their phone mailbox.  Each time the Mickelsons called the customer service, who did answer, customer service would claim to send an email to these individuals to speak with the Mickelsons.

4.2.20.    On March 10, 2009, Mickelsons placed a call and "Cody" with Chase Customer Service indicated they should fill out the paperwork for help for homeowners.

4.2.21.    On March 11, 2009, to March 12, 2009, the Mickelson's placed four more calls to Da Nei Clark, Ricky Rolfston, and Ryan Reid to discuss loan modification.

4.2.22.    On March 12, 2009, a "Mrs. Bartlett" from Chase called and left a message. The Mickelsons returned the call, and she advised the Mickelsons to re-apply for homeowners assistance and for special forbearance.

APPENDIX I - 4

4.2.23.    The Mickelsons called Chase Customer Service and talked to a "Warren" who suggested the Mickelsons fax Da Nei Clark a message declining the prior modification and requesting they reapply under the new rules being enforced by the Obama administration.

4.2.24.    Between March 13, 2009, and March 23, 2009, the Mickelsons made one or more daily attempts during the workweek to reach Da Nei Clark by phone and fax.

4.2.25.    Facing the deadline and having made many attempts to contact Chase to determine whether they could get a lower rate, the Mickelson's executed the loan modification on March 24, 2009, and Chase cashed a the previously sent Cashier Check in February for $3,400. The Mickelsons were not represented by counsel, nor had they succeeded in ever having a conversation with Da Nei Clark to discuss a lower percentage rate, the amount alleged to have been added to the obligation, or alternative modification terms.

4.2.26.    On March 24, 2009, the Mickelsons talked to "Nicole" with Chase customer service to see if they could reach someone about whether their paperwork had been received and auction postponed. Nicole told the Mickelsons to call back a week later.

4.2.27.    On March 31, 2009, the Mickelsons learned from 'Ken" with Customer service that their foreclosure had been lifted, and they could go ahead and reapply for homeowners assistance and to send their cashier's check for April under their modification.

4.2.28.    On April 11, 2011, the Mickelsons made a $2,949.02 payment on the modified note.

4.2.29.    On April 27, 2009, the Mickelsons called Chase Customer Service, who told them to talk with Da Nei Clark about getting into the Obama Administration's Home Affordable Modification Program (HAMP) or other modification "program," as well as, get into a special forbearance "program". Throughout May of 2009, the Mickelsons made attempts to contact Da Nei Clark to discuss getting a lower rate modification or forbearance, she did not return their calls nor did she talk with them.

4.2.30.    Between June 11, 2009 and July 22, 2009, Chase sent delinquency notices to the Mickelsons and threatened foreclosure. The Mickelsons frequently called Chase to get advice. On July 23, 2007, the Mickelsons attended a workshop in Everett where Chase representatives advised the Mickelsons to supply information for assistance "program". On August 7, 2009, the Mickelsons submitted supplemental information pursuant to a Chase's request.

4.2.31.    On September 1, 2009, "Rose" with Chase called to offer the Mickelson's a "special forbearance" of three months at $1320.00 a month, and she would be sending them paperwork to sign and require a cashier check. Rose also advised the Mickelsons' that they would need to resubmit paperwork to get into another program for a lower rate modification. Rose also advised that "Kelli Dillard" replaced Da Nei Clark as their file representative. The Mickelsons called Chase on September 2, 2009, and told them they would accept and Chase would send the paperwork.

4.2.32.    On September 8, 2009, the Mickelsons called Chase to find out why they had not received the paperwork, Customer Service Representative "Alma" said it would take another 7-10 days and to call back then if the Mickelsons had not received it.

4.2.33.    On September 18, 2009, the Mickelsons called Chase to determine why they had not received their approved special forbearance documents, Chase representative "John" said to call back in 7-10 days.

4.2.34.    On September 29, 2009, Mickelsons called Chase to find out why they had not received the paperwork for their approved special forbearance documents. Chase customer service "Mike" promised to email "Kelli Dillard" and the Mickelson's underwriter to see what was responsible for the delay.

4.2.35.    On October 5, 2009, the Mickelsons spoke to "Alma" with Chase customer service, who told the Mickelsons they re-sent the documents. Alma also said Chase would send the Mickelsons a note letting them know what the Mickelsons needed to do to re-apply for homeowners assistance.

4.2.36.    On October 22, 2009, the Mickelsons spoke with "Grace" with Chase customer service who told the Mickelsons they would email Kelli Dillard to find out where the documents were.

4.2.37.    The paperwork for the special forbearance arrived on October 26, 2009, but had September, October, and November of 2009 as the months approved for the special forbearance.

4.2.38.    On November 3, 2009, the Mickelsons called Chase to see if they could change the dates because the documents never arrived at the Mickelsons.

4.2.39.    On November 14, 2009, the Mickelsons sent their acceptance letter for special forbearance and mailed a cashier checks for $1320.00 on December 4, 2009, and January and February, 2010.

4.2.40.    On January 18, 2010, Chase sent a letter which advised the Mickelsons that Chase could help, and to re-apply for a home assistance program.

4.2.41.    On January 29, 2010, Chase sent the Mickelsons a notice of intent to foreclose claiming $51,522.83 past due, including late fees, with $1,097.98 held in suspense.

4.2.42.    On April 8, 2010, the Mickelsons faxed documents to get into a loan modification program. On April 20, 2010, Chase claimed it never received the documents and the Mickelsons needed to re-fax the materials. On April 22, 2010, "Larry" with Chase Loan Modification indicated they received the documents, but was having computer problems. Larry also indicated on one form, of many which had the number, the Mickelsons did not put on Travis Mickelsons social security number, and that they would need to refax pages of the application, and they did.

4.2.43.    On August 6, 2010, Defendant Routh Crabtree Olsen sent the Mickelson's a letter stating they would commence foreclosure proceedings against the Mickelsons and take advantage of opportunities to keep their home.

4.2.44.    Throughout August and November, 2010, the Mickelson made calls to defendants to stop a foreclosure sale, get a loan modification and get into a program.

4.2.45.    In November, the Mickelsons received a letter dated Nov. 6, 2010, asking the Mickelsons to send $1,861.37 to fully amortize their new loan payment plan effective January 1, 2011 to June 1, 2011. Attached as Exhibit H and incorporated by reference is a copy of that letter. The Mickelsons sent two cashier's checks per request by Chase's customer representative Andrea who was being directed by "Relation Expert" "Brandon."

4.2.46.    On November 17, 2010, Brandon left a message to call him back, the Mickelson's called and spoke with "Tammy" who would not transfer the Mickelsons to Brandon because he "only looks at accounts once a week". The Mickelsons learned that Chase wanted more information sent to them and faxed that information.

4.2.47.    On November 29, 2010, the Mickelson's received a letter stating that Chase would not accept their Cashier's checks.

4.2.48.    On November 30, 2010, Chase's customer service indicated their system was down for two days and to call back.

4.2.49.    On December 1, 2010, Chase's customer service representative Michelle indicated that Chase had all paperwork and would sent to underwriting, and that the foreclosure had been delayed.

4.2.50.    On December 7, 2010, Chase's phone system would not accept the Mickelson's repeated calls.

4.2.51.    On December 8, 2010, Chase customer service indicated the sale would go through because underwriting had not received all of the Mickelson's documents, and that they were missing pages of the bank statements. The missing pages were a blank page and balance sheets. Chase stated, again, they would postpone the sale until January, 2011, and to re-fax the pages.

4.2.52.    On December 15, 2010, Chase confirmed a new request for modification under the Making Home Affordable program, but requested additional documentation to finish the application, which the Mickelsons submitted.

4.2.53.   On December 30, 2010, "Julie", with Chase, became the Mickelson's contact for the Making Home Affordable program. Julie requested that the Mickelson fax additional documents, and the Mickelson's faxed the materials.

4.2.54.   On January 1, 2011, Chase sent a letter regarding the Mickelsons new rate and payments effective January 1, 2011 to June 1, 2011.

4.2.55.   On January 12, 2011, Julie indicated that the Mickelson's paperwork was complete and in underwriting; and that the sale date was on hold and to call her back the following week.

4.2.56.   On January 19, 2011, Julie called indicating that underwriting wanted more information, including: a household list of monthly expenses, and profit and loss statements. The Mickelsons sent this information.

4.2.57.   On January 27, 2011, Chase sent a letter to the Mickelson's stating they needed additional information; the Mickelsons sent this information on January 31, 2011.

4.2.58.   On February 10, 2011, Judy with Chase indicated the Mickelson's account had been flagged as an "inactive foreclosure" and no sale date was issued. Subsequently, the Mickelsons spoke with Julie who indicated underwriting wanted more information including a new profit and loss statement, a letter stating why Travis Mickelson was not working; and Julie reconfirmed there was no sale date. Later, Julie called to ask for a letter as to why Danielle Mickelson was no longer doing real estate. The requested information was faxed to Chase.

4.2.59.    On February 18, 2011, the Mickelsons received a letter from the trustee stating the foreclosure has been postponed to March 25, 2011. This letter was inconsistent to the statements of Chase that the sale had been inactivated.

4.2.60.    On March 10, 2011, the Mickelsons returned Chases call, and Jenny Adams in underwriting wanted more information, including updated bank statements for January and February, and contribution letter from the Mickelson's parents for the program. The Mickelsons faxed this information.

4.2.61.    On March 10, 2011, the Mickelsons received a letter stating their mortgage account "may be closed." This was inconsistent to the statements of Chase that they may qualify for a program.

4.2.62.    On March 16, 2011, Chase requested updated 4506T forms because it "had been longer than 90 days" since they had received those forms from the Mickelsons. On March 20, 2011, the Mickelsons faxed the forms.

4.2.63.    On March 25, 2011, notice of the foreclosure sale occurrence was taped to the Mickelsons door.