Exhibit A

copy of the Trustee's Notice letters in 2008

.

# Notice of Default

**To:**

Travis Mickelson                          Danielle H. Mickelson
436 Ezduzit Lane                          436 Ezduzit Lane
Camano Island, WA  98282                  Camano Island, WA  98282

Regarding the real property "Property" located at:

**Property Address:**
436 Ezduzit Lane
Camano Island, WA  98282

If you are the owner of this property and you occupy it as your residence, you should take care to protect your interest in your home. This notice of default (your failure to pay) is the first step in a process that could result in you losing your home. You should carefully review your options. For example:

Can you pay and stop the foreclosure process?
Do you dispute the failure to pay?
Can you sell your property to preserve your equity?
Are you able to refinance this loan with a new loan from another lender with payments, terms, and fees that are more affordable?
Do you qualify for any government or private homeowner assistance programs?
Do you know if filing for bankruptcy is an option? What are the pros and cons of doing so?

Do not ignore this notice; because if you do nothing, you could lose your home at a foreclosure sale. (No foreclosure sale can be held any sooner than ninety days after a notice of sale is issued and a notice of sale cannot be issued until thirty days after this notice.) Also, if you do nothing to pay what you owe, be careful of people who claim they can help you. There are many individuals and businesses that watch for the notices of sale in order to unfairly profit as a result of borrowers' distress.

You may feel you need help understanding what to do. There are a number of professional resources available, including home loan counselors and attorneys, who may assist you. Many legal services are lower-cost or even free, depending on your ability to pay. If you desire legal help in understanding your options or handling this default, you may obtain a referral (at no charge) by contacting the county bar association in the county where your home is located. These legal referral services also provide information about lower-cost or free legal services for those who qualify.

A) Property description:

Parcel A: that portion of the Southwest quarter of the Southwest quarter of the Southwest quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, described as follows: commencing at the Southwest corner of the said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18 West 30.00 feet to the Northerly margin of the Cross Island County Road; thence continue North 0 degrees 27'18" West 315.45 feet to the true point of beginning; thence continue North 0 degrees 27'18" West 158.22 feet; thence South 89 degrees 55'15" East 329.98 feet to the East line of said Southwest quarter of the Southwest quarter of the Southwest quarter; thence South 0 degrees 24'37" East along said East line, 158.25 feet to a point that is South 89 degrees 54'56" East from the true point of beginning; thence North 89 degrees 54'56" West 320.86 feet to the true point of beginning. Parcel B: an easement for road, ingress and egress and public and private utilities being 60 feet in width from the Northerly margin of the Cross Island County Road to the North line of the Southwest quarter of the Southwest quarter of the Southwest quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, the centerline of said 60 foot easement

1. As of the date of this notice you owe $416,457.32. Because of interest, late charges, and other charges that may vary from day to day, the amount due on the day you pay may be greater. Hence, if you pay the amount shown above, an adjustment may be necessary after we receive your check. For further information, write to the address provided in Section 5 below or call us at 425-586-1900.
2. The creditor to whom the debt is owed Chase Home Finance LLC/Chase Home Finance, LLC - Columbus OH.
3. Unless within 30 days after receipt of this notice you dispute the debt or any portion of it, we will assume the debt to be valid.
4. If you notify us in writing within 30 days after receipt of this notice that you dispute the debt or any part of it, we will request that the creditor obtain verification of the debt and mail it to you.
5. If you request in writing within 30 days after receipt of this notice, we will request that the creditor provide you with the name and address of the original creditor, if different from the current creditor.
6. Written requests should be addressed to Northwest Trustee Services, Inc., Post Office Box 997, Bellevue, WA 98009-0997.

**Dated:  August 25, 2008**         Chase Home Finance LLC
                                    By Northwest Trustee Services, Inc., its duly authorized agent

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

NORTHWEST TRUSTEE SERVICES, INC.
P.O. BOX 997
BELLEVUE, WA 98009-0997

File No: 7037.16475
Borrower: Mickelson, Travis and Danielle H.
Client: Chase Home Finance, LLC

VONNIE MCELLIGOTT
5-586-1900
FAX 425-586-1997

After Recording, Return to:
Vonnie McElligott
Northwest Trustee Services, INC.
P.O. Box 997
Bellevue, WA 98009-0997

File No.:        ▬▬▬▬▬
Grantors:        **Northwest Trustee Services, Inc.**
                 **Chase Home Finance LLC**
Grantee:         **Travis Mickelson and Danielle H. Mickelson, husband and wife**
Tax Parcel ID No.: R23225-045-0530
Abbreviated Legal: Ptn. SW SW 25-32-2E

## Notice of Trustee's Sale
Pursuant to the Revised Code of Washington 61.24, et seq.

### I.

On December 26, 2008, at 10:00 a.m. outside the main entrance of the Island County Annex Building near the Veteran's Memorial at 1 NE 6th Street in the City of Coupeville, State of Washington, the undersigned Trustee (subject to any conditions imposed by the Trustee) will sell at public auction to the highest and best bidder, payable at time of sale, the following described real property "Property", situated in the County(ies) of Island, State of Washington:

Parcel A: that portion of the Southwest quarter of the Southwest quarter of the Southwest quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, described as follows: commencing at the Southwest corner of the said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18 West 30.00 feet to the Northerly margin of the Cross Island County Road; thence continue North 0 degrees 27'18" West 316.45 feet to the true point of beginning; thence continue North 0 degrees 27'18" West 158.22 feet; thence South 89 degrees 55'15" East 329.98 feet to the East line of said Southwest quarter of the Southwest quarter of the Southwest quarter; thence South 0 degrees 24'37" East along said East line, 158.25 feet to a point that is South 89 degrees 54'56" East from that true point of beginning; thence North 89 degrees 54'56" West 329.86 feet to the true point of beginning. Parcel B: an easement for road, ingress and egress and public and private utilities being 60 feet in width from the Northerly margin of the Cross Island County Road to the North line of the Southwest quarter of the Southwest quarter of the Southwest quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, the centerline of said 60 foot easement is described as follows: commencing at the Southwest corner of said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18" West 30.00 feet said Northerly margin of the Cross Island County Road and the true point of beginning of said centerline; thence continue North 0 degrees 27'18" West 632.89 feet to the North line of said subdivision and the terminus of said centerline. Situated in Island County, Washington.

Commonly known as:     436 Ezduzit Lane
                       Camano Island, WA 98282

which is subject to that certain Deed of Trust dated 11/22/05, recorded on 11/29/05, under Auditor's File No. 4155570, records of Island County, Washington, from Travis Mickelson and Danielle H. Mickelson, husband and wife, as Grantor, to Chicago Title, as Trustee, to secure an obligation

"Obligation" in favor of Mortgage Electronic Registration Systems, Inc. solely as nominee for Lender and Lender's successors and assigns, as Beneficiary, the beneficial interest in which was assigned by Mortgage Electronic Registration Systems, Inc. "MERS" to Chase Home Finance LLC, under an Assignment/Successive Assignments recorded under Auditor's File No. 4236910.

*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording statutes and are not intended to supplement, amend or supersede the Property's full legal description provided herein.

II.

No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the Obligation in any Court by reason of the Grantor's or Borrower's default on the Obligation.

III.

The Beneficiary alleges default of the Deed of Trust for failure to pay the following amounts now in arrears and/or other defaults:

|  | | Amount due to reinstate by 09/25/08 |
|---|---|---|
| Monthly Payments | | $13,184.90 |
| Late Charges | | $659.25 |
| Lender's Fees & Costs | | $74.50 |
| Total Arrearage | $13,918.65 | |
| Trustee's Expenses (Itemization) | | |
| Trustee's Fee | | $725.00 |
| Title Report | | $1,166.38 |
| Statutory Mailings | | $11.48 |
| Recording Costs | | $32.00 |
| Postings | | $57.50 |
| Sale Costs | | $0.00 |
| Total Costs | $1,992.36 | |
| Total Amount Due: | | $15,911.01 |

Other known defaults as follows:

IV.

The sum owing on the Obligation is:  Principal Balance of $403,495.51, together with interest as provided in the note or other instrument evidencing the Obligation from 04/01/08, and such other costs and fees as are due under the Obligation, and as are provided by statute.

V.

The Property will be sold to satisfy the expense of sale and the Obligation as provided by statute.  The sale will be made without representation or warranty, express or implied regarding title, possession, encumbrances or condition of the Property on December 26, 2008.  The default(s) referred to in

paragraph III, together with any subsequent payments, late charges, advances costs and fees thereafter due, must be cured by 12/15/08 (11 days before the sale date), to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before the close of the Trustee's business on 12/15/08 (11 days before the sale date), the default(s) as set forth in paragraph III, together with any subsequent payments, late charges, advances, costs and fees thereafter due, is/are cured and the Trustee's fees and costs are paid.  The sale may be terminated any time after 12/15/08 (11 days before the sale date), and before the sale by the Borrower, Grantor, any Guarantor or the holder of any recorded junior lien or encumbrance paying the entire balance of principal and interest secured by the Deed of Trust, plus costs, fees, and advances, if any made pursuant to the terms of the obligation and/or Deed of Trust.

## VI.

A written notice of default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

NAME AND ADDRESS

Travis Mickelson
436 Ezduzit Lane
Camano Island, WA  98282

Danielle H. Mickelson
436 Ezduzit Lane
Camano Island, WA  98282

by both first class and either certified mail, return receipt requested on 08/25/08, proof of which is in the possession of the Trustee; and on 08/25/08 Grantor and Borrower were personally served with said written notice of default or the written notice of default was posted on a conspicuous place on the real property described in paragraph I above, and the Trustee has possession of proof of such service or posting.

## VII.

The Trustee, whose name and address are set forth below, will provide in writing to anyone requesting it a statement of all foreclosure costs and trustee's fees due at any time prior to the sale.

## VIII.

The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their right, title and interest in the Property.

## IX.

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130.  Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

## X.

NOTICE TO OCCUPANTS OR TENANTS - The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the Deed of

Trust (the owner) and anyone having an interest junior to the deed of trust, including occupants and tenants. After the 20th day following the sale the purchaser has the right to evict occupants and tenants by summary proceedings under the unlawful detainer act, Chapter 59.12 RCW.

The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference. You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com.

EFFECTIVE: 09/25/08

Northwest Trustee Services, Inc., Trustee

By _____
Authorized Signature
P.O. BOX 997
Bellevue, WA 98009-0997
Contact: Vonnie McElligott
(425) 586-1900

STATE OF WASHINGTON  )
                     ) ss.
COUNTY OF KING       )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _____

RHEA S. PRE
STATE OF WASHINGTON
NOTARY — · — PUBLIC
MY COMMISSION EXPIRES 04-22-10

NOTARY PUBLIC in and for the State of
Washington, residing at _____
My commission expires _____

NORTHWEST TRUSTEE SERVICES, INC., SUCCESSOR BY MERGER TO NORTHWEST TRUSTEE SERVICES PLLC FKA NORTHWEST TRUSTEE SERVICES, LLC, P.O. BOX 997,  BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997
File No: 7037.16475
Client: Chase Home Finance, LLC
Borrower: MICKELSON, TRAVIS AND DANIELLE H.

SERVING WA, OR, ID, CA, NV, AZ, MT HI

This is an attempt to collect a debt and any information obtained will be used for that purpose.

File No. 7037.16475/MICKELSON, TRAVIS AND DANIELLE H.

## Notice of Foreclosure
Pursuant to the Revised Code of Washington
RCW 61.24, et seq.

To:

Travis Mickelson
436 Ezduzit Lane
Camano Island, WA  98282

Danielle H. Mickelson
436 Ezduzit Lane
Camano Island, WA  98282

Travis Mickelson
2803 B 254th Street Northwest
Stanwod, WA  98282

Danielle H. Mickelson
2803 B 254th Street Northwest
Stanwod, WA  98282

The attached Notice of Trustee's Sale is a consequence of default(s) in the obligation to the Beneficiary of your Deed of Trust.  Unless the default(s) is/are cured, your property will be sold at auction on **December 26, 2008**.

To cure the monetary default(s), you must bring the payments current, cure any other default(s), pay accrued late charges, advances, other costs, trustee's fees and attorneys' fees as set forth below by 12/15/08 (11 days before sale date). These arrears and costs are as follows:

|  | Amount due to reinstate by 09/25/08 | Estimated amount due to reinstate by 12/15/08 |
|---|---|---|
| Monthly Payments | $13,184.90 | $21,095.84 |
| Late Charges | $659.25 | $922.94 |
| Lender's Fees and Costs | $74.50 | $74.50 |
| Total Arrears | $13,918.65 | $22,093.28 |
| Trustee's Expenses (Itemization) | | |
| Trustee's Fee | $725.00 | $725.00 |
| Title Report | $1,166.38 | $1,166.38 |
| Postings | $57.50 | $115.00 |
| Postage | $11.48 | $81.48 |
| Recording Fees | $32.00 | $122.00 |
| Sale Costs | $0.00 | $0.00 |
| Publication | $0.00 | $500.00 |
| Total Costs | $1,992.36 | $2,709.86 |
| Total Amount Due: | $15,911.01 | $24,803.14 |

To pay off the entire obligation secured by your Deed of Trust as of the 9/25/2008, you must pay a total of 403,495.51 in principal, $12,962.98 in interest, plus other costs and advances estimated to date in the amount of 74.50.  From and after the date of this notice you must submit a written request to the Trustee to obtain the total amount to pay off the entire obligation secured by your Deed of Trust as of a certain payoff date. You may reinstate your Deed of Trust and the obligation secured thereby at any time up to and including 12/15/08 (11 days before the sale date), by paying the amount set forth or estimated above and by curing any other defaults as noted above.  Of course, as time passes other payments may become due, and any further payments coming due and any additional late charges must be added to your reinstating payment.  Any new defaults not requiring

p⁻vment of money that occur after the date of this notice must also be cured in order to effect reinstatement.  In
     tion, because some of the charges can only be estimated at this time and because the amount necessary to
reinstate or to pay off the entire indebtedness may include presently unknown expenditures required to preserve
the property or to comply with state or local law, it will be necessary for you to contact the Trustee prior to the
time you tender reinstatement or the payoff amount so that you may be advised of the exact amount you will be
required to pay.  In addition, the Trustee's fees may increase as more time is allowed to pass before reinstatement
is made.

Tender of payment or performance must be made to: **Northwest Trustee Services, Inc., whose address is P.O.
Box 997, Bellevue, Washington 98009-0997 (425) 586-1900.**

**AFTER THE TRUSTEE'S CLOSE OF BUSINESS ON 12/15/08** (11 days before the sale date), **YOU MAY
NOT REINSTATE YOUR DEED OF TRUST BY PAYING THE BACK PAYMENTS AND COSTS AND
FEES AND CURING THE OTHER DEFAULTS AS OUTLINED ABOVE.**  The Trustee will respond to any
written request for current payoff or reinstatement amounts within ten days of receipt of your written request. In
such a case, you will only be able to stop the sale by paying, before the sale, the total principal balance of
$403,495.51 plus accrued interest, costs, fees and advances, if any, made pursuant to the terms of the loan
documents and by curing the other defaults as outlined above.

You may contest this default by initiating court action in the Superior Court of the County in which the sale is to
be held.  In such action, you may also raise any legitimate defenses you have to this default.  A copy of your
Deed of Trust and documents evidencing the obligation secured thereby are enclosed.  You may wish to consult a
lawyer.  Legal action on your part may prevent or restrain the sale, but only if you persuade the court of the
merits of your defense.

ʻ₁he court may grant a restraining order or injunction to restrain the trustee's sale pursuant to RCW 61.24.130
upon five days notice to the trustee of the time when, place where, and the judge before whom the application for
the restraining order or injunction is to be made.  This notice shall include copies of all pleadings and related
documents to be given to the judge.  Notice and other process may be served on the trustee at 3535 Factoria
Boulevard SE, Suite 220, Bellevue, WA 98006.

If you do not reinstate the secured obligation and your Deed of Trust in the manner set forth above, or if you do
not succeed in restraining the sale by court action, your property will be sold.  The effect of such sale will be to
deprive you and all those who hold by, through or under you of all your interest in the property.

EFFECTIVE: 09/25/08

**Northwest Trustee Services, Inc., Trustee
P.O. Box 997
Bellevue, WA 98009-0997
(425) 586-1900
Contact: Vonnie McElligott**

NORTHWEST TRUSTEE SERVICES, INC., , P.O. BOX 997, BELLEVUE, WA 98009-0997 PHONE  (425) 586-1900 FAX (425) 586-1997

File No: 7037.16475
Client:   Chase Home Finance, LLC
Borrower: MICKELSON, TRAVIS AND DANIELLE H.

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

Exhibit B

copy of the modification agreement

Chase Home Finance LLC
3415 Vision Drive
Columbus, OH 43219
Prepared by Robert Woodward
RE: Loan Number ████████566
FHLMC: 328591920
(800) 446-8939 Homeowner's Assistance Department

## LOAN MODIFICATION AGREEMENT
(Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made effective the First day of February 2009, between TRAVIS MICKELSON, Husband and DANIELLE H MICKELSON, Wife ("Borrower") and Chase Home Finance LLC, successor by merger to Chase Manhattan Mortgage Corporation ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") to MILA FUNDING CORPORATION, dated NOVEMBER 22, 2005, and recorded as instrument no. 4155570, on NOVEMBER 29, 2005, of the Records of ISLAND County, and subsequently assigned to Chase Home Finance LLC, successor by merger to Chase Manhattan Mortgage Corporation of the Records of ISLAND County, The Trustee is CHICAGO TITLE.   (2) the Note bearing the same date as, and secured by, the Security Instrument ("Note"), (collectively, the "Loan Documents"), which cover the real and personal property described in the Security Instrument and defined therein as the "Property", located at 436 EZDUZIT LANE, CAMANO ISLAND, WASHINGTON 98282, with the original principal balance U.S. $403,500.00, and the principal balance before the loan modification being U.S. $403,495.51, the real property described being set forth as follows:

### See Schedule A attached hereto and made a part hereof

A.P. NO.: ████████

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Loan Documents):

1. The Borrower represents that the Borrower is the occupant of the property.

2. The Borrower acknowledges that interest has accrued but not been paid and the Lender has incurred, paid or otherwise advanced taxes, insurance premiums and other expenses necessary to protect or enforce its interest in the Note and the Security Instrument, and that such interest, costs and expenses, in the total amount of $29,304.83, have been added to the indebtedness under the terms of the Note and Security Instrument. As of February 1, 2009, the amount, including such amounts which have been added to the indebtedness (if any), payable under the Note and Security Instrument (the "Unpaid Principal Balance") is U.S. $432,800.34.

3. The Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of the Lender, until the Unpaid Principal Balance has been paid. Interest will be charged on the Unpaid Principal Balance at the yearly rate of 6.625%, beginning February 1, 2009. The Borrower promises to make monthly payments of principal and interest of U.S. $2,572.50, beginning on the first day of March, 2009, and continuing thereafter on the same day of each succeeding month. If on February 01, 2049 (the "Modified Maturity Date"), the Borrower still owes amounts under the Note and Security Instrument, as amended by the Modification, the Borrower will pay these amounts in full on the Modified Maturity Date.

The Borrower will make such payments at P.O. Box 78420, Phoenix, AZ 85062-8420, or at such other place as the Lender may require.



4. Except to the extent that they are modified by this Modification, the Borrower will comply with all of the covenants, agreements, and requirements of the Note and the Security Instrument, including without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that the Borrower is obligated to make under the Security Instrument.

5. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in the Borrower is sold or transferred and the Borrower is not a natural person) without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Loan Documents. If the Lender exercises this option, the Lender shall give the Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which the Borrower must pay all sums secured by the Loan Documents. If the Borrower fails to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Loan Documents without further notice or demand on the Borrower.

6. Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Loan Documents. Except as otherwise specifically provided in this Agreement, the Loan Documents will remain unchanged, and the Borrower and Lender will be bound by, and comply with, all of the terms and provisions thereof, as amended by this Agreement.

7. If one or more riders are executed by the Borrower and recorded together with this Modification, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Modification as if the rider(s) were a part of this Modification. [Check Applicable]

( ) 1-4 Family Rider – Assignment of Rents
( ) Modification Due on Transfer Rider

---

_Jeni W. Botten_
Witness 1 Signature
_Jeni H. Borrin_
Printed Name of Witness

---

Witness 2 Signature

---

Printed Name of Witness

_signature_
TRAVIS MICKELSON
_3/24/09_
Date

---

_Jeni W. Botten_
Witness 1 Signature
_Jeni H. Borrin_
Printed Name of Witness

---

Witness 2 Signature

---

Printed Name of Witness

_signature_
DANIELLE H MICKELSON
_3/24/09_
Date

ACKNOWLEDGEMENT

STATE OF _Washington_

COUNTY OF _Snohomish_

Before me, a Notary Public, in and for said County, personally appeared the above named TRAVIS MICKELSON who acknowledged that he/she did sign the foregoing instrument, and that the same is his/her free act and deed.

In Testimony Whereof, I have hereunto subscribed my name and affixed my official seal at _Stanwood_, this _24th_ day of _March_, 20_09_

_____
Notary Public

My commission expires: _May 23rd, 2011_

Notary Public
State of Washington
HEATHER M LAWLER
My Appointment Expires May 23, 2011

STATE OF _Washington_

COUNTY OF _Snohomish_

Before me, a Notary Public, in and for said County, personally appeared the above named DANIELLE H MICKELSON who acknowledged that he/she did sign the foregoing instrument, and that the same is his/her free act and deed.

In Testimony Whereof, I have hereunto subscribed my name and affixed my official seal at _Stanwood_, this _24th_ day of _March_, 20_09_

_____
Notary Public

My commission expires: _May 23rd, 2011_

Notary Public
State of Washington
HEATHER M LAWLER
My Appointment Expires May 23, 2011

## SCHEDULE A

**Parcel A:**

That Portion Of The Southwest Quarter Of The Southwest Quarter Of The Southwest Quarter Of Section 25. Township 32 North, Range 2 East Of The Willamette Meridian, Described As Follows:

Commencing At The Southwest Corner Of Said Section 25; Thence South 89°54'20,, East Along The South Line Of Said Section 25, 329.60 Feet; Thence North 0°27'18,, West 30.00 Feet To The Northerly Margin Of The Cross Island County Road;

Thence Continue North 0°27'18' West 316.45 Feet To The True Point Of Beginning; Thence Continue North 0°27'18,, West 158.22 Feet; Thence South 89°55'15,, East 329.98 Feet To The East Line Of Said Southwest Quarter Of The Southwest Quarter Of The Southwest Quarter; Thence South 0°24'37,, East Along Said East Line, 158.25 Feet To A Point That Is South 89°54'56,, East From That True Point Of Beginning;

Thence North 89°54'56' West 329.86 Feet To The True Point Of Beginning.

**Parcel B:**

An Easement For Road, Ingress And Egress And Public And Private Utilities Being 60 Feet In Width From The Northerly Margin Of The Cross Island County Road To The North Line Of The Southwest Quarter Of The Southwest Quarter Of Section 25, Township 32 North, Range 2 East Of The Willamette Meridian, The Centerline Of Said 60 Foot Easement Is Described As Follows:

Commencing At The Southwest Corner Of Said Section 25: Thence South 89°54'20,, East Along The South Line Of Said Section 25,329.60 Feet; Thence North 0°27'18,, West 30.00 Feet Said Northerly Margin Of The Cross Island County Road And The True Point Of Beginning Of Said Centerline; Thence Continue North 0°27'18 West 632.89 Feet To The North Line Of Said Subdivision And The Terminus Of Said Centerline.

For Informational Only:

Portion Of Sw 1/4 Of The Sw 1/4 Of 25-32-2

AP NO # ▓▓▓▓▓▓▓0530

Loan number: ██████9566

Chase Home Finance LLC, successor by merger
to Chase Manhattan Mortgage Corporation

_____
Witness 1  Signature

Robert D. Harris
Assistant Vice President

_____
Printed Name of Witness

_____
Witness 2 Signature

_____
Printed Name of Witness

STATE OF OHIO
COUNTY OF FRANKLIN

     Before me, a Notary Public, in and for said County, personally appeared Robert D. Harris,
to me known and known to the person who, as an Assistant Vice President of Chase Home
Finance LLC, successor by merger to Chase Manhattan Mortgage Corporation, the corporation
which executed the foregoing instrument, signed the same, and acknowledged to me that said
person did so sign said instrument in the name and behalf of said corporation as such officer; that
the same is that person's free act and deed as such officer, and the free and corporate act and
deed of said corporation; that said person was duly authorized thereunto by its Board of
Directors.

     In Testimony Whereof, I have hereunto subscribed my name, and affixed my official seal,
at Columbus, Ohio, this _____ day of _____, 20__.

_____
Notary Public

My commission expires: _____

## DOCUMENT CORRECTION AGREEMENT
("Agreement")

Loan No. 10 (the "Loan")

**AGREEMENT TO CORRECT MISSTATED DOCUMENTS AND TO PROVIDE ADDITIONAL DOCUMENTATION OR FEES:** In consideration of Chase Home Finance, LLC as Servicing Agent ("Chase") modifying the Loan (the "Modification") as requested by the undersigned ("Borrower"), and regardless of the reason for any loss, misplacement, or inaccuracy in the modification agreement or any other document prepared in connection with the Modification, Borrower agrees as follows: if any document is lost, misplaced, misstated or inaccurately reflects the true and correct terms and conditions of the Modification, upon request of Chase, Borrower will comply with Chase's request to execute, acknowledge, and deliver to Chase any documentation ("Replacement Documents") Chase deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). Borrower agrees to deliver the Replacement Documents within ten (10) days after receipt by Borrower of a written request for such replacement. Borrower also agrees that upon request Borrower will pay to Chase any additional sum ("Fee") previously disclosed to Borrower as a cost or fee associated with the Modification, which, for whatever reason, was not previously collected.

**REQUEST BY CHASE:** Any request under this Agreement made by Chase, (including assignees and persons acting on behalf of Chase), shall be prima facie evidence of the necessity for same. A written statement addressed to Borrower, first class postage prepaid, at the mailing address indicated in Chase's records shall be considered conclusive evidence of receipt by Borrower of the request for Replacement Documents.

**BORROWER LIABILITY:** If Borrower fails or refuses to execute, acknowledge, and deliver the Replacement Documents or Fee to Chase more than (10) days after being requested to do so by Chase, Borrower shall be liable for any and all loss or damage which Chase reasonably sustains thereby, including, but not limited to all reasonable attorneys' fees and costs incurred by Chase. In addition, Chase may elect to declare the Modification null and void in which case the Loan shall be payable at the rate and on the terms as existed prior to the Modification. Any funds received by Chase in conjunction with the Modification shall be retained by Chase and applied to the Loan as determined by Chase in its discretion.

TRAVIS MICKELSON

3/24/09 Date

DANIELLE H MICKELSON

3/24/09 Date

Exhibit C

copy of the 2010 Notice of Trustee's Sale, Notice of Foreclosure, and attached copies of the

alleged Note and Deed of Trust

After Recording, Return to:
Vonnie McElligott
Northwest Trustee Services, INC.
P.O. Box 997
Bellevue, WA 98009-0997

File No.:         ▮▮▮▮▮▮▮
Grantors:     **Northwest Trustee Services, Inc.**
                    **Chase Home Finance LLC**
Grantee:      **Travis Mickelson and Danielle H Michelson, husband and wife**
Tax Parcel ID No.: R23225-045-0530
Abbreviated Legal: Section 25, Township 32, Range 2, PTN SW SW

### Notice of Trustee's Sale
Pursuant to the Revised Code of Washington 61.24, et seq.

I.

On December 10, 2010, at 10:00 a.m. outside the main entrance of the Island County Annex Building near the Veteran's Memorial at 1 NE 6th Street in the City of Coupeville, State of Washington, the undersigned Trustee (subject to any conditions imposed by the Trustee) will sell at public auction to the highest and best bidder, payable at time of sale, the following described real property "Property", situated in the County(ies) of Island, State of Washington:

Parcel A: that portion of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, described as follows: commencing at the Southwest corner of said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18" West 30.00 feet to the Northerly margin of the Cross Island County Road; thence continue North 0 degrees 27'18" West 316.45 feet to the True Point of Beginning; thence continue North 0 degrees 27'18" West 158.22 feet; thence South 89 degrees 55'15" East 329.98 feet to the East line of said Southwest Quarter of the Southwest Quarter of the Southwest Quarter; thence South 0 degrees 24'37" East along said East line, 158.25 feet to a point that is South 89 degrees 54'56" East from that True Point of Beginning; thence North 89 degrees 54'56" West 329.86 feet to the True Point of Beginning. Parcel B: an easement for road ingress and egress and public and private utilities being 60 feet in width from the Northerly margin of the Cross Island County Road to the North line of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, the centerline of said 60 foot easement is described as follows: commencing at the Southwest corner of said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18" West 30.00 feet said Northerly margin of the Cross Island County Road and the True Point of Beginning of said centerline; thence continue North 0 degrees 27'18" West 632.89 feet to the North line of said subdivision and the terminus of said centerline. Situated in Island County, Washington.

Commonly known as:        436 Ezduzit Lane
                                           Camano Island, WA 98282

which is subject to that certain Deed of Trust dated 11/22/05, recorded on 11/29/05, under Auditor's File No. 4155570, records of Island County, Washington, from Travis Mickelson and Danielle H. Mickelson, husband and wife, as Grantor, to Chicago Title, as Trustee, to secure an obligation

"Obligation" in favor of Mortgage Electronic Registration Systems, Inc., as Beneficiary, the beneficial interest in which was assigned by Mortgage Electronic Registration Systems, Inc. "MERS" to Chase Home Finance LLC, under an Assignment/Successive Assignments recorded under Auditor's File No. 4236910.

*The Tax Parcel ID number and Abbreviated Legal Description are provided solely to comply with the recording statutes and are not intended to supplement, amend or supersede the Property's full legal description provided herein

## II.

No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the Obligation in any Court by reason of the Grantor's or Borrower's default on the Obligation.

## III.

The Beneficiary alleges default of the Deed of Trust for failure to pay the following amounts now in arrears and/or other defaults:

|  |  | Amount due to reinstate by 09/06/10 |
| --- | --- | --- |
| Monthly Payments |  | $68,561.48 |
| Late Charges |  | $2,784.50 |
| Lender's Fees & Costs |  | $1,008.14 |
| Total Arrearage | $72,354.12 |  |
| Trustee's Expenses (Itemization) |  |  |
| Trustee's Fee |  | $725.00 |
| Title Report - |  | $1,169.61 |
| Statutory Mailings |  | $10.00 |
| Recording Costs |  | $0.00 |
| Postings |  | $70.00 |
| Sale Costs |  | $0.00 |
| Total Costs | $1,974.61 |  |
| Total Amount Due: |  | $74,328.73 |

Other known defaults as follows:

## IV.

The sum owing on the Obligation is:  Principal Balance of $403,495.51, together with interest as provided in the note or other instrument evidencing the Obligation from 07/01/08, and such other costs and fees as are due under the Obligation, and as are provided by statute.

## V.

The Property will be sold to satisfy the expense of sale and the Obligation as provided by statute.  The sale will be made without representation or warranty, express or implied regarding title, possession,

encumbrances or condition of the Property on December 10, 2010. The default(s) referred to in paragraph III, together with any subsequent payments, late charges, advances costs and fees thereafter due, must be cured by 11/29/10 (11 days before the sale date), to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before the close of the Trustee's business on 11/29/10 (11 days before the sale date), the default(s) as set forth in paragraph III, together with any subsequent payments, late charges, advances, costs and fees thereafter due, is/are cured and the Trustee's fees and costs are paid. The sale may be terminated any time after 11/29/10 (11 days before the sale date), and before the sale by the Borrower, Grantor, any Guarantor or the holder of any recorded junior lien or encumbrance paying the entire balance of principal and interest secured by the Deed of Trust, plus costs, fees, and advances, if any made pursuant to the terms of the obligation and/or Deed of Trust.

## VI.

A written notice of default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

### NAME AND ADDRESS

| | |
|---|---|
| Travis Mickelson | Danielle H. Mickelson |
| 436 Ezduzit Lane | 436 Ezduzit Lane |
| Camano Island, WA  98282 | Camano Island, WA  98282 |

by both first class and either certified mail, return receipt requested on 08/06/10, proof of which is in the possession of the Trustee; and on 08/06/10 Grantor and Borrower were personally served with said written notice of default **or** the written notice of default was posted on a conspicuous place on the real property described in paragraph I above, and the Trustee has possession of proof of such service or posting.

## VII.

The Trustee, whose name and address are set forth below, will provide in writing to anyone requesting it a statement of all foreclosure costs and trustee's fees due at any time prior to the sale.

## VIII.

The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their right, title and interest in the Property.

## IX.

Anyone having any objection to the sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

## X.

NOTICE TO OCCUPANTS OR TENANTS - The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the Deed of

Trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**The trustee's rules of auction may be accessed at www.northwesttrustee.com and are incorporated by this reference. You may also access sale status at www.northwesttrustee.com and www.USA-Foreclosure.com.**

EFFECTIVE: 09/06/10

Northwest Trustee Services, Inc., Trustee

By _____
**Authorized Signature**
**P.O. BOX 997**
**Bellevue, WA 98009-0997**
**Contact: Vonnie McElligott**
**(425) 586-1900**

STATE OF WASHINGTON      )
                                           ) ss.
COUNTY OF KING              )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _____

RHEA S. PRE
STATE OF WASHINGTON
**NOTARY PUBLIC**
MY COMMISSION EXPIRES
04-22-14

NOTARY PUBLIC in and for the State of
Washington, residing at _____
My commission expires _____

**NORTHWEST TRUSTEE SERVICES, INC., SUCCESSOR BY MERGER TO NORTHWEST TRUSTEE SERVICES PLLC FKA NORTHWEST TRUSTEE SERVICES, LLC, P.O. Box 997, BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997**

**File No:** 7037.08418
**Client:** Chase Home Finance, LLC
**Borrower:** MICKELSON, TRAVIS AND DANIELLE H.

**SERVING WA, OR, ID, CA, NV, AZ, MT HI**

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

File No. 7037.08418/MICKELSON, TRAVIS AND DANIELLE H.

## Notice of Foreclosure
### Pursuant to the Revised Code of Washington
### RCW 61.24, et seq.

To:

| | |
|---|---|
| Travis Mickelson | Danielle H. Mickelson |
| 436 Ezduzit Lane | 436 Ezduzit Lane |
| Camano Island, WA 98282 | Camano Island, WA 98282 |
| | |
| Travis Mickelson | Danielle H. Mickelson |
| 2803 B 254th Street Northwest | 2803 B 254th Street Northwest |
| Stanwood, WA 98292 | Stanwood, WA 98282 |

The attached Notice of Trustee's Sale is a consequence of default(s) in the obligation to the Beneficiary of your Deed of Trust. Unless the default(s) is/are cured, your property will be sold at auction on **December 10, 2010.**

To cure the monetary default(s), you must bring the payments current, cure any other default(s), pay accrued late charges, advances, other costs, trustee's fees and attorneys' fees as set forth below by 11/29/10 (11 days before sale date). These arrears and costs are as follows:

| | Amount due to reinstate by 09/06/10 | Estimated amount due to reinstate by 11/29/10 |
|---|---|---|
| **Monthly Payments** | $68,561.48 | $73,835.44 |
| **Late Charges** | $2,784.50 | $3,118.64 |
| **Lender's Fees and Costs** | $1,008.14 | $1,008.14 |
| **Total Arrears** | **$72,354.12** | **$77,962.22** |
| **Trustee's Expenses** | | |
| **(Itemization)** | | |
| Trustee's Fee | $725.00 | $725.00 |
| Title Report | $1,169.61 | $1,169.61 |
| Postings | $70.00 | $140.00 |
| Postage | $10.00 | $108.00 |
| Recording Fees | $0.00 | $100.00 |
| Sale Costs | $0.00 | $0.00 |
| Publication | $0.00 | $500.00 |
| **Total Costs** | **$1,974.61** | **$2,742.61** |
| **Total Amount Due:** | **$74,328.73** | **$80,704.83** |

To pay off the entire obligation secured by your Deed of Trust as of the 9/6/2010, you must pay a total of $403,495.51 in principal, $58,370.04 in interest, plus other costs and advances estimated to date in the amount of $1,008.14. From and after the date of this notice you must submit a written request to the Trustee to obtain the total amount to pay off the entire obligation secured by your Deed of Trust as of a certain payoff date. You may reinstate your Deed of Trust and the obligation secured thereby at any time up to and including 11/29/10 (11 days before the sale date), by paying the amount set forth or estimated above and by curing any other defaults described above. Of course, as time passes other payments may become due, and any further payments coming due and any additional late charges must be added to your reinstating payment. Any new defaults not requiring payment of money that occur after the date of this notice must also be cured in order to effect reinstatement. In

addition, because some of the charges can only be estimated at this time and because the amount necessary to reinstate or to pay off the entire indebtedness may include presently unknown expenditures required to preserve the property or to comply with state or local law, it will be necessary for you to contact the Trustee prior to the time you tender reinstatement or the payoff amount so that you may be advised of the exact amount you will be required to pay. In addition, the Trustee's fees may increase as more time is allowed to pass before reinstatement is made.

Tender of payment or performance must be made to: **Northwest Trustee Services, Inc., whose address is P.O. Box 997, Bellevue, Washington 98009-0997 (425) 586-1900.**

**AFTER THE TRUSTEE'S CLOSE OF BUSINESS ON** 11/29/10 (11 days before the sale date), **YOU MAY NOT REINSTATE YOUR DEED OF TRUST BY PAYING THE BACK PAYMENTS AND COSTS AND FEES AND CURING THE OTHER DEFAULTS AS OUTLINED ABOVE.** The Trustee will respond to any written request for current payoff or reinstatement amounts within ten days of receipt of your written request. In such a case, you will only be able to stop the sale by paying, before the sale, the total principal balance of $403,495.51 plus accrued interest, costs, fees and advances, if any, made pursuant to the terms of the loan documents and by curing the other defaults as outlined above.

You may contest this default by initiating court action in the Superior Court of the County in which the sale is to be held. In such action, you may also raise any legitimate defenses you have to this default. A copy of your Deed of Trust and documents evidencing the obligation secured thereby are enclosed. You may wish to consult a lawyer. Legal action on your part may prevent or restrain the sale, but only if you persuade the court of the merits of your defense. You may contact the Department of Financial Institutions or the statewide civil legal aid hotline for possible assistance or referrals

The court may grant a restraining order or injunction to restrain the trustee's sale pursuant to RCW 61.24.130 upon five days notice to the trustee of the time when, place where, and the judge before whom the application for the restraining order or injunction is to be made. This notice shall include copies of all pleadings and related documents to be given to the judge. Notice and other process may be served on the trustee at 13555 SE 36th St., Suite 100, Bellevue, WA 98006.

If you do not reinstate the secured obligation and your Deed of Trust in the manner set forth above, or if you do not succeed in restraining the sale by court action, your property will be sold. The effect of such sale will be to deprive you and all those who hold by, through or under you of all your interest in the property.

EFFECTIVE: 09/06/10

**Northwest Trustee Services, Inc., Trustee**
**P.O. Box 997**
**Bellevue, WA 98009-0997**
**(425) 586-1900**
**Contact: Vonnie McElligott**

NORTHWEST TRUSTEE SERVICES, INC., , P.O. BOX 997, BELLEVUE, WA 98009-0997 PHONE (425) 586-1900 FAX (425) 586-1997

File No: ▓▓▓▓▓▓▓
Client: Chase Home Finance, LLC
Borrower: MICKELSON, TRAVIS AND DANIELLE H.

**This is an attempt to collect a debt and any information obtained will be used for that purpose.**

SEE "PREPAYMENT NOTE ADDENDUM" ATTACHED HERETO AND MADE A PART HEREOF.
SEE "INTEREST-ONLY ADD. TO ARM NOTE" ATTACHED HERETO AND MADE A PART HEREOF.
SEE "ADDENDUM TO NOTE" ATTACHED HERETO AND MADE A PART HEREOF.



MIN 100112065709467936
MERS Phone: 1-888-679-6377

# ADJUSTABLE RATE NOTE

LOAN NO.: 9722

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps) this

*I hereby certify to be a true & correct of the original.*

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY. BY

|  |  |  |
|---|---|---|
| NOVEMBER 22, 2005 | LAKE STEVENS | WASHINGTON |
| [Date] | [City] | [State] |

436 EZDUZIT Lane, CAMANO ISLAND, WA 98282
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 403,500.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
MHL FUNDING CORP.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.625 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on JANUARY, 2006. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on DECEMBER 01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at MORTGAGEIT, INC.
PO BOX 79135, PHOENIX, AZ 85062-
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my initial monthly payments will be in the amount of U.S. $ 2,583.65 . This amount may change.

(C) Monthly Payment Changes

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - Fannie Mae UNIFORM INSTRUMENT

Initials:
Form 3520 1/01



I hereby certify this to be a true & correct copy of the original.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may change on the first day of DECEMBER 2010 and on that day every 6th month thereafter. Each date on which my interest rate could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

(D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 12.625 % or less than 2.250 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than TWO AND 000/1000THS percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.625 % .

(E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

(F) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Initials:



I hereby certify this
to be a true & correct
copy of the original.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000** % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:



*I hereby certify this to be a true & correct original.*

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
**TRAVIS MICKELSON**                    -Borrower

_____ (Seal)
**DANIELLE H. MICKELSON**          -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

_____ (Seal)
                                                -Borrower

*[Sign Original Only]*

VMP-838N (0210)                    Page 4 of 4                    Form 3520 1/01



**ISLAND COUNTY AUDITOR**                                    DT

4155570
Page: 1 of 20
11/29/2005 02:55P

Return To:
MORTGAGEIT

1350 DEMING WAY, 3RD FLOOR
MIDDLETON, WI 53562

Assessor's Parcel or Account Number: 223225-045-0530
Abbreviated Legal Description:
PTN. SW SW 25-32-2E

(Include lot, block and plat or section, township and range)          Full legal description located on page 3.
Trustee: _CHICAGO TITLE

Additional Grantees located on page 2.

——————————————————————[Space Above This Line For Recording Data]——————————————————————

1597326—          **DEED OF TRUST**                              558

LOAN NO.: ████722                                    MIN   100112085709467936
                                                     MERS Phone: 1-888-679-6377

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.
(A) "Security Instrument" means this document, which is dated          NOVEMBER 22, 2005
together with all Riders to this document.
(B) "Borrower" is

TRAVIS  MICKELSON AND DANIELLE H. MICKELSON, HUSBAND AND WIFE

Borrower is the trustor under this Security Instrument.
(C) "Lender" is
MHL FUNDING CORP.

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3048  1/01
VMP-6A(WA) (0012)                        Page 1 of 15          LENDER SUPPORT SYSTEMS, INC. MERS6AWA.NEW (05/04)

||||| |||| ||| ||||| ||| ||||| ||||| ||| ||||| |||   4155570
Page: 2 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                                      D7

Lender is a **CORPORATION**
organized and existing under the laws of **NEW YORK**
Lender's address is
**33 MAIDEN LANE, 6TH FLOOR, NEW YORK, NY 10038**

(D) "Trustee" is
_CHICAGO TITLE

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated      **NOVEMBER 22, 2005**
The Note states that Borrower owes Lender
**FOUR HUNDRED THREE THOUSAND FIVE HUNDRED AND NO/100 X X X X X X X X X X X X X X X X X**

Dollars
(U.S. $ **403,500.00**                   ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than      **DECEMBER 01, 2035**

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "RIDERS" means all riders to this Security Instrument that are executed by Borrower. The following riders are to be executed by Borrower [check box as applicable]:

[XX] Adjustable Rate Rider      [ ] Condominium Rider              [ ] 1-4 Family Rider
[ ] Graduated Payment Rider   [ ] Planned Unit Development Rider  [ ] Biweekly Payment Rider
[ ] Balloon Rider             [ ] Rate Improvement Rider          [ ] Second Home Rider
[XX] Other(s) [specify] PREPAYMENT RIDER
                        INTEREST-ONLY ADDENDUM TO ADJUSTABLE RATE RIDER
                        ADDENDUM TO ADJUSTABLE RATE RIDER

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

VMP-6A(WA) (0012)                    Page 2 of 15                    Form 3048 1/01

4135570
Page 3 of 36
11/29/2006 02:58P
ISLAND COUNTY AUDITOR

(F) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

COUNTY [Type of Recording Jurisdiction] of ISLAND [Name of Recording Jurisdiction]:

SEE COMPLETE LEGAL DESCRIPTION DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 232225-045-0530 which currently has the address of

436 EZDUZIT Lane [Street]

CAMANO ISLAND [City], Washington 98282 [Zip Code]

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

4155570
Page: 4 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                    DT

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community

4155578
Page: 5 of 28
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                DT

Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a Lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

4155570
Page: 6 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR        DT

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to

4155570
Page: 7 of 26
11/29/2005 02 65P
ISLAND COUNTY AUDITOR        DT

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials: _____
Form 3048  1/01

4155570
Page: 8 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                    DT

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

Initials:

4155570
Page: 9 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                    DT

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

4155570
Page: 10 of 26
11/29/2006 02:55P
ISLAND COUNTY AUDITOR                                         DT

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's

Initials: ___

4155570
Page: 11 of 26
11/29/2005 02:58P
ISLAND COUNTY AUDITOR          DT

notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)

4155570
Page: 12 of 26
11/29/2006 02:55P
ISLAND COUNTY AUDITOR                DT

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

VMP-6A(WA) (0012)                    Page 12 of 15                    Form 3048  1/01

4155570
Page: 13 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR          DT

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.**

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

**24. Substitute Trustee.** In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

VMP-6A(WA) (0012)                         Page 13 of 15                         Initials: ___  Form 3048 1/01



4155576
Page: 14 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR          DT

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any RIDER executed by Borrower and recorded with it.

Witnesses:

_____
·Witness

_____
·Witness

_____ (Seal)          _____ (Seal)
TRAVIS MICKELSON          -Borrower          DANIELLE H. MICKELSON          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower          -Borrower

_____ (Seal)          _____ (Seal)
-Borrower          -Borrower

VMP-6A(WA) (0012)          Page 14 of 15          Form 3048  1/01



4155570
Page: 16 of 26
11/29/2006 02:95P

ISLAND COUNTY AUDITOR                    DT

STATE OF WASHINGTON
County of **Snohomish**                    } ss:
On this day personally appeared before me
**TRAVIS MICKELSON AND DANIELLE H. MICKELSON**

to me known to be the individual(s) described in and who executed the within and foregoing instrument,
and acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the
uses and purposes therein mentioned.
GIVEN under my hand and official seal this    23rd    day of    November 2005

_____  Sheree Hill
Notary Public in and for the State of Washington, residing at
*Steelene*
My Appointment Expires on 7/22/09

SHEREE HILL
STATE OF WASHINGTON
NOTARY ----- PUBLIC
My Commission Expires 7-22-2009

VMP-6A(WA) (0012)                Page 16 of 15                Form 3048  1/01



4155570
Page: 18 of 26
11/29/2006 02:66P
ISLAND COUNTY AUDITOR                          PT

Loan Name: TRAVIS MICKELSON                              LOAN NO.:  40473722

Property Address: 436 EZDUZIT Lane, CAMANO ISLAND, WA  98282

# EXHIBIT  "A"
## LEGAL DESCRIPTION OF PROPERTY

**PARCEL A:**

That portion of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, described as follows:

Commencing at the Southwest corner of said Section 25;
thence South 89°54'20" East along the South line of said Section 25, 329.60 feet;
thence North 0°27'18" West 30.00 feet to the Northerly margin of the Cross Island County Road;
thence continue North 0°27'18" West 316.45 feet to the true point of beginning;
thence continue North 0°27'18" West 158.22 feet;
thence South 89°55'15" East 329.98 feet to the East line of said Southwest Quarter of the Southwest Quarter of the Southwest Quarter;
thence South 0°24'37" East along said East line, 158.25 feet to a point that is South 89°54'56" East from that true point of beginning;
thence North 89°54'56" West 329.86 feet to the true point of beginning.

**PARCEL B:**

An easement for road, ingress and egress and public and private utilities being 60 feet in width from the Northerly margin of the Cross Island County Road to the North line of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, the centerline of said 60 foot easement is described as follows:

Commencing at the Southwest corner of said Section 25;
thence South 89°54'20" East along the South line of said Section 25, 329.60 feet;
thence North 0°27'18" West 30.00 feet said Northerly margin of the Cross Island County Road and the true point of beginning of said centerline;
thence continue North 0°27'18" West 632.89 feet to the North line of said subdivision and the terminus of said centerline.

Situated in Island County, Washington.

- END OF EXHIBIT "A" -

4155570
Page: 17 of 26
11/29/2006 02:55P
ISLAND COUNTY AUDITOR          DT

# ADJUSTABLE RATE RIDER

**(LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)**
SEE "ADDENDUM TO ARM RIDER" ATTACHED HERETO AND MADE A PART HEREOF.
SEE "INTEREST-ONLY ADDENDUM TO ARM RIDER" ATTACHED HERETO AND MADE A PART HEREOF.
LOAN NO.: 40473722                                    MIN: 100112065709467936
                                                     MERS Phone: 1-888-679-6377

THIS ADJUSTABLE RATE RIDER is made this    22nd   day of      NOVEMBER, 2005    ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed
of Trust, or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
MHL FUNDING CORP.

("Lender") of the same date and covering the property described in the Security Instrument
and located at:

436 EZDUZIT Lane, CAMANO ISLAND, WA  98282
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME
AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:
**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial interest rate of       6.625      %. The Note provides
for changes in the interest rate and the monthly payments, as follows:
**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the first day of      DECEMBER, 2010     ,
and on that day every     6th     month thereafter. Each date on which my interest rate
could change is called a "Change Date."

(B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is the average of interbank offered rates for six month U.S. dollar-denominated
deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most
recent Index figure available as of the first business day of the month immediately preceding
the month in which the Change Date occurs is called the "Current Index."

Initials 
Form 3138 1/01

**MULTISTATE ADJUSTABLE RATE RIDER - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN
THE WALL STREET JOURNAL)** - Single Family - Fannie Mae Uniform Instrument
VMP-838R (0402)                     Page 1 of 4          LENDER SUPPORT SYSTEMS INC. 838R NEW (07/04)

4165578
Page: 18 of 26
11/29/2005 02:58P
ISLAND COUNTY AUDITOR        DT

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE QUARTER                                    percentage points
(        2.250        %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than
        12.625        % or less than        2.250        %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than
                        TWO AND 000/1000THS                        percentage points
(      2.000      %) from the rate of interest I have been paying for the preceding        6
months. My interest rate will never be greater than   12.625   % .

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

VMP-838R (0402)                    Page 2 of 4                    Form 3138 1/01

4155570
Page: 19 of 26
11/29/2005 02.56P
ISLAND COUNTY AUDITOR          DT

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VMP-838R (0402)                    Page 3 of 4                    Form 3138 1/01



4155570
Page: 20 of 26
11/29/2005 02:55P

ISLAND COUNTY AUDITOR          DT

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____(Seal)        _____(Seal)
TRAVIS MICKELSON        -Borrower      DANIELLE H. MICKELSON        -Borrower

_____(Seal)        _____(Seal)
                        -Borrower                              -Borrower

_____(Seal)        _____(Seal)
                        -Borrower                              -Borrower

_____(Seal)        _____(Seal)
                        -Borrower                              -Borrower

VMP-838R (0402)              Page 4 of 4              Form 3138 1/01



ISLAND COUNTY AUDITOR          DT

4155570
Page: 21 of 26
11/29/2005 02:55P

# PREPAYMENT RIDER
## (Multi-State)

MIN: 100112065709467936
MERS Phone: 1-888-679-6377

LOAN NO.:  40473722

This Prepayment Rider is made this 22nd day of NOVEMBER, 2005          and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note (the "Note") to
MHL FUNDING CORP.

(the "Lender") of the same date and covering the property described in the Security Instrument and located at
436 EZDUZIT Lane, CAMANO ISLAND, WA  98282
(the "Property").

**Additional Covenants.** Notwithstanding anything to the contrary set forth in the Note or Security Instrument, Borrower and Lender further covenant and agree as follows:

Borrower has the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." A "full prepayment" is the prepayment of the entire unpaid principal due under the Note. A payment of only part of the unpaid principal is known as a "partial prepayment."

**If, within the   36   month period beginning with the date Borrower executes the Note (the "Penalty Period"), Borrower makes a full prepayment, or partial prepayment in any   TWELVE   (12)-month period that exceeds 20 % of the original principal loan amount, Borrower will pay a prepayment charge as consideration for the Note Holder's acceptance of such prepayment. The prepayment charge will equal the amount of interest that would accrue during a   SIX   ( 6 ) month period on the amount prepaid that exceeds 20 % of the original principal balance of the Note, calculated at the rate of interest in effect under the terms of the Note at the time of the prepayment, unless otherwise prohibited by applicable law or regulation. No prepayment charge will be assessed for any prepayment occurring after the Penalty Period.**

Notwithstanding the foregoing, in the event of a full prepayment concurrent with a bona fide sale of the Property to an unrelated third party after the first   0   months of the term of the Note, no prepayment penalty will be assessed. In that event, Borrower agrees to provide the Note Holder with evidence acceptable to the Note Holder of such sale.



**4155570**
Page: 22 of 26
11/29/2006 02:55P

ISLAND COUNTY AUDITOR                    DT

By signing below, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Rider.

_____ (Seal)        _____ (Seal)
TRAVIS MICKELSON          -Borrower      DANIELLE H. MICKELSON        -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                  -Borrower

_____ (Seal)        _____ (Seal)
                          -Borrower                                  -Borrower



**4155570**
Page: 23 of 26
11/29/2005 02:55P

ISLAND COUNTY AUDITOR                    DT

# INTEREST-ONLY ADDENDUM
## TO ADJUSTABLE RATE RIDER

LOAN NO.:  40473722

MIN: 100112065709467936
MERS Phone: 1-888-679-6377

PROPERTY ADDRESS: 436 EZDUZIT Lane, CAMANO ISLAND, WA  98282

THIS ADDENDUM is made this   22nd   day of NOVEMBER, 2005          , and is incorporated into
and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as this
Addendum executed by the undersigned and payable to
MHL FUNDING CORP.

(the "Lender").

THIS ADDENDUM supersedes Section 4(C) of the Rider.  None of the other provisions of the Note are
changed by this Addendum.

**4.     INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(C)     Calculation of Changes**
            Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO  AND ONE QUARTER                      percentage point(s) ( 2.250    %) to the Current Index
for such Change Date.  The Note Holder will then round the result of this addition to the nearest
one-eighth of one percentage point (0.125%).  Subject to the limits stated in Section 4(D) below, this
rounded amount will be my new interest rate until the next Change Date.

            During the Interest-Only Period, the Note Holder will then determine the amount of the
monthly payment that would be sufficient to repay accrued interest.  This will be the amount of my
monthly payment until the earlier of the next Change Date or the end of the Interest-Only Period unless I
make a voluntary prepayment of principal during such period.  If I make a voluntary prepayment of
principal during the Interest-Only Period, my payment amount for subsequent payments will be reduced to
the amount necessary to pay interest at the then current interest rate on the lower principal balance.  At the
end of the Interest-Only Period and on each Change Date thereafter, the Note Holder will determine the
amount of the monthly payment that would be sufficient to repay in full the unpaid principal that I am
expected to owe at the end of the Interest-Only Period or Change Date, as applicable, in equal monthly
payments over the remaining term of the Note.  The result of this calculation will be the new amount of
my monthly payment.  After the end of the Interest-Only Period, my payment will not be reduced due to
voluntary prepayments.

Form 603F                              Page 1 of 2          LENDER SUPPORT SYSTEMS INC. AURIORDR.ADD 603(04)        Initials:

4155570
Page: 24 of 26
11/29/2005 02:56P
ISLAND COUNTY AUDITOR        DT

_____(Seal)        _____(Seal)
TRAVIS MICKELSON        -Borrower        DANIELLE H. MICKELSON        -Borrower

_____(Seal)        _____(Seal)
-Borrower        -Borrower

_____(Seal)        _____(Seal)
·Borrower        -Borrower

_____(Seal)        _____(Seal)
·Borrower        -Borrower

Page 2 of 2



4155576
Page: 25 of 26
11/29/2005 02:55P
ISLAND COUNTY AUDITOR                    DT

# ADDENDUM TO ADJUSTABLE RATE RIDER

MIN: 10011206570946793 6
MERS Phone: 1-888-679-6377                              LOAN NO.:  40473722

This addendum is made  NOVEMBER 22, 2005  and is incorporated into and deemed to amend and supplement the Adjustable Rate Rider of the same date.

The property covered by this addendum is described in the Security Instrument and located at:
436 EZDUZIT Lane, CAMANO ISLAND, WA  98282

**AMENDED PROVISIONS**
In addition to the provisions and agreements made in the Security Instrument, I/we further covenant and agree as follows:

**ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 12.625      % or less than        2.250        %.  Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than  TWO AND 000/1000THS percentage point(s) ( 2.000 %) from the rate of interest I have been paying for the preceding six (6) months.  My interest rate will never be greater than      12.625      %.  My interest rate will never be less than        2.250      %.

**TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

1202 LIBOR Addendum to Rider                Page 1 of 2          LENDER SUPPORT SYSTEMS, INC. AURA1202.AUR (07/05)        Initials:



ISLAND COUNTY AUDITOR                DT

4155570
Page: 26 of 26
11/29/2005 02:56P

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

In Witness Thereof, Trustor has executed this addendum.

Witness

_____

_____(Seal)
TRAVIS MICKELSON                   -Borrower

_____(Seal)
DANIELLE H. MICKELSON              -Borrower

_____(Seal)
                                   -Borrower

_____(Seal)
                                   -Borrower

1202 USCA Addendum to Rider                Page 2 of 2

1

Exhibit D

2

Trustee's Deed

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

After Recording Return To:
Federal Home Loan Mortgage Corporation
5000 Plano Parkway
Carrollton, TX 75010-4902

File No.:  7037.08418/MICKELSON, TRAVIS AND DANIELLE H.

## Trustee's Deed

The GRANTOR, Northwest Trustee Services, Inc., as present Trustee under that Deed of Trust (defined below), in consideration of the premises and payment recited below, hereby grants and conveys, without representation or warranty, expressed or implied, to Federal Home Loan Mortgage Corporation, as GRANTEE, all real property (the Property), situated in the County of Island, State of Washington, described as follows:

Tax Parcel No.: R23225-045-0530

Abbreviated Legal:  Section 25, Township 32, Range 2, PTN SW SW

Parcel A: that portion of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, described as follows: commencing at the Southwest corner of said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18" West 30.00 feet to the Northerly margin of the Cross Island County Road; thence continue North 0 degrees 27'18" West 316.45 feet to the True Point of Beginning; thence continue North 0 degrees 27'18" West 158.22 feet; thence South 89 degrees 55'15" East 329.98 feet to the East line of said Southwest Quarter of the Southwest Quarter of the Southwest Quarter; thence South 0 degrees 24'37" East along said East line, 158.25 feet to a point that is South 89 degrees 54'56" East from that True Point of Beginning; thence North 89 degrees 54'56" West 329.86 feet to the True Point of Beginning. Parcel B: an easement for road ingress and egress and public and private utilities being 60 feet in width from the Northerly margin of the Cross Island County Road to the North line of the Southwest Quarter of the Southwest Quarter of the Southwest Quarter of Section 25, Township 32 North, Range 2 East of the Willamette Meridian, the centerline of said 60 foot easement is described as follows: commencing at the Southwest corner of said Section 25; thence South 89 degrees 54'20" East along the South line of said Section 25, 329.60 feet; thence North 0 degrees 27'18" West 30.00 feet said Northerly margin of the Cross Island County Road and the True Point of Beginning of said centerline; thence continue North 0 degrees 27'18" West 632.89 feet to the North line of said subdivision and the terminus of said centerline. Situated in Island County, Washington.

RECITALS:

1.  This conveyance is made pursuant to the powers, including the power of sale, conferred upon the Beneficiary by that certain Deed of Trust between Travis Mickelson and Danielle H. Mickelson, husband and wife, as Grantor, to Chicago Title, as Trustee, and Mortgage Electronic Registration Systems, Inc., Beneficiary, dated 11/22/05, recorded 11/29/05, under Auditor's No. 4155570, records of Island County, Washington and subsequently assigned to Chase Home Finance LLC under Island County Auditor's No. 4236910.

2. The Deed of Trust was executed to secure, together with other undertakings, the payment of one or more promissory note(s) ("Note") in the sum of $403,500.00 with interest thereon, according to the terms thereof, in favor of Mortgage Electronic Registration Systems, Inc. and to secure any other sums of money which might become due and payable under the terms of said Deed of Trust.

3. The Deed of Trust provided that the Property is not used principally for agricultural or farming purposes and the Grantor has no actual knowledge that the Property is used principally for agricultural or farming purposes.

4. Default having occurred in the obligations secured and/or covenants of the Deed of Trust grantor, as set forth in Notice of Trustee's Sale described below, which by the terms of the Deed of Trust make operative the power to sell, the thirty-day advance Notice of Default was transmitted to the Deed of Trust grantor, or his successor in interest, and a copy of said Notice was posted or served in accordance with law.

5. Chase Home Finance LLC, being then the holder of the indebtedness secured by the Deed of Trust, delivered to said Grantor a written request directing Grantor to sell the Property in accordance with law and the terms of the Deed of Trust.

6. The defaults specified in the "Notice of Default" not having been cured, the Grantor, in compliance with the terms of the Deed of Trust, executed and on 09/07/10, recorded in the office of the Auditor of Island County, Washington, a " Notice of Trustee's Sale" of the Property under Auditor's File No. 4280389.

7. The Grantor, in the "Notice of Trustee's Sale", fixed the place of sale as outside the main entrance of the Island County Annex Building near the Veteran's Memorial at 1 NE 6th Street, City of Coupeville, State of Washington a public place, at 10:00 o'clock a.m., and in accordance with the law caused copies of the statutory "Notice of Trustee's Sale" to be transmitted by mail to all persons entitled thereto and either posted or served prior to 90 days before the sale; further, the Grantor caused a copy of said "Notice of Trustee's Sale" to be published in a legal newspaper in each county in which the property or any part thereof is situated, once between the thirty-fifth and twenty-eighth day before the date of sale, and once between the fourteenth and the seventh day before the date of sale; and further, included with the Notice, which was transmitted to or served upon the Deed of Trust grantor or his successor in interest, a "Notice of Foreclosure" in substantially the statutory form, to which copies of the Note and Deed of Trust were attached.

8. During foreclosure, no action by the Beneficiary, its successors or assigns was pending on an obligation secured by the Deed of Trust.

9. All legal requirements and all provisions of said Deed of Trust have been complied with, as to acts to be performed and notices to be given, as provided in chapter 61.24 RCW.

10. The defaults specified in the "Notice of Trustee's Sale" not having been cured ten days prior to the date of Trustee's Sale and said obligation secured by said Deed of Trust remaining unpaid, on March 25, 2011, the date of sale, which was not less than 190 days from the date of default in the obligation secured, the Grantor then and there sold the Property at public auction to said Beneficiary, the highest bidder therefore, for the sum of $325,297.00. Beneficiary then directed Grantor to issue this Trustee's Deed directly to Grantee.

This conveyance is made without representations or warranties of any kind, expressed or implied. By recording this Trustee's Deed, Grantee understands, acknowledges and agrees that the Property was purchased in the context of a foreclosure, that the trustee made no representations to Grantee concerning the Property and that the trustee owed no duty to make disclosures to Grantee concerning the Property, Grantee relying solely upon his/her/theirits own due diligence investigation before electing to bid for the Property.

DATED: March 30, 2011

GRANTOR
Northwest Trustee Services, Inc.

By _____

Assistant Vice President
Northwest Trustee Services, Inc.

STATE OF WASHINGTON )
                     ) ss.
COUNTY OF KING       )

**Heather Westrall**

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that (he/she) signed this instrument, on oath stated that (he/she) was authorized to execute the instrument and acknowledged (he/she) as the Assistant Vice President of Northwest Trustee Services, Inc. to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated:  March 30, 2011

JULIE BOUFFLEUR
STATE OF WASHINGTON
NOTARY PUBLIC
MY COMMISSION EXPIRES
02-23-13

NOTARY PUBLIC in and for the State of
Washington, residing at King Co.
My commission expires: 02/23/2013

Exhibit E

copy of the action, which as of the date of this complaint was unfiled,

1
2
3
4
5
6
7

## SUPERIOR COURT OF WASHINGTON
## IN AND FOR ISLAND COUNTY

8

9    Federal Home Loan Mortgage Corporation,    )
                                                )
10                      PLAINTIFF,              ) No.
                                                )
11           v.                                 )
                                                ) EVICTION SUMMONS
12   Travis Mickelson, Danielle H. Mickelson, AND  ) (Residential, Post-Foreclosure)
     ALL OCCUPANTS OF THE PREMISES             )
13   LOCATED AT 436 Ezduzit Lane, Camano        )
     Island, WA  98282,                         )
14                                              )
                        DEFENDANT(s).           )
15   _____)

16

17         **THIS IS NOTICE OF A LAWSUIT TO EVICT YOU.**
18              **PLEASE READ IT CAREFULLY.**
           **THE DEADLINE FOR YOUR WRITTEN RESPONSE IS:**
19                **5:00 P.M. ON August 5, 2011**

20         TO DEFENDANT(S): Travis Mickelson, Danielle H. Mickelson, AND ALL
     OCCUPANTS OF THE PREMISES LOCATED AT 436 Ezduzit Lane, Camano Island, WA
21   98282.

22         A lawsuit has been started against you in the Superior Court of Island County by

23   Federal Home Loan Mortgage Corporation, plaintiff.  Plaintiff's claim is stated in the written

24   Complaint for Unlawful Detainer, a copy of which is served upon you with this Summons.

25

26

Eviction Summons -1

**ROUTH**
**CRABTREE**
**OLSEN, P.S.**

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1   This is notice of a lawsuit to evict you from the property, which has been foreclosed

2   by your lender or the lender of the owner of the property. The new owner is asking the court

3   to terminate your occupancy and or tenancy and direct the sheriff to remove you and your

4   belongings from the property.

5   If you want to defend yourself in this lawsuit, you must respond to the eviction

6   complaint in writing on or before the deadline stated below. **You must respond in writing**

7   **even if no case number has been assigned by the court yet.** In order to defend against

8   this lawsuit, you must respond to the Complaint for Unlawful Detainer by stating your

9   defense in writing and serve a copy upon the undersigned attorney for the plaintiff on or

10   before 5:00 p.m., August 5, 2011, or a default judgment will be entered against you without

11   notice.

12   You can respond to the complaint in writing by delivering a copy of a notice of

13   appearance or answer to undersigned attorney by personal delivery, mailing, or facsimile to

14   the address or facsimile number stated below TO BE RECEIVED NO LATER THAN THE

15   DEADLINE STATED ABOVE.   Service by facsimile is complete upon successful

16   transmission to the facsimile number, if any, listed in the summons.

17   The notice of appearance or answer must include the name of this case (plaintiff(s)

18   and defendant(s)), your name, the street address where further legal papers may be sent,

19   your telephone number (if any), and your signature.

20   If there is a number on the upper right side of the eviction summons and complaint,

21   you must also file your original notice of appearance or answer with the court clerk by the

22   deadline for your written response.

Eviction Summons -2

**ROUTH**
**CRABTREE**
**OLSEN, P.S.**

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1    You may demand that the plaintiff file this lawsuit with the court.  If you do so, the

2    demand must be in writing and must be served upon the person signing the summons.

3    Within fourteen days after you serve the demand, the plaintiff must file this lawsuit with the

4    court, or the service on you of this summons and complaint will be void.

5    If you wish to seek the advice of an attorney in this matter, you should do so

6    promptly so that your written response, if any, may be served on time.

7

8    You may also be instructed in a separate order to appear for a court hearing on your

9    eviction. If you receive an order to show cause you must personally appear at the hearing on

10   the date indicated in the order to show cause IN ADDITION to delivering and filing your

11   notice of appearance or answer by the deadline stated above.

12
     **IF YOU DO NOT RESPOND TO THE COMPLAINT IN WRITING BY THE**
13   **DEADLINE STATED ABOVE YOU WILL LOSE BY DEFAULT. THE**
     **PLAINTIFF MAY PROCEED WITH THE LAWSUIT,**
14   **EVEN IF YOU HAVE MOVED OUT OF THE PROPERTY.**

15   The notice of appearance or answer must be delivered to:

16
     Routh Crabtree Olsen P.S.
17   13555 SE 36th St., Suite 300
     Bellevue, WA 98006
18   Phone: (425) 586-1991
     Fax: (425) 283-5991
19

20   You are further notified that this is an action for unlawful detainer and that the relief

21   sought in this action is for restitution of the premises located at 436 Ezduzit Lane, Camano

22   Island, WA 98282, Island County, Washington; for forfeiture of your tenancy of these

23   premises; for the damages incurred by plaintiff due to the unlawful detainer; for plaintiff's

24   costs and disbursements; and for such other relief as the court finds just and proper.

25

26

Eviction Summons -3

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1    This Summons is issued pursuant to Rule 4 of the Superior Court Civil Rules of the

2    State of Washington.

3        DATED on July 15, 2011.

4                                    ROUTH CRABTREE OLSEN, P.S.

5                                    By

6                                    Janaya L. Carter, WSBA #32715
                                     Lauren Davidson Humphreys, WSBA #41694
7                                    Valerie I. Holder, WSBA #42968
                                     Attorneys for Plaintiff
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Eviction Summons -4

ROUTH
CRABTREE
OLSEN, P.S.    13555 SE 36th St., Ste 300
               Bellevue, WA 98006
               Telephone: 425.458.2121
               Facsimile: 425.458.2131

1

2

3

4

5

6

7

**SUPERIOR COURT OF WASHINGTON
IN AND FOR ISLAND COUNTY**

8

Federal Home Loan Mortgage Corporation,   )

9                       PLAINTIFF,      ) No.

10              v.

11 Travis Mickelson, Danielle H. Mickelson, AND ) **COMPLAINT FOR UNLAWFUL**
ALL OCCUPANTS OF THE PREMISES ) **DETAINER**

12 LOCATED AT 436 Ezduzit Lane, Camano )
Island, WA 98282, )

13                        DEFENDANT(s). )

14

15

16       Plaintiff, by and through its attorneys, ROUTH CRABTREE OLSEN, P.S., alleges as

17 follows:

18                           **I. Parties**

19       The plaintiff is a federal corporation authorized to bring suit pursuant to 12 U.S.C.

20 1452.

21

22       The defendants are residents of 436 Ezduzit Lane, Camano Island, WA 98282, and

23 unlawfully detain the above-described real property. The defendant(s) TRAVIS

24 MICKELSON and DANIELLE H. MICKELSON previously owned the subject property.

25

26

Complaint for Unlawful Detainer-1

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

## II. Facts

### a.

On March 25, 2011, plaintiff acquired title to the real property situated at 436 Ezduzit Lane, Camano Island, WA 98282, at a nonjudicial foreclosure sale conducted pursuant to RCW 61.24.010 *et seq.* The Trustee's Deed to the property was issued to plaintiff on March 30, 2011. A true copy of the Trustee's Deed is attached hereto as "Exhibit A."

### b.

The subject property may qualify as a distressed property as the plaintiff has obtained title to this property at a foreclosure sale. However, as a financial institution, the plaintiff is not considered a distressed home purchaser and is not covered by the provisions of RCW 61.34.020.

### c.

No pre-requisite notice was given the defendants before beginning this action pursuant to RCW 61.24.060 or Public Law 111-22 (2009 Foreclosure Act) as they are the former owners of the property.

### d.

Pursuant to RCW 61.24.060, the purchaser at the trustee's sale is entitled to possession of the property on the twentieth day following the sale and shall have a right to summary proceedings to obtain possession of the property under RCW 59.12.

## III. Prayer for Relief

More than twenty (20) days have passed since the trustee's sale and defendants have failed and/or refused to vacate or surrender the premises.

WHEREFORE, plaintiff prays for the following relief:

Complaint for Unlawful Detainer-2

ROUTH
CRABTREE
OLSEN, P.S.

13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

1.   For restitution of the described premises and an order issuing a writ of restitution;

2.   For fair rental value of the property from the date that the plaintiff became entitled to possession until vacancy, in an amount to be set by the Court as appropriate;

3.   That the Plaintiff reserves the right to seek a judgment for attorney fees and costs in the event this action is contested by the filing of an answer or is set for trial; and

4.   For such other and further relief as the Court deems just and equitable.

DATED on July 15, 2011.

ROUTH CRABTREE OLSEN, P.S.

By

Janaya L. Carter, WSBA #32715
Lauren Davidson Humphreys, WSBA #41694
Valerie I. Holder, WSBA #42968
Attorneys for Plaintiff

Complaint for Unlawful Detainer-3

**ROUTH
CRABTREE
OLSEN, P.S.**   13555 SE 36th St., Ste 300
Bellevue, WA 98006
Telephone: 425.458.2121
Facsimile: 425.458.2131

Exhibit F

MERS user manual



# TRAINING DEPARTMENT
*training@mersinc.org*

# Foreclosure Transactions

## Overview:

The Servicer or Subservicer of a loan that enters into foreclosure is required to update the MERS® System at the time of the first legal action. **As of July 22, 2011, MOM and Non-MOM loans must be assigned out of the name of Mortgage Electronic Registration Systems, Inc. (MERS) before foreclosure is commenced.** The Member must select Option 1 (assigned to servicer) for MOM and Non-MOM loans. Option 3 (iRegistration) must be used for iRegistration loans.

Option 1 (foreclosure on MOM or Non-MOM loan in the name of the servicer):
- Member must prepare and record assignment out of MERS
- Reinstatements/modifications reported to the MERS® System using Option 1

Option 3 (foreclosure on iRegistration loan only):
- Reinstatements and modifications reported to the MERS® System using Option 3

Within seven (7) calendar days after a foreclosed property has gone to sale and, if applicable, the redemption period has expired, a Foreclosure Complete status must be reported to the MERS® System.

If you have reported a pending, modified, or reinstated foreclosure status to the MERS® System in error, and need to correct the status, you can use Foreclosure Status Reset to change the loan back to "not in foreclosure" status. If a Foreclosure Complete or Reinstated Option 1 (not assigned back to MERS) deactivation has been reported, you must use a Deactivation Reversal transaction (see the Reversals Quick Reference Guide for more detail) before you can use Foreclosure Status Reset.

## Reports:
- **Foreclosure Verification Report (DA)** – This report contains all updates made by any foreclosure transactions entered in the previous processing cycle.
- **Foreclosure Reject Report (DF)** – This reports lists the reasons for all batch foreclosure transactions rejected, and MINs with warnings messages, in the previous processing cycle.
- **Past Due Foreclosure Terminations Report (DK)** – Lists all loans in a foreclosure pending status that have not had a status update for more than the Member-specified period. (This is edited in the Administration, Member Information, Options page – "Days in pending foreclosure")
- **Deactivation Summary Report (DD)** - Lists all loans that were deactivated since the last processing cycle, grouped by deactivation reason.

## MERS® OnLine Guides (from the Main Menu, choose Foreclosure and then):



For MOM and Non-MOM loans, select Pending (option 1), Assigned to Servicer

Assignee Information required

List the MOM and Non-MOM MIN(s) to be included (must also record assignments)

As of July 22, 2011, no foreclosure may be commenced in the name of Mortgage Electronic Registration Systems, Inc. (MERS), so the Pending (option 2), retained on MERS option is no longer used

Click Submit

**Use Foreclosure Pending, option 3 to report foreclosure on an iRegistration loan**

To report a foreclosure pending on an iRegistration, select Pending (option 3), iRegistration only

List the iRegistration MIN(s) to be included

Click Submit



**If Option 3 was used to report the Foreclosure Pending, use Option 3 to report a Reinstatement or Modification.**

Select Reinstated or Modified (option 3)

Enter the reinstated or modified MIN(s)

Click Submit



**If Option 1 was used to report the Foreclosure Pending, use Option 1 to report a Reinstatement or Modification.**

If you are recording an assignment back to MERS, choose Reinstated or Modified (option 1), assigned back to MERS

Enter the reinstated or modified MIN(s)

Click Submit

If the loan will not be assigned back to MERS, but you wish to keep it active as an iRegistration, choose Reinstated or Modified (option 1), Not assigned back to MERS - iRegistration

Enter the reinstated or modified MIN(s)

Click Submit

If the loan will not be assigned back to MERS, and you wish to deactivate it from the MERS® System, choose Reinstated or Modified (option 1), Not assigned back to MERS - Deactivate

Enter the reinstated or modified MIN(s) to be deactivated

Click Submit





**If Option 2 was used to report the Foreclosure Pending, use Option 2 to report a Reinstatement or Modification.**

MERS OnLine
Process Loans, Not Paperwork™
Foreclosure Reinstated or Modified (option 2)
Enter the reinstated/modified MIN(s)
Select Reinstated or Modified (option 2)
Click Submit

**Use Foreclosure Status Reset to correct an erroneously reported foreclosure status**

MERS OnLine
Process Loans, Not Paperwork™
Foreclosure Status Reset
Enter the MIN(s) to be reset
Select Foreclosure Status Reset
Click Submit

**After a loan has gone to sale and, if applicable, the redemption period has expired, use the Foreclosure Complete option to deactivate the loan on the MERS® System.**

MERS OnLine
Process Loans, Not Paperwork™
Foreclosure Complete
Use this date field if multiple foreclosures have identical Servicer Liquidation Dates
Enter the MIN(s) to be deactivated
Enter individual Servicer Liquidation Date if different from the one entered above
Select Foreclosure Complete
Click Submit

MERS OnLine
Process Loans, Not Paperwork™
Foreclosure Complete
Click here for a new Foreclosure Complete transaction
MIN: 1000101000000067672 - Request completed

## Transfer of Servicing Transactions

**Overview:**

MERS® OnLine allows you to create two types of transactions to reflect the transfer of servicing rights. Which one you use depends on whether you are transferring only servicing rights or both servicing and beneficial rights. Each transfer transaction will automatically determine whether the loans submitted are flow loans (less than 270 days old) or seasoned loans (270 days old or older) and separate them into different transfer batches. Descriptions of the transfers are listed below to help determine which transfer transaction to use:

- Create TOS
  - o Transfers Servicing Only (no change in beneficial rights/investor)
- Create TOS/TOB Combo
  - o Transfers Servicing **AND** Beneficial Rights (investor) to the **SAME** member
- Create Option 1 TOS
  - o Used by Option 1 Investors to transfer servicing in case of default by Servicer

**Reports:** The reports that relate to a Transfer of Servicing and a brief description of their purpose are:

- Pending Transfer of Servicing Rights Report (SA) – Lists all transfer of servicing batches that have been created the previous day and are awaiting confirmation by the current investor, the current or new servicer, or the new subservicer
- Physical Transfer of Servicing Rights Report (SC) – Lists all physical transfers of the servicing function from one servicer or subservicer to another, for which the transfer date has occurred
- Expired Transfer of Servicing Rights Report (SD) – Lists all transfer of servicing batches that have surpassed the 30-day grace period that did not have confirmations completed. Batches expire 30 days after the later of the transfer date or batch creation date.
- Overdue Transfer of Servicing Rights Report (SE) – Lists all transfer of servicing batches that have not been confirmed by all concerned parties, and for which the sale date or transfer date has passed.
- Transfer of Servicing Rights Rejects Report (SF) – Lists all transfer of servicing transactions that were rejected in the previous processing cycle because of operator or system error. This report includes a sale ID field in the report section header with the MERS transfer batch number. One MIN from each rejected batch will also be displayed.
- Canceled Transfer of Servicing Rights Report (SG) – Lists all transfer of servicing rights batches that have been cancelled by the initiator of the batch.
- Current Investor Changes for Pending Transfer of Servicing Rights Report (SH) – Lists MINs that existed simultaneously in a transfer of servicing rights batch and a transfer of beneficial rights, Option 1 batch and for which the transfer of beneficial rights investor replaced the current investor
- MINs Deleted from Pending Transfer of Servicing Rights Report (SI) – Lists MINs that were deleted from a pending transfer of servicing rights batch because the MIN existed simultaneously in an Option 1 transfer of beneficial rights or an Option 1 transfer of servicing rights batch.

**MERS® OnLine Guides:**

To follow the screen prints, start from the **Main Menu**, select **TOS Menu** and then choose one of the two transfer types (**Create TOS** or **Create TOS/TOB**). Only the first screen differs between the transfer types, while the remaining screens remain the same.

## Example of Servicing Transfer



## Example of TOS/TOB Combined Transfer



## 2nd Screen remains the same for each transfer type



## Success page displays batch number(s) created



**TRAINING DEPARTMENT**

**Modifications**

*training@mersinc.org*

**Overview:**

- The "Modification (Mod) Agreement" section of the "Registration" page is completed when a loan modification is executed at the time of origination and MIN registration. The Mod Agreement information can also be updated post-registration, via "MIN Information." Modification information includes the Modification Agreement Note Date and Note Amount, as well as Modification Recording Details.

- This is applicable for a Consolidation, Extension, and Modification Agreement (CEMA). The CEMA is be used when a state law, typically New York, requires a lender to pay taxes only on additional funding of an existing loan or a new loan. The lender may choose to execute a CEMA to consolidate or modify the existing loan without additional funding to save taxes associated with refinancing.

- The Modification Agreement information may also be entered if a loan goes through a Loss Mitigation workout and the terms of the note were modified.

- Modifications are also executed with Construction loans that convert to permanent financing.

**MERS® OnLine Guides:**

**Registration**



**MIN Information**





**2.** From the MIN Information Menu, select Mod Agree



**4.** Enter the Modification Note Date

Enter the Modification Note Amount

If the document has been recorded, enter the Recording Information

Click Submit



**3.** Press Add



**5.** The Modification Results Page will display



# TRAINING DEPARTMENT
### *training@mersinc.org*

## Transfer Confirmations

**Overview:**
Transfer of Servicing (TOS) and Transfer of Beneficial Rights (TOB) Option 2 transactions must be confirmed by the new investor and/or servicer. Each party may accept or reject the transfer, and the new Servicer and/or Investor may supply a Reject Reason for rejected transfers. If all confirmations have been received, the transfer will process on the transfer date; otherwise it will process on the date all required confirmations are received for each MIN. If any MIN in a pending transfer is neither confirmed nor rejected within 30 days after the later of the Transfer Date or the transfer creation date, the transfer batch will expire.

**TOB Confirmations…**
- May be performed via batch interface, or from the TOB menu in MERS® OnLine
- From the New Investor are required
- From the Current Investor are required for transfers initiated by the Servicer or Subservicer
- Are automatic for Passive Investors

**TOS Confirmations…**
- Include both TOS and TOS/TOB Combo
- May be performed via batch interface, or from the TOS menu in MERS® OnLine
- Are required from the New Servicer, or from the New Subservicer if one is named
- From the Current Servicer are required for transfers initiated by the Subservicer
- From the Current Investor are required for seasoned TOS transactions if the Current Investor has chosen the Member Option to require it

**Reports:**
For Transfer of Beneficial Rights (TOB) confirmations:
- Pending Transfer of Beneficial Rights (BA) Lists all transfer of beneficial rights batches with a transfer date in the future. Confirmations performed by the new and current investor are reported here up to the transfer date.
- Overdue Transfer of Beneficial Rights (BC) Lists all MINs in beneficial rights transfer batches that have not been confirmed or rejected by all required parties by the transfer date, but which are still within the 30-day confirmation grace period.
- Physical Transfer of Beneficial Rights (BB) Lists all physical transfer of beneficial rights to an investor when the transfer date has occurred. This report also lists all loans that did not process on the transfer date due to rejection by the old investor, new investor, or system.
- Expired Transfer of Beneficial Rights (BD) Lists all option 2 beneficial rights batches that have passed the transfer date and the 30-day grace period that follows without being confirmed or rejected by all parties.

For Transfer of Servicing (TOS) confirmations:
- Pending Transfer of Servicing Rights (SA) Lists all transfer of servicing batches that have been created the previous day and are awaiting confirmation by the current investor, new servicer, or new subservicer.
- Overdue Transfer of Servicing Rights (SE) Lists all transfer of servicing batches that have not been confirmed or rejected by all concerned parties, and for which the sale date or transfer date has passed.
- Physical Transfer of Servicing Rights (SC) Lists all physical transfers of the servicing function from one servicer or subservicer to another, for which the transfer date has occurred. This report also lists all loans that did not process on the transfer date due to rejection by the old servicer, new servicer, investor (if applicable), or system.
- Expired Transfer of Servicing Rights (SD) Lists all transfer of servicing batches that have passed the 30-day grace period following the transfer date without being confirmed or rejected by all parties.

## MERS® OnLine Guides:

The confirmation screens for TOS and TOB are similar, and have been used interchangeably for the examples.

To access the Confirm Batch List, start from the **Main Menu**, select **TOS Menu** (for TOS and TOS/TOB Combo confirmations) or **TOB Menu** (for TOB Option 2 confirmations), and then choose **Confirm Batch**.

## Confirm Batch List



- Select Confirm Batch from the TOS or TOB menu
- Enter a transfer batch number here and click Go To to display the Confirm Batch Page for that batch
- Click on batch number hyperlink to display the Confirm Batch Page for that batch
- Click on Confirm Status hyperlink to display a confirmation information popup for that batch
- Click on Org ID hyperlink to display a Member Summary for the Member who initiated this batch
- Select the Confirm Batch checkbox for each batch you want to confirm, and click Submit

## Confirm Batch Page

- To confirm or reject the entire batch:
  - Select either Confirm or Reject
  - Choose a Reject Reason, if applicable
  - Click Submit
- To confirm or reject individual MINs, select this hyperlink
- To confirm or reject specific Pool Numbers, select this hyperlink

## Confirm by MIN Page



- For rejected MINs, you may optionally select a Reject Reason for each MIN
- QR flag will always be No for an IR registration
- Choose Confirm or Reject for each MIN from the drop down list
- Y=MOM  N=Non-MOM  I=IRegistration
- You can also enter Investor Loan Number and/or Agency ID for each MIN
- When the information is complete, click Submit

## Confirm by Pool Page

- For rejected pools, you may optionally select a Reject Reason for each pool from this dropdown
- Choose Confirm or Reject for each pool from the drop down list
- When the information is complete, click Submit

## Success page displays confirmation results





**TRAINING DEPARTMENT**

*training@mersinc.org*

**Transfers of Beneficial Rights – Option 1**

**Overview:**

A beneficial rights transfer is the transfer of the security interest held under a mortgage or deed of trust for a loan or group of loans to a new owner or Investor. MERS® OnLine users have two options for transferring beneficial rights to another member:  Option 1 and Option 2.  The determination of whether Option 1 or Option 2 is used is based on the membership profile of the purchasing investor. Option 1 Investors include, Fannie Mae, Freddie Mac and Ginnie Mae, as well as RFC and the FHLB.   The buyer initiates an Option 1 transfer as a result of the transmission of sales data through each of the investors' unique methods (Mornet, Midanet, Ginninet, etc.).

- An Option 1 transaction can be done in either batch mode or online; however, most are processed through batch. In a batch Option 1 transaction, the investor transfers beneficial rights on a system other than MERS. The batch transfer is on MERS using an Electronic Data Interchange (EDI) or MERS proprietary flat file format process. Loans that are rejected from either batch process are generally corrected and recorded on MERS using the Option 1 online process. Using either of the Option 1 processes, the Option 1 Investor replaces any Option 2 investor on the loan. The Investor Removed by Option 1 TOB Report notifies the investor that was removed during the Option 1 process of their removal via MERS Report.

- No confirmations are required for Option 1 transfers and Interim funder interests are released automatically in an Option 1 beneficial rights transfer.

- A MIN can be in an Option 1 and Option 2 beneficial rights transfer batch at the same time.  When the Option 1 beneficial rights transfer is recorded, the duplicate MIN is deleted from the Option 2 beneficial rights transfer.  The MINs deleted from the Option 2 beneficial rights transfer appear on a report. Non-duplicate MINs remain in the Option 2 transfer batch.

- MINs can exist simultaneously in an Option 1 beneficial rights transfer batch and a transfer of servicing batch.  However, MINs cannot exist simultaneously in both an Option 2 beneficial rights transfer batch and a transfer of seasoned servicing rights batch or a Flow TOS/TOB batch.

- A MIN can exist simultaneously in both an Option 2 beneficial rights transfer batch and a transfer of flow servicing rights batch only if the new investor Org ID of the Option 2 transfer of beneficial rights batch matches the new servicer Org ID of the flow transfer of servicing rights batch.

**Reports:**

- <u>Pending Transfer of Beneficial Rights Report (BA)</u> Lists all transfer of beneficial rights batches with a transfer date in the future. Confirmations performed by the new and current investor are reported here up to the transfer date.
- <u>Physical Transfer of Beneficial Rights Report (BB)</u> Lists all physical transfer of beneficial rights to an investor when the transfer date has occurred.  This report also lists all loans that did not process on the transfer date due to rejection by the old investor, new investor, or system rejection.
- <u>Overdue Transfer of Beneficial Rights Report (BC)</u> Lists all MINs in beneficial rights transfer batches that have not been confirmed or rejected by all required parties before the transfer date, and the transfer batches are considered to be in overdue status.
- <u>Transfer of Beneficial Rights Rejects Report (BF)</u> Lists all transfer of beneficial rights transactions that were rejected in the previous processing cycle because of operator or system error.  This report includes a sale ID field in the report section header with the MERS transfer batch number.  One MIN from each rejected batch will also be displayed.

- <u>Canceled Transfer of Beneficial Rights Report (BG)</u> Lists all transfer of beneficial rights batches that have been canceled by the initiator of the batch.  Only the initiator of a batch can cancel a batch.  A batch can be canceled any time prior to the transfer effective date.
- <u>MINs Deleted from Transfer of Beneficial Rights Report (BH)</u> Lists all MINs transferred as a result of Option 1 batch processing where MINs that also existed in an Option 2 batch were deleted from the Option 2 batch.
- <u>Investor Removed by Option 1 TOB Report (BI)</u> Lists MINs on which the investor was removed in the Option 1 transfer process.
- <u>Summary of Transfer of Beneficial Rights Rejects Report (BJ)</u> The report lists, by servicer Org ID, the number of rejected MINs for each servicer Org ID.
- <u>Org ID to Agency ID Cross-Reference Report (BK)</u> This report lists the Org ID and Member Name for all MERS members that have Agency IDs populated for the Agency investor.  The report is used by GNMA and other Agency investors to verify accurate Agency IDs have been loaded to MERS as well as to identify any missing Agency IDs for members selling beneficial rights to the Agencies.

**MERS® OnLine Guides:**

To follow the screen prints, start from the **Main Menu**, select **TOB Menu** and then **Create TOB Option 1**.

**Create TOB Option 1 Batch**

**Transfer of Beneficial Rights (Option 1) MIN List**







**TRAINING DEPARTMENT**
*training@mersinc.org*

**Transfers of Beneficial Rights – Option 2**

**Overview:**

A beneficial rights transfer is the transfer of the security interest held under a mortgage or deed of trust for a loan or group of loans to a new owner or Investor. MERS® OnLine users have two options for reflecting the transfer of beneficial rights to another member (TOB): Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the membership profile of the purchasing investor. Option 1 Investors include Fannie Mae, Freddie Mac and Ginnie Mae, as well as RFC and the FHLB.   For investors other than Fannie Mae, Freddie Mac, Ginnie Mae, RFC and the FHLB, the seller initiates an Option 2 TOB.

- TOB transactions can be conducted both in batch and online. The servicer or subservicer creates a TOB Option 2 transfer batch.
- The new investor and the current investor confirm or reject the TOB transaction. For investors set up as passive, confirmation is automatic.
- The TOB completes on the transfer date if all confirmations are received. If the transfer is overdue, the TOB completes on the date all confirmations are received.
- A Mortgage Loan Transfer Notice is generated on behalf of the new investor on the date the TOB is completed, unless the new investor has opted out of generation of Mortgage Loan Transfer Notices.
- If any MIN in a pending TOB batch is not confirmed within 30 days after the later of the Transfer Date or the batch creation date, the TOB batch will expire and the investor will remain unchanged for that MIN.
- For loans on which an interim funder is named, the interim funder remains until they release their interest; interim funder interest is not released automatically.
- The presence of an interim funder does not prevent the processing of the TOB. Completed TOBs with interim funding interests not released appear on the Coexisting Security Interest Report.

**Reports:**

- <u>Pending Transfer of Beneficial Rights (BA)</u> Lists all TOB batches with a transfer date in the future. Confirmations performed by the new and current investors are reported here up to the transfer date.
- <u>Physical Transfer of Beneficial Rights (BB)</u> Lists all completed TOB transactions when the transfer date has occurred.  This report also lists all loans that did not process on the transfer date due to rejection by the old investor, new investor, or system rejection.
- <u>Overdue Transfer of Beneficial Rights (BC)</u> Lists all MINs in TOB batches that have not been confirmed or rejected by all required parties before the transfer date, and the transfer batches are considered to be in overdue status.
- <u>Expired Transfer of Beneficial Rights (BD)</u> Lists all TOB Option 2 batches that have expired because they were not confirmed by all parties by the end of the 30-day grace period following the transfer date or batch creation date.
- <u>Transfer of Beneficial Rights Rejects (BF)</u> Lists all TOB transactions that were rejected in the previous processing cycle because of operator or system error.  This report includes a sale ID field in the report section header with the MERS transfer batch number.  One MIN from each rejected batch will also be displayed.
- <u>Canceled Transfer of Beneficial Rights (BG)</u> Lists all TOB batches that have been canceled by the initiator of the batch. Only the initiator of a batch can cancel a batch.  A batch can be canceled any time prior to the transfer effective date.
- <u>MINs Deleted from Transfer of Beneficial Rights (BH)</u> Lists all MINs that were transferred as a result of Option 1 batch processing where the MINs that also existed in an Option 2 batch were deleted from that Option 2 batch.
- <u>Summary of Transfer of Beneficial Rights Rejects (BJ)</u> Lists, by servicer Org ID, the number of rejected MINs for each servicer Org ID.
- <u>Org ID to Agency ID Cross-Reference (BK)</u> Lists the Org ID and Member Name for all MERS members that have Agency ID populated for the Agency investor. The report is used by GNMA and other Agency investors to verify accurate Agency IDs have been loaded to MERS as well as to identify any missing Agency IDs for members selling beneficial rights to the Agencies.
- <u>Modify Batch - Transfer of Beneficial Rights (BL)</u> Lists MINs that were added to or deleted from a pending or overdue TOB Option 2 batch.
- <u>Mortgage Loan Transfer Notices (BN)</u> Lists MINs for which a Mortgage Loan Transfer Notice was generated.
- <u>Co-Existing Security Interests (IA)</u> Lists MINs with a new investor that still have an interim funder named.

**MERS® OnLine Guides:**

To follow the screen prints, start from the **Main Menu**, select **TOB Menu** and then **Create TOB Option 2.**

**Create TOB Option 2 Batch**



**Transfer of Beneficial Rights (Option 2) MIN List**



![MERS]

## TRAINING DEPARTMENT

training@mers.org

# Post-Closing Registration

**Overview:**

Post-Closing Registration is the process used to register a loan a loan active after it has been registered as a Pre-Closing. The post-closing registration must be performed within ten (10) calendar days of the Note Date for a MOM (MERS as Original Mortgagee) loan, and recording information entered within 30 days of the registration date. For a loan assigned to MERS (Non-MOM), the post-closing registration must be performed within 14 calendar days of the Transfer Date if purchased (or 14 days of the assignment date if assigned to MERS by the originator), the MERS assignment sent for recording within 14 calendar days of the registration date, the "Assignment Sent Date" entered on the MERS® System within five (5) days of the actual date sent for recording, and recording information entered within 180 days of the registration date.

- **MINs for the Same Primary Borrower, Property, and Lien Daily Report (RH) –** Lists the MINs registered or updated in the previous processing cycle for which another active MIN has the same current primary borrower SSN, property, and first lien information

- **MINs for the Same Primary Borrower, Property, and Lien Monthly Report (RI) –** Lists active MINs that have the same current primary borrower SSN, property, and first lien information. This is a cumulative report and is produced on the last business day of the month. MINs continue to appear on this report until borrower, property, SSN or lien information is updated.

### Loan Section



**Reports:** The reports that relate to post-closing registrations are:

- Seasoned Registration Verification Report (RA) – Lists all MINs that were successfully registered by seasoned post-closing registration transactions in the previous processing cycle. Also distributed to Pre-Closing Registering Member.

- Seasoned Registration Rejects/Warnings Report (RB) - Lists all batch seasoned registration transactions that were rejected in the previous processing cycle. The report indicates multiple reasons for rejection unless the first error is a problem with the MIN or security access.

- Registration Verification Report (RF) – Lists all new loans that were successfully registered by flow registration transactions in the previous processing cycle in both batch and on-line transactions. Also distributed to Pre-Closing Registering Member.

- Registration Rejects/Warnings Report (RG) – Lists all new batch loan registration transactions that were rejected in the previous processing cycle

### MERS® Online Guides:







**TRAINING DEPARTMENT**

training@mersinc.org

## Pre-Closing Loans

**Overview:**

Pre-Closing Registration is the process of entering loan information into the MERS® System for loans that have not yet closed. Security Instrument, Assignment, and Recording information is not allowed for Pre-Closings. The MERS® System reflects a Pre-Closing (not active) status, so Pre-Closing loans may not be updated, transferred, or deactivated. When the loan closes, it may be registered as active using a Post-Closing Registration. For active loans on which MERS is the mortgagee, see the Registration Quick Reference Guide. For active loans on which MERS is not the mortgagee, see the iRegistration Quick Reference Guide.  A Pre-Closing Registration may be reversed if the loan does not close.

**Reports:**  The reports that relate to Pre-Closing iRegistrations are:

o   Pre-Closing Registration Verification Report (PF) – Lists all new Pre-Closing loans that were successfully registered in the previous processing cycle in both system-to-system and on-line transactions.

o   Registration Rejects/Warnings Report (PG) – Lists all new batch Pre-Closing loan registration transactions that were rejected in the previous cycle

o   MINs for the Same Primary Borrower, Property, and Lien Daily Report (RH) – Lists the MINs registered or updated in the previous processing cycle for which another active MIN has the same current primary borrower SSN, property, and first lien information

o   MINs for the Same Primary Borrower, Property, and Lien Monthly Report (RI) – Lists active MINs that have the same current primary borrower SSN, property, and first lien information.  This is a cumulative report and is produced on the last business day of the month.  MINs continue to appear on this report until borrower, property, SSN or lien information is updated.

**MERS® OnLine Guides:**









Exhibit G

Yves Smith, "How Did the Banks Get Away with Pledging Mortgages to Multiple Buyers?,"

*Naked Capitalism*

How Did the Banks Get Away with Pledging Mortgages to Multiple Buyers?

Yves Smith

http://nakedcapitalism.com, 26 October 2010

Bank of America, in "Bank of America's Reply to Objection of Freddie Mac to Bank of America's Motion for an Order Authorizing and Directing Examination of FHLMC . . .," in *In Re: Taylor, Bean & Whitaker Mortgage Corp., Debtor*, Case No. 3:09-bk-07047-JAF (M.D. Florida, Jacksonville Div., 16 June 2010), alleges that Taylor Bean, Colonial, and Platinum all have sold mortgage Notes to multiple Real Estate Mortgage Investment Conduit Trusts:

> It appears as though many loans and other mortgage-related
> assets have been double- and even triple-pledged to various
> constituencies.

April Charney- - a consumer lawyer with Jacksonville Area Legal Aid -- and CNBC's Dennis Kneale noted in February 2009 that courts have found that some mortgages have been sold again and again to different trusts, when they should have only been sold *once*.   Kneale explained that *that* is the reason that two different banks sometimes try to simultaneously foreclose on the same home.

And today, Chris Whalen told CNBC's Larry Kudlow that Bear Stearns will be

exposed as having sold the *same* loan to different investors on numerous

occasions:

> As I have repeatedly pointed out, the failure of the mortgage
> originators and banks to prepare and record proper documen-
> tation has led to an epidemic of fraud. The pledging of the
> same mortgage again and again to different trusts related to
> mortgage backed securities is just one result.

And as long-time foreclosure investigator Nye Lavalle writes:

> On thousands of occasions I stated to regulators, CEOS, banks,
> Fannie and Freddie that the practices of the banks were that they
> were double and multi-pledging assets and pledging paid off and
> refinance notes to securitizations. This is something April, Max
> and I have discussed for years now.  Now, they come and admit
> that each of my allegations were true Without analyzing the deal,
> as complex as they are, you WILL NEVER KNOW IF THE
> FORECLOSING PARTY HAS "ANY" RIGHT TO FORECLOSE!!!

The motives I identified for the "Blank Endorsements" and missing

assignments and "pre-notarized" "Blank Assignments" and "Blank Allonges" that

"were placed into the "custodial/collateral" files were to be able to: Multi-pledge

collateral (Notes) so as to cook the books . . . .

Update: Bank of America has sued the FDIC in connection with claims that:

Executives at Taylor Bean, Colonial and Platinum ... fraudulently schemed to "double- and triple-pledge mortgages and steal assets" to hide their faltering conditions as the housing market declined.

Was Abacus the Business Model for the Entire Mortgage Industry? I've repeatedly pointed out, the big banks intentionally signed up as many borrowers as possible, even if there was no way they could repay their loans. For example, I recently wrote that Professor William K. Black, University of Missouri at Kansas City, explained that fraud by a financial company usually involves the company:

> 1) Growing like crazy
>
> 2) Making loans to people who are uncreditworthy, because they'll agree to pay you more, and that's how you grow rapidly. You can grow really fast if you loan to people who can't you pay you back
> and
> 3) Using extreme leverage.

This combination *guarantees* stratospheric initial profits during the expansion phase of the bubble.  But it *guarantees* a catastrophic subsequent failure when the bubble loses steam.  And collectively- - if a lot of companies are playing this game - -it produces extraordinary losses (more than all other forms of property crime

combined), and a crash.  In other words, the companies intentionally make loans to

people who will not be able to repay them, because -- during an expanding bubble

phase -- they'll make huge sums of money.  The top executives of these companies

will make massive salaries and bonuses during the bubble (enough to live like

kings even if the companies go belly up after the bubble phase).

Economist Simon Johnson , the former chief economist at the International

Monetary Fund and co-author of *"13 Bankers,"* confirmed that a high housing

default rate was ***part of the banks' models***.  The financial giants knew they would

make huge sums during the boom, and then transfer their losses to the American

people during the bust.

But there might have been another reason that loaning to borrower who

couldn't repay was the prevalent business model.   As foreclosure expert Neil

Garfield, expert witness and consultant for GTC Consulting, explains, mortgages

are worth *a lot more* if they default than if they perform.  Specifically, a mortgage

worth $300,000 if the homeowner repays in full might be worth *$9 million* to the

various owners of synthetic CDO's and credit default swaps if the owner defaults.

We know - as alleged by the SEC: Paulson & Co. effectively shorted the RMBS

portfolio it helped select by entering into credit default swaps (CDS's) with Goldman Sachs to buy protection on specific layers of the ABACUS capital structure.  Paulson also advised Los Angeles apartment mogul Jeff Greene to do something similar.  Greene was heavily involved in the subprime market, and he bought the worst of the mortgage backed securities, and then bet against the bonds using CDS's.

But Garfield says that it is broader than just a couple of investors like Paulson and Greene.   He believes that was basically the business model for the *entire mortgage industry*.

In response, some people (including one of the country's top bankruptcy lawyers) have told me they don't buy it.   Specifically, they ask such questions as:

- With a mortgage sold to two different entities, wouldn't the income from the mortgage be shown on the books of both entities?

- Was the interest/principal payments that were made by the homeowner before they stopped being divided between both entities? If so, wouldn't this have rung alarm bells immediately?

- If only one was getting it, why didn't the other entity immediately try to foreclose?

- If there was one servicer involved, was the servicer covering the difference between what was collected and the payments actually made? If so, how did the servicer do this and still remain in business?

- If two servicers were involved, why didn't this come out sooner or were both servicers hiding this fraud?

So I wrote to some of the leading experts on mortgage fraud – L. Randall Wray (economics professor), Christopher Whalen (banking expert with Institutional Risk Analytics), and William K. Black (professor of economics and law, and the senior regulator during the S & L crisis) – to seek their insight.

Chris Whalen told me:

> All good points, but the short answer is that nobody may have noticed until now. The issue of substitution and other games played by servicers makes exact tracking of loans problematic. It should show up in the servicers reports and should be caught, but there are a lot of things that go on in loan servicing that nobody talks about. Until about 2006, the GSEs and banks would advance cash and would substitute, but not now. The noble practitioners you heard from are all sincere and want to believe in intelligent design.

Whalen explained:

> Prior to FAS [i.e. Financial Accounting Standards] 166/167, a defaulted loan might sit in a FNM/FRE pool for up to a year before the default was removed from the trust. The issuer would then place a new loan into the pool or "substitute" for the old loan. No purchase event was booked. The investor would never know. In fact, the issuer would keep paying interest on the original principal amount in those days. Now under FAS 166/167, the issuer must immediately repurchase the defaulted loan and take the loss less estimated recovery. That is why the pace picked up this

year when it comes to repurchase demands.
You should refer your dubious and very naive friends
to the case of National Bank of Keystone, WV. One of t
he worst failures per $ of assets in FDIC history. The
management hid a Ponzi scheme in the loan servicing
area for five years. Paid interest to investors with their
own principal.  Two auditors missed the fraud and later
were sued by the FDIC acting as receiver for the dead
bank.  And this was a small operation.  The big five are
an even worse mess.

Remember, when the seller of a loan and the servicer
are the same, anything can happen. And it usually does.

Professor Black told me:

Double pledges (as they're typically called, though one
could pledge multiple times) are a well known fraud
device. It is correct that one of the key purposes of
adopting Article 9 of the Uniform Commercial Code
(UCC) was to reduce the risk and frequency of this form
of fraud. So, double pledges in the modern era require
both  (A)  fraud (on the part of the borrower or purchaser)
and (B) incompetence, indifference, or corruption on the
part of the original secured lender or their agents if the
borrower is the fraudster or the purchasers if they are the
fraudsters.

The two potential sources of fraud: A fraudulent borrower could pledge the

same home as security for multiple mortgage loans. Title checks, by the lender/title

insurer are so easy to conduct and so vital to protect the lender that this form of

fraud is vanishingly rare. Alternatively, and far more likely, the lender could sell

the mortgage to multiple buyers. Those buyers could have far lower incentives to

check on prior pledges and less ability to check for prior pledges. The entity selling

a loan to multiple parties (A) has a compelling incentive to hide the prior pledge(s),

(B) is financially sophisticated, and therefore more capable of deception than a

homeowner, and (C) can pick who to make the multiple sales to — allowing them

to select the most vulnerable targets for fraud.

      Subpart (C) provides the logical transition to the second requisite for

multiple pledge frauds — vulnerable victims. The characteristics they would

exhibit include (A) growing massively, (B) purchasing nonprime loans without

fully underwriting the quality of the loans (and quality in this context inherently

requires superb "paperwork"), (C) poor internal and external controls, and (D)

opaque systems that make it extremely difficult to determine the beneficial owner

and locate key mortgage documents that would reveal multiple sales. Unfortun-

tely, these four characteristics were characteristic of many purchasers of nonprime

mortgages. That is why I have long stated that the process was dominated by the

financial sector equivalent of "don't ask; don't tell."  Bottom line: the elite bankers

and the anti-regulators have been so unwilling to find the truth that no one knows

how bad these frauds became.  Finding the facts is essential and can and should be

done by reviewing samples of the loans pledged or sold to Fannie and Freddie and

the Fed.

And Professor Wray told me that record-keeping by servicers was terrible, and pointed me to the following article from the *Tampa Tribune*:

> Peter Bakowski, a 58-year-old former Tampa mortgage broker, has admitted orchestrating a Ponzi scheme that involved more than 30 investors and institutions and more than 150 deals, documents show.

Bakowski sold the mortgage assignments to multiple investors, promising high rates of return and using all the money he generated to "keep the scheme afloat," according to his plea agreement.

In another must-read piece, economics professors William K. Black and L. Randall Wray  ["Foreclose on the Foreclosure Fraudsters, Part 2: Spurious Arguents against Holding the Fraudsters Accountable," *Huffington Post*  (October 24, 2010), republished at www.TheForeclosureFraud.com] confirm that several banks would go after the same homeowner, each claiming to hold the same mortgage (***Bear Stearns sold the same mortgage over and over***).  As USA Today pointed out in 2008, Bear Sterns was one of the big players in this area: Bear Stearns was one of the biggest underwriters of com-plex investments linked to mortgages.  Two of its hedge funds, heavily invested in subprime mortgages, folded in July.  Bear Stearns was linked to many other financial institutions, through the mortgage-backed securities it sponsored as well as through complex financial agreements called derivatives.  The Fed wasn't so much concerned that

85-year-old Bear Stearns would go bankrupt, but rather that it would take other companies down with it, causing a financial meltdown.   A lot of toxic mortgages and mortgage related assets ended up on the taxpayer's tab directly or indirectly.

For example, as Bloomberg noted in April 2009:

> Maiden Lane I is a $25.7 billion portfolio of Bear Stearns securities related to commercial and residential mortgages. JPMorgan refused to buy them when it acquired Bear Stearns to avert the firm's bankruptcy.

> The Fed's losses included writing down the value of commercial-mortgage holdings by 28 percent to $5.6 billion and residential loans by 38 percent to $937 million as of Dec. 31, the central bank said. Properties in California and Florida accounted for 45 percent of outstanding principal of the residential mortgages.

1

Exhibit H

2

Nov. 6, 2010, asking the Mickelsons to send $1,861.37 to fully amortize their new loan

3

payment plan effective January 1, 2011 to June 1, 2011

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
************New Payment Amount************
Principal & Interest: $ 924.68
Total Monthly Payment: $ 1,315.00
Effective Date:        January 01, 2011
```

RE: Home Mortgage Loan███████████:

**Rate Change Notice**

Dear Mortgagor(s):

Our records indicate that your loan, secured by a Mortgage on the property located at 436 Ezduzit Ln, Camano Island WA 98282 is scheduled to be adjusted as of December 01, 2010 effective with the January 01, 2011 payment.

Based on the monthly payments due by December 01, 2010, your principal balance will be $ 403,495.51.  Your interest rate of 2.75000% will be in effect until the next adjustment date of June 01, 2011. The current index value is 0.44844% which is based on the WSJ 6 MO LIBOR FIRST BUSINESS DAY effective for November 01, 2010.

We are adjusting your interest only payment from $ 2,227.63 to $ 924.68.  Your new total payment amount is therefore $ 1,315.00 beginning with the payment due on January 01, 2011.

************************************************************************
Interest Rates are determined as follows:

| Previous Index         | 4.37500% | Current Index      | 0.44844% |
|------------------------|----------|--------------------|----------|
| Margin                 | 2.25000% | Margin             | 2.25000% |
| Previous Interest Rate | 6.62500% | New Interest Rate  | 2.75000% |

Note: The interest rate may be subject to a .12500 % rounding factor.
************************************************************************

Based on your current loan balance and interest rate, the monthly payment of principal and interest that would be required to fully amortize your loan by maturity would be $ 1,861.37.

Chase's goal is to provide the highest level of quality service for each of our customers.  If you have any questions concerning this rate adjustment, please contact Customer Care at (800) 848-9136.

We appreciate your business and value our relationship with you.

Sincerely,

Special Loans Department

AR100

1-800-345-4676



Exhibit J

*Bain v. OneWest Bank, F.S.B.*, 2011 U.S. Dist. LEXIS 26318 (U.S. Dist. W.D. Wash., Mar. 15, 2011).



**KRISTEN BAIN, Plaintiff, v. ONEWEST BANK, F.S.B; DEUTSCHE BANK NATIONAL TRUST COMPANY; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC; REGIONAL TRUSTEE SERVICES CORPORATION; Defendants.**

**Case No. C09-0149-JCC**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WASHINGTON**

*2011 U.S. Dist. LEXIS 26318*

**March 15, 2011, Decided
March 15, 2011, Filed**

**PRIOR HISTORY:** *Bain v. Metro. Mortg. Group, Inc., 2010 U.S. Dist. LEXIS 22690 (W.D. Wash., Mar. 11, 2010)*

**COUNSEL:** [*1] For Kristin Bain, Plaintiff: Melissa A Huelsman, LEAD ATTORNEY, SEATTLE, WA.

For Mortgage Electronic Registration Systems, IndyMac Bank FSB, Defendants: Douglas Lowell Davies, LEAD ATTORNEY, DAVIES LAW GROUP, SEATTLE, WA.

For Regional Trustee Services Corporation, Defendant: Jennifer L Tait, LEAD ATTORNEY, ROBINSON & TAIT PS, SEATTLE, WA; Nicolas A Daluiso, ROBINSON TAIT, SEATTLE, WA.

For Fidelity National Title, Defendant: Douglas Lowell Davies, LEAD ATTORNEY, DAVIES LAW GROUP, SEATTLE, WA; Denise M Hamel, Thomas F. Peterson, SOCIUS LAW GROUP PLLC, SEATTLE, WA; Richard E Spoonemore, SIRIANNI YOUTZ SPOONEMORE, SEATTLE, WA.

For Federal Deposit Insurance Corporation, as receiver for IndyMac Bank, F.S.B., Deutsche Bank National Trust Company, OneWest Bank, F.S.B., Defendant: Douglas Lowell Davies, DAVIES LAW GROUP, SEATTLE, WA.

For Lender Processing Services, Inc, Defendant: Richard E Spoonemore, SIRIANNI YOUTZ SPOONEMORE, SEATTLE, WA.

**JUDGES:** THE HONORABLE John C. Coughenour, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** John C. Coughenour

**OPINION**

**ORDER**

This matter comes before the Court on Defendant Mortgage Electronic Registration Systems, Inc's ("MERS") motion for summary judgment (Dkt. No. 88), Defendant Regional Trustee [*2] Services Corporation's ("Regional") motion for summary judgment (Dkt. No. 91), MERS's supplemental motion for summary judgment (Dkt. No. 120), Regional's supplemental motion for summary judgment (Dkt. No. 122), Defendant Deutsche Bank National Trust Company's ("Deutsche Bank") motion for partial summary judgment (Dkt. No. 131), Defendant OneWest Banks, F.S.B.'s ("OneWest") motion for summary judgment (Dkt. No. 132), and Deutsche Bank's additional motion for partial summary judgment (Dkt. No. 146), as well as the parties' various responses to the Court's order to show cause (Dkt. Nos. 140-44). Having thoroughly considered the parties' briefing and the relevant record, the Court grants in part several of Defendants' motions for summary judgment and stays this action pending the Washington Supreme Court's decision in *Vinluan v. Fidelity National Title & Escrow*

*Co.*, No. 10-2-27688-2 SEA (King Cnty. Superior Ct. filed July 29, 2010).

## I. BACKGROUND

Plaintiff, a young woman with severe ADD, purchased a condominium in Everett, Washington, that she could not afford. Soon afterward, she defaulted on her mortgage payments. After the initiation of nonjudicial foreclosure proceedings, Plaintiff filed [*3] suit in Washington state court alleging that Defendants--a group of lending organizations, banks, and service providers--committed common-law torts and violated federal and Washington statutes in connection with their issuance and administration of a deed of trust and their subsequent attempted foreclosure on Plaintiff's home. (Compl. (Dkt. No. 2 at 49.)

Plaintiff executed a promissory note and deed of trust on March 9, 2007. IndyMac Bank, F.S.B. ("IndyMac"), was the lender on the promissory note. The deed of trust listed MERS as the beneficiary. The original trustee was Stewart Title Guaranty Co. After Plaintiff became delinquent on her payments, she received a Notice of Default from Regional. (Dkt. No. 112 at 5.) Thereafter, she received a Notice of Trustee's Sale. (*Id.*) Plaintiff successfully sought a restraining order in state court preventing the foreclosure. (Dkt. No. 1 at 19.)

Defendants thereafter removed the matter to this Court. (Notice of Removal 1-2 (Dkt. No. 1).) [1] On stipulation of the parties, the Court dismissed Plaintiff's claims against Defendant Metropolitan Mortgage Group, Inc. (Dkt. No. 31.) On March 11, 2010, the Court granted Lender Processing Services' motion for [*4] summary judgment and dismissed Plaintiff's claims against it. (Dkt. No. 80.) And on June 9, 2010, the Court granted the Federal Deposit Insurance Corporation's motion for summary judgment and dismissed Plaintiff's claims against it. (Dkt. No. 108.) These actions left MERS and Regional as the only remaining defendants. Both parties thereafter filed separate motions for summary judgment. (Dkt. Nos. 88, 91.)

> 1   Removal jurisdiction was predicated on the federal questions in the complaint as well as the fact that IndyMac Bank, F.S.B., one of the Defendants, went into receivership in 2008 with the Federal Deposit Insurance Corporation appointed as its receiver and successor in interest. Any civil suit in which the Federal Deposit Insurance Corporation, in any capacity, is a party is "deemed to arise under the laws of the United States." *12 U.S.C. § 1819(b)(2)(A).*

While those motions were pending, recently produced documents led Plaintiff to believe that Deutsche

Bank was the holder of the promissory note secured by the deed of trust and serviced by OneWest. The Court granted Plaintiff's motion to amend her complaint (Dkt. No. 111), and Plaintiff added Deutsche Bank and OneWest to the amended [*5] complaint (Dkt. No. 112). In the light of Plaintiff's amended complaint, MERS and Regional supplemented their motions for summary judgment (Dkt. Nos. 120, 122).

Plaintiff alleges various errors in the assignments of the deeds of trust, for example, that MERS could not serve as the beneficiary of the deed of trust when it was not the lender on the promissory note nor received any benefits from that note. Plaintiff further alleges that because MERS could not, under Washington law, serve as the beneficiary on the deed of trust, MERS's assignment of the deed of trust to IndyMac (under a new identity) was also improper. And because the transfer to IndyMac was allegedly improper, so too was IndyMac's appointment of Regional as successor trustee improper. Plaintiff also alleges that the timing of the assignments of beneficiaries and trustees was erroneous, that is, that certain assignments occurred before the assignor had authority to act. But Plaintiff does not contest the delinquency of her payments under the promissory note.

In her amended complaint, Plaintiff stated that she would seek via separate motion an additional restraining order or preliminary injunction against Regional and Deutsche [*6] Bank to stop any foreclosure. (Dkt. No. 112 at 7-8.) Plaintiff has not so moved, but the state court's initial restraining order remains, to the Court's knowledge, in effect. Plaintiff also asserts against all Defendants a cause of action for intentional infliction of emotional distress by causing Plaintiff stress and anxiety as she faces the potential loss of her home. (*Id.* at 8-9.) Plaintiff asserts that all Defendants breached a fiduciary or quasi-fiduciary duty. (*Id.* at 9-10.) Plaintiff further asserts against Deutsche Bank violations of the Truth in Lending Act for IndyMac's initial alleged failure to provide a "Good Faith Estimate or a Truth in Lending Disclosure document three days after Plaintiff submitted a loan application." (*Id.* at 10.) Finally, Plaintiff asserts against all Defendants a cause of action for violations of Washington's Consumer Protection Act. (*Id.* at 10-11.)

## II. DISCUSSION

### A. Legal Standard

The Court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)(2).* [*7] Summary judgment is appropriate against a non-moving party who does not make a showing sufficient to

establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* That is, after the movant has carried its burden of demonstrating that there is no genuine issue of material fact, the burden shifts to the nonmovant, who must present a quantum of evidence such "that a reasonable jury could return a verdict" in its favor. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* "When the nonmoving party relies only on its own affidavits to oppose summary judgment, it cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact." *Hansen v. United States, 7 F.3d 137, 138 (9th Cir. 1993).* In determining whether summary judgment is appropriate, the Court must view the facts in the light most favorable to the nonmoving party and draw reasonable inferences in its favor. *Scheuring v. Traylor Bros., Inc., 476 F.3d 781, 784 (9th Cir. 2007).*

## B. OneWest

In response to OneWest's motion for summary judgment, Plaintiff stated that upon further [*8] review of documentation, she should not have substituted OneWest into this civil action. (Dkt. No. 145 at 1-2.) Plaintiff represented that she would file a motion to dismiss OneWest, but to date she has not. On the basis of Plaintiff's representation, however, the Court dismisses all of Plaintiff's claims against OneWest without prejudice.

## C. Truth in Lending Act

The Court grants Deutsche Bank's motion for summary judgment on Plaintiff's TILA cause of action.

According to the amended complaint, Plaintiff did not receive a Good Faith Estimate or other disclosure documents at the time she received her loan. (*Id.* at 4.) Claims for monetary damages under TILA are subject to a one-year statute of limitations, subject to equitable tolling. *15 U.S.C. § 1640(e)* ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation . . . ."). "Where a party allegedly fails to make TILA-required disclosures, the date of the violation is the date that the loan documents are signed." *Ulyanchuk v. Bank of Am., N.A., No. C10-0554 MJP, 2010 U.S. Dist. LEXIS 71332, 2010 WL 2803047, at *2 (W.D. Wash. July 15, 2010)* [*9] ; *see also Meyer v. Ameriquest Mortg. Co., 342 F.3d 899, 902 (9th Cir. 2003)* ("The failure to make the required disclosures occurred, if at all, at the time the loan documents were signed."); *NLRB v. Don Burgess Constr. Corp., 596 F.2d 378, 382 (9th*

*Cir. 1979)* ("The general rule applicable to federal statutes of limitations is that a limitation period begins to run when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." (punctuation omitted)). Plaintiff's loan closed in March 2007. (Dkt. No. 112 at 4.) Plaintiff did not file her action until December 2008, well past the one-year deadline. (Dkt. No. 1 at 67.) At best, Plaintiff contends that the statute of limitations should be tolled because there are allegations of fraudulent concealment. (Dkt. No. 138 at 5.) Yet Plaintiff provides no evidence of fraud, nor does Plaintiff's complaint allege fraud. Accordingly, the Court declines to toll the statute of limitations and dismisses the TILA claim against Deutsche Bank.

## D. Intentional Infliction of Emotional Distress

The Court grants Defendants' motions for summary judgment on Plaintiff's cause [*10] of action for intentional infliction of emotional distress.

In her amended complaint, Plaintiff alleges that "[b]y their conduct described in this Complaint, all of the Defendants have committed the tort of intentional infliction of emotional distress by causing her stress and anxiety as she faces the potential loss of her home." (Dkt. No. 112 at 9.) Plaintiff accuses MERS and Regional of improperly transferring the beneficiary and trustee status with respect to the deed of trust. Plaintiff also argues that even if MERS was a proper beneficiary, the appointment of Regional as trustee was improper. Because IndyMac signed an Appointment of Successor Trustee to Regional *before* MERS signed the Assignment of the Deed of Trust to IndyMac, Plaintiff submits that Regional was not properly appointed as the trustee and therefore did not have legal authority to initiate a foreclosure. Plaintiff makes no similar allegations against Deutsche Bank.

In Washington, the tort of intentional infliction of emotional distress [2] requires that a plaintiff prove three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff [*11] of severe emotional distress. *Kloepfel v. Bokor, 149 Wn.2d 192, 66 P.3d 630, 632 (Wash. 2003)* (citing cases). The first prong requires that the defendant have engaged in behavior "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (internal punctuation omitted) (citing *Grimsby v. Samson, 85 Wn.2d 52, 530 P.2d 291 (Wash. 1975)* and *Restatement (Second) of Torts § 46 cmt.d*).

2   In Washington, "outrage" and "intentional infliction of emotional distress" are synonyms for

the same tort. *Kloepfel v. Bokor, 149 Wn.2d 192, 66 P.3d 630, 631 n.1 (Wash. 2003)*.

The Court concludes that none of Defendants' alleged actions rises to a level of extreme or outrageous conduct. *See Strong v. Terrell, 147 Wn. App. 376, 195 P.3d 977, 981-82 (Wash. App. 2008)* ("Although these elements are generally factual questions for the jury, a trial court faced with a summary judgment motion must first determine whether reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability."). With respect to MERS, Plaintiff asserts throughout the amended complaint that MERS never maintained a beneficiary interest [*12] and that MERS is not a beneficiary as defined by the Washington Deed of Trust Act. Indeed, this Court pauses at MERS's assertion that it may, in a case like this, serve as a beneficiary under Washington's Deed of Trust Act. But even if Washington law does not permit MERS to serve as the beneficiary, nothing in the amended complaint or Plaintiff's summary-judgment responses plausibly suggests that MERS's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Courts in other states have concluded that MERS acts appropriately in serving as the beneficiary; it remains, at best, an open question of law in Washington. The courts may disagree on whether MERS may act as a beneficiary, but reasonable minds could not differ in concluding that MERS's conduct falls well short of the standard for a claim of intentional infliction of emotional distress.

The same is true for Regional. Plaintiff alleges that there was an error in the foreclosure process when a representative of IndyMac signed an appointment of successor trustee before the assignment of the deed [*13] of trust was signed. But the documents became effective only when they were both recorded on the same day. *See Wash. Rev. Code § 61.24.010(2)* ("Only upon recording the appointment of a successor trustee in each county in which the deed of trust is recorded, the successor trustee shall be vested with all powers of an original trustee."). Even if the timing of the original signature was improper, neither that conduct nor Regional's conduct as it relates to MERS's status as the beneficiary rises to a level of extreme or outrageous behavior.

Plaintiff makes even fewer allegations with respect to Deutsche Bank. At best, Plaintiff asserts that improper foreclosure tactics *may* serve as the basis for intentional infliction of emotional distress. To support her position, Plaintiff cites an unpublished decision of the Ninth Circuit that upheld a bankruptcy court's finding of intentional infliction of emotional distress during foreclosure. *See Jared v. Keahey (In re Keahey), No. 09-6000, 414 Fed. Appx. 919, 2011 U.S. App. LEXIS 1977, 2011 WL*

*288966 (9th Cir. Jan. 31, 2011)*. Aside from the fact that this unpublished decision is not binding on this Court, Plaintiff concedes that the facts of this case are not similarly egregious as those in *Keahey.* [*14] None of Deutsche Bank's conduct as alleged by Plaintiff rises to a level of extreme or outrageous behavior. ³Accordingly, the Court dismisses Plaintiff's cause of action for intentional infliction of emotional distress.

> 3   Nor does Plaintiff cite to any evidence indicating that any of the Defendants intentionally or recklessly inflicted the emotional distress. *See Kloepfel, 66 P.3d at 632.*

## E. Breach of Fiduciary Duty

The Court grants Deutsche Bank's and MERS's motions for summary judgment on Plaintiff's claim of breach of fiduciary duty.

Quite simply, "[t]he general rule in Washington is that a lender is not a fiduciary of its borrower; a special relationship must develop between a lender and a borrower before a fiduciary duty exists." *Miller v. U.S. Bank of Wash., N.A., 72 Wn. App. 416, 865 P.2d 536, 543 (Wash. Ct. App. 1994)*. Although a "quasi-fiduciary relationship may exist where the lender has superior knowledge and information, the borrower lacks such knowledge or business experience, the borrower relies on the lender's advice, and the lender knew the borrower was relying on the advice," *id.*, there is no allegation that Deutsche Bank or MERS advised Plaintiff regarding the loan or that Plaintiff relied [*15] on any such advice. In fact, Plaintiff's complaint asserts misrepresentations from her mortgage broker, a party with whom Plaintiff has settled her claims. (Dkt. No. 31.) Accordingly, neither Deutsche Bank nor MERS owed Plaintiff a fiduciary or quasi-fiduciary duty.

Plaintiff's claim against Regional as the trustee takes a different course. The duty owed by a trustee to a borrower under Washington law is (or at least was) not obvious. Prior to June 12, 2008, the Washington Supreme Court held that

> a trustee of a deed of trust is a fiduciary for both the mortgagee and mortgagor and must act impartially between them. The trustee is bound by his office to present the sale under every possible advantage to the debtor as well as to the creditor. He is bound to use not only good faith but also every requisite degree of diligence in conducting the sale and to attend equally to the interest of the debtor and creditor alike.

*Cox v. Helenius, 103 Wn.2d 383, 693 P.2d 683, 686 (Wash. 1985).* However, the state legislature amended the deed of trust act in 2008. Now, a trustee "shall have no fiduciary duty or fiduciary obligation to . . . persons having an interest in the property" but shall have "a duty of good faith [*16] to the borrower, beneficiary, and grantor." *Wash. Rev. Code § 61.24.010.* Accordingly, Regional owed Plaintiff a duty of good faith, not a fiduciary duty.

Regional may have breached its duty of good faith by attempting to foreclose on Plaintiff's property because Regional may not have been properly appointed as the successor trustee empowered with the authority to foreclose. That is, if MERS could not serve as the beneficiary of the deed of trust under Washington law, as Plaintiff so alleges, then MERS's assignment of the deed of trust to IndyMac was erroneous. And because the transfer to IndyMac would therefore be erroneous, so too would IndyMac's appointment of Regional as successor trustee be erroneous. Essentially, Plaintiff's claim depends on MERS's ability to serve as the beneficiary of the deed of trust.

This Court does need to add even more pages to the legal discourse discussing whether MERS may serve as a beneficiary in deeds of trust generally. *Compare, e.g., Silvas v. GMAC Mortg., LLC, No. CV-09-265-PHX-GMS, 2009 U.S. Dist. LEXIS 118854, 2009 WL 4573234 (D. Ariz. 2009)* (favoring MERS); *Pantoja v. Countrywide Home Loans, Inc., 640 F. Supp. 2d 1177, 1188-89 (N.D. Cal. 2009)* (favoring MERS), *with, e.g., Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark., 2009 Ark. 152, 301 S.W.3d 1 (Ark. 2009)* [*17] (favoring borrower); *In re Agard, No. 810-77338-reg, 444 B.R. 231, 2011 Bankr. LEXIS 488 (E.D.N.Y. Bankr. Feb. 10, 2011)* (favoring borrower). *See also* Christopher L. Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359 (2010).* Nor will the Court discern, more narrowly, whether MERS may serve as a beneficiary under Washington's Deed of Trust Act. That answer remains patently unclear. *See* Certification Order, *Vinluan v. Fidelity National Title & Escrow Co.,* No. 10-2-27688-2 SEA (King Cnty. Superior Ct. Jan. 18, 2011). Because a state circuit court has recently certified this very question to the Washington Supreme Court, this Court declines to decide the issue before the Washington Supreme Court evaluates it. [4] *See Ojo v. Farmers Group, Inc., 600 F.3d 1205, 1210 (9th Cir. 2010)* ("Because this question of Texas law is unsettled, and because the issue's resolution will have pervasive implications for future claims brought against Texas insurers, we have concluded that the appropriate course of action is to certify this issue to the Supreme Court of

Texas. We stay further proceedings in this case pending resolution of our certified question.").

4   Although [*18] the Court does not yet decide whether Washington law permits MERS to serve as the beneficiary, the Court nonetheless dismisses any monetary-damages claim Plaintiff asserts under her third cause of action. Because Plaintiff's home has not been foreclosed, her claim is, in part, for the wrongful institution of a nonjudicial foreclosure proceeding. The Deed of Trust Act does not authorize a cause of action for damages for the wrongful institution of a non-judicial foreclosure proceeding where no trustee's sale has occurred. *See, e.g., Vawter v. Quality Loan Serv. Corp., 707 F.Supp.2d 1115, 1123 (W.D. Wash. 2010).* Plaintiff may, nonetheless, be entitled to injunctive relief, and the Court extends the state court's restraining order on the sale.

## F. Consumer Protection Act

Finally, Plaintiff alleges that Defendants violated the Consumer Protection Act ("CPA"). To state a claim under the CPA, Plaintiff must show (1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the plaintiff in his or her business or property, and (5) which injury is causally linked to the unfair or deceptive act. *Griffith v. Centex Real Estate Corp., 93 Wn. App. 202, 969 P.2d 486, 492 (Wash. Ct. App. 1998).*

MERS [*19] asserts that Plaintiff has not shown an unfair or deceptive practice on its part, has not shown how any act of MERS impacts the public interest, and presents nothing showing injuries caused by an unfair or deceptive practice by MERS. The Court disagrees. Like her other claims arising under the Deed of Trust Act, Plaintiff's CPA claims depend on whether MERS may be the beneficiary (or nominee of the beneficiary) under Washington state law. MERS's attempt to serve as the beneficiary may have been improper under state law and it may have led to widespread confusion regarding home ownership, payment delivery, and negotiable positions. If MERS violated state law, its conduct may very well be classified as "unfair" under the CPA. There is no doubt that MERS's conduct impacts the public interest. *See Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 719 P.2d 531, 537-38 (Wash. 1986)* (listing factors for determining public interest); Peterson, *supra, at 1362* ("Although MERS is a young company, 60 million mortgage loans are registered on its system."); R. K. Arnold, *Yes, There Is Life on MERS, 11 Prob. & Prop. 32, 33 (1997)* ("Some have called MERS the most significant event for [*20] the mortgage in-

dustry since the formation of Fannie Mae and Freddie Mac. Others have compared it to the creation of uniform mortgage instruments, which have become standard throughout the residential mortgage industry. This suggests that the journey to MERS will have a tremendous effect on the mortgage industry."). And the harm Plaintiff may have suffered because of MERS's conduct may include expending resources to avert an unlawful foreclosure and preventing Plaintiff from identifying the real beneficiary and negotiating a new arrangement to avoid foreclosure.

The same reasoning applies to Regional, who also argued that Plaintiff cannot show an unfair or deceptive practice or show an impact on the public interest. Regional asserts that it acted appropriately because it was candid and forthcoming about its identity and its authority to conduct the foreclosure. That Regional was candid about its role is not dispositive. *See Carlile v. Harbour Homes, Inc., 147 Wn. App. 193, 194 P.3d 280, 289 (Wash. Ct. App. 2008)* ("An unfair or deceptive act or practice need not be intended to deceive, it need only have the capacity to deceive a substantial portion of the public."). Moreover, just as MERS has its hands [*21] in countless home loans affecting the general public, so too does Regional play a key role in numerous foreclosure actions affecting the general public. MERS and Regional ultimately may bear no liability under the CPA, but this Court will await the state-court analysis before ruling on the parties motions for summary judgment. [5]

5   Deutsche Bank has satisfied the Court that federal law preempts Plaintiff's CPA claims against it because it acquired the promissory note from IndyMac. Plaintiff's one-paragraph, conclusory response to Deutsche Bank's detailed position is barely one step removed from having filed no response at all on that issue. *See Local Rules W.D. Wash. CR 7(b)(2)* ("If a party fails to file papers in opposition to a motion, such failure may be considered by the court as an admission that the motion has merit."). Plaintiff's argument that Deutsche Bank is not a bank does not address Deutsche Bank's position that it acts no differently than the entity from which it purchased the promissory note. Plaintiff may be correct that federal law does not preempt in this case, but her

response is insufficient for the Court on summary judgment to permit the claim to go forward against [*22] Deutsche Bank.

III. CONCLUSION

Plaintiff admits that she has been delinquent in her mortgage payments. A ruling favorable to Plaintiff in this case and others like it cannot and should not create a windfall for all homeowners to avoid upholding their end of the mortgage bargain--paying for their homes. But a homeowner's failure to make payments cannot grant lenders, trustees, and so-called beneficiaries like MERS license to ignore state law and foreclose using any means necessary. Whether these and similar defendants complied with Washington state law remains unclear.

The Court GRANTS IN PART and DENIES IN PART Defendants' motions for summary judgment. The Court DISMISSES all claims against OneWest without prejudice. The Court DISMISSES Plaintiff's TILA claims against Deutsche Bank with prejudice. The Court DISMISSES Plaintiff's claims for intentional infliction of emotional distress against all Defendants with prejudice. The Court DISMISSES Plaintiff's claims for breach of fiduciary or quasi-fiduciary duty against Deutsche Bank and MERS with prejudice. The Court DISMISSES Plaintiff's CPA claim against Deutsche Bank.

The Court DENIES Regional's motion for summary judgment on Plaintiff's [*23] claim for breach of fiduciary or quasi-fiduciary duty. The Court DENIES MERS's and Regional's motions for summary judgment on Plaintiff's CPA claim.

The Court STAYS this action pending the Washington Supreme Court's decision in *Vinluan v. Fidelity National Title & Escrow Co.*, No. 10-2-27688-2 SEA. Counsel for the parties shall notify the Court when the Washington Supreme Court decides whether to accept certification and, if so, when it renders an opinion.

DATED this 15th day of March 2011.

/s/ John C. Coughenour

John C. Coughenour

UNITED STATES DISTRICT JUDGE

149TPX

********** Print Completed **********

Time of Request: Wednesday, August 31, 2011   19:21:47 EST

Print Number:    1827:303951380
Number of Lines: 323
Number of Pages:

Send To:   Krawczyk, Andrew
           STAFNE LAW FIRM
           239 N OLYMPIC AVE
           ARLINGTON, WA 98223-1336

Exhibit L

Re: Important Information about Your Payment (L17)

```
************New Payment Amount************
Principal & Interest: $ 882.65
Total Monthly Payment: $ 1,272.97
Effective Date:        July 01, 2011
```

RE: Home Mortgage Loan 1915309566

**Rate Change Notice**

Dear Mortgagor(s):

Our records indicate that your loan, secured by a Mortgage on the property
located at 436 Ezduzit Ln, Camano Island WA 98282
is scheduled to be adjusted as of June 01, 2011 effective with the
July 01, 2011 payment.

Based on the monthly payments due by June 01, 2011, your principal
balance will be $ 403,495.51.  Your interest rate of 2.62500% will
be in effect until the next adjustment date of December 01, 2011.
The current index value is 0.43050% which is based on the
WSJ 6 MO LIBOR FIRST BUSINESS DAY effective for
May 02, 2011.

We are adjusting your interest only payment from $ 924.68 to
$ 882.65.  Your new total payment amount is therefore
$ 1,272.97 beginning with the payment due on July 01, 2011.

*********************************************************************
Interest Rates are determined as follows:

| Previous Index         | 0.44844% | Current Index      | 0.43050% |
|------------------------|----------|--------------------|----------|
| Margin                 | 2.25000% | Margin             | 2.25000% |
| Previous Interest Rate | 2.75000% | New Interest Rate  | 2.62500% |

Note: The interest rate may be subject to a .12500 % rounding factor.
*********************************************************************

Based on your current loan balance and interest rate, the monthly payment
of principal and interest that would be required to fully amortize your
loan by maturity would be $ 1,862.19.

Chase's goal is to provide the highest level of quality service for each
of our customers.  If you have any questions concerning this rate
adjustment, please contact Customer Care at (800) 848-9136.

We appreciate your business and value our relationship with you.

Sincerely,

Special Loans
Chase Home Lending
www.chase.com


AR100

**Chase (OH4-7218)**
3415 Vision Drive
Columbus, OH  43219-6009

**CHASE** ◯



*Rec'vd*
*5-16-2011*

May 07, 2011

017580 1 of 1 NSP0VYG · ZA 000000000000 AR100
Travis Mickelson
Danielle H Mickelson
436 Ezduzit Ln
Camano Island WA 98282-



RE:  Important Information about Your Payment

******Please see Reverse Side******

Exhibit M

Screenshot

Mortgage Account Profile

# Mortgage Account Summary

**Customer:** DANIELLE H MICKELSON

**Account:** NY/NJ/CT Mortgage # ▇▇▇▇▇ 0566

## Related Customers

| Name | Relationship | SSN/EIN | Date of Birth |
|---|---|---|---|
| DANIELLE H MICKELSON | Primary Borrower | ▇▇▇ | ▇▇ |
| TRAVIS S MICKELSON | Prim Borrower (S) | ▇▇▇ | ▇▇ |

## Comments

No Comments Available.

No Alert, General, or Summary Comments returned.

## Account Details

| | | | |
|---|---|---|---|
| **Product Description:** | Conventional Without PMI | **Property Type:** | Single Family Detached |
| **Product Code:** | Other Interest Only | **Loan Purpose:** | Refinance No Cash Out |
| **Account Status:** | No paid in full stop | **Insurance Policy Number:** | |
| **Property Occupied By:** | Occupied by the owner | **Tax Parcel Number:** | 00092465 |
| **Mailing Address:** | 436 EZDUZIT LN | **Collateral Address:** | 436 EZDUZIT LN |
| | CAMANO ISLAND, WA 98282 | | CAMANO ISLAND, WA 98282 |
| | United States / US Territories | | United States / US Territories |
| **Term (months):** | 360 | **Original Loan Amount:** | $403,500.00 |
| **Property Owner:** | TRAVIS MICKELSON | | |
| | DANIELLE H MICKELSON | | |

## Financial Information

| | | | |
|---|---|---|---|
| **Current Interest Rate:** | 6.625% | **Note Date:** | 11/29/2005 |
| **Principal Balance:** | $403,495.51 | **Maturity Date:** | 12/01/2035 |
| **Acquired Date:** | 06/20/2006 | **Principal On Acquired Date:** | $403,500.00 |
| **Billing Method:** | Bill And Receipt With Late | **Scheduled Additional** | $0.00 |
| | Charge | **Principal Amount:** | |
| **Last Fast Pay Bank Name:** | | **Last Fast Pay Bank Routing** | |
| | | **#:** | |
| **Lockbox Location:** | Regular : | | |
| | Chase Home Lending | | |

P.O. Box 78420
Phoenix, AZ 85062-8420
United States / US Territories

## Payment Information

| | | | |
|---|---|---|---|
| Paid Through Date: | 07/01/2008 | Next Payment Due Date: | 08/01/2008 |
| Current Amount Due: | $84,868.90 | Last Payment Date: | |
| Last Payment Amount: | | Accept Payments? | No |
| Has Escrow Been Stopped? | NO PMI DISBURSEMENTS | ACH Effective Date: | |
| Days Past Due: | 1021 | Payments Past Due: | 34 |
| Last Additional Principal Payment Date: | | Last Additional Principal Amount: | |
| Fees Due: | $45.00 | Late Charge Due: | $2,004.84 |
| Statement Date: | 07/16/2010 | Monthly P&I: | $2,227.63 |
| First Payment Date: | 01/01/2006 | Payments Made: | 31 |
| Payments Received, Not Applied (UAF): | $0.00 | YTD Principal Applied: | $0.00 |
| YTD Interest Paid: | $0.00 | YTD Taxes Paid: | $2,032.45 |

## Next Payment Details

| | |
|---|---|
| Date Due: | 08/01/2008 |
| Principal Due: | $0.00 |
| Interest Due: | $2,227.63 |
| Escrow Due: | $409.35 |
| Subsidy Due: | $0.00 |
| Past Due Amount: | $82,819.06 |
| Total Amount Due: | $82,819.06 |

## Adjustable Rate Mortgage Information

| | | | |
|---|---|---|---|
| New Rate: | 2.75% | New Rate Effective Date: | 01/01/2011 |
| New Payment Amount: | $924.68 | New Payment Effective Date: | 01/01/2011 |

## Interest Only Mortgage Information

| | | | |
|---|---|---|---|
| **Expiration Date:** | 01/01/2016 | **Payment Change Date:** | 01/01/2011 |
| **Payment Amount:** | $924.68 | | |

## Past Due History By Months

| | |
|---|---|
| **View Details:** | ○ Yes  ◉ No |

## Escrow Details

| | | | |
|---|---|---|---|
| **View Details:** | ◉ Yes  ○ No | | |
| **Escrow Balance:** | -$11,955.60 | **Escrow Reserve:** | $0.00 |
| **Lender Paid Escrow:** | | **YTD Escrow Interest Earned:** | $0.00 |
| **Escrow Claim Amount:** | $0.00 | **Is Insurance Force Placed?:** | No |
| **New Escrow Analysis Date:** | 11/25/2009 | **New Escrow Payment Start Date:** | 01/01/2010 |

## Escrow Disbursement Details

**View Details:** ◉ Yes  ○ No

| Date | Disbursement Amount | Disbursement Type | Disbursement Nature | Paid By | Payee Code | Payee Name |
|---|---|---|---|---|---|---|
| | | HomeOwner | Homeowners Insurance | Lender | 6W643 | STATE FARM-PACIFIC NW |
| | | RealEstateTaxPaid | County Tax | Lender | 46029 | ISLAND COUNTY |
| 09/28/2010 | -$1,968.68 | Tax | County Tax | Lender | 46029 | |
| 04/01/2010 | -$1,968.68 | Tax | County Tax | Lender | 46029 | |
| 10/02/2009 | -$1,883.38 | Tax | County Tax | Lender | 46029 | |
| 09/11/2009 | -$917.00 | Insurance | Homeowners Insurance | Lender | 6W643 | |
| 07/03/2009 | -$1,883.38 | Tax | County Tax | Lender | | |

```
*************New Payment Amount************
Principal & Interest: $ 882.65
Total Monthly Payment: $ 1,272.97
Effective Date:          July 01, 2011
```

RE: Home Mortgage Loan 1915309566

**Rate Change Notice**

Dear Mortgagor(s):

Our records indicate that your loan, secured by a Mortgage on the property
located at 436 Ezduzit Ln, Camano Island WA 98282
is scheduled to be adjusted as of June 01, 2011 effective with the
July 01, 2011 payment.

Based on the monthly payments due by June 01, 2011, your principal
balance will be $ 403,495.51.  Your interest rate of 2.62500% will
be in effect until the next adjustment date of December 01, 2011.
The current index value is 0.43050% which is based on the
WSJ 6 MO LIBOR FIRST BUSINESS DAY effective for
May 02, 2011.

We are adjusting your interest only payment from $ 924.68 to
$ 882.65.  Your new total payment amount is therefore
$ 1,272.97 beginning with the payment due on July 01, 2011.

```
****************************************************************************
```
Interest Rates are determined as follows:

| | | | |
|---|---|---|---|
| Previous Index | 0.44844% | Current Index | 0.43050% |
| Margin | 2.25000% | Margin | 2.25000% |
| Previous Interest Rate | 2.75000% | New Interest Rate | 2.62500% |

Note: The interest rate may be subject to a .12500 % rounding factor.
```
****************************************************************************
```

Based on your current loan balance and interest rate, the monthly payment
of principal and interest that would be required to fully amortize your
loan by maturity would be $ 1,862.19.

Chase's goal is to provide the highest level of quality service for each
of our customers.  If you have any questions concerning this rate
adjustment, please contact Customer Care at (800) 848-9136.

We appreciate your business and value our relationship with you.

Sincerely,

Special Loans
Chase Home Lending
www.chase.com


AR100

**Chase (OH4-7218)**
3415 Vision Drive
Columbus, OH 43219-6009



Rec'vd
5-16-2011

May 07, 2011



017580 1 of 1 NSP0VYG - ZA 00000000000 AR100
Travis Mickelson
Danielle H Mickelson
436 Ezduzit Ln
Camano Island WA 98282-

RE:  Important Information about Your Payment

******Please see Reverse Side******



Exhibit N

Rate Change letter

Chase (SC1-3050)
2210 Enterprise Drive
Florence SC  29501



May 25, 2011


Law Office of Cole & Gilday, P.C.
Attn:  Gregory L. Gilday
9029 271st Street Northwest
P.O. Box 249
Stanwood WA  98292



**Modification Request for Loan******9566**
Travis S. Mickelson
Danielle H. Mickelson

Dear Gregory L. Gilday:

This letter is in response to your correspondence dated March 29, 2011, addressed to Chase,
regarding the request for a modification to the above-reference mortgage loan for
Travis S. Mickelson and Danielle H. Mickelson.

Our records confirm that a modification was not offered to the borrowers.  The document you
referenced in your letter is the Notice of Rate Change, which refers to the borrowers' adjustable
rate mortgage.  A copy of the notice is enclosed for your review.  The home was sold at a
foreclosure sale on March 25, 2011.

We apologize that the service you received did not meet your expectations.  If you have
additional questions, please contact Stephanie Jackson at (888) 310-7995, extension 3247037.

Sincerely,

Chase Home Lending Executive Office
(800) 582-0542 TDD/Text Telephone
www.chase.com

\*\*\*\*\*\*\*\*\*\*\*\*New Payment Amount\*\*\*\*\*\*\*\*\*\*\*\*
Principal & Interest: $ 924.68
Total Monthly Payment: $ 1,315.00
Effective Date:        January 01, 2011

RE: Home Mortgage Loan

Rate Change Notice

Dear Mortgagor(s):

Our records indicate that your loan, secured by a Mortgage on the property located at 436 Ezdukit Ln, Camano Island WA 98282 is scheduled to be adjusted as of December 01, 2010 effective with the January 01, 2011 payment.

Based on the monthly payments due by December 01, 2010, your principal balance will be $ 403,495.51. Your interest rate of 2.75000% will be in effect until the next adjustment date of June 01, 2011. The current index value is 0.44844% which is based on the WSJ 6 MO LIBOR FIRST BUSINESS DAY effective for November 01, 2010.

We are adjusting your interest only payment from $ 2,227.63 to $ 924.68. Your new total payment amount is therefore $ 1,315.00 beginning with the payment due on January 01, 2011.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Interest Rates are determined as follows:

| Previous Index | 4.37500% | Current Index | 0.44844% |
|---|---|---|---|
| Margin | 2.25000% | Margin | 2.25000% |
| Previous Interest Rate | 6.62500% | New Interest Rate | 2.75000% |

Note: The interest rate may be subject to a .12500 % rounding factor.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Based on your current loan balance and interest rate, the monthly payment of principal and interest that would be required to fully amortize your loan by maturity would be $ 1,861.37.

Chase's goal is to provide the highest level of quality service for each of our customers. If you have any questions concerning this rate adjustment, please contact Customer Care at (800) 848-9136.

We appreciate your business and value our relationship with you.

Sincerely,

Special Loans Department

AR100