**APPENDIX 2**

No. 86206-1

SUPREME COURT
OF THE STATE OF WASHINGTON

CERTIFICATION FROM UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE
(CASE NO. C09-0149 JCC)

KRISTIN BAIN

*Plaintiff,*

v.

MORTGAGE ELECRONIC REGISTRATION
SYSTEMS, INC., *et. al.,*

*Defendants.*

## HOMEOWNERS' ATTORNEYS AMICUS CURIAE BRIEF

Scott E. Stafne, WSBA # 6964
Ha Dao, WSBA #21793
Rebecca Thorley, WSBA #42646
Andrew Krawczyk, WSBA #42982
Stafne Law Firm
239 North Olympic Avenue
Arlington, WA 98223
Phone: (360) 403-8700
Fax: (360) 386-4005

Timothy Robbins, WSBA #15867
Robbins & Herber, P.S.
3501 Rucker Ave.
Everett, WA 98201
Phone: (425) 339-5537
Fax: (425) 645-8383

Nicholas D. Fisher, WSBA #40716
Law Office of Nicholas D. Fisher
1604 Hewitt Ave., Ste. 6001
Everett, WA 98201
Phone: (425) 314-6737

TABLE OF CONTENTS

I.   IDENTITY AND INTEREST OF AMICUS CURIAE...............1

II.  STATEMENT OF THE CASE.........................................1

     A.  HISTORICAL PERSPECTIVE...............................2

III. ARGUMENT...........................................................4

     A.  THE PROMISSORY NOTE OBLIGATED DISCLOSURE
         OF THE ACTUAL NOTE HOLDER TO BAIN............4

     B.  MERS' ROLE UNDER BAIN'S NOTE AND BAIN'S
         DOT..............................................................7

     C.  BAIN DID NOT AGREE TO THE ILLEGAL
         PROVISIONS OF THE DOT................................16

IV. CONCLUSION.........................................................18

i

TABLE OF CASES

WASHINGTON STATE CASES

*Amresco v. SPS Props.*, 129 Wn. App. 532, 157 P.3d 415 (2005).........16

*Byrne v. Ackerlund*, 44 Wn. App. 1, 719 P.2d 1363 (1986)...............…...6

*CHD, Inc. v. Boyles*, 138 Wn. App. 131, 157 P.3d 415 (2007)............16

*Coey v. Low*, 36 Wash. 10, 77 P. 1077 (1904)............................…...18

*Coronado v. Orona*, 137 Wn. App. 308, 153 P.3d 217 (2007)............18

*Cox v. Helenius*, 103 Wn. 2d 383, 693 P.2d 683 (1985)..............…....7

*Evans v. Luster*, 84 Wn. App. 447, 450, 928 P.2d 455 (1996)..........…...18

*Foelkner v. Perkins,* 197 Wash. 462, 85 P.2d 1095 (1938)..................6

*Koegel v. Prudential Mut. Sav. Bank*, 51 Wn. App. 108, 752,
P.2d 385 (1988)...................................................................................4

*Parry v. Hewitt*, 68 Wn. App. 664, 847 P.2d 483 (1992)...................5

*Peplinski v. Campbell,* 37 Wn.2d 857, 226 P.2d 211 (1951)..............6

*Plein v. Lackey*, 149 Wn.2d 214, 67 P.3d 1061 (2003)..............….....7

*Sienkiewicz v. Smith*, 97 Wn.2d 711, 649 P.2d 112 (1982).......…......18

*State v. Kaiser*, 161 Wn. App. 705, 254 P.3d 850 (2011)..................…...9

*Washington v. Recontrust Company, N.A.*, King County Superior Court

No. 11-2-26867-5 (filed Aug. 4, 2011)..........................................17

*Woodson v. State*, 95 Wn.2d 257, 623 P.2d 683 (1980)....................15

<u>FEDERAL CASES</u>

*Bank of N.Y. v. Silverberg*, 86 A.D.3d 274,
926 N.Y.S.2d 532 (2011)……………………………………………………….3

*Carpenter v. Longan*, 83 U.S. (16 Wall.) 271,
21 L. Ed. 313 (1872)……………………………………………………….10

*Cervantes v. Countrywide Home Loans*, 656 F.3d 1034 (9th Cir. Ariz.
2011)………………………………………………………………..….17

*Chattanooga Nat'l Bldg. & Loan Ass'n. v. Denson*, 189 U.S. 408, 23 S. Ct.
630 (U.S. 1903)……………………………………………………..…….17

*Culhane v. Aurora Loan Services of Nebraska*, 2011 U.S. Dist. LEXIS
136112 (D. Mass. Nov. 28, 2011)…………………………………...…12, 13

*Flyer v Sullivan*, 284 A.D. 697,134 N.Y.S.2d 521 (1954)……………...…10

*Jackson v. Mortg. Elec. Registration Sys. Inc.*, 770 N.W. 2d 487 (Minn.
2009)…………………………………………………………....……..2, 3

*Kluge v. Fugazy*, 145 A.D.2d 537, 536 N.Y.S.2d 92 (1988)……...…….10

*MBIA Ins. Corp. v. Royal Indem. Co.*, 321 Fed. Appx. 146, 150 (3d Cir.
Del. 2009)……………………………………………………..…….11

*Merritt v. Bartholick*, 36 N.Y. 44, 34 How. Pr. 129,
1 Transc. App. 63…………………………………………………..….9

*MERSCORP, Inc. v. Romaine,* 8 N.Y.3rd 90,
861 N.E.2d 81 (N.Y. 2006)………………………………..…………….2, 3

*Moon v. GMAC Mortg. Corp.,* 2008 U.S. Dist. LEXIS 90912
(W.D. Wash. Oct. 24, 2008)………………………………………….13

*Pavino v. Bank of Am., N.A.,* 2011 U.S. Dist. LEXIS 22118
(W.D. Wash. Mar. 4, 2011)……………………………….…………..13

*Reinke v. Northwest Trs. Servs. (In re Reinke),* 2011 Bankr.
LEXIS 4142 (Bankr. W.D. Wash. Oct. 26, 2011)…………………….13

*Salmon v. Bank of Am. Corp.,* 2011 U.S. Dist. LEXIS 55706
(E.D. Wash. May 25, 2011)…………………………………..……..13

*U.S. Bank, N.A. v. Collymore,* 68 A.D.3d 752;
890 N.Y.S.2d 578 (2009)……………………………………………...10

*US Bank N.A. v. Madero,* 80 A.D.3d 751,
915 N.Y.S.2d 612 (2011)……………………………………....……..10

*Vawter v. Quality Loan Serv. Corp.,* 707 F. Supp. 2d 1115
(W.D. Wash. 2010)…………………………………………..………..13

*Williams v. Wells Fargo Bank, N.A.,* 2012 U.S. Dist. LEXIS 2871
(W.D. Wash. Jan. 10, 2012)………………………………….…...…..13

WASHINGTON STATE STATUTES

Chapter 61.24 RCW………………………………….…………………..12

RCW 61.24.005(2)………………………………………………….*passim*

RCW 61.24.010(2),(16)………………………………………………….9

RCW 61.24.020…………………………………....……………..9, 17

RCW 61.24.030(1),(3)……………………………………………....…..9

RCW 61.24.163(8)(b)(iii)…………………………………....…………..3

RCW 62A.1-204………………………………………………..……….6

RCW 62A.2-309……………………………………………….………..6

OTHER AUTHORITIES

2011 Wash. Sess. Laws 58………………………………………………..3, 15

## I. IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus Curiae are Washington licensed attorneys Scott E. Stafne, Timothy Robbins, Ha Dao, Rebecca Thorley, Nic Fisher, Andrew Krawczyk, ("Homeowners' Attorneys"). These attorneys have represented, currently represent, and expect to represent home owners regarding a broad range of issues related to promissory notes, deeds of trust, mediations, nonjudicial and judicial foreclosures. Over the last year they have met periodically to discuss issues relating to the needs of these clients and also for purposes of submitting an Amicus Curiae brief with regard to the issues in this case, which will likely affect their clients, but may not have been sufficiently briefed in this case so as to render a fair decision with regard to the facts of Homeowner Attorneys' clients' cases.

## II. STATEMENT OF THE CASE

Attached as Appendix I is a copy of Ms. Bain's promissory note ("Bain's note") for her March 3, 2007, loan with Indy Mac. Attached as Appendix II is the purported deed of trust between Indy Mac and Ms. Bain ("Bain's DOT"). Many homeowners in Washington, like Ms. Bain, have been and/or are now facing being removed from their homes through procedures related to non-judicial foreclosures premised on the language

1

of similar agreements.   Although there are several forms of uniform

promissory notes and deeds of trust (DOT), most contain provisions which

include MERS as a party for purposes of securitizing individual

promissory notes into pools of thousands of other notes known as

mortgage backed securities.  *See* MERS Briefs, pp. 12-17, 32-34.

## A.  Historical Perspective

MERS' history can be traced back to 1993.  Bain Opening Brief,

pp. 6-7.[1]  From 1993 until now the present WDTA has been amended

several times.  *Id.*, pp. 18-33.  Unlike some states, Washington never

enacted amendments designed to "privatize" portions of the WDTA so as

to specifically allow for MERS.  For example, as the Minnesota Supreme

Court explained in *Jackson v. Mortg. Elec. Registration Sys. Inc.*:

> When MERS began having mortgages recorded in its name
> as nominal mortgagee, questions arose in certain
> jurisdictions as to whether MERS had the authority to act
> on behalf of its members. *See, e.g., MERSCORP, Inc. v.
> Romaine,* 8 N.Y.3rd 90, 861 N.E.2d 81, 82-83, 828
> N.Y.S.2d 266 (N.Y. 2006). As a result of questions
> raised about the MERS system, the Minnesota Legislature passed
> an amendment to the Recording Act that expressly permits
> nominees to record "[a]n assignment, satisfaction, release,
> or power of attorney to foreclose." Act of Apr. 6, 2004, ch.
> 153, § 2, 2004 Minn. Laws 76, 76-77 (codified at Minn.
> Stat. § 507.413 (2008)). The amendment, frequently called

---

[1] *Jackson v. Mortg. Elec. Registration Sys. Inc.*, 770 N.W. 2d 487, 490 (Minn. 2009)
("MERS is an electronic registration system that was created in the aftermath of the 1993
savings and loan crisis").

2

"the MERS statute," went into effect on August 1, 2004. *Id.,* § 2, 2004 Minn. Laws at 76-77.

*Jackson v. Mortg. Elec. Registration Sys. Inc.*, 770 N.W. 2d 487, 491 (Minn. 2009); *compare, Merscorp v. Romaine*, 8 N.Y.3d 90, 99-105, 861 N.E. 81 (2006) (concurring and dissenting opinions) *with, Bank of N.Y. v. Silverberg*, 86 A.D.3d 274; 926 N.Y.S.2d 532 (2011).

The Washington legislature has had several opportunities to clarify our law so as to include MERS or a nominee within the definition of the term "beneficiary" set forth in RCW 61.24.005(2). The legislature has not changed the definition at all or added provisions similar to Minnesota's MERS statute. Instead, the most recent law enacted in 2011 reiterated the same "Note Holder" requirements for a beneficiary as have been in existence since 1998. *See* 2011 Wash. Sess. Laws 58; *see, e.g.,* RCW 61.24.163(8)(b)(iii).[2]

---

[2] For example a mediation provision was added to the WDTA in 2011. 2011 Wash. Sess. Laws 58. It states in pertinent part:

> (8) A violation of the duty to mediate in good faith as required under this section may include:
> [***]
> (iii) Proof that the entity claiming to be the beneficiary is the owner of any promissory note or obligation secured by the deed of trust.

RCW 61.24.163(8)(b)(iii). Homeowners' Attorneys contend this provision reconfirms that the only beneficiary contemplated by RCW 61.24.005(2) is the owner of the promissory note or obligation secured by the deed of trust. *Id.* Homeowners' Attorneys further argue that the legislature recognized the importance of communication between the owner of the obligation and the borrower as part of the nonjudicial foreclosure process. *See id.*

### III. ARGUMENT

Homeowners' Attorneys raise the following issues of concern: whether Bain's note and deed of trust imposed a duty to disclose the actual note holder; whether MERS role under Bain's note and deed of trust comports with Washington Law; whether the exclusionary clause of RCW 61.24.005(2) limits the status of parties as beneficiaries under the Washington Deed of Trust Act (WDTA), and, whether Bain could agree to provisions of note and deed of trust documents that were incompatible with the WDTA.

### A.   THE PROMISSORY NOTE OBLIGATED DISCLOSURE OF THE ACTUAL NOTE HOLDER TO BAIN

MERS claims Ms. Bain had no right to disclosure of the actual "Note Holder" at any time. MERS brief, p. 6. Homeowners' Attorneys disagree, the uniform note and DOT agreements Bain signed in this case require disclosure of transfers by "Note Holders". Ms. Bain's opening brief discusses the difficulty virtually all homeowners experience when they attempt to identify the present "Note Holder" of the promissory note which is secured by a DOT on their residence. Bain's Opening Brief, pp. 2, 10-11.

To the extent there is any ambiguity in this contractual provision it should be interpreted in favor of the borrower. *See Koegel v. Prudential*

4

*Mut. Sav. Bank*, 51 Wn. App. 108, 111, 752 P.2d 385 (1988); *c.f.*, *Parry v. Hewitt*, 68 Wn. App. 664, 669 (1992)(where terms are ambiguous, ambiguity must be construed against the drafters and those claiming the benefit of a restriction). To elaborate, the first paragraph of Bain's note states:

> **1. BORROWER'S PROMISE TO PAY**
> In return for a loan that I have received, I promise to pay U.S. $193,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender.   The Lender is INDYMAC BANK, F.S.B., A FEDEALLY CHARTERED SAVINGS BANK
> I        will make all payments under this Note in the form of cash, check, or money order. I understand the Lender may transfer this Note. ***The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."***[3]

Appendix I.  Every paragraph of Bain's note refers to "Note Holder" except the last two subparagraphs, 11 (A) and (B), which use the word "Lender." *Id*. The note contemplates the borrower shall have the right to know the identity of the "Note Holder." *Id*.  For example, paragraph **"5. BORROWER'S RIGHT TO PREPAY"** specifically allows for prepayments of principal to "Note Holder." *Id*. at ¶5. In this regard, the third sentence of this provision states: "When I make a prepayment, I will tell the Note Holder in writing that I am doing so." *Id*. This provision, as

---

[3] Ms. Bain and MERS appear to agree this note is a negotiable instrument. Homeowners' Attorneys respectfully request that the extent any decision turns on such a determination this Court point out whether the Court decided the issue that such a note is a negotiable instrument issue, or just accepted the parties' characterization of the agreement.

well as most of the provisions referring to "Note Holder" indicate that borrower will be able to obtain the identity of the "Note Holder" in order to mutually perform the provisions of Ms. Bain's promissory note. *See* Appendix I.

Additionally, the Deed of Trust, page 12, paragraph 20 states: "The Note or a partial interest in the Note (together with the Security Agreement) can be sold one or more times ***without prior notice*** to the borrower." Appendix II.  The fact that there is no duty to provide notice "prior" to transfer suggests that a reasonably timed notice should have been given to Bain after a transfer of the note occurred. *See id*. This is because where notice is contemplated, but no time is stated in the contract, the law implies a reasonable time in which to perform, i.e., when a contract does not fix a time for performance, it will be presumed that a reasonable time was intended. *See Byrne v. Ackerlund*, 44 Wn. App. 1, 5, 719 P.2d 1363 (Wash. App. Div. 1 1986); *Foelkner v. Perkins*, 197 Wash. 462, 85 P.2d 1095 (1938); *see also*, RCW 62A.2-309[4]. What constitutes a reasonable time for the performance of a contract will depend upon the circumstances of each case. *Peplinski v. Campbell*, 37 Wn.2d 857, 226 P.2d 211 (1951); *see also*, RCW 62A.1-204.[5]

---

[4] *See* Footnote 3 *Supra* on clarification on negotiable instruments.

[5] *Id*.

Bain's note and the Bain's DOT, as written, are consistent with the second policy of the WDTA;[6] namely "the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure." *Cox v. Helenius*, 103 Wn. 2d at 387. Homeowners' Attorneys contend that any reading or performance of Bain's note and Bain's DOT that does not promote disclosure of the Note Holder to Bain (the borrower) violates policies of the WDTA, as well as, the terms of Bain's note and the Bain's DOT. *See also*, Infra. at 18.

## B. MERS' ROLE UNDER BAIN'S NOTE AND BAIN'S DOT

Bain's note states: "The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the 'Note Holder'." Appendix I, ¶ 1. Bain's DOT does not mention the term "Note Holder," but does refer to the promissory note. Appendix II, ¶ Definition F. Contrary to the WDTA, Bain's DOT contemplates MERS as a super-party (nominee of Lender and legal owner of the DOT security instrument) and defines the original note holder, Indy Mac, as the Lender, rather than the beneficiary (Attachment I, Definition ¶ C).

---

[6] The policies which under the WDTA are:  First, the nonjudicial foreclosure process should remain efficient and inexpensive.  Second, the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure.  Third, the process should promote the stability of land titles. *Plein v. Lackey*, 149 Wn.2d 214, 67 P.3d 1061 (2003); *Cox v. Helenius*, 103 Wn. 2d 383, 387, 693 P.2d 683 (1985).

Bain's DOT document appoints MERS as the "beneficiary under the security agreement" (Appendix II, ¶ D); but not in the meaning contemplated by the WDTA because the same paragraph also states "MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's Successors and Assigns." Id. Then, in a separate unnumbered paragraph on page 4 of the DOT under the heading "TRANSFER OF RIGHTS IN THE PROPERTY," (*id.*) the Bain's DOT document provides that MERS owns legal title to the Security Document and has the trustee's power of sale:

> The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns of MERS) and the successors and assigns of MERS.  This security agreement accrues to Lender: (i) the repayment of the Loan [***]; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and Note.
>
> [***]
>
> All of the foregoing is referred to in the Security Agreement as the "Property".  ***Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument***, but if necessary to comply with law or custom, MERS as nominee for  Lender and Lender's successors and assigns) has the right to: exercise any or all of those interests, including, but not limited to, ***the right to foreclose and sell the property***; and to take any action required of Lender including, but not limited to releasing and cancelling this Security Instrument.

Appendix II (Emphasis Supplied).

The designation of MERS (the beneficiary's nominee) to also hold legal title with the power of sale directly conflicts with the statutory definition of "beneficiary" which requires that the beneficiary must hold the note, not the power of sale.   This violates RCW 61.24.020, which states: "[n]o person, corporation or association may be both trustee and beneficiary under the same deed of trust". *See also*, RCW 61.24.005(2), (16) (definition of "beneficiary" and "trustee"); RCW 61.24.010(2) "shall be vested with all powers of an original trustee;" RCW 61.24.030(1), (3) (Power of Sale); RCW 61.24.050 (legal interest conveyed by Trustee after sale).   Allowing MERS to have both beneficial and legal interests in the security agreement violates general principles of law that one party cannot be both a trustee and a co-beneficiary. *C.f. State v. Kaiser*, 161 Wn. App. 705, 723, 254 P.3d 850 (2011).

MERS is well aware of the super power accorded it by Bain's DOT. Indeed on two separate occasions in its brief MERS argues that it is the holder, *i.e.* owner, of the Deed of Trust.   MERS brief pp. 22-3 ("MERS is indisputably the holder of the Deed of Trust") *see also, Id.*, p. 34. Homeowners attorneys do not dispute MERS owns Bain's DOT lock, stock, and barrel; but surely, this is not the type of DOT the legislature has ever contemplated.   Indeed, a deed of trust which is not owned by the Note Holder is a nullity. *See Merritt v. Bartholick*, 36 N.Y. 44, 45, 34 How. Pr.

129, 1 Transc. App. 63 ("a transfer of the mortgage without the debt is a nullity, and no interest is acquired by it"); *Carpenter v. Longan*, 83 U.S. (16 Wall.) 271, 274, 21 L. Ed. 313 (1872) (an assignment of the mortgage without the note is a nullity, "[a] different doctrine would involve strange anomalies [***]."); *US Bank N.A. v. Madero*, 80 A.D.3d 751, 752, 915 N.Y.S.2d 612 (2011); *U.S. Bank, N.A. v. Collymore*, 68 A.D.3d 752, 754; 890 N.Y.S.2d 578 (2009); *Kluge v. Fugazy*, 145 A.D.2d 537, 538, 536 N.Y.S.2d 92 (1988)(plaintiff, the assignee of a mortgage without the underlying note, could not bring a foreclosure action); *Flyer v Sullivan*, 284 A.D. 697, 698, 134 N.Y.S.2d 521 (1954)(mortgagee's assignment of the mortgage lien, without assignment of the debt, is a nullity).

Allowing MERS' intrusion into the Bain's DOT for purposes of exercising considerable power for purposes of securitizing individual promissory notes of Washington homeowners violates all of the policies which underlie the WDTA. *See* supra, note 6.

> At ... [MERS] core, it is a system designed by the banks' lawyers to grow the securitization industry. In this it has been remarkably successful. Securitization has replaced financial institutions in funding home mortgage loans, with over eighty percent of all such loans originated in 2006 ... having been securitized. ... A closer look at the larger securitization process reveals a system apparently intended to raise a virtually impenetrable smokescreen to the detriment of homeowners and the communities where they live.

Slicing and dicing a home mortgage transaction as was done here profoundly alters the economic incentives of the banking industry in the home mortgage market. ***Banks necessarily focus on the immediate cash return from securitizing their home mortgage loans, rather than relying upon them as long term investments.*** Their agents, the loan servicers, have little, if any, incentive to "work out" a troubled home mortgage loan and every incentive to realize an immediate return from foreclosure sales. Moreover, one who holds bare legal title, without more, has no incentive whatever to maintain the home it owns. *Id.*

[***]

What the process of securitization, and the market for loan servicing that has developed to support it, highlights is that loan servicers, despite their duty to act for the benefit of investors, are in fact "principal-less agents." *Levitin & Twomey,* supra, at 81. Their incentives in managing individual loans do not mirror the interests of investors or trustees acting on behalf of investors, much less homeowners.

Yet, investors are without the information or capacity to track servicers' handling of mortgage loans in default. *Id.* at 58, 81; Thompson, supra, at 8. While the typical pooling and servicing agreement charges the trustee with protecting the interests of the investors, the trustee's duties involve reporting, not analyzing, data received from the loan servicer. *MBIA Ins. Corp. v. Royal Indem. Co.*, 321 F.Appx. 146, 150 (3d Cir. 2009). The trustee is further disincentivized from scrutinizing the performance of the loan servicer because, should such scrutiny reveal real shortcomings, the trustee would have to assume the unwelcome role of servicer. Levitin & Twomey, supra, at 58-62, 82. The mortgagor-homeowner, the party to the mortgage transaction most affected by loan servicing practices that favor foreclosure over modification, is often unaware that his loan has been securitized and that the servicing rights have been transferred to a servicer with whom he has no direct contractual relationship. *Id.* at 83. By the time of default, the homeowner is in no position to

negotiate a price that accounts for the servicing risk inherent in his decision to take out a mortgage loan months or years earlier. *Id.* at 84. Loan servicers are thus virtually unchecked in their drive to bolster their own bottom line, with foreclosure overwhelmingly the best economic decision.

*Culhane v. Aurora Loan Services of Nebraska*, 2011 U.S. Dist. LEXIS 136112, note 15 (D. MA. 2011).[7]

Homeowners' Attorneys agree with Ms. Bain that MERS cannot be a beneficiary under RCW 61.24.005(2) because it was never the holder of Bain's note. Bain's Brief, pp. 15-18. However, Homeowners Attorneys also contend MERS' multitude of powers under the Bain's DOT document is also violative of the WDTA and in most instances will result in subsequent note holders being excluded as beneficiaries entitled to pursue nonjudicial foreclosure as security pursuant to Chapter 61.24 RCW.

MERS incorrectly states the statutory definition of "beneficiary" at page 19 of its brief. MERS brief, p. 19. MERS leaves off the exclusionary provision of the statutory definition, which is emphasized below:

"Beneficiary" means the holder of the instrument or document evidencing the obligations secured by the deed of

---

[7] Judge Young ultimately concludes in *Culhane* foreclosure was proper where the service of an agent of the note holder started foreclosure without holding the note. Judge Young notes in his opinion that a state judge may have reached a different result because of the differences in the judicial duty imposed on a state judge than a federal judge interpreting state law under the federal court's diversity jurisdiction. The reason Homeowners cite Judge Young's factual findings about how MERS and the securitization process works is to help this Court evaluate whether MERS' functioning is consistent with the policies of the WDTA.

trust, *excluding persons holding the same as security for a different obligation*."[8]

RCW 61.24.005(2); *see* MERS brief, p. 19.

As Judge Young explained in *Culhane v. Aurora Loan Services of Nebraska*, 2011 U.S. Dist. LEXIS 136112, note 15 (D. MASS. 2011):

> Where a mortgage loan has been pooled with others in a trust that then issues mortgage-backed securities to investors, the holder of the note is the trustee on behalf of the investors, who are the real beneficial owners.[9]

*Culhane v. Aurora Loan Services of Nebraska*, 2011 U.S. Dist. LEXIS 136112, note 15 (D. MASS. 2011).

Deutsch Bank is apparently the "trustee" for those investors who actually own the note through a pooled investment vehicle. Bain's opening brief, pp. 2, 10-11. Deutsch Bank cannot be a beneficiary under

---

[8] The exclusionary clause of RCW 61.24.005(2) has been mentioned, but not construed, by several federal district judges in Washington. *See Vawter v. Quality Loan Serv. Corp.*, 707 F. Supp. 2d 1115 (W.D. Wash. 2010) (Judge Robart); *Reinke v. Northwest Trs. Servs. (In re Reinke)*, 2011 Bankr. LEXIS 4142 (Bankr. W.D. Wash. Oct. 26, 2011)(Judge Overstreet,); *Salmon v. Bank of Am. Corp.*, 2011 U.S. Dist. LEXIS 55706 (E.D. Wash., May 25, 2011) (Judge Peterson); *Williams v. Wells Fargo Bank, N.A.*, 2012 U.S. Dist. LEXIS 2871(W.D. Wash. Jan. 10, 2012); *Pavino v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 22118 (W.D. Wash. March 4, 2011) (Judge Laznick); *Moon v. GMAC Mortg. Corp.*, 2008 U.S. Dist. LEXIS 90912 (W.D. Wash. Oct. 24, 2008). The Homeowners Attorneys do not necessarily believe that the meaning of this exclusionary provision should be construed in this case, but believe that the language should be pointed out so that federal and state courts are alerted to the issue created by the exclusionary clause. So far as Homeowners Attorneys know this is the only clause like it in the United States regarding a legislative intention that deeds of trust are not the same as security for any other obligation other than the original promissory note.

[9] MERS does not dispute that investors are the owners of the pooled debt in which Ms. Bain's promissory note resides. MERS' brief, p. 9. "Secondary market purchasers often bundle loans into mortgage backed securities that are sold to investors, who then have interests in the underlying debt."

the exclusion because it holds the note as security for the investors as a result of a different obligation owed by Deutsch Bank to the investors. Deutsch Bank also cannot meet the definition of "Note Holder" as Deutsch Bank is not entitled to receive payments under Bain's note. *See* Appendix I, ¶ 1.

The operative aspect to the exclusion set forth in RCW 61.24.005(2) is a change in the obligation for which Bain's note was being held as security. Deutsch Bank clearly is not the "Note Holder" under Bain's note, *see* Appendix I, ¶ 1. The only relationship to the note the trustee of the investment pool has stems from a wholly different security, which includes pooled notes.

Pages 32 through 35 of MERS' brief documents and admits how the real estate industry went about attempting to eliminate the "beneficiary," *i.e.* "Note Holder" as one of the mandatory parties to DOT Security Instruments under the WDTA. MERS brief, pp. 32-35. MERS tells this Court that:

> the use of an agent to hold legal title in a mortgage while another holds interest in the mortgage loan (*i.e.* promissory note) has a long history in the residential housing industry, which the legislature has clearly endorsed.

MERS Brief, p. 33. A Deed of Trust is a three part document. Here Homeowners Attorneys ask: where is the legislative endorsement for not

14

requiring a beneficiary as one of these parties?  Despite modifications (e.g., 2011 Wash. Sess. Laws 58) the statutory definition of beneficiary, including its exclusionary provision, remains intact.

The very circumstances MERS contends indicate a legislative acceptance of the absence of a beneficiary from a DOT security instrument  appear to fall squarely within the exclusionary language of RCW 61.24.005(2) relating to other types of obligations.  Thus, to the extent there was legislative knowledge regarding MERS (and MERS concedes there was) it appears the legislature's intention was to continue to exclude banks and investors from utilizing Washington homes as security for obligations other than the individual promissory note.  The legislature did not intend or want Washington residences to secure trillions of dollars of pooled debts which are owed to domestic and foreign investors with whom borrowers can have no meaningful communication.

The Legislature is presumed to be aware of existing Washington case law on the subjects about which it is legislating. *Woodson v. State*, 95 Wn.2d 257, 623 P.2d 683 (1980). Had the legislature wanted to expose Washington homeowners to such obligations and risks from the international marketplace, it certainly would have eliminated the exclusionary "other obligation" language in RCW 64.21.005(2).  This exclusion, which was enacted shortly after mortgage securitization by

MERS began, should be interpreted in favor of homeowners and determined to have been designed to, among other things, protect Washington residents from losing their homes as security for Wall Street's excesses. *See CHD, Inc. v. Boyles*, 138 Wn. App. 131, 137, 157 P.3d 415 (2007) (Since the statutes allowing for nonjudicial foreclosure dispense with many protections commonly enjoyed by borrowers, "lenders must strictly comply with the statutes, and courts must strictly construe the statutes in the borrower's favor."); *Amresco v. SPS Props.*, 129 Wn. App. 532, 536-537, 157 P.3d 415 (2005).

It is important to state here that the Homeowners' Attorneys are not denying liability to the owners of valid promissory notes or other obligations. The Homeowner's Attorneys contend that the DOT cannot be used as security where provisions of the WDTA are violated and/or the provisions of the promissory note and deed of trust are violated in a prejudicial way to homeowners.

### C.   BAIN DID NOT AGREE TO THE ILLEGAL PROVISIONS OF THE DOT

MERS argues that Bain agreed to MERS participation in the DOT and therefore Bain is contractually bound to its terms regarding MERS status and authority.  MERS Brief, pp 24-9.  But as the Ninth Circuit

explained, this contract analysis does not work if an agreement is illegal or void under state law.

> The plaintiffs' claims that focus on the operation of the MERS system ultimately fail because the plaintiffs have not shown that the alleged illegalities associated with the MERS system injured them or violated state law

*See Cervantes v. Countrywide Home Loans*, 656 F.3d 1034, 1047 (2011).

MERS misinforms the Court when it suggests Lenders and borrowers can make any agreements they want pursuant to WDTA. MERS Brief, p. 25. RCW 61.24.020 makes clear the WDTA contains limits which are not applicable to mortgages generally. "Except as provided in this chapter, a deed of trust is subject to all laws relating to mortgages on real property." RCW 61.24.020.

The United States Supreme Court voided an Alabama deed of trust instrument where the mortgagee was not licensed to do business in Alabama. *See Chattanooga Nat'l Bldg. & Loan Ass'n. v. Denson*, 189 U.S. 408, 23 S. Ct. 630 (1903); *see also*, Complaint in *Washington v. Recontrust Company, N.A.*, King County Superior Court No. 11-2-26867-5, at ¶¶ 2.5, 4.2-4.3 (filed Aug. 4, 2011) (available at: http://www.atg.wa.gov/pressrelease.aspx?id=28750)(brought for high volume Trustee's chronic failures to follow strict procedures of the Act).

In Washington an agreement that violates a statute or municipal ordinance is void, except where the agreement is not criminal or immoral and the statute or ordinance contains an adequate remedy for its violation. *Sienkiewicz v. Smith*, 97 Wn.2d 711, 716, 649 P.2d 112 (1982). *See also Coey v. Low*, 36 Wash. 10, 17, 77 P. 1077 (1904); *Coronado v. Orona*, 137 Wn. App. 308, 153 P.3d 217 (2007); *Evans v. Luster*, 84 Wn. App. 447, 450, 928 P.2d 455 (1996).

MERS' role in the Bain's DOT runs contrary to the policies of the WDTA and should not be countenanced. MERS and the securitization process it fosters does not promote an efficient and inexpensive nonjudicial foreclosure process; or promote communications between borrower and real Note Holder, *i.e.* beneficiary as that term is defined by the WDTA; and do not promote the stability of land titles.

## IV. CONCLUSION

Homeowners Counsel request this Court keep in mind and, if appropriate, address the issues raised herein which this Court does not intend to resolve by its decision in this case.

Respectfully Submitted,


By: /s/ Scott E. Stafne
Scott E. Stafne, WSBA #6964
Stafne Law Firm
239 North Olympic Avenue
Arlington, WA 98223
Phone: (360) 403-8700
Fax: (360) 386-4005
scott.stafne@stafnelawfirm.com


By: /s/ Timothy Robbins
Timothy Robbins, WSBA #15867
Robbins & Herber, P.S., Inc.
3501 Rucker Ave.
Everett, WA 98201
Phone: (425) 339-5537
Fax: (425) 645-8383
timothy.c.robbins@frontier.com


By: /s/ Ha Dao
Ha Dao, WSBA #21793
Stafne Law Firm
239 North Olympic Avenue
Arlington, WA 98223
Phone: (360) 403-8700
Fax: (360) 386-4005
ha@stafnelawfirm.com

19

By: /s/ Nic Fisher
Nic Fisher, WSBA #40716
Law Offices of Nic Fisher
1604 Hewitt Ave., Ste. 601
Everett, WA 98201
Phone: (425) 314-6737
Fax: (425) 328-1542
www.NicFisherLaw.com


By: /s/ Rebecca Thorley
Rebecca Thorley, WSBA #42646
Stafne Law Firm
239 North Olympic Avenue
Arlington, WA 98223
Phone: (360) 403-8700
Fax: (360) 386-4005
r.thorley@stafnelawfirm.com


By: /s/ Andrew J. Krawczyk
Andrew J. Krawczyk, WSBA #42982
Stafne Law Firm
239 North Olympic Avenue
Arlington, WA 98223
Phone: (360) 403-8700
Fax: (360) 386-4005
andrew@stafnelawfirm.com

20

APPENDIX I

# FIXED/ADJUSTABLE RATE NOTE
### (LIBOR ARM Balloon Loan - Rate Caps)

Loan # 125723223                                    MIN: 100055401257232233

THIS NOTE PROVIDES FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND HAS PROVISIONS ALLOWING CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

THIS LOAN IS PAYABLE IN FULL AT MATURITY. YOU MUST REPAY THE ENTIRE PRINCIPAL BALANCE OF THE LOAN AND UNPAID INTEREST THEN DUE. THE LENDER IS UNDER NO OBLIGATION TO REFINANCE THIS LOAN AT THAT TIME. YOU WILL, THEREFORE, BE REQUIRED TO MAKE PAYMENT OUT OF OTHER ASSETS THAT YOU MAY OWN, OR YOU WILL HAVE TO FIND A LENDER, WHICH MAY BE THE LENDER YOU HAVE THIS LOAN WITH, WILLING TO LEND YOU THE MONEY. IF YOU REFINANCE THIS LOAN AT MATURITY, YOU MAY HAVE TO PAY SOME OR ALL OF THE CLOSING COSTS NORMALLY ASSOCIATED WITH A NEW LOAN EVEN IF YOU OBTAIN REFINANCING FROM THE SAME LENDER.

March  9, 2007                OLYMPIA                Washington
  [Date]                    [City]                    [State]

15340 MACADAM RD S UNIT B105, SEATTLE, WA 98188

[Property Address]

**1.   BORROWER'S PROMISE TO PAY**
   In return for a loan that I have received, I promise to pay U.S. $    193,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK
I will make all my payments under this Note in the form of cash, check or money order.
   I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.   INTEREST**
   Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of     9.500        %. The interest rate I will pay may change in accordance with Section 4 of this Note.
   The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.   PAYMENTS**
   (A) Time and Place of Payments
   I will pay principal and interest by making payments every month.
   I will make my monthly payments on the first day of each month beginning on        May  1, 2007
I will make my monthly payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied as of its scheduled due date and will be applied to interest before Principal. If, on        April  1, 2037    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
   I will make my monthly payments at        INDYMAC BANK, F.S.B., P.O. BOX 78826, PHOENIX, AZ 85062-8826
or at a different place if required by the Note Holder.
   (B) Amount of Monthly Payments
   My initial monthly payment will be in the amount of U.S. $    1,563.42        . This amount may change.

IndyMac Bank
MULTISTATE ARM BALLOON LOAN - LIBOR                    Initials: _KB_

**(C) Monthly Payment Changes**
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4.   **ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**
    **(A) Change Dates**
    The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of April, 2009 , and the adjustable interest rate I will pay may change on that day every 6th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change is called a "Change Date."
    **(B) The Index**
    Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of Interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."
    If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.
    **(C) Calculation of Changes**
    Before each Change Date, the Note Holder will calculate my new interest rate by adding  six and NO/1000ths percentage point(s) (    6.000    %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.
    The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date on the "Amortization Period Date" at my new interest rate in substantially equal payments. The Amortization Period Date is    April 1, 2047    , which is greater than the Maturity Date. The result of this calculation will be the new amount of my monthly payment. I acknowledge that this amount will not be sufficient to repay my loan in full on the Maturity Date and that I may owe a significant amount to the Lender on the Maturity Date.
    **(D) Limits on Interest Rate Changes**
    The interest rate I am required to pay at the first Change Date will not be greater than    12.500    % or less than  6.500   %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than  one  and NO/1000ths percentage point(s) (    1.000 %  ) from the rate of interest I have been paying for the preceding  6  month(s). My interest rate will never be greater than  15.500   %, which is called the "Maximum Rate."
    **(E) Effective Date of Changes**
    My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.
    **(F) Notice of Changes**
    The Note Holder will deliver or mail to me a notice of any changes in my initial fixed interest rate to an adjustable interest rate and of any changes in my adjustable interest rate before the effective date of any change. The notice will include the amount of my monthly payment, any information required by law to be given to me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

5.   **BORROWER'S RIGHT TO PREPAY**
    I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this note.
    I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my prepayment to reduce the Principal amount of the note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

Loan No: 125723223
8480785 (0505)                                            Page 2 of 4                  Form 4300  5/05



**6.   LOAN CHARGES**
If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**
(A) Late Charges for Overdue Payments
If the Note Holder has not received the full amount of any monthly payment by the end of       15      calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be       5.000      % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.
(B) Default
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.
(C) Notice of Default
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.
(D) No Waiver By Note Holder
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
(E) Payment of Note Holder's Costs and Expenses
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10.   WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11.   UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument, Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | | | |
|---|---|---|---|
| _Kristin Bain_ (Seal) | | Pay To The Order Of (Seal) | |
| KRISTIN BAIN -Borrower | | -Borrower | |
| _____ (Seal) | | Without Recourse _____ (Seal) | |
| -Borrower | | IndyMac Bank, F.S.B. -Borrower | |
| | | By:  | |
| _____ (Seal) | | _____ (Seal) | |
| -Borrower | | Sam Lindstrom -Borrower | |
| | | Vice President | |
| _____ (Seal) | | _____ (Seal) | |
| -Borrower | | -Borrower | |

[Sign Original Only]

Loan No: 125723223

Form 4300
5/08

8480796 (0505)

Page 4 of 4



## ADDENDUM TO ADJUSTABLE RATE NOTE

Loan #: 125723223

THIS ADDENDUM is made this **9th** day of **March, 2007** , and is incorporated into and intended to form a part of an Adjustable Rate Note dated the same date as this Addendum.

**1. Section 4(D) of the Adjustable Rate Note is modified as follows:**

The interest rate I am required to pay at the first Change Date will not be greater than **12.500** % or less than **6.500** %. Thereafter, my interest rate will never be increased or decreased on any single change Date by more than **one and NO/1000ths** percentage point(s) ( **1.000** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **15.500** % or less than **6.000** %.

**2. All other provisions of the Adjustable Rate Note are unchanged by this Addendum and remain in full force and effect.**

Dated: ___3/13/07___

_Kristin Bain_ _____ (Seal)
KRISTIN BAIN                    -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

IndyMac Bank
ARM Note Addendum - Multistate
84BD344 (0602)                VMP Mortgage Solutions, Inc.

1074
(2/06)

APPENDIX II

Case 2:09-cv-00149-■■■   Document 131-2   Filed 09/22/10   Page 2 of 18

After recording please return to:
INDYMAC BANK, F.S.B., C/O DOCUMENT MANAGEMENT
*[Company Name]*

*[Name of Natural Person]*
BLDG. B, 901 E 104TH ST, SUITE 400/500
*[Street Address]*
KANSAS CITY, MO 64131
*[City, State Zip Code]*

*We certify this to be a true and exact copy of the original*

Assessor's Property Tax Parcel or Account Number:   6698500130
Abbreviated Legal Description:
UNIT B-105, BLDG B, THE PEAKS AT TUKWILA CONDO

_____ *[Space Above This Line For Recording Data]* _____

# DEED OF TRUST

MIN 100055401257232233

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)    "Security Instrument" means this document, which is dated   March  9, 2007 together with all Riders to this document.

(B)    "Borrower" is  KRISTIN BAIN A SINGLE PERSON

. Borrower is the trustor under this Security Instrument.

(C)    "Lender" is  INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK

Lender is a        Federal Savings Bank        organized and existing under the laws of
United States of America        . Lender's address is  155 NORTH LAKE AVENUE, PASADENA,
CA 91101

(D)    "Trustee" is STEWART TITLE GURANTY CO.

(E)    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—        Page 1 of 14        14301WA 08/00 Rev. 11/04
www.compliancesource.com        ©2004, The Compliance Source, Inc.

Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F)   "Note" means the promissory note signed by Borrower and dated   March 9, 2007
The Note states that Borrower owes Lender    one hundred ninety three thousand and NO/100ths                                                          Dollars
(U.S. $ 193,000.00    ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than    April 1, 2037

(G)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H)   "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest;

(I)   "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☒ Condominium Rider            ☐ Second Home Rider
☐ Balloon Rider              ☐ Planned Unit Development Rider  ☐ Biweekly Payment Rider
☐ 1-4 Family Rider           ☐ Revocable Trust Rider
☐ Other(s) [specify]

(J)   "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K)   "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L)   "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M)   "Escrow Items" means those items that are described in Section 3.

(N)   "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O)   "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P)   "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                      Page 2 of 14                          14301WA 08/00 Rev. 11/06
www.compliancesource.com                                                                 ©2006, The Compliance Source, Inc.

(Q)    "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R)    "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the   County                        of                    KING                        :
    [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]
    SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF

which currently has the address of            15340 MACADAM RD S UNIT B105
                                                            [Street]
SEATTLE                              ,    Washington        98188                    ("Property Address"):
                [City]                                    [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Loan No: 125723223
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mae UNIFORM INSTRUMENT          . MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                                    Page 3 of 14                          14191WA 03/04 Rev. 11/04
www.compliancesource.com                                                                      ©2004, The Compliance Source, Inc.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.   **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority:  (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.   **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                    Page 4 of 14
www.compliancesource.com

MERS Modified Form 3048 01/01
14301WA 08/00 Rev. 11/04
©2006, The Compliance Source, Inc.

receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.   **Charges; Liens.**   Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.   **Property Insurance.**   Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right

Loan No:  125723223

shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

Loan No: 125723223

7.   Preservation, Maintenance and Protection of the Property; Inspections.   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   Borrower's Loan Application.   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   Protection of Lender's Interest in the Property and Rights Under this Security Instrument.   If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10.   Mortgage Insurance.   If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                                        Page 7 of 14
www.compliancesource.com

MERS Modified Form 3048 01/01
1431IWA 04/04 Rev. 11/04
©2006, The Compliance Source, Inc.

non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has — if any — with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       MERS Modified Form 3048  01/01
—THE COMPLIANCE SOURCE, INC.—                          Page 8 of 14
www.compliancesource.com

reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

MERS Modified Form 3048 01/01
14301WA 08/00 Rev. 11/06
©2006, The Compliance Source, Inc.

Page 9 of 14

be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such

Loan No: 125723223
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—                    Page 10 of 14
www.compliancesource.com
MERS Modified Form 3048 01/01
1431WA 08/18 Rev. 11/06
©2004, The Compliance Source, Inc.

other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Loan No: 125723223
Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 14

MERS Modified Form 3048 01/01
14301WA 08/00 Rev. 11/04
©2004, The Compliance Source, Inc.

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Use of Property. The Property is not used principally for agricultural purposes.

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—        Page 12 of 14        1434IWA 41/01 Rev. 11/04
www.compliancesource.com        ©2004, The Compliance Source, Inc.

26. **Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees", whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    *Kristin Bain*    (Seal)
                            KRISTIN BAIN       -Borrower
                                               [Printed Name]

_____    _____    (Seal)
                                                       -Borrower
                                                       [Printed Name]

_____    _____    (Seal)
                                                       -Borrower
                                                       [Printed Name]

_____    _____    (Seal)
                                                       -Borrower
                                                       [Printed Name]

———————————————— [Acknowledgment on Following Page] ————————————————

Loan No: 125723223

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          MERS Modified Form 3048 01/01
—THE COMPLIANCE SOURCE, INC.—                Page 13 of 14                                 14301WA 8/00 Rev. 11/04
www.compliancesource.com                                                                   ©2006, The Compliance Source, Inc.

State of Washington
County of _____

I certify that I know or have satisfactory evidence that KRISTEN BAIN

is the person who appeared before me, and said person(s) acknowledged that (he/she/they) signed this instrument and acknowledged it to be (his/her/their) free and voluntary act for the uses and purposes mentioned in the instrument.

Date: 8/13/07

(Signature)

(Printed Name)

Title (Rank/State of Notary Public)

Item No: 129728023

Washington Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com

Page 14 of 14

MERS Modified Form 3048 01/01