UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

TRAVIS MICKELSON, et. ux.

                     Plaintiffs,

vs.

CHASE HOME FINANCE LLC, et. al.

                     Defendants.

NO.  2:11-cv-01445

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

I, William J. Paatalo, HEREBY DECLARE AS FOLLOWS:

1.    I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

2.    I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this Declaration. I have personal knowledge of the matters declared herein, and if called to testify, I could and would competently testify thereto.

3.    I have 17 years combined experience in law enforcement and the mortgage industry.

4.    I worked in the mortgage industry from 1999 – 2008. I was a "loan officer" with Conseco Home Finance from 1999 – 2000 before becoming a "mortgage broker" from 2000 –

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 1

2008. I was the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008. My company was strictly a "broker" for numerous lending institutions to which I would originate loans on their behalf.  I was not a "lender," nor was I involved in "Table-Funding" loans.

     5.    I have worked exclusively over the last 24 months investigating foreclosure fraud and issues related to the securitization of residential and commercial mortgage loans.

     6.    I am a Certified Forensic Mortgage Loan Auditor (CFLA), and have spent more than 3,500 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. I have performed such analyses for residential real estate located in many states, including, but not limited to Washington, Oregon, California, Nevada, Florida, Montana, and several other states.

     7.    As a result of the above education and experience I am familiar with and have sufficient training and expertise to qualify as an expert with regard the substantive differences between mortgage origination, Table-Funding, and traditional mortgage lending.

     8.    My securitization and chain of title analyses here involve the factual aspects of securitization and chain of title.

     9.    In the performance of my securitization and chain of title audits I rely, as do all persons who perform specialized investigative work relating to the securitization of mortgage loans and chain of title issues, on a multitude of sources.  These sources include, but are not limited to my Bloomberg subscription;[1] Edgar (a search tool for Securities and Exchange Commission Filings); other paid subscription sources, including those related to known robo-signers and foreclosure related documents.  I also sometimes rely on, and have relied upon in

---

[1] To assist in my investigations and research, I subscribe to the "Bloomberg Terminal." This tool provides specific information pertaining to mortgage backed securities and the "securitization" of residential and commercial loans. I have been trained in the use of the Bloomberg Terminal and am competent in the use of this product / tool.

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 2

**STAFNE LAW FIRM**

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

1   this case, the services of other experts, such as Dr. Laurie A. Hoeltzel, who is expert in

2   handwriting analysis.   I have attached a copy of her resume hereto as Exhibit 1.

3        10.   In performing this audit and report I have also relied upon documents provided me

4   by the Stafne Law Firm relating to the Mickelson's mortgage loan and foreclosure as well as

5   public information posted on the purported beneficiary's website.  (Mickelson's Deed of Trust

6   identifies the Mortgage Electronic Registration System (MERS) as the beneficiary under that

7   four party instrument.)   I am also an expert with regard to those rules MERS discloses to the

8   public and which MERS and it members purport to follow.

9        11.   I was retained by the Stafne Law Firm to research the securitization of MERS loan

10  number "100112065709467936" and to provide evidence pertaining to the securitization of

11  said loan. I was also asked to conduct an investigation into any potential defects or

12  deficiencies pertaining to the chain of title.  Chain of title deficiencies include among other

13  things lapses in the chain of title necessary to establish the chain of ownership for the

14  promissory note as well as chain of title entries which are fraudulently manufactured or

15  produced through robo-signing.

16       12.  Based on my review of the closing documents it appears the Mickelson's loan was

17  originated on 11/23/05.  The lender was stated on these documents to be MHL Funding Corp.

18  The beneficiary was identified to be the Mortgage Electronic Registry System as nominee for

19  the lender and its successors and assigns.

20       13.  However, the subject Deed of Trust and Promissory Note were assigned a Mortgage

21  Identification Number (MIN#) through MERS, which indicates that MortgageIt was the

22  original lender.   That MIN# is 100112065709467936.

23       14. According to the members' link on the MERS website, this particular MIN# was

24  issued to MERS Member "MortgageIT, Inc."  This would indicate that MHL Funding Corp.,

25  which has its own different MERS Member number, was either not the original lender or

26  assigned this mortgage to MortgageIt, Inc.   Because the subject DOT was registered with

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 3

**S T A F N E   L A W   F I R M**

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

1    MERS under MortgageIT, Inc., rather than MHL Funding, Inc., (the lender identified in the

2    Note and Deed of Trust) there appears to be a break between the ownership of the note and

3    the ownership of deed of trust which was assigned to MERS at the time the mortgage

4    documents were signed.

5        15. I have reviewed the 10-K for "MortgageIT Holdings, Inc." for fiscal year 2005,

6    which was filed with the SEC, and is attached as exhibit 1 hereto.   MortgageIT Holdings was

7    the parent of both MortgageIt, Inc and MHL Funding Corp. in 2005.

8        16. I have been asked whether I believe MortgageIT Holdings, Inc., MortgageIT Inc.,

9    and MHL Funding were in the business of traditional mortgage lending at the time a loan was

10    made to the Mickelsons.

11        17. I do have an opinion.

12        18. My opinion is that MortgageIt Holdings, Inc., Mortgage, Inc. and MHL Funding

13    were in the business of "table funding" and/or loan origination.  It is my opinion these

14    companies were not in the business of traditional mortgage lending at the time the

15    Mickelson's obtained a loan and signed the four party Deed of Trust instrument, which was

16    likely sold for securitization purposes within 30 to 60 days after the loan documents were

17    signed.

18        19. My opinion in this regard is based in part on the following language from

19    MortgageIT Holdings' description of its Mortgage Investment Operations set forth in its 10 K,

20    a portion of which (pages 1 – 30) is attached as Exhibit 2.  The Court should note this 10K

21    describes the business operations of MorgageIT Holdings, as well as its subsidiaries

22    MortgageIT, Inc. and Mortgage Funding, Inc. as being loan originators and/or table funders.

23        Mortgage Investment Operations:

24        Our mortgage investment operations involve the acquisition and retention, in a leveraged portfolio, of traditional ARM loans, hybrid ARM loans and

25        mortgage-backed securities (collectively, ''Portfolio Assets''). Traditional ARM loans are mortgage loans that have interest rates that reprice in one

26        year or less (''Traditional ARMs'' or ''Traditional ARM loans''), and

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 4

**STAFNE LAW FIRM**

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

hybrid ARM loans are mortgage loans that have a fixed interest rate for an initial period of not more than five years and then convert to Traditional ARMs for their remaining terms to maturity ("Hybrid ARMs" or "Hybrid ARM loans", and together with the Traditional ARM loans, "Portfolio ARM Loans").

All of the Portfolio ARM Loans we acquire are originated by our mortgage banking operations and must meet the underwriting criteria and guidelines set forth in our investment and risk management policy. For purposes of maintaining liquidity for borrowings or as collateral, we may also invest in U.S. Treasury securities or debentures and discount notes guaranteed by either of two government-sponsored corporations, Federal National Mortgage Association ("FNMA" or "Fannie Mae") and Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac").

*The funding of our mortgage loan portfolio primarily consists of borrowings from our warehouse lines of credit for loans awaiting securitization, the issuance of collateralized debt obligations ("CDOs") and repurchase agreements. We originate ARM loans for our investment portfolio and either securitize them from the TRS with subsequent purchase of a portion of the securities by Holdings, or transfer the loans to Holdings with the intention of securitizing them by transferring them to independent trusts. In order to facilitate the securitization of our loans, we generally create subordinate certificates, which provide a specified amount of credit enhancement to the higher rated certificates. Upon securitization, we finance the loans through the issuance of CDOs in the capital markets and occasionally retain certain subordinate certificates. We service Portfolio ARM Loans through a subservicer.*

*When a securitization is accomplished through Holdings, we do not account for CDOs placed with third party investors as sales and, therefore, do not record any gain or loss in connection with securitization transactions. The securitizations are accounted for as long-term collateralized financings. Consequently, the Portfolio ARM Loans transferred to the independent trust are shown as assets on our balance sheet. On our balance sheet, our Portfolio ARM Loans consist of ARM loans collateralizing debt obligations and ARM loans held for securitization. We, therefore, generate revenue in our mortgage investment operations from the spread between the interest income on our Portfolio ARM Loans and our cost of borrowings (i.e., the interest expense on our CDOs, warehouse lines of credit, and repurchase agreements). The loan securitization process benefits us by creating highly liquid securitized assets that can be readily financed in the capital markets.*

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

*When a securitization is accomplished through the TRS and the securitization is structured to qualify as a sale, we account for MBS placed with third party investors as sales and consequently record a gain or loss in connection with the securitization transaction. The TRS may also retain the MSR associated with the securitized loans. The securities purchased by Holdings are shown as assets on our balance sheet. These securities are classified as available for sale and, therefore, are carried at fair value on the balance sheet.* Exhibit 2, pp. 5-6.

20. My opinion that MortgageIT Holdings, Inc., MortgageIT Inc., and MHL Funding were not traditional real estate lenders who held the property as security for repayment of the debt which was used to purchase the Mickelsons' home is also based on the additional following language from MortgageIT Holdings' 10 K, Exhibit 2:

> MortgageIT generally sells the mortgage loans it originates within 30 to 60 days of funding. To the extent it takes longer to sell its mortgage loans, MortgageIT is subject to interest rate risk, market risk, credit spread risk, and liquidity and funding risk with respect to its mortgage loans held for sale. In addition, MortgageIT must finance its mortgage loans held for sale, hedge such loans and commit a portion of its capital to support the holding of such loans. These costs may or may not offset the interest income realized from such loans. At December 31, 2005, MortgageIT had $3.38 billion in mortgage loans held for sale, as compared to $784.6 million as of December 31, 2004. The increase in mortgage loans held for sale from December 31, 2004 to December 31, 2005 is due primarily to an increase in loan originations, as well as a decline in the marketability of the Company's sub-prime loans. Exhibit 2, p. 19.

21. Entities which intend to rely upon a house as security for their repayment of a loan would not expect to sell their note within 60 to 90 days. This business plan set forth in MortgageIT's 10K is characteristic of table lenders and mortgage originators; not traditional mortgage lenders.

22. Table funding is generally defined as:

> A lending method employed when a loan originator does not have access to the money necessary to make loans and then hold them until it has enough to sell on the secondary market. As a result, the originator forms a relationship with a lender who provides the funds for closing and immediately takes an

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 6

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

assignment of the loan. This is called table funding. Under regulations of the Department of Housing and Urban Development, table-funded loans must disclose service release premiums—profit received by the originator—on the loan closing settlement statement. Loans sold on the secondary market do not have to make those disclosures.

This definition is taken from the Free Dictionary by Farflex, which can be found at http://financial-dictionary.thefreedictionary.com/table+funding.  This website cites "The Complete Real Estate Encyclopedia by Denise L. Evans, JD & O. William Evans, JD. Copyright © 2007 by The McGraw-Hill Companies, Inc. as a source for its information." Id.

23.  The following diagram indicates some of the central features of table funders funding.  This diagram can be found at the web site identified in the above paragraph.



Table funding—everything occurs on the same day.

///

///

///

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 7

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

24.  Loan originators also sell their loans shortly after negotiation.  This diagram reproduced from internet URL cited above illustrates this.



**A typical (non-table funded) loan transaction.**

25.  It is also significant to me in forming my opinions that MortgageIT defines its competition in its 10 K to include "traditional banks and thrift lenders."

> We anticipate that the majority of our competition will be in the mortgage industry. In addition to mortgage banking companies, internet-based lending companies, ***traditional banks and thrift lenders***, and securities brokers, government-sponsored entities, such as Fannie Mae and Freddie Mac, are also expanding their participation in the mortgage industry. … Exhibit 2, p. 21. [Emphasis Supplied].

///

///

///

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 8

26.  MortgageIT's 10K suggests that its business model is not traditional mortgage lending, but quick securitizations of notes to obtain liquidity.

**If we do not generate sufficient liquidity, we will be unable to conduct our operations as planned.**

If we do not generate sufficient liquidity, we will be unable to continue to grow our operations, grow our asset base, maintain our hedging policy and pay dividends. We derive our liquidity for our mortgage investment operations from the following sources:

- use of repurchase agreements;

- receipt of principal and interest payments from ARM and hybrid ARM loans that we retain during the period between origination and sale to our investment operations or to a third-party investor;

- issuance of MBS; and

- net interest earned from securitized loans.

In addition to the foregoing sources of liquidity, we derive liquidity from several warehouse facilities with major lenders that are used to fund mortgage loans held for securitization and mortgage loan originations through our mortgage banking operations. We cannot assure you that any of our sources of liquidity will continue to be available to us or that we will be able to negotiate favorable terms. Exhibit 2, p. 16.

See also Mortgage Banking Operations:

Our mortgage banking operations are conducted through MortgageIT and its subsidiaries. The TRS is a full-service residential mortgage banking company *that is licensed to originate loans throughout the United States*.

The TRS generates revenue through the origination, sale and brokering of mortgage loans sourced through its loan production channels. This revenue primarily consists of gain on sale of mortgage loans, loan brokerage revenues and net interest income. Gain on sale of mortgage loans is typically generated from the sale of mortgage loans to investors, on a servicing released basis, generally within 30 to 60 days of funding. Accordingly, we do not generally capitalize the value of MSR. Gain is recognized based on the difference between the net sales proceeds and the carrying value of the mortgage loans sold and is recognized in earnings at the time of sale. The

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 9

**S T A F N E   L A W   F I R M**

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

carrying value of the mortgage loans sold includes direct loan-related origination costs and fees. When the TRS securitizes loans through a REMIC transaction, structured to qualify as a sale, it generates gain on sale revenue when the loans are sold to the REMIC, and it also may capitalize the value of MSR and amortize it i n proportion to, and over the period of, estimated net servicing income (the excess of servicing revenues over servicing costs). Brokerage revenue consists of fees and commissions earned by brokering mortgage loans ultimately funded by third party lenders. Interest on mortgage loans held for sale accrues on loans from the date of funding through the date of sale.  Exhibit 2, p. 6. [Emphasis Supplied]

27. I have attached hereto as Exhibit 3 a "Custodial Agreement" dated 10/14/05 between JPMorgan Chase Bank, N.A. (Buyer), MortgageIT, Inc. (Seller), MortgageIT Holdings, Inc. (Seller), MHL Funding Corp. (Seller), Next At Bat Lending, Inc. (Seller), and Deutsche Bank National Trust Company Custodian).  This agreement illustrates some of the warehouse lending practices utilized by MortgageIT Holdings, Inc, MortgageIT, Inc. and MHL Funding Corp. as originating-mortgage sellers with J.P. Morgan Chase, as buyer.

28.  It is my opinion based on my training and experience that Chase Home Finance, LLC never owned the note in question because its role is usually as a servicer or subservicer for JP Morgan Chase Bank, N.A.  In other words, in my opinion on a more likely than not basis, Chase Home Finance, LLC never owned the Mickelsons' note in question, but was only acting as a servicer for J.P. Morgan Chase Bank, N.A., which on a more likely than not basis had access to the note through a Custodian.

29. Based on my education and experience Exhibit 3 is the type of loan purchase agreement which is used prior to the securitization of promissory notes into a Mortgage Backed Security.  What happens is that the securitization will include loans which have been purchased and pooled through this or a similar type loan purchase agreement.

///

///

///

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 10

30. Section 2 of Exhibit 3 states in pertinent part:

(a)   With respect to each purchased mortgage loan, no later than 4:00 p.m. (New York City time) one business day prior to each purchase date, Seller shall deliver or cause to be delivered to the Custodian (i) the mortgage files with respect to the Purchased Mortgage Loans[2] and (ii) the related Loan Schedule.[3]

The Custodian shall deliver to the Buyer via electronic mail in a format acceptable to the Buyer (with the original to follow by overnight courier), no later than 3:00 p.m. (New York City time) on the Purchase Date,[4] a Mortgage Loan Schedule and Exception Report[5] and (ii) a Trust Receipt,[6] in respect of all Mortgage Loans then held or to be held by the Custodian for the Buyer's benefit (including Mortgage Loans to be purchased on such Purchase Date to the extent that the Custodian has timely received the items required by this Section 2(a)).

(b) On each Purchase Date with respect to Purchased Mortgage Loans, upon receipt of the Mortgage Loan Schedule and Exception Report[7] from the Custodian, in form and substance acceptable to the Buyer, the Buyer shall

---

[2] The Custodial Agreement defines "Purchased Mortgage Loan" to "mean each Mortgage Loan, and/or any other evidence of ownership of a Mortgage Loan mutually agreed upon by the Buyer and the Sellers and identified to the Custodian transferred or caused to be transferred by the Sellers to the Buyer or its designee (including the Custodian) in a Transaction under the Repurchase Agreement and any Additional Purchased Mortgage Loans delivered pursuant to this Agreement."

[3] The Custodial Agreement defines Mortgage Loan Schedule to "mean a schedule in written and computer readable formats of Purchased Mortgage Loans, containing the information set forth in Exhibit 7 hereto and otherwise acceptable to the Buyer."

[4] The Custodial Agreement states "Purchase Date shall mean with respect to each Purchased Mortgage Loan, the date on which such Purchased Mortgage Loan is purchased by the Buyer pursuant to the Repurchase Agreement."

[5] The Custodial Agreement states: "Mortgage Loan Schedule and Exception Report" shall mean a list of Purchased Mortgage Loans delivered by the Custodian to the Buyer, reflecting the Mortgage Loans held by the Custodian for the benefit of the Buyer, which includes codes indicating any exceptions with respect to each Mortgage Loan listed thereon. Each Mortgage Loan Schedule and Exception Report shall contain a list of exceptions with respect to the information set forth in the first paragraph of Section 3 hereof, with any updates thereto from time to time last delivered, with respect to the Mortgage Loans being purchased by the Buyer on any applicable Purchase Date as well as the Mortgage Loans previously purchased by the Buyer and held by the Custodian hereunder."

[6] The Custodial Agreement states:  "Trust Receipt shall mean a trust receipt issued by the Custodian evidencing the Purchased Mortgage Loans it holds, in the form attached hereto as Exhibit 2 and delivered to the Buyer by the Custodian in accordance with Section 2 hereof."

[7] See footnote 5.

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 11

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

transfer to each Seller immediately available funds in an amount equal to the related Purchase Price.[8]

31. Section 3 of the Custodian Report sets forth the Custodian's obligations regarding the Mortgage Loan Schedule and Exception Report. These obligations include verification of chain of title. In this regard, Section 3 requires:

> … (viii) if the Mortgage Note does not name the Seller as the holder or payee, the Mortgage Note bears original endorsements that complete the chain of ownership from the original holder or payee to the last endorsee (the "Last Endorsee"); (ix) if the Mortgage does not name the Seller or MERS as the mortgagee or beneficiary, the original of the Assignment of Mortgage from the named mortgagee or beneficiary bears the original signature purporting to be the signature of the named mortgagee or beneficiary (including any subsequent assignors) or in the case of copies certified by the Seller, such copies bear a reproduction of such signature or signatures and that the Assignment of Mortgage and any intervening assignments of mortgage complete the chain of title from the originator to the Last Endorsee;… (Exhibit 3, pp. 6-7)

32. It is my opinion based on a reasonable degree of certainty that these provisions requiring chain of title ownership verification stem from the fact that several states require that a beneficiary or holder of the note attempting to foreclose on a home as security require proof of note holder status.

33. If, as I have concluded it is more likely than not that the Mickelsons' promissory note was securitized, the following chain of title questions arise:

A. MERS identified its initial principal as MortgageIT, Inc., not MHL Funding, Inc. Does this constitute a break between the note and its DOT security?

---

[8] Interestingly, the Custodian Agreement does not define "Purchase Price" even though it is capitalized. The Custodian Agreement states: Capitalized terms used but not defined herein shall have the meanings assigned to them in the Repurchase Agreement.

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

B. Where is the transfer of MortgageIT's interest by MERS to the next
assignee, which most likely would have taken place within 30 to 60 days
later according to MortgageIT Holdings, Inc. 10 K filing?  The only
assignment of record of the DOT is executed 08/28/08 from MERS to Chase
Home Finance, LLC, which is typically a servicer and was the servicer on
this loan.

C. Who actually "funded" the subject loan?  The 10-K states, "The funding of
our mortgage loan portfolio primarily consists of borrowings from our
warehouse lines of credit for loans awaiting securitization, the issuance of
collateralized debt obligations (''CDOs'') and repurchase agreements." This
language suggests that the money used to fund the loans came from
warehouse funders or pre-sold certificates to investors.

   34.  The assignment of the DOT, which MERS identifies as being owned by
MortgageIT, Inc, is executed on 08/25/08 by "Vonnie McElligott" as Vice President of
MERS. We know, however, that MERS was holding the Deed of Trust for the benefit of
MortgageIT, Inc.  The Limited Power of Attorney Agreement document executed on 09/01/05
and recorded 10/28/05 (attached as Exhibit 4) shows that Vonnie McElligott is actually
employed by Northwest Trustee Services, Inc.

   35.  Typically in foreclosure cases, assignment(s) are executed around the time of a
declared "default." If the Mickelson's were behind in their payments at the time of the
assignment, then arguments can be made regarding whether Chase was a holder of the note
under the UCC.   Parties seeking to foreclose often claim to be the "Holder in Due Course" by
virtue of the "blank" endorsement.  However, as stated earlier, this does not work in some
states where proof as to how the party acquired the negotiable note is required.

   36.  I have been asked whether I have an opinion based on my training and experience as
to whether the "blank" endorsement on the Mickesons' promissory note has been robo-signed.

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 13

STAFNE LAW FIRM
239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

37. I do have an opinion.

38. My opinion is that the note was likely robo-signed.

39. I base my opinion on the following facts:  the promissory note allegedly endorsed in blank by MHL Funding shows the borrower's signatures and initials in blue colored ink while the endorsement signature appears in black.  In my opinion, based on my experience in law enforcement and mortgage auditing, this brings the authenticity of the document into question because the endorsement signature should also be in a colored ink, rather than black.  My opinion is also based on the prevalence of robo-signing in the industry as well as the fact that MERS indicates its initial principal in relation to the DOT was MortgageIT, Inc., rather than MHL Funding, Inc.

40. I also asked Dr. Laurie A. Hoeltzel, a handwriting and robosigning expert, to evaluate the endorsement signature, but have not heard back from her yet.  I will provide the Court with her analysis when I receive it.

41. Attached hereto are examples signature samples of parties employed by NWTS that vary in appearance and style, and appear to be synonymous with the definition of "robo-signing."

42. I ran a check of the subject loan in the MERS Registration System.  I have attached a copy of this as Exhibit 4.  The MERS system shows the subject loan as still being "active" with Freddie Mac as the "investor."

43. As I have stated previously, according to MERS the DOT was given a Mortgage Identification Number (Min#) 100112065709467936.   A Loan with this Min# was identified by the MERS Registry Search Engine. The report on the MERS Registry stated that JPMorgan Chase Bank, N.A. is the current servicer of the Mortgage, and the MERS file is "active."  Freddie Mac is named as the investor.

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 14

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

44.  Because the subject property was foreclosed and sold per Trustee's Deed dated 03/30/11, the subject loan should have been "deactivated" within the MERS system.  The MERS Quality Assurance Procedures Manual Glossary defines "Deactivation" as follows:

"When a loan becomes inactive on the MERS System for one of the following reasons:

• Paid in Full (includes payoff, deed in lieu, short sale, etc.)
• Transfer to non-MERS Status
• Involuntary transfer/default by Servicer
• Involuntary transfer/default by Subservicer
• Foreclosure Complete
• Reinstated or modified (option 1), not assigned back to MERS

45.  I unable to determine exactly when Freddie Mac acquired the subject loan prior to the foreclosure sale.  This information is available to the defendants, who are members of MERS via their obtaining of a MERS milestone report.  Vonnie McElligott and other NWTS are vice presidents of MERS and should be able to provide this Court with the "MERS Milestone Report" they relied upon in determining who was the owner of the promissory note and deed of trust.

46.  In the absence of the MERS Milestone Report it is my opinion on a more likely than not basis within a reasonable degree of certainty that Freddie Mac would not have purchased a defaulted loan at a foreclosure sale as it is not supposed to purchase non-performing loans or loans which are in default.  It is my opinion based on all of the evidence I have reviewed that Freddie Mac was the investor/owner of the Mickelson's promissory note prior to foreclosure.

47.  Further, it is my opinion that MHL Funding likely assigned the promissory note to some entity (most likely Freddie Mac) within 30 to 60 days after the promissory note was signed.  But at this point the deed of trust was owned by MERS as an agent for MortgageIT, Inc.

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 15

48. My opinions set forth in paragraphs 34 through 36 are also supported by discovery responses provided by NWRS on this issue. NWTS' first discovery responses identify Freddie Mac as the beneficiary which made a credit bid at the foreclosure sale.

49. As an expert in securitization and chain of title analysis, I credit this discovery response as being as, more likely more true than NWTS' later amended productions. NWTS' later claim was that that Chase Home Finance (an entity I believe was most likely the servicer of the Mickelsons' loan) was actually the owner of the note who sold the note to Freddie Mac after the sale.

50. I was unable to retrieve Island County, Washington Land Records.


I declare under penalty of perjury under the laws of the State of Oregon that the foregoing is true and correct and that this declaration was executed on the 7th day of September, 2012.


William J. Paatalo
Private Investigator – OR PSID# 49411
5200 SW Meadows Rd. #150
Lake Oswego, OR 97035

DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT- 16

**STAFNE LAW FIRM**

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM