EXHIBIT 2

*SEC Info*   Home   Search   My Interests   Help   Sign In   *Please Sign In*

## MortgageIT Holdings/Inc · 10-K · For 12/31/05

**Filed On 3/15/06 3:38pm ET · SEC File 1-32213 · Accession Number 950136-6-1963**

| Find | | in | this entire Filing. ▼ | Show | Docs searched ▼ | and | every "hit". ▼ |

Help...   *Wildcards:* ? (any letter). * (many). *Logic:* for Docs: (and), ) (or); for Text: ( (anywhere), "(&)" (near).

| As Of | Filer | Filing | For/On/As | Docs:Size | Issuer | Agent |
|---|---|---|---|---|---|---|
| 3/15/06 | MortgageIT Holdings/Inc | 10-K | 12/31/05 | 9:536 | | Capital Systems 01/FA |

**Annual Report · Form 10-K**
**Filing Table of Contents**

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Annual Report | HTML | 1.70M |
| 2: EX-3.2 | Mhl Bylaws | HTML | 78K |
| 3: EX-10.46 | Incentive Plan | HTML | 15K |
| 4: EX-21.1 | Subsidiaries | HTML | 8K |
| 5: EX-23.1 | Bdo Consent | HTML | 7K |
| 6: EX-31.1 | Certificate Pursuant to Section 302 | HTML | 14K |
| 7: EX-31.2 | Certification Pursuant to Section 302 | HTML | 14K |
| 8: EX-32.1 | Certification Pursuant to Section 906 | HTML | 12K |
| 9: EX-32.2 | Certification Pursuant to Section 906 | HTML | 12K |

**10-K · Annual Report**

*This is an EDGAR HTML document rendered as filed. [ Alternative Formats ]*

| 10-K | 1st "Page" of 104 | TOC | Top | Previous | Next | Bottom | Just 1st |

Sponsored Ads...

BECU Home Loans  Valuable mortgage resources, tips and more - available only at BECU  www.becu.org

Mortgage Securitization  Serving Attorneys - All 50 States Attorney Operated / BBB Approved  confidentialsecuritization.com

3.0% No Closing Cost Refi  No Closing Cost APR Refi. Quote As Seen on CNN News. Call Today!  Greenlisb  AdChoices ▷

| 10-K | 2nd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 2nd |

UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended: December 31, 2005

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from     to

Commission File Number: 001-32213

## MORTGAGEIT HOLDINGS, INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Maryland | 20-0947002 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification Number) |
| 33 Maiden Lane New York, New York | 10038 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (212) 651-7700

Securities registered pursuant to Section 12(b) of the act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| COMMON STOCK, PAR VALUE $.01 PER SHARE | NEW YORK STOCK EXCHANGE |

**Securities registered pursuant to Section 12(g) of the act:**

NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act

Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act

Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15 (d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports, and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.

☒

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated and large accelerated filer" in Rule 12b-2 of the Exchange Act.(Check one):

Large accelerated filer ☐        Accelerated filer ☒        Non-accelerated filer ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act).

Yes ☐  No ☒

The aggregate market value of the outstanding common equity of the registrant held by non-affiliates as of June 30, 2005 was $450,796,809.

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:

COMMON STOCK, $0.01 PAR VALUE PER SHARE: 28,799,140 SHARES OUTSTANDING AS OF March 2, 2006.

**DOCUMENTS INCORPORATED BY REFERENCE**

The definitive proxy statement relating to the registrant's annual meeting of stockholders, to be held on June 13, 2006, is incorporated by reference in Part III to the extent described therein.

| 10-K | 3rd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 3rd |
|---|---|---|---|---|---|---|---|

**MORTGAGEIT HOLDINGS, INC.**
**2005 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

Page

**PART I**

| ITEM 1. | BUSINESS | 3 |
| ITEM 1A. | RISK FACTORS | 11 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 29 |
| ITEM 2. | PROPERTIES | 29 |
| ITEM 3. | LEGAL PROCEEDINGS | 29 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 30 |

**PART II**

| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 31 |
| ITEM 6. | SELECTED FINANCIAL DATA | 32 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 35 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 53 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 58 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 58 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 58 |
| ITEM 9B | OTHER INFORMATION | 61 |

PART III

| ITEM 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 62 |
| ITEM 11. | EXECUTIVE COMPENSATION | 62 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 62 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 62 |
| ITEM 14. | PRINCIPAL ACCOUNTING FEES AND SERVICES | 62 |

PART IV

| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 63 |

| FINANCIAL STATEMENTS | F-1 |
| SIGNATURES | |
| EXHIBIT INDEX | |

2

| 10-K | 4th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 4th |

## FORWARD-LOOKING STATEMENTS

This annual report on Form 10-K contains certain "forward-looking statements," which are based on management's current expectations. Such forward-looking statements include information concerning possible or assumed future results of operations, trends, financial results and business plans, including, among other things, the Company's ability to fund a fully-leveraged, self-originated loan portfolio, its anticipated loan funding volume and the Company's ability to pay dividends. For these statements, the Company claims the protection of the safe harbor for forward-looking statements contained in the Private Securities Litigation Reform Act of 1995. Forward-looking statements are statements that relate to future, not past events and are generally identifiable by use of forward-looking terminology such as "may," "will," "should," "potential," "intend," "expect," "endeavor," "seek," "anticipate," "estimate," "overestimate," "underestimate," "believe," "could," "project," "predict," "continue" or other similar words or expressions. Forward-looking statements are based on the current economic environment and management's current expectations and beliefs, and are subject to a number of trends and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. Forward-looking statements are inherently subject to significant economic, competitive, and other contingencies that are beyond the control of management. The Company can give no assurance that its expectations will be attained. Factors that could cause actual results to differ materially from the Company's expectations include, but are not limited to, MortgageIT's continued ability to originate new loans, including loans that we deem suitable for our securitization portfolio; changes in the capital markets, including changes in interest rates and/or credit spreads; and the risk factors or other uncertainties described from time to time in the Company's filings with the Securities and Exchange Commission, including the Risk Factors section included in this annual report on Form 10-K.

Readers are cautioned not to place undue reliance on any of these forward-looking statements, which reflect our management's views as of the date of this report. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, levels of activity, performance or achievements. We do not undertake, and specifically disclaim, any obligation to update or revise any of the forward-looking statements after the date of this annual report on Form 10-K, to conform these forward-looking statements to actual results or to update the reasons why actual results could differ from those projected in the forward-looking statements.

## PART I

## ITEM 1.  BUSINESS

Unless the context suggests otherwise, the terms "Company," "Holdings," "we," "us," and "our" refer to MortgageIT Holdings, Inc., a Maryland corporation incorporated in March 2004, and its subsidiaries. "MortgageIT" or "TRS" refers to our wholly owned subsidiary, MortgageIT, Inc., a New York corporation.

### GENERAL

Formed in March 2004, Holdings is organized and conducts its operations to qualify as a real estate investment trust ("REIT") for federal income tax purposes, and is focused on earning net interest income from mortgage loans originated by MortgageIT, its taxable REIT subsidiary. MortgageIT was incorporated in New York in February 1999, and began marketing mortgage loan services in May 1999. MortgageIT is a full-service residential mortgage banking company that is licensed to originate mortgage loans throughout the United States. MortgageIT originates single-family mortgage loans of all types, with a particular focus on prime ARM and fixed-rate, first lien residential mortgage loans. Prior to August 4, 2004, MortgageIT sold all of the loans it originated through both its retail and wholesale operations to third party investors. Home Closer LLC ("Home Closer"), a subsidiary of MortgageIT, Inc., provides settlement, title and related services. IPI Skyscraper Mortgage Corporation, which provides retail mortgage lending operations, was a wholly owned subsidiary of MortgageIT until it was merged with and into MortgageIT effective December 31, 2004.

3

| 10-K | 5th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 5th |

The Company's business strategy is to self-originate prime ARM loans that are used to collateralize debt obligations, and generate earnings by holding these loans or investment securities in our portfolio and receiving the spread between the yield on our assets and the cost of borrowings. In the majority of cases, the ARM loans originated by the TRS are held in our investment portfolio. In some cases, the TRS sells loans that collateralize mortgage-backed securities ("MBS") issued through a real estate mortgage investment conduit ("REMIC"). Mortgage-backed securities are debt obligations that represent claims to the cash flows from pools of mortgage loans. A REMIC is an entity through which an issuer can sell multiple-class securities to investors. The entity invests in a pool of mortgages, and sells interests in those mortgages through securities with one or more senior classes as well as subordinated classes that assume the credit risk of defaults and delinquencies.

A REMIC securitization may be structured to qualify as either a sale or a financing for accounting purposes. The REMIC securitization, executed by the TRS in November 2005, is structured to qualify as a sale and, as such, the loans are removed from our balance sheet, but the Company retains excess interest, prepayment penalty and subordinated securities for its investment portfolio. The TRS generates gain on sale revenue through the sale of loans to the REMIC, and may also retain mortgage servicing rights ("MSR") on the underlying loans, thereby generating a stream of revenue over the life of the loans. The securities purchased by the Company for its investment portfolio are funded with a combination of repurchase line financing and equity capital.

Our investment strategy is designed to mitigate credit risk and interest rate risk. Our mortgage loan investment portfolio consists primarily of prime ARM Loans that collateralize multi-class pass-through securities that we issue in securitization transactions, and prime ARM Loans that we intend to securitize.

The loans that we retain in portfolio are serviced through a subservicing arrangement. Generally, we expect to continue to sell the fixed rate loans originated by MortgageIT to third parties as well as any ARM or hybrid ARM loans that we do not retain in portfolio.

On August 4, 2004, we closed our initial public offering and sold 14.6 million shares of common stock at a price to the public of $12.00 per share, for net proceeds of approximately $163.4 million, after deducting the underwriters' discount and other offering-related expenses. Since the completion of our initial public offering, the primary focus of our business has been to build a leveraged portfolio of single-family residential mortgage loans comprised largely of traditional ARM and hybrid ARM loans, the majority of which have an initial fixed-rate period followed by an adjustable-rate period. Our portfolio of mortgage loans consists exclusively of loans originated by the TRS. As of December 31, 2005, we had transferred to our investment portfolio approximately $5.6 billion of residential traditional ARM and hybrid ARM loans originated by MortgageIT, as well as $24.3 million of investment securities collateralized by self-originated ARM loans.

In June 2005, the Company conducted a secondary public offering of its common stock and sold 7,289,428 shares at a price to the public of $18.25 per share. In July 2005, the underwriters of the secondary public offering exercised, in full, their option to purchase an additional 1,422,646 shares of common stock from the Company at the public offering price of $18.25 to cover over-allotments. Net proceeds to the Company, after deducting the underwriting discount and estimated offering expenses, were approximately $150 million. In addition, certain stockholders sold 2,194,878 shares in the secondary public offering. The Company did not receive any proceeds from the sale of shares by the selling stockholders.

In April and May 2005, the Company issued, in two private placements, an aggregate of $75 million of trust preferred securities ("TPS") through trust subsidiaries and sold them to collateralized debt obligation pool vehicles under Rule 144A of the Securities Act of 1933. The floating-rate TPS bear a variable interest rate of 375 basis points above 3-month LIBOR, paid quarterly, and will mature in 2035. They are redeemable at par after five years and, in certain limited circumstances, at a premium to par in less than five years. Proceeds from the TPS sale were used to grow the Company's self-originated loan portfolio as well as to support the continued expansion of the Company's taxable REIT subsidiary.

4

| 10-K | 6th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 6th |

In October 2005, the Company announced a program to repurchase up to $30 million of its outstanding common stock, depending upon management's discretion based upon ongoing assessments of the capital needs of the Company and the market valuation of its stock. During the fourth quarter of 2005, the Company repurchased approximately $1.2 million of stock. The Company does not anticipate actively repurchasing its common stock during the first quarter of 2006.

Also, in October 2005, Holdings established a captive mortgage reinsurance company, which generates earnings from mortgage insurance premiums paid on a portion of the loans originated by MortgageIT. Approximately 5.5% of the loans originated by MortgageIT during the twelve months ended December 31, 2005 required mortgage insurance.

In December 2005, the TRS declared a $10 million dividend to Holdings, substantially all of which was included in the 2005 dividend payments paid to shareholders of the Company.

During the fourth quarter of 2005, gain on sale margins for sub-prime loans narrowed significantly industry-wide. In response to these adverse industry conditions, the Company reduced its presence in the sub-prime origination market by decreasing the number of its sub-prime branches from six to three and implementing related work force reductions. As of December 31, 2005, this division had reduced its number of employees from 476 to 412. This division generated 10.7% of MortgageIT's total originations in the fourth quarter of 2005. All of the sub-prime loan production is sold to third party investors and we do not hold sub-prime loans in our investment portfolio.

During the first quarter of 2006, the Company continued to reduce its sub-prime staff and operations. The Company expects future sub-prime loan volume not to be a material component of its total originations as the Company will have substantially exited the wholesale sub-prime business by the end of the first quarter of 2006.

## DESCRIPTION OF BUSINESS

The Company operates its business in two primary segments, mortgage investment operations and mortgage banking operations. Mortgage investment operations are driven by the net interest income generated on our

leveraged prime mortgage loan investment portfolio. Mortgage banking operations are driven by income generated from our mortgage loan origination business and include sales, loan processing, underwriting, funding, secondary marketing and brokerage activities.

Financial information regarding the Company's business segments can be found in Note 13 to the consolidated financial statements included elsewhere in this annual report on Form 10-K.

### Mortgage Investment Operations

Our mortgage investment operations involve the acquisition and retention, in a leveraged portfolio, of traditional ARM loans, hybrid ARM loans and mortgage-backed securities (collectively, ''Portfolio Assets''). Traditional ARM loans are mortgage loans that have interest rates that reprice in one year or less (''Traditional ARMs'' or ''Traditional ARM loans''), and hybrid ARM loans are mortgage loans that have a fixed interest rate for an initial period of not more than five years and then convert to Traditional ARMs for their remaining terms to maturity (''Hybrid ARMs'' or ''Hybrid ARM loans'', and together with the Traditional ARM loans, ''Portfolio ARM Loans'').

All of the Portfolio ARM Loans we acquire are originated by our mortgage banking operations and must meet the underwriting criteria and guidelines set forth in our investment and risk management policy. For purposes of maintaining liquidity for borrowings or as collateral, we may also invest in U.S. Treasury securities or debentures and discount notes guaranteed by either of two government-sponsored corporations, Federal National Mortgage Association (''FNMA'' or ''Fannie Mae'') and Federal Home Loan Mortgage Corporation (''FHLMC'' or ''Freddie Mac'').

The funding of our mortgage loan portfolio primarily consists of borrowings from our warehouse lines of credit for loans awaiting securitization, the issuance of collateralized debt obligations (''CDOs'') and repurchase agreements. We originate ARM loans for our investment portfolio and either securitize them from the TRS with subsequent purchase of a portion of the securities by Holdings, or

5

| 10-K | 7th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 7th |

transfer the loans to Holdings with the intention of securitizing them by transferring them to independent trusts. In order to facilitate the securitization of our loans, we generally create subordinate certificates, which provide a specified amount of credit enhancement to the higher rated certificates. Upon securitization, we finance the loans through the issuance of CDOs in the capital markets and occasionally retain certain subordinate certificates. We service Portfolio ARM Loans through a subservicer.

When a securitization is accomplished through Holdings, we do not account for CDOs placed with third party investors as sales and, therefore, do not record any gain or loss in connection with securitization transactions. The securitizations are accounted for as long-term collateralized financings. Consequently, the Portfolio ARM Loans transferred to the independent trust are shown as assets on our balance sheet. On our balance sheet, our Portfolio ARM Loans consist of ARM loans collateralizing debt obligations and ARM loans held for securitization. We, therefore, generate revenue in our mortgage investment operations from the spread between the interest income on our Portfolio ARM Loans and our cost of borrowings (i.e., the interest expense on our CDOs, warehouse lines of credit, and repurchase agreements).

The loan securitization process benefits us by creating highly liquid securitized assets that can be readily financed in the capital markets.

When a securitization is accomplished through the TRS and the securitization is structured to qualify as a sale, we account for MBS placed with third party investors as sales and consequently record a gain or loss in connection with the securitization transaction. The TRS may also retain the MSR associated with the securitized loans. The securities purchased by Holdings are shown as assets on our balance sheet. These securities are classified as available for sale and, therefore, are carried at fair value on the balance sheet.

### Portfolio Strategy

It is our general policy to originate 100% of the ARM Loans we hold in our investment portfolio. However, we retain the right to purchase mortgage-backed securities guaranteed by Fannie Mae or Freddie Mac or the Government National Mortgage Association (''GNMA'' or ''Ginnie Mae'').

We select loans for inclusion in our investment portfolio based on a variety of credit risk factors. Our Corporate Risk Committee has established specific loan investment guidelines, including minimum FICO scores, maximum loan-to-value ratios, maximum loan size and other applicable credit quality criteria.

According to our investment guidelines, we invest at least 85% of assets in high quality ARMs and Hybrid ARMs, and short-term investments, including:

- Traditional ARM and Hybrid ARM mortgage loans that have been deposited into trusts that issue MBS collateralized by the transferred loans;

- FNMA and FHLMC mortgage securities;

- ARM securities rated within one of the two highest rating categories by at least one of the nationally recognized statistical ratings agencies (Moody's Investors Service (''Moody's''); Standard & Poor's, a division of The McGraw-Hill Companies, Inc. (''S&P''); or Fitch Ratings (''Fitch''));

- securities and loans that are unrated but that we determine to be of comparable quality to comparable high-quality rated mortgage securities; and

- cash and cash equivalents, including short-term investments in U.S. Treasury and agency non-mortgage securities.

The portfolio also may retain certain classes of our MBS that are below investment grade (below BBB). Interests in non-investment grade assets will comprise no more than 25% of stockholders' equity on an historical cost basis.

At December 31, 2005, our investment operations held total assets of $4.9 billion, of which $4.7 billion consisted of

securitized loans, loans awaiting securitization and securities available for sale. That

6

| 10-K | 8th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 8th |

compares to $2.4 billion in total assets at December 31, 2004, of which $2.3 billion consisted of securitized loans and loans awaiting securitization.

### Mortgage Banking Operations

Our mortgage banking operations are conducted through MortgageIT and its subsidiaries. The TRS is a full-service residential mortgage banking company that is licensed to originate loans throughout the United States.

The TRS generates revenue through the origination, sale and brokering of mortgage loans sourced through its loan production channels. This revenue primarily consists of gain on sale of mortgage loans, loan brokerage revenues and net interest income. Gain on sale of mortgage loans is typically generated from the sale of mortgage loans to investors, on a servicing released basis, generally within 30 to 60 days of funding. Accordingly, we do not generally capitalize the value of MSR. Gain is recognized based on the difference between the net sales proceeds and the carrying value of the mortgage loans sold and is recognized in earnings at the time of sale. The carrying value of the mortgage loans sold includes direct loan-related origination costs and fees. When the TRS securitizes loans through a REMIC transaction, structured to qualify as a sale, it generates gain on sale revenue when the loans are sold to the REMIC, and it also may capitalize the value of MSR and amortize it in proportion to, and over the period of, estimated net servicing income (the excess of servicing revenues over servicing costs). Brokerage revenue consists of fees and commissions earned by brokering mortgage loans ultimately funded by third party lenders. Interest on mortgage loans held for sale accrues on loans from the date of funding through the date of sale.

The first REMIC securitization completed by the TRS in November 2005 was collateralized by pay option ARM loans ("POAs"). POAs are mortgage loans that carry a low introductory or "teaser" rate for the first 30-60 days and, thereafter, reprice monthly on the basis of an index, such as the 12-month Treasury Average. POAs offer three monthly payment options each month: permitting the borrower to pay a fully amortizing amount, including principal and interest; interest only; or an amount that is less than the accrued interest. This last option results in an increase in the loan balance due, which is commonly referred to as "negative amortization." In the November 2005 REMIC transaction, a pool of ARM loans totaling approximately $388 million were securitized and sold to the public. We retained the mortgage servicing rights and retained approximately $24 million in MBS created in the transaction. MortgageIT has historically sold POAs on a whole loan, non-recourse basis to third party investors.

In February 2006, MortgageIT completed its second REMIC transaction, which was structured to qualify as a financing. In the February 2006 REMIC transaction, we issued, through a trust, AAA and AA-rated floating-rate pass-through certificates totaling $723.0 million and A subordinated floating-rate securities totaling $10.1 million to third party investors, and retained $33.3 million of subordinated certificates, which provide credit support to the higher-rated certificates.

MortgageIT's mortgage banking operations expenses consist primarily of:

- loan origination commissions, salaries and employee benefits;

- mortgage loan processing expenses;

- general and administrative expenses;

- marketing, loan acquisition and business development expenses; and

- rent expense, professional fees, and depreciation expense.

A substantial portion of MortgageIT's expenses are variable in nature. Loan origination commissions are paid to loan production officers only upon the origination of the mortgage loan, making such commission expenses 100% variable. Salaries, benefits and other related payroll costs may fluctuate based upon management's assessment of current and predicted future levels of mortgage loan origination volume.

### Loan Underwriting

We follow a specific underwriting methodology based on the following philosophy — first, evaluate the borrower's ability to repay the loan and, then, evaluate the value of the property securing the

7

| 10-K | 9th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 9th |

loan. We have developed underwriting guidelines and practices that establish clear parameters for our loan underwriters and credit officers to make loan approval decisions. For mortgage loans retained in our investment portfolio, we seek those loans that we believe have low risk of default and resulting loss. Although our loan underwriting procedures are structured to predict future borrower payment patterns and financial capability, based on the borrower's past history and current financial information, as well as our ability to collect the remaining loan balance through foreclosure in the event of a default, no assurance can be made that every loan originated will perform as anticipated.

In evaluating the borrower's ability and willingness to repay a loan, we review and analyze the following aspects of the borrower: credit score, income and its source, employment history, debt levels in revolving, installment and other mortgage loans, credit history and use of credit in the past, and the ability and/or willingness to provide verification for the above. Credit scores, credit history, use of credit in the past and information as to debt levels typically can be obtained from a third party credit report through a credit repository. Those sources are used in all

instances, as available. Sometimes, borrowers have little or no credit history that can be tracked by one of the primary credit repositories. In these instances, the reason for the lack of history is considered and taken into account. In our experience, most prospective borrowers have accessible credit histories.

In evaluating a potential property to be used as collateral for a mortgage loan, we consider all of the following aspects of the property: the loan balance versus the property value, e.g., the loan-to-value ratio, the property type, how the property will be occupied (a primary residence, second home or investment property), if the property's apparent value is supported by recent sales of similar properties in the same or a nearby area, any unique characteristics of the property and our confidence in the data and their sources.

Other considerations that may effect our decision regarding a borrower's loan application are the borrower's purpose in requesting the loan (e.g., purchase of a home as opposed to cashing equity out of the home through a refinancing), the loan type (e.g., adjustable-rate, including adjustment periods and loan life rate caps, or fixed-rate), and any items unique to a loan that we believe could affect credit performance.

*Business Strategy*

All of the loans originated at the TRS are transferred to our investment loan portfolio, sold or brokered to third party investors, or used in REMIC transactions to collateralize MBS that are sold to third party investors as well as to the REIT. Our mortgage banking operations consist primarily of the following activities:

- retail prime production operations, including both brokered loans and funded loans that are originated through retail branch offices and through its internet origination channel;

- wholesale prime production operations, including loans originated through retail loan brokers and correspondents that are not MortgageIT employees and funded by MortgageIT;

- sub-prime production operations, including both retail loans originated through MortgageIT's retail sub-prime department, and wholesale loans originated through MortgageIT's sub-prime lending division;

- correspondent lending operations, including loans originated through banks, credit unions and mortgage bankers and funded by MortgageIT through its correspondent lending division;

- secondary loan marketing operations; and

- mortgage loan title, settlement and other mortgage related services through Home Closer.

*Sale of Loans*

We generally sell our mortgage loans on a whole loan, non-recourse basis. However, we do have potential liability under the representations and warranties we make to purchasers and insurers of the loans. In the event of a breach of such representations and warranties, we may be required to either

8

| 10-K | 10th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 10th |
|------|--------------------|----|----|----------|------|--------|-----------|

repurchase the subject mortgage loans or indemnify the investor or insurer. In such cases, any subsequent credit loss on the mortgage loans is recognized by MortgageIT. When we execute a REMIC transaction from the TRS, we use our loans to collateralize MBS that are sold to third party investors as well as to the REIT.

All of our sub-prime loan production is sold to third party investors.

*Loan Products*

MortgageIT originates both mortgage loans to finance home purchases, referred to as purchase mortgage loans, and loans to refinance existing mortgage loans. For the year ended December 31, 2005, MortgageIT's purchase loan originations represented approximately 50.0% of its total residential mortgage loan originations measured by principal balance.

MortgageIT originates prime first lien conventional and non-conventional, conforming single-family residential mortgage loans. In addition, MortgageIT also originates a lesser amount of non-conforming first lien single-family residential mortgage loans such as jumbo loans, non-prime loans and "Alt A" loans, as well as home equity and second lien mortgage loans.

*Correspondent Lending Division*

MortgageIT's correspondent lending division, which was launched in October 2004, accounted for 12.1% of MortgageIT's total originations in the fourth quarter of 2005. This business unit, through its centralized management and loan acquisition teams, seeks to purchase prime first-lien closed mortgage loans from small to mid-sized banks, credit unions and mortgage bankers. The loans originated through this business channel are subject to the same credit review standards utilized by our other prime production channels and are sold to third-party investors.

*Geographic Concentration*

MortgageIT originates loans in all 50 states. The majority of MortgageIT's loan origination volume during 2005, as measured by principal balance, was sourced from the states of California, New York and Florida. For the years ended December 31, 2005, 2004 and 2003, the total loan origination volume for these three states was 53%, 63%, and 49%, respectively.

*Hedging Activities*

We generally do not seek to anticipate the direction of interest rates as a part of our business strategy. We seek to maintain hedge positions that avoid the effects of severe interest rate movements, which might otherwise impair our ability to earn net interest income and gain on sale revenues. Accordingly, we generally seek to mitigate interest rate risk by matching the repricing durations of our Portfolio ARM Loans with the repricing durations of our liabilities. We also seek to mitigate the interest rate risk associated with our mortgage loans held for sale and interest rate lock commitments issued to borrowers.

For our mortgage investment operations, subject to the limitations imposed by the REIT qualification tests, some

or all of the following financial instruments are used for hedging financing cost interest rate risk: Eurodollar futures contracts; interest rate swaps; interest rate caps, collars and floors; and other instruments that may be determined to be advantageous and are permitted under the investment and risk management policy adopted by our board of directors.

For our mortgage banking operations, some or all of the following financial instruments are used for hedging the fair value of loans held for sale: forward sale loan commitments and forward sales and purchases of MBS and options on such securities in the forward delivery TBA market; Eurodollar futures contracts; and other instruments that may be determined to be advantageous and are permitted under the investment and risk management policy adopted by our board of directors.

For further information on our interest rate risk management, see Item 7A Quantitative and Qualitative Disclosures About Market Risk – Interest Rate Risk Management of this annual report on

9

| 10-K | 11th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 11th |

Form 10-K and Note 4 – Derivatives and Hedging Activities to the consolidated financial statements included elsewhere in this annual report on Form 10-K.

**Competition**

We face intense competition from finance and mortgage banking companies, other mortgage REITs, internet-based lending companies where entry barriers are relatively low, and from traditional bank and thrift lenders. As we expand our portfolio of mortgage loans and MBS and our loan origination business, we face a significant number of additional competitors, many of whom are well established in the markets we serve. Some of our competitors are much larger than we are, have better name recognition than we do and have far greater financial and other resources than we do.

The majority of our competition is in the mortgage banking companies. In addition to mortgage banking companies, internet-based lending companies, traditional banks and thrift lenders, the government sponsored entities, Fannie Mae and Freddie Mac, also are expanding their participation in the mortgage industry. While the government-sponsored entities currently do not have the legal authority to originate mortgage loans, they do have the authority to buy loans. If, as a result of their purchasing practices, these government-sponsored entities experience significantly higher-than-expected losses, the experience could adversely affect overall perception of the mortgage industry.

Competition within the mortgage industry can take many forms, including lower interest rates and fees, less stringent underwriting standards, ease and convenience in obtaining a loan, customer service, amount and term of a loan and marketing and distribution channels. The need to maintain mortgage loan volume in this competitive environment creates a risk of price and quality competition in the mortgage industry. Price competition could cause MortgageIT to lower the interest rates that it charges borrowers, which could lower the value of its loans. If MortgageIT's competitors adopt less stringent underwriting standards, it could be pressured to do so as well. If MortgageIT does not relax underwriting standards in response to its competitors, it may lose market share. If MortgageIT relaxes its underwriting standards in response to price competition, we may be exposed to higher credit risk without compensating pricing. Any increase in these pricing and underwriting pressures could reduce the volume of MortgageIT's loan originations and sales, and significantly harm our business, financial condition, liquidity and results of operations.

**Employees**

At December 31, 2005, the Company had approximately 2,300 full-time employees. None of our employees are represented by a union or covered by a collective bargaining agreement. We believe that our relations with our employees are good.

**Federal Income Tax Considerations**

We are organized and conduct our operations to qualify, and have elected to be taxed, as a REIT for federal income tax purposes, commencing with our taxable year ended December 31, 2004. MortgageIT elected for MortgageIT and its subsidiaries to be treated as taxable REIT subsidiaries. In order to meet certain of the requirements for us to qualify as a REIT, we intend to continue to conduct all of our loan sales and loan brokerage activities, as well as certain origination functions, through MortgageIT and its subsidiaries.

The provisions of the Internal Revenue Code of 1986, as amended (the "Code"), pertaining to REITs are highly technical and complex. Under the Code, if certain requirements are met in a taxable year, a REIT generally will not be subject to federal income tax with respect to income that it distributes to its stockholders. If we fail to qualify during any taxable year as a REIT, we will be subject to tax (including any applicable alternative minimum tax) on our taxable income at regular corporate rates.

Qualification as a REIT requires that we satisfy a variety of tests relating to income, assets, distributions and ownership. The significant tests are summarized below.

10

| 10-K | 12th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 12th |

**Income**

We must satisfy two income tests annually: the 75% income test, and the 95% income test. The 75% income test requires that we derive at least 75% of gross income, excluding gross income from prohibited transactions, from real estate related sources. The 95% income test requires that an additional 20% of gross income must consist either of income that qualifies under the 75% income test, TRS dividends, other types of interest and dividends,

gain from the sale or disposition of stock or securities, or any combination of these.

<u>Assets</u>

We must satisfy five asset tests relating to the nature of our assets at the end of each quarter. Under the first test, at least 75% of the value of our total assets must consist of cash or cash items (including certain receivables), government securities or real estate assets. Second, of our investments not included in the 75% asset class, the value of our interest in any one issuer's securities may not exceed 5% of the value of our total assets. Third, we may not own more than 10% of the voting power or 10% of the value of any one issuer's outstanding securities that are not included in the 75% asset class. Fourth, no more than 20% of the value of our total assets may consist of the securities of one or more taxable REIT subsidiaries. Fifth, not more than 25% of the value of our total assets may consist of the securities of the TRS and other non-TRS taxable subsidiaries and other assets that are not qualifying assets for purposes of the 75% asset test.

<u>Distributions</u>

Each taxable year, we must distribute at least 90% of our REIT taxable income and 90% of our after-tax net income, if any, from foreclosure property, less certain items of non-cash income over 5% of our REIT taxable income.

<u>Ownership</u>

Our capital stock must be held by at least 100 persons for at least 335 days of each taxable year of 12 months, or during a proportionate part of a taxable year of less than 12 months. At all times, not more than 50% in value of our capital stock may be owned directly or indirectly by 5 or fewer individuals during the last half of any taxable year. These requirements will apply to us beginning with our taxable year beginning January 1, 2005. To monitor compliance with the share ownership requirements, we must demand written statements each year from the record holders of significant percentages of our stock.

**ITEM 1A.   RISK FACTORS**

**Risks Related to Our Business**

**We have a limited operating history.**

We were formed in March 2004 for the purposes of becoming the parent holding company of MortgageIT, a mortgage banking company, and to conduct mortgage investment operations by building a leveraged mortgage loan portfolio. We commenced our mortgage investment operations upon the completion of our acquisition of MortgageIT and our initial public offering in August 2004, and, therefore, there is a limited operating history and a limited amount of historical financial data from which you can evaluate our mortgage investment operations.

**Our past operating results may not be indicative of future results.**

MortgageIT's growth rate has benefited from low interest rates and a period of economic growth in the residential mortgage banking industry. We do not know whether these favorable conditions will continue. Due to stable and decreasing interest rates over recent years, MortgageIT's historical performance may not be indicative of future results of our mortgage banking operations in a rising interest rate environment, and our results of operations may be materially adversely affected if interest rates continue to rise. In addition, our business strategy of building a leveraged portfolio of

11

| 10-K | 13th "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 13th |
|------|--------------------|--|-----|-----|----------|------|--------|-----------|

residential mortgage loans affects the comparability of our income, cash flows and financial condition against prior periods since, beginning in the second half of 2004, we have been retaining, rather than selling, a material portion of the loans we originate. We also have incurred, and will continue to incur, additional costs as a result of becoming a public company. In light of this growth and changes in our business, our historical performance and operating and origination data may not be predictive of our future performance.

**In a period of rising interest rates, (1) our interest expense could increase while the interest we earn on our assets might not change as rapidly due to our strategy of funding longer-term assets with shorter-term liabilities and (2) mortgage refinancings could decline, which could cause our origination volume to decrease.**

We believe that our primary interest rate exposure relates to our mortgage loans, MBS and variable-rate debt, as well as the interest rate swaps and caps that we utilize for risk management purposes. Changes in interest rates may affect our net interest income, which is the difference between the interest income we earn on our interest-earning investments and the interest expense we incur in financing these investments. Changes in the level of interest rates also may affect our ability to originate or acquire mortgage loans or MBS, the value of our assets and our ability to realize gains from the sale of such assets. In a period of rising interest rates, our interest expense could increase while the interest we earn on our assets might not change as rapidly due to our strategy of funding longer-term assets with shorter-term liabilities. This would adversely affect our profitability.

While interest rates have generally been low over the past few years, any increase in interest rates may discourage potential borrowers from refinancing mortgages, borrowing to purchase homes or seeking second mortgages. This may decrease the number of mortgages available to be originated by our mortgage banking operations, and subsequently acquired by our mortgage investment operations, which could adversely affect our operating results. If short-term interest rates exceed long-term interest rates, there is a higher risk of increased loan prepayments, as borrowers may seek to refinance their fixed and adjustable rate mortgages at lower long-term fixed interest rates.

**Interest rate movements between the date that MortgageIT commits to originate mortgages and the date that MortgageIT sells mortgages could adversely affect our gains on sale.**

MortgageIT is subject to the risk of rising mortgage interest rates between the time it commits to originate mortgages at a fixed price through the issuance of interest or other rate-locks and the time it sells those mortgages in the secondary market or transfers them to our mortgage investment operations. Increases in interest rates during such period will generally result in a decrease in the market value of mortgages that MortgageIT has committed to originate at a fixed price, which have not been sold or which were not properly hedged. As a result, a

smaller gain, or even a loss, may be recorded upon the sale or transfer of those mortgages.

**Increases in interest rates may adversely affect us and the market value of our assets.**

Increases in interest rates may negatively affect borrowers' ability to timely pay their mortgage loan obligations, residential property values and the market value of our mortgage-related assets. Our fixed-rate securities and loans generally will be affected more negatively by these increases than our adjustable-rate securities and loans.

**Loan prepayment rates may increase, adversely affecting yields on our investment in mortgage loans and mortgage-backed securities.**

In periods of declining mortgage loan interest rates, prepayments on mortgage loans generally increase. If general interest rates decline as well, the proceeds of such prepayments received during such periods are likely to be reinvested by us in assets with lower yields than the yields on the assets that were prepaid. In addition, the market value of any mortgage assets may, because of the risk of prepayment, benefit less than other fixed-income securities from declining interest rates. Conversely, in periods of rising interest rates, prepayments on mortgage loans generally decrease, in which case we

12

| 10-K | 14th "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 14th |
|------|--------------------|--|-----|-----|----------|------|--------|-----------|

would not have the prepayment proceeds available to invest in assets with higher yields. In addition, our mortgage investment operations will be affected by prepayment rates under varying interest rate environments with respect to subordinate classes of MBS and residual interests we hold because prepayments accelerate the cash flows to the investors who receive the principal payments early but never receive the future interest payments that would have been made on that principal.

**An increase in market rates of interest may result in a decrease in our net interest margin because of the adjustable-rate borrowings we utilize to fund ARM and hybrid ARM loans, which may have interest rate caps and/or fixed interest rates for an initial period of time.**

Our mortgage loan portfolio includes mortgages that are hybrid ARM mortgage loans. These are mortgages with fixed interest rates for an initial period of time, after which they bear interest based upon short-term interest rate indices and adjust periodically. We fund these mortgages with adjustable-rate borrowings having interest rates that are indexed to short-term interest rates and which adjust periodically at various intervals. To the extent that there is an increase in the interest rate indexused to determine our adjustable-rate borrowings and the interest rate on the hybrid ARM loan is fixed, our net interest margin will decrease or become negative.

Adjustable-rate mortgages typically have interest rate caps, which limit interest rates charged to the borrower during any given period, and substantially all of the ARM loans being originated by us contain interest rate caps. Our borrowings are not subject to similar restrictions. As a result, in a period of rapidly increasing interest rates, and absent any hedging activities, the interest rates we pay on our borrowings could increase without limitation, while the interest rates we earn on our ARM assets would be capped. If this occurs, our net interest spread could be significantly reduced or we could suffer a net interest loss.

**Our hedging transactions may limit our gains or result in losses.**

We have a well-defined policy to use derivatives for risk management purposes, which includes hedging our liabilities. The use of derivatives to hedge liabilities has certain risks, including the risk that losses on a hedging transaction will reduce the amount of cash available for distribution to our stockholders and losses may exceed the amount invested in derivative instruments. To the extent consistent with maintaining our qualification as a REIT and the requirements of our risk management policy, we may use derivatives, including interest rate swaps and caps, Eurodollar <u>contracts</u>, forward <u>contracts</u> and futures <u>contracts</u>, in our risk management strategy, to limit the effects of changes in interest rates on our operations. However, the use of derivatives as hedge instruments may not be effective in eliminating the risks inherent in any particular position. The derivative instruments that we utilize also have their own risks, which include:

- basis risk, which consists of the risk of loss associated with variations in the spread between the asset yield and the funding and/or hedge cost;

- credit or default risk, which consists of the risk of insolvency or other inability of the counterparty to a particular transaction to perform its obligations in such transaction; and

- legal risk, which consists of the risk that we are unable to enforce certain terms of such instruments.

All or any of such risks could expose us to losses. Consequently, our profitability may be adversely affected during any period as a result of the use of derivatives in a hedging transaction.

**We rely on securitizations to fund the growth of our investment portfolio and our inability to utilize that method of financing may increase our cost of borrowing and could decrease our net interest margin.**

We primarily fund mortgage loan purchases for our investment portfolio through securitizations. Since the completion of our initial public offering, we have completed seven securitizations raising aggregate proceeds of approximately $5.25 billion. In the event that we would be unable to utilize securitizations as our primary funding source, we would be required to finance the growth of our investment portfolio with other funding vehicles, such as repurchase agreements and our warehouse facilities. Repurchase

13

| 10-K | 15th "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 15th |
|------|--------------------|--|-----|-----|----------|------|--------|-----------|

agreements and warehouse facilities typically have shorter terms than our securitizations and the lenders under these funding facilities have significant discretion to terminate them. The utilization of these other funding facilities may increase our cost of borrowing and could decrease our net interest margin. Under such circumstances, funds available for distribution to stockholders could decrease.

**The mortgage loans that we hold are subject to risks of delinquency, foreclosure and loss, which could result in losses to us.**

Our residential mortgage loans are secured by residential properties and are subject to risks of delinquency, foreclosure and loss of principal and interest. The ability of a borrower to repay a loan secured by residential property typically is dependent primarily upon the income or assets of the borrower. In addition, the ability of the borrower to repay its mortgage loan may be affected by, among other things:

- property location and condition;

- competition and demand for comparable properties;

- changes in zoning laws for the property or its surrounding area;

- environmental contamination at the property;

- the occurrence of any uninsured casualty at the property;

- changes in national, regional or local economic conditions;

- declines in regional or local real estate values;

- increases in interest rates and/or real estate tax rates;

- changes in governmental rules, regulations and fiscal policies, including environmental legislation and tax laws; and

- other events, such as acts of God, natural disasters, war, terrorism, social unrest and civil disturbances.

In the event of any default under a mortgage loan held in our mortgage loan portfolio, we will bear a risk of loss of principal to the extent of any deficiency between the value of the collateral that we can realize upon foreclosure and sale and the principal and accrued interest of the mortgage loan, and the cost of foreclosing on the related property. Losses resulting from mortgage loan defaults and foreclosures could have a material adverse effect on our income and cash flow from operations and could limit the amount we have available for distribution to our stockholders. We are exposed to greater risks of loss where we make both a first and second lien mortgage loan on the same property and do not have the benefits of private mortgage insurance. Our securitizations would also be affected adversely by losses on our mortgage loans that have been included in any such securitization.

In the event of the bankruptcy of a mortgage loan borrower, the mortgage loan to such borrower will be deemed to be secured only to the extent of the value of the underlying collateral at the time of bankruptcy, as determined by the bankruptcy court. The lien securing the mortgage loan will be subject to the avoidance powers of the bankruptcy trustee or debtor-in-possession to the extent the lien is unenforceable under state law. Foreclosure of a mortgage loan can be an expensive and lengthy process that can have a substantial negative effect on our originally anticipated return on the foreclosed mortgage loan. In addition, to the extent that the mortgage loans we originate experience relatively high rates of delinquency and/or foreclosure, we may be unable to securitize our mortgage loans on terms that are attractive to us, if at all.

**Our mortgage loan originations historically have been concentrated in specific geographic regions and any adverse market or economic conditions in those regions may have a disproportionately adverse effect on the ability of our customers to make their loan payments.**

Our mortgage loan originations have been and may in the future be concentrated in specific geographic regions. For example, for the years ended December 31, 2005 and 2004, approximately 53% and 63%, respectively, of our originated mortgage loans, as measured by principal balance, were

14

secured by properties located in California, New York and Florida. California represented 40% and 45% of the originated mortgage loans for the years ended December 31, 2005 and 2004, respectively. In addition, for the years ended December 31, 2005 and 2004, approximately 69% and 76%, respectively, of the mortgage loans held in our investment portfolio, as measured by principal balance, were secured by properties located in California, Arizona and Washington. California represented 55% and 67% of the mortgage loans held in our investment portfolio for the years ended December 31, 2005 and 2004, respectively.

Adverse market or economic conditions in a particular state or region where we have significant investments may disproportionately increase the risk that borrowers in that state or region are unable to make their mortgage payments. In addition, the market value of the real estate securing those mortgage loans could be adversely affected by adverse market and economic conditions in that state or region. Any sustained period of increased payment delinquencies, foreclosures or losses caused by adverse market or economic conditions in that state or region could adversely affect our net interest income from loans in our investment portfolio and our ability to make distributions to our stockholders. In addition, our ability to originate, sell and securitize loans would be significantly affected, which would result in a decrease in our originations and gains on sale of loans.

**Adverse economic conditions or declining real estate values would likely result in a reduction of our mortgage origination activity, which would adversely affect our ability to grow our mortgage loan portfolio and, thus, our net income.**

An economic downturn or a recession may have a significant adverse impact on our operations and our financial

condition, particularly if accompanied by declining real estate values. Declining real estate values will likely reduce our level of new mortgage loan originations, since borrowers often use increases in the value of their existing homes to support the refinancing of their existing mortgage loans or the purchase of new homes at higher levels of borrowings. To the extent that the market value of the property underlying our mortgage loans decreases, our loans might be impaired, which might decrease the value of our assets. Further, declining real estate values significantly increase the likelihood that we will incur losses on loans we acquire in the event of default. Any sustained period of increased payment delinquencies, foreclosures or losses could adversely affect both our net interest income from loans in our portfolio, as well as our ability to originate, sell and securitize loans, which would significantly harm our revenues, results of operations, financial condition, business prospects and our ability to make distributions to our stockholders.

**Some of the loans we originate are sub-prime, rather than prime, and generally have delinquency and default rates higher than prime loans, which could result in higher loan losses.**

We currently originate sub-prime loans, although all sub-prime loans are sold in the secondary market and none are retained in our portfolio. Sub-prime mortgage loans generally have higher delinquency and default rates than prime mortgage loans. Delinquency interrupts the flow of projected interest income from a mortgage loan, and default can ultimately lead to a loss if the net realizable value of the real property securing the mortgage loan is insufficient to cover the principal and interest due on the loan. We bear the risk of delinquency and default on sub-prime mortgage loans when we originate them. In whole loan sales, our risk of delinquency typically only extends to the first payment. We also assume the risks of delinquency and default for loans that we are obligated to repurchase. We attempt to manage these risks with risk-based loan pricing and appropriate underwriting policies. However, we cannot assure you that such management policies will prevent delinquencies or defaults and, if such policies and methods are insufficient to control our delinquency and default risks and do not result in appropriate loan pricing, our business, financial condition, liquidity and results of operations could be harmed.

During the years ended December 31, 2005 and 2004, we originated $4.1 billion and $851.7 million, respectively, of sub-prime mortgage loans, which constituted 14.1% and 6.5%, respectively, of our total originations.

15

| 10-K | 17th "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 17th |
|------|--------------------|--|-----|-----|----------|------|--------|-----------|

**Certain of the mortgage products we offer may expose us to greater credit risks, including the risks of delinquencies and/or credit losses, which may adversely impact our earnings.**

During the years ended December 31, 2005 and December 31, 2004, we originated $7.9 billion and $3.6 billion, respectively, of Alt A mortgage loans (which are loans within typical Fannie Mae or Freddie Mac guidelines but that have loan characteristics, such as higher loan-to-value ratios or limited income verification, which make them non-conforming under those guidelines) through MortgageIT, which represented 27.1% and 27.4%, respectively, of total originations during such periods. Since the completion of our initial public offering through December 31, 2005, $4.0 billion of Alt A mortgage loans have been transferred to our investment portfolio, which represents approximately 73% of the total mortgage loans transferred to the investment portfolio. Our operations may be negatively affected due to our investments in these mortgages. Credit risks associated with these mortgages may be greater than those associated with conforming mortgages. The interest rates we charge on these mortgages are often higher than those charged for conforming loans to compensate for the higher risk and lower liquidity. Lower levels of liquidity may cause us to hold loans or other mortgage-related assets supported by these loans that we otherwise would not hold. By doing this, we assume the potential risk of increased delinquency rates and/or credit losses, as well as interest rate risk.

**Retaining subordinated interests exposes us to increased credit risk.**

We have retained subordinated interests in MBS that relate to loans that MortgageIT originates and we securitize. Subordinated interests are classes of mortgage-backed securities that may incur losses experienced on the related loans prior to the more senior mortgage-backed securities issued in the related transaction. If the actual rate and severity of losses on the related loans are higher than those assumed by us, the actual return on our investment in those subordinated interests may be lower than anticipated.

**A decline in the market value of our assets may limit our ability to borrow and may lead to losses on our investments.**

A decline in the market value of our investments may limit our ability to borrow or result in lenders requiring additional collateral or initiating margin calls under our repurchase agreements. As a result, we could be required to sell some of our investments under adverse market conditions to maintain liquidity. If such sales are made at prices lower than the amortized costs of such investments, we will incur losses. A default under our repurchase agreements could also result in the liquidation of the underlying investments used as collateral and result in a loss equal to the difference between the value of the collateral and the amount owed under our repurchase agreements.

**If we do not generate sufficient liquidity, we will be unable to conduct our operations as planned.**

If we do not generate sufficient liquidity, we will be unable to continue to grow our operations, grow our asset base, maintain our hedging policy and pay dividends. We derive our liquidity for our mortgage investment operations from the following sources:

- use of repurchase agreements;

- receipt of principal and interest payments from ARM and hybrid ARM loans that we retain during the period between origination and sale to our investment operations or to a third-party investor;

- issuance of MBS; and

- net interest earned from securitized loans.

In addition to the foregoing sources of liquidity, we derive liquidity from several warehouse facilities with major lenders that are used to fund mortgage loans held for securitization and mortgage loan originations through our

mortgage banking operations, We cannot assure you that any of our sources of liquidity will continue to be available to us or that we will be able to negotiate favorable terms.

16

| 10-K | 18th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 18th |

Our ability to meet our long-term liquidity requirements is subject to the renewal of credit and repurchase facilities and/or obtaining other sources of financing, including additional debt or equity from time to time. In addition, our existing lines of credit and future lines of credit will generally be short-term and, in certain cases, not fully committed (such that they can be terminated with minimal notice) and, in the case of repurchase facilities, subject to margin calls. Any decision by our lenders and/or investors to make additional funds available to us in the future will depend upon a number of factors, such as our compliance with the terms of our existing credit arrangements, our financial performance, industry and market trends in our various businesses, the lenders' and/or investors' own resources and policies concerning loans and investments, and the relative attractiveness of alternative investment or lending opportunities. If we cannot raise cash by selling debt or equity securities, we may be forced to sell our assets at unfavorable prices or discontinue various business activities. Our inability to access the capital markets in the future could have a negative impact on our earnings growth and ability to pay dividends.

**Our use of leverage may adversely affect the return on our investments, which may reduce cash available for distribution to our stockholders.**

Our investment portfolio is currently leveraged through the use of repurchase agreements, securitizations and other borrowings. The amount of leverage we incur will vary depending on our equity, our ability to obtain borrowings and our lenders' estimates of the value of our portfolio's cash flow. The return on our investments and cash available for distribution to our stockholders may be reduced to the extent that changes in market conditions cause the cost of our financing to increase relative to the income that can be derived from the assets we hold in our investment portfolio.

Our debt service payments reduce the net income available for distributions to our stockholders. We may not be able to meet our debt service obligations in the future and, to the extent that we cannot, we risk the loss of some or all of our assets to foreclosure or sale to satisfy our debt obligations. A decrease in the value of our assets may lead to margin calls on repurchase agreements that we will have to satisfy. We may not have the funds available to satisfy any margin calls. There is no limitation on the aggregate amount of our borrowings. We currently have a target overall investment portfolio leverage ratio of 14 to 16 times our equity, and our investment portfolio leverage ratio as of December 31, 2005 was approximately 13 times our equity. We may change our target leverage ratio, up or down, subject to market conditions, covenants contained in our financing facilities and other factors. We had outstanding indebtedness, including obligations under our warehouse facilities, mortgage loan repurchase facilities, securitization borrowings and other sources of borrowing of approximately $7.84 billion as of December 31, 2005.

**Our business strategy is focused on acquiring and retaining self-originated ARM and hybrid ARM loans in our portfolio and our success will depend on our ability to originate such loans in the volume and over the time period we anticipate.**

As part of our business strategy, we are focused upon the acquisition and retention of a portfolio of high quality traditional ARM and hybrid ARM loans comprised primarily of mortgage loans that we originate through MortgageIT. If MortgageIT is unable to originate ARM and hybrid ARM loans that meet our investment objectives, it could have an adverse effect on our net income, which could adversely impact our ability to make distributions to our stockholders. For the years ended December 31, 2005 and December 31, 2004, $16.2 billion and $6.1 billion, respectively, or approximately 55.5% and 46.7%, respectively, of MortgageIT's mortgage loan originations, as measured by principal balance, consisted of ARM and hybrid ARM loans.

**We have limited experience in making provisions for loan losses, and our allowance for loan losses may be inadequate to cover potential future losses in our mortgage loan portfolio.**

We attempt to maintain an appropriate allowance for loan losses to provide for potential losses in our portfolio of mortgage loans. We periodically determine the amount of the allowance based upon our consideration of several factors, including:

- an ongoing review of the size, quality and risk of our portfolio of mortgage loans, as well as specific known risks;

17

| 10-K | 19th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 19th |

- our historical loan loss experience with similar types of loans;

- the amount of past due and nonperforming loans;

- regular reviews of loan delinquencies;

- the value of the collateral securing the loans;

- evaluation of economic and interest rate conditions; and

- relevant industry data.

There is no precise method of predicting losses on mortgage loans held in our portfolio, and we make various

assumptions and judgments with respect to the factors listed above. These assumptions and judgments are inherently uncertain, and, if they prove to be wrong, then we face the risk that charge-offs in future periods will exceed our allowance for loan losses and that additional increases in the allowance for loan losses will be required. In addition, because we have limited loan loss experience and limited experience evaluating the adequacy of an allowance for loan losses, the risk of charge-offs in excess of our allowance for loan losses may be greater than if we had more experience in this area. Any additions to the allowance for loan losses could significantly impact our results of operations, financial condition, the price of our common stock and our ability to make distributions to our stockholders.

**The terms of MortgageIT's warehouse credit facilities contain restrictive financial and other covenants, which may restrict MortgageIT's ability to pay dividends to us in situations where MortgageIT is not in compliance with such covenants.**

The terms of MortgageIT's warehouse credit facilities contain restrictive financial and other covenants that, among other things, require MortgageIT to maintain a minimum ratio of total liabilities to tangible net worth, minimum levels of tangible net worth, liquidity and stockholders' equity, and maximum leverage ratios, as well as to comply with applicable regulatory and other requirements. If MortgageIT is not in compliance with these financial and other covenants in the warehouse credit facilities, its ability to pay dividends to us may be restricted, which could reduce the earnings available for distribution to our stockholders.

While we have received waivers and amended our financing facilities to cure prior defaults, we may not be able to obtain such waivers or amend such financing facilities in the future in the event defaults occur. Such defaults could result in the acceleration of all or substantially all our indebtedness and the loss of earning assets securing our indebtedness, which would also adversely affect the market value of our shares of common stock and the cash available for distribution to our stockholders.

**Our business would suffer if we were unable to sell the mortgage loans that we originate and that are not transferred to our mortgage investment operations.**

MortgageIT sells, in the secondary market, all of the mortgage loans that it originates and that are not transferred to our mortgage investment operations. MortgageIT's ability to sell mortgage loans that are not transferred to our mortgage investment portfolio depends on the availability of an active secondary market for residential mortgage loans, which, in turn, depends on the continuation of programs that currently are offered by Fannie Mae, Freddie Mac and other institutional investors upon which we rely. These entities account for a substantial portion of the secondary market in residential mortgage loans. Some of the largest participants in the secondary market, like Freddie Mac and Fannie Mae, are government-sponsored enterprises whose activities are governed by federal law, including capital adequacy requirements. Any future changes in laws or regulations, or other changes in the capital requirements, oversight, or activities of these government-sponsored enterprises could harm our mortgage banking business, as these likely would disrupt the secondary markets for mortgage loans and mortgage servicing rights, and the spreads or profits available in such markets. Moreover, recent accounting changes, restatements and disclosures regarding the accounting risk management practices of the government-sponsored entities and inquiries regarding such practices by their regulators and the press may result in additional oversight or regulation that could have an adverse affect on our mortgage banking business.

18

| 10-K | **20th "Page" of 104** | TOC | 1st | Previous | Next | Bottom | Just 20th |
|------|------------------------|-----|-----|----------|------|--------|-----------|

MortgageIT's ability to sell mortgage loans to third parties also depends on its ability to remain eligible for the programs offered by Fannie Mae, Freddie Mac and other institutional and non-institutional investors. Such investors may change the criteria for mortgage loans to be accepted under these programs, and if MortgageIT loses its eligibility for any reason, or if its eligibility is impaired, then our mortgage banking business would be harmed. Changes in laws in the states where MortgageIT operates could adversely affect its ability to sell loans. MortgageIT's profitability from participating in any of these programs may vary depending on a number of factors, including its administrative costs of originating and selling qualifying mortgage loans, and the costs imposed upon MortgageIT by the purchasers' programs. Any decline in profitability from participating in these programs would harm our mortgage banking business.

MortgageIT generally sells the mortgage loans it originates within 30 to 60 days of funding. To the extent it takes longer to sell its mortgage loans, MortgageIT is subject to interest rate risk, market risk, credit spread risk, and liquidity and funding risk with respect to its mortgage loans held for sale. In addition, MortgageIT must finance its mortgage loans held for sale, hedge such loans and commit a portion of its capital to support the holding of such loans. These costs may or may not offset the interest income realized from such loans. At December 31, 2005, MortgageIT had $3.38 billion in mortgage loans held for sale, as compared to $784.6 million as of December 31, 2004. The increase in mortgage loans held for sale from December 31, 2004 to December 31, 2005 is due primarily to an increase in loan originations, as well as a decline in the marketability of the Company's sub-prime loans.

**We may be required to repurchase mortgage loans that have been sold and we may be required to indemnify holders of our MBS, which could adversely affect our cash flow and limit our ability to make distributions to our stockholders.**

If any of the mortgage loans that MortgageIT originates and sells or that we pledge to secure warehouse credit facilities or any of the MBS that we issue in our securitizations do not comply with the representations and warranties that we make about the characteristics of the loans, the borrowers and the properties securing the loans, we may, in the case of loans that we have financed, be required to repurchase those loans or, in the case of the loans we have securitized or sold, repurchase the loans or replace them with substitute loans with similar characteristics. If we were to breach any of our representations and warranties, then we may have to bear any associated losses directly. In addition, in the case of breaches relating to loans that we have sold, we may be required to indemnify the purchasers of such loans for losses or expenses incurred as a result of a breach of a representation or warranty made by us. Also, in most cases, if a borrower misses one of the first payments on a mortgage loan, or if the borrower prepays the mortgage loan within a specified time of its origination, we are required to repurchase the loan. Repurchased loans typically require an allocation of working capital to carry on our books, and our ability to borrow against such assets is limited, which could limit the amount by which we can leverage our equity. Any significant repurchases or indemnification payments could significantly harm our cash flow and results of operations, and limit our ability to make distributions to our stockholders.

**We may be subject to losses due to misrepresented or falsified information or if we obtain less than full documentation with respect to our mortgage loans.**

When we originate mortgage loans, we rely upon information supplied by borrowers and other third parties, including information contained in the applicant's loan application, property appraisal reports, title information and employment and income documentation. If any of this information is misrepresented or falsified and if we do not discover it before funding a loan, the actual value of the loan may be significantly lower than anticipated. As a practical matter, we generally would bear the risk of loss associated with a misrepresentation, whether the loan applicant, the mortgage broker, another third party or one of our employees makes it. A loan subject to a material misrepresentation typically cannot be sold or is subject to repurchase or substitution if it is sold or securitized prior to detection of the misrepresentation. Although we may have rights against persons and entities who made or knew about the misrepresentation, those persons and entities may be difficult to locate, and it is often difficult to collect from them any monetary losses that we may have suffered.

19

| 10-K | 21st "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 21st |
|------|--------------------|-----|-----|----------|------|--------|-----------|

In the case of certain loan products, we do not receive full documentation of the borrower's income and/or assets. Instead, we base our credit decision on the borrower's credit score and credit history, the value of the property securing the loan and the effect of the loan on the borrower's debt service requirements. During the years ended December 31, 2005 and 2004, we received less than full documentation of the borrower's income and/or assets on approximately 54% and 43%, respectively, of mortgage loans, as measured by principal balance, that we originated. We believe that there is a higher risk of default on loans where there is less than full documentation of the borrower's income and/or assets.

**We price our mortgage products to reflect risk, but our pricing terms may not be able to protect us from loss.**

In pricing and determining customer eligibility for our mortgage loan products, we consider a variety of factors, including, among other things, the amount and type of documentation of the borrower's income and/or assets, the borrower's credit score and history, the property value securing the loan, the effect the loan may have on the borrower's debt service requirements and the loan-to-value ratio. We assess the risks related to each of these factors and price our loan products according to our final risk assessment. The pricing and terms of our loan products, however, may not ultimately protect us from the risk of default on loans that we originate. In the event of defaults, we may experience losses, which would negatively affect our cash flows and results of operations as the losses are incurred.

**We are exposed to environmental liabilities with respect to properties to which we take title, which may result in losses.**

In the course of our business, we may foreclose and take title to residential properties securing our mortgage loans, and, if we do take title, we could be subject to environmental liabilities with respect to these properties. In such a circumstance, we may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation, and clean-up costs incurred by these parties in connection with environmental contamination, or may be required to investigate or clean up hazardous or toxic substances, or chemical releases at a property. The costs associated with investigation or remediation activities could be substantial. If we become subject to significant environmental liabilities, our business, financial condition, liquidity, and results of operations could be materially adversely affected.

**Certain of our assets generate mismatches between taxable income and cash available for distribution, which could adversely affect our liquidity and our ability to make distributions to our stockholders.**

Certain of our assets generate mismatches between taxable income and available cash. As a result, our taxable income may exceed our cash available for distribution and the requirement to distribute a substantial portion of our net taxable income in order to comply with the REIT distribution requirements could cause us to: (1) sell assets under adverse market conditions; (2) borrow on unfavorable terms; or (3) distribute amounts that would otherwise be invested in future acquisitions, capital expenditures or repayment of debt.

**We rely on key personnel with long-standing business relationships, the loss of any of whom would impair our ability to successfully operate.**

Our continued future success depends, to a significant extent, on the continued services of Doug W. Naidus, our chief executive officer, and other key members of our senior management team. In particular, the extent and nature of the relationships that these individuals have developed with financial institutions and existing and prospective mortgage loan origination channels is critically important to the success of our business. Although we have entered into employment agreements with Mr. Naidus and certain of our other senior executives, these executives may not remain employed by us. We currently maintain key person life insurance on our senior executive officers. Nevertheless, the loss of services of one or more members of our senior management team could harm our business and our prospects.

20

| 10-K | 22nd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 22nd |
|------|--------------------|-----|-----|----------|------|--------|-----------|

**We may not have the right personnel to execute our strategy and operate as a REIT.**

Our strategy, which is focused on managing a leveraged portfolio of traditional ARM and hybrid ARM loans and MBS, differs from MortgageIT's historic strategy of originating loans and generating income from gain on sale of loans and brokerage fees. Additionally, our strategy includes maintaining our qualification as a REIT under the

Code. While our key management personnel has had extensive experience in mortgage banking and managing investment portfolios, there can be no assurance that such individuals will have the appropriate experience or synergy as a management team to execute our strategy. The inability to effectively implement our strategy, including operating as a REIT, could harm our business and our prospects.

**We face intense competition that could adversely affect our market share and our revenues.**

We face intense competition from finance and mortgage banking companies, other mortgage REITs, internet-based lending companies where entry barriers are relatively low and, to a growing extent, from traditional bank and thrift lenders, and securities brokers that are active participants in the mortgage industry. As we seek to expand our loan origination business further and build our portfolio of mortgage loans and MBS, we face a significant number of additional competitors, many of whom are well established in the markets we operate within and seek to penetrate. Some of our competitors are much larger than we are, have better name recognition than we do, have been established for a longer period of time in certain market areas that we target and have far greater financial and other resources than we do.

We anticipate that the majority of our competition will be in the mortgage industry. In addition to mortgage banking companies, internet-based lending companies, traditional banks and thrift lenders, and securities brokers, government-sponsored entities, such as Fannie Mae and Freddie Mac, are also expanding their participation in the mortgage industry. While the government-sponsored entities presently do not have the legal authority to originate mortgage loans, they do have the authority to buy the same type of loans that we intend to hold for investment and, thereby, indirectly compete for these products by providing purchase facilities to mortgage loan originators with which we compete. These entities, which dominate the secondary market, have lower capital costs and capital requirements than private entities, and their programs and loans made by our competitors pursuant to these programs could adversely affect both our ability to compete in the mortgage industry and the value of our common stock. The recent accounting changes, restatements and disclosures regarding the accounting risk management practices of these government-sponsored entities and inquiries regarding such practices by their regulators and the press could also affect investor confidence in, and the values of the securities of, us and our competitors in the residential mortgage markets. In addition, if, as a result of their purchasing practices, these government-sponsored entities experience significantly higher-than-expected losses, the experience could adversely affect overall investor perception of the mortgage industry.

Competition within the mortgage industry can take many forms, including offering lower interest rates and fees, applying less stringent underwriting standards, offering enhanced customer service and convenience in obtaining loans, and offering a wide variety of loan products, including various amounts and terms, through diverse marketing and distribution channels. The need to maintain mortgage loan volume in this competitive environment creates a risk of price and quality competition in the mortgage industry. Price competition could cause us to lower the interest rates that we charge our borrowers, which could reduce our profitability and the value of the loans that we sell or retain in our investment portfolio. If our competitors adopt less stringent underwriting standards, we will be pressured to do so as well. If we do not relax underwriting standards in response to our competitors, we may lose market share. If we relax our underwriting standards in response to price competition, we may be exposed to higher credit risk without receiving adequate fees and interest to compensate for the higher risk. Any increase in these pricing and underwriting pressures could reduce the volume of our loan originations and sales and significantly harm our business, financial condition, liquidity, results of operations, cash flows and ability to make distributions to our stockholders.

21

| 10-K | 23rd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 23rd |
|------|--------------------|-----|-----|----------|------|--------|-----------|

**To the extent we are unable to adapt to and implement technological changes involving the loan origination process, we may have difficulty remaining competitive and our loan origination business may be adversely affected.**

Our mortgage loan origination business is dependent upon our ability to interface effectively with our borrowers and other third parties and to process loan applications efficiently. The origination process is becoming more dependent upon technological advancements, such as the ability to process applications over the internet, interface with borrowers and other third parties through electronic means, and underwrite loan applications using specialized software. Implementing new technology and maintaining the efficiency of the current technology used in our operations may require significant capital expenditures. As these requirements increase in the future, we will have to develop these technological capabilities fully to remain competitive or our mortgage banking business will be significantly harmed.

**If we do not manage our growth effectively, our financial performance could be harmed.**

In recent years, we have experienced growth at rates that have applied pressure to our management, administrative, operational and financial infrastructure. In the future, we expect to continue to experience those and other pressures on our organization, including the need to hire additional experienced personnel to meet our growth and our needs as a publicly traded REIT. An increase in the size of our operations may make it more difficult for us to originate quality loans in accordance with our current mortgage loan origination focus and strategies. We expect to need to attract and hire additional experienced managers and loan officers in a competitive hiring environment and, at the same time, continue to upgrade and expand our financial, operational and managerial systems and controls. We cannot assure you that we will be able to meet our capital needs, expand our systems effectively or hire and retain qualified employees in sufficient numbers to meet our requirements. Any failure by us to manage our current level of business or our growth effectively may result in increased costs and decreased loan production, and could negatively affect our business, financial condition, liquidity, profitability, cash flows, and ability to make distributions to our stockholders.

**The mortgage banking business is seasonal, and our operating results vary accordingly.**

The mortgage banking industry generally is subject to seasonal variations, especially in states with adverse winter weather. Purchase money mortgage loan originations generally experience greater seasonal fluctuations than refinancings, which tend to be less seasonal and more closely related to changes in interest rates. Sales and resales of homes in our markets and, accordingly, purchase money mortgage originations, typically peak during

the spring and summer seasons and decline to lower levels from mid-November through February. In addition, delinquency rates typically rise in the winter months, which results in higher servicing costs in our mortgage banking operations. The magnitude of seasonal variations is beyond our control and could adversely affect our business, especially if we are unable to take advantage of increased mortgage volume during peak periods, or if peak periods do not produce anticipated mortgage volume. These variations will also affect our quarterly results of operations and our cash and capital requirements, and the amounts available, without borrowing, for distribution to our stockholders each quarter.

**Risks Related to Government Regulation**

**Our operations are subject to a body of complex laws and regulations at the federal, state and local levels and our failure to comply with such laws and regulations could result in civil or criminal liability.**

We must comply with the laws, rules and regulations, as well as judicial and administrative decisions, of all jurisdictions in which we originate mortgage loans, as well as an extensive body of federal laws, rules and regulations. The volume of new or modified laws, rules and regulations applicable to our business has increased in recent years and individual municipalities have also begun to enact laws, rules and regulations that restrict or otherwise affect loan origination activities. The laws, rules and

22

---

| 10-K | 24th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 24th |

regulations of each of these jurisdictions are different, complex and, in some cases, in direct conflict with each other. It may be more difficult to identify comprehensively, to interpret accurately, to program properly our information systems or to train effectively our personnel with respect to all of these laws, rules and regulations, thereby potentially increasing the risks of non-compliance with these laws, rules and regulations.

Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the lender. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices, and debt collection practices may apply to the origination, servicing and collection of loans. Mortgage loans are also subject to federal laws, including:

- the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the borrowers regarding the terms of the loans;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act in the extension of credit;

- the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience;

- the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws; and

- the Alternative Mortgage Transaction Parity Act of 1982, which preempts certain state lending laws that regulate alternative mortgage transactions.

Our failure to comply with these laws, rules and regulations could lead to:

- civil and criminal liability, including potential monetary penalties;

- loss of state licenses or permits required for continued lending operations;

- legal defenses causing delay or otherwise adversely affecting our ability to enforce loans, or giving the borrower the right to rescind or cancel the loan transaction;

- demands for indemnification or loan repurchases from purchasers of our loans;

- class action lawsuits; and/or

- administrative orders and enforcement actions.

It is difficult to determine the effect that any of these outcomes could have on our business operations, and, even if without an appropriate legal basis, their occurrence would likely result in unforeseeable expenses and diversions of management time.

Some states in which we operate may impose regulatory requirements on our officers and directors and parties holding 10% or more, and in some cases 5% or more, of our outstanding shares of common stock. If any officer, director or person holding 10%, and in some cases 5%, or more of our outstanding shares of common stock fails to meet or refuses to comply with a state's applicable regulatory requirements for mortgage lending, we could lose our authority to conduct business in that state. The loss of our authority to conduct business in a state, for this or any other reason, could have a material adverse effect on our business, financial condition, or results of operations.

**Our operations may be adversely affected if we are subject to the Investment Company Act.**

We intend to conduct our business at all times so as not to become regulated as an investment company under the Investment Company Act of 1940, or the Investment Company Act. The Investment Company Act exempts from regulation entities that are primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate.

To qualify for this exemption, we must maintain at least 55% of our assets directly in mortgages, qualifying pass-

through certificates and certain other qualifying interests in real estate. As of

23

| 10-K | 25th "Page" of <u>104</u> | <u>TOC</u> | <u>1st</u> | <u>Previous</u> | <u>Next</u> | <u>Bottom</u> | Just 25th |
|------|---------------------------|------------|------------|-----------------|-------------|---------------|-----------|

<u>December 31, 2005</u>, the percentage of our total assets in mortgages, pass-through certificates and other qualifying interests in real estate was 96%. The provisions of the Investment Company Act may limit our ownership of certain mortgage assets. If the Securities and Exchange Commission, or SEC, adopts a contrary interpretation with respect to these securities or otherwise believes we do not satisfy the above exception, we could be required to restructure our activities or sell certain of our assets. To insure that we continue to qualify for the exemption, we may be required at times to adopt less efficient methods of financing certain of our mortgage assets and we may be precluded from acquiring certain types of higher-yielding mortgage assets. The net effect of these factors will be to lower our net interest income. If we fail to qualify for the exemption from registration as an investment company, our ability to use leverage would be substantially reduced, and we would not be able to conduct our business as described. Our business will be materially and adversely affected if we fail to qualify for this exemption.

**New laws affecting the mortgage industry may increase our costs and decrease our mortgage origination and acquisition.**

In recent years, federal and several state and local laws, rules and regulations have been adopted, or are under consideration, that are intended to eliminate certain lending practices, often referred to as "predatory" lending practices, that are considered to be abusive. Many of these laws, rules and regulations restrict commonly accepted lending activities and would impose additional costly and burdensome compliance requirements on us. These laws, rules and regulations impose certain restrictions on loans on which certain points and fees or the annual percentage rate, or APR, meet or exceed specified thresholds. Some of these restrictions expose a lender to risks of litigation and regulatory sanction regardless of how carefully a loan is underwritten. In addition, an increasing number of these laws, rules and regulations seek to impose liability for violations on the purchasers of mortgage loans, regardless of whether a purchaser knew of or participated in the violation. Accordingly, the third parties that buy our loans or provide financing for our loan originations may not want, and are not contractually required, to buy or finance loans that do not comply with these laws, rules and regulations; further, if these third parties do buy loans from us that do not comply with these laws, rules and regulations, we may be required to repurchase such loans or indemnify the third parties against losses related to such loans.

These laws, rules and regulations have required us to develop systems and procedures to ensure that we do not violate these new requirements and may prevent us from making certain loans and cause us to reduce the APR or the points and fees we charge on the mortgage loans that we originate. The difficulty of managing the compliance risks presented by these laws, rules and regulations may decrease the availability of warehouse financing and the overall demand for the purchase of our originated loans. Our competitors that are banks or federal thrifts may not be subject to these state laws, as federal bank regulators have preempted state laws for these competitors. Although these predatory lending laws currently are state or local laws, Congress has recently begun discussing possible federal predatory lending legislation, which, if adopted, would preempt inconsistent state laws.

**Tax Risks Related to Our Qualification as a REIT**

**Failure to maintain qualification as a REIT would materially and adversely affect our operations and ability to make distributions to our stockholders.**

We are organized and conduct our operations so as to maintain qualification as a REIT for federal income tax purposes. However, the federal income tax laws governing REITs are extremely complex and interpretations of these laws are limited. Our continuing qualification as a REIT depends on our ability to meet various requirements concerning, among other things, the ownership of our outstanding stock, the nature of our assets, the sources of our income, and the amount of our distributions to our stockholders.

If we fail to meet the requirements to qualify as a REIT in any taxable year, and we do not qualify for certain statutory relief provisions, we would be subject to federal income tax (including any

24

| 10-K | 26th "Page" of <u>104</u> | <u>TOC</u> | <u>1st</u> | <u>Previous</u> | <u>Next</u> | <u>Bottom</u> | Just 26th |
|------|---------------------------|------------|------------|-----------------|-------------|---------------|-----------|

applicable alternative minimum tax) on our taxable income at regular corporate rates. Distributions to stockholders in any year in which we fail to qualify as a REIT will not be deductible by us nor will they be required to be made under the Code. In such event, to the extent of current and accumulated earnings and profits, all distributions to stockholders will be taxable as ordinary income and, subject to certain limitations of the Code, corporate distributees may be eligible for the dividends received deduction and individuals may be eligible for the maximum 15% tax rate on qualified dividend income. Unless we are entitled to relief under specific statutory provisions, we would be disqualified from treatment as a REIT for the four taxable years following the year in which we lost our REIT qualification. Losing our REIT qualification would reduce our net earnings available for investment or distribution to stockholders because of the additional tax liability, and we would no longer be required to make distributions to stockholders. We might be required to borrow funds or liquidate some investments to pay the applicable tax.

In certain circumstances, we may be able to pay a penalty tax and retain our REIT qualification, notwithstanding our failure to satisfy one or more REIT requirements. We cannot predict, however, whether we would qualify for such relief provisions.

Moreover, no assurance can be given that legislation, new regulations, administrative interpretations or court decisions will not significantly change the tax laws with respect to qualification as a REIT or the federal income tax consequences of such qualification. Our continued qualification as a REIT will depend on our satisfaction of

certain asset, income, organizational and stockholder ownership requirements on a continuing basis.

Even if we qualify as a REIT for federal income tax purposes, we may be required to pay some federal, state and local taxes on our income or property. Also, in certain cases, we may be required to pay a 100% penalty tax in the event we sell property, including mortgage loans, as a dealer or if a taxable REIT subsidiary of ours enters into agreements with us on a basis that is determined to be other than arms-length. In addition, any taxable REIT subsidiary we own will be required to pay federal, state and local income taxes on its taxable income, including income from the sale of any loans to the REIT and in the secondary market.

**Complying with REIT requirements may cause us to forego otherwise attractive opportunities.**

To maintain our qualification as a REIT, we must continually satisfy tests concerning, among other things, our sources of income, the nature and diversification of our assets, the amounts we distribute to our stockholders and the ownership of our stock. We may also be required to make distributions to our stockholders at unfavorable times or when we do not have funds readily available for distribution. Thus, compliance with REIT requirements may hinder our ability to operate solely with the goal of maximizing profits.

In addition, the REIT provisions of the Code impose a 100% tax on income from "prohibited transactions." Prohibited transactions generally include sales of assets that constitute inventory or other property held for sale in the ordinary course of a business, other than foreclosure property. This 100% tax could impact our desire to sell mortgage-backed securities at otherwise opportune times if we believe such sales could result in us being treated as engaging in prohibited transactions. However, we would not be subject to this tax if we were to sell assets through MortgageIT or another taxable REIT subsidiary, in which case, gains from the sales of these assets would be subject to federal income tax at regular corporate income tax rates.

**Complying with REIT requirements may limit our ability to hedge effectively.**

The REIT provisions of the Code may substantially limit our ability to hedge MBS and related borrowings if we do not enter into and properly identify "tax hedges." Income from hedges that are good tax hedges and that hedge only indebtedness incurred or to be incurred to acquire or carry real estate assets is not treated as income when calculating the 95% REIT gross income tests. We must limit our aggregate gross income from non-qualified hedges, fees, and certain other non-qualifying sources, to less than 5% of our annual gross income, and from all hedges and other non-real estate

25

| 10-K | *27th "Page" of 104* | TOC | 1st | Previous | Next | Bottom | Just 27th |
|---|---|---|---|---|---|---|---|

related sources to less than 25% of our annual gross income. As a result, we may, in the future, have to limit our use of hedging techniques or implement these hedges through a taxable REIT subsidiary. This could result in greater risks associated with changes in interest rates than we would otherwise want to incur. If we fail to satisfy the 5% or 25% limitation, we could lose our REIT qualification for federal income tax purposes, unless our failure was due to reasonable cause and not due to willful neglect, and we meet certain other technical requirements. Even if our failure was due to reasonable cause, we may have to pay a penalty tax equal to the amount of income in excess of certain thresholds, multiplied by a fraction intended to reflect our profitability.

**Complying with REIT requirements may force us to liquidate otherwise attractive investments.**

In order to maintain our qualification as a REIT, we must ensure that, at the end of each calendar quarter, at least 75% of the value of our assets consists of cash, cash items, government securities and qualified REIT real estate assets, such as mortgage loans and interests in mortgage loans. The remainder of our investment in securities generally cannot include more than 10% of the outstanding voting securities of any one issuer or more than 10% of the total value of the outstanding securities of any one issuer. In addition, generally, no more than 5% of the value of our assets can consist of the securities of any one issuer and no more than 20% of the value of all assets can consist of securities of one or more taxable REIT subsidiaries. If we fail to comply with these requirements and we are not eligible for specified relief provisions under the Code, we must dispose of a portion of our assets within 30 days after the end of the calendar quarter in which we acquire such securities in order to avoid losing our REIT qualification and suffering adverse tax consequences. Even if we can avail ourselves of the Code's relief provisions, we may have to pay a tax equal to the greater of (i) $50,000 and (ii) the amount determined by multiplying the net income generated from non-qualifying assets by the highest applicable federal corporate income tax rate.

**Misplaced reliance on legal opinions or statements by issuers of mortgage-backed securities could result in a failure to comply with REIT gross income or asset tests.**

When purchasing MBS, we may rely on opinions of counsel for the issuer or sponsor of such securities, or statements made in related offering documents, for purposes of determining whether and to what extent those securities constitute REIT real estate assets for purposes of the REIT asset tests and produce income which qualifies under the REIT gross income tests. The inaccuracy of any such opinions or statements may adversely affect our REIT qualification and result in significant corporate-level tax.

**Limitations on taxable REIT subsidiaries could limit the growth of our taxable REIT subsidiary.**

We cannot maintain our qualification as a REIT if more than 20% of the value of our assets is represented by securities of one or more taxable REIT subsidiaries as of the end of a calendar quarter. As of December 31, 2005, MortgageIT represented approximately 4% of our assets, which is within the required 20% of the value of our assets.

The 20% limit may also constrain the growth of MortgageIT. We will need to monitor the growth of MortgageIT to make sure that its value does not in the aggregate exceed 20% of our assets as of the end of any calendar quarter. We expect to have sufficient leverage and acquire sufficient qualified assets such that our taxable REIT subsidiaries will be able to grow, but we cannot provide any assurance of their growth and, accordingly, that our profit will not be constrained.

The value of the securities of our taxable REIT subsidiaries may not be subject to precise valuation. Accordingly, we could exceed the 20% limit inadvertently either because of changing values of assets or because the Internal

Revenue Service, or IRS, believes that we undervalued our taxable REIT subsidiaries or overvalued other assets. If we exceed the 20% limit inadvertently at the close of a calendar quarter, we could lose our REIT qualification.

**REIT distribution requirements could adversely affect our liquidity, profitability and future growth.**

In order to maintain our qualification as a REIT, we generally are required each year to distribute to our stockholders at least 90% of our REIT taxable income, determined without regard to the

26

| 10-K | 28th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 28th |
|------|---------------------|-----|-----|----------|------|--------|-----------|

dividends paid deduction and excluding any net capital gain. To the extent that we distribute at least 90%, but less than 100%, of our taxable income, we will be subject to corporate income tax on our undistributed taxable income. In addition, we will be subject to a 4% nondeductible excise tax on the amount, if any, by which certain distributions paid by us with respect to any calendar year are less than the sum of (1) 85% of our ordinary income for that year, (2) 95% of our capital gain net income for that year and (3) 100% of our undistributed taxable income from prior years.

We intend to continue to make distributions to our stockholders in order to comply with the 90% distribution requirement and to avoid corporate income tax and the nondeductible excise tax. However, differences in timing between the recognition of taxable income and the actual receipt of cash could require us to sell assets or to borrow funds on a short-term basis to meet the 90% distribution requirement and to avoid corporate income tax and the nondeductible excise tax.

Certain of our assets may generate mismatches between taxable income and available cash. Among other things, examples of possible timing differences and mismatches include the following:

- Because we may deduct capital losses only to the extent of our capital gains, we may have taxable income that exceeds our economic income.

- We will recognize taxable income in advance of the related cash flow if any of our mortgage loans or mortgage-backed securities are deemed to have original issue discount. We generally must accrue original issue discount based on a constant yield method that takes into account projected prepayments but that defers taking into account credit losses until they are actually incurred.

- We may recognize taxable market discount income when we receive the proceeds from the disposition of, or principal payments on, loans that have a stated redemption price at maturity that is greater than our tax basis in those loans, although such proceeds often will be used to make nondeductible principal payments on related borrowings.

- We may recognize taxable income without receiving a corresponding cash distribution if we foreclose on or make a significant modification to a loan, to the extent that the fair market value of the underlying property or the principal amount of the modified loan, as applicable, exceeds our basis in the original loan.

- Certain transaction costs that are paid currently may have to be amortized for federal income tax purposes.

The requirement to distribute at least 90% of our taxable income could cause us to:

- sell assets in adverse market conditions;

- borrow on unfavorable terms; or

- distribute amounts that would otherwise be invested in earning assets, future acquisitions, capital expenditures or repayment of debt.

Our distributions may, from time to time, include a return of capital. Amounts distributed will not be available to fund our operating activities and growth. We expect to fund our mortgage loan originations and other operating activities by raising capital and through borrowings from financial institutions, securitization financings and future issuances of our common stock. If we fail to obtain debt or equity capital in the future, then our growth may be limited, which likely would have a negative effect on the value of our common stock.

**Classification as a taxable mortgage pool or investment in a residual interest in a real estate mortgage investment conduit, or REMIC, could subject us or certain of our stockholders to increased taxation.**

If we issue debt obligations with two or more maturities and (1) those obligations are secured by mortgages or MBS, (2) the payments made on the borrowings are related to the payments received on the underlying assets and (3) substantially all of our assets consist of debt obligations or interests in debt obligations, then the obligations and the pool of mortgages or mortgage-backed securities to which such obligations relate may be classified as a taxable mortgage pool, or TMP, under the Code. If any part of our Company were to be treated as a taxable mortgage pool or if we hold a residual

27

| 10-K | 29th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 29th |
|------|---------------------|-----|-----|----------|------|--------|-----------|

interest in a REMIC, then our REIT qualification would not be impaired, but a portion of the taxable income we recognize may, under regulations to be issued by the Treasury Department, be characterized as excess inclusion income and allocated among our stockholders to the extent of and generally in proportion to the distributions we make to each stockholder. Any excess inclusion income would:

- not be allowed to be offset by a stockholder's net operating losses;

- be subject to a tax as unrelated business income if a stockholder were a tax-exempt stockholder;

- be subject to the application of federal income tax withholding at the maximum rate (without reduction for any otherwise applicable income tax treaty) with respect to amounts allocable to foreign stockholders; and

- be taxable (at the highest corporate tax rate) to us, rather than to our stockholders, to the extent the excess inclusion income relates to stock held by disqualified organizations (generally, tax-exempt companies not subject to tax on unrelated business income, including governmental organizations).

The tax on prohibited transactions will limit our ability to engage in transactions, including certain methods of securitizing mortgage loans, that would be treated as sales for U.S. federal income tax purposes.

Under the Code, a REIT's net income from prohibited transactions is subject to a 100% penalty tax. In general, prohibited transactions are sales or other dispositions of property, other than foreclosure property, but including mortgage loans held primarily for sale to customers in the ordinary course of business. We might be subject to this tax if we were to sell or securitize loans in a manner that was treated as a sale of the loans for federal income tax purposes. Therefore, in order to avoid the penalty tax, we may choose not to engage in certain sales of loans and may limit the structures we utilize for our securitization transactions even though such sales or structures might otherwise be beneficial to us.

**Recent changes in taxation of corporate dividends may adversely affect the value of our common stock.**

The Jobs and Growth Tax Relief Reconciliation Act of 2003 reduced to 15% the maximum marginal rate of tax payable by domestic noncorporate taxpayers on dividends received from a regular domestic subchapter C corporation and certain qualified foreign corporations ("qualified dividend income"). This reduced tax rate, however, generally does not apply to dividends paid to domestic noncorporate taxpayers by a REIT, except for certain limited amounts. Although the earnings of a REIT that are distributed to its stockholders still generally will be subject to less total federal income taxation than earnings of a non-REIT subchapter C corporation that are distributed to its stockholders net of corporate-level income tax, this legislation could cause domestic noncorporate investors to view the stock of non-REIT subchapter C corporations as more attractive relative to the stock of a REIT than was the case before the enactment of the legislation, because dividends from non-REIT subchapter C corporations generally will be taxed at a lower rate to the investor while dividends from REITs generally will be taxed at the same rate as the investor's other ordinary income. We cannot predict what effect, if any, this legislation may have on the value of the stock of REITs in general or on our common stock in particular, either in terms of absolute price or relative to other investments.

**Risks Related to Our Company and Structure**

**The stock ownership limit imposed by our articles of incorporation may inhibit market activity in our stock and may restrict our business combination opportunities.**

In order for us to maintain our qualification as a REIT under the Code, not more than 50% in value of the outstanding shares of our capital stock may be owned, directly or indirectly, by five or fewer individuals (as defined in the Code to include certain entities) at any time during the last half of each taxable year after our first REIT taxable year. Our articles of incorporation, with certain exceptions,

---

authorize our directors to take such actions as are necessary and desirable to preserve our qualification as a REIT and provide that, unless exempted by our board of directors, no person may own more than 9.8% in value or number of outstanding shares of our common stock and of a combination of our common stock and any preferred stock which we may issue in the future. Our directors also have authority under our articles of incorporation to impose a similar ownership limitation as to any separate class or series of preferred stock we may issue in the future. Our board of directors may grant an exemption from that ownership limit in its sole discretion, subject to such conditions, representations and undertakings as it may determine that are consistent with ensuring compliance with the REIT provisions of the Code. In December 2004, our board of directors exercised its discretionary authority and permitted an investment advisor to own up to 15% of our outstanding shares of common stock until June 30, 2005, provided that no individual client account owned in excess of 9.8% of our outstanding shares of common stock at any time during the relevant period. Our articles of incorporation also prohibit anyone from buying shares if the purchase would result in us losing our REIT qualification. If anyone acquires shares in excess of the ownership limit or in violation of the ownership requirements of the Code for REITs, we:

- will consider the transfer to be null and void;

- will not reflect the transaction on our books;

- may institute legal action to enjoin the transaction;

- will not pay dividends or other distributions with respect to those shares;

- will not recognize any voting rights for those shares; and

- will consider the shares held in trust for the benefit of a charitable beneficiary as designated by us.

The trustee shall sell the shares held in trust and the owner of the excess shares will be entitled to the lesser of:

- the price paid by the owner;

- if the owner did not purchase the excess shares, the closing price for the shares on the national securities exchange on which our common stock is listed on the day of the event causing the shares to be held in trust; or

- the price received by the trustee from the sale of the shares.

This ownership limit could delay or prevent a transaction or a change in our control that might involve a premium price for our common stock or otherwise be in the best interest of our stockholders.

### ITEM 1B.   UNRESOLVED STAFF COMMENTS

The Company has no unresolved staff comments as of the filing of this annual report on Form 10-K.

### ITEM 2.   PROPERTIES

Our executive and administrative office is located at 33 Maiden Lane, New York, New York 10038. This office is leased under a non-cancelable lease from an unaffiliated third party expiring December 31, 2009. The current annual rent for this office is approximately $2.5 million and the office consists of approximately 66,000 square feet.

For mortgage banking operations, we also lease real estate premises at an additional 51 locations in 22 states. The aggregate annual rental for these locations is approximately $7.8 million.

### ITEM 3.   LEGAL PROCEEDINGS

On February 16, 2006, EMC Mortgage Corp. ("EMC") filed suit against MortgageIT in the 95th Judicial District Court of Dallas County, Texas. This suit alleges, among other things, that MortgageIT

29

| 10-K | 31st "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 31st |
|------|--------------------|-----|-----|----------|------|--------|-----------|

is obligated to repurchase from EMC approximately $70.5 million in sub-prime mortgage loans sold to EMC pursuant to a Mortgage Loan Purchase and Interim Servicing Agreement dated January 1, 2003, as amended, due to alleged breaches of representations and warranties as well as alleged early payment default repurchase obligations with respect to such loans. MortgageIT is in the process of evaluating the claims and potential counterclaims, and intends to vigorously defend the suit. At this stage of the proceedings, it is not possible to predict the outcome of this litigation.

On September 29, 2004, as amended on October 12, 2004, an action was filed in the U.S. District Court for the Southern District of New York against our subsidiary, MortgageIT, and IPI Skyscraper Mortgage, which was, at the time, a subsidiary of, and has now been merged with and into, MortgageIT. The case was filed by four former loan officers of a MortgageIT branch in Newburgh, New York, and seeks to recover allegedly unpaid minimum wage and overtime under both federal and New York labor laws. The case was filed as a putative class action; a motion for certification of a class under New York law and for collective action under federal law was filed on March 11, 2005. We opposed the motion, which remains pending, and we are vigorously asserting our defenses in this action. At this stage of the proceedings, it is not possible to predict the ultimate outcome of this litigation.

In addition to these cases, in the ordinary course of business, the Company is a defendant in or party to a number of pending and threatened legal actions and proceedings, and is also involved from time to time in investigations and administrative proceedings by governmental agencies. Certain of such actions and proceedings involve alleged violations of consumer protection laws, including claims relating to the Company's loan origination and collection efforts, and other federal and state banking laws. Certain of such actions and proceedings include claims for breach of contract, restitution, compensatory damages, punitive damages and other forms of relief. Due to the difficulty of predicting the outcome of such matters, the Company can give no assurance that it will prevail on all claims made against it; however, management believes, based on current knowledge and after consultation with counsel, that these legal matters and administrative proceedings and the losses, if any, resulting from the final outcome thereof, will not have a material adverse effect on the Company's financial position, results of operations or liquidity, but can give no assurance that they will not have such an effect.

Although it is difficult to predict the outcome of any litigation, the Company has established litigation reserves where necessary in accordance with generally accepted accounting principles.

### ITEM 4.   SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS

No matters were submitted to a vote of our stockholders during the fourth quarter of 2005.

30

| 10-K | 32nd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 32nd |
|------|--------------------|-----|-----|----------|------|--------|-----------|

### PART II

### ITEM 5.   MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS
### AND ISSUER PURCHASES OF EQUITY SECURITIES

Our common stock began trading on the New York Stock Exchange under the trading symbol "MHL" on July 30, 2004. As of March 2, 2006, we had 28,799,140 shares of common stock outstanding, held by 119 holders of record and approximately 9,400 beneficial owners.

The following table sets forth, for the periods indicated, the high, low and closing sales prices per share of our

Case 2:11-cv-01445-MJP  Document 105-2  Filed 09/07/12  Page 24 of 33

common stock as reported on the New York Stock Exchange composite tape and the cash dividends declared per share of common stock.

| | Stock Prices | | | Cash Dividends Declared Per Share |
|---|---|---|---|---|
| | High | Low | Close | |
| **2005** | | | | |
| Fourth Quarter | $ 15.00 | $ 12.88 | $ 13.66 | $ 0.48[1] |
| Third Quarter | 20.22 | 12.88 | 14.22 | 0.48 |
| Second Quarter | 19.41 | 14.60 | 18.25 | 0.48 |
| First Quarter | 18.65 | 15.40 | 15.95 | 0.48 |
| **2004** | | | | |
| Fourth Quarter | $ 19.46 | $ 13.70 | $ 17.95 | $ 0.44[2] |
| Third Quarter[3] | 14.59 | 11.30 | 14.45 | |

(1)  Our fourth quarter dividend was declared in December 2005 and paid in January 2006.

(2)  Our first dividend was declared in December 2004 and paid in January 2005 with respect to our REIT taxable earnings during the third and fourth quarters of 2004.

(3)  Commenced trading July 30, 2004.

In order to qualify for the tax benefits accorded to a REIT under the Code, we intend to pay quarterly dividends such that all or substantially all of our REIT taxable income each year (subject to certain adjustments) is distributed to our stockholders. All of the distributions that we make will be at the discretion of our board of directors and will depend on our earnings and financial condition, maintenance of REIT status and any other factors that the board of directors deems relevant.

Following is information about securities authorized for issuance under our equity compensation plans at December 31, 2005:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights (a) | Weighted-average exercise price of outstanding options, warrants and rights (b) | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a)) (c) |
|---|---|---|---|
| Equity compensation plans approved by stockholders | 859,165 | $ 12.15 | 1,094,075 |
| Equity compensation plans not approved by stockholders | — | — | — |
| **Total** | **859,165** | **$ 12.15** | **1,094,075** |

31

| 10-K | 33rd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 33rd |

**Issuer Purchases of Equity Securities:**

| Period | Total Number of Shares Purchased (a) | Average Price Paid per Share (b) | Total Number of Shares Purchased as Part of Publicly Announced Plan or Programs (c) | Maximum Number (or Approximate Dollar Value) of Shares that May Yet be Purchased Under the Plans or Programs (d) |
|---|---|---|---|---|
| November 2005 | 90,400 | $ 13.03 | 90,400 | $ 28,822,291 |
| **Total** | **90,400** | **$ 13.03** | **90,400** | **$ 28,822,291** |

**ITEM 6.  SELECTED FINANCIAL DATA**

The summary consolidated historical balance sheet and statement of operations data have been derived from the historical consolidated financial statements of the Company. You should read the consolidated selected financial data together with the more detailed information contained in the consolidated financial statements and related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included elsewhere in this annual report on Form 10-K.

| | Years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2005 | 2004 | 2003 | 2002 | 2001 |
| | (Dollars and shares in thousands except per share data) | | | | |
| **Operating Data:** | | | | | |
| **Revenues:** | | | | | |
| Gain on sale of mortgage loans | $ 200,517 | $ 70,397 | $ 87,215 | $ 35,145 | $ 18,817 |
| Brokerage revenues | 28,065 | 36,283 | 63,030 | 50,218 | 8,834 |

| | | | | | |
|---|---|---|---|---|---|
| Net interest income | 69,042 | 30,887 | 10,720 | 7,937 | 2,735 |
| Realized and unrealized gain (loss) on hedging instruments | 9,672 | (7,852) | — | — | — |
| Other | 962 | 566 | 980 | 216 | — |
| Total revenues | 308,258 | 130,281 | 161,945 | 93,516 | 30,386 |
| **Operating expenses:** | | | | | |
| Compensation and employee benefits | 135,146 | 82,077 | 77,851 | 54,844 | 16,769 |
| Processing expenses | 61,225 | 24,603 | 27,828 | 16,235 | 9,000 |
| General and administrative expenses | 26,875 | 12,321 | 9,867 | 7,719 | 3,896 |
| Rent | 10,614 | 7,670 | 6,483 | 4,738 | 1,477 |
| Marketing, loan acquisition and business development | 4,407 | 4,203 | 6,504 | 5,062 | 1,844 |
| Professional fees | 10,615 | 3,510 | 2,930 | 1,918 | 687 |
| Depreciation and amortization | 4,360 | 2,726 | 2,408 | 1,890 | 1,010 |
| Total operating expenses | 253,242 | 137,110 | 133,871 | 92,406 | 34,683 |
| Income (loss) before income taxes | 55,016 | (6,829) | 28,074 | 1,110 | (4,297) |
| Income taxes | 14,669 | 1,617 | 3,799 | 252 | 107 |
| Net income (loss) | 40,347 | (8,446) | 24,275 | 858 | (4,404) |
| Dividends on convertible redeemable preferred stock, accrued and unpaid | — | 3,947 | 6,299 | 5,757 | 8,029 |
| Net income (loss) attributable to common stockholders | $ 40,347 | $ (12,393) | $ 17,976 | $ (4,899) | $ (12,433) |
| Net income (loss) per share: | | | | | |
| Basic | $ 1.69 | $ (1.46) | $ 34.71 | $ (9.53) | $ (24.20) |
| Diluted | $ 1.66 | $ (1.46) | $ 5.23 | $ (9.53) | $ (24.20) |
| Weighted average shares outstanding, basic | 23,887 | 8,517 | 518 | 514 | 514 |
| Weighted average shares outstanding, diluted | 24,258 | 8,517 | 4,644 | 514 | 514 |

32

---

| | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| | | (Dollars In thousands) | | | |
| **Other Data:** | | | | | |
| Purchase originations | $ 14,606,017 | $ 6,373,666 | $ 3,366,837 | $ 2,460,245 | $1,018,772 |
| Refinancing originations | 14,616,767 | 6,672,231 | 8,529,449 | 4,972,621 | 1,915,184 |
| Total originations | $ 29,222,784 | $ 13,045,897 | $ 11,896,286 | $ 7,432,866 | $2,933,956 |
| Fixed-rate originations | $ 12,998,453 | $ 6,957,182 | $ 9,225,722 | $ 6,300,949 | $2,891,812 |
| Adjustable-rate originations | 16,224,331 | 6,088,715 | 2,670,564 | 1,131,917 | 42,144 |
| Total originations | $ 29,222,784 | $ 13,045,897 | $ 11,896,286 | $ 7,432,866 | $2,933,956 |
| Conventional conforming originations | $ 7,476,519 | $ 4,283,001 | $ 7,610,969 | $ 4,919,549 | $2,058,798 |
| Pay option ARM originations | 5,326,259 | — | — | — | — |
| Non-conventional ("Government") conforming originations | 727,804 | 589,722 | 1,378,396 | 934,451 | 745,521 |
| Jumbo originations | 1,871,047 | 3,054,216 | 1,845,344 | 1,131,130 | 96,670 |
| Non-prime originations | 4,111,470 | 851,678 | 198,796 | 60,943 | 1,821 |
| Alt A originations | 7,913,058 | 3,574,392 | 651,239 | 291,168 | 25,077 |
| Home equity and second mortgage originations | 1,796,627 | 692,888 | 211,542 | 95,625 | 6,069 |
| Total originations | $ 29,222,784 | $ 13,045,897 | $ 11,896,286 | $ 7,432,866 | $2,933,956 |
| Weighted average middle FICO credit score | 717 | 720 | 718 | 709 | 694 |
| Total mortgage whole loan sales | $ 22,175,190 | $ 7,637,053 | $ 8,048,591 | $ 5,422,590 | $2,826,868 |
| Brokered originations | 1,718,368 | 2,079,516 | 3,631,476 | 2,003,243 | 106,878 |
| Weighted average first lien principal balance of loan originations | 236.9 | 230.6 | 200.6 | 183.9 | 130.9 |
| Weighted average first lien loan-to-value ratio of loan originations | 74.19% | 72.73% | 72.02% | 71.87% | 78.59% |
| Percentage of single family loan originations to total loan originations | 68.1 | 70.6 | 75.5 | 76.2 | 81.4 |
| Percentage of co-op apartment loan originations to total loan originations | 0.8 | 1.2 | 7.0 | 6.8 | 0.3 |
| Weighted average whole loan | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| sales price as a percent of par | 101.96 | 101.98 | 102.38 | 102.78 | 101.96 |
| Operating expense as a percent of total loans originated[1] | 0.87 | 0.84 | 1.13 | 1.24 | 1.18 |
| Return on average assets | 0.01 | (0.43) | 5.64 | 0.17 | (1.47) |
| Number of branches at period end | 56 | 47 | 31 | 24 | 20 |
| Number of employees at period end | 2,328 | 1,518 | 1,285 | 1,002 | 475 |

33

---

| 10-K | 35th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 35th |
|---|---|---|---|---|---|---|---|

| | December 31, | | | | |
|---|---|---|---|---|---|
| | **2005** | **2004** | **2003** | **2002** | **2001** |
| | | | (Dollars in thousands) | | |
| **Balance Sheet Data:** | | | | | |
| Cash and equivalents | $  36,757 | $  70,224 | $  22,261 | $    2,104 | $    3,418 |
| Restricted cash | 712 | 1,679 | 1,517 | 5,106 | 2,240 |
| Marketable securities held to maturity | 3,675 | 7,546 | 1,419 | 1,398 | 1,649 |
| ARM loans collateralizing debt obligations, net | 4,681,554 | 1,432,692 | — | — | — |
| ARM loans held for securitization, net | 282 | 1,166,961 | — | — | — |
| Mortgage loans held for sale | 3,378,197 | 784,592 | 324,753 | 434,258 | 502,523 |
| Mortgage-backed securities-available for sale | 23,357 | — | — | — | — |
| Hedging instruments | 54,472 | 19,526 | 343 | 3,792 | 1,623 |
| Receivables, net of allowance | 146,043 | 28,731 | 10,301 | 15,137 | 7,841 |
| Prepaids and other current assets | 31,262 | 11,693 | 5,538 | 4,251 | 1,853 |
| Goodwill | 11,639 | 11,639 | 11,665 | 8,250 | 5,845 |
| Property and equipment | 13,941 | 5,567 | 5,324 | 4,091 | 2,505 |
| Total assets | $ 8,381,891 | $ 3,540,850 | $  383,121 | $  478,387 | $ 529,497 |
| Collateralized debt obligations | $ 4,485,197 | $ 1,331,986 | — | — | — |
| Warehouse lines payable | 3,177,990 | 1,869,385 | $ 300,699 | $ 413,916 | $ 490,713 |
| Repurchase agreements | 87,058 | 67,674 | — | 8,889 | — |
| Hedging instruments | 8,801 | 1,145 | 3,202 | | — |
| Junior subordinated debentures | 77,324 | — | — | | |
| Notes payable and other debt | 15,000 | 15,000 | 1,125 | 6,250 | 3,155 |
| Accounts payable, accrued expenses and other liabilities | 176,619 | 63,993 | 30,996 | 26,509 | 13,857 |
| Total liabilities | 8,027,989 | 3,349,183 | 336,022 | 455,564 | 507,725 |
| Convertible redeemable preferred stock | — | — | 62,557 | 56,259 | 50,501 |
| Total stockholders' equity | 353,902 | 191,667 | (15,458) | (33,436) | (28,729) |
| Total liabilities and stockholders' equity | $ 8,381,891 | $ 3,540,850 | $  383,121 | $  478,387 | $ 529,497 |

(1)   Total operating expenses divided by total originations, as measured by original principal balance.

34

---

| 10-K | 36th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 36th |
|---|---|---|---|---|---|---|---|

**ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**OVERVIEW**

We are a self-originating real estate investment trust that generates earnings by managing a portfolio of high quality ARM loans and by originating loans for sale through our mortgage banking subsidiary. Our goal is to grow our mortgage banking operations and our ARM portfolio with the objective of generating stable earnings and dividends that grow over time.

**2005 Results**

In 2005, we expanded our investment portfolio of self-originated ARM loans from approximately $2.6 billion as of December 31, 2004 to approximately $4.7 billion as of December 31, 2005. To fund our portfolio growth and support continued growth in mortgage banking operations, we completed a secondary public offering of common stock in June 2005 and sold 7,289,428 shares at a price to the public of $18.25 per share. In July 2005, the underwriters of the secondary public offering exercised, in full, their option to purchase an additional 1,422,646 shares of common stock from the Company at the public offering price of $18.25 to cover over-allotments. Net proceeds to the Company, after deducting the underwriting discount and estimated offering expenses, were approximately $150

million. In addition, certain stockholders sold 2,194,878 shares in the public offering. The Company did not receive any proceeds from the sale of shares by the selling stockholders.

During 2005, we completed five securitizations, and our taxable REIT subsidiary completed its first REMIC securitization. The securitizations totalled approximately $4.4 billion. The transactions provided the Company with attractive financing costs and a stable source of long-term liquidity. Our annualized net interest margin on the REIT portfolio during 2005 was 97 basis points, generating $37.5 million of net interest income on a standalone basis.

In April and May 2005, the Company issued, in two private placements, an aggregate of $75 million of TPS through trust subsidiaries and sold them to a collateralized debt obligation pool vehicle. Proceeds from the TPS sales were used to support the continued expansion of MortgageIT, as well as to grow the Company's self-originated loan portfolio.

Our mortgage banking operations expanded significantly during 2005. Despite flat year-over-year industry origination volume, we grew our volume by 124% in 2005. Our strategy has been to grow the business organically through the development of new branches managed by seasoned mortgage professionals. In 2005, we added a total of 9 new branches to accommodate growth across our wholesale, correspondent, retail and sub-prime wholesale operations. As a result, our funded loan volume increased in 2005 to $29.2 billion from $13.0 billion in 2004.

During the course of the year, the composition of our mortgage originations changed in response to the market environment. Rising interest rates caused a shift toward new loan programs that offer flexibility in payments, such as POAs. The Company's taxable REIT subsidiary began originating POAs in the second quarter of 2005 and volume grew throughout the year. Total loan origination volume for these products, for the three and twelve months ended December 31, 2005, constituted 24.4% and 18.2% of total loan volume, respectively.

Sub-prime volume also significantly increased in 2005. However, in the fourth quarter of 2005, gain on sale margins for sub-prime loans narrowed significantly industry-wide. In response to these adverse industry conditions, the Company reduced its presence in the sub-prime origination market by decreasing the number of its sub-prime branches from six to three and implementing related work force reductions. Sub-prime volume accounted for 13.8% of total 2005 volume, versus 6.5% of total 2004 volume.

On a consolidated basis, our net income increased from a loss of $(8.4) million in 2004 to $40.3 million in 2005. The increase is primarily attributable to higher gain on sale of mortgage loans despite the decline in sub-prime margins in the fourth quarter, as well as higher net interest income in mortgage banking and in the investment portfolio.

35

| 10-K | 37th "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 37th |

**Outlook for 2006**

According to the Mortgage Bankers Association, further interest rate increases are expected to cause an overall industry slowdown in mortgage originations, resulting in 19% lower volume in 2006 versus 2005. Nevertheless, under current conditions, we anticipate continued growth in our mortgage originations as branches that we opened in 2005 reach full productivity and expand our market penetration in regions that we entered during 2005. We expect our loan origination volume to be approximately $6.0 to $6.5 billion in the first quarter of 2006. At the same time, we anticipate that increased competition will put pressure on gain on sale margins. Also we expect future sub-prime loan volume not to be a material component of our total originations as we will have substantially exited the wholesale sub-prime business by the end of the first quarter of 2006.

During 2006, the yield curve is expected to flatten further, driven by increasing short-term interest rates, and we anticipate that, by year-end, this will cause higher warehouse borrowing costs for our mortgage banking operations as well as additional compression in our net interest margin at the REIT.

**RESULTS OF OPERATIONS**

The following table sets forth certain financial data as a percentage of total revenues for the years ended December 31, 2005, 2004 and 2003.

|  | Years ended December 31, | | |
|  | 2005 | 2004 | 2003 |
|---|---|---|---|
| Revenues: | | | |
| Gain on sale of mortgage loans | 65.1% | 54.0% | 53.9% |
| Brokerage revenues | 9.1% | 27.9% | 38.9% |
| Net interest income | 22.4% | 23.7% | 6.6% |
| Realized and unrealized gain (loss) on hedging instruments | 3.1% | (6.0)% | — |
| Other | 0.3% | 0.4% | 0.6% |
| Total revenues | 100.0% | 100.0% | 100.0% |
| Operating expenses: | | | |
| Compensation and employee benefits | 44.0% | 62.9% | 48.2% |
| Processing expenses | 19.9% | 18.9% | 17.2% |
| General and administrative expenses | 8.7% | 9.5% | 6.1% |
| Rent | 3.4% | 5.9% | 4.0% |
| Marketing, loan acquisition and business development | 1.4% | 3.2% | 4.0% |
| Professional fees | 3.4% | 2.7% | 1.8% |
| Depreciation and amortization | 1.4% | 2.1% | 1.5% |
| Total operating expenses | 82.2% | 105.2% | 82.8% |
| Income (loss) before income taxes | 17.8% | (5.2)% | 17.2% |
| Income taxes | 4.7% | 1.3% | 2.2% |

| | 13.1% | (6.5)% | 15.0% |
|---|---|---|---|
| Net income (loss) | | | |

*Year ended December 31, 2005 compared to year ended December 31, 2004*

*Net income (loss)*

On a consolidated basis, our net income increased from a loss of $(8.4) million in 2004 to $40.3 million in 2005. The increase is primarily attributable to higher gain on sale of mortgage loans despite the decline in sub-prime margins in the fourth quarter, as well higher net interest income in mortgage banking and in the investment portfolio. Total revenues increased year over year by approximately 137% from $130.3 million to $308.3 million, while total expenses increased approximately 85% year over year from $137.1 million to $253.2 million. Gain on sale of mortgage loans increased by 185% in 2005 compared to 2004 and net interest income increased by

36

approximately 124%. In addition, we recorded a $9.7 million gain on derivatives used in our investment portfolio hedging program, as we did not qualify for hedge accounting on certain hedging transactions during the first quarter of 2005. These revenue increases were partly offset by decreases of approximately 17% and 23%, respectively, in our 2005 loan brokerage volume and revenue compared with 2004. The following table presents the average balance for each category of our interest-earning assets and interest-bearing liabilities, with the corresponding annualized effective rate of interest and the related interest income or expense for the same period:

**Average Balance, Rate and Interest Income/Expense Table**
**(Dollars in thousands)**

| | For the year ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2005** | | | **2004**[2] | | |
| | Average Balance | Effective Rate/Yield | Interest Income and Expense | Average Balance | Effective Rate/Yield | Interest Income and Expense |
| Interest-earning assets: | | | | | | |
| Portfolio Assets | $ 3,798,462 | 5.01% | $ 190,341 | $ 462,596 | 5.09% | $ 23,536 |
| Mortgage loans held for sale | 2,431,995 | 5.54 | 134,701 | 636,950 | 5.61 | 35,737 |
| Cash and cash equivalents | 55,695 | 1.37 | 764 | 47,411 | 2.26 | 1,073 |
| | 6,286,152 | 5.18 | 325,806 | 1,146,957 | 5.26 | 60,346 |
| Interest-bearing liabilities: | | | | | | |
| Collateralized debt obligations | 3,214,276 | 4.06 | 130,391 | 250,090 | 2.77 | 6,955 |
| Warehouse lines payable | 2,770,380 | 4.26 | 118,001 | 807,397 | 2.62 | 21,140 |
| Other debt | 154,138 | 5.43 | 8,372 | 25,124 | 5.43 | 1,364 |
| | 6,138,794 | 4.18 | 256,764 | 1,082,611 | 2.72 | 29,459 |
| Net interest-earning assets and spread | $ 147,358 | 1.00% | $ 69,042 | $ 64,346 | 2.54% | $ 30,887 |
| Net interest margin[1] | | 1.10% | | | 2.69% | |

(1)  Net interest margin is computed by dividing annualized net interest income by the average daily balance of interest-earning assets.

(2)  There were no mortgage investment operations prior to August 4, 2004.

Mortgage Investment Operations

Our mortgage investment operations segment, or "REIT", began operations on August 4, 2004 as a result of our reorganization and initial public offering. This business segment generates revenue from net interest income earned on our Portfolio ARM Loans.

*Revenues*

**Net interest income.**   REIT net interest income increased to $37.5 million for the twelve months ended December 31, 2005 from $10.9 million for the period ended December 31, 2004. The increase was due to higher average earning assets of $3.9 billion for the twelve months ended December 31, 2005 compared with average earning assets of $1.2 billion for the period ended December 31, 2004. Net interest margin at the REIT declined to .97% for the twelve months ended December 31, 2005 from 2.18% for the period ended December 31, 2004 due to continued flattening of the yield curve as average 1-month LIBOR rose to 3.39% in 2005 from 1.50% in 2004, as well as the impact of increased loan basis amortization due to faster pre-payment speeds. The following table presents the average balance for each category of our interest-earning assets and interest-bearing liabilities, with the corresponding annualized effective rate of interest and the related interest income or expense for the same period:

37

**Average Balance, Rate and Interest Income/Expense Table**
**(Dollars in thousands)**

| | For the year ended December 31, | | | August 4, through December 31, | | |
| | 2005 | | | 2004 | | |
| | Average Balance | Effective Rate | Interest Income and Expense | Average Balance | Effective Rate | Interest Income and Expense |
|---|---|---|---|---|---|---|
| Interest-earning assets: | | | | | | |
| Portfolio Assets | $ 3,798,462 | 4.83% | $ 183,510 | $ 1,117,682 | 4.99% | $ 23,143 |
| Cash and cash equivalents | 63,094 | 3.38 | 2,135 | 85,843 | 2.24 | 798 |
| | 3,861,556 | 4.81 | 185,645 | 1,203,525 | 4.79 | 23,941 |
| Interest-bearing liabilities: | | | | | | |
| Collateralized debt obligations | 3,214,276 | 4.04 | 130,015 | 604,244 | 2.77 | 6,955 |
| Warehouse lines payable | 391,407 | 3.86 | 15,118 | 460,351 | 2.99 | 5,743 |
| Repurchase agreements | 86,426 | 3.53 | 3,049 | 33,328 | 2.21 | 306 |
| | 3,692,109 | 4.01 | 148,182 | 1,097,923 | 2.84 | 13,004 |
| Net interest-earning assets and spread | $ 169,447 | 0.80% | $ 37,463 | $ 105,602 | 1.95% | $ 10,937 |
| Net interest margin[1] | | 0.97% | | | 2.18% | |

(1)   Net interest margin is computed by dividing annualized net interest income by the average daily balance of interest-earning assets.

*Expenses*

**Compensation and employee benefits.**   Compensation and employee benefits expenses increased 50% to $1.8 million for the twelve months ended December 31, 2005 from $1.2 million for the period ended December 31, 2004. The increase was primarily due to an increase in the number of employees as the mortgage investment operations increased in scale.

**Processing expenses.**   Mortgage loan processing expenses increased $5.2 million for the twelve months ended December 31, 2005 from $729,000 for the period ended December 31, 2004. The increase was primarily due to higher subservicing costs and loan loss provision, driven by an increase in the average earning assets to $3.9 billion from $1.2 billion for the twelve months ended December 31, 2005 from $1.2 billion for the 2004 period.

**General and administrative expenses.**   General and administrative expenses increased to $2.0 million for the twelve months ended December 31, 2005 from $592,000 for the period ended December 31, 2004. This increase was primarily due to higher insurance and hedge expenses, driven by an increase in the average earning assets to $3.9 billion for the year ended December 31, 2005 from $1.2 billion for the 2004 period.

**Professional fees.**   Professional fees increased to $2.0 million for the twelve months ended December 31, 2005 from $479,000 for the period ended December 31, 2004. This increase was primarily due to higher legal and audit expenses, which audit expenses include costs associated with the Company's Sarbanes-Oxley Section 404 requirements.

<u>Mortgage Banking Operations</u>

*Revenues*

**Gain on sale of mortgage loans.**   Gain on sales of mortgage loans increased approximately 173% to $224.8 million for the twelve months ended December 31, 2005 from $82.4 million for the twelve months ended December 31, 2004. Mortgage whole loan sales to third parties increased by approximately 192% to $22.2 billion, after the elimination of $3.3 billion in intercompany loan sales, for the twelve months ended December 31, 2005 from $7.6 billion for the twelve months ended December 31, 2004.

38

| 10-K | 40th "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 40th |
|---|---|---|---|---|---|---|---|---|

**Brokerage revenue.**   Brokerage revenue decreased by approximately 23% to $28.1 million for the twelve months ended December 31, 2005 from $36.3 million for the twelve months ended December 31, 2004. The decrease was primarily attributable to a 23% decrease in the volume of loans brokered to third parties, resulting primarily from a shift away from loans brokered to loans funded using the TRS warehouse lines in the Company's retail channel.

**Net interest income.**   Net interest income increased by approximately 24% to $24.2 million for the twelve months ended December 31, 2005 from $19.6 million for the twelve months ended December 31, 2004. The increase is attributable to a higher average balance of loans held for sale, primarily due to the aggregation of loans in anticipation of transfer to the REIT, as well as a higher average balance of loans held for sale to third parties. However, the cost of funds for loans held for sale increased in 2005 in line with an increase in average 1-month LIBOR to 3.39% in 2005 from 1.50% in 2004. The following table presents the average balance for each category of our interest-earning assets and interest-bearing liabilities, with the corresponding annualized effective rate of interest and the related interest income or expense.

**Average Balance, Rate and Interest Income/Expense Table**
(Dollars in thousands)

| | For the years ended December 31, | | | | | |
| | 2005 | | | 2004 | | |
| | Average Balance | Effective Rate | Interest Income and Expense | Average Balance | Effective Rate | Interest Income and Expense |
|---|---|---|---|---|---|---|
| Interest-earning assets: | | | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage loans held for sale | $ 2,431,995 | 5.54% | $ 134,701 | $ 636,950 | 5.61% | $ 35,737 | |
| Cash and cash equivalents | 20,663 | 2.90 | 599 | 11,882 | 2.32 | 275 | |
| | 2,452,658 | 5.51 | 135,300 | 648,832 | 5.55 | 36,012 | |
| Interest-bearing liabilities: | | | | | | | |
| Warehouse lines payable | 2,378,973 | 4.32 | 102,883 | 616,863 | 2.50 | 15,397 | |
| Junior subordinated debentures and other debt | 94,804 | 8.71 | 8,256 | 11,330 | 9.34 | 1,058 | |
| | 2,473,777 | 4.49 | 111,139 | 628,193 | 2.62 | 16,455 | |
| Net interest-earning assets and spread | $ (21,119) | 1.02% | $ 24,161 | $ 20,639 | 2.93% | $ 19,557 | |
| Net interest margin[1] | | 0.99% | | | 3.01% | | |

(1)   Net interest margin is computed by dividing annualized net interest income by the average daily balance of interest-earning assets.

*Expenses*

**Compensation and employee benefits.**   Compensation and employee benefits expenses increased approximately 65% to $133.4 million for the twelve months ended December 31, 2005 from $80.8 million for the twelve months ended December 31, 2004. The increase was due to higher staffing resulting from the addition of eight branches and a new operations center opened in 2005.

**Processing expenses.**   Mortgage loan processing expenses increased approximately 131% to $57.8 million for the twelve months ended December 31, 2005 from $25.0 million for the twelve months ended December 31, 2004. The increase was primarily due to higher prime and sub-prime origination volumes as well as higher loan repurchase expenses in 2005 relative to 2004.

**General and administrative expenses.**   General and administrative expenses increased by approximately 107% to $24.2 million for the twelve months ended December 31, 2005 from $11.7 million for the twelve months ended December 31, 2004. This increase was primarily due to

| 10-K | 41st "Page" of 104 | | TOC | 1st | Previous | Next | Bottom | Just 41st |
|---|---|---|---|---|---|---|---|---|

greater general and administrative expenses related to eight new branches and a new operations center opened in 2005, as well as staffing growth in existing branches resulting from higher origination volumes.

**Marketing, loan acquisition and business development expenses.**   Marketing, loan acquisition and business development expenses increased approximately 5% to $4.4 million for the twelve months ended December 31, 2005 from $4.2 million for the twelve months ended December 31, 2004. The increase was primarily due to higher business development expenses associated with the expansion into new geographic areas and growth in originations in 2005.

**Rent expense.**   Rent expense increased approximately 38% to $10.6 million for the twelve months ended December 31, 2005 from $7.7 million for the twelve months ended December 31, 2004. This increase was primarily due to eight new branches and a new operations center opened in 2005.

**Professional fees.**   Professional fees increased approximately 187% to $8.6 million for the twelve months ended December 31, 2005 from $3.0 million for the twelve months ended December 31, 2004. This increase was primarily due to higher audit expenses, which include costs associated with the Company's Sarbanes-Oxley Section 404 requirements, accounting and consulting fees associated with our first full year as a public company, as well as an increase in legal expenses and increased management recruitment fees.

**Depreciation and amortization expenses.**   Depreciation and amortization expenses increased approximately 63% to $4.4 million for the twelve months ended December 31, 2005 from $2.7 million for the twelve months ended December 31, 2004. The increase was primarily due to increased capital expenditures related to eight new branches and a new operations center opened in 2005.

**Income tax expense.**   MortgageIT made the election to be treated as a taxable REIT subsidiary and, therefore, is subject to federal and state corporate income taxes. Accordingly, the Company records a tax provision on the taxable income of the TRS, which includes intercompany income that is eliminated in our consolidated statements of operations.

*Year ended December 31, 2004 compared to year ended December 31, 2003*

*Net income (loss)*

Consolidated net income decreased by approximately 135% to a net loss of $(8.4) million for the twelve months ended December 31, 2004 from net income of $24.3 million for the twelve months ended December 31, 2003. The decrease is attributable to lower gain on sale of mortgage loans, lower profitability from retail origination activity, including lower brokerage revenues, losses on derivatives used in our investment portfolio hedge program and increased operating expenses, inclusive of expansion activities in our mortgage operations. Total revenues decreased year over year by approximately 19.6% from $161.9 million to $130.3 million, while total expenses increased 2.4% year over year from $133.9 million to $137.1 million. Our 2004 loan brokerage volume and revenue decreased by 42.7% and 42.4%, respectively, from 2003. In addition, gain on sale of mortgage loans decreased by 19.3% in 2004 compared to 2003 and we recorded a $7.8 million loss on derivatives used in our investment portfolio hedging program. The decline in brokerage and gain on sale revenues and the loss on derivatives were partly offset by a 188% increase in net interest income from 2003 to 2004.

Mortgage Investment Operations

Our mortgage investment operations segment, or "REIT", began operations on August 4, 2004 as a result of our reorganization and initial public offering. This business segment generates revenue from net interest income earned on our Portfolio ARM Loans.

*Revenues*

**Net interest income.**  REIT net interest income was $10.9 million on average earning assets of $1.2 billion for the period from August 4, to December 31, 2004. The following table presents the average balance for each category of our interest-earning assets and interest-bearing liabilities, with

40

| 10-K | 42nd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 42nd |
|------|--------------------|----|-----|----------|------|--------|-----------|

the corresponding annualized effective rate of interest and the related interest income or expense for the same period (there were no mortgage investment operations prior to August 4, 2004):

**Average Balance, Rate and Interest Income/Expense Table**
**(Dollars in thousands)**

| | August 4, through December 31, 2004 | | |
|---|---|---|---|
| | Average Balance | Effective Rate | Interest Income and Expense |
| Interest-earning assets: | | | |
| Portfolio ARM Loans | $ 1,117,682 | 4.99% | $ 23,143 |
| Cash and cash equivalents | 85,843 | 2.24 | 798 |
| | 1,203,525 | 4.79 | 23,941 |
| Interest-bearing liabilities: | | | |
| Collateralized debt obligations | 604,244 | 2.77 | 6,955 |
| Warehouse lines payable | 460,351 | 2.99 | 5,743 |
| Repurchase agreements | 33,328 | 2.21 | 306 |
| | 1,097,923 | 2.84 | 13,004 |
| Net interest-earning assets and spread | $ 105,602 | 1.95% | $ 10,937 |
| Net interest margin[(1)] | | 2.18% | |

(1)  Net interest margin is computed by dividing annualized net interest income by the average daily balance of interest-earning assets.

*Expenses*

REIT operating expenses totaled $3.0 million for the period from August 4, to December 31, 2004, primarily consisting of:

- compensation and employee benefits;

- mortgage loan processing expenses; and

- professional fees and general and administrative expenses.

A substantial portion of REIT expenses are fixed in nature. The variable expenses are primarily processing expenses, including subservicing costs, provision for credit losses and brokerage commission expenses paid on Eurodollar contracts.

**Mortgage Banking Operations**

*Revenues*

**Gain on sale of mortgage loans.**  Gain on sales of mortgage loans decreased approximately 5.5% to $82.4 million for the twelve months ended December 31, 2004 from $87.2 million for the twelve months ended December 31, 2003. Mortgage whole loan sales to third parties decreased by 5.0% to $7.6 billion, after the elimination of $2.4 billion in intercompany loan sales, for the twelve months ended December 31, 2004 from $8.0 billion for the twelve months ended December 31, 2003.

**Brokerage revenue.**  Brokerage revenue decreased by approximately 42.4% to $36.3 million for the twelve months ended December 31, 2004 from $63.0 million for the twelve months ended December 31, 2003. The decrease was attributable to a 42.7% decrease in the volume of loans brokered to third parties, resulting from a general industry decline in volume during the twelve months ended December 31, 2004.

**Net interest income.**  Net interest income increased by approximately 82.4% to $19.6 million for the twelve months ended December 31, 2004 from $10.7 million for the twelve months ended December

41

| 10-K | 43rd "Page" of 104 | TOC | 1st | Previous | Next | Bottom | Just 43rd |
|------|--------------------|----|-----|----------|------|--------|-----------|

31, 2003. The increase is primarily attributable to a higher average balance of loans held for sale due to the aggregation of loans in anticipation of transfer to the REIT, as well as greater net interest spreads due to reduced borrowing costs. The following table presents the average balance for each category of our interest-earning assets and interest-bearing liabilities, with the corresponding annualized effective rate of interest and the related

*SEC Info*   Home   Search   My Interests   Help   User Info   *Bill Pantalo*

## MortgageIT Holdings/Inc · S-11 · On 6/6/05 · EX-21.1

Filed On 6/6/05 3:58pm ET · SEC File 333-125556 · Accession Number 950136-5-3287

[Find]              in  this entire Filing.    ▼;  Show  Docs searched  ▼ and  every "hit".  ▼
Help...   *Wildcards:* ? (any letter), * (many).  *Logic:* for Docs- & (and), | (or); for Text- | (anywhere), "(&)" (near).

| As Of | Filer | Filing | For/On/As Docs:Size | Issuer | Agent |
|---|---|---|---|---|---|
| 6/06/05 | MortgageIT Holdings/Inc | S-11 | 7:636 | | Capital Systems 01/FA |

Registration Statement for Securities of a Real Estate Company  ·  Form S-11
Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: S-11 | Registration Statement for Securities of a Real Estate Company | HTML | 2.61M |
| 2: EX-4.2 | Registration Rights Agreement Dated May 16, 2000 | HTML | 100K |
| 3: EX-4.3 | Registration Rights Agreement Dated June 7, 2001 | HTML | 66K |
| 4: EX-5.1 | Opinion of Patton Boggs | HTML | 10K |
| 5: EX-8.1 | Opinion of Patton Boggs Llp | HTML | 14K |
| 6: EX-21.1 | List of Subsidiaries | HTML | 4K |
| 7: EX-23.1 | Consent of Bdo Seidman, Llp | HTML | 5K |

EX-21.1 · List of Subsidiaries

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

| EX-21.1 | Last Page of 2 | TOC | 1st | Previous | Next | Bottom | Just 2nd |

EXHIBIT 21.1

LIST OF SUBSIDIARIES OF MORTGAGEIT HOLDINGS, INC.
-------------------------------------------------

| NAME | STATE OF FORMATION |
|------|--------------------|
| MortgageIT, Inc. | New York |
| Home Closer LLC | New York |
| MortgageIT SPV I | Delaware |
| Next at Bat Lending, Inc. | Delaware |
| MHL Funding Corp. | Delaware |

Filing Submission  -  Alternative Formats (Word / Rich Text, HTML, Plain Text, SGML, XML, et al.)

Sponsored Ads...

**Company Information**

The most comprehensive company info available. Get your free trial.
www.hoovers.com/

AdChoices ▷

Copyright © 2012 Fran Finnegan & Company.  All Rights Reserved.
About – Privacy – Redactions – Help — Fri, 7 Sep 19:55:09.0 GMT