EXHIBIT H

## APPENDIX I

3.32.1. On September 5, 2008, the Mickelsons faxed a letter and forms for "help for homeowners" which explained their hardship, and included taxes, expenses and forms to secure a modification.

3.32.2. On October, 20, 2008, the Mickelsons called Chase, whose representative "Craig" suggested also asking for a "special forbearance."

3.32.3. On October 21, 2008, the Mickelsons faxed ten pages requesting a special forbearance.

3.32.4. On October 30, 2008, the Mickelsons called Chase, whose representative "Alex" stated the fax machine is "backed up" and would take 5-10 days to get their faxes.

3.32.5. Between October 30, 2008, and March of 2009, the Mickelsons were not advised as to their request for special forbearance.

3.32.6. On November 18, 2008, the Mickelsons called Chase, whose representative "Carmen" told "Ricky Rolfston" was assigned their file on November 11, 2008 and the Mickelsons would have to work with him exclusively to get help.

3.32.7. On December 9, 2008, the Mickelsons called Chase whose representative "Ken" informed them the auction was postponed from December 26, 2008 to January 16, 2009.

3.32.8. On December 24, 2008, the Mickelsons called Chase whose representative "Anthony" gave them the direct extension of Ricky Rolfston

3.32.9. On January 14, 2009, the Mickelsons attempted to call Chase's Representative "Ricky Rolfston" but his mailbox was full. The Mickelson's then called Chase Customer

APPENDIX I- 1

Service, and representative "Allen" said he would have "Ricky Rolfston" email them. To their knowledge, Ricky never emailed the Mickelsons.

3.32.10. On the eve of an auction, January 15, 2009, the Mickelson's placed three calls to Northwest Trustee Services, Chase's Customer Service department, and Chase's Foreclosure department to postpone the auction and determine the status of being placed into a special program. On information and belief, due solely to the Mickelsons' efforts, the auction was postponed until February 6, 2009.

3.32.11. On January 23, 2009, Mickelsons placed a call to the foreclosure department's representative "Daniel." The Mickelsons offered to make substantial payments, but Daniel indicated that Chase would not accept any money, except a complete payment, until Ricky Rolfston put them into a program, which would take another 30-45 days. Daniel gave the Mickelsons the understanding that Ricky Rolfston would contact them soon. He never did.

3.32.12. On the eve of the auction, February 5, 2009, the Mickelsons placed seven calls to Chase, Routh, Crabtree, Olsen, and Northwest Trustee Services to find out their status for a program and postponing the auction. They learned from a customer representative named "Deborah" they had a new representative, "Da Nei Clark" and were approved for a modification program, but the auction date had not been postponed. Deborah claimed she could not open file which contained their paperwork and promised to find out why the auction had not been postponed.

3.32.13. On February 13, 2009, the Mickelsons received modification paperwork dated February 5, 2009, which had been delayed in the mail due to the President's Day weekend. The paperwork indicated the Mickelsons were approved for a loan modification with a monthly payment of $2,949.02. The letter requested the Mickelsons forward a cashier's check

or money order in the amount of $3,400 for a fee, closing cost and first month payment and stated there will not be another opportunity to modify your loan. The letter and attached agreement purported that the Mickelsons had accumulated $29,304.83 in added indebtedness since August of 2008.

3.32.14. On February 17, 2009, the Mickelsons called Da Nei Clark and left a message to see if they could lower their interest rate on the modification.

3.32.15. On February 18, 2009, the Mickelson's called Da Nei Clark twice without being able to reach her. The Mickelsons than called "Frankie" at Customer Service who gave them Da Nei Clark's supervisor "Ryan Reitmeyer." The Mickelson's called Ryan Reitmeyer whose mailbox was full and gave "Ryan Reid" as an alternative contact. The Mickelson's then called Ryan Reid whose mailbox was full and gave Ryan Reitmeyer as the contact. Unable to reach Da Nei Clark or her supervisors to ask questions about the loan modification, the Mickelson's called Chase Customer Service again and talked to "Chris" who gave them fax numbers for Da Nei Clark and Home Modification, and they wrote and faxed their questions to both.

3.32.16. On February 25, 2009, the Mickelsons received a letter, dated February 20, 2011, from Chase indicating they had until February 26, 2009 to sign the modification. The Mickelsons called Da Nei Clark, whose mailbox was full, then Ryan Reitmeyer whose mailbox was full and indicated he was out of the office until March 10, 2009, then to Ryan Reid, whose mailbox was full, then to Chase Switchboard who transferred them to "Scott" who said he would email Da Nei Clark and her supervisor a note to call the Mickelsons.

3.32.17. Facing the deadline and having made many attempts to contact Chase to determine whether they could get a lower rate. The Mickelsons sent some of the loan modification

documents and a letter trying to get a hold of them and sent a Cashier Check for $3,400 to Chase.

3.32.18. Defendants do not recall the specific date in late February or early March of 2009, but they received a brief early morning phone message from Da Nei Clark confirming receipt of a prior call, and if they still had questions to give her a call.

3.32.19. Between February 27, 2009 and March 10, 2009, the Mickelson's placed over fourteen calls to Ricky Rolfston, Ryan Reitmeyer, Ryan Reid and Da Nei Clark to discuss options on getting a lower rate. Each time they were unable to speak with these representatives or leave a message in their phone mailbox. Each time the Mickelsons called the customer service, who did answer, customer service would claim to send an email to these individuals to speak with the Mickelsons.

3.32.20. On March 10, 2009, Mickelsons placed a call and "Cody" with Chase Customer Service indicated they should fill out the paperwork for help for homeowners.

3.32.21. On March 11, 2009, to March 12, 2009, the Mickelson's placed four more calls to Da Nei Clark, Ricky Rolfston, and Ryan Reid to discuss loan modification.

3.32.22. On March 12, 2009, a "Mrs. Bartlett" from Chase called and left a message. The Mickelsons returned the call, and she advised the Mickelsons to re-apply for homeowners assistance and for special forbearance.

3.32.23. The Mickelsons called Chase Customer Service and talked to a "Warren" who suggested the Mickelsons fax Da Nei Clark a message declining the prior modification and requesting they reapply under the new rules being enforced by the Obama administration.

3.32.24. Between March 13, 2009, and March 23, 2009, the Mickelsons made one or more daily attempts during the workweek to reach Da Nei Clark by phone and fax.

3.32.25. Facing the deadline and having made many attempts to contact Chase to determine whether they could get a lower rate, the Mickelson's executed the loan modification on March 24, 2009, and Chase cashed a the previously sent Cashier Check in February for $3,400. The Mickelsons were not represented by counsel, nor had they succeeded in ever having a conversation with Da Nei Clark to discuss a lower percentage rate, the amount alleged to have been added to the obligation, or alternative modification terms.

3.32.26. On March 24, 2009, the Mickelsons talked to "Nicole" with Chase customer service to see if they could reach someone about whether their paperwork had been received and auction postponed. Nicole told the Mickelsons to call back a week later.

3.32.27. On March 31, 2009, the Mickelsons learned from 'Ken" with Customer service that their foreclosure had been lifted, and they could go ahead and reapply for homeowners assistance and to send their cashier's check for April under their modification.

3.32.28. On April 11, 2011, the Mickelsons made a $2,949.02 payment on the modified note.

3.32.29. On April 27, 2009, the Mickelsons called Chase Customer Service, who told them to talk with Da Nei Clark about getting into the Obama Administration's Home Affordable Modification Program (HAMP) or other modification "program," as well as, get into a special forbearance "program". Throughout May of 2009, the Mickelsons made attempts to contact Da Nei Clark to discuss getting a lower rate modification or forbearance, she did not return their calls nor did she talk with them.

3.32.30. Between June 11, 2009 and July 22, 2009, Chase sent delinquency notices to the Mickelsons and threatened foreclosure. The Mickelsons frequently called Chase to get advice. On July 23, 2007, the Mickelsons attended a workshop in Everett where Chase representatives

advised the Mickelsons to supply information for assistance "program". On August 7, 2009, the Mickelsons submitted supplemental information pursuant to a Chase's request.

3.32.31. On September 1, 2009, "Rose" with Chase called to offer the Mickelson's a "special forbearance" of three months at $1320.00 a month, and she would be sending them paperwork to sign and require a cashier check. Rose also advised the Mickelsons' that they would need to resubmit paperwork to get into another program for a lower rate modification. Rose also advised that "Kelli Dillard" replaced Da Nei Clark as their file representative. The Mickelsons called Chase on September 2, 2009, and told them they would accept and Chase would send the paperwork.

3.32.32. On September 8, 2009, the Mickelsons called Chase to find out why they had not received the paperwork, Customer Service Representative "Alma" said it would take another 7-10 days and to call back then if the Mickelsons had not received it.

3.32.33. On September 18, 2009, the Mickelsons called Chase to determine why they had not received their approved special forbearance documents, Chase representative "John" said to call back in 7-10 days.

3.32.34. On September 29, 2009, Mickelsons called Chase to find out why they had not received the paperwork for their approved special forbearance documents. Chase customer service "Mike" promised to email "Kelli Dillard" and the Mickelson's underwriter to see what was responsible for the delay.

3.32.35. On October 5, 2009, the Mickelsons spoke to "Alma" with Chase customer service, who told the Mickelsons they re-sent the documents. Alma also said Chase would send the Mickelsons a note letting them know what the Mickelsons needed to do to re-apply for homeowners assistance.

3.32.36. On October 22, 2009, the Mickelsons spoke with "Grace" with Chase customer service who told the Mickelsons they would email Kelli Dillard to find out where the documents were.

3.32.37. The paperwork for the special forbearance arrived on October 26, 2009, but had September, October, and November of 2009 as the months approved for the special forbearance.

3.32.38. On November 3, 2009, the Mickelsons called Chase to see if they could change the dates because the documents never arrived at the Mickelsons.

3.32.39. On November 14, 2009, the Mickelsons sent their acceptance letter for special forbearance and mailed a cashier checks for $1320.00 on December 4, 2009, and January and February, 2010.

3.32.40. On January 18, 2010, Chase sent a letter which advised the Mickelsons that Chase could help, and to re-apply for a home assistance program.

3.32.41. On January 29, 2010, Chase sent the Mickelsons a notice of intent to foreclose claiming $51,522.83 past due, including late fees, with $1,097.98 held in suspense.

3.32.42. On April 8, 2010, the Mickelsons faxed documents to get into a loan modification program. On April 20, 2010, Chase claimed it never received the documents and the Mickelsons needed to re-fax the materials. On April 22, 2010, "Larry" with Chase Loan Modification indicated they received the documents, but was having computer problems. Larry also indicated on one form, of many which had the number, the Mickelsons did not put on Travis Mickelsons social security number, and that they would need to refax pages of the application, and they did.

3.32.43. On August 6, 2010, Defendant Routh Crabtree Olsen sent the Mickelson's a letter stating they would commence foreclosure proceedings against the Mickelsons and take advantage of opportunities to keep their home.

3.32.44. Throughout August and November, 2010, the Mickelson made calls to defendants to stop a foreclosure sale, get a loan modification and get into a program.

3.32.45. In November, the Mickelsons received a letter dated Nov. 6, 2010, asking the Mickelsons to send $1,861.37 to fully amortize their new loan payment plan effective January 1, 2011 to June 1, 2011. Attached as exhibit Y and incorporated herein by reference is a copy of that letter. The Mickelsons sent two cashier's checks per request by Chase's customer representative "Andrea" who was being directed by "Relation Expert" "Brandon."

3.32.46. On November 17, 2010, Brandon left a message to call him back, the Mickelson's called and spoke with "Tammy" who would not transfer the Mickelsons to Brandon because he "only looks at accounts once a week". The Mickelsons learned that Chase wanted more information sent to them and faxed that information.

3.32.47. On November 29, 2010, the Mickelson's received a letter stating that Chase would not accept their Cashier's checks.

3.32.48. On November 30, 2010, Chase's customer service indicated their system was down for two days and to call back.

3.32.49. On December 1, 2010, Chase's customer service representative "Michelle" indicated that Chase had all paperwork and would sent to underwriting, and that the foreclosure had been delayed.

3.32.50. On December 7, 2010, Chase's phone system would not accept the Mickelson's repeated calls.

APPENDIX 1- 8

3.32.51. On December 8, 2010, Chase customer service indicated the sale would go through because underwriting had not received all of the Mickelson's documents, and that they were missing pages of the bank statements. The missing pages were a blank page and balance sheets. Chase stated, again, they would postpone the sale until January, 2011, and to re-fax the pages.

3.32.52. On December 15, 2010, Chase confirmed a new request for modification under the Making Home Affordable program, but requested additional documentation to finish the application, which the Mickelsons submitted.

3.32.53. On December 30, 2010, "Julie", with Chase, became the Mickelson's contact for the Making Home Affordable program. Julie requested that the Mickelsons fax additional documents, and the Mickelson's faxed the materials.

3.32.54. On January 1, 2011, Chase sent a letter regarding the Mickelsons new rate and payments effective January 1, 2011 to June 1, 2011.

3.32.55. On January 12, 2011, Julie indicated that the Mickelson's paperwork was complete and in underwriting; and that the sale date was on hold and to call her back the following week.

3.32.56. On January 19, 2011, Julie called indicating that underwriting wanted more information, including: a household list of monthly expenses, and profit and loss statements. The Mickelsons sent this information.

3.32.57. On January 27, 2011, Chase sent a letter to the Mickelson's stating they needed additional information; the Mickelsons sent this information on January 31, 2011.

3.32.58. On February 10, 2011, "Judy" with Chase indicated the Mickelson's account had been flagged as an "inactive foreclosure" and no sale date was issued. Subsequently, the

APPENDIX 1- 9

Mickelsons spoke with Julie who indicated underwriting wanted more information including a new profit and loss statement, a letter stating why Travis Mickelson was not working; and Julie reconfirmed there was no sale date. Later, Julie called to ask for a letter as to why Danielle Mickelson was no longer doing real estate. The requested information was faxed to Chase.

3.32.59.   On February 18, 2011, the Mickelsons received a letter from the trustee stating the foreclosure has been postponed to March 25, 2011. This letter was inconsistent to the statements of Chase that the sale had been inactivated.

3.32.60.   On March 10, 2011, the Mickelsons returned Chases call, and Jenny Adams in underwriting wanted more information, including updated bank statements for January and February, and contribution letter from the Mickelson's parents for the program. The Mickelsons faxed this information.

3.32.61.   On March 10, 2011, the Mickelsons received a letter stating their mortgage account "may be closed." This was inconsistent to the statements of Chase that they may qualify for a program.

3.32.62.   On March 16, 2011, Chase requested updated 4506T forms because it "had been longer than 90 days" since they had received those forms from the Mickelsons. On March 20, 2011, the Mickelsons faxed the forms.

3.32.63.   On March 25, 2011, notice of the foreclosure sale occurrence was taped to the Mickelsons door.

3.32.64.   After the sale, the Mickelsons continued to receive bills and calls requesting payments on their Note.