Appendix 1



Copyright (c) 2011 Washington Law Review Association
Washington Law Review

December, 2011

Washington Law Review

*86 Wash. L. Rev. 755*

**LENGTH:** 35117 words

ARTICLE: FORECLOSING MODIFICATIONS: HOW SERVICER INCENTIVES DISCOURAGE LOAN MODIFICATIONS

**NAME:** Diane E. Thompson*

**BIO:** * My colleagues at the National Consumer Law Center (NCLC) provided, as always, generous and substantive support for this piece. Carolyn Carter, John Rao, Margot Saunders, Tara Twomey, and Andrew Pizor all made significant contributions to the form and content of this paper. Alys Cohen insisted that I write it. Denise Lisio and Jillian McLaughlin helped with the footnotes; Tamar Malloy and Svetlana Ladan worked on the charts and the formatting. Beyond NCLC, Kathleen Engel and Kevin Byers were generous enough to read and comment on this paper. All tables, where not cited, represent the author's summary conclusions. All errors remain my own.

**LEXISNEXIS SUMMARY:**

... Principal or interest rate reductions or forbearances - the sorts of modifications that most borrowers need to make the loans sustainable - will generally result in an immediate recognition of loss to the servicer and an elevated number of reported delinquencies, which can result in the servicer losing its most valuable asset, the mortgage servicing rights. ... The Article begins with an overview of the origins and functions of the servicing industry; the tax, accounting, and contract rules that form the legal backdrop for servicers' actions; and the enforcement of those rules, primarily by the credit rating agencies and bond insurers. ... Sometimes the pooling and servicing agreements (PSAs) - the documents created at the inception of the trust, which provide servicers with most of their guidance and authority in acting on behalf of the trust - require that servicing be transferred automatically upon default to a specialty servicer. ... Dual-Track Provisions in Investor Contracts Hinder Modifications Many PSAs, as well as the credit rating agencies, require servicers to process both foreclosures and loan modifications at the same time. ... The incentives are strong for servicers to structure modifications to ensure a quick repayment of advances, either through upfront fees, short term forbearances followed by lump sum repayment of missed payments, or capitalizing arrears and pulling those capitalized arrears from the pool. :201;15125:0YCA20120119;1 Figure 6 Servicers encounter significant expenses in financing the principal and interest advances to investors. ... HAMP's servicer incentive payments offset these staffing costs, but the payment is post hoc, after the modification has been performed and the staff costs have been incurred. ... Foreclosing on homes where homeowners have suffered an involuntary drop in income without evaluating the feasibility of a further modification is punitive to homeowners and does not serve the interests of investors.

**HIGHLIGHT:**

Abstract: Despite record losses to investors, homeowners, and surrounding communities, the foreclosure crisis continues to swell. Many commentators have urged an increase in the number of loan modifications as a solution to the foreclosure crisis. The Obama Administration created a program specifically designed to encourage modifications. Yet, the number of foreclosures continues to outpace modifications.

One reason foreclosures outpace modifications is that the mortgage-modification decision maker's incentives generally favor a foreclosure over a modification. The decision maker is not the investor or the lender, but a separate entity, the servicer. The servicer's main function is to collect and process payments from homeowners, and servicers do not necessarily have any ownership interest in the loan. Servicers, unlike investors, generally recover all their hard costs after a foreclosure, even if the home sells for less than the mortgage loan balance. Servicers may even make money from foreclosures through charging borrowers and investors fees that are ultimately recouped from the loan pool.

Existing regulatory guidance could be improved to facilitate modifications. Investors need increased transparency to hold servicers accountable for failing to make modifications when it is in the investors' best interests to make modifications. Fundamentally, servicers must be required to make modifications when doing so would benefit the trust as a whole.

**TEXT:**
[*758]

INTRODUCTION

We are living through a period of historic levels of foreclosures. The foreclosure rate in 2010 n1 was more than three times what it was in 1933, at the height of the Great Depression. n2 The crisis has impacted every part of our country and most of the world. n3 As the chairman of the Federal Reserve Board has noted, the crisis threatened our national economy. n4 Families who have lost their homes face losses projected to exceed $ 2.6 trillion, n5 with spillover effects on neighbors and communities in the trillions of dollars. n6

[*759]   One response to high rates of default and foreclosure is to modify, or restructure the loans in order to ease payment. Modifying loans to ease repayment makes sense because lenders lose a lot of money on foreclosures. n7 When a borrower makes payments under a modification, lenders can save money. n8 Modifications are routine in the commercial context, with lenders agreeing to drop interest rates, forgive or forbear principal, or provide a grace period for payments. n9 In spite of the benefits of modification, residential lending has long lagged behind commercial lending in the depth and variety of loan modifications offered to borrowers in default. n10 In residential lending, the most common form of modification historically was a relatively ineffective short-term forbearance agreement. n11 These agreements reduce the payment, sometimes to zero, for a few months. Homeowners are typically expected to make up the accumulated arrearages in one large payment, or sometimes the accumulated arrearage is postponed to the end of the loan term. n12

Unsurprisingly, many homeowners who enter these short-term agreements end up back in foreclosure within a few months. n13 As recently as 2008, most modifications of residential loans failed to reduce the payment, and many actually increased the monthly mortgage   [*760]   payment for homeowners already struggling to make existing payments. n14 Even now, a significant number of mortgage modifications continue to increase the monthly mortgage payment. n15 Most modifications increase the total amount the homeowner owes. n16 However, these modifications have been little more than Band-Aids on a bleeding wound, leaving the loan to bleed itself out and end up back in foreclosure in short order. The modifications offered homeowners have not, by and large, been sustainable.

Deeper, more sustainable modifications have been slow in coming, despite the staggering losses suffered by both homeowners and lenders in the foreclosure crisis. n17 Even as defaults climbed in 2007 and 2008, n18 servicers preferred short-term repayment plans to permanent modifications of the loan terms. n19 Indeed, in 2009, once a loan was in default, its chance of ending in foreclosure, as opposed to being   [*761]   modified or reinstated, actually increased. n20 The government's flagship response to the foreclosure crisis, the Home Affordable Modification Program (HAMP), has failed to promote modifications in sufficient numbers to ease the crisis. n21 The most recent government data suggests that the number of loan modifications in the country is declining, n22 while serious delinquencies remain near all-time highs. n23

Foreclosures continue to outpace sustainable loan modifications in part because the incentive structure for the servicers, the institutions actually making the decisions whether to foreclose or modify, generally favors foreclosures over modifications. Servicers are not necessarily lenders or investors, n24 and their compensation structure is generally independent of the performance of the loans they service. The complex incentive structure for servicers means that servicers can sometimes make more money from foreclosing than from modifying, n25 and that, for servicers, short-term,

unsustainable modifications may be more profitable than long-term, sustainable modifications. n26 The subject of this Article is how that incentive structure influences servicers to choose   [*762]   either foreclosure or modification.

In the parts that follow, this Article will discuss how servicers' incentives shape the modifications they offer. The Article begins with an overview of the origins and functions of the servicing industry; the tax, accounting, and contract rules that form the legal backdrop for servicers' actions; and the enforcement of those rules, primarily by the credit rating agencies and bond insurers. Against that backdrop, the Article looks at the pressures that expenses and income place on servicers as they choose between foreclosures and modifications, generally, and among various forms of modifications, particularly. The last part discusses how servicers' incentives might be shifted so that more modifications are made, where doing so would serve the interests of investors, homeowners, and society at large.

## I. THE FRAMEWORK OF MORTGAGE SERVICING IMPEDES MODIFICATIONS

This part briefly surveys the modern mortgage market and describes its major players. The modern mortgage market is a highly complex and opaque world, with fragmented ownership. n27 One result of this complexity is increased diffi-culties for both homeowners and investors who would like to see more economically viable modifications made. n28

### A. The Mortgage Market Has Evolved Into Fragmented Ownership

Once upon a time, it was a wonderful life. n29 In this prediluvian America, those that owned the loan also evaluated the risk of the loan, collected the payments, and adjusted the payment agreement as circumstances warranted. In this model, in most circumstances, lenders made money through the repayment of principal with interest over time, borrow-ers had unmediated access to the holder of their loan, and both lenders and borrowers had in-depth information about local markets. n30   [*763]   Even if few bank owners or managers were as singularly civic-minded as George Bailey, they were at least recognizable individuals who could be appealed to and whose interests and incentives, if not always aligned with those of borrowers, were mostly transparent.

This unity of ownership, with its concomitant transparency, has long since passed from the home mortgage market. n31 Lenders now typically originate loans with the intention of selling the loan to investors. Loans may be sold in whole on the secondary market, so one investor ends up with the entire loan, but, more commonly, the loans are secu-ritized. n32 The securitization process transforms home loans into commodities, with diffuse ownership and accounta-bility. n33 Today, through the secondary market and securitization, loan ownership is fragmented with a corresponding loss of transparency.

In securitization, thousands of loans are pooled together in common ownership. Ownership of the loans is held by a trust. The expected income stream from the pooled loans together forms the basis for bonds that are sold to investors. Investors who purchase the bonds do not own the loans, but they do own the right to receive payment based on the loan payments. Bonds may be issued for different categories of payments, including: interest payments, principal payments, late payments, and prepayment penalties. n34 Different groups of bond holders - or tranches - may get paid from dif-ferent pots of money and in different order. n35 The majority of all home loans in recent years were securitized. n36

Usually, hundreds or thousands of different individuals have at least a nominal interest in the payment stream on any given mortgage. The homeowner is unlikely to know who any of these people are and has only limited access to their agent, the trustee. The actual, quite complex,   [*764]   control and decision making structure is discussed further in the next section.

### B. Decision Making Is Divorced from Ownership for Most Home Loans

When we talk about loan modifications and foreclosures, colloquially over coffee or in court cases, we tend to refer to a "lender," who is presumed both to own the loan, with a corresponding risk of loss if the loan does not perform, and to exercise control over the decision to foreclose or modify. This simplistic terminology does not reflect the reality of most home loans.

For a securitized loan, there are multiple entities that we might naively call a lender. There is an originating lender and often a broker, whom the borrower may identify as the lender but who only arranges the transaction. n37 There is the servicer, the entity that collects the payments, which sometimes is the same as the originator but often is not. n38 There is a trust that holds the legal title to the loan, and a trustee that acts on behalf of the trust but seldom exercises any meaningful day-to-day authority over the loan. n39 And there are the investors in the trust, who have a beneficial own-ership interest in the loan and its proceeds. n40

While all of these entities will exercise some control over the loan, only the investors ultimately bear the risk of loss if the loan does not perform. Only the servicer has control over the modification of any individual loan. Practically, investors have little control over loan modifications, even though the investors collectively bear the risk of loss from a foreclosure. As a result, servicers proceed with foreclosures, even though investors may lose the entire value of the home loan at a foreclosure. n41

[*765]   The following subsections will provide an overview of servicers' functions in the loan modification process and the limited oversight exercised by investors. They then discuss the foreseeable consequence that, by and large, the loan modifications servicers make reflect the interests of servicers, not of investors, and that too often loans that should be modified from an economic standpoint are foreclosed instead.

1. Who Is a Servicer?

The servicer stands in for the trust, the beneficial owners of the loans, and the investors in virtually all dealings with homeowners. n42 It is the servicer to whom homeowners mail their monthly payments, the servicer who provides billing and tax statements for homeowners, and the servicer to whom a homeowner in distress must address a petition for a loan modification.

Some servicers are affiliated with the originators - nearly half of all subprime loans are serviced by either the originator or an affiliate of the originator n43 - but many are not. Even when the servicer is affiliated with the originator, it no longer has an undivided interest in the loan's performance because the loan itself is no longer held by any single entity. The servicers stand apart and separate, both from the original lenders and from the current owners of the loans - the trusts and investors.

Most of what servicers do is routine and automated: accepting payments and applying them to accounts. n44 But when a loan becomes delinquent, the amount and nature of servicing changes. Decisions about whether to foreclose or modify must be made. The homeowner must be contacted. If the house is vacant, it must be secured. The timing of the foreclosure must be managed, and ancillary service providers, from title companies to attorneys to real estate brokers for a post-foreclosure sale, must be hired. All those decisions are left largely to servicers' discretion.

Nominally, the trustee oversees the servicer and has the right - and   [*766]   duty - to fire the servicer when appropriate. n45 Nominally, as an agent of the trust under the securitization contract, the servicer has a duty to act in the best interests of the trust. n46 But, practically, neither trustees nor investors have much say in the manner that servicers perform their duties. n47 Instead, servicers are left to perform their duties and collect their fees with little, if any, oversight. n48

There are servicers, called "special servicers" or "default servicers," as the name suggests, who specialize in servicing mortgages on which the borrowers have missed payments. Sometimes the pooling and servicing agreements (PSAs) - the documents created at the inception of the trust, which provide servicers with most of their guidance and authority in acting on behalf of the trust n49 - require that servicing be transferred automatically upon default to a specialty servicer. n50 More often, the PSAs leave the decisions about who performs the day-to-day servicing activities on any given loan to the designated "master servicer," which may directly service all, some, or none of the loans itself. n51

[*767]   Servicers are not paid, strictly speaking, based on the performance of the loans in the pool. The master servicer typically is entitled to receive a portion of the monthly principal balance of the pool of mortgages serviced until those mortgages are paid off - regardless of the performance of the loans or the quality of the servicing. n52 A servicer purchases the right to receive this income stream (the mortgage servicing rights) at the inception of the pool n53 and continues to receive it unless removed by the trustee - an exceptional event. n54

Servicers sometimes retain or acquire a junior interest in the pools they service. Some pooling and servicing agreements require servicers to maintain an interest in the pool on the theory that a servicer with skin in the game will do a better job of servicing the loans. n55 These junior tranches held by servicers are usually interest only: if there is "excess" or "surplus" interest, then the servicer receives that interest income. If the servicer collects no more interest income than is required to satisfy the senior bond obligations, then the servicer receives nothing. n56 The junior interests held by servicers are generally intended to absorb any losses on the pool. n57 The impact of these junior interests, or residuals, on servicers' behavior is discussed in Part III.E.4 below.

In summary, servicers, although they may be called "lenders" by courts and homeowners alike, are neither the originators of the loan nor the owners of most loans. They are, in good times, little more than payment processing centers. In bad times, they bear the responsibility for deciding who gets a loan modification and on what terms. Their in-

86 Wash. L. Rev. 755, *

come stream comes primarily from their monthly servicing fee, which is a fixed percentage of the outstanding principal balance. Even where servicers retain a junior interest in the pool, their compensation is not tied directly to long-term performance of the loans they service. The  [*768]   conflict between servicers' compensation and the interests of investors, the beneficial owners of loans, depresses the number of loan modifications made, and increases the number of foreclosures.

2. Investors Seldom Can or Do Influence the Servicer's Actions on Loan Modifications

Nominally, the servicer works at the behest of the investors, through the trustee. Yet, investors seldom give servicers guidance on how or when to conduct loss mitigation and are generally willing to defer to the servicer's judgment. n58 Investors' inaction results from a common action problem (how to coordinate hundreds of different investors with varying interests?) n59 and a dearth of hard information (if investors do not know if they are losing or making money on a modification compared to a foreclosure, how can they act effectively?). n60

In order for investors to take action against a servicer, a majority of the investors must agree. n61 This is often impractical, if not impossible. n62 In large subprime pools there may be hundreds of investors who have differing views of what the appropriate response to a pending foreclosure is. n63 For most subprime securities, different investors own different parts of the security - principal payments, interest payments, or  [*769]   prepayment penalties, for example - and get paid in different orders depending on their assigned priority. n64 Depending on the priority of payment and whether or not a modification reduces interest or principal payments, two investors in the same pool may fare very differently from the same modification, with one investor seeing no change in payments and the other investor having its payments wiped out completely. n65

Investors also lack the necessary information to make judgments about the cost or benefit of a loan modification. Obtaining information about the nature and extent of loan modifications is not easy, even for investors. Neither loan-specific information nor detailed information on loan modification characteristics and performance throughout the pool is generally available. n66 Determining how loan modifications impact the return on any one security is even harder: the type of modification, the accounting treatment of the modification, and the characteristics of the security held will all influence whether any given loan modification is a net benefit or cost for any individual security holder. n67 Even the sometimes substantial fees paid to servicers in foreclosure are often invisible to investors. n68 As one commentator observed, "the investor has to completely trust the servicer to act in their behalf, often in substantially unverifiable dimensions." n69 Servicers, not investors, call  [*770]   the shots on loan modifications. n70

Although servicers are nominally accountable to investors, investors exercise little control or oversight of modifications. The result is that servicers may, when they choose, evade modifications, even when doing so would serve investors' interests.

3. Servicers Make Modifications that Benefit Themselves, Not Investors or Homeowners

Servicers, though nominally acting on behalf of investors, have wide discretion in deciding whether to modify a loan. n71 As a result, servicers may refuse to modify loans even when modification would benefit investors. n72 Bondholders have alleged that servicers profit at the expense of investors by failing to devote sufficient staff to modifications n73 and by piling on property maintenance fees, for example. n74 Because servicers generally have weak incentives to perform modifications, the result is that the number of modifications is depressed below what would make  [*771]   economic sense from the standpoint of investors. n75

Where servicers do make modifications, they primarily make modifications that benefit themselves without regard to either investors or homeowners. Modifications that include capitalization of arrearages are consistently the largest category of modifications, n76 yet they are harmful to both investors and homeowners. Investors lose because their interest income may be diverted to the servicer to reimburse the servicer for expenses associated with modifying the loan. n77 Homeowners lose because modifications that capitalize arrearages increase their balances, leaving homeowners owing more than they did pre-modification. Both homeowners and investors lose, because modifications that increase the principal balance are more likely to re-default. n78 Servicers, however, benefit from these modifications, because they speed up their ability to recover advances and increase the basis for their main source of income, the principal-based monthly servicing fee. n79 Servicers make these modifications, harmful to both investors and homeowners, with impunity. n80

Unlike investors, servicers do not necessarily lose money from a foreclosure for less than the outstanding balance of the loan. Indeed, servicers have seen their profitability per loan rise in the last year as losses to investors from fore-

closures have skyrocketed. n81 Servicers can   [*772]   make more money from foreclosing than from modifying. n82 Servicers can also make more money by making short-term, unsustainable payment agreements than they can by making long-term, sustainable modifications. n83 Because servicers can make more money from foreclosing than modifying, and more money from short-term, unsustainable payment agreements than sustainable, permanent modifications, servicers have strong incentives not to modify. n84 The result is that servicers often do not modify or choose modifications that benefit themselves, harming both homeowners and investors.

C. Third Parties Constrain Servicer Discretion

The following subsections discuss the influence exercised by credit rating agencies, bond insurers, and the Financial Accounting Standards Board (FASB) on servicer incentives.

1. Credit Rating Agencies and Bond Insurers Exercise Influence over Servicers

In addition to the "lenders," credit rating agencies and bond insurers play critical roles in facilitating securitization. Credit rating agencies and bond insurers exercise more influence over the servicers than investors do. n85 The pronouncements of the credit rating agencies and bond insurers are treated as surrogates for any statement by the investors of their intent   [*773]   with regard to the meaning of their contracts with the servicers. n86

The major credit rating agencies provide the most meaningful oversight of servicers. n87 When the loans are pooled and bonds are issued, credit rating agencies effectively determine the price investors will pay for those bonds. n88 Credit rating agencies issue opinions as to the credit-worthiness of the different bonds. The higher the rating (AAA is the highest), the more stable and secure the payments are expected to be. n89 The same pool of loans can generate bonds n90 at various rating levels through credit enhancements on the higher-rated bonds. n91 Credit enhancements include lower-rated tranches that are designated to absorb losses first and bond insurance on the higher rated tranches. n92 Credit rating agencies also issue opinions as to servicers' financial solvency; these opinions set the price of borrowing for servicers, a key expense, as well as the price a servicer must pay for the mortgage servicing rights. n93 A subsequent drop in the credit rating of the pool or of the servicer could be used as grounds for terminating a servicer. n94

Bond insurers also exercise influence over the servicing of the pools. n95 In many pools, bond insurance on the top-rated tiers of mortgage   [*774]   securities guarantees payment of the bond. n96 Often, subprime junk mortgages, mortgages that could never be expected to perform, were turned into gold through the use of bond insurance. n97 Bonds based on a pool of under-collateralized, subprime, hybrid, adjustable rate mortgages achieved the AAA rating necessary for purchase by, say, a Norwegian pension fund through bond insurance. n98 If (or when) those bonds fail to deliver the above-average returns promised, bond insurers are on the hook to make up some or all of the difference. n99 As a result, a bond with bond insurance will command a higher price than the identical bond without bond insurance.

Many of the securitization contracts allow bond insurers an ongoing role in monitoring the performance of the loans in the pool. n100 Many PSAs give bond insurers special rights with respect to approving waivers of limitations on modifications. n101 Thus, bond insurers can continue to influence servicers' decisions about modifications throughout the life of the pool. Because bond insurance is usually provided only on the top-rated tiers of bonds, n102 the bond insurers will generally act to protect the interests of the highest-rated bond holders. As a result, bond insurers push servicers to reject modifications that result in losses to the highest-rated bond holders.

Credit rating agencies and bond insurers, although not parties to the loan contract between the homeowner and the lender, nonetheless   [*775]   influence whether homeowners can get loan modifications and what kinds of loan modifications homeowners will get.

2. The FASB Accounting Rules Regulate Servicer Performance

Finally, the accounting rules promulgated by the FASB shape servicer performance. FASB is a private organization whose work nonetheless has the force of market regulation. The Securities and Exchange Commission (SEC) requires compliance with the FASB standards by all public companies, n103 and the FASB standards are incorporated into the contracts governing the formation of the trusts. n104 The FASB-issued Financial Accounting Statements (FAS) n105 often provide an elaboration of the underlying tax rules; n106 accountants may look to the FASB rules in applying the tax rules, which have the direct force of law. Thus, although the FASB provides no direct control over servicers' decisions to modify or not to modify loans, the rules issued by the FASB nonetheless influence servicers and limit their options.

86 Wash. L. Rev. 755, *

The FASB rules dictate how profits and losses are allocated and when a profit or loss must be recognized. n107 These rules shape both the actual profitability of performing modifications and the perceived financial stability of a servicer performing modifications, as investors and regulators review the servicers' quarterly reports and annual statements. Failure to follow accounting rules can result in loss of the tax-preferred  [*776]  status given trusts that qualify as Real Estate Mortgage Investment Conduits (REMICs). n108 Because of their favorable tax status, a majority of securitized mortgages are placed in REMICs. n109 Failure to follow the REMIC rules can result in significant lost income for the trust. n110

II. CHOOSING BETWEEN FORECLOSURES AND MODIFICATIONS: THE BALANCE OF SERVICER INCENTIVES DISCOURAGES MODIFICATIONS

The following subsections review the complex calculus associated with the choice, for a servicer, between foreclosure and modification. Although the tax and accounting rules are sometimes thought to prevent modification, they generally do not prevent modifications of loans in default or at imminent risk of default. The constraints imposed by these rules do favor certain modifications over others, may incline servicers toward short term modifications, and - particularly in the common requirement that a foreclosure and modification be processed simultaneously - result in unnecessary foreclosures. The rules imposed by the credit rating agencies and bond insurers also tilt the scales away from permanent, sustainable modifications. The final two subsections review in detail the relationship between servicer income and servicer expenses and the choice between a foreclosure and a modification.

A. The Cost-Benefit Analysis of a Foreclosure or a Modification

Servicers, when they decide to offer a modification or proceed with a foreclosure, face competing incentives. Either path has costs and potential benefits, but, in general, the simplest and fastest recovery of expenses - and the most likely fee-generator for the servicer - is the foreclosure route. n111 A foreclosure guarantees the loss of future income, but a modification will also likely reduce future income, cost more in the present in staffing, and delay recovery of expenses. Often, the cost of a loan in default drives servicer decision making: servicers are required in most cases to continue making advances to the trust even if the borrower is not making payments; financing these advances can be a servicer's  [*777]  largest expense.

For servicers, the true sweet spot lies in stretching out a delinquency without either a modification or a foreclosure. While financing advances is a large expense for servicers, one they will want to end as soon as possible, n112 late fees and other default-related fees can add significantly to a servicers' bottom line, and the longer a homeowner is in default, the larger those fees can be. n113 The nether-world status between a foreclosure and a modification also boosts the monthly servicing fee (because monthly payments are not reducing principal) and slows down servicers' largest non-cash expense: the amortization of mortgage servicing rights (because homeowners who are in default are unlikely to prepay via refinancing). n114 Finally, foreclosure or modification, not delinquency by itself, usually triggers loss recognition in the pool under the accounting rules. n115 Waiting to foreclose or modify postpones the day of reckoning for a servicer.

How long a delay in the foreclosure will be profitable depends on the interplay of the servicer's ability to charge additional fees during the foreclosure, the servicer's financing costs for advances, and the time limits for proceeding through foreclosure imposed by the investor contracts and credit rating agencies. If the servicer can juggle the time limits - perhaps by offering short-term workout agreements - the prospect of increased fees may outweigh interim interest costs. Once the servicer's financing costs outweigh the incremental fees that can be extracted by maintaining a borrower in delinquency, the servicer will then choose the faster option - either a foreclosure or a modification -  [*778]  all other things being equal. n116

Macroeconomic trends influence the servicer's decisions to modify or foreclose. If servicing rights cannot be replenished because no new loans are being made, the servicer will be more inclined to modify rather than foreclose. n117 Similarly, if the time to sell the house after a foreclosure, and thus recover the costs, stretches out for months, a modification may look more attractive as the servicer's interest expense mounts. Interest rate trends and the availability of credit generally bear heavily on a servicer's decision making. As the relative cost of financing advances increases (and the availability of credit decreases), some servicers have become more willing to perform modifications if they can do so quickly and cheaply. n118

Table I below summarizes the competing forces favoring modifications and foreclosures, as well as the influence of these competing forces on the speed of foreclosures.

[*779]

TABLE I: Effects of Components of Servicer Compensation

| | | Favors Foreclosure? | Likely Effect on Speed of Foreclosure? |
|---|---|---|---|
| Structural Factors | PSAs | Neutral | Speeds Up |
| | Repurchase Agreements | Neutral | Slows Down |
| | REMIC rules | Neutral | Neutral |
| | FAS 140 | Neutral | Neutral |
| | TDR Rules | Slightly Favors Foreclosure | Neutral |
| | Credit Rating Agency | Slightly Favors Foreclosure | Speeds Up |
| | Bond Insurers | Slightly Favors Foreclosure | Speeds Up |
| Servicer Compensation | Fees | Strongly Favors Foreclosure | Slows Down |
| | Float Interest Income | Slightly Favors Foreclosure | Neutral |
| | Monthly Servicing Fee | Strongly Favors Modification (but not principal reductions) | Slows Down |
| | Residual Interests | Slightly Favors Modification (but not interest reductions) | Slows Down |
| Servicer Assets | Mortgage Servicing Rights | Neutral | Slows Down |
| Servicer Expenses | Advances | Strongly Favors Foreclosures | Speeds Up |
| | Fee Advances to Third Parties | Slightly Favors Foreclosure | Speeds Up |
| | Staff Costs | Strongly Favors Foreclosures | Speeds Up |

[*780]   Servicers do not make binary choices between modification and foreclosure. Servicers may offer temporary modifications, modifications that recapitalize delinquent payments, modifications that reduce interest, modifications that reduce principal, or combinations of all of the above. Servicers may demand upfront payment of fees or waive certain fees. Or servicers may simply postpone a foreclosure, hoping for a miracle. n119

Once a servicer chooses a modification, the servicer must further choose between types of modifications. Servicers will often, if they can, choose a short-term forbearance or repayment agreement over a permanent modification of the loan terms. A permanent modification of the loan terms might involve capitalizing arrears, extending the term, reducing the interest, and reducing or merely forbearing the obligation to repay principal. As summarized in Table II below, the weight of servicer incentives is always against principal reductions and weighs heavily in favor of short-term agreements. Principal reductions cut into the servicer's main source of income - the monthly principal-based servicing fee - without offering any additional income. Short-term modifications delay loss recognition and preserve cash flow to the residual interests held by many servicers. Interest rate reductions are only slightly more favorable from a servicer's standpoint than principal reduction or forbearance: they will still, ultimately, result in a drop in the principal as borrow-

ers pay down principal more quickly over time at a lower interest rate. While the incentives are mixed for a foreclosure, there are more incentives in favor of a foreclosure than against.

[*781] TABLE II: Effect of Servicer Incentives on Default Outcomes. This chart shows whether specific elements of servicers' compensation and expenses create positive, negative, or neutral incentives for them to pursue different types of outcomes for homeowners in default.

| | Short-Term Forbearance or Repayment Agreement | Interest Rate Reduction | Principal Forbearance | Principal Reduction | Short Sale | Foreclosure |
|---|---|---|---|---|---|---|
| Repurchase Agreements | Positive | Negative | Negative | Negative | Neutral | Neutral |
| TDR Rules | Positive | Negative | Negative | Negative | Neutral | Neutral |
| Fees | Positive | Neutral | Negative | Negative | Negative | Positive |
| Float Interest Income | Neutral | Negative | Negative | Negative | Positive | Positive |
| Monthly Servicing Fee | Neutral | Neutral | Positive | Negative | Negative | Negative |
| Residual Interests | Positive | Negative | Negative | Negative | Negative | Negative |
| Advances | Positive | Neutral | Negative | Negative | Positive | Positive |
| Staff Costs | Neutral | Negative | Negative | Negative | Negative | Positive |

B. Servicers Are Not Prevented from Modifying Loans by Securitization Contracts or Tax and Accounting Rules

The rules governing investor oversight of servicers are contained in the securitization contracts and tax and accounting rules promulgated by public and private agencies. Servicers have blamed these rules for their [*782] failure to perform loan modifications. n120 These rules almost never barred modifying individual loans in either actual or foreseeable default. Recent changes to these rules have further reduced restrictions on servicers' ability to perform loan modifications.

For example, the tax rules governing the special purpose trusts that most mortgages are in REMICs were often cited as preventing loan modifications. n121 While a trust can lose its preferential tax treatment if more than an insignificant number of mortgages in a pool are modified, the rules have always provided an exception for loans modified when they are in default or when default is reasonably foreseeable. n122 IRS guidance issued in 2007 and 2008 elaborated on that exception and provided a safe harbor. n123 So long as loans are modified according to a standardized protocol, modifications of loans in or on the cusp of default will not trigger a loss of REMIC status. n124

In general, the tax, accounting, and contract rules seek to prevent servicers from giving individual borrowers (or investors) preferential treatment. Requirements guard against preferential treatment by restricting active management of the pool. For example, standardized protocols are required, there must be individualized and documented determinations of the imminent risk of default, and modified loans must either be in default or at imminent risk of default. n125 In part, these rules exist as a quid pro quo for the preferential tax treatment that assets in a REMIC receive n126 and the bankruptcy-remote status of loans transferred to a trust. As exemplified by the changes to the REMIC rules, these restrictions do not prevent modifications where they are most needed - when borrowers cannot pay their mortgages and are facing foreclosure.

1. Investor Contracts Do Not Prevent Most Loan Modifications

The securitization contracts offer another example of how the [*783] limitations on modifications have been overstated. Servicers have often asserted that they would make loan modifications but are scared of investor litigation or prevented by the terms of their contracts with investors. n127 Although there are restrictions in these contracts on the number and sometimes the types of modifications performed, the vast majority of pools have no meaningful restrictions on loan modifications. n128

PSAs spell out the duties of a servicer, how the servicer gets paid, and what happens if the servicer fails to perform as agreed. n129 They generally leave the servicer great discretion in determining both how and whether to modify a loan. n130 Actual limits on modifying loans in default or imminent default in a PSA are rare. n131 The only common restriction on the types of modifications performed is that the modification is in accordance with standard industry practices. n132 This restriction is so vague and undefined that it provides essentially no limitation. n133 Common types of loan modifications, including principal forbearance, are not even mentioned in most PSAs. n134

[*784]   Many PSAs cap the total of modified loans at five percent, either of the unpaid principal balance or of the number of loans, measured as of the pool's formation. n135 But this is not an absolute cap; rather, it is a moving ceiling of how many modifications may be performed within any twelve-month period. n136 Modified loans that remain performing for twelve months (or that are removed from the pool by foreclosure, refinancing, or repurchase by the servicer) are not counted against the cap. n137 In some cases, the cap has been lifted entirely from the securitization agreements. n138 As the Congressional Oversight Panel determined, "the cap is not the major obstacle to successful modifications." n139

Even in the small number of pools that originally prohibited all material modifications (probably no more than ten percent of all subprime loans), n140 some securitization sponsors have successfully petitioned the trustee to amend the contract to allow modifications generally so long as the loan is in default or at imminent risk of default. n141 Thus, even where the PSAs prohibited material modifications, those barriers have been removed in many cases.

Additionally, servicers have not faced litigation from investors for making loan modifications. Of all the lawsuits filed by investors in 2008, not a single one questioned the right of a servicer to make a loan modification. n142 Increasingly, investors have questioned servicers for   [*785]   their failure to make modifications or implement principal reduction via refinancing. n143 Furthermore, federal law has immunized servicers from investor suits so long as the modification is made in accordance with standard industry practice or government programs such as Making Home Affordable. n144 The specter of investor litigation is not a legitimate basis for servicers to refuse to perform modifications.

Like the tax rules, the impact of the PSAs on modifications has been greatly overstated. In general, the caps on modifications never impeded modifications on loans in default where modifications are most urgently needed. To the extent the caps ever were a barrier, their impact has been lessened by subsequent amendments to the contract terms in some instances. Furthermore, federal law has mooted the fear of investor litigation (if this fear was ever realistic). The PSAs do not prevent loan modifications from being made.

2. The Accounting Rules Do Not Prevent Modification of Loans in Default

The accounting rules generally allow modifications of loans in default. There are three key statements governing mortgage servicer accounting: FAS 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities; n145 FAS 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings; n146 and FAS 114, Accounting by Creditors for Impairment of Loans, An Amendment of FASB Statement No. 5 and   [*786]   15. n147 These accounting rules determine how loan modifications are reported to investors and how the projected losses are allocated. These rules, like the REMIC rules, permit modifications of loans in default or where default is foreseeable, so long as the loans are modified according to a standardized protocol, without active management. The rules generally require individualized review to confirm default and penalize permanent modifications in favor of short-term agreements.

If FAS 140 is not complied with, the trust fails and loses its REMIC status and accompanying preferential tax treatment. Any loans and associated liabilities - for accounting purposes but not necessarily as a matter of legal title - revert to the originator. n148 This is the case even if the originator does not otherwise have any interest in the loans. n149 If the trust fails, the originator must account on its books for loans - and any losses accompanying those loans - it no longer has any control over (because the legal title has passed to the trust and does not necessarily revert to the originator even if the trust fails). A servicer will want to shelter an affiliated originator from the likely losses of having to report loans on its books that the affiliated originator does not legally control. On the other hand, if the FAS 140 rules are complied with, the originator's creditors cannot reach the loans in the trust - with the result that the originator can sell its loans for more money. n150

FAS 140 is designed to protect creditors from the originators' temptation to make loans to affiliates and then sell those loans to a trust at a discount, leaving the originators insolvent and creditors without recourse. n151 This potential moral hazard is exacerbated if originators remain free, post-transfer, to modify the loans on any terms they like. Thus, the FAS 140 rules are designed to draw a clear line between the assets pre-transfer and post-transfer. Pre-transfer, in

theory the originator has complete control over the loans and can dispose of them however it likes, including by offering modifications on favorable terms. Post-transfer, even if the originator continues servicing the loans, it cannot   [*787] dispose of the loans however it likes but must act (if it is the servicer) in a disinterested and impartial manner for the benefit of the trust.

FAS 140 generally allows modifications for loans in default or for which default is "reasonably foreseeable." n152 These modifications cannot be done willy-nilly. Although recent FASB guidance has expanded somewhat the range of servicer discretion in approving modifications, n153 FAS 140 requires that the trust's governing documents limit the authority of trustees - and their agents, servicers - to modify loans. n154 Servicers may modify loans only when doing so will benefit the trust as a whole. n155 Modifications cannot involve new collateral, new extensions of credit, or an additional borrower. n156

The difficult question is when loans that are not in default may be modified. FAS 140 requires an individual deter-mination of the "reasonably foreseeable" prospect of default. n157 The servicer must contact each borrower and docu-ment any bases for anticipated default, including job loss, fraud in origination or servicing, a death in the family result-ing in reduced income, or depleted cash reserves, as well as the unavailability of refinancing. n158 The SEC has eased the documentation   [*788]   burden on servicers if the basis for the anticipated default is a coming rate increase on an adjustable mortgage by providing for streamlined modifications in accordance with the American Securitization Fo-rum's (ASF) guidance. n159 Significantly, recent ASF guidance also permits servicers to reach out to borrowers who are less than sixty days delinquent, n160 at a time when a modification may have the most chance of success. n161 In conclusion, the FASB rules generally allow modifications of loans that are either in default or at risk of imminent de-fault. There is no absolute bar in the FASB rules to modifying loans.

C. Some Features of the Accounting Rules and Investor Contracts Can Discourage Sustainable Modifications

Although the accounting rules and the investor contracts do not forbid modifications, they can discourage permanent, sustainable modifications. Both the accounting rules requiring loss recognition upon modification and the troubled debt restructuring rules may encourage servicers to deny permanent modifications in favor of short-term Band-Aids. Inves-tors' insistence on proceeding with loan modifications and foreclosures simultaneously, or dual track, has led to count-less unnecessary foreclosures. The repurchase agreements found in some PSAs, while not preventing modifications, nonetheless discourage servicers from modifying loans permanently. Finally, the reliance in the PSAs on industry standards as the gauge of permissible modifications chills innovation.

1. FASB Requirements for the Immediate Recognition of Loss Discourage Permanent Modifications

The loss recognition rules encourage servicers to pursue temporary modifications and short-term forbearance plans over more sustainable permanent modifications. When the accounting rules appeared to allow delayed loss recognition for principal forbearance but not principal reduction, servicers had increased appetite for loan modifications with [*789]   principal forbearance. n162

A delay in loss recognition does not change the cash flow position of the trust: if a homeowner is not paying, or is making partial payments, or is not paying principal, there will be less income coming into the trust regardless of when the loss is recognized. But who bears the brunt of that cash reduction is determined in part by when the loss is recog-nized. n163

If recognition of the entire loss is delayed, the servicer may spread the loss to more senior tranches. Under most subprime securitizations, the senior tranches are only entitled to principal payments after every class of certificate hold-er receives a pre-determined portion of the interest payments. n164 If the total monthly payments dip down in any given month, the interest payments to the investors will still be made, in order of priority, but there will be no funds left to pay the senior tranches their promised principal payments. n165 If, however, there is a permanent loss of income and the loss recognition rules are triggered, the rules require that the total amount of the loss is generally allocated to the junior interests, which are then entitled to a smaller fraction of any subsequent income. n166 Once recognized losses pass a threshold, the most junior interests are cut off altogether from some sources of future income under the terms of many of the securitization contracts. n167 In other words, once the loss is recognized, the standing division of the income stream is reallocated, so that senior bond holders will continue to receive their interest and principal payments, with junior bond holders losing some or all of their income. Thus, senior investors will generally favor faster loss recognition than junior investors: loss recognition protects the income of the senior tranches at the expense of the junior tranches. Any form of delayed loss recognition will benefit servicers who hold junior interests in the pool.

The accounting rules, including FAS 15, n168 generally require   [*790]   immediate loss recognition upon a permanent modification. n169 Servicers' junior interests in the pool will thus take the first hit from most permanent modifications. n170 Temporary modifications, short-term forbearance, and repayment agreements, however, do not require loss recognition. n171 Thus, a cut in income occasioned by a temporary modification will first cut into the principal payments to the senior tranches but will not necessarily reduce the interest payments to the junior certificate holders. n172 As a result, servicers have an interest in performing temporary rather than permanent modifications when possible, because the temporary modifications will not require immediate loss recognition and thus will not deplete any junior interests the servicer may hold. n173

Servicers have looked to ways other than characterizing a modification as temporary to delay loss recognition. For example, until recently, some servicers were able to argue that recognition of the interest losses on principal forbearance should be delayed. n174 A servicer could thus substantially modify the loan through principal forbearance without experiencing the income consequences to junior certificates discussed above. n175 This made principal forbearance attractive as a loss mitigation tool to servicers who were also holders of junior certificates.

However, most available industry guidance now requires principal or   [*791]   interest forbearance to be treated in the same manner as principal or interest forgiveness for accounting purposes. n176 As a result, principal or interest forbearance, like a principal reduction, results in an immediate hit to the most junior level tranches. Thus, servicers have nearly the same incentive to offer principal forbearance as a principal reduction - and not much incentive to offer either.

In summary, any form of delayed loss recognition protects the income stream of the junior tranches at the expense of the senior tranches. Because servicers often hold interests in the junior tranches, they have an interest in delaying loss recognition. The most common way servicers can delay loss recognition is by choosing to offer temporary modifications rather than permanent modifications. Servicers have also sometimes exploited differential loss recognition rules between principal forbearance and principal reduction to delay loss recognition when modifying loans. The requirement to recognize losses in full upon modification may discourage servicers from offering the most appropriate and sustainable modifications.

2. The Troubled Debt Restructuring Rules Discourage Sustainable Modifications

The troubled-debt restructuring (TDR) rules found in FAS 15 and FAS 114 also discourage permanent modifications, as well as more generally discouraging modifications that provide deep payment reductions and modifications before default - the very modifications most likely to be successful. n177 While the TDR accounting rules only apply to loans held in portfolio, n178 servicers generally categorize modifications using the TDR rules to preserve trust assets from the originators' creditors. n179

[*792]   FAS 15 generally requires any permanent modifications occasioned by the "debtor's financial difficulties" to be treated as a TDR. n180 A TDR usually results in immediate loss recognition and, for loans held in portfolio, a cessation of interest payments. n181 Servicers can evade immediate loss recognition if they re-underwrite the loans and demonstrate that the terms of the loan modification reflect market realities and not a concession. n182 But re-underwriting a loan is slow and cumbersome, preventing streamlined modifications. Thus, while servicers could avoid loss recognition by re-underwriting the loans, servicers generally will choose to forego the tedious task of re-underwriting loans.

FAS 15's TDR rules apply whether the loan is current or delinquent when modified. n183 A servicer who modifies a loan pre-default - say an adjustable rate mortgage in advance of a rate reset - will thus have to report that loan as a TDR. Reporting a TDR triggers loss recognition rules as well as potential credit rating downgrades of the pool. Many servicers prefer to postpone that paper loss until a loan actually becomes delinquent, because a loss deferred is a loss reduced. n184

Compounding the problem, the TDR rules apply payments to principal before interest, which inverts the normal payment scheme for securities. n185 This adds incentives for servicers to favor short-term forbearance agreements over permanent modifications. Paying principal   [*793]   over interest would cut into the income stream for any junior interest in the pool held by the servicer and directly erode the servicer's major source of income: the principal-based monthly servicing fee.

A simplified example may be helpful. Assume a monthly payment for an unmodified loan of $ 300. Assume further that $ 250 of that payment is interest and $ 50 is principal. If $ 200 of the interest payment is allocated, there remains a potential "excess interest" monthly payment of $ 50. A permanent modification that reduces the payment to $ 250 a

month can leave the servicer without any surplus interest income, while a deeper, but short-term, payment reduction to $ 225 leaves the servicer with a surplus interest income of $ 150 - money that would otherwise go to senior bondholders. The chart below steps through the details of this comparison. n186

Figure 1 [*794]

3. Dual-Track Provisions in Investor Contracts Hinder Modifications

Many PSAs, as well as the credit rating agencies, require servicers to process both foreclosures and loan modifications at the same time. n187 Servicers face the possibility of noncompliance with the PSA (and legal action by the trust) or a lowered credit rating if they ignore these mandates. These incentives to proceed along a dual track result in many unnecessary and otherwise avoidable foreclosures. The lack of communication within the servicer between the loan modification and the foreclosure department, the piling on of foreclosure fees, and the often longer time to process a loan modification than a foreclosure, all mean that needless foreclosures are commonplace.

Subprime servicers, in particular, are expected to show "strict adherence to explicit timelines," offer and accept workouts from only a predefined and standardized set of options, and not delay foreclosure while loss mitigation is underway. n188 The speed at which loans are moved from default through foreclosure is "a key driver in the servicer rating process," n189 encouraging servicers to compete for the fastest time to foreclosure.

Servicers process foreclosures and loan modifications through different departments. n190 Communication between the two departments is imperfect. n191 Homeowners assured that they will be receiving a loan modification by one department may nonetheless find themselves facing a foreclosure. n192

In part because loan modifications often require more deviations from the norm, loan modifications often take more time to work out than foreclosures do. Servicers rely heavily on the mechanized production of [*795] form documents in processing both foreclosures and loan modifications. Any variation from the cookie-cutter norm imposed by the form documents causes delay and consternation. But the two-track system pushes the foreclosure forward regardless, with the result that foreclosures frequently occur while homeowners are negotiating a loan modification, sometimes even after they have been approved for a loan modification. n193

Even if a foreclosure never happens, the cost of the modification increases as the servicer imposes various foreclosure-related (and often improper) fees on the homeowner, n194 and the homeowner suffers the financial, credit, and emotional toll of defending a foreclosure. These fees are lucrative to the servicer but can price a modification out of a homeowner's reach. n195 Moreover, where there is little or no equity left in the home, reimbursement for these fees will come out of the investor's pockets at any foreclosure sale. n196

The rules requiring the two-track system were instituted to encourage servicers to minimize delay. n197 In the current market, where the time to sell a property can stretch out for months and losses are severe, the two-track system does not serve even investors well. The two-track system [*796] has allowed servicers to continue to skim costs from the foreclosure process. Worse, because the two-track system does not ensure that homeowners are evaluated for appropriate loan modifications before foreclosure, it has resulted in many unnecessary and expensive foreclosures.

4. Repurchase Agreements Encourage Servicers to Pursue Short-Term Forbearance Agreements over Permanent Modifications

Some PSAs require the originator to buy back loans that are modified or go into default. Where a repurchase requirement is triggered, the trustee will request that the originator of the loan buy the loan back from the trust. Repurchase agreements, where present, encourage servicers to avoid loan modifications that will trigger the repurchase requirement.

Short-term forbearance agreements postpone default and do not count as modifications requiring repurchase. n198 Thus, servicers subject to repurchase agreements may pursue short-term forbearance agreements rather than permanent modification, in effect kicking the can down the road through unsustainable short-term workout plans and other accounting subterfuge. n199

While this disincentive is real, n200 repurchase agreements have limited reach. Repurchase agreements are generally applicable only to servicers who are either the originator or an affiliate of the originator. Even then, the repurchase requirement may be waived for loans in default at the time of modification. n201 Moreover, loans removed from a securitization [*797] can often be repackaged and resecuritized in the so-called "scratch and dent" market, thus protecting originators' access to capital, even upon repurchase. n202 Indeed, thousands of Countrywide loans subject to

repurchase requirements n203 have been modified, and many of those have been repackaged and resecuritized. n204 Thus, repurchase requirements have limited impact in the market.

To the extent that repurchase requirements weigh in servicers' calculus, they incline servicers towards short-term, temporary forbearance agreements that do not trigger the repurchase requirement.

5. Reliance on Industry Standards Slows the Pace of Innovation in Loan Modifications

Investors, lacking detailed information about loan modifications, have relied on stock language referencing "industry standards" in PSAs to constrain servicers instead of requiring a careful evaluation of the costs and benefits of any individual loan modification or even a systematic overall approach to loan modifications. n205 But limiting modifications to those "prudent," "customary," or "usual" is necessarily a conservative standard. Worse, articulated industry standards may tip the balance in favor of foreclosure or short sales instead of creative modifications that preserve homeownership and provide a superior return to investors.

If servicers went beyond industry standards, they could provide   [*798]   greater savings for investors while saving homes. For example, reducing the principal balance when a home is worth less than the loan amount (or "underwater") will, in most cases, benefit the pool: the costs of foreclosure are avoided; the investors receive the actual value of the collateral, the most they could expect to recover after a foreclosure; and investors retain the right to receive interest payments over the life of the loan. n206 Despite the apparent win-win nature of this result - the homeowner stays in place, the investors and servicer continue receiving income, and everyone avoids costly litigation - few servicers have done so. n207 While servicers have other reasons for avoiding principal reductions, n208 the weight of standard industry practice provides additional cover for servicers worried about legal liability.

Standard industry practice - as reflected in the guidelines of Fannie Mae and Freddie Mac n209 and directives under Making Home Affordable n210 - favors forcing homeowners to sell their homes, even if the result is a partial write-off of the mortgage balance, rather than offering outright reductions to homeowners via a principal reduction modification that would allow the homeowner to stay in place. n211 The   [*799]   more punitive approach of short sales - the homeowner loses the home - may reassure investors that a servicer is aggressively looking out for the investors' interests. The net result, however, is often a loss for both investors and homeowners. n212

Standard industry practice has not been adequate to the current crisis. Servicers must move beyond the limitations of standard industry practice in providing loan modifications.

D. The Rules Promulgated by Credit Rating Agencies and Bond Insurers Discourage Modifications, Particularly Permanent Sustainable Modifications

Both credit rating agencies and bond insurers have defined what loan modifications are permissible. Bond insurers have restricted some of the most promising forms of loan modifications: principal reductions and forbearances. n213 Similarly, the credit rating agencies' insistence that servicers adhere to a two-track system - pushing through foreclosures as fast as possible even while pursuing loan modifications - results in the denial of loan modifications. The rules imposed by credit rating agencies and bond insurers restrict the range of modifications available.

1. Credit Rating Agencies' Mixed Messages Discourage Sustainable Modifications

Although the credit rating agencies have given public support to increased numbers of modifications, n214 they have also imposed specific rating criteria that impede successful modifications. As discussed above, the two-track system, mandated in part by the credit rating agencies' insistence on "strict adherence to explicit timelines[,]" results in   [*800]   unnecessary foreclosures. n215 Rating agencies have also historically preferred foreclosures, deeds-in-lieu, and short sales over default resolutions that keep homeowners in their homes, n216 through their treatment of expenses and requirements that modified loans count against delinquency triggers for a year. The net impact of these standards is to discourage permanent and sustainable modifications, despite the credit rating agencies' public pro-modification pronouncements.

Credit rating agencies have skirmished with servicers over servicer recovery of expenses post-modification. The credit rating agencies' position preferences the recovery of expenses post-foreclosure over the recovery of expenses post-modification. The general rule, announced repeatedly by the rating agencies, is that servicers should only recover their expenses from modifying a loan from either payments made on the modified loan or principal-only payments to the pool. n217 The interest payments made on other loans in the pool must be left untouched for distribution according

to the PSA, primarily to the benefit of the senior bond holders. n218 This is in contradistinction to the generous rules for recovery of expenses post-foreclosure sale, when the servicer may reimburse itself directly from the trust account containing the pooled principal and interest payments on the loans. n219 One predictable result is to discourage modifications in favor of foreclosures - although, in a rare display of defiance, some servicers have ignored these edicts and used the capitalization of arrearages to pull the modification expenses back out of the pool. n220

Credit rating agency reporting requirements for modified loans favor temporary forbearances over permanent modifications and discourage servicers from modifying loans prior to default. The credit rating agencies require modified loans to count against the delinquency triggers in the PSA for twelve months. n221 Once delinquency triggers in a pool are reached, the servicer may be replaced, sometimes automatically. n222 Income from residual interests may also be cut off. n223 Servicers have an  [*801]  incentive to push temporary forbearance agreements instead of permanent modifications - even if doing so generates less income for the pool and increases the risk of loss through foreclosure - because temporary forbearances do not count against the delinquency triggers n224. Under these rules, servicers lose less if they wait until a loan is already in default before modifying it and, once a loan is in default, if they substitute a temporary forbearance for a permanent modification.

Despite the credit agencies' public pro-modification stance, credit agency rules and regulations weigh heavily against permanent, sustainable modifications. The credit rating rules distinguish the treatment of modification and foreclosure expenses, count modified loans against delinquency triggers, and push the dual track system of simultaneous foreclosures and modification. These rules all encourage foreclosure over modification or, at best, reward shallow, temporary agreements instead of permanent modifications.

2. Bond Insurers Favor Modifications When the Cost Is Borne Entirely by Junior Tranches

Bond insurers generally protect only tranches containing the most highly rated securities. n225 So long as these top-rated tranches continue to deliver returns at the insured level, bond insurers will not have to advance any money. As a result, bond insurers will support modifications whose weight is primarily borne by the lowest-rated tranches but oppose modifications when the losses are spread evenly across all tranches - regardless of the benefit to the pool as a whole. n226 Servicers, on the other hand, often hold the lowest-rated tranches in the pool. n227 Implementing modifications favored by bond insurers thus cuts directly into servicers' profits.

The response of bond insurers to the substantial principal reductions made by servicers on some loans in 2007 brought this tension into sharp relief. Since most PSAs are silent on the accounting treatment of principal reductions, n228 these principal reductions were allocated across  [*802]  all classes, with the result that senior bond holders, including AAA-rated bond holders, saw payments on their interest certificates drop. n229 The bond insurers reacted swiftly, creating an industry consensus" that the losses from principal reductions should be charged first to the bottom-rated tranches. n230 The initial surge of principal reduction modifications faded back. n231

Bond insurers do not generally prevent modifications, but as this example illustrates, their interest in promoting modifications is selective. As a result, servicers' incentives to foreclose outweigh the empty pronouncements of bond insurers in favor of modifications. What servicers will be excited about modifying loans knowing that they alone will bear the entire cost of modification? This dynamic leaves foreclosure as the path of least resistance.

E. Servicer Compensation Tilts the Scales Away from Principal Reductions and Short Sales and Towards Short-Term Repayment Plans, Forbearance Agreements, and Foreclosures

Ownership of mortgage servicing rights entitles servicers to receive several distinct forms of compensation: the monthly, principal-based servicing fee; float interest income; and miscellaneous fees from borrowers. n232 Many servicers also receive some income from their junior, or residual, interests in the pool. n233 In general, a completed foreclosure means a loss of ongoing income as the loan is removed from the pool, but the foreclosure process itself can generate significant income for servicers. The potential losses of income from residuals and the monthly servicing fee are often dwarfed by the fees generated for the servicer by the foreclosure process, with the result that servicer compensation can shift the scales against modification and in favor of foreclosure.

[*803]

1. Servicers' Entitlement to Fee Retention Encourages Foreclosure and Strips Wealth from Both Investors and Homeowners

Most PSAs permit servicers to retain fees charged to delinquent homeowners. Examples of these fees include late fees n234 and fees for "default management" such as property inspections. n235 The profitability of these fees can be significant. n236 Late fees alone constitute a significant fraction of many subprime servicers' total income and profit. n237

The following charts illustrate the contribution of fees to the bottom line of one large subprime servicer. n238

Figure 2

Figure 3 [*804]   The next chart illustrates the variety of fees that make up the "process management" fees that are a profit center for many servicers.

Figure 4

Servicers can collect these fees post-foreclosure before the investors receive any recovery. n239 This guaranteed recovery of fees strongly favors foreclosures over modifications that waive fees, including the government's Making Home Affordable program, n240 and encourages servicers to delay foreclosures in order to maximize the number of fees charged. n241 In a self-perpetuating cycle, the imposition of fees makes a foreclosure more likely by pricing a modification out of a homeowners' reach: the assessed fees can eat up all of the homeowner's savings if  [*805]  they are imposed as a lump sum, or make monthly payments unaffordable if the fees are capitalized. n242

Servicers' dependence on fees may partly explain their reluctance to enter into short sales. n243 In addition to pre-foreclosure fees, servicers are usually entitled to recover the costs of selling the home post-foreclosure before investors are paid, and many servicers arrange the listing, maintenance, and sale of the property through an affiliate. n244 In a short sale, the borrower typically bears the cost of arranging the sale, from maintaining the property to listing it. n245 As a result, the servicer and its affiliates will not receive fees for property maintenance, real estate brokering, or title work in a short sale. Short sales are an example of a divergence in interests between the servicer and the investor: the investor saves money if the borrower bears the cost of arranging the sale because the investor must reimburse the servicer, but not the borrower, for all the costs of the sale. n246 Short sales may generate a higher return for investors to the extent that occupied properties sell for more than vacant properties do and are subject to less vandalism (in a short sale, the borrower usually keeps possession through the closing; in a post-foreclosure sale by the servicer, the home is usually vacant). Investors can also benefit from getting their money faster due to the shorter time to sell a home in a short sale.

[*806]  Investors have attempted to encourage short sales through incentive payments to servicers. n247 Nevertheless, the total number of short sales remains anemic. n248 The investor payments have not tilted the servicer's scales towards a short sale and away from a foreclosure. Servicers can squeeze more from default management fees than the investors can or should pay to encourage short sales. n249

2. Servicers' Receipt of Float Interest Income Has a Negligible Impact on Servicer Incentives to Foreclose or Modify

Part of servicers' income comes from the interest paid during the period from when the homeowner pays until the servicer turns over the payment to the trust or pays the taxes and insurance, in cases of escrowed funds. n250 Servicers who can stretch the time to turn over funds - by paying taxes or insurance late or at the last possible moment, for example - will have more float income. Prepayments of loans can also increase this float income because there are then larger amounts of money sitting in the float account, accumulating interest, until turned over to the investors. n251 However, PSAs usually reduce the benefit of float interest income by requiring the servicer to remit "compensating interest," or the difference between a full month's interest and the interest collected from the borrower. n252 Moreover, the principal-based  [*807]  monthly servicing fee, as discussed in the next section, creates a strong countervailing incentive to avoid or at least postpone prepayment.

3. Servicers' Largest Form of Compensation - the Payment Based on Percentage of Outstanding Principal - Discourages Foreclosures and Modifications that Result in Principal Reduction and Encourages Modifications that Increase the Principal Balance

Most servicers derive the majority of their income based on a percentage of the outstanding loan principal balance. n253 The percentage, set in the PSA, can vary somewhat from pool to pool, but is generally 25 basis points annually for prime fixed-rate loans, 37.5 basis points for prime variable-rate and Alt-A loans, and 50 basis points for subprime loans. n254 A subprime loan with an average unpaid principal balance of $ 250,000 will therefore generate $ 1250 per year

(0.5% of $ 250,000). For most pools, the servicer is entitled to take that compensation from the monthly collected payments, even before the highest-rated certificate holders are paid and even if the loan is not performing. n255

The higher a servicer can keep the principal balance - whether by capitalizing arrears and unpaid fees, holding a borrower's payments in a suspense account instead of applying them to principal, refusing to issue a payoff statement, or postponing a foreclosure or short sale - the larger the monthly servicing fee will be. Foreclosures are a net loss from the standpoint of the monthly servicing fee: they shrink the overall pool of loans on which a servicer's income is based. Unless those loans, or the servicing rights to a different pool, can be quickly replaced at the same or lower price, the servicer will earn less money each month after a loan is foreclosed. n256 Modifications, on the other hand, maintain monthly servicing income for a servicer. Because replenishment of the loan pools is currently a slim prospect for most servicers, n257 servicers, particularly those with thin margins, have some incentive to make modifications. n258 [*808]   The monthly servicing fee encourages servicers to favor modifications that do not reduce the principal balance of the loan. Principal write-downs obviously reduce the servicer's monthly fee, but even modifications with interest-rate reductions can reduce a servicer's profit, by allowing homeowners to pay down principal more quickly. Principal forbearance, unlike interest or principal reductions, stabilizes the monthly servicing fee.

Most PSAs appear to allow servicers to include the amount of principal forbearance in their calculation of the outstanding balance, while principal write-downs cannot be included in the amount of the outstanding balance. n259 Even better for a servicer, the amount of forborne principal is not reduced by the borrower's monthly payments, since the forborne principal is only paid when the loan is paid off. As a result, the servicer has an inflated income stream for the life of the loan, since the monthly servicing fee is based on the outstanding principal in the loan pool, including forborne principal.

Principal forbearance is generally less desirable than principal reduction from a borrower's viewpoint: borrowers do not accumulate equity and face a balloon payment at the end of the loan. Moreover, principal forbearance may result in higher-rated bond holders being shorted on interest payments. n260 But, for a servicer, principal forbearance is preferable to principal reduction: it preserves their monthly servicing fee income.

Even better than principal forbearance for servicers, of course, are loan modifications that capitalize arrears. Modifications that include capitalization of arrears have increased more than any other kind of modification, and now represent the most frequent change to loan terms. n261 The capitalization of arrears boosts the monthly servicing fee and likely slows the repayment of principal. Unfortunately for homeowners and investors, loan modifications with capitalized arrears perform worse than modifications without capitalization. n262

Servicers' largest form of compensation, the monthly servicing fee based on the outstanding principal balance of the pool, discourages all forms of principal reduction, and likely even discourages reduction in [*809]   interest rates, since a lower interest rate leads to a faster reduction of principal. The monthly servicing fee encourages servicers to keep the principal balance high, whether by permitting principal forbearance instead of principal reduction, capitalizing arrears, or applying payments to fees, suspense accounts, or escrow before principal payment. The higher the principal balance, the larger the servicer's monthly income. Servicers, therefore, are discouraged from performing modifications that lower the principal balance.

4. Servicers' Retention of Residual Interests Encourages Servicers to Delay Loss Recognition and Promotes Temporary Modifications Rather than Permanent Modifications

Commonly, servicers affiliated with the loan originator hold the lowest level investment interests in the pool, called residuals. In most subprime securitizations, bond holders are paid designated amounts of interest income every month. n263 If all borrowers make their payments, there will be some excess income. Residuals represent payment of this excess income after the senior certificate holders have been paid. If the pool shrinks, through foreclosure, prepayment, or principal reduction, or if the interest rate drops on the loans in the pool due to modifications, there will be less of a surplus. Residuals provide some incentive to keep loans performing, to delay loss recognition, and to protect excess interest payments. n264

Ownership of residual interests is meant to encourage servicers to keep loans performing, and it does skew servicers' incentives. Servicers who hold residuals, which are in the first loss position, typically seek ways to minimize or delay losses that would be allocated to the residual interest. For example, servicers who hold residual interests delay foreclosures and resist modifications that reduce interest payments. n265   [*810]   On the other hand, ownership of residual interests may encourage modifications if their cost can be spread out among all the investor classes, thus spar-

86 Wash. L. Rev. 755, *

ing the residual interest from bearing the full weight of a default or modification, as typically happens in either a fore-closure or interest-rate reduction modification. n266

Under most PSAs, if overall losses in the pool reach a pre-defined level, the residuals can no longer receive the surplus interest income, even if the pool continues to generate surplus interest income. n267 Modifications that reduce principal and interest count against these cumulative loss triggers. n268 Principal forbearance will usually count against these cumulative loss triggers as well. n269 On the other hand, modifications that do not count against the cumulative loss triggers, including temporary modifications, leave the surplus interest income untouched.

As illustrated in the following chart, the timing of the loss recognition can have a large impact on the income received by servicers through their residual interests. Delayed loss recognition of a principal reduction or principal forbearance can shield the servicer from experiencing a total loss of income in the residuals.

[*811]

Figure 5

5. The Valuation of Mortgage Servicing Rights Encourages Servicers to Re-Age Loans Through Temporary Modifications and Forbearance

Servicers acquire the right to receive the monthly servicing fee and the opportunity to collect default fees by purchasing mortgage servicing rights. The value of those rights is, for most servicers, the biggest driver of net worth. n270 Nevertheless, a loss of those rights may not represent a net loss to the servicer. This assessment depends on whether (and at what price) those mortgage servicing rights can be replaced, how expensive the initial acquisition of the rights was, and the accounting treatment of the mortgage servicing rights.

Accounting treatment of mortgage servicing rights is highly variable n271 and can overshadow losses occasioned by high default and [*812] delinquency. n272 Valuation is nominally based on expected prepayment and default rates, and the remaining principal balance in the pool. n273 Most observers, including servicers themselves, believe that the rate of default and prepayment is driven more by macroeconomic trends and the initial quality of loans in the pool than it is by servicer behavior. n274 Thus valuation of the mortgage servicing rights tends to be decoupled from the actual servicing of the pool. n275 To the extent that servicers do not control - or do not attempt to control - the rate of default and delinquency in the pool, servicers' loss or gain from the acquisition of mortgage servicing rights results from wise (or lucky) investment decisions n276 and market perceptions of the quality of the pool, not from servicing mortgage loans. Indeed, some market observers believe that high-quality default servicing can trigger write-downs in the valuation of the pool, thus providing a further disincentive for servicers to perform loan modifications. n277

Servicers have a strong incentive to manipulate market perceptions of the quality of the pool. If the pool appears high quality, the valuation of the servicer's largest assets, its mortgage servicing rights, will also appear higher, and the servicer's book value, stock price, and credit rating are all pushed up. In contrast, a downgraded pool can cost a servicer book value, stock price, and credit rating. Managing [*813] market perception of the quality of the pool is therefore of the utmost importance for servicers. n278

One way servicers have camouflaged weaknesses in the pool has been by "re-aging" delinquent mortgages. Servicers accomplish re-aging by entering into short-term workout agreements. Short-term workout agreements allow servicers to skirt the accounting rules that require modified loans to be reported as delinquent for a period after modification n279 and can expedite the recovery of fees and advances.

Re-aging loans helps servicers in three other ways. First, re-aging delays recognition of losses to the residual interests in the pool, which in turn reduces servicers' losses if they hold residual interests. n280 Second, re-aging of loans permits servicers to avoid delinquency trigger thresholds in the PSA that may permit the trustee or master servicer to appoint a special servicer (or reapportion the allocation of payments, to the detriment of the residual interests). n281 Third, re-aging allows servicers to avoid repurchase agreements.

Re-aging of loans has been accomplished primarily through short-term workout agreements. These agreements seldom provide any benefit to homeowners. Re-aging via short-term workout agreements has also been of signal concern to investors, because it obscures the true value of the pool. n282 Re-aging is another example of how servicers' incentives put servicers at odds with both investors and homeowners.

Because the value of servicers' mortgage servicing rights is such a large driver of their book value and credit rating, servicers have strong incentives to manipulate the perceived value of those servicing rights. One way that servicers can do this is by concealing delinquencies in the pool. Often this objective is accomplished through short-term work out agreements that provide little benefit to either homeowners or investors.

[*814]

F. Servicer Expenditures Encourage Quick Foreclosures

As shown in the previous subsection, servicers' income generally encourages servicers to perform short-term workout agreements, to pile on fees, and to delay (but not avoid altogether) foreclosures. Servicer expenditures, on the other hand, encourage a quick resolution of default, primarily through foreclosure. Servicers have two main expenses when a loan is in default: (1) advances of principal; and (2) interest to the trust and payments to third parties for default services, such as property inspections. n283 Financing these costs is one of servicers' biggest expenses. n284 Recovery of these fees (but not the financing costs) is more certain and often swifter via a foreclosure than a modification. When a modification offers a faster recovery of advances than a foreclosure, the financing costs may incline a servicer toward a modification. n285

The following subsections review the impact of these two main expenses, the financing of principal and interest advances and the third-party fee advances, followed by an overview of other important items on the expense side: the amortization of mortgage servicing rights and staff costs. This section concludes with a review of the impact of the availability of refinancing on a servicer's decision to modify or foreclose. Refinancing, unlike modification or foreclosure, costs a servicer nothing out of pocket, and so is the path of least resistance.

1. Interest and Principal Advances to Investors Drive Servicer Expenses and Push Servicers to Resolve Delinquencies Quickly

The financing cost of advances on delinquent loans is the largest expense of many servicers. n286 Reducing the cost of that expense is a key component of making servicing profitable. Because the requirement to make advances can be terminated either by a modification or a foreclosure, either a foreclosure or modification can be beneficial for a servicer. Which one is better depends on many factors: the time to execution of the modification or post-foreclosure sale of the home, the current interest rate environment confronting the servicer, and the time to recovery of the advance post-modification or post-foreclosure. The   [*815]   rules promulgated by the credit rating agencies have generally frowned on the pool-level recovery of advances after a modification, n287 while such recovery is clearly permitted after a foreclosure. n288 Most servicers have found ways around this, including capitalizing the advances before executing even a principal reduction modification. n289 In all cases, the ability to recover advances is a key driver of the decision between a modification and a foreclosure, and between types of modifications.

The need for advances comes from the PSA and the investors' desire for a steady income stream. Servicers, under their agreements with investors, are typically required to continue to advance interest on loans that are delinquent. n290 Unpaid principal may or may not be advanced, depending on the PSA. n291 The requirement for advances usually continues until a foreclosure is completed, a loan modification is reached, or the servicer determines that there is no realistic prospect of recovering the advances from either the borrower or the collateral. n292 In a small number of cases, servicers may be exempted from continuing to make advances once the loan is in foreclosure or more than five months delinquent. n293 A servicer's failure to make advances, even "nonrecoverable" advances, can lead to the servicer's removal. n294 Even in the face of large loss severities, n295 servicers have continued to make advances. n296

[*816]   Once a foreclosure is complete, the requirement to continue making advances stops and servicers are entitled to receive their advances back. n297 Servicers' advances are taken off the top, in full, at the post-foreclosure sale, before investors receive anything. n298 If advances of principal and interest payments remain beyond the sale value, servicers can usually collect them directly from the trust's bank account (or withhold them from payments to the trust). n299

In contrast, there is no bright line rule as to when or how advances may be recovered for a modified loan. Some PSAs limit recovery of advances only to payments made on the modified loan; others restrict the recovery of advances to principal payments made on all the loans in the pool. n300 Under these rules, modifications involving principal reductions are especially disfavored: they not only slow the recovery of advances on any individual modified loan, but they reduce the amount of principal payments available for application to recovery of advances on other modified loans. n301 A strict reading of these rules would suggest that   [*817]   servicers would face a delay of months to years in re-

couping their advances on a modification, with the time to recover the advances uncertain, depending on many variables, including how many loans in the pool are modified and how deeply and whether homeowners stay current or not.

In order to speed recovery of advances, and provide certainty in recovering the advances, servicers have recapitalized advances, despite disapproval from the credit rating agencies. n302 Modifications that recapitalize advances are consistently the largest category of modifications. n303 Recapitalizing advances artificially boosts the loan balance, and thus, on paper, creates more collateral for the pool. The servicers are then able to draw out from the pool the capitalized advances, and reap the benefit of an increased monthly servicing fee, based on the inflated principal. n304 Both homeowners and investors lose, because modifications that increase the principal balance are more likely to re-default. n305 In order to obtain a swift and sure recovery of advances when modifying, servicers strip wealth from pools and put borrowers in non-sustainable modifications.

Although the cost of the advances themselves may be recovered, the significant financing costs associated with making advances are not recoverable under the PSAs. n306 Thus, servicers are encouraged to reach a resolution of default as quickly and completely as possible in order to minimize their financing costs, even at the expense of investors at a post-foreclosure fire sale. n307 The combined force of the limitations on the [*818] recovery of advances to the loan level and the non-recoverability of the cost of financing advances drives servicers to seek upfront payments from homeowners prior to modification. Few borrowers, having once defaulted, are positioned to make the large payments required to bring their loans current and then continue making regular payments; consequently, many re-default. But, of course, if the loan ends in foreclosure after a modification, the advances will again have super-priority status because advances have super-priority status in a foreclosure. n308 Thus, servicers face no real risk by insisting on the payment of large upfront fees, even if the result is re-default.

The following chart illustrates how much servicers have to lose by a delayed recovery of advances. The incentives are strong for servicers to structure modifications to ensure a quick repayment of advances, either through upfront fees, short term forbearances followed by lump sum repayment of missed payments, or capitalizing arrears and pulling those capitalized arrears from the pool.

[*819]

Figure 6

Servicers encounter significant expenses in financing the principal and interest advances to investors. The longer they must make advances, the more they must finance, and the longer to recover the advances, the more financing costs servicers incur. The time to recover advances, and the certainty of doing so, is a significant factor in servicers' financial calculus.

2. Servicers' Fee Advances to Third Parties Are a Profit Center that Can Imperil Modifications

In addition to interest advances, servicers advance expenses associated with default servicing, such as title searches, drive-by [*820] inspections, and foreclosure fees. n309 Taxes and insurance costs are also often advanced. n310 Although some PSAs impose caps on these fee advances, n311 these fee advances are often a profit center for servicers due to fee-sharing arrangements with the third-party vendors. n312 Because these fees are only charged in connection with loans in default, servicers who receive a share of third-party fees have an incentive to put and keep homeowners in default and a disincentive to return loans to performing status via a modification. These fee advances may or may not represent actual out-of-pocket expense to the servicer. In many cases, affiliates of the servicer, not true third parties, receive the fees, and the resulting profit wipes out any cost of financing the advance. n313 These fees may also be marked-up: in one case, Wells Fargo reportedly charged a borrower $ 125 for a broker price opinion when its out-of-pocket expense was less than half that, $ 50. n314 Such padding more than offsets the cost of financing the advance.

The availability of third-party fees rewards servicers for initiating foreclosure, proceeding with a foreclosure, and, in the case of post-foreclosure sale fees, concluding a foreclosure. These fees may also encourage servicers to draw out the time to resolution for a loan in default; the longer the time period before the property is liquidated, the more fees that may at least potentially be assessed. Additionally, such fees can price a modification out of reach of a homeowner, if the fees are added to the principal balance or the homeowner is asked to pay the accumulated fees before entering into the modification. Third-party fees [*821] encourage servicers to proceed with foreclosure and impede sustainable modifications.

86 Wash. L. Rev. 755, *

### 3. Amortization of Mortgage Servicing Rights Can Encourage Modifications

Servicers, on their books, spread out the cost of acquiring servicing rights over the expected life of the pool via amortization. n315 Modifications can prolong the life of the pool and thus reduce the annual cost of the servicing rights, creating potentially a paper profit for servicers. n316

The amortization of mortgage servicing rights is one of servicers' largest expenses. n317 When servicers purchase mortgage servicing rights, the purchase cost is amortized on their books over the expected life of the pool. n318 As that expected life changes, the amortization may either speed up or slow down. If loans drop out - through foreclosure, refinancing, or payoff - the amortization speeds up. If loans are retained in the pool past their expected payoff date, the amortization slows down. The longer the expected life of the pool, the more that initial expenses can be spread out, resulting in a lower paper expense every year.

Thus, servicers can ease their costs to acquire mortgage servicing rights, at least on paper, by extending the amortization period. Modifying loans keeps loans in the pool, and can extend the life of the pool, particularly when the modification includes a term extension. Amortization of servicing rights may encourage modifications, particularly when there is no realistic possibility that the modified loans will escape the pool due to a lack of available refinancing options.

### 4. Staffing Costs and Institutional Inertia Favor Foreclosure over Modification

Modifications are costly in terms of staff time and skill to implement. n319 Most servicers are still simply not set up to do [*822] modifications; n320 the routine response in normal times is to allow the cheaper and easier option, a foreclosure, to proceed. n321 Trying to change this pattern has proved difficult for servicers, with the result that foreclosures continue to outpace modifications. n322

Modifications are not largely automated, unlike foreclosures or initial underwriting. n323 Most investors do not pick up the increased staffing costs of performing modifications. n324 HAMP's servicer incentive payments offset these staffing costs, n325 but the payment is post hoc, after the modification has been performed and the staff costs have been incurred. n326 The priority for staffing remains the cheaper and more routine collections department. n327 The increases in staffing have not kept pace with the rising rate of delinquencies and foreclosures. n328

[*823] While loss mitigation employees are generally more highly trained than collections employees, line-level loss mitigation employees are still not extensively trained, adequately supported, or given meaningful discretion as to the terms of a modification. n329 Most servicers do not reward loss-mitigation employees for performance: staff are typically paid on an hourly basis, and only a few servicers offer bonuses for completing a modification. n330 Turnover among line-level loss mitigation employees remains high. n331 These relatively poorly trained and paid line-level employees, fielding sometimes hundreds of calls a week or even a day, decide whether or not any particular borrower is eligible for an approved form of loss mitigation. These employees may not be aware of the servicer's formal matrix for evaluating loss mitigation options and may not be motivated to use it even if they are aware. Poor training, low compensation, and insufficient oversight results in high staff turnover, terrible customer service, and relatively few completed loan modifications per staff.

One partial solution is to increase the use of automated loan modifications. n332 An automated system works well for resolving quickly the easy, standard cases, conserving servicer resources for more time-intensive cases. It poses significant risks of failure, however, because an automated modification cannot be carefully tailored to a borrower's circumstances. n333 To be effective and fair, automation requires servicers to reassess failed modifications; the standard modification may not fit some borrowers and the need for a customized modification may only become apparent once the first, one-size-fits-all, modification has failed.

Ironically, the servicers with the worst loan pools may be the best positioned in terms of staffing: they have had to squeeze margins out of weak mortgage pools for a long time. n334 Servicers with stronger pools, on the other hand, have been less invested in the performance of the [*824] loans they manage. n335 This dynamic has left many of the latter group of servicers indifferent to the performance of the loans they service and unmotivated to hire and train the staff needed to improve performance.

Persistent problems with staffing, including lack of expertise in modifying loans, have undermined efforts to modify loans, particularly among larger servicers, with stronger pools. Increased automation of the loan modification process could partially address this hurdle to modifying loans.

### 5. The Possibility of Refinancing or Cure Encourages Servicers to Foreclose Instead of Modifying

86 Wash. L. Rev. 755, *

The cheapest option for a servicer is to do nothing. If the servicer does nothing, the borrower may resolve the situation without servicer involvement. A borrower can cure in various ways - by refinancing, by borrowing money from friends and family, or by winning the lottery. Many servicers prefer to play those odds - historically around one in four - rather than incur the costs of a modification. n336

The availability of refinancing as an option reduces a servicer's incentives to do loan modifications. If refinancing is available for an individual homeowner, a modification may not pass muster under the FASB rules: if a homeowner can refinance, then the homeowner can avoid default, and thus default is not "reasonably foreseeable." n337 More importantly, refinancing, even if it only "kicks the can down the road" for the homeowner, offers a full payoff to investors and spares the servicer the costs of all modifications. n338 A refinancing will not trigger repurchase requirements on the part of the servicer nor require advances: once the loan is removed from the pool through refinancing, there is nothing to repurchase or pay advances on. Better still, all classes usually  [*825]  share in prepayments, at least after certain triggers are met. n339 If the servicer can engineer the refinancing with an affiliate or otherwise acquire the mortgage servicing rights to the refinanced loan, the servicer will not suffer even a net reduction of its mortgage servicing fees due to the prepayment. This is so because the new refinanced loan will continue generating fees for the servicer or its affiliate (and indeed, the monthly fee may be even higher, reflecting the likely increased principal balance due to refinancing). For servicers, refinancing may be the only form of modification that costs nothing upfront and provides, at least sometimes, a return.

Until June 2008, refinancings exceeded even the total number of foreclosures. n340 As long as refinancing was an available option, servicers had little incentive to make their loss mitigation departments work. Only as cure rates dropped below seven percent n341 did servicers begin to realize that refinancing alone will not manage their escalating default rates and focus more seriously on modifications. n342

III. SOLUTIONS

A. HAMP and Other Programs to Encourage Modifications Have Failed

Existing incentives too often push foreclosure at the expense of modifications that would help both investors and homeowners, as well as society at large. The failure of servicers to make modifications undermines efforts to stabilize our national and global economies. Until foreclosures are brought in check - they likely can only be brought in check through an increase in modifications executed by servicers - we will continue to experience financial turmoil. The existing incentives of  [*826]  servicers are not easily overcome by one-time incentive payments or voluntary programs. n343

The failure of HAMP n344 to produce a meaningful number of permanent modifications more than two years into its implementation n345 is a paradigmatic example of the limitations of voluntary programs. As the Special Inspector General for the Troubled Asset Relief Program wrote, "the number of permanent mortgage modifications under HAMP remains anemic." n346

While the Administration has touted HAMP as setting new standards for loan modifications, n347 total modifications in the country - both HAMP and non-HAMP - fell after HAMP was rolled out, as foreclosures continued to climb. n348 HAMP eased the pressure on servicers to perform modifications: with the introduction of HAMP it became clear that servicers would not be required to do modifications. n349 The pre-HAMP fear that the government would impose a mandatory program of loan modifications was a powerful incentive to servicers to perform modifications; that fear has proved to be a more powerful incentive than HAMP incentive payments. n350 HAMP's failure is due in large part to the lack of accountability servicers face under HAMP. n351

[*827]  One negative effect of HAMP's misplaced reliance on servicers to do the right thing, without accompanying accountability, is the dearth of principal reduction modifications under HAMP. HAMP requires servicers to evaluate whether a loan modification with a principal reduction would generate a greater return for investors than a loan modification without a principal reduction. n352 But HAMP does not require servicers to implement a modification with a principal reduction, n353 even if investors would be better off with a principal reduction than without. As a result, less than 3.3% of all the permanent modifications done under HAMP include principal reduction n354 and principal reductions in non-HAMP modifications outnumber those in HAMP modifications by nearly four to one. n355 HAMP's voluntary program of principal reductions has produced even fewer principal reduction modifications than servicers are willing to do without incentives.

Other programs designed to overcome servicers' reluctance to modify loans with incentive payments have met similar results. Fannie Mae and Freddie Mac - market makers for most prime loans - have long offered some payment for loan modifications. n356 Other investors have sometimes done likewise, and some private mortgage insurance companies make small payments if a loan in default becomes performing, as does the Federal Housing Administration loan guarantee program. n357 None of  [*828]   these incentives, however, has been sufficient to generate much interest among servicers in loan modifications. n358

In part the failure of these incentive schemes reflects the conflicting incentives given servicers. Fannie and Freddie have historically paid less for a modification than the modification costs, while paying servicers several times more for processing a short sale, where the homeowner loses the home. n359 Most incentive schemes also torpedo their own effectiveness by requiring the servicer to proceed with the foreclosure simultaneously with the loan modification. n360 The incentive programs also do little to restrict the potential benefits servicers reap from pursuing a foreclosure, including guaranteed recovery of all costs upon the post-foreclosure sale, accumulated default fees assessed borrowers, and, often, fees related to the foreclosure and subsequent sale of the property, such as title, valuation, and property maintenance fees. n361

Nonetheless, limited compensation is probably not why servicers fail to perform modifications. HAMP, after all, authorizes payment to servicers of up to $ 4500 for a successful permanent modification, n362 well more than the $ 750 to $ 1000 that modifications are estimated to cost. n363 As one servicer wrote, the HAMP "incentives are meaningful and revenue-generating." n364 And servicers express little to no interest in having investors compensate them for performing loan modifications. n365  [*829]   Incentives exist to perform modifications, but servicers choose not to avail themselves of those incentives.

Servicer incentives and compensation are complex. Any modification requires an initial outlay of capital - for staff, for advances, for infrastructure and overhead. Even where the financial rewards for performing a modification are greater than those of proceeding with a foreclosure, they are usually further off in the future, with fewer opportunities to generate ancillary fees, and they require that initial up-front outlay. The limited out-of-pocket costs for proceeding with a foreclosure pale beside the significant upfront outlays required for a successful modification.

Furthermore, in many cases, there is a cost to the servicer in obtaining the promised incentives of a modification. HAMP modifications, for example, require servicers to waive late fees and forbid the imposition of an upfront payment for the modification or the waiver by the borrower of legal rights. n366 Proprietary modifications by servicers will often be premised on a waiver of the borrower's legal rights, as well as the payment of substantial sums. n367 HAMP modifications are permanent modifications, not the temporary ones still favored by many servicers. n368 And HAMP modifications require, in many cases, deep principal forbearance and rate reduction, n369 with correspondingly deep and permanent cuts to servicers' monthly servicing income and residual interest income streams. n370

These restrictions on HAMP modifications are critical to the long-term sustainability of the modifications made, but servicers' incentives are not aligned with the long-term sustainability of loan modifications. Post-hoc incentives per modification are not enough to overcome servicers' resistance to performing sustainable modifications. As long as servicers can choose not to perform modifications, they will, by and large, choose the path of least resistance - foreclosures and temporary modifications that strip wealth from both investors and homeowners.

[*830]

B. Increased Accountability and Transparency Would Increase the Number of Sustainable Loan Modifications

Given the failure of existing programs to produce meaningful numbers of modifications, it is time to reconsider our reliance on voluntary programs. n371 Servicer non-compliance is well documented and unaddressed. n372 Only mandates on servicers to provide modifications and increased transparency throughout the modification process will increase modifications to a significant level. n373 Accounting rules that hamper modifications should be eased, and more guidance from FASB, credit rating agencies, and banking agencies for the treatment of modifications should be provided.

C. End the Dual-Track System and Mandate Loan Modification Before a Foreclosure

Foreclosures impose high costs on families, neighbors, extended communities, and ultimately our economy at large. n374 Proceeding with a foreclosure before considering a loan modification results in high costs for both investors and homeowners. These costs - which accrue primarily to the benefit of the servicer - can make an affordable loan modifica-

tion impossible. n375 Moreover, the two track system of proceeding simultaneously with foreclosures and loan modification negotiations results in many "accidental" foreclosures due to bureaucratic bungling by servicers, as one department of the servicer fails to communicate with another, or papers are lost, or instructions are not conveyed to the foreclosure attorney. n376

If a servicer can escape doing a modification by proceeding through a foreclosure, servicers can choose, and in many instances have chosen, to   [*831]   forgo nominal incentives to modify in favor of the certainty of recovering costs in a foreclosure. n377 Staying all foreclosures during the pendency of a loan modification review would encourage servicers to expedite their reviews, rather than delaying them. Congress and state legislatures should mandate consideration of a loan modification before any foreclosure is started, and should require loan modifications where they are more profitable to investors than foreclosure. n378

D. Provide for Principal Reductions in HAMP and via Bankruptcy Reform

The double whammy of declining home values and job losses helps fuel the current foreclosure crisis. n379 Homeowners who could normally refinance their way out of a lost job or sell their homes in the face of foreclosure are denied both options when they owe more on the home than it is worth. Without principal reductions, homeowners who lose their jobs, have a death in the family, or otherwise experience a drop in income are more likely to experience re-default and foreclosure. n380 Existing data on loan modifications shows that loan modifications with principal reductions tend to perform better. n381 In order to bring down the re-default rate and make loan modifications financially viable for investors, principal reductions must be part of the package. n382

[*832]   HAMP only mandates principal forbearance, not principal reduction. n383 Principal forbearance provides a homeowner with limited relief: the payments may be affordable, but the lack of equity in the home prevents homeowners from selling or refinancing to meet unexpected expenses or life events. As a result, principal forbearance sets both the homeowner and the loan modification up for failure in the long term. The HAMP guidelines should be revised so that they require the reduction of loan balances to at least 125% of the home's current market value, as does the Federal Reserve Board's loan modification program. n384

Outside of HAMP, homeowners could access principal reductions through the bankruptcy courts if bankruptcy judges were allowed to modify first lien home loans. Currently, bankruptcy judges may, in at least some circumstances, modify any type of loan except a first lien home loan. n385 Regardless of how underwater the home is, bankruptcy judges may never modify a first lien home loan. n386 This exclusion of home mortgages from bankruptcy supervision dates back to the 1978 Bankruptcy Code, n387 when mortgages were generally conservative instruments with a simple structure. n388 Although the goal at the time was to support mortgage lending and homeownership, the provision reflects an outdated and simplistic view of the lending market. Today, supporting homeownership demands that bankruptcy judges have greater flexibility to address distressed mortgages. Congress should enact   [*833]   legislation to allow bankruptcy judges to modify mortgages in distress, when appropriate.

E. Continue to Increase Automated and Standardized Modifications, with Individualized Review for Borrowers for Whom the Automated and Standardized Modification Is Inappropriate

Servicers lack staff, training, and software to underwrite loans. n389 Underwriting takes time - and the longer it takes to make a delinquent loan performing, the more money, generally speaking, servicers will lose. In order to be effective on the necessary scale, loan modification programs must speed up the process and reduce the reliance on individual servicer-borrower contacts, a major sticking point for current mass modification efforts. n390 The main way to get speed is to automate the process with standardized modifications. This was one of the key insights of the Federal Depository Insurance Corporation's loan modification program. n391

More could and should be done to automate the process. n392 Servicers should present borrowers in default with a standardized offer based on information in the servicer's file, including the income at the time of origination. Borrowers would then be free to accept or reject the modification, based on their own assessment of their ability to make the modified payments. Only when a borrower rejects a modification - or if an initial, standard modification fails - should detailed underwriting be done. The urgency of the need requires speed and uniformity; fairness requires the opportunity for a subsequent review if the standardized program is inadequate.

A standardized modification may be insufficient for a number of reasons. Many of the existing loans were poorly underwritten, based on   [*834]   inflated income or a faulty appraisal. n393 Borrowers may have other debt, including high medical bills that render a standardized payment reduction unaffordable. Subsequent life events, including the

death of a spouse, unemployment, or disability, may also make a standardized modification unsustainable. In all of these cases, borrowers should be able to request and get an individually tailored loan modification, at least when such a loan modification is forecast to save the investor money.

Some servicers provide modification review upon re-default as part of their loss mitigation programs. n394 This approach should be standard and mandated, and should include continued eligibility for HAMP modifications rather than only specific servicer or investor programs. Foreclosing on homes where homeowners have suffered an involuntary drop in income without evaluating the feasibility of a further modification is punitive to homeowners and does not serve the interests of investors.

A standardized approach cannot cure all defaults. But it will make many loans affordable, saving investors the costs of foreclosure and servicers the cost of detailed underwriting. The savings in speed and staffing created through automated and standardized modifications should more than compensate for the costs of underwriting individualized modifications where necessary.

F. Ease Accounting Rules for Modifications

The current accounting rules, particularly as interpreted by the credit rating agencies, may discourage appropriate modifications. In particular, the requirements for individual documentation of default prevent streamlined modifications. n395 The troubled debt restructuring rules may discourage sustainable modifications of loans not yet in default, with the unintended consequence of promoting short-term repayment plans rather than long-term, sustainable modifications that reflect the true value of the assets. Finally, limiting recovery of servicer expenses when a modification is performed to the proceeds on that loan rather than allowing the servicer to recover more generally from the income on the pool as a whole, as is done in foreclosure, biases servicers against [*835] meaningful modifications, particularly modifications with principal reduction or forbearance. The credit rating agencies and bond insurers should review their guidance on how servicers are reimbursed for advances when a modification is entered into.

Streamlined modifications should be allowed to proceed without full documentation, for the reasons discussed above. Individual documentation of existing default beyond noting the fact of default seems unnecessary. If the goal is the return to the investors, the reason for the default is largely irrelevant; what is relevant is whether or not the loan can be made performing.

FASB and the SEC could help by formalizing more flexible servicer discretion in determining "reasonably foreseeable default" and the ability to pursue sustainable, systematic, streamlined loan modifications without the threat of punitive regulatory or accounting consequences. The guidance issued by the Office of the Chief Accountant of the SEC permitting streamlined modifications in the event of a rate reset should be extended to all standardized programs, in line with the REMIC requirements.

The SEC and FASB should also review the relevant troubled debt restructuring, impairment, and recognition guidance to ensure that owners of one to four unit residential mortgages are not unduly penalized for undertaking modifications of loans prior to default. n396 Such review could encourage servicers to modify more loans in a timely way. Such pre-default modifications are particularly important because they have a higher rate of success and fewer negative consequences for both borrowers and investors than post-default modifications. n397

Rational investors should care more about whether a loan modification will save them money over a foreclosure than whether everybody else is performing exactly the same sort of modification. Shifting the test of a permissible modification from "standard industry practice" to "net present value return to investors" introduces both more certainty and more flexibility in servicers' loan modification determinations.

[*836]

G. Encourage FASB and the Credit Rating Agencies to Provide More Guidance Regarding the Treatment of Modifications

Investors are losing mind-boggling sums of money on foreclosures. n398 The available data suggests that investors lose ten times more on foreclosures than they do on modifications. n399 In particular, leading investor groups have advocated broader use of principal reductions as part of the anti-foreclosure arsenal, but only a handful of servicers have obliged. n400 Foreclosures continue to outstrip modifications of all kinds. n401 Part of the solution must be giving investors the tools they need to police servicers.

86 Wash. L. Rev. 755, *

Investors' interests are not necessarily the same as those of borrowers. There are many times when an investor will want to foreclose although a borrower would prefer to keep a home. This will, for example, almost always be the case whenever a homeowner has substantial equity in the home. Simply put, investors make money by foreclosing on little old ladies whose loans are almost paid off. Investors may also simply prefer to cash out their asset - the loan - through a foreclosure and pursue other investment opportunities, particularly if they think that the asset has become risky - perhaps because of an increased risk of default, perhaps because other investment opportunities are more attractive, or perhaps because home prices (and the value of the collateral) are falling. Investors as well as servicers need improved incentives to favor  [*837]  modifications over foreclosures when doing so serves a larger social good. Still, there would likely be far fewer foreclosures if investors had information as to the extent of their losses from foreclosures and could act on that information.

Existing rules can stymie investors' ability to get clear and accurate reporting as to the status of the loan pool. Additional guidance by the SEC, FASB, and the credit rating agencies could force servicers to disclose more clearly to investors and the public the nature and extent of the modifications in their portfolio - and the results of those modifications. Without more transparency and uniformity in accounting practices, investors are left in the dark. As a result, servicers are free to game the system to promote their own financial incentives, to the disadvantage, sometimes, of investors, as well as homeowners and the public interest at large.

H. Encourage Investors to Regulate Default Fees

Fees serve as a profit center for many servicers and their affiliates. n402 They increase the cost to homeowners of curing a default. n403 They encourage servicers to place homeowners in default and can doom modifications. Fees cost both borrowers and investors.

Borrowers are not in a position to police default fees. For starters, the fees may be relatively small in an individual case. For example, an Indiana homeowner was recently assessed $ 229 in title fees in order to obtain a modification. n404 That is enough money to get the homeowner's attention, but not enough to risk the potentially home-saving mortgage modification over. The property inspection fees at issue in one bankruptcy case were only fifteen dollars, and disclosed only after extensive litigation. n405 Even should a borrower be willing to fight over the fees, most modification documents do not, in any event, provide an itemization of fees, but simply offer a take-it-or-leave-it total unpaid principal balance. n406 Moreover, a desperate borrower may agree to pay  [*838]  even an unaffordable fee, only to end up quickly back in foreclosure. Such a result is costly for everyone but the servicer.

Servicers' fees should be treated as non-recoverable advances, in the event of either a modification or a foreclosure, subject to recovery from the pool, provided that such fees are legal, reasonable, and necessary. This treatment would spread the cost of modifications more uniformly across the pool, in line with the loss allocations contemplated at the pool's origin, while creating parity between foreclosures and modifications.

Permitting servicers to recover waived default fees from all the income from a pool in the event of a modification would increase investors' incentive to monitor servicers' use of default fees, perhaps reducing the imposition of bogus fees. It would also reduce servicers' incentives to complete a foreclosure and increase the availability of affordable modifications. Investors share borrowers' interests in sustainable modifications; investors are in a better position than borrowers to set and enforce prudential standards for the imposition of default fees.

CONCLUSION

The financial compensation and constraints imposed on and chosen by servicers generally lead servicers to prefer refinancing, foreclosures, and short-term repayment plans to modifications. Servicers recover all costs in a refinancing or foreclosure, without incurring unreimbursed expenses. Refinancing, where available, will always be preferred: the servicer incurs no costs in a refinancing, other than the staff cost of providing a payoff statement, and may gain some incidental float income from the prepayment. Moreover, if refinancing is available as an option, servicers are likely to be able to replenish their servicing rights and ensure a steady income.

Under the current rules, a foreclosure is the next best option. The servicer's expenses, other than the costs of financing advances, will be paid first out of the proceeds of a foreclosure. Thus, the servicer will recover all sunk expenditures upon completion of the foreclosure. The servicer's costs of financing those advances will not be recovered - but all other costs, including those services provided by affiliated entities, like title and property inspection, will be recovered.

[*839]   Whether and when costs are recovered in a modification is more uncertain. While the credit rating agencies have taken steps to improve clarity on the treatment of advances in a modification, ambiguities remain. Existing PSAs provide, at best, spotty coverage of how a servicer should be paid for doing a modification and what kinds of modifications are preferred, offering the vague usual and customary practices as guidance to skittish servicers. Worse, recovery of costs is delayed in a modification, with some costs, particularly the sunk costs of staffing and time, not recovered at all.

If a servicer chooses to modify, a short-term repayment plan is the most attractive option. Such a plan requires little to no underwriting, does not require the servicer to recognize any long-term loss and, because it is quick, addresses servicers' largest expense: the black hole of financing principal and interest advances to investors. Time is money, perhaps even more for servicers than for others, given their acute dependence on financing. In order to be attractive to a servicer, a modification must provide for the quick and full recovery of all advances.

Modifications that are more sensitive to borrowers' needs require more staff and more time, and may require the recognition of losses, either through a principal write down or an interest rate reduction. Recognized losses can ripple through a servicer's incentive scheme, draining the residuals dry and reducing the monthly mortgage servicing fee. Principal or interest rate reductions or forbearances - the sorts of modifications that most borrowers need to make the loans sustainable - will generally result in an immediate recognition of loss to the servicer and an elevated number of reported delinquencies, which can result in the servicer losing its most valuable asset, the mortgage servicing rights.

Other options pushed by investors and regulators, such as short sales, are no more attractive to servicers than foreclosures and perhaps less so. Ordinarily, the property is purchased at the foreclosure sale by the owner of the loan, and then the servicer is given the task of reselling the property to a third party, with the opportunity to charge and collect fees related to that sale, including property maintenance and brokerage fees. These post-foreclosure sales are called "REO" sales for "real-estate owned." A short sale should return a higher sales price than an REO sale after foreclosure, but so long as the REO sales price is higher than the servicer's advances, that higher price does not benefit the servicer. The time to complete a short sale versus a foreclosure may be attractive to a servicer facing high interest costs on advances (if placing a loan into foreclosure does not cut off the servicer's obligation to make advances). But weighed against the interest payments in many cases is the real   [*840]   possibility for the servicer or its affiliates to reap high fees throughout the foreclosure and REO process. If a servicer can make more money through foreclosure and REO-related fees than financing the advances costs, the balance tips sharply against a short sale. Finally, servicers are also capable of irrational optimism about the future and may want to delay a sale in hopes that the housing market will rebound, bringing higher prices than the short sale offer. n407 Thus, in most instances, a servicer has little to gain from agreeing to a short sale and potentially some loss. n408

Given the complex web of incentives - and disincentives - that servicers face in performing modifications and choosing among modifications, it is unsurprising that most servicers continue to follow the path of least resistance and surest returns: foreclosure or refinancing. All other paths require complex calculations and certain sunk costs without any guarantee of an offsetting return. Payments to servicers without explicit mandates are unlikely to shift this dynamic; such payments will not be sufficient for servicers to staff up nor will they outweigh servicers' hedge positions in the pools of toxic mortgages.

Overcoming servicers' resistance to performing modifications will require honest evaluation of modification possibilities, better guidance, and foreclosure of fees. Until and unless these steps are taken, servicers will continue to foreclose modifications.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Estate, Gift & Trust LawTrustsGeneral OverviewReal Property LawFinancingMortgages & Other Security InstrumentsMortgagee's InterestsReal Property LawFinancingMortgages & Other Security InstrumentsMortgagor's Interests

**FOOTNOTES:**

n1. The U.S. foreclosure rate (the percentage of outstanding mortgage loans in foreclosure) at the end of the fourth quarter of 2010 was 4.63%. Mortg. Bankers Ass'n, National Delinquency Survey Q4 2010, at 2 (2011).

86 Wash. L. Rev. 755, *

n2. The foreclosure rate for non-farm mortgages peaked in 1933, below 1.4%. David C. Wheelock, The Federal Response to Home Mortgage Distress: Lessons from the Great Depression, 90 Fed. Res. Bank St. Louis Rev. 133, 138-39 fig.9 (2008).

n3. See generally Kathleen C. Engel & Patricia A. McCoy, The Subprime Virus: Reckless Credit, Regulatory Failure and Next Steps (2011).

n4. See, e.g., Ben S. Bernanke, Chairman, Bd. of Governors of the Fed. Reserve Sys., Speech at the Federal Reserve System Conference on Housing and Mortgage Markets: Housing, Mortgage Markets, and Foreclosures (Dec. 4, 2008) [hereinafter Bernanke, Speech at Federal Reserve], http://www.federalreserve.gov/newsevents/speech/bernanke20081204a.htm ("Despite good-faith efforts by both the private and public sectors, the foreclosure rate remains too high, with adverse consequences for both those directly involved and for the broader economy.").

n5. See State-by-State Figures: Foreclosure and Housing Wealth Losses, U.S. Cong. Joint Econ. Comm. (Apr. 10, 2008), http://jec.senate.gov/public/index.cfm?p=Reports1&ContentRecord_id=392cb915-9c45-fa0d-5a46-f61f6e61938 1&ContentType_id=efc78dac-24b1-4196-a730-d48568b9a5d7&Group_id=c120e658-3d60-470b-a8a1-6d2d8fc3 0132&YearDisplay=2008.

n6. E.g., Soaring Spillover: Accelerating Foreclosures to Cost Neighbors $ 502 Billion in 2009 Alone; 69.5 Million Homes Lose $ 7,200 on Average, Ctr. for Responsible Lending at 2 (May 2009), http://www.responsiblelending.org/mortgage-lending/research-analysis/soaring-spillover-3-09.pdf (estimating losses to neighboring property values due to the foreclosure crisis at $ 1.86 trillion dollars during the years 2009 to 2013); see also William Apgar & Mark Duda, Collateral Damage: The Municipal Impact of Today's Mortgage Foreclosure Boom, Homeownership Preservation Found. 4 (May 11, 2005), http://www.hpfonline.org/content/pdf/Apgar_Duda_Study_Short_Version.pdf (estimating per-foreclosure costs to the City of Chicago at upwards of $ 30,000 for some vacant properties); Majority Staff of the Joint Econ. Comm., The Subprime Lending Crisis: The Economic Impact on Wealth, Property, Values and Tax Revenues and How We Got Here, U.S. Cong. Joint Econ. Comm., 1, 12 (Oct. 2007), http://jec.senate.gov/public/?a=Files.Serve&File_id=148eaf7c-ee62-42f0-b215-006db6a11d65 (projecting foreclosed homeowners will lose $ 71 billion due to foreclosure crisis, their neighbors will lose $ 32 billion, and state and local governments will lose $ 917 million in property tax revenue).

n7. See, e.g., Grant Bailey et al., Fitch Ratings, Revised Loss Expectations for 2006 and 2007 Subprime Vintage Collateral 2 (2008) (forecasting losses of twenty-eight percent on the pools of subprime mortgages originated in 2006 and 2007).

n8. See, e.g., Alan M. White, Foreclosures and Modifications-Securitized Mortgage Data through May 25, 2011, Valparaiso Univ. (May 25, 2011), [hereinafter White, Foreclosures Data], http://www.valpo.edu/law/faculty/awhite/data/index.php (follow "Foreclosures and Modifications - Securitized Mortgage Data through May 25, 2011" hyperlink) (reporting that in September 2010, lenders lost an average of $ 145,636 on every foreclosure but only $ 52,195 on a modification).

n9. See, e.g., Rev. Proc. 2009-45, 2009-40 I.R.B. 471.

n10. Compare id. (describing how servicers of commercial loans often have experience with restructuring commercial loans), with Jay Brinkman, Mortg. Bankers Ass'n, An Examination of Mortgage Foreclosures, Modifications, Repayment Plans and Other Loss Mitigation Activities in the Third Quarter of 2007, at 5 (2008) ("The [residential] mortgage industry has historically used modifications sparingly ... .").

86 Wash. L. Rev. 755, *

n11. See, e.g., Diane Pendley & Thomas Crowe, Fitch Ratings, U.S. RMBS Servicers' Loss Mitigation and Modification Efforts 4 (May 2009) (charting decline in use of repayment plans and forbearance agreements over preceding twenty-four month period).

n12. See, e.g., John Rao et al., Nat'l Consumer Law Ctr., Foreclosures § 2.11.4.4 (3d ed. 2010).

n13. See, e.g., Zhiqin Huang et al., Modified Current Loans Are Three Times as Likely to Default as Unmodified Current Loans, Moody's ResiLandscape 9, 11 (Feb. 1, 2011); Yan Zhang, Does Loan Renegotiation Differ by Securitization Status? An Empirical Study 29, 41 tbl.4 (Dec. 2010) (unpublished manuscript), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1773103 (follow "One-Click Download" hyperlink) (finding that temporary repayment agreements result in foreclosure nearly three times as often as permanent modifications).

n14. See, e.g., Alan M. White, Deleveraging the American Homeowner: The Failure of 2008 Voluntary Mortgage Contract Modifications, *41 Conn. L. Rev. 1107, 1116-17 (2009)* (showing that 53% of loan modifications in November 2008 held payments steady or increased the payment; 35% of loan modifications in November 2008 increased payments); Office of the Comptroller of the Currency & Office of Thrift Supervision, OCC and OTS Mortgage Metrics Report: Disclosure of National Bank and Federal Thrift Mortgage Loan Data, First Quarter 2009, Off. Comptroller Currency 25 (June 2009) [hereinafter OCC Metrics Report, First Quarter 2009], http://www.ots.treas.gov/_files/4820471.pdf (showing that 54.6% of loans modified between January 1, 2008, and March 31, 2009, either increased payments or left them unchanged).

n15. See Office of the Comptroller of the Currency & Office of Thrift Supervision, OCC and OTS Mortgage Metrics Report: Disclosure of National Bank and Federal Thrift Mortgage Loan Data: Fourth Quarter 2010, Off. Comptroller Currency 29 (March 2011) [hereinafter OCC Metrics Report, Fourth Quarter 2010], http://www.ots.treas.gov/_files/482142.pdf (reporting that 7.8% of loan modifications made in the fourth quarter of 2010 increased the payment).

n16. Id. at 49-50.

n17. See The Worsening Foreclosure Crisis: Is It Time to Reconsider Bankruptcy Reform?: Before the S. Subcomm. on Admin. Oversight and the Courts of the Comm. on the Judiciary, 111th Cong. 13 (2009) (written testimony of Alys Cohen), available at http://judiciary.senate.gov/pdf/07-23-09CohenTestimony.pdf; Amherst Sec. Grp. LP, Amherst Non-Agency Mortgage Market Monitor 34 (2011) (reporting loss severities approaching 100% on some subprime pools); Diane Pendley et al., Fitch Ratings, U.S. RMBS Servicers' Loss Mitigation and Modification Efforts Update II, at 1, 14 (June 2010) (reporting loss severity rates approaching 80% for subprime foreclosures).

n18. See, e.g., Press Release, Mortg. Bankers Ass'n, Delinquencies and Foreclosures Increase in Latest MBA National Delinquency Survey (Mar. 6, 2008), available at http://www.mbaa.org/NewsandMedia/PressCenter/60619.htm; Press Release, Mortg. Bankers Ass'n, Delinquencies Continue to Climb in Latest MBA National Delinquency Survey (Mar. 5, 2009), available at http://www.mbaa.org/NewsandMedia/PressCenter/68008.htm.

n19. See, e.g., State Foreclosure Prevention Working Group, Analysis of Subprime Mortgage Servicing Performance: Data Report No. 3 at 12 (Sept. 2008) [hereinafter State Foreclosure Prevention Working Grp., Report No. 3], http://www.csbs.org/Content/NavigationMenu/Home/SFPWGReport3.pdf.

n20. Pendley et al., supra note 17, at 1.

n21. See Cong. Oversight Panel, 111th Cong., April Oversight Rep.: Evaluating Progress on TARP Foreclosure Mitigation Programs 68 (2010) ("As of February 2010 the Panel's best estimate for foreclosures prevented by HAMP is approximately 900,000 to 1.2 million, or 15 to 20 percent of the total population of 60+ day delinquencies.").

n22. Office of the Comptroller of the Currency & Office of Thrift Supervision, OCC and OTS Mortgage Metrics Report: Disclosure of National Bank and Federal Thrift Mortgage Loan Data: First Quarter 2011, Off. Comptroller Currency 5 tbl.1 (2011), http://www.ots.treas.gov/_files/490078.pdf.

n23. See Mortg. Bankers Ass'n, National Delinquency Survey Q1 2011, at 3 (2011).

n24. Servicers may or may not be affiliated with a lender, and even if they are affiliated with a lender, may or may not be servicing loans originated by that lender. This Article will discuss the incentives present both when the servicer is servicing a loan originated by an affiliate and when it is not servicing a loan originated by an affiliate. See generally Adam Levitin & Tara Twomey, Mortgage Servicing, 28 Yale J. on Reg. 1, 22 (2010) (discussing structure of servicing industry); State Foreclosure Prevention Working Grp., Analysis of Subprime Mortgage Servicing Performance: Data Report No. 1, app. A at 1 (Feb. 2008) [hereinafter State Foreclosure Prevention Working Grp., Report No. 1] (showing that slightly less than half of subprime loans are serviced by an affiliate of the originator).

n25. See Problems in Mortgage Servicing from Modification to Foreclosure: Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs, 111th Cong. 19-33 (2010) [hereinafter Problems in Mortgage Servicing] (written testimony of Diane E. Thompson, Of Counsel, Nat'l Consumer Law Center); cf. Manuel Adelino et al., Why Don't Lenders Renegotiate More Home Mortgages? Redefaults, Self-Cures, and Securitizations 4 (Fed. Reserve Bank of Bos., Pub. Policy Discussion PapersNo.09-4,July6,2009),availableat http://www.bos.frb.org/economic/ppdp/2009/ppdp0904.pdf ("In addition, the rules by which servicers are reimbursed for expenses may provide a perverse incentive to foreclose rather than modify."). See generally infra text accompanying notes 75, 81-82, 239.

n26. See infra Part III.C.

n27. See, e.g., Christopher L. Peterson, Predatory Structured Finance, *28 Cardozo L. Rev. 2185, 2208* fig.A (2007) (graphically illustrating the complexity of home mortgage securitization in the mid-2000s).

n28. Some studies find an increased risk of foreclosure attributable solely to securitization. E.g., Zhang, supra note 13, at 1.

n29. It's a Wonderful Life (Liberty Films 1946) (narrating the adventures of George Bailey, mid-twentieth century bank manager of a building and loan that provides home loans for the working poor).

n30. See, e.g., Kathleen C. Engel & Patricia A. McCoy, Turning a Blind Eye: Wall Street Finance of Predatory Lending, *75 Fordham L. Rev. 2039, 2049 (2007);* Levitin & Twomey, supra note 24, at 11.

n31. See, e.g., Michael G. Jacobides, Mortgage Banking Unbundling: Structure, Automation, and Profit, Housing Fin. Int'l 28 (2001) (describing the "atomization" of mortgage lending); Peterson, supra note 27, at 2199-212 (2007) (describing securitization and its development).

n32. In 2009, 85.6% of all mortgages originated were securitized. 2 Inside Mortg. Fin., The 2010 Mortgage Market Statistical Annual 3.

86 Wash. L. Rev. 755, *

n33. Elizabeth Renuart & Kathleen E. Keest, The Cost of Credit: Regulation, Preemption, and Industry Abuses § 11.5 (4th ed. 2009).

n34. See, e.g., IndyMac MBS, Inc., Prospectus Supplement S-12 (2007) [hereinafter IndyMac, Prospectus Supplement] (listing various certificates offered).

n35. A tranche is a portion of the securitization bearing a specific credit-risk rating. Riskier tranches have correspondingly higher rates of return but do not get paid until after less risky tranches do, thus giving rise to "tranche warfare." Kurt Eggert, Held Up in Due Course: Predatory Lending, Securitization, and the Holder in Due Course Doctrine, *35 Creighton L. Rev. 503, 560-66 (2002)* [hereinafter Eggert, Held Up in Due Course].

n36. In 2009, for example, 85.6% of all mortgages originated were securitized. See Inside Mort. Fin., supra note 32, at 3.

n37. See Peterson, supra note 27, at 2208-09 (describing roles of originators and brokers). To complicate matters further, sometimes ownership of the mortgage is recorded in the name of the Mortgage Electronic Registration System (MERS). See generally Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, *78 U. Cin. L. Rev. 1359 (2010)* (discussing the complications arising from MERS' involvement).

n38. See, e.g., State Foreclosure Prevention Working Grp., Report No. 1, supra note 24, at app. A at 1 (showing that slightly less than half of subprime loans are serviced by an affiliate of the originator).

n39. See, e.g., Kurt Eggert, Limiting Abuse and Opportunism by Mortgage Servicers, 15 Housing Pol'y Debate 753, 754 (2004) [hereinafter Eggert, Limiting Abuse].

n40. See, e.g., Elizabeth Renuart et al., Foreclosure Prevention Counseling: Preserving the American Dream 238 (2d ed. 2009); Levitin & Twomey, supra note 24, at 16 (discussing structure of servicing industry).

n41. Amherst Sec. Grp. LP, supra note 17, at 32, 34 (reporting loss severities approaching 100% on some subprime lien pools); Pendley et al., supra note 17, at 14 (reporting loss severity rates approaching 80% for subprime foreclosures).

n42. While homeowners have long been able to request from the servicer the identity of the owner of the loan, *15 U.S.C. § 1641*(f) (2006), only recently did Congress mandate that homeowners be told when the ownership of the loan changed. Helping Families Save Their Homes Act of 2009, Pub. L. No. 111-22, § 404, *123 Stat. 1632* (codified at *15 U.S.C. § 1641*(g) (Supp. IV 2010)).

n43. See State Foreclosure Prevention Working Grp., Report No. 1, supra note 24, app. A at 1 (showing 44.9% by number of loans, 42.85% by dollar volume as of October 2007).

n44. Levitin & Twomey, supra note 24, at 22.

n45. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at 80-81; Michael Laidlaw et al., Fitch Ratings, U.S. Residential Mortgage Servicer Bankruptcies, Defaults, Terminations, and Transfers 2, 3 (2007).

86 Wash. L. Rev. 755, *

n46. See, e.g., Am. Securitization Forum, Statement of Principles, Recommendations, and Guidelines for the Modification of Securitized Subprime Residential Mortgage Loans 4 (2007) [hereinafter Am. Securitization Forum, Statement of Principles] (stating that modifications should be made "in a manner that is in the best interests of the securitization investors in the aggregate").

n47. See, e.g., Kate Berry, Reputation Risk Jolts MBS Trustee Banks to Action, Am. Banker, Feb. 15, 2011, at 2 (describing the lack of control trustees exercise over foreclosures). Jim Della Sala, a Deutsche Bank managing director and head of corporate trust has said, "We don't hire the servicer, we don't pay them and typically we can't fire them." Id. See generally infra Part II.B.2.

n48. Cf. Larry Cordell et al., The Incentives of Mortgage Servicers: Myths and Realities 18 (Fed. Reserve Bd. Div. of Research & Statistics & Monetary Affairs, Fin. & Econ. Discussion Series, Working Paper No. 2008-46, 2008) (discussing lack of input by investors into servicers' loan modification decision making).

n49. See, e.g., Anna Gelpern & Adam J. Levitin, Rewriting Frankenstein Contracts: Workout Prohibitions in Residential Mortgage Backed Securities, 82 S. Cal. L. Rev. 1075, 1077 (2009).

n50. See Joseph R. Mason, Subprime Servicer Reporting Can Do More for Modification than Government Subsidies 5-7 (Mar. 16, 2009) [hereinafter Mason, Servicer Reporting], http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1361331 (follow "One-Click Download" hyperlink); Levitin & Twomey, supra note 24, at 23-24 (discussing different kinds of servicers); see also Exhibit B at 20-21, In re The Bank of New York Mellon, No. 11-cv-5988- WHP, 2011 WL 4953907 (S.D.N.Y. Oct. 19, 2011) (Settlement Agreement) (requiring transfer of delinquent mortgages to subservicers).

n51. Servicers may specialize in prime or subprime loans, and some servicers specialize in loans that are in default. Some companies contain entire families of servicers, prime and subprime, default and performing. See Mason, Servicer Reporting, supra note 50, at 5-7 (discussing different kinds of servicers). See generally Levitin & Twomey, supra note 24, at 23-24 (same).

n52. See, e.g., Anthony Pennington-Cross & Giang Ho, Loan Servicer Heterogeneity & The Termination of Subprime Mortgages 2 (Fed. Res. Bank of St. Louis Research Div., Working Paper No. 2006-024A, 2006); Follow the Money: How Servicers Get Paid, 26 NCLC Reports Bankr. & Foreclosures Edition 27 (2008); Cordell et al., supra note 48, at 16; Ocwen Fin. Corp., Form 10-K (Annual Report) 7-8 (Mar. 17, 2008). See generally infra Part III.E.3.

n53. See, e.g., Ocwen Fin. Corp., supra note 52, at 22; Joseph R. Mason, Mortgage Loan Modification: Promises and Pitfalls 4 (Oct. 2007) [hereinafter Mason, Mortgage Loan Modification], http://ssrn.com/abstract=1027470.

n54. Indeed, PSAs usually allow a trustee to increase its monitoring of a servicer, typically a necessary prerequisite to firing the servicer, only in the case of a narrowly circumscribed list of triggering events, primarily financial defaults. Laidlaw et al., supra note 45, at 2; see also Berry, supra note 47 at 2.

n55. See, e.g., Engel & McCoy, supra note 30, at 2063.

n56. See Mason, Servicer Reporting, supra note 50, at 4, 45-46.

n57. See Engel & McCoy, supra note 30, at 2047; Peterson, supra note 27, at 2205.

86 Wash. L. Rev. 755, *

n58. See Cordell et al., supra note 48, at 18 (reporting that servicers of private label securitizations receive little guidance from investors regarding loss mitigation); id. at 23 ("Servicers admitted that investors have rarely questioned a workout, or asked to see NPV worksheets, or threatened a lawsuit in the past."). Once a pool is up and running, investors are usually constrained from giving active direction on the management of the assets under tax and accounting rules. See id. at 19, 22.

n59. Tomasz Piskorski et al., Securitization and Distressed Loan Renegotiation: Evidence from the Subprime Mortgage Crisis 2 (Chi. Booth Sch. of Bus., Research Paper No. 09-02, 2010), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1321646 (discussing the "coordination" problem among investors).

n60. See Cordell et al., supra note 48, at 22; Mason, Servicer Reporting, supra note 50, at 64 (noting that servicers often obfuscate key elements of their performance).

n61. See, e.g., Complaint at 6, Carrington Asset Holding Co. v. Am. Home Mortg. Servicing, Inc., No. FST-CV 09-5010295-S (Conn. Super. Ct. Feb. 9, 2009) [hereinafter Complaint, Carrington] (describing "special rights" Carrington allegedly bargained for as holder of the most junior certificates to direct the disposition of property after foreclosure and stating that certificate holders normally have no power to direct the actions of the servicer in property disposition); Ameriquest Mortg. Sec. Inc., Prospectus Supplement, Asset-Backed Pass-Through Certificates, Series 2002-2, at 44-45 (2002) [hereinafter Ameriquest, Prospectus Supplement] (requiring agreement of fifty-one percent of certificate holders).

n62. Cf. Jody Shenn, Mortgage Investors with $ 500 Billion Urge End of Practices, Lawyer Says, Bloomberg (July 23, 2010, 12:25 PM), http://www.bloomberg.com/news/2010-07-23/mortgage-investors-with-500-billion-urge-end-of-practices-lawyer-says.html (reporting on letters sent to trustees of mortgage pools on behalf of a majority of the investors in the pool).

n63. See Cordell et al., supra note 48, at 22.

n64. See, e.g., Complaint, Carrington, supra note 61, at 5; Eggert, Held Up in Due Course, supra note 35, at 560-62 (2002); Engel & McCoy, supra note 30, at 2041-42; Peterson, supra note 27, at 2203.

n65. Cf. Maurna Desmond, The Next Mortgage Mess: Loan Servicing? Claims of Fraud in the Subprime Mortgage Market Illuminate a Murky World, Forbes.com (Mar. 20, 2009), http://www.forbes.com/2009/03/20/subprime-mortgages-carrington-capital-business-wall-street-servicers.html (noting that delaying foreclosures and concealing defaults helps junior investors but hurts senior investors).

n66. See Complaint, Carrington, supra note 61, at 6 (noting that information on the disposition of foreclosed property was available to junior investor only because of "special rights" bargained for by institutional investor).

n67. See, e.g., Matthew Tomiak & William Berliner, The Complex New World of RMBS Shortfalls, Am. Securitization J., Winter/Spring 2010, at 16, 16-17 (discussing the many layers to securities and the difficulty of how to apply modifications).

n68. See Peter Goodman, Lucrative Fees May Deter Efforts to Alter Troubled Loans, N.Y. Times, July 30, 2009, at A1 [hereinafter Goodman, Lucrative Fees]; cf. Press Release, Ass'n of Mortg. Investors, AMI Supports Long Term, Effective, Sustainable Solutions to Avert Foreclosure; Invites Bank Servicers to Join (Nov. 16, 2010), available at http://the-ami.com/2010/11/16/ami-supports-long-term-effective-sustainable-solutions-to-avert-foreclosure-invit

es-bank-servicers-to-join/ (citing servicers' profit from fees and payments from affiliates as an impediment to loan modifications that would be in the interests of investors); Letter from Kathy D. Patrick to Countrywide Home Loans Servicing (Oct. 18, 2010) (on file with author) (notifying a trust and master servicer of breaches in the master servicer's performance); Shenn, supra note 62 (reporting on letters sent to trustees of mortgage pools on behalf of a majority of the investors in the pool).

n69. Mason, Servicer Reporting, supra note 50, at 14; see also Berry, supra note 47, at 2 (describing the lack of control trustees exercise over foreclosures).

n70. See, e.g., *CWCapital Asset Mgmt., LLC v. Chi. Props., LLC, 610 F.3d 497, 501 (7th Cir. 2010)* (concluding that the servicer has the "whip hand" in making decisions about whether to foreclose on a loan); Karen Weise, When Denying Loan Mods, Loan Servicers Often Wrongly Blame Investors, ProPublica (July 23, 2010, 6:50 AM), http://www.propublica.org/article/when-denying-loan-mods-loan-servicers-often-blame-investors-wrongly (quoting managing director of brokerage firm dealing in mortgage backed securities as saying investors have "zero vote" in determining loan modifications and Bank of New York Mellon spokesperson as saying it is "misinformation" that investors make the decisions on loan modifications).

n71. See, e.g., Kurt Eggert, Comment on Michael A. Stegman et al.'s "Preventive Servicing Is Good for Business and Affordable Homeownership Policy": What Prevents Loan Modifications, 18 Housing Pol'y Debate 279, 287 (2007) [hereinafter Eggert, Stegman Comment]; Levitin & Twomey, supra note 24, at 29 (discussing compensation structure of servicing industry); see also Cordell et al., supra note 48, at 18; Bernanke, Speech at Federal Reserve, supra note 4 ("The rules under which servicers operate do not always provide them with clear guidance or the appropriate incentives to undertake economically sensible modifications."); Discussion Paper on the Impact of Forborne Principal on RMBS Transactions, Am. Securitization Forum 1 (June 18, 2009) [hereinafter Am. Securitization Forum, Discussion Paper], http://www.americansecuritization.com/uploadedFiles/ASF_Principal_Forbearance_Paper.pdf (noting that servicers are largely left to their own discretion in determining what kinds of modifications to approve).

n72. See, e.g., Complaint, Carrington, supra note 61, at 15 (alleging that servicer's rapid liquidation of homes instead of pursuing modifications hurts investors due to the depressed foreclosure sales prices of the homes); cf. Eggert, Stegman Comment, supra note 71, at 287 ("While preventive servicing can at times help both borrowers and investors, servicers' self-interest can sometimes harm borrowers, even at investors' expense.").

n73. See Shenn, supra note 62 (reporting on letters sent to trustees of mortgage pools on behalf of a majority of the investors in the pool).

n74. Letter from Kathy D. Patrick to Countrywide Home Loans Servicing, supra note 68, at 3, 4 (notifying a trust and master servicer of breaches in the master servicer's performance).

n75. See Bernanke, Speech at Federal Reserve, supra note 4 ("The rules under which servicers operate do not always provide them with clear guidance or the appropriate incentives to undertake economically sensible modifications."); Zhang, supra note 13, at 32-33; cf. White, supra note 8, at 1 (reporting that lenders lose an average of $ 145,636 on every foreclosure but only $ 52,195 on a modification).

n76. OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 50.

n77. See Jeremy Schneider & Chuye Ren, Standard & Poor's, Ratings Direct, Analysis of Loan Modifications and Servicer Reimbursements for U.S. RMBS Transactions with Senior/Subordinate Tranches 2 (Apr. 10,

86 Wash. L. Rev. 755, *

2008) (indicating that servicer use of capitalization modifications to reimburse servicers for modification expenses is a suspect accounting practice and may subject the pool to a credit rating downgrade).

n78. Rod Dubitsky et al., Credit Suisse, Subprime Loan Modifications Update 6-7 (2008); Andrew Haughwout et al., Second Chances: Subprime Mortgage Modification and Re-Default 30 (Fed. Reserve Bank of N.Y., Staff Report No. 417, rev. 2010), http://www.newyorkfed.org/research/staff_reports/sr417.pdf; Pendley et al., supra note 17, at 16; Huang et al., supra note 13, at 9, 10; Hassan Shamji & Bulat Mustafin, Measure of Modifications: A Look Across Servicers, Moody's ResiLandscape 11, 12 (Feb. 1, 2011) ("If this capitalization is large enough, it can outweigh benign changes such as rate reductions and term extensions.").

n79. See generally infra Parts III.E.1, III.E.3.

n80. See Jeff Horwitz, A Servicer's Alleged Conflict Raises Doubts About "Skin in the Game' Reforms, Am. Banker, Feb. 25, 2011 at 1.

n81. See Servicers Earn More Per Loan, MortgageDailyNews.com, June 29, 2010 (on file with author); Problems in Mortgage Servicing, supra note 25, at 19-33 (written testimony of Diane E. Thompson); cf. Adelino et al., supra note 25, at 4 ("In addition, the rules by which servicers are reimbursed for expenses may provide a perverse incentive to foreclose rather than modify."). See generally infra text accompanying footnotes 114-341.

n82. See Problems in Mortgage Servicing, supra note 25, at 19-33 (written testimony of Diane E. Thompson); cf. Adelino et al., supra note 25, at 4 ("In addition, the rules by which servicers are reimbursed for expenses may provide a perverse incentive to foreclose rather than modify."). See generally infra text accompanying footnotes 114-341.

n83. See infra text accompanying footnotes 230-249.

n84. See generally infra Part III.E.

n85. See, e.g., Am. Securitization Forum, Statement of Principles, supra note 46, at 3 (reporting that limits contained in the PSA on loan modifications may usually be waived either by bond insurers or credit rating agencies; only in rare cases is investor consent required to waive the cap and in no case is investor consent required to approve an individual loan modification otherwise permitted by the PSA); John P. Hunt, Loan Modification Restrictions in Subprime Securitization Pooling and Servicing Agreements from 2006: Final Results, Berkeley Law 4, 6 [hereinafter Hunt, Loan Modification Restrictions], http://www.law.berkeley.edu/files/bclbe/Subprime_Securitization_Paper_John_Hunt_7.2010.pdf (last visited Oct. 30, 2011) (finding that 52% of the PSAs expressly permitting modification require consent of rating agency, insurer or trustee; in 32.5% of the PSAs implicitly allowing modification, bond insurer must give consent if the servicer seeks to modify more than 5% of the loans in the pool).

n86. Investor Comm. of the Am. Securitization Forum, Mortgage investors endorse Treasury Department's Guidance on Accounting Treatment of Foreborne Principal 3 (2009) (citing potential rating agency downgrades as proof of the "intent and expectations of parties to the securitization").

n87. See, e.g., Eggert, Limiting Abuse, supra note 39, at 763-66 (chronicling the involvement of the ratings agencies in the reform of servicing practices at Fairbanks Capital Corporation).

n88. See, e.g., Renuart & Keest, supra note 33, at 680; Peterson, supra note 27, at 2204.

86 Wash. L. Rev. 755, *

n89. See, e.g., Engel & McCoy, supra note 30, at 2047.

n90. See supra text accompanying notes 34-36 (discussing how bonds are generated from pooled loans).

n91. E.g., Peterson, supra note 27, at 2205.

n92. See, e.g., id.

n93. See, e.g., Diane Pendley et al., Criteria Report: Rating U.S. Residential Mortgage Servicers 2-3 (2006) [hereinafter Pendley et al., Criteria Report]; cf. Mason, Servicer Reporting, supra note 50, at 25-26 (pools serviced by higher-rated servicers require less credit enhancement).

n94. For example, after an investigation by the Federal Trade Commission into the servicing practices of Fairbanks Capital Corporation (currently known as Select Portfolio Servicing), Moody's Investors Service and Standard & Poor's Corporation downgraded Fairbank's servicer rating to "below average," making it impossible for the servicer to bid on new contracts. See Erick Bergquist, Fairbanks CEO Eager to Reenter Servicing Market, Am. Banker, May 14, 2004, at 1. Fairbanks was later able to resume bidding for new business when its servicer rating was changed to "average." Id.

n95. See, e.g., Laidlaw et al., supra note 45, at 2 (bond insurers may be involved in oversight of the servicer); id. at 3 (bond insurers must be notified in the event of servicer default or termination); id. at 5 (bond insurer can initiate servicer termination).

n96. Eggert, Held Up in Due Course, supra note 35, at 540, 541; see Peterson, supra note 27, at 2205-06 (discussing internal credit enhancement, for example, dividing the loan pool up into classes which receive payment in descending order of risk, and external enhancement, including insurance).

n97. See, e.g., Christine Richard, Ambac, MBIA Lust for CDO Returns Undercut AAA Success (Update 2), Bloomberg (Jan. 22, 2008, 5:28 PM), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aw1Oh4B0Wvv8.

n98. Norwegian pension funds were among the many institutions devastated by the collapse of the subprime market. See, e.g., Sean O'Grady, The Books Cashing in on the Crash, Independent (Nov. 20, 2009), http://www.independent.co.uk/arts-entertainment/books/features/the-books-cashing-in-on-the-crash-1823810.html. For an amusing and accurate explanation of how Norwegian pension funds were brought down by subprime securitization, see Subprime Primer: Stick Figures Explain Economic Collapse, Boing Boing (Feb. 26, 2008, 10:41 PM) http://boingboing.net/2008/02/26/subprime-primer-stic.html (follow "Link" hyperlink).

n99. Peterson, supra note 27, at 2206.

n100. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at S-113 to S-114; Laidlaw et al., supra note 45, at 2.

n101. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at S-113 to S-114 (authorizing the bond insurers to enforce the PSA and to waive limitations on modifications contained in the PSA).

n102. Cf. Engel & McCoy, supra note 30, at 2048 (noting that insurance is provided to raise tranche rating to AAA).

n103. The Roles of the SEC and the FASB in Establishing GAAP: Hearing Before the Subcomm. on Capital Mkts., Ins., and Gov't Sponsored Enters. of the H. Comm. on Fin. Servs., 107th Cong. 1-2 (2002) (statement of Robert K. Herdman, Chief Accountant, U.S. Securities & Exchange Commission); Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, Securities Release Act No. 33-8221, Exchange Act Release No. 34-47743, Investment Company Act Release No. 26028, *68 Fed. Reg. 23,333* (May 1, 2003).

n104. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at 83 (requiring compliance with generally accepted accounting principles sufficient to retain REMIC status).

n105. The FASB recently completed a five-year project of codifying all previously issued Financial Accounting Statements. See FASB Codification Expected to Become Single Source of Authoritative U.S. GAAP on July 1, 2009, Fin. Acct. Standards Bd., http://www.fasb.org/cs/ContentServer?c=Document_C&pagename=FASB%2FDocument_C%2FDocumentPage &cid=1176156244073 (last visited Oct. 30, 2011). The codification process did not change the substance of the discussed statements, but did change the organizational structure. Id.

n106. For example, FAS 140 is 102 pages long, but the REMIC rules are easily read in one sitting. Compare Accounting for Transfers and Servicing of Fin. Assets and Extinguishments of Liabs., Statement of Fin. Accounting Standards No. 140, §§35, 42-43 (Fin. Accounting Standards Bd. 2000), with *26 C.F.R. § 1.860-1 to 1.860-5 (2011)*.

n107. See, e.g., Stanley Siegel & David A. Siegel, Accounting and Financial Disclosure: A Guide to Basic Concepts 1 (1983) ("Accounting is the process of accumulating information concerning assets, liabilities, revenues and expenses, and summarizing and presenting the results in various forms.").

n108. See *I.R.C. § 860(i)* (2006).

n109. See *Inside Mortgage Finance, supra* note 32, at 9 (2010).

n110. See, e.g., Milton A. Vescovacci, Servicing Real Estate Mortgage Investment Conduits in U.S. Mortgage Securitizations, World Servs. Grp. (Nov. 2006), available at https://worldservicesgroup.com/publications.asp?action=article&artid=1598 (discussing the disastrous consequences of non-compliance with the tax rules).

n111. See, e.g., Piskorski et al., supra note 59, at 1 n.5.

n112. See, e.g., Mary Kelsch et al., Fitch Ratings, Impact of Financial Condition on U.S. Residential Mortgage Servicer Ratings 2 (2007); Ocwen Fin. Corp., supra note 52, at 5.

n113. See infra text accompanying notes 225-242, 305-308.

n114. See Ocwen Fin. Corp., supra note 52, at 30.

Servicing continues to be our most profitable segment, despite absorbing the negative impact, first, of higher delinquencies and lower float balances that we have experienced because of current economic conditions and, se-

86 Wash. L. Rev. 755, *

cond, of increased interest expense that resulted from our need to finance higher servicing advance balances. Lower amortization of MSRs [mortgage servicing rights] due to higher projected delinquencies and declines in both projected prepayment speeds and the average balance of MSRs offset these negative effects. As a result, income ... improved by [$ 52,107,000], or 42% in 2008 as compared to 2007.

Id.

n115. E.g., Accounting by Debtors and Creditors for Troubled Debt Restructurings, Statement of Fin. Accounting Standards No. 15, at 33 (Fin. Accounting Standards Bd. 1977) [hereinafter FAS 15] (requiring loss recognition upon permanent modification); Piskorski et al., supra note 59, at 2 (noting that servicers may delay foreclosure in order to avoid accounting losses); MBS Losses Grow Murky as Defaults Rocket, Asset Backed Alert (Sept. 11, 2009), http://www.abalert.com/headlines.php?hid=142183 ("Losses aren't recorded by a servicer until a mortgage is liquidated.").

n116. Cf. John Rao & Geoff Walsh, Foreclosing a Dream: State Laws Deprive Homeowners of Basic Protections, Nat'l Consumer L. Ctr., Feb. 2009, at 1, 11-12, available at http://www.nclc.org/images/pdf/foreclosure_mortgage/state_laws/foreclosing-dream-report.pdf (discussing the need for judicial foreclosure processes to ensure that homeowners are not improperly foreclosed on); Zhang, supra note 13 (finding that the foreclosure rate in states with judicial foreclosure processes dropped nearly eighty percent, perhaps because of the longer time to foreclose).

n117. See Press Release, Paul A. Koches, Exec. Vice President, Gen. Counsel and Sec'y, Ocwen Fin. Corp. (Feb. 25, 2010) (on file with author) ("Losing [mortgage servicing rights], in an environment where there are no new mortgage securitizations on which to bid for servicing rights, is damaging.").

n118. See, e.g., Ocwen Fin. Corp., supra note 52, at 4-5, 12 (describing measures that Ocwen uses to avoid foreclosure processes and keep loans current).

n119. See Piskorski et al., supra note 59, at 28 (surveying the range of approaches a servicer may take when facing a delinquent loan).

n120. See, e.g., Thomas A. Humphreys, Tales from the Credit Crunch: Selected Issues in the Taxation of Financial Instruments and Pooled Investment Vehicles, 7 J. Tax'n Fin. Products 33, 41-42 (2008); Cordell et al., supra note 48, at 23-24; J.M. Collins & C.K. Reid, Who Receives a Mortgage Modification? Race and Income Differentials in Loan Workouts 4 (Jan. 2011), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1743159 (follow "One-Click Download" hyperlink); Weise, supra note 70.

n121. See Humphreys, supra note 120, at 41-42.

n122. 26 C.F.R. § 1.860G-2(b)(3)(i) (2011).

n123. Rev. Proc. 2008-28, § 3.07, at 2; Rev. Proc. 2007-72, § 3.07, at 2.

n124. Rev. Proc. 2008-28, § 5.04, at 3; Rev. Proc. 2007-72, § 3, at 2.

n125. Am. Securitization Forum, Discussion Paper, supra note 71, at 1.

n126. See Vescovacci, supra note 110.

86 Wash. L. Rev. 755, *

n127. See, e.g., Cordell et al., supra note 48, at 23-24; Collins & Reid, supra note 120, at 4; Weise, supra note 70.

n128. E.g., Cong. Oversight Panel, 111th Cong., Foreclosure Crisis: Working Toward a Solution 44 (2009) [hereinafter Cong. Oversight Panel, Foreclosure Crisis]; John P. Hunt, What Do Subprime Securitization Contracts Actually Say About Loan Modification?: Preliminary Results and Implications, Berkeley Ctr. for Law, Bus., & Econ., Mar. 25, 2009, at 6-7, [hereinafter Hunt, What Do Subprime Securitization Contracts Actually Say?], available at http://www.law.berkeley.edu/files/bclbe/Subprime_Securitization_Contracts_3.25.09.pdf.

n129. See, e.g., Gelpern & Levitin, supra note 49, at 1077.

n130. Eggert, Stegman Comment, supra note 71, at 287.

n131. See Am. Securitization Forum, Statement of Principles, supra note 46, at 2 ("Most subprime transactions authorize the servicer to modify loans that are either in default, or for which default is either imminent or reasonably foreseeable."); Adelino et al., supra note 25, at 24 (summarizing several different studies finding no meaningful PSA restrictions in a majority of securitizations reviewed); Cordell et al., supra note 48, at 22 (reporting that of 500 different PSAs under which a large servicer operated, 48% had no limitations on modifications other than that they maximize investor return; only 7.5% of the PSAs had meaningful limits on the types of modifications a servicer could authorize); Rod Dubitsky et al., Credit Suisse, The Day After Tomorrow: Payment Shock and Loan MOdifications 5 (2007) (finding that over half of all PSAs surveyed contain no restrictions on loan modifications other than they be in the investor's interests; of those that contain restrictions on modifications, most are only as to the frequency of either individual modifications or of modifications in the pool as a whole); Hunt, Loan Modification Restrictions, supra note 85, at 2 (noting that only eight percent of subprime contracts reviewed barred modifications); Hunt, What Do Subprime Securitization Contracts Actually Say?, supra note 128, at 7 (discussing various limitations and quantifying the frequency of limitations).

n132. See Cordell et al., supra note 48, at 18-19; Mason, Servicer Reporting, supra note 50, at 14-15; Hunt, What Do Subprime Securitization Contracts Actually Say?, supra note 128, at 8.

n133. See Mason, Servicer Reporting, supra note 50, at 14-15.

n134. Investor Comm. of the Am. Securitization Forum, supra note 86, at 2.

n135. Mason, Servicer Reporting, supra note 50, at 16, 56 (discussing reasons for five percent limitation).

n136. Monica Perelmuter & Waqas I. Shaikh, Standard & Poor's, Criteria: Revised Guidelines for U.S. RMBS Loan Modification and Capitalization Reimbursement Amounts 3 (Oct. 11, 2007).

n137. Id.

n138. Moody's Investors Service, Moody's: No Negative Ratings Impact from RFC Loan Modification Limits Increases (May 25, 2008).

n139. Cong. Oversight Panel, Foreclosure Crisis, supra note 128, at 44. The Congressional Oversight Panel was created by Congress in 2008 to "review the current state of financial markets and the regulatory system." See About the Congressional Oversight Panel, Cong. Oversight Panel, http://cybercemetery.unt.edu/archive/cop/20110401223216/http://cop.senate.gov/about/ (last visited Oct. 31, 2011) (archived by the University of North Texas).

86 Wash. L. Rev. 755, *

n140. Hunt, What Do Subprime Securitization Contracts Actually Say?, supra note 128, at 6-7.

n141. Morgan Stanley Omnibus Amendment (Aug. 23, 2007) (on file with author). The securitization's sponsor in this case likely held some equity interest in the securitization.

n142. See, e.g., Complaint at 2, Greenwich Fin. Servs. Distressed Mortg. Fund 3, LLC v. Countrywide Fin. Corp., No. 650474/2008 (N.Y. Sup. Ct. Dec. 1, 2008), available at http://www.housingwire.com/wp-content/uploads/2008/12/countrywide-class-action-complaint.pdf. The suit filed by investors against Countrywide is often cited as a counterexample, yet that suit was not about the ability of Countrywide to make modifications but the requirement that it repurchase loans it originated. Id. Countrywide had agreed to modify the subject loans in response to a suit by several states' attorneys general, alleging unfair and deceptive acts and practices in loan origination. Id.; Adelino et al., supra note 25, at 4 (reporting that of more than 800 suits filed by investors by the end of 2008, not a single one questioned the right of a servicer to make a loan modification).

n143. See, e.g., Preserving Homeownership: Progress Needed to Prevent Foreclosures: Hearing Before the S. Comm. on Banking, Hous. & Urban Affairs, 111th Cong. (July 16, 2009) [hereinafter Preserving Homeownership] (testimony of Curtis Glovier, Managing Director, Fortress Investment Group, on behalf of the Mortgage Investors Coalition); Weise, supra note 70, at 3 (quoting managing director of brokerage securities firm as saying investors would prefer to see more modifications). See generally Letter from Kathy D. Patrick to Countrywide Home Loans Servicing, supra note 68; Shenn, supra note 62.

n144. See, e.g., 15 U.S.C. § 1639a (Supp. III 2009) (rewriting earlier servicer safe harbor provision enacted by the Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1403, 122 Stat. 2654 (2008)).

n145. Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Fin. Accounting Standards No. 140 (Fin. Accounting Standards Bd. 2000).

n146. Accounting by Debtors and Creditors for Troubled Debt Restructurings, Statement of Fin. Accounting Standards No. 15 (Fin. Accounting Standards Bd. 1977).

n147. Accounting by Creditors for Impairment of a Loan, Statement of Fin. Accounting Standards No. 114 (Fin. Accounting Standards Bd. 1993) (amending FASB Statement Nos. 5 and 15).

n148. FAS 140 Implications of Restructurings of Certain Securitized Residential Mortgage Loans, Mortg. Bankers Ass'n 2 [hereinafter FAS 140, Mortg. Bankers Ass'n], http://www.mortgagebankers.org/files/News/InternalResource/55315_MBAPositionPaperonFAS140Restructurti ngs.pdf (last visited Oct. 31, 2011).

n149. Id.

n150. Id.

n151. See, e.g., Neal Newman, Enron and the Special Purpose Entities - Use or Abuse? - The Real Problem - The Real Focus, 13 L. & Bus. Rev. Am. 97, 111-12 (2007).

86 Wash. L. Rev. 755, *

n152. Letter from Christopher Cox, Chairman, SEC, to Barney Frank, Chairman, House Comm. Fin. Servs. (July 24, 2007), available at http://democrats.financialservices.house.gov/FinancialSvcsDemMedia/file/key_issues/Predatory_Subprime_Mortgage_Lending/SEC%20letter%20072407.pdf; Letter from Conrad Hewitt, Chief Accountant, SEC, to Arnold Hanish, Chairman, Comm. on Corporate Reporting, Fin. Execs. Int'l, & Sam Ranzilla, Chairman, Prof'l Practice Exec. Comm., Ctr. for Audit Quality 3-4 (Jan. 8, 2008), available at http://www.sec.gov/info/accountants/staffletters/hanish010808.pdf.

n153. Accounting for Transfers of Financial Assets, Statement of Fin. Accounting Standards No. 166, at 81 (Fin. Accounting Standards Bd. 2009) [hereinafter FAS 166] (amending FASB Statement No. 140,§§A29-A30 (2009)). See generally Meghan Crowe & Christopher D. Wolfe, Fitch Ratings, Off-Balance Sheet Accounting Changes: SFAS 166 and SFAS 167 (2009) (discussing the expansion of servicer discretion).

n154. Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, Statement of Fin. Accounting Standards No. 140, at 15 (Fin. Accounting Standards Bd. 2000) (replacing FASB Statement No. 125§§35, 42-43); Stephen G. Ryan, Accounting In and for the Subprime Crisis 35 (Mar. 2008) (unpublished essay), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1115323 (follow "One-Click Download" hyperlink).

n155. Cf. Am. Securitization Forum, Streamlined Foreclosure and Loss Avoidance Framework for Securitized Subprime Adjustable Rate Mortgage Loans 9-10 (2007) [hereinafter Am. Securitization Forum, Streamlined Foreclosure].

n156. See Letter from Christopher Cox to Barney Frank, supra note 152; Letter from Conrad Hewitt to Arnold Hanish & Sam Ranzilla, supra note 152.

n157. See FAS 140, Mortg. Bankers Ass'n, supra note 148, at 5 n.13 (noting that the accounting standards for default are consistent with the REMIC definition).

n158. This restriction on modification builds on the American Securitization Forum's definition of "reasonably foreseeable." Ryan, supra note 154, at 35-36.

n159. See Letter from Conrad Hewitt to Arnold Hanish & Sam Ranzilla, supra note 152, at 3-4; see also Am. Securitization Forum, Streamlined Foreclosure, supra note 155, at 4-5 (applying a streamlined refinancing framework to loans where the borrower is current and able to make payments but would presumably not be able to do so after an impending rate increase).

n160. See Adelino et al., supra note 25, at 4.

n161. See Pendley & Crowe, supra note 11, at 9.

n162. Cf. Am. Securitization Forum, Discussion Paper, supra note 71, at 11-12 (discussing views of subordinate lien holders and master servicers regarding loss recognition of principal forbearance); Dubitsky et al., supra note 78, at 8 (noting a "sudden increase" in principal reduction modifications before trustees started recognizing losses at the time of modification).

n163. Cf. Tomiak & Berliner, supra note 67, at 17 (discussing how accounting treatment of interest subsidies paid in connection with HAMP can shift losses between junior and senior bond holders).

86 Wash. L. Rev. 755, *

n164. See Am. Securitization Forum, Discussion Paper, supra note 71, at 4-7.

n165. See, e.g., Tomiak & Berliner, supra note 67, at 18.

n166. See Am. Securitization Forum, Discussion Paper, supra note 71, at 3-7.

n167. See id. at 5 (discussing so-called "trigger events"); Perelmuter & Shaikh, supra note 136, at 2 (discussing cumulative loss triggers).

n168. FAS 15, supra note 115, at 11.

n169. See id. This discussion focuses on the rules governing loss recognition after a modification. A discussion of the accounting rules requiring that the value of loans and other assets be reflected at market value, or the mark-to-market rules, are beyond the scope of this piece.

n170. See, e.g., Mason, Servicer Reporting, supra note 50, at 44-45.

n171. An informal or temporary change in the payments will not change a borrower's effective rate of borrowing on the underlying obligation, which is the test under FAS 15 as to whether a troubled-debt restructuring has occurred or not. Determining Whether a Debtor's Modification or Exchange of Debt Instruments Is Within the Scope of FASB Statement No. 15, EITF Abstract of Fin. Accounting Standards No. 02-4, at 5-6 (Fin. Accounting Standards Bd. 2002).

n172. The junior tranches in most subprime securitizations are currently cut off from receiving any principal payments due to the accumulated losses in the pool as a whole. For prime securitizations, where the distribution is based on cash flow and is not predetermined, subordinate and senior tranches may share equally in the reduction of principal payments, although subordinate tranches will continue to take the first hit on interest losses. See Am. Securitization Forum, Discussion Paper, supra note 71, at 3-6.

n173. See infra text accompanying notes 275-277 for a discussion of how servicers' incentives to perform loan modifications are influenced by a common type of junior interest: residuals.

n174. See Am. Securitization Forum, Discussion Paper, supra note 71, at 11-12 (discussing views of market participants as to the proper timing of loss recognition in principal forbearance modifications); cf. Dubitsky et al., supra note 78, at 8 (discussing delayed loss recognition for principal reduction modifications).

n175. See supra text accompanying notes 163-170.

n176. See, e.g., Investor Comm. of the Am. Securitization Forum, supra note 86, at 2; Monica Perelmuter & Jeremy Schneider, Standard & Poor's, Criteria: Structured Finance: RMBS: Methodology for Loan Modifications That Include Forbearance Plans for U.S. RMBS 2 (July 23, 2009).

n177. E.g., OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 6; Pendley & Crowe, supra note 11, at 9; Pendley et al., supra note 17, at 15.

n178. Accounting by Creditors for Impairment of a Loan, Statement of Fin. Accounting Standards No. 114, at 5-6 (Fin. Accounting Standards Bd. 1993) (amending FASB Statement Nos. 5 and 15) (excluding "debt securities" from the definition of covered loans).

86 Wash. L. Rev. 755, *

n179. Cf. *FAS 140, Mortg. Bankers Ass'n, supra* note 148 (noting that compliance with the TDR rules is necessary for maintaining status as a QSPE, or qualifying special purpose entity, the bankruptcy remote entity). The FASB has recently altered the rules protecting the bankruptcy-remote status of the trust. Instead of qualifying as a special purpose entity, all "variable interest entities" now must be reviewed to determine the extent to which the transferring entity maintains control and appropriate disclosures are provided. This is unlikely to impact the weight of the TDR rules directly, but it does change the formal mechanism by which bankruptcy-remote status is achieved and evaluated. See FAS 166, supra note 153, §§A29-A30.

n180. FAS 15, supra note 115, at 4.

n181. See Adelino et al., supra note 25, at 23-24.

n182. See FAS 15, supra note 115, at 5-6.

n183. "Many troubled debt restructurings involve modifying terms to reduce or defer cash payments required of the debtor in the near future ... ." Id. at 4. See also EITF Abstract of Fin. Accounting Standards, supra note 171, at 4-5 (listing factors indicating that the debtor is experiencing financial difficulties and stating that a debtor's ability to service the existing debt is not determinative as to whether or not the debtor is experiencing financial difficulties).

n184. See Adelino et al., supra note 25, at 23-24.

n185. Cf. William G. Murray, Jr. & Judith A. Boyle, Accounting for Troubled Debt, Cal. Real. Prop. J. (1991) (discussing the regulatory accounting principles that govern financial institutions and extend FAS 15: "Once the loan is classified as nonperforming, the lender will not be able to accrue interest on the loan... . For financial accounting purposes, the inability to accrue interest on the loan means that even though the borrower makes the required interest payment, the payment will be credited against principal and will not be treated as income to the lender ... ."; Stan Ross, What Can My Banker Be Thinking: Write-offs, Regulators, and Accountants, 389 PLI Real. 421, 439 (1993) ("If the total future payments, whether as interest or principal, are less than the recorded investment in the receivable, the receivable would be written down to an amount equal to such total future payments. As such, all future collections would be applied as a recovery of principal, and no interest would be recorded.");

n186. The author created this hypothetical.

n187. See Cordell et al., supra note 48, at 9; Pendley et al., Criteria Report, supra note 93, at 15.

n188. Pendley et al., Criteria Report, supra note 93, at 11; see also Michael Guttierez et al., Standard & Poor's, Structured Finance: Servicer Evaluations 15-16 (Sept. 21, 2004). The rating agencies do not set benchmarks for any of these, but expect servicers to develop timelines and standardized loss mitigation options for each loan product, with reference to the industry standards as developed by Fannie Mae and Freddie Mac.

n189. Pendley et al., Criteria Report, supra note 93, at 9.

n190. See, e.g., Renuart et al., supra note 40, at 102.

86 Wash. L. Rev. 755, *

n191. See, e.g., The Need for National Mortgage Servicing Standards: Hearing Before the S. Subcomm. on Hous., Transp., & Cmty. Dev., 112th Cong. 11 (2011) [hereinafter The Need for National Mortgage Servicing Standards] (written testimony of Diane E. Thompson, Of Counsel, Nat'l Consumer Law Center).

n192. See, e.g., Problems in Mortgage Servicing, supra note 25, at 28-29 (written testimony of Diane E. Thompson).

n193. See, e.g., The Need for National Mortgage Servicing Standards, supra note 191, at 7-14 (written testimony of Diane E. Thompson).

n194. See generally Katherine Porter, Misbehavior and Mistake in Bankruptcy Mortgage Claims, 87 Tex. L. Rev. 121, 144-68 (2008) (reporting that servicers appear to be imposing often improper default-related fees on borrowers in bankruptcy proceedings).

n195. As fees rise, they are added to the principal balance that must be repaid. The result often is that homeowners can no longer afford the monthly payment necessary to repay the loan. Additionally, servicers sometimes demand payment of these fees upfront, a request that becomes impossible to satisfy as the fees mount into the thousands of dollars. Finally, many modification programs put a limit on how far in arrears a homeowner may be, including the capitalized fees. See, e.g., Problems in Mortgage Servicing, supra note 25, at 8 (statement of Donald Bisenius, Executive Vice President, Freddie Mac) (noting that it is harder to bring a borrower current the more delinquent the borrower is); Problems in Mortgage Servicing, supra note 25, at 10-11, 14 (written testimony of Diane E. Thompson); cf. Shamji & Mustafin, supra note 78, at 12 (noting that capitalization of fees can doom a modification to re-default).

n196. See, e.g., Chase Funding Loan Acquisition Trust, Prospectus Supplement, 34 (2004), available at http://www.sec.gov/Archives/edgar/data/825309/000095011604003012/four24b5.txt ("The Servicer will be entitled to deduct from related liquidation proceeds all expenses reasonably incurred in attempting to recover amounts due on defaulted loans and not yet repaid, including payments to senior lienholders, legal fees and costs of legal action, real estate taxes and maintenance and preservation expenses.").

n197. See Problems in Mortgage Servicing, supra note 25, at 8 (statement of Donald Bisenius) ("The dual track process enables commencement of the foreclosure process, so that ... the servicer can move forward with the foreclosure as expeditiously as possible ... ."); cf. Pendley et al., Criteria Report, supra note 93, at 11-12 (discussing the importance of timelines for processing a foreclosure and a parallel track for loan modifications and foreclosures).

n198. Adelino et al., supra note 25, at 5-6.

n199. Cf. Engel & McCoy, supra note 30, at 2073-74 (discussing limitations of recourse agreements, including litigation risk, frequent insolvency of originators, and reliance on substitution in place of repurchase). Many PSAs allow substitution of loans in place of repurchase, but these time limitations on substitution are usually limited to two years, to protect REMIC status. See, e.g., Ameriquest, Prospectus Supplement supra note 61, at 33.

n200. See, e.g., David Reilly, BofA's Mortgage Migraine Keeps Throbbing, Wall St. J. (May 8, 2011), http://online.wsj.com/article/SB10001424052748704810504576307612197041904.html (describing heavy costs incurred by Bank of America in repurchasing loans).

n201. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at 73.

86 Wash. L. Rev. 755, *

Notwithstanding the foregoing, in connection with a defaulted mortgage loan, the servicer, consistent with the standards set forth in the pooling and servicing agreement, sale and servicing agreement or servicing agreement, as applicable, may waive, modify or vary any term of that mortgage loan (including modifications that change the mortgage rate, forgive the payment of principal or interest or extend the final maturity date of that mortgage loan), accept payment from the related mortgagor of an amount less than the stated principal balance in final satisfaction of that mortgage loan, or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any mortgagor if in the servicer's determination such waiver, modification, post-ponement or indulgence is not materially adverse to the interests of the securityholders (taking into account any estimated loss that might result absent such action).

Id. Empirical evidence suggests that repurchase requirements are waived in the vast majority of cases; less than two percent of the loans that go into default in the first months of placement in securitization are repurchased. Manuel Adelino et al., What Explains Differences in Foreclosure Rates? A Response to Piskorski, Seru, and Vig 11 (Fed. Reserve Bank of Bos., Working Paper No. 10-02, 2010).

n202. See Piskorski et al., supra note 59, at 27 (stating that a "substantial fraction" of repurchased loans were resecuritized within six months).

n203. The Countrywide securitizations are the most famous example of repurchase requirements and were widely believed to be difficult to modify because of the repurchase requirements in those securitizations. See, e.g., Mason, Servicer Reporting, supra note 50, at 55. In mid-2007, the repurchase agreement was removed from Countrywide securitizations, suggesting to at least some observers that the original drafting was an inadvertent failure to distinguish among types of modifications. See, e.g., Gretchen Morgenson, Assurances on Buybacks Cost a Lender, N.Y. Times, Aug. 23, 2007, at C1 (reporting that as of April 1, 2007, Countrywide's securitiza-tion agreements removed the buyback requirement).

n204. See Adelino et al., supra note 201, at 12 (discussing prevalence of resecuritization of repurchased loans generally).

n205. See, e.g., Verified Petition at 3, In re Bank of N.Y. Mellon No. 651786/2011 (N.Y. Sup. Ct. June 28, 2011) (alleging that Countrywide undertook to comply with "customary and usual" industry servicing stand-ards); Cordell et al., supra note 48, at 19; Mason, Servicer Reporting, supra note 50, at 14-15; Hunt, What Do Subprime Securitization Contracts Actually Say?, supra note 128, at 8 (discussing various limitations and quan-tifying the frequency of limitations).

n206. Investors in particular may stand to benefit from principal reductions, because they reduce re-default rates on loan modifications the most. See, e.g., Shamji & Mustafin, supra note 78, at 13 (suggesting that re-default rates can be brought down by an increase in the number of principal reduction modifications done).

n207. See, e.g., OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 49-50 (showing that fewer modifications with principal reduction are done than any other kind of modification); Brady Dennis, Ahead of Mortgage Settlement Talks, Banks Offer to Change Their Ways, Wash. Post, Mar. 29, 2011, at 1 (reporting that bank's counterproposal to fifty-state attorney general coalition does not include principal reductions as banks "have questioned the fairness and the massive cost of being forced to write down a significant number of loans").

n208. See generally infra Part III.E.3.

n209. The Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) create liquidity in the credit markets - and set the terms on which credit is issued, in

86 Wash. L. Rev. 755, *

many instances - through their purchase of debt instruments and securities on the secondary market. Fannie Mae and Freddie Mac are the principal actors in the secondary market for prime and near-prime rate home mortgage loans. See Renuart et al., supra note 40, at 109-10; 2 Inside Mortgage Finance, The 2010 Mortgage Market Statistical Annual 9, 10.

n210. Making Home Affordable is the Obama Administration's umbrella name for its anti-foreclosure initiative. See Making Home Affordable, http://www.makinghomeaffordable.gov (last visited on Nov. 1, 2011).

n211. See Announcement 08-20, Fannie Mae, Increase in Incentive Fees for Loss Mitigation Alternatives 2-3 (Aug. 11, 2008), available at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2008/0820.pdf (compensating servicers $ 700 for loan modifications and $ 1000 to $ 1500 for short sales); Bulletin from Freddie Mac to all Freddie Mac Sellers and Servicers 3-4 (July 31, 2008), http://www.freddiemac.com/sell/guide/bulletins/pdf/bll073108.pdf (compensating servicers $ 800 for loan modifications and $ 2200 for short sales); Supplemental Directive 09-09 Revised, U.S. Dep't of the Treasury, Home Affordable Foreclosure Alternatives - Short Sale and Deed-in-Lieu of Foreclosure Update 1 (Mar. 26, 2010), available at https://www.hmpadmin.com/portal/programs/docs/hafa/sd0909r.pdf (introducing the Home Affordable Foreclosure Alternatives program, which "provides financial incentives to servicers and borrowers who utilize a short sale or a deed-in-lieu to avoid a foreclosure").

n212. See Letter from Charles E. Schumer, U.S. Senator, to Daniel Mudd, CEO of Fannie Mae, and Richard Syron, CEO of Freddie Mac (Feb. 6, 2008) (on file with author).

n213. See infra text accompanying notes 228-230 (discussing bond insurers de facto regulation of these kinds of modifications). Although few principal reduction modifications have been executed to date, the evidence suggests that they perform better over time. See, e.g., Dubitsky et al., supra note 78, at 6-7; Haughwout et al., supra note 78, at 24; Pendley et al., supra note 17, at 16.

n214. See Moody's Investors Service, supra note 138 (stating that it will not downgrade ratings on several pools with increased limits on the number of modifications since Moody's believes "that the judicious use of loan modifications can be beneficial to securitization trusts as a whole").

n215. See Pendley et al., Criteria Report, supra note 93, at 11, 15; see also supra notes 187-194 and accompanying text.

n216. See Pendley et al., Criteria Report, supra note 93, at 11-12.

n217. See, e.g., Perelmuter & Shaikh , supra note 136, at 3; Schneider & Ren, supra note 77.

n218. Schneider & Ren, supra note 77.

n219. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at 71, 73.

n220. See Horwitz, supra note 80, at 3.

n221. E.g., Perelmuter & Schneider, supra note 176, at 2.

n222. See Laidlaw et al., supra note 45, at 2-3, 5.

n223. See infra text accompanying notes 265-266 (discussing residual interests).

n224. See supra text accompanying notes 169-170 (discussing accounting treatment of temporary forbearance agreements); cf. Perelmuter & Schneider, supra note 176, at 1-2 (discussing the need to address forbearance agreements that defer principal to the end of the loan term).

n225. E.g., Peterson, supra note 27, at 2205.

n226. See Dubitsky et al., supra note 78, at 8 (reporting opposition from AAA rated tranches to principal reduction modifications when losses from principal reduction spread evenly through all tranches).

n227. See Mason, Servicer Reporting, supra note 50, at 4, 44-45.

n228. Cf. Am. Securitization Forum, Discussion Paper, supra note 71, at 1 (noting that most PSAs fail to address how to account for forborne principal).

n229. See Dubitsky et al., supra note 78, at 8.

n230. See id.

n231. See id.

n232. See *In re Stewart, 391 B.R. 327, 336 (Bankr. E.D. La. 2008)* (providing overview of servicer compensation), aff'd, *No. 08-3225, 2009 WL 2448054* (E.D. La. Aug. 7, 2009), vacated on other grounds, *647 F.3d 553 (5th Cir. 2011).*

n233. See supra text accompanying notes 55-57.

n234. See, e.g., CWALT, Inc., Prospectus Supplement 53 (Oct. 25, 2005) ("In addition, generally the master servicer or a sub-servicer will retain all prepayment charges, assumption fees and late payment charges, to the extent collected from mortgagors ... ."). But see IndyMac, Prospectus Supplement, supra note 34, at S-12 (noting that late payment fees are payable to a certificate holder in the securitization).

n235. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at S-74 ("In connection with the servicing of defaulted Mortgage Loans, the Servicer may perform certain default management and other similar services (including, but not limited to, appraisal services) and may act as a broker in the sale of mortgaged properties related to those Mortgage Loans. The Servicer will be entitled to reasonable compensation for providing those services, in addition to the servicing compensation described in this prospectus supplement.").

n236. See *In re Stewart, 391 B.R. at 343 n.34* ("While a $ 15.00 inspection charge might be minor in an individual case, if the 7.7 million home mortgage loans Wells Fargo services are inspected just once per year, the revenue generated will exceed $ 115,000,000.00."); Complaint for Permanent Injunction and other Equitable Relief at 6-7, FTC v. Countrywide Home Loans, Inc., No. CV10 4193 (C.D. Cal. June 7, 2010) [hereinafter Complaint, Countrywide], available at http://www.ftc.gov/os/caselist/0823205/100607countrywidecmpt.pdf.

n237. See, e.g., Eggert, Limiting Abuse, supra note 39, at 758; Gretchen Morgenson, Dubious Fees Hit Borrowers in Foreclosures, N.Y. Times, Nov. 6, 2007, at A1 (reporting that Countrywide received $ 285 million in revenue from late fees in 2006); Ocwen Fin. Corp., supra note 52, at 34 (noting that revenue from late charges

86 Wash. L. Rev. 755, *

reported as nearly $ 46 million in 2008 and, including loan collection fees, made up almost eighteen percent of Ocwen's 2008 servicing income).

n238. Ocwen is used as an example because it is a free-standing, publicly traded company that specializes in servicing, which makes its reporting more accessible and transparent than that of many of the other large servicers. In 2009, Ocwen ranked as the twenty-first largest servicer and the seventh largest subprime servicer. 1 Inside Mortgage Finance, The 2010 Mortgage Market Statistical Annual 174, 253.

n239. See, e.g., Chase Funding Loan Acquisition Trust, Prospectus Supplement, supra note 196, at 34 ("The Servicer will be entitled to deduct from related liquidation proceeds all expenses reasonably incurred in attempting to recover amounts due on defaulted loans and not yet repaid, including payments to senior lienholders, legal fees and costs of legal action, real estate taxes and maintenance and preservation expenses.").

n240. See Adelino et al., supra note 25, at 4 ("In addition, the rules by which servicers are reimbursed for expenses may provide a perverse incentive to foreclose rather than modify."). Under the Department of the Treasury's Home Affordable Modification Program, servicers are required to waive unpaid late fees for eligible borrowers, but all other foreclosure related fees, including, presumably, paid late fees, remain recoverable and are capitalized as part of the new principal amount of the modified loan. See Home Affordable Modification Program, Supplemental Directive 09-01: Introduction of the Home Affordable Modification Program, Making Home Affordable 22 (Apr. 6, 2009), available at http://reaction.orrick.com/reaction/email/pdf/SupplementalDirective09-01.pdf.

n241. Goodman, Lucrative Fees, supra note 68 ("So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue - fees for insurance, appraisals, title searches and legal services.").

n242. See Jones v. Wells Fargo Home Mortg., 366 B.R. 584, 595 (Bankr. E.D. La. 2007), aff'd, 391 B.R. 577 (E.D. La. 2008) (noting that diversion of mortgage payments to cover inspection charges led to increased deficiency and imperiled bankruptcy plan); Porter, supra note 194, at 131-32.

n243. See Peter S. Goodman, Homeowners and Investors May Lose, But the Bank Wins, N.Y. Times, July 30, 2009, at A3 [hereinafter Goodman, Homeowners and Investors May Lose] (describing Bank of America's refusal to entertain three separate short sale offers during two years of non-payment while its affiliate continues to assess property inspection fees).

n244. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at S-74 (noting that the servicer is entitled to retain the costs of managing properties related to defaulted loans, including brokering the sale of the property).

n245. Cf. Home Affordable Foreclosures Alternatives Program: Overview, Making Home Affordable, https://www.hmpadmin.com/portal/programs/foreclosure_alternatives.jsp (last visited Nov. 1, 2011) (discussing the process for conducting a short sale under the government's Making Home Affordable program).

n246. Compare IndyMac, Prospectus Supplement, supra note 34, at S-74 (noting that the servicer is entitled to retain the costs of managing properties related to defaulted loans, including brokering the sale of the property), with Home Affordable Foreclosures Alternatives Program: Overview, supra note 245 (noting that only certain fees, like brokering, will be taken off the sales price and providing that there is a set net sales price, thus imposing a cap on fees taken from the proceeds in a short sale).

n247. See Announcement 08-20, supra note 211, at 2-3; Bulletin from Freddie Mac, supra note 211, at 3-4.

86 Wash. L. Rev. 755, *

n248. See, e.g., Office of the Comptroller of the Currency & Office of Thrift Supervision, OCC and OTS Mortgage Metrics Report: Disclosure of National Bank and Federal Thrift Mortgage Loan Data, Third Quarter 2010, Off. Comptroller Currency 24 (Dec. 2010) [hereinafter OCC Metrics Report, Third Quarter 2010], http://www.ots.treas.gov/_files/490058.pdf (reporting completed short sales half the number of completed foreclosures during the fourth quarter of 2010).

n249. The real estate broker fee by itself could easily be more than twice the investors' incentive payments. For example, a real estate broker's fee is likely to run between 4.5% and 6% on a home sale, or $ 4500 to $ 6000 on a $ 100,000 home. Aleksandra Todorova, More Real Estate Brokers Are Reducing Their 6% Fees, SmartMoney (Apr. 2, 2007), http://www.smartmoney.com/personal-finance/real-estate/more-real-estate-brokers-are-reducing-their-6-fees-21 036. Investors payments typically run between $ 1000 and $ 2200. See Dubitsky et al., supra note 78, at 8.

n250. See Follow the Money, supra note 52, at 28. In 2006, one of the nation's largest subprime servicers - Ocwen Financial Corporation - reported an additional $ 48 million in revenue from float income which made up fifteen percent of its servicing income. Due to a decline in both the average float balance and yield, Ocwen's float income went down to $ 29 million in 2007 and $ 11 million in 2008. See Ocwen Fin. Corp., supra note 52, at 34; Eggert, Limiting Abuse, supra note 39, at 761.

n251. See Ocwen Fin. Corp., supra note 52, at 7.

n252. See, e.g., Deutsche Alt-A Sec., Inc., Prospectus Supplement 83 (2006) (showing that the servicer must remit as compensating interest any interest shortfall on loans prepaid in the first sixteen days of the month).

n253. See, e.g., Ocwen Fin. Corp., supra note 52, at 3 (stating that servicers typically receive fifty basis points annually on the total outstanding principal balance of the pool).

n254. Follow the Money, supra note 52, at 27; Cordell et al., supra note 48, at 15; Pennington-Cross & Ho, supra note 52, at 2.

n255. See, e.g., IndyMac, Prospectus Supplement, supra note 34, at S-12, S-71.

n256. See, e.g., Ocwen Fin. Corp., supra note 52, at 7-8.

n257. See Paul Muolo, Drop in Mortgage Debt Could Hit Servicers, Am. Banker, June 8, 2010, at 1.

n258. Vikas Bajaj & John Leland, Modifying Mortgages Can be a Tricky Business, N.Y. Times, Feb. 19, 2009, at A16 (reporting views of Credit Suisse analyst that "smaller companies ... that are under more financial pressure ... have been most aggressive in lowering payments" than larger companies, who offer weaker modifications); Press Release, Koches, supra note 117 ("Losing [the principal-based servicing fees], in an environment where there are no new mortgage securitizations on which to bid for servicing rights, is damaging.").

n259. See Am. Securitization Forum, Discussion Paper, supra note 71, at 8-9.

n260. See id. at 5-6.

n261. OCC Metrics Report, Third Quarter 2010, supra note 248, at 24.

86 Wash. L. Rev. 755, *

n262. Huang et al., supra note 13, at 10.

n263. See, e.g., Am. Securitization Forum, Discussion Paper, supra note 71, at 4-7.

n264. See, e.g., Ocwen Fin. Corp., supra note 52, at 20; *Mason, Mortgage Loan Modification, supra* note 53, at 8 ("Loan modifications ... will negatively impact residual valuations ... . Since the servicer often owns an equity stake in the trust, the servicer is bound to lose."). In some cases, the servicer may even bet against itself by purchasing a credit default swap on the pool, in which case it makes money if there is a foreclosure. See Patricia A. McCoy & Elizabeth Renuart, The Legal Infrastructure of Subprime and Nontraditional Home Mortgages, Harvard Univ. Joint Ctr. for Hous. Studies 36 (Feb. 2008), http://www.jchs.harvard.edu/publications/finance/understanding_consumer_credit/papers/ucc08-5_mccoy_renuart.pdf.

n265. See Eggert, Stegman Comment, supra note 71, at 282; *Mason, Mortgage Loan Modification, supra* note 53, at 14 (noting that servicers in a first-loss position delay instituting and completing foreclosures compared to servicers in a junior loss position); Mason, Servicer Reporting, supra note 50, at 45 (noting that servicers who hold residuals or interest-only strips resist making loan modifications).

n266. Dubitsky et al., supra note 78, at 7-8 (discussing Ocwen's delayed loss recognition in its accounting treatment of modifications involving principal reduction in 2007).

n267. Am. Securitization Forum, Discussion Paper, supra note 71, at 4-7.

n268. Perelmuter & Schneider, supra note 176, at 2.

n269. See, e.g., Investor Comm. of the Am. Securitization Forum, supra note 86, at 2; Perelmuter & Schneider, supra note 176, at 2.

n270. See *Mason, Mortgage Loan Modification, supra* note 53, at 4.

n271. Prior to 2007, there was virtually no uniformity in how servicers accounted for the value of mortgage servicing rights. David Moline, Servicing Gets a Tune Up: FASB Amends Guidance on Servicing of Financial Assets, Deloitte Heads Up, Mar. 20, 2006, at 1-2, http://www.deloitte.com/assets/Dcom-UnitedStates/Local%20Assets/Documents/us_assur_Heads%20Up%20Servicing%20of%20Financial%20Assets.pdf.

n272. Ocwen Fin. Corp., supra note 52, at 30. Ocwen's 2009 Annual Report (Form 10-K) stated:

Servicing continues to be our most profitable segment, despite absorbing the negative impact, first, of higher delinquencies and lower float balances that we have experienced because of current economic conditions and, second, of increased interest expense that resulted from our need to finance higher servicing advance balances. Lower amortization of MSRs [mortgage servicing rights] due to higher projected delinquencies and declines in both projected prepayment speeds and the average balance of MSRs offset these negative effects. As a result, income ... improved by $ 52,107[,000] or 42% in 2008 as compared to 2007.

Id. at 48.

n273. See, e.g., Ocwen Fin. Corp., supra note 52, at 22.

n274. See Mason, Servicer Reporting, supra note 50, at 7-12 (noting that it is "generally recognized" that good servicing cannot improve the quality of a loan pool and may in fact only mask problems in valuation); cf. Sara Lepro, Servicer Hedging Costs to Grow, Even If Rates Don't, Am. Banker, Mar. 30, 2010, at 1 (noting that prepayment rates are driven by market interest rates, not by servicing).

n275. See Eggert, Limiting Abuse, supra note 39, at 769 (stating that a "servicer's reputation among borrowers does not, therefore, directly affect the ability to obtain new contracts or retain existing ones").

n276. See, e.g., Lepro, supra note 274, at 1 (describing complex investment decisions made by servicers to offset any potential loss from a decline in value of mortgage servicing rights).

n277. Servicers' Collection Profits May Outweigh Cost of Defaults, Mortg. Serv. News, Dec. 28, 2010, http://www.nationalmortgagenews.com/dailybriefing/2010_249/servicers-collection-profits-1022710-1.html.

n278. Cf. Marina Walsh, Servicing Performance in 2007, Mortg. Banking, Sept. 1, 2008, available at Factiva, Doc. MTGB000020081010e4910000k (noting that "managing the MSR asset was a significant challenge for the high-default servicers" in 2007).

n279. Perelmuter & Schneider, supra note 176, at 2; see also supra text accompanying notes 264-266.

n280. See supra Part III.E.4.

n281. See, e.g., Am. Securitization Forum, Discussion Paper, supra note 71, at 3-6; Mason, Servicer Reporting, supra note 50, at 5-7.

n282. *Mason, Mortgage Loan Modification, supra* note 53, at 13.

n283. See Levitin & Twomey, supra note 24, at 24.

n284. Kelsch et al., supra note 112, at 2; Ocwen Fin. Corp., supra note 52, at 5.

n285. Cf. Wen Hsu et al., Fitch Ratings, U.S. Residential Mortgage Servicer Advance Receivables Securitization Rating Criteria 4 (2009) (finding that modifications do not appear to accelerate the rate of recovery of advances, in part because of high rates of re-default).

n286. Kelsch et al., supra note 112, at 2; Ocwen Fin. Corp., supra note 52, at 5.

n287. See Perelmuter & Schneider, supra note 176, at 2 (stating that ratings assumptions "exclude amounts, including balloon payments, that are added to the mortgage loan balance from the overcollateralization definition"); Schneider & Ren, supra note 77, at 3 (indicating that servicer use of capitalization modifications to reimburse servicers for modification expenses is a suspect accounting practice and may subject the pool to a credit rating downgrade).

n288. See, e.g., CWALT, Prospectus Supplement, supra note 234, at 47; IndyMac, Prospectus Supplement, supra note 34, at 72, 73 (limiting right of reimbursement from trust account "to amounts received representing

late recoveries of the payments for which the advances were made") (permitting principal and interest advances to be recovered from the trust's bank account); Ocwen Fin. Corp., supra note 52, at 11 ("In the majority of cases, advances in excess of loan proceeds may be recovered from pool level proceeds.").

n289. See Horwitz, supra note 80, at 1, 3.

n290. See Cordell et al., supra note 48, at 16.

n291. See, e.g., Brendan J. Keane, Moody's Investors Services, Structural Nuances in Residential MBS Transactions: Advancing 3-4 (1994) (stating that Countrywide was in some circumstances only advancing interest, not principal); Ocwen Fin. Corp., supra note 52, at 4 (advances include principal payments).

n292. See Keane, supra note 291, at 3.

n293. Servicers may also escape the requirement for advances if a borrower files for bankruptcy. Brian Rosenlund, MetWest Metropolitan W. Asset Mgmt. LLC, RMBS Research Winter 2009, at 3 (2009).

n294. Id.

n295. See, e.g., Home Foreclosures: Will Voluntary Mortgage Modification Help Families Save Their Homes? Hearing Before the Subcomm. on Commercial and Admin. Law of the H. Comm. on the Judiciary, 111th Cong. 1, 4 (2009) [hereinafter Home Foreclosures] (testimony of Alan M. White) (reporting 65% loss severity rates on foreclosures in June 2009); Amherst Sec. Grp. LP, supra note 17, at 34 (reporting loss severities approaching 100% on some subprime pools); Pendley et al., supra note 17, at 14 (reporting loss severity rates approaching 80% for subprime foreclosures).

n296. See Brian Rosenlund, supra note 293, at 10 (showing that as late as May 2009 servicers continued to advance the vast majority of payments due for delinquent loans; while advances were slowing for option ARMs and subprime loans, servicers were continuing to make advances for approximately ninety-four percent of delinquent loans in those categories). The one exception to this general rule was servicers' response to the allegations of robo-signing and other foreclosure improprieties in the fall of 2010. See Kate Berry, Pipeline: A Roundup of Credit Market News and Views, Am. Banker, Nov. 11, 2010, at 1, 2 (citing research by Amherst Securities Group, LP). Servicers used those allegations to deem the advances on many loans irrecoverable, thus justifying the cessation of the payment of advances. Id.

n297. See Hsu et al., supra note 285, at 1 (noting that advances are at the "top of the cash flow waterfall" and get paid first); Ocwen Fin. Corp., supra note 52, at 4 (same); Cordell et al., supra note 48, at 11; see also IndyMac, Prospectus Supplement, supra note 34, at 73 (servicers repaid all advances when foreclosure is concluded).

n298. See sources cited supra note 297.

n299. See, e.g., CWALT, Prospectus Supplement, supra note 234, at 47 (limiting right of reimbursement from trust account "to amounts received representing late recoveries of the payments for which the advances were made"); IndyMac, Prospectus Supplement, supra note 34, at 73 (permitting principal and interest advances to be recovered from the trust's bank account); Ocwen Fin. Corp., supra note 52, at 11 ("In the majority of cases, advances in excess of loan proceeds may be recovered from pool level proceeds.").

n300. See Perelmuter & Shaikh, supra note 136, at 4-5.

n301. See Dubitsky et al., supra note 78, at 8 (discussing how some servicers exploited then-existing imprecision in the accounting treatment of principal reduction modifications to use principal reduction modifications to halt interest advances).

n302. See source cited supra note 287.

n303. OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 50.

n304. See Horwitz, supra note 80, at 1, 3.

n305. Shamji & Mustafin, supra note 78, at 11, 12 ("If this capitalization is large enough, it can outweigh benign changes such as rate reductions and term extensions."); see also Dubitsky et al., supra note 78, at 6-7; Haughwout et al., supra note 78, at 30; Huang et al., supra note 13, at 10; Pendley et al., supra note 17, at 16.

n306. See *Mason, Mortgage Loan Modification, supra* note 53, at 4. A large subprime servicer noted in its 2007 annual report that although "the collectibility of advances generally is not an issue, we do incur significant costs to finance those advances. We utilize both securitization, (i.e., match funded liabilities) and revolving credit facilities to finance our advances. As a result, increased delinquencies result in increased interest expense." Ocwen Fin. Corp., supra note 52, at 18; see also Hsu et al., supra note 285, at 1 ("Servicer advance receivables are typically paid at the top of the cash flow waterfall, and therefore, recovery is fairly certain. However ... there is risk in these transactions relating to the timing of the ultimate collection of recoveries.").

n307. See Complaint, Carrington, supra note 61, at 14 (alleging that servicer conducted "fire sales" of foreclosed properties in order to avoid future advances and recover previously made advances); Eggert, Limiting Abuse, supra note 39, at 757 (reporting that servicers sometimes rush through a foreclosure without pursuing a modification or improperly foreclose in order to collect advances); Goodman, Lucrative Fees, supra note 68.

n308. See sources cited supra note 297.

n309. Cordell et al., supra note 48 at 17; cf. Am. Securitization Forum, Operational Guidelines for Reimbursement of Counseling Expenses in Residential Mortgage-Backed Securitizations (2008) [hereinafter Am. Securitization Forum, Operational Guidelines], available at http://www.americansecuritization.com/uploadedFiles/ASF_Counseling_Funding_Guidelines%20_5%20_20_08 .pdf (stating that payments of $ 150 for housing counseling for borrowers in default or at imminent risk of default should be treated as servicing advances and recoverable from the general securitization proceeds).

n310. See, e.g., Ocwen Fin. Corp., supra note 52, at 4.

n311. Walsh, supra note 278.

n312. See, e.g., Jeff Horwitz, Ties to Insurers Could Land Mortgage Servicers in More Trouble: Force-Placed Polices Impose Costs on Both Homeowner, Investor, Am. Banker, Nov. 10, 2010, at 3 (discussing referral fees for force-placed insurance).

n313. See Complaint, Countrywide, supra note 236, at 6-7 (alleging that Countrywide's "countercyclical diversification strategy" was built on its subsidiaries funneling the profits from marked-up default fees back to

86 Wash. L. Rev. 755, *

Countrywide); Goodman, Homeowners and Investors May Lose, supra note 243, at A3; Goodman, Lucrative Fees, supra note 68, at A1.

n314. *In re Stewart, 391 B.R. 327, 345-46 (Bankr. E.D. La. 2008),* aff'd, *No. 08-3225, 2009 WL 2448054 (E.D. La. 2009),* vacated on other grounds, *647 F.3d 553 (5th Cir. 2011);* see also Complaint, Countrywide, supra note 236, at 9 (alleging a subsidiary of Countrywide routinely marked up property preservation fees by 100%).

n315. See Alternative Mortgage Servicing Compensation Discussion Paper, Fed. Hous. Fin. Agency 8 (Sept. 27, 2011), http://www.fhfa.gov/webfiles/22663/ServicingCompDiscussionPaperFinal092711.pdf.

n316. See, e.g., Ocwen Fin. Corp., supra note 52, at 30.

n317. Id. at 13.

n318. Id. at 7.

n319. Cordell et al., supra note 48, at 16; cf. Laurie Goodman & Roger Ashworth, Alternative Compensation Arrangements for Mortgage Servicing - The Debate Begins, Amherst Mortg. Insight (Feb. 2, 2011) (arguing that default servicing is much more costly than servicing performing loans).

n320. See, e.g., Press Release, Koches, supra note 117.

n321. See Servicers' Collection Profits May Outweigh Cost of Defaults, supra note 277.

n322. See supra text accompanying note 21.

n323. See Pendley & Crowe, supra note 11, at 9.

n324. Cordell et al., supra note 48, at 10, 17 (reporting that servicers of private label securitizations do not get paid for contacts with delinquent borrowers, unlike servicers for Fannie Mae or Freddie Mac loans).

n325. Press Release, Koches, supra note 117.

n326. Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages v. 3.3, at 104 (2011) (noting that servicers are only paid "once the borrower enters into a permanent modification").

n327. Ocwen Fin. Corp., supra note 52, at 19; Michael A. Stegman et al., Preventive Servicing Is Good for Business and Affordable Homeownership Policy, 18 Housing Pol'y Debate 243, 271-73 (2007) (reporting on the staff levels of eight servicers; servicers universally employed more collectors per loan than loss mitigators; the ratio between collectors and loss mitigators ranged from a low of 1.25 to a high of twenty-five; the ratio of loss mitigators to loans ranged from one per 20,000 loans to one per 100,000 loans. If we assume a default rate of ten percent, roughly the current rate of loans seriously delinquent, the best-case scenario would be one loss mitigation specialist for every 2000 loans in default); Cordell et al., supra note 48, at 16; cf. Servicers' Collection Profits May Outweigh Cost of Defaults, supra note 277 ("Sinking money into default-servicing infrastructure does not generally bring down costs unless specifically geared toward speeding up the foreclosure process").

86 Wash. L. Rev. 755, *

n328. Dubitsky et al., supra note 78, at 5 (listing staff increases at several large subprime servicers from 2007 to 2008; servicers had year-to-year increases ranging from 20% to 100%); Preston DuFauchard, Cal. Dep't of Corp., Loss Mitigation Survey Results 4 (2007); Peter S. Goodman, Paper Avalanche Buries Plan to Stem Foreclosures, N.Y. Times, June 29, 2009, at A3 [hereinafter Goodman, Paper Avalanche] ("They need to do a much better job on the basic management and operational side of their firms" (quoting Michael Barr, Assistant Secretary of the Treasury for Financial Institutes)); Walsh, supra note 278 (stating that subprime servicers report that the ratio of staff to foreclosure fell during 2007, and reporting a servicer as saying, "We simply could not hire loss mitigation and other default staff fast enough"); Cordell et al., supra note 48, at 9-10; State Foreclosure Prevention Working Grp., Report No. 3, supra note 19, at 8; cf. Aashish Marfatia, Moody's, U.S. Subprime Market Update: November 2007, at 3 (2007) (expressing concern as to servicers' abilities to meet staffing needs).

n329. See, e.g., Complaint at 5-40, Harryman v. BAC Home Loans Servicing, LP, No. 6:10-cv-00051 (S.D. Tex. June 29, 2010) (detailing the travails of several homeowners attempting to get a loan modification).

n330. Stegman et al., supra note 327, at 271 (noting that only two of eight servicers surveyed provided bonuses for staff successfully completing workout agreements with borrowers).

n331. Guttierez et al., supra note 188, at 6 (noting that average turnover for all positions for residential mortgage servicers ranged from 15% to 25% over a six month period).

n332. Eggert, Stegman Comment, supra note 71, at 286; Jack Guttentag, New Plan to Jump-Start Loan Mods: Web Portal Would Centralize Communication, Break Logjam, Inman News (July 20, 2009), http://www.inman.com/buyers-sellers/columnists/jackguttentag/new-plan-jump-start-loan-mods.

n333. Walsh, supra note 278.

n334. Bajaj & Leland, supra note 258, at A16.

n335. Id.

n336. See State Foreclosure Prevention Working Grp., Report No. 3, supra note 19, at 12 (reporting that twenty-three percent of closed loss mitigation efforts in May 2008 were either refinancings or reinstatements in full by the borrower without any contact from the servicer); Goodman, Lucrative Fees, supra note 68, at A1 (reporting that a former Countrywide employee characterized the banks' strategy as waiting to see if the economy improved and borrowers cured on their own instead of performing modifications). For a general discussion of the value to a servicer of the possibility of the homeowner's independent cure of a default, see Adelino et al., supra note 25.

n337. See supra notes 154-55 and accompanying text.

n338. Cf. Piskorski et al., supra note 59, at 12 (finding that the difference between foreclosure rates for loans held in portfolio and securitized loans increases during periods of housing price depreciation, suggesting that "declining housing prices eroded borrowers' ability to renegotiate their contract through refinancing" and servicers' reliance on such refinancing as a strategy for dealing with delinquent borrowers).

n339. Mason, Servicer Reporting, supra note 50, at 57.

86 Wash. L. Rev. 755, *

n340. Alan M. White, Rewriting Contracts, Wholesale: Data on Voluntary Mortgage Modifications from 2007 and 2008 Remittance Reports, *36 Fordham Urb. L.J. 509, 523-24 (2009);* cf. Marfatia, supra note 328, at 5 (reporting that half of all active loans facing reset in the first three quarters of 2007 refinanced; more than one-quarter of all remaining loans refinanced after reset); State Foreclosure Prevention Working Grp., Report No. 3, supra note 19, at 8 (reporting that 24.07% of closed loss mitigation efforts in May 2008 were either refinancings or reinstatements in full by the borrower).

n341. Fitch: Delinquency Cure Rates Worsening for U.S. Prime RMBS, BusinessWire, Aug. 24 2009, http://www.businesswire.com/news/home/20090824005549/en (reporting that cure rates are now at historical lows for both prime, at 6.6%, and subprime, at 5.3%).

n342. OCC Metrics Report, First Quarter 2009, supra note 14, at 21 (reporting an increase in loan modifications during 2009).

n343. See Helping Families Save Their Homes: The Role of Bankruptcy Law: Hearing Before the Comm. on the Judiciary, 110th Cong. 1 (2008), available at http://www.judiciary.senate.gov/hearings/testimony.cfm?id=e655f9e2809e5476862f735da1421ed9&wit_id=e65 5f9e2809e5476862f735da1421ed9-0-3 (statement of Russ Feingold, Member, Senate Comm. on the Judiciary) ("One thing that I think is not well understood is that because of the complex structure of these securitized mortgages that are at the root of the financial calamity the nation finds itself in, voluntary programs to readjust mortgages may simply be doomed to failure.").

n344. For more information on HAMP, including a homeowner-based critique of the program, see the materials collected on the National Consumer Law Center's website, http://www.nclc.org/issues/loan-modification-programs.html.

n345. Office of the Special Inspector Gen. for the Troubled Asset Relief Program, SIG-QR-10-03, Quarterly Report to Congress 6 (2010).

n346. Office of the Special Inspector Gen. for the Troubled Asset Relief Program, SIG-QR-11-01 Quarterly Report to Congress 11 (2011) [hereinafter TARP Report SIG-QR-11-01].

n347. See, e.g., id.

n348. See, e.g., Pendley et al., supra note 17, at 2 (noting that 38,000 subprime modifications per month in May 2010 "far short" of the 70,000 modifications per month in March 2010, just prior to HAMP); Cal. Reinvestment Coalition, The Ongoing Chasm Between Words and Deeds: Abusive Practices Continue to Harm Families and Communities in California 3-4 (2009) (reporting observations by housing counselors that loan modifications declined in the second quarter); Gretchen Morgenson, Fair Game - So Many Foreclosures, So Little Logic, N.Y. Times, July 4, 2009, at SundayBusiness 1, 4.

n349. See, e.g., TARP Report SIG-QR-11-01, supra note 346, at 12 (discussing lack of compliance or enforcement under HAMP).

n350. See, e.g., Cong. Oversight Panel, 111th Cong., December Oversight Report: A Review of Treasury's Foreclosure Prevention Programs 49-51 (2010) [hereinafter Cong. Oversight Panel, December 2010 Oversight Report]

n351. See, e.g., TARP report SIG-QR-11-01, supra note 346, at 12.

n352. See Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages v. 3.0, at 67 (2010) [hereinafter Making Home Affordable Program, Handbook v. 3.0].

n353. Id. at 79.

n354. OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 25 (reporting that of 289,226 permanent HAMP modifications made through September 30, 2010, 9537 involved principal reductions - calculated by adding the number of modifications reported for each quarter, reported immediately underneath the date in the rightmost set of columns, and adding the number of modifications reported with principal reductions, as reported in the fifth row of the leftmost columns).

n355. Id. at 24-25 (reporting total modifications involving principal reductions through September 2010 at 46,436; total HAMP modifications with principal reductions number at 9537).

n356. Rao et al., supra note 12, § 2.11 (reviewing government-sponsored entity modification options); id. § 2.12 (reviewing the modification options of Housing and Urban Development, the Department of Veteran Affairs, and the Rural Housing Service); Cordell et al., supra note 48, at 20.

n357. See Rao et al., supra note 12, § 2.12.1.6; Renuart et al., supra note 40, at 127.

n358. See, e.g., Joe Nocera, Talking Business; From Treasury to Banks, An Ultimatum on Mortgage Relief, N.Y. Times, July 11, 2009, at B1 (noting that servicers find the HAMP incentives "meaningless").

n359. See Announcement 08-20, supra note 211, at 1-3 (for loan modifications, $ 700; for repayment plans, $ 400; for short sales, range from $ 1000 to $ 1500; for deed-in-lieu, $ 1000, plus up to $ 350 in expenses); Bulletin from Freddie Mac, supra note 211, at 3-4 (reporting change in servicer compensation, effective July 2008: for loan modifications, increase from $ 400 to $ 800; for repayment plans, increase from $ 250 to $ 500; for short sales, increase from $ 1100 to $ 2200; for deed-in-lieu, to remain at current level of $ 275); see also Cordell et al., supra note 48, at 20. The Fannie Mae Announcement also limits servicer compensation by forbidding charging borrowers fees for a modification, though certain out-of-pocket expenses such as credit reports and title searches may continue to be charged to the borrower. Announcement 08-20, supra note 211, at 2.

n360. See supra Part III.D.1.

n361. See supra Part III.E.1.

n362. See Making Home Affordable Program, Handbook for Servicers of Non-GSE Mortgages v. 1.0, at 58 (2010).

n363. Piskorski et al., supra note 59, at 2 n.2; see also Mason, Mortgage Loan Modification, supra note 53, at 7 (citing a range of $ 500 to $ 600 to complete a modification); cf. Am. Securitization Forum, Operational Guidelines, supra note 309 (stating that payments of $ 150 for housing counseling for borrowers in default or at imminent risk of default should be treated as servicing advances and recoverable from the general securitization proceeds).

n364. See Press Release, Koches, supra note 117.

86 Wash. L. Rev. 755, *

n365. Cordell et al., supra note 48, at 30-31.

n366. Making Home Affordable Program, Handbook v. 3.0, supra note 352, at 42.

n367. See, e.g., Preserving Homeownership, supra note 143, at 22-23, 25 (written testimony of Diane E. Thompson).

n368. OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 5 (reporting that payment plans continued to increase as a percentage of all new home retention activities over both the last quarter and the last year).

n369. See Cong. Oversight Panel, December 2010 Oversight Report, supra note 350, at 23 (reporting that median interest rate on HAMP modifications drops from 6.63% to 2%).

n370. See generally supra Part III.E.3 (discussing the influence of the monthly mortgage servicing fee); supra Part III.E.4 (discussing the impact of residual interests on servicer behavior).

n371. TARP Report SIG-QR-11-01, supra note 346, at 13 ("At some point, Treasury needs to ask itself what value there is in a program under which not only participation, but also compliance with the rules, is voluntary.").

n372. Id. at 14. See also The Need for National Mortgage Servicing Standards, supra note 191, at 6-15 (written testimony of Diane E. Thompson).

n373. See The Need for Mortgage Servicing Standards, supra note 191, at 1-75 (written testimony of Diane E. Thompson) (detailing needed reforms to servicing).

n374. Bernanke, Speech at Federal Reserve, supra note 4.

n375. See, e.g., The Need for National Mortgage Servicing Standards, supra note 191, at 40 (written testimony of Diane E. Thompson).

n376. See, e.g., Problems in Mortgage Servicing, supra note 25, at 10-11 (written testimony of Diane E. Thompson); Goodman, Paper Avalanche, supra note 328, at 1; Michael Powell & Andrew Martin, Foreclosure Aid Fell Short, and is Fading, N.Y. Times, Mar. 29, 2011, at 2; Guttentag, supra note 332.

n377. See, e.g., The Need for National Mortgage Servicing Standards, supra note 191, at 13-15 (written testimony of Diane E. Thompson). See generally supra Part IV.A.

n378. See, e.g., Regulation of Mortgage Servicing Act of 2011, S. 967, 112th Cong. (2011); Foreclosure Prevention and Sound Mortgage Servicing Act of 2011, H.R. 1567, 112th Cong. (2011); Preserving Homes and Communities Act of 2011, S. 489, 112th Cong. (2011).

n379. Preserving Homeownership, supra note 143 (testimony of Paul Willen, Senior Economist and Policy Advisor, Federal Reserve Bank of Boston).

n380. This is especially so because the HAMP modification program does not permit a second HAMP modification for any reason, even if there is a subsequent, unavoidable drop in income. Making Home Affordable Program, Handbook v. 1.0, supra note 362, at 17.

n381. Dubitsky et al., supra note 78, at 6-7; Haughwout et al., supra note 78, at 24; Pendley & Crowe, supra note 11, at 2, 10-11 (noting that re-default rate is lowest for modifications with a greater than twenty percent principal reduction); Pendley et al., Criteria Report, supra note 93, at 16 (noting that modifications without principal reductions experience higher re-default rates than those with principal reductions); Pendley et al., supra note 17, at 16; Huang et al., supra note 13, at 9-10; Shamji & Mustafin, supra note 78, at 11-12; Roberto G. Quercia et al., Loan Modifications and Redefault Risk: An Examination of Short-Term Impact 16 (Mar. 2009) (working paper), available at http://www.ccc.unc.edu/documents/LM_March3_%202009_final.pdf.

n382. See, e.g., James R. Hagerty, Investors Join Activists' Bid to Prevent Foreclosures, Wall St. J., Feb. 9, 2010, at C1 (quoting Laurie Goodman, senior managing director at mortgage-bond trader Amherst Securities Group LP, that "principal reduction is the only answer"); Bernanke, Speech at Federal Reserve, supra note 4 ("Principal write-downs may need to be part of the toolkit that servicers use to achieve sustainable mortgage modifications.").

n383. See Cong. Oversight Panel, December 2010 Oversight Report, supra note 350, at 15-16 (noting that principal forbearance is part of HAMP's mandatory waterfall, while principal reduction is an "option").

n384. Fed. Reserve System, Homeownership Preservation Policy for Residential Mortgage Assets 5 (2009), available at http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20090130a1.pdf.

n385. 11 U.S.C. § 1322(b)(2) (Supp. IV 2010). Second liens can be modified if they are, as many are in the current market, completely unsecured because the amount of the first lien equals or exceeds the market value of the property. See, e.g., In re Zimmer, 313 F.3d 1220 (9th Cir. 2002); In re Lane, 280 F.3d 663 (6th Cir. 2002); In re Pond, 252 F.3d 122 (2d Cir. 2001); In re Dickerson, 222 F.3d 924 (11th Cir. 2000); In re Tanner, 217 F.3d 1357 (11th Cir. 2000); In re Bartee, 212 F.3d 277 (5th Cir. 2000); In re McDonald, 205 F.3d 606 (3d Cir. 2000); In re Griffey, 335 B.R. 166 (B.A.P. 10th Cir. 2005); In re Mann, 249 B.R. 831 (B.A.P. 1st Cir. 2000).

n386. Nobelman v. Am. Sav. Bank, 508 U.S. 324, 326 (1993).

n387. Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2549 (1978). Prior to 1978, the bankruptcy laws had last been substantively overhauled in 1938. S. Rep. No. 95-989, at 2 (1978).

n388. See supra Part II.A.

n389. Nocera, supra note 358, at B1 (characterizing work of servicers as "relatively simple" whose default servicing consisted largely of either "prodding people" to pay or "initiating foreclosure").

n390. Preserving Homeownership, supra note 143, at 47-48 (testimony of Mary Coffin, Executive Vice President, Servicing Division, Wells Fargo Home Mortgage) (stating that Wells Fargo experiences delays and difficulties in contacting borrowers).

n391. See A Review of Foreclosure Mitigation Efforts Before the H. Comm. on Fin. Servs., 110th Cong. 78-79 (2008) (statement of Sheila Bair, Chairman, FDIC) (discussing the importance of streamlined modifications in addressing the foreclosure crisis); Fed. Deposit Ins. Corp., FDIC Loan Modification Program, FDICLoanMod 7, http://fdic.gov/consumers/loans/loanmod/FDICLoanMod.pdf (last visited Nov. 29, 2010); see

86 Wash. L. Rev. 755, *

also Pendley & Crowe, supra note 11, at 9 (discussing the benefits of streamlined modification programs generally).

n392. See, e.g., Guttentag, supra note 332.

n393. See, e.g., Office of Pol'y Dev. & Research, U.S. Dep't. Housing & Urban Dev., Report to Congress on the Root Causes of the Foreclosure Crisis 26-28 (2010), available at http://www.huduser.org/portal/publications/hsgfin/foreclosure_09.html. See generally Renuart & Keest, supra note 33,§§11.3, 11.4, 11.6.

n394. See Preserving Homeownership, supra note 143, at 218 (statement of Diane E. Thompson).

n395. See generally supra Part II.B.

n396. See Kate Davidson, The "Trouble' with Bank Bad-Debt Restructurings, Am. Banker, May 21, 2010, at 1-2 (discussing lack of guidance for accounting for modifications under troubled debt restructuring rules).

n397. See Pendley & Crowe, supra note 11, at 9.

n398. See, e.g., *Home Foreclosures, supra* note 295, at 10 (testimony of Alan E. White); Amherst Sec. Grp. LP, supra note 17, at 33 (reporting loss severities approaching 100% on some subprime pools); Pendley et al., supra note 17, at 14 (reporting loss severity rates approaching 80% for subprime foreclosures).

n399. *Home Foreclosures, supra* note 295, at 10 (testimony of Alan E. White) (reporting 65% loss severity rates on foreclosures in June 2009).

n400. Preserving Homeownership, supra note 143, at 50 (testimony of Curtis Glovier); see also Weise, supra note 70, at 3 (quoting managing director of brokerage securities firm as saying investors would prefer to see more modifications).

n401. Compare OCC Metrics Report, Fourth Quarter 2010, supra note 15, at 22 (reporting that 473,415 "home retention actions," including HAMP modifications and payment plans, were initiated in the fourth quarter of 2010), with Mortg. Bankers Ass'n, National Delinquency Survey Q2 2010, at 4 (2010) (reporting that 4.63% of 43,579,051, or 2,017,711, mortgage loans in the U.S. were in foreclosure in the fourth quarter of 2010). The OCC-OTS Mortgage Metrics report puts a positive spin on these numbers by comparing the total home retention actions started to the number of new foreclosures. But the goal of modifications should be to stop existing foreclosures as well as prevent new ones, and, as the National Delinquency numbers show, the number of existing foreclosures far outstrips the efforts at modification. Indeed, this nearly five-to-one ratio understates the scope of the problem, because most modification programs aim at loans sixty days or more delinquent. Looking at the sixty-day-plus delinquency rates, we see that, as of the fourth quarter of 2010, the eligible pool of loans to be modified is approaching 4.4 million loans, almost ten times the number of new home retention actions.

n402. See supra text accompanying note 80.

n403. See supra note 190 and accompanying text.

n404. Personal communication with Marcy Wenzler, Senior Attorney, Ind. Legal Servs., Inc. (May 2, 2011).

86 Wash. L. Rev. 755, *

n405. *In re Stewart, 391 B.R. 327, 343 (Bankr. E.D. La. 2008)* (providing overview of servicer compensation), aff'd, *No. 08-3225, 2009 WL 2448054* (E.D. La. Aug. 7, 2009), vacated on other grounds, *647 F.3d 553 (5th Cir. 2011).*

n406. See, e.g., Making Home Affordable Program, Home Affordable Modification Agreement 2 (2010), available at https://www.hmpadmin.com/portal/programs/borrower.jsp (follow "Provision of Modification Agreement" option; then follow "Home Affordable Modification Agreement - English" hyperlink).

n407. See Goodman, Lucrative Fees, supra note 68, at A1 (describing such optimism and consequent delay by one servicer).

n408. Affiliated servicers holding junior liens may be particularly reluctant to agree to a short sale because the junior lien must usually be wiped out by a short sale. The junior lien could be erased in a foreclosure, as well, but in that circumstance the servicer would have at least the possibility of a deficiency judgment against the borrower. Additionally, if the foreclosure is delayed, an optimistic servicer may believe that the housing market will recover sufficiently to cover both the first lien and some of the second lien.

149TPX

********** Print Completed **********

Time of Request: Thursday, September 27, 2012  14:38:39 EST

Print Number:    1825:372334742
Number of Lines: 2472
Number of Pages:

Send To:  Krawczyk, Andrew
          STAFNE LAW FIRM
          239 N OLYMPIC AVE
          ARLINGTON, WA 98223-1336