Appendix 2



Copyright (c) 2010 Pepperdine University School of Law
Pepperdine Law Review

2010

PEPPERDINE LAW REVIEW

*37 Pepp. L. Rev. 737*

**LENGTH:** 15878 words

Article: How Negotiability Has Fouled Up the Secondary Mortgage Market, and What to Do About It

**NAME:** Dale A. Whitman*

**BIO:** * D & L Straus Visitor, Pepperdine University School of Law; Professor of Law Emeritus, University of Missouri-Columbia School of Law

**LEXISNEXIS SUMMARY:**
... Because negotiability is, for different reasons, undesirable from the viewpoint of both borrowers and secondary market investors, it is possible that consensus could be developed to eliminate it with respect to mortgage notes. ... Secondary markets may also require delivery of additional documents beyond those ordinarily required by Fannie Mae, including the original mortgage that shows the applicable recording data, the original title insurance policy, any guaranties executed in connection with the loan, any applicable private mortgage insurance policy or certificate, and the appraisal made in connection with the loan's origination.   ... Under U.C.C. section 3-309 : A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process.   ... When the holder of a mortgage appeared in court in a judicial foreclosure action, the holder would prove ownership of the note by producing a copy of the assignment document, together with a photocopy of the note and mortgage or, if a photocopy is not available, other evidence to establish their terms.   ... Perhaps the result of making all mortgage notes nonnegotiable will be an increased level of attention by secondary market investors in the honesty and solvency of those from whom they buy loans.   ... Negotiability is bad for mortgage holders because it forces them into the extremely inconvenient process of physically transferring the promissory note for each loan sold on the secondary market, or in the alternative, to endure the uncertainties and expenses of the lost note process.

**TEXT:**
 [*737]

The premise of this paper is that the concept of negotiability of promissory notes, which derives in modern law from Article 3 of the Uniform Commercial Code, is not only useless but positively detrimental to the operation of the modern secondary mortgage market. Therefore, the concept ought to be eliminated from the law of mortgage notes.

This is not a new idea. More than a decade ago, Professor Ronald Mann made the point that negotiability is largely irrelevant in every field of consumer and commercial payment systems, including mortgages. n1 But Mann's article made no specific recommendations for change, and no change has occurred.

I propose here to examine the ways in which negotiability and the holder in due course doctrine of Article 3 actually impair the trading of mortgages. Doing so, I conclude that these legal principles have no practical value to the parties in the mortgage system, but that they impose significant   [*738]   and unnecessary costs on those parties. I conclude with a recommendation for a simple change in Article 3 that would do away with the negotiability of mortgage notes.

## I. The Secondary Mortgage Market

In this era, it is a relatively rare mortgage that is held in portfolio for its full term by the originating lender. Instead, the vast majority of mortgages are either traded on the secondary market to an investor who will hold them, n2 or to an issuer (commonly an investment banker) who will securitize them. Securitization refers to the practice of issuing securities based on pools of underlying mortgages. n3 The securities may be "participation certificates," each of which represents a small fractional share of ownership in the underlying mortgage pool. n4 More commonly, however, the securities are, in effect, bonds that are collateralized by the pool of mortgages. n5 The advantage of the latter approach is that there may be many classes of bonds carrying different payment schemes and different priorities, collateralized by a single pool of mortgages. n6

Recent events have demonstrated that this system has many defects. During the period from 2001 through 2006, many very bad mortgage loans were made. n7 By "bad," I mean that they were originated either extremely carelessly or by means of outright fraud on the part of the borrower, often with the connivance of a mortgage broker or a loan officer for the originating lender, and sometimes with the lender's full knowledge and encouragement. n8 Because these loans were so badly underwritten, they carried a high probability of default. The subsequent downturn in real estate   [*739]   prices throughout most of the nation between 2006 and 2008 virtually guaranteed that many residential mortgage loans would default. n9 Moreover, when these loans were securitized, the investors who purchased the securities were generally unaware or heedless of the poor quality of the underlying loans, and they were not sufficiently warned by the national rating agencies of the risks they were accepting. n10 Enormous losses to the investors ensued. n11

When investors began to realize the full scope of these losses, the system of mortgage securitization ground to a halt. n12 Indeed, a number of reforms will need to be implemented before it makes sense to resurrect the system again. In all likelihood, mortgage securitization will once again become a source of mortgage capital. Though an interesting topic, n13 the nature of those reforms is not the focus of this paper. Meanwhile, the two major federally-sponsored secondary market agencies, Fannie Mae and Freddie Mac, continue to purchase residential mortgages in large quantities from originating lenders n14 despite the fact that they have been placed in federal conservatorship. n15

[*740]   While the secondary mortgage market has experienced a major hiccup, it is not dead and will not die. We are unlikely to return to a system in which most mortgages are held in portfolio by their originators. Despite the current pause in securitization activity, it makes sense to cure its defects, including those arising from the negotiability doctrines addressed here, so that securitization will operate more effectively when the market returns.

I propose to show that negotiability introduces three major defects into the mortgage market. First, it is difficult, and sometimes well-nigh impossible, to determine whether a note is negotiable. This fact engenders either unnecessary litigation or a willingness on the part of litigants and courts to sidestep the issue, thus eliminating the transparency with which legal rules should be applied. Second, the maker of a negotiable note is often unable to raise as a defense the fraud or other misconduct of the originating lender. This tends to encourage misconduct, to reduce the incentive of secondary market purchasers to screen their loan sellers for bad behavior, and to produce a result that is unfair to the borrower. Third, negotiability requires that, for every loan sold on the secondary market, the original promissory note must be delivered to the purchaser. In a national or global market, this requirement is extremely inefficient and inconvenient, and in recent years, has been widely ignored, much to the detriment of mortgage purchasers.

Because negotiability is, for different reasons, undesirable from the viewpoint of both borrowers and secondary market investors, it is possible that consensus could be developed to eliminate it with respect to mortgage notes. I conclude by advocating this change.

This Article will proceed accordingly: Section II, which immediately follows, will explain why negotiability is an issue and show why it makes little sense in the modern secondary mortgage market. n16 Section III will discuss the difficulties that courts have encountered in determining whether or not negotiability is present, and will consider how the holder in due course doctrine, which arises out of negotiability, is currently being used in mortgage cases and whether it serves a useful function. n17 Section IV will explain how negotiability requires the delivery of the original promissory note when a loan is sold on the secondary market, and why that requirement is costly and undesirable to

secondary market participants. n18 Finally, Section   [*741]   V will discuss how the problems associated with negotiability can be eliminated from the law of mortgage transfers. n19

    II. The Relevance of Negotiability to the Secondary Mortgage Market

  The early history of the concept of negotiability has been thoroughly and admirably recounted elsewhere, n20 and will be described only briefly here. It was developed in England in the late seventeenth and eighteenth centuries as a tool for facilitating the passage of bills of exchange in commerce. In 1696 Justice Holt decided Hussey v. Jacob, n21 holding that a good faith transferee of a bill of exchange took the bill free of the defenses that the drawer might raise to it - thus stating the fundamental premise of negotiability. Four years later, Holt refused to extend this principle to promissory notes, n22 but Parliament immediately reversed his decision in the 1704 Promissory Notes Act. n23 Thus, the stage was set for Lord Mansfield who, following Holt as Chief Justice, crystallized and restated the law of negotiable instruments forcibly and plainly. n24 Mansfield employed a "special jury" of merchants to advise him in doing so, n25 and his objective was to provide a body of law that was both certain and consistent with the commercial expectations of his day. In this he was spectacularly successful.

  Mansfield's concepts of negotiability were codified in England in 1882 in the Bills of Exchange Act, n26 and in America in the Negotiable Instruments Law, first adopted by Connecticut in 1897, and subsequently by all of the states. The Negotiable Instruments Law ("N.I.L.") was supplanted in 1954 by Article III of the Uniform Commercial Code ("U.C.C."). These codifications did not alter the fundamental concepts of negotiability laid   [*742]   down by Lord Mansfield, but they effectuated a significant shift from treating negotiability as a matter of intent to employing a "checklist" approach, under which an instrument was negotiable if it met certain precise objective standards, irrespective of subjective intent. n27 Professor Kurt Eggert notes that drafting processes for both the N.I.L. and Article III were characterized by certain features: they were driven by the perceived need to satisfy banks and other commercial lenders (without whose support it was thought that the uniform acts could not achieve enactment), n28 and they gradually broadened the concept of negotiability, permitting more and more clauses to be added to documents without impairing their negotiability. n29

  It is important to realize that the modern applications of negotiability are entirely different from the needs it gave rise to satisfy. The original negotiable instruments were bills of exchange, employed by merchants to settle accounts for merchandise bought and sold, particularly in international transactions. The concept of the bill of exchange has long been obsolete, and modern merchants settle trades by the use of checks or wire transfers drawn on banks. The idea that a bill of exchange should be collectible by a good faith purchaser without regard to the defenses its issuer might raise simply has no modern relevance.

  As noted above, promissory notes were also treated as negotiable from the early eighteenth century. But the types of promissory notes in use when the negotiability doctrine arose were quite distinguishable from those in use today. Early notes were typically issued by banks (or by goldsmiths, the predecessors of banks). Indeed, in the United States, privately issued bank notes were the principal form of currency until 1862, when the federal government began printing currency. n30

  Today, Federal Reserve Notes are the only currency in use in the United States. Private promissory notes are, for the most part, issued not by banks, but to banks. Their makers are private businesses and, to a very large extent, consumers. Banks and other commercial lenders are thus the primary beneficiaries of the negotiability concept, as witnessed by their vigorous efforts to maintain and strengthen it during the drafting of the N.I.L. and U.C.C. mentioned above. n31

  [*743]   The concept of negotiability was and is still purportedly based on the notion that one accepting such an instrument need not be concerned about the defenses its issuer might raise, nor about any extrinsic facts except the economic solvency of the issuer and any endorsers. It could, therefore, be accepted by anyone in the ordinary course of its transfer without any need for the person accepting it to inquire into the circumstances of its creation. Hence, the instrument could be treated like currency - the equivalent of cash. n32 As the Pennsylvania Supreme Court put it in 1846:

[A] negotiable bill or note is a courier without luggage. It is a requisite that it be framed in the fewest possible words, and those importing the most certain and precise contract ... . To be within the statute, it must be free from contingencies or conditions that would embarrass it in its course ... . n33

37 Pepp. L. Rev. 737, *

Indeed, as Professor Eggert explains, early promissory notes issued by goldsmiths and banks were extremely simple, consisting merely of a promise to pay the principal sum, usually upon demand, and the signature of the maker. n34

The typical promissory note used in a modern mortgage transaction is a far cry from this paradigm. The standard note form approved by Fannie Mae and Freddie Mac for use in one-to-four-family residential loans is 1,455 words in length in three pages without signatures, n35 and notes used in loans on commercial properties are commonly several times that size. n36

More to the point, no intelligent investor in the modern secondary mortgage market would ever acquire a note without making extremely detailed inquiries about the circumstances of its creation. Doing so would be hardly less than financial suicide. To enumerate some of these concerns, the investor will need to know about - indeed will want assurances concerning - the real estate that secures the note, including: its value, the nature and condition of its improvements, its title, its zoning, and its  [*744]  occupancy. The investor will also wish to know a great deal of information about the borrower: income, employment, credit-worthiness and past payment history, assets, and the like. With loans on commercial properties, a variety of additional facts become significant to the purchaser of the loan, including the nature of the property's tenants and leases, the ability of the property's rental income to support its operating expenses and debt service, and the possible presence of hazardous waste.

While some investors in recent years have been sloppy and careless in their verification of these underlying facts, only a fool would doubt that they are highly relevant; any investor who disregards them does so at his peril. When a mortgage loan is sold on an individualized basis (as sometimes occurs with respect to large, multimillion dollar commercial loans), the secondary-market investor will ordinarily evaluate all of the facts mentioned above "by hand," reviewing the documentation as part of a "due diligence" effort. However, residential loans are often sold in large quantities, with dozens or even hundreds of loans in a single pool. In this setting, individualized due diligence is impractical. Hence, secondary-market investors employ other techniques: they establish published standards, which the loans they purchase must meet, and they require mortgage originators, who deliver loans to them, to represent and warrant that the loans being delivered meet those standards.

When Fannie Mae purchases a mortgage, for example, the mortgagee selling the loan is required to provide extensive warranties to Fannie Mae. n37 These warranties include statements that the mortgagee is authorized to do business in the jurisdiction where the property is located, that the loan conforms to all of Fannie Mae's requirements, that the mortgagee has the right to sell and assign the mortgage loan, that the mortgage is a valid lien on the property and is not subject to any prior liens (such as mechanics liens), that the documents are valid and enforceable and have not been modified or subordinated, that both title insurance and casualty insurance are in force, that the improvements on the property have not been damaged by a casualty and are located entirely within the property's boundaries, and that the property conforms to applicable zoning laws. n38

The selling mortgagee must warrant that each loan was originated in conformity with Fannie Mae's very extensive requirements, including verification of the borrower's income, employment, credit history, assets and  [*745]  funds on deposit, and previous mortgage payment history. n39 The mortgage itself must be warranted by the seller to meet Fannie Mae's guidelines with respect to the borrower's age and immigration status, the property's construction and occupancy, the type of mortgage transaction (with respect to limitations on "cash out" in refinancing), the amortization and payment schedule, and the existence of government or private mortgage insurance. n40

Every loan delivered to Fannie Mae must be accompanied by the note (endorsed in blank), any documents modifying the note, any applicable power of attorney, an original unrecorded assignment of the mortgage to Fannie Mae (unless the original mortgagee was MERS n41), and a Delivery Transmittal form. n42

These procedures are also typical of private (non-government-sponsored) entities that purchase mortgages on the secondary markets. Indeed, the latter often demand that the selling mortgagee provide even more elaborate representations and warranties. n43 Secondary markets may also require delivery of additional documents beyond those ordinarily required by Fannie Mae, including the original mortgage that shows the applicable recording data, the original title insurance policy, any guaranties executed in connection with the loan, any applicable private mortgage insurance policy or certificate, n44 and the appraisal made in connection with the loan's origination. n45

In addition, an investor who buys a "seasoned" loan - one that is not newly-originated - will be intensely interested in its payment history. If there have been defaults in payment, the investor will want to know their  [*746]  duration and severity, and may well decide not to purchase the loan on this basis. This highlights a significant difference between the bills of exchange and bank notes of the eighteenth and nineteenth centuries, when the doctrine of negotiability was

established, and modern mortgage notes. The former were virtually always "single-pay" notes, payable either on demand or with a due date or "law day" on which the entire principal was to be paid. So long as the note was purchased before its due date, a preexisting default was impossible and no inquiry concerning default would be relevant. Modern notes nearly always call for installment payments, usually on a monthly basis, and a history of defaults is an important sign of trouble that must be considered by any investor.

The requirements of secondary market investors may be enforced by means of actions for damages when those who sell the mortgages breach the warranties and representations they have made. Requirements can also be enforced through buy-back provisions under which a mortgage that is found to be out of compliance with the investor's standards must be repurchased by the originating mortgagee. n46 Finally, in extreme cases in which the secondary market investor has lost confidence in the originator, the investor may completely terminate the business relationship. In the case of Fannie Mae or Freddie Mac, such a decision can have extremely harsh consequences for the originator, n47 including business failure.

As these procedures demonstrate, the notion that any intelligent secondary market investor would accept a negotiable promissory note in a mortgage transaction as a "courier without luggage" is absurd. Every such investor realizes that the protection provided by the holder in due course doctrine is, by itself, completely inadequate. Indeed, most of the precautions routinely taken by investors in mortgage notes have nothing to do with possible defenses of the note's maker; the precautions relate to the condition of the property and to the borrower. Rather than worrying about defenses the maker of the note might raise, investors are more likely to worry about fraud or deception perpetrated by the maker - often with the connivance or cooperation of the originating lender. Negotiability and the holder in due course doctrine are simply irrelevant in this context, and investors must take the other measures outlined above to prevent losses on the loans they buy.

[*747]  Modern Negotiability. Not only are modern mortgage notes vastly different from the bills of exchange and the notes that formed the foundations of negotiability, but the law governing negotiability has also undergone enormous changes. Professor Kurt Eggert has documented the ways in which negotiability was molded and repositioned, first through the Negotiable Instruments Law and then through Article 3 of the U.C.C., to accommodate the wishes of banks as holders, rather than issuers, of negotiable notes. n48 I do not propose to recount that story here, but rather to summarize the law of negotiability as it now stands in the United States.

It is fundamental to understand that Article 3 of the U.C.C. deals exclusively with negotiable instruments; n49 it says nothing at all about notes that are not negotiable, but leaves their treatment to other law. Hence, the holder in due course doctrine, a creature of Article 3, n50 is available only if the note is negotiable, n51 and negotiability can exist only if the requirements of Article 3 are satisfied.

Under Article 3, the definition of an "instrument" is complex and highly technical. An instrument, to be negotiable, must "(a) be signed by the maker or drawer; and (b) contain an unconditional promise ... and no other promise, order, obligation or power given by the maker or drawer ... ; and (c) be payable on demand or at a definite time; and (d) be payable to order or to bearer." n52

There are, however, a number of exceptions to the notion that the instrument must not contain any undertaking to do any act other than the payment of money. Thus, under Article 3 it is permissible, without detracting from negotiability, for the instrument to contain:

. an undertaking or power to give, maintain, or protect collateral to secure payment; n53

. an authorization or power to the holder to confess judgment or realize on or dispose of collateral; n54

[*748]  . a waiver of the benefit of any law intended for the advantage or protection of an obligor. n55

In addition, a promise is considered unconditional even if:

. it contains a reference to another record, so long as the promise to pay is not subject to or governed by another record, and rights or obligations with respect to the promise or order are not stated in another record; n56

. it includes a reference to another record for a statement of rights with respect to collateral, prepayment, or acceleration; n57 or

. payment is limited to resort to a particular fund or source. n58

Prior to the adoption of the current version of Article 3, n59 a controversy existed as to whether a note carrying an adjustable interest rate could be negotiable in light of the fact that reference to some external source of information, such as a published document reporting the note's index rate, would be necessary to determine the amount owed. n60 This issue was resolved in favor of negotiability in the 1990 revision of Article 3, which provides that interest may be stated as: "[A] fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument." n61

As is apparent from these definitions, determining whether a note is or is not negotiable is a complicated and potentially difficult process, which requires a review and analysis of all of the note's terms. The definitions have been broadened and made more complex by successive revisions of Article 3. n62 For example, as noted above, an adjustable rate note would arguably have been nonnegotiable under the prior version of Article 3. n63 So   [*749]   would a note containing a non-recourse clause n64 or a note requiring payment of insurance premiums on the security property. n65 Despite these expansions of negotiability, the concept is not unlimited, and it is obvious that not every note used in a mortgage transaction is negotiable. n66

Nonetheless, applying the relevant definitions can be a tricky and uncertain process. Two illustrations will demonstrate the difficulty. The first arises from the standard Fannie Mae-Freddie Mac residential mortgage form, n67 which is employed in a very high proportion of all residential loans in the nation. A dozen years ago, Professor Ronald Mann concluded that the note was nonnegotiable on the basis of its statement in the clause permitting prepayment that provided: "When I make a prepayment, I will tell the Note Holder in writing that I am doing so." n68 Mann argued that this sentence was an "undertaking ... to do an act in addition to the payment of money" n69 - namely, the act of giving the written notice - and that was sufficient to render the note nonnegotiable. n70 It is uncertain whether his conclusion is correct; there is no case authority interpreting this aspect of the clause. Article 3 provides that "A promise or order is "payable at a definite time' if it is payable ... at a fixed date or dates ... subject to rights of (i) prepayment ... ." n71 This phraseology obviously contemplates that a clause governing the right of prepayment may be inserted without impairing the note's negotiability, and, in opposition to Mann's conclusion, one might argue that the quoted language requiring written notice of a prepayment by the borrower is merely a natural and logical extension of the privilege of providing for prepayment in a negotiable note.

There is simply no way to resolve this question conclusively. Yet, it seems bizarre that the negotiability of the most widely used mortgage note form in the nation, employed in many millions of transactions, is uncertain and that no one has bothered to do anything to clarify it. Professor Mann   [*750]   argued that the very presence of the notice clause reflected the fact that Fannie Mae and Freddie Mac ultimately do not care about negotiability and, hence, have not troubled themselves to make an effort to remove language that would impair their notes' negotiability. n72 He observed, "Because the home-mortgage note market cannot practicably assure the benefits of negotiability, there is no reason why the parties drafting the notes that the system uses should take any great care to ensure that the notes retain technical negotiability." n73 The benefit that cannot be assured, of course, is the benefit of accepting a note without the necessity of inquiring into a multitude of underlying facts, as we have seen above - a benefit that was the original objective of the negotiability doctrine, but that is wholly unrealistic and unachievable in the context of the modern secondary mortgage market. Professor Mann's example also makes vividly the point that resolving questions of negotiability is not a simple or certain process.

As a second illustration, while teaching my students about negotiability in Winter 2008, I reprinted and distributed to them a promissory note that had been used in a commercial real estate loan made by the Bank of America on a shopping center in a transaction in which I had been involved a few years earlier. n74 Though lengthy, the note was entirely typical of such transactions. I invited the students to read the note carefully and to come to class prepared to discuss whether it was negotiable.

More than two pages of the note were devoted to a "defeasance" clause. n75 Prepayment of the loan was "locked out" and thus was not permitted during the first ten years of the loan's term. However, the defeasance clause permitted the borrower, during this "lockout" period, to release the real estate from the lien of the mortgage by substituting other collateral in the form of U.S. Treasury securities. The complex procedures for doing so were spelled out in detail in the note. Is such a clause an "undertaking ... to do an[] act in addition to the payment of money," n76 thus denying the note negotiability? The defeasance clause contained many highly specific steps that the borrower must carry out in order to accomplish a defeasance, but they were applicable only if the borrower first elected to   [*751]   engage in a defeasance. n77 In other words, they were promises to do a variety of acts other than remit payment, but the promises were condi-

tioned on the borrower's voluntary decision to defease the mortgage. I am uncertain whether such a clause would negate the note's negotiability, and can find no case authority answering the question. Once again, it is simply hard to tell.

This illustration has an ironic ending. After discussing the issues in the foregoing paragraph thoroughly in class, I thought we had fought our way to an inconclusive ending. Then a student sent me an e-mail pointing out a different clause - one that the other students and I had overlooked. The introductory paragraph of the note provided: "All of the terms, definitions, conditions and covenants of the Loan Documents are expressly made a part of this Note by reference in the same manner and with the same effect as if set forth herein at length." The term "Loan Documents," as defined in a separate Loan Agreement, included "this Loan Agreement, the Commitment, the Note, the Security Instrument, the Financing Statements, the Assignment of Management Agreement, and all other documents evidencing, securing or relating to the Loan." Needless to say, these documents were chock full of promises "to do ... acts in addition to the payment of money," n78 and in any event it had become absolutely clear that incorporation of any other document would make a note nonnegotiable! n79

There are two points to be made here. First, determining whether the note would be held nonnegotiable on the basis of its defeasance clause is a venture with an uncertain outcome. Second, because it is absolutely clear that the incorporation of the other loan documents by reference into the note makes it nonnegotiable, one is led to suspect that the drafters of that particular note form simply did not care whether it was negotiable or not. Unless one is willing to assume that Bank of America's lawyers were incompetent or unfamiliar with Article 3, this conclusion seems irresistible.

[*752]   As we will see below, cases are quite rare in which courts analyze the negotiability of a mortgage note carefully, n80 and even when they do, the quality of the analysis is often unsatisfying. A good (or bad) example is Bankers Trust (Delaware) v. 236 Beltway Investment, n81 decided by the Federal District Court for the Eastern District of Virginia in 1994. 236 Beltway, a limited partnership, built a large commercial project with a loan from a bank. n82 The loan was subsequently sold into a securitized pool from which passthrough certificates were sold to investors. n83 The parties had evidently agreed when the loan was made that it would be nonrecourse, but strangely, no one thought to include a nonrecourse clause into the promissory note or other loan documents. n84 When the pool trustee, Banker's Trust, brought an action against the general partners on the note, they raised the defense that the failure to include the non-recourse clause in the note was a result of a mutual mistake, warranting reformation of the note. n85 Banker's Trust claimed holder in due course status. n86 If this claim had been sustained by the court, Banker's Trust would have been immune to the mutual mistake defense, and would have been able to collect from the partners.

The case was complicated by the fact that the original construction loan was made by First National Bank of Maryland with a variable interest rate. n87 When construction was completed, that bank assigned the loan to Meritor Savings Bank, which simultaneously entered into a modification agreement and "allonge" with the borrowers that increased the principal amount of the loan and fixed its interest rate at 10 percent. n88

The court was faced with deciding whether the note was negotiable, since if it was not, Banker's Trust could not be a holder in due course. n89 Under Virginia law at the time of the loan, a note providing for variable interest could not be negotiable. n90 However, the note was modified by 236 Beltway and Meritor when construction of the project was finished in order to eliminate the variable interest feature. n91 The Court refused to consider the modification, despite the fact that it was included in an allonge that was made a permanent part of the note. n92 The court reasoned that the allonge   [*753]   was a "separate agreement," and hence outside the "four corners" of the note. n93 But this reasoning mistakes the nature of an allonge, which is - and by its nature must be - "permanently affixed" to the note itself, so as to become a part of it. n94 There is no apparent reason that the note, with the attached allonge making the interest rate certain, should not have been considered negotiable on this score.

There was, however, a further issue of negotiability in Bankers Trust. The allonge and modification agreement provided that the interest rate was subject to change at the mutual election of 236 Beltway and the holder of the note. n95 The court took the view that this provision made the interest rate   [*754]   uncertain, because to know whether the 10% interest rate had been changed, one would need to learn whether 236 Beltway had requested a change and the holder of the note had agreed to it. n96 Upon reflection, however, this reasoning seems completely fatuous. The reason is, of course, that the terms of any bilateral contract can always be modified if both of the parties agree to the modification. Hence, the provision calling for further changes in the interest rate was essentially meaningless; it merely stated a right that the parties would have had in the absence of the provision, and it changed their legal relationship not a wit. On this point as well, the court seems to have gotten it wrong.

The point of this excursion into the 236 Beltway opinion is not to belittle the district court judge who wrote it. Indeed, the opinion is generally an exceedingly careful and thoughtful one. Rather, the purpose of the analysis is simply to

show that deciding whether a complex promissory note is negotiable is a process fraught with frustration and the possibility of error, and that the predictability of such cases is low. Perhaps that is why so few judges undertake it, as the next section demonstrates.

III. Determining Negotiability: A Survey

To obtain a broader picture of the ways in which the negotiability issue is handled by the courts, I attempted to identify every reported case, state and federal, decided in the past twenty years, n97 in which the negotiability of a mortgage note was in issue. Of course, a review of reported cases, most of which are decided by appellate courts, does not necessarily provide an accurate representation of cases that are filed and subsequently settled pre-trial, or are tried but never appealed. Still, these reported cases should give a fair, general sense, if not a statistically accurate picture, of the way negotiability of mortgage notes is being handled by the courts.

Forty-two cases were identified in which a court made a decision on the merits n98 concerning negotiability or an issue, such as the existence of a holder in due course, that depended on negotiability. Remarkably, in only two of the forty-two opinions did the court provide a thorough analysis of the negotiability of the note! n99 Three additional opinions discussed only the   [*755]   fact that the note might not be negotiable because it provided for an adjustable interest rate, n100 an issue that, as we have seen, was eliminated by revised Article 3. Three other opinions contain a limited analysis, dealing with some of the elements of negotiability but disregarding others. n101

Hence, in thirty-three of the forty-two cases, the court either expressly assumed without analysis that the note or notes in question were negotiable, or implicitly assumed the same result by moving directly to an issue that depended on negotiability without any mention of negotiability itself! n102 It is not easy to explain this widespread disregard for the presence of negotiability. In a few of the cases studied, the court pointed out that the parties themselves had stipulated or conceded that the note or notes were negotiable. n103 It seems probable that in the remaining cases - a large majority of all of the cases studied - the parties either ignored the negotiability issue in their briefs despite its relevance, or their arguments were not intelligible enough for the court to engage in an analysis.

Why should this be so? If one is sufficiently familiar with the elements of negotiability, one can argue that virtually any complex promissory note is nonnegotiable, as the discussion above has illustrated. n104 Evidently the arguments are so complicated that most lawyers steer clear of them. If a set of rules is this off-putting to litigators, perhaps there should be a serious conversation about eliminating it.

This is not to say that the results of negotiability are irrelevant or that lawyers fail to argue them. Indeed, thirty-seven of the cases studied involved application of the holder in due course doctrine, which applies, as   [*756]   noted above, only if the note is negotiable. n105 Other issues raised in the cases that hinge on negotiability included competing claims to the note itself, n106 claims under various federal and state consumer protection statutes, n107 and set-offs or counterclaims against the note-holder. n108 In summary, the majority of the cases can be fairly characterized as reaching results that were dependent on a finding of negotiability, but the courts' determination of that negotiability was poorly executed or not attempted at all.

The Harshness of Negotiability. It is impossible to avoid the sense that the negotiability doctrine produces harsh and unfair results to borrowers in many cases. Of the thirty-seven cases I studied that involved application of the holder in due course doctrine, nineteen found that the holder was in due course and fourteen rejected application of the doctrine (four cases remanded or otherwise failed to decide the matter). In at least ten of the cases in which a holder in due course was found, the court used the doctrine to preclude a borrower from raising a defense of fraud in the origination of the loan.

Why should this be so? If a borrower has been defrauded by a mortgage originator, why should the sale of the loan on the secondary market deny the borrower the opportunity to raise and prove the defense? The holder in due course doctrine was invented to ensure the free acceptability of paper issued by banks and other commercial lenders. However, most negotiable notes in today's mortgage market are issued by borrowers, not banks. Borrowers do not supply the forms. They are not usually surrounded by lawyers, accountants, and the other accoutrements of the lending profession designed   [*757]   to guard against their being cheated. Whether consumers or commercial borrowers, participants almost never understand the implications of the holder in due course doctrine, and can hardly be said to have voluntarily elected to make it applicable. Unlike banks, borrowers rarely engage in sufficiently large numbers of transactions in order to give themselves the opportunity to spread the risk of the occasional loss or fraud. To a lender, an infrequent case of fraud merely produces a "bad loan" to be written off against the overall profits of the institution. To a borrower, a single case of fraud can be financially (and often personally) devastating.

No convincing case can be made for the fairness of the quirks of the negotiability doctrine that forces mortgage borrowers to give up their defenses when their loans are sold on the secondary market. Thirty-four years ago, the Federal Trade Commission decreed that the holder in due course concept would no longer apply to most consumer loans. n109 It is now time to complete that process by also exempting mortgage loans from the negotiability doctrine.

IV. The Problem of Delivery of Negotiable Notes

Eliminating the negotiability of mortgage notes would also carry with it major advantages to secondary market mortgage investors. This follows from the fact, apparently not well-recognized in the mortgage industry, that the right to enforce a negotiable note can be transferred only by physical delivery of the original note.

To understand why this is so, two sections of U.C.C. Article 3 must be read together. Under section 3-301, a "person entitled to enforce" an instrument means (with certain exceptions not relevant here) either "the holder of the instrument" or "a nonholder in possession of the instrument who has the rights of a holder." n110 Thus, section 3-301 ties the enforcement right to possession of the paper. Section 3-203(a) provides that "an instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." n111

The implications of these sections are powerful. Under them, no one can enforce (and hence, no one can foreclose a mortgage secured by) a   [*758]   negotiable note unless the note has been delivered to that person. While delivery of the note might seem a simple matter of compliance, experience during the past several years has shown that, probably in countless thousands of cases, promissory notes were never delivered to secondary market investors or securitizers, and, in many cases, cannot presently be located at all. n112 The issue is extremely widespread, and, in many cases, appears to have been the result of a conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes representing the loans they were selling. One prominent foreclosure defense attorney, April Charney, estimated that, in about 300 foreclosures she had defended in Florida during 2008, eighty percent of the complaints had lost-note affidavits attached to them, indicating that the foreclosing party did not possess the original note. n113 She commented, "Lost-note affidavits are pattern and practice in the industry. They are not exceptions. They are the rule." n114

This concept has not been lost on attorneys who defend borrowers in foreclosure actions. Increasingly, attorneys have been appearing in court and demanding that the foreclosing party - ostensibly the holder of the note - actually display it or otherwise prove delivery and possession. n115 In many cases, this proof simply cannot be adduced, and, as a result, the court may well dismiss the foreclosure proceeding. n116

Technically, this argument against foreclosure is relevant only if the note is negotiable and U.C.C. Article 3 is thereby applicable. The right to   [*759]   enforce a nonnegotiable note can be transferred by physical delivery, but it can also be transferred by a separate document of assignment. Indeed, it is arguable that an assignment of the mortgage will automatically assign a nonnegotiable note as well. n117

The principle that the right of enforcement of a negotiable note can be transferred only by delivery is modified by the "lost note" concept. Under *U.C.C. section 3-309*:

A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. n118

This language seems, on its face, to provide a solution to the problem of the lost note. However, it contains a major weakness. By its literal terms, the person who seeks to enforce the note must have been in possession of it when the loss occurred. Under this view, the "lost note" provisions do nothing to assist a party who claims to own a note but who never had possession of it to begin with, either because it was lost by a predecessor holder or because the predecessor never delivered it to the present claimant. This was the court's understanding of the language in Dennis Joslin Co. v.   [*760]   Robinson Broadcasting Corp. n119 Other courts have reached the opposite conclusion. As Professor Tim Zinneker n120 has noted, some courts have extended enforcement rights to assignees of possessors by relying on section 3-203, which states that transfer of an instrument "vests in the transferee any right of the transferor to enforce the instrument ... ." n121 Other courts have reached the same result by using the general assignment principles incorporated

in *U.C.C. section 1-103(b)*, n122 which states: "Unless displaced by the particular provisions of [this Act], the principles of law and equity ... [shall] supplement its provisions." n123

The resolution of this issue is uncertain. To correct the problem, in 2002 the Permanent Editorial Board of the Uniform Commercial Code approved an amendment to section 3-309 that authorizes enforcement of a note by a person who "has directly or indirectly acquired ownership of the instrument from a person who was entitled to enforce the instrument when loss of possession occurred." n124 However, the Amendment has been adopted only in ten states: Arkansas, n125 Florida, n126 Kentucky, n127 Minnesota, n128 Nebraska, n129 Nevada, n130 New Hampshire, n131 Oklahoma, n132 South Carolina, n133 and Texas. n134 In the rest of the nation, the uncertainty remains.

Even in states in which the "lost note" provisions apply to a loss by a predecessor, compliance with them is quite burdensome. For example, [*761] under the 2002 Amendments to section 3-309, the party seeking to enforce the note must still prove that its predecessor has possession of the note and did not transfer it to anyone else. n135 Presumably, this requires obtaining an affidavit from the predecessor, which may not be an easy task, particularly if that party is now bankrupt, dissolved, or has been absorbed into another entity. In addition, the party seeking enforcement must prove that the right to enforce the instrument was transferred to it by the predecessor, and must provide proof that the maker of the note is "adequately protected against loss that might occur by reason of a claim by another person to enforce the instrument." n136 The "adequate protection" is typically provided in the form of a commercial surety bond insuring that the maker will not be subjected to a double claim, n137 and the cost may be quite significant. n138

Moreover, in many cases the foreclosing party who executes a lost note affidavit is without a doubt committing perjury. The typical affidavit provides: "The note has been lost and after the exercise of due diligence cannot be located." n139 Section 3-309 does not literally require the inclusion of the "due diligence" language; it merely requires proof that the party seeking enforcement cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. n140 The "due diligence" language is probably included in most affidavits simply because the borrower's counsel or the judge would otherwise be likely to ask, "Did you try to locate the note?" But if the note is still in the hands of [*762] the originating mortgagee or some intermediate holder, as is often the case, it is extremely unlikely that the party presently foreclosing has contacted that party and inquired as to the note's whereabouts. In this situation, the "due diligence" language is simply a lie. Of course, borrowers are often unrepresented by counsel in foreclosure, so the affidavit will often be accepted without question. To this point, one foreclosure defense attorney commented, "As an officer of the court, I find it troubling that they've been going in and saying we lost the note, and because nobody is challenging it, the foreclosures are pushed through the system." n141

There is a further problem arising from the fact that the provisions of section 3-309 do not fit well with nonjudicial foreclosure. It is clear that the drafters of section 3-309 had judicial enforcement of the note in mind; they say that "the court may not enter judgment" n142 until adequate protection against double enforcement is provided. But in a nonjudicial foreclosure, n143 no court or judge is involved unless the debtor brings an action to enjoin the foreclosure, which is surely rare. n144 It is unclear to whom the relevant proof or affidavits under section 3-309 will be submitted, or who will evaluate the adequacy of the bond or other protection against double liability of the debtor. If a title insurance company is asked to insure title coming out of the foreclosure proceeding, presumably it will need to be satisfied that the documents and bond are sufficient to stand up to a later judicial attack. Similarly, the trustee under a deed of trust may (or may not) ask or demand to see or take possession of the note, and may (or may not) insist on compliance with section 3-309 if it is not produced. n145

A final caution: All of the discussion above assumes that the promissory note is negotiable, because U.C.C. Article 3 has no application to [*763] nonnegotiable notes. n146 But as we have already seen, determining whether a mortgage note is or is not negotiable is a highly problematic task, and there is no assurance that a court will agree with a determination by the note's holder. n147 If the note is held to be nonnegotiable, state law may or may not provide any procedure, analogous to *U.C.C. section 3-309*, to deal with the "lost note" issue. n148

Producing the Note. While *U.C.C. section 3-203(a)* requires delivery of a negotiable note to the person seeking to enforce it, n149 it does not literally require that the note be produced in court and introduced as evidence in the foreclosure or enforcement action. At least conceptually, other proof that the note was in fact delivered might suffice. n150 Nonetheless, it is easy to see why courts would (and often do) regard production of the note as the most obvious and natural way - and usually the only way - of proving that it was delivered. n151 As the Arkansas Supreme Court observed, "Arkansas case law dating as far back as 1842 has required a creditor to prove the debt by admitting the original promissory note into evidence." n152 The court added, "for [the mortgagee] to have prevailed in enforcing the [debtors']

note, it   [*764]   was required either to produce the original or satisfy the requirements for a lost negotiable instrument under [*U.C.C. section 3-309*]." n153

Oddly (unless one has read the earlier portion of this article), these sorts of holdings often make no reference to whether the note was negotiable. n154 The notion that the mortgagee must have physical possession of even a nonnegotiable note and display it seems well-embedded in the law, even if one cannot precisely locate that notion's roots.

Of course, failure to produce the note is not the only reason a court might dismiss a foreclosure action. For example, if the action is brought by a servicer, even one with clear written authority to represent the mortgagee, the court might still dismiss the action for lack of standing n155 or failure of the "real party in interest" n156 to appear. Similarly, whether a foreclosure may be   [*765]   pursued in the name of MERS n157 has been controversial. n158 And in a number of states, proof of a recorded chain of assignments of the mortgage to the present holder is essential to a valid foreclosure. n159 But these problems can   [*766]   be resolved by appropriate assignments of the note and mortgage and recording of the mortgage assignments, n160 while lack of possession of the note may well be incurable and prove fatal to the foreclosure. n161

V. The Solution: Eliminating Negotiability of Mortgage Notes

As the foregoing discussion demonstrates, the lender who attempts to foreclose a mortgage without possessing and producing the promissory note is faced with a host of difficulties and ambiguities. Improvements in drafting of the U.C.C. and other legislation undoubtedly could alleviate some of these problems, but a larger point remains: in an era in which millions of mortgage loans are transferred, often multiple times, it is nonsensical to rely on physical possession of the note as the indicium of ownership.

The simplest way to change this absurd and dysfunctional system is to declare mortgage notes nonnegotiable. If this were done, delivery of the original note would no longer be the sole method of transferring the right of enforcement. Delivery would still function to transfer the right of enforcement n162 by virtue of the "symbolic writing" notion that regards a note as a reification of the obligation it contains. n163 But a transfer could also be   [*767]   made by a separate document of assignment, with the seller retaining possession of the note. n164

This change would provide a huge improvement in convenience to those in the secondary mortgage market. It would no longer be necessary for them to be concerned about the location of the original note. Transfers of mortgage note pools could be accomplished by a single assignment document, simply listing each note to be covered by the assignment. n165 When the holder of a mortgage appeared in court in a judicial foreclosure action, the holder would prove ownership of the note by producing a copy of the assignment document, together with a photocopy of the note and mortgage or, if a photocopy is not available, other evidence to establish their terms. n166

No perceptible change would occur in mortgage industry practice. Indeed, the effect of the change would be to legitimize what mortgage holders have been rebuffed by the courts for trying to do in a number of recent cases: to foreclose without having possession of the original note. n167 The change would have no impact on MERS, the industry's private record-keeping system for mortgage assignments. n168

[*768]   Proving Ownership of Mortgage Notes. From the time that assignments of "choses in action" became permissible under the English common law, n169 they have been plagued by the absence of any system of ownership records. Because of the absence of such an information system, it is possible for an assignor to make two or more competing assignments, both to good faith purchasers. Anglo-American law has never satisfactorily resolved the dilemma of determining which purchaser should prevail. n170

As we have seen, this problem was ostensibly solved for negotiable notes under U.C.C. Article 3 by regarding delivery of the original note as the only method of transferring the right of enforcement. n171 Thus if there were two assignees, the one who could actually produce the original note would prevail. n172 This method worked reasonably well as long as the secondary market for notes was mainly a localized one, but as discussed above, it has turned out to be highly unsatisfactory in a national market because of the extreme inconvenience of moving many millions of notes around the nation.

If, as I advocate here, negotiability of mortgage notes is done away with, it will no longer be necessary to deliver the original note in order to transfer the right of enforcement. Hence, owners of notes will not necessarily be able to prove their ownership by possession. Whether some alternative records system for proving ownership is needed is a question that participants in the mortgage market will have to answer to their own satisfaction. Given the cavalier manner in which many have treated both negotiability and possession of original promissory notes, the answer may well be

that they regard the issue as not worth worrying about. After all, there are plenty of nonnegotiable mortgage notes in circulation now, n173 and no one seems worried about proving ownership of them. The issue of ownership arises when a mortgage seller dishonestly engages in the double-selling of a loan. While such instances certainly do occur, n174 they are  [*769]   comparatively rare, and market participants may well decide (or already have decided) that the risks such actions engender do not warrant the expense of measures to forestall them.

If market participants decide that they need to develop a system of public records to track ownership of mortgage notes, at least two possibilities might be suggested. One course of action would be for the purchaser of mortgage notes to insist that the seller place a written legend on each note (or on an attached allonge) n175 stating that the note had been transferred. This approach would be reasonably effective in preventing double-selling of the notes, n176 but implementing and policing it, at least with large masses of residential loans, would likely be regarded as at least as burdensome and undesirable as the purchaser taking possession of the notes.

A second possibility is for MERS to change its existing role and begin taking custody of notes as well as tracking mortgage assignments. This step would be highly effective in proving ownership; the party for whom MERS held the note on its records would be the beneficial owner and could demand a transfer of the note from MERS at any time. But this step would also imply a vast increase in MERS' responsibilities and potential liability; it was rejected when MERS was created in 1997, n177 and it seems unlikely that MERS' owners would be willing to take it now.

Thus, it seems most probable that no record-keeping system for ownership of nonnegotiable notes will develop just as there is no such system now, despite the fact that a significant number of mortgage notes in use today are nonnegotiable. Perhaps the result of making all mortgage notes nonnegotiable will be an increased level of attention by secondary market investors in the honesty and solvency of those from whom they buy loans. n178

[*770]

VI. Conclusion

I have sought to demonstrate that the negotiability of mortgage notes is a bad idea, and that the time has come to end this practice. Negotiability is bad for borrowers because it often prevents them from raising defenses based on fraud or other misconduct by the originating lender. Negotiability is bad for mortgage holders because it forces them into the extremely inconvenient process of physically transferring the promissory note for each loan sold on the secondary market, or in the alternative, to endure the uncertainties and expenses of the lost note process. Negotiability is bad for both lenders and mortgage holders when it subjects them to the need to litigate about whether a particular note is negotiable or not.

Because there are advantages to both mortgage holders and borrowers in doing away with the negotiability of mortgage notes, there is reason to think that such a change might be politically acceptable to both sides and thus might actually be accomplished. It would be simple to amend the U.C.C. to implement the change. All that is needed is a statement in Article 3 that an instrument secured by real property is not negotiable.

While this change may seem radical, it is likely that it would have only a minor effect on the way mortgage market participants interact. As we have seen, precious little actual attention seems to have been given to making mortgage notes negotiable or to the delivery of those notes in connection with secondary market sales, despite possession's ostensible importance under current law. Under the change proposed here, no attention would be needed. Otherwise, market practices would not change materially, and both mortgage investors and borrowers would benefit.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Commercial Law (UCC)Negotiable Instruments (Article 3)General OverviewReal Property LawFinancingSecondary Mortgage MarketFederal Home Loan Mortgage CorporationReal Property LawFinancingSecondary Mortgage Market-Federal National Mortgage Association

**FOOTNOTES:**

n1. Ronald J. Mann, Searching for Negotiability in Payment and Credit Systems, *44 UCLA L. Rev. 951, 969-73 (1997).*

37 Pepp. L. Rev. 737, *

n2. Fannie Mae and Freddie Mac, the two principal government-sponsored entities (GSE), were traditionally the largest secondary market investors in residential mortgages. See Thomas E. Plank, Regulation and Reform of the Mortgage Market and the Nature of Mortgage Loans: Lessons from Fannie Mae and Freddie Mac, 60 S.C. L. Rev. 779, 796-804 (2009).

n3. Ryan E. Scharar, Comment, The Limits of Securitization: Why Bankruptcy Courts Should Substantively Consolidate Predatory Sub-Prime Mortgage Originators and Their Special Purpose Entities, 2008 Mich. St. L. Rev. 913, 918-19 (2008).

n4. Id.

n5. Id.

n6. Mortgage securitization and its variations are described in Adam B. Ashcraft & Til Schuermann, Fed. Reserve Bank of N.Y., Understanding the Securitization of Subprime Mortgage Credit, (2008), available at http://www.newyorkfed.org/research/staff_reports/ sr318.pdf. See also Derrick M. Land, Residential Mortgage Securitization and Consumer Welfare, 61 Consumer Fin. L.Q. Rep. 208, 209-10 (2007); Scharar, supra note 3, at 918-26.

n7. See Ronald D. Utt, The Heritage Foundation, Subprime Mortgage Problems: A Quick Tour Through the Rubble (Apr. 3, 2008), http://www.heritage.org/Research/Economy/ wm_1881.pdf.

n8. See, e.g., Bob Tedeschi, Loan Fraud Seen on the Rise, N.Y. Times, Jan. 18, 2009, at RE6, available at http://www.nytimes.com/2009/01/18/realestate/18mort.html; John Leland, Officials Falling Behind on Mortgage Fraud Cases, N.Y. Times, Dec. 25, 2007, http://www.nytimes.com/2007/12/25/us/25fraud.html.

n9. See James Saft, U.S. Housing Collapse May Portend Slow Economic Growth for Years, N.Y. Times, Feb. 9, 2008, http://www.nytimes.com/2008/01/29/business/worldbusiness/29iht-inside30.1. 9568999.html.

n10. See, e.g., Credit Rating Agencies and the Financial Crisis: Hearing Before the Comm. on Oversight and Gov't Reform, 110th Cong. 1 (Oct. 22, 2008) (opening statement of Rep. Waxman, Chairman, House Comm. on Oversight and Gov't Reform), available at http://oversight.house.gov /documents/20081022102221.pdf (detailing the failures of the rating agencies). See also John Patrick Hunt, One Cheer for Credit Rating Agencies: How the Mark-to-Market Accounting Debate Highlights the Case for Rating-Dependent Capital Regulation, 60 S.C. L. Rev. 749, 750-52 (2009). For evidence that securitization does indeed weaken the incentives of financial intermediaries to assess default risk carefully, see Benjamin J. Keys et al, Securitization and Screening: Evidence from Subprime Mortgage Backed Securities, 1 (2008), available at http://www2.law.columbia.edu /contracteconomics/conferences/laweconomicsS08/Vig%20paper.pdf.

n11. Losses to major banks and investment banking houses through early 2008 are detailed in Mortgage-Backed Securities (MBS), Wikinvest.com, http://www.wikinvest.com/metric/Mortgage-Backed_Securities_(MBS) (last visited Nov. 3, 2009). See also Gretchen Morgenson, Investors in Mortgage-Backed Securities Fail to React to Market Plunge, N.Y. Times, Feb. 18, 2007, http://www.nytimes.com/2007/02/18/business/worldbusiness/18iht-morgenson.4633573.html; Christian Baumgaertel & Christine Harper, UBS Has Loss, to Cut Jobs, After Subprime Writedowns, Oct. 1, 2007, http://www.bloomberg.com/apps/news?pid=20601087&sid= amzHxK6x1zNU&refer =home.

37 Pepp. L. Rev. 737, *

n12. See Standard & Poor's, RMBS Trends: U.S. RMBS Subprime Securitization Volume Declines Amid More-Stringent Guidelines, Aug. 31, 2007, http://www2.standardandpoors.com/portal/site/sp/en/us/page.article/3,1,1,0,1148447105682.html.

n13. See, e.g., Mortgage Reform and Anti-Predatory Lending Act, H.R. 1728, 111th Cong. (2009); Plank, supra note 2 (discussing mortgage loans and different reforms of the mortgage market).

n14. Alan Zibel, Fannie Mae, Freddie Mac Struggle a Year After Takeover, Huffington Post, Sept. 4, 2009, http://huffingtonpost.com/2009/09/08/fannie-mae-freddie-mac-st_0_n_279112.html.

n15. The two government-sponsored entities (GSEs) were placed in conservatorship on September 7, 2008. Mark Jickling, Cong. Res. Serv., Fannie Mae and Freddie Mac in Conservatorship 1 (2008), http://assets.opencrs.com/rpts/RS22950_20080915.pdf.

n16. See infra notes 20-96 and accompanying text.

n17. See infra notes 97-109 and accompanying text.

n18. See infra notes 110-61 and accompanying text.

n19. See infra notes 162-78 and accompanying text.

n20. See Kurt Eggert, Held up in Due Course: Codification and the Victory of Form over Intent in Negotiable Instrument Law, *35 Creighton L. Rev. 363, 368-74 (2002);* Edward L. Rubin, Learning from Lord Mansfield: Toward a Transferability Law for Modern Commercial Practice, *31 Idaho L. Rev. 775, 775-77 (1995);* James Steven Rogers, The Myth of Negotiability, *31 B.C. L. Rev. 265 (1990).*

n21. (1696) *87 Eng. Rep. 588 & 591* (K.B.).

n22. *Clerke v. Martin, (1702) 92 Eng. Rep. 6* (K.B.); *Buller v. Crips, (1703) 87 Eng. Rep. 793* (K.B.).

n23. Promissory Notes Act, 1704, 3 & 4 Ann., c. 9 (Eng.).

n24. See, e.g., *Miller v. Race, (1758) 97 Eng. Rep. 398* (K.B.) (good faith purchaser of bank note acquired good title to note); *Peacock v. Rhodes, (1781) 99 Eng. Rep. 402* (K.B.) (good faith purchaser acquired title to bill of exchange).

n25. See Rubin, supra note 20, at 780 & nn.26-30.

n26. Bills of Exchange Act, 1882, 45 & 46 Vict., c. 61 (Eng.).

n27. See Eggert, supra note 20, at 408-24 for a detailed description of the drafting process of the codification of the Negotiable Instrument Laws and the Uniform Commercial Code.

n28. Id. at 409 (N.I.L), 419 (U.C.C.).

37 Pepp. L. Rev. 737, *

n29. See infra notes 49-58 and accompanying text.

n30. See John J. Chung, Money as Simulacrum: The Legal Nature and Reality of Money, *5 Hastings Bus. L.J. 109, 128-30 (2009)* (noting that the Bank of the United States and the Second Bank of the United States issued notes that were used as currency (along with private bank notes) from 1791 until 1837. The period from 1837 to 1862 was known as the "Free Banking" period, and the only available currency consisted of private bank notes.).

n31. See supra notes 28-29 and accompanying text.

n32. Thus Justice Mansfield held in *Miller v. Race, (1758) 97 Eng. Rep. 398, 402* (K.B.), that "[a] bank-note is constantly and universally, both at home and abroad, treated as money, as cash; ... and it is necessary, for the purposes of commerce, that their currency should be established and secured."

n33. *Overton v. Tyler, 3 Pa. 346, 347 (1846).*

n34. See Eggert, supra note 20, at 395-96, 401-02.

n35. eFannniemae.com, Single Family, Legal Documents, Multistate Fixed Rate Note, Form 3200, available at https://www.efanniemae.com/sf/formsdocs/documents/notes/pdf/320 0.pdf.

n36. For example, a promissory note used in a commercial loan by the Bank of America, in which the author represented the borrower, had 6,130 words in nine pages. Bank of America Promissory Note (Dec. 1999) (on file with author).

n37. For purposes of brevity, the illustrations in the text refer to Fannie Mae's procedures, but Freddie Mac's are similar. Both Fannie Mae and Freddie Mac guidelines, requirements, and contracts are available at www.allregs.com. See Freddie Mac Single Family Seller/Servicer Guide, http://www.allregs.com/tpl/Main.aspx (last visited Nov. 4, 2009).

n38. Fannie Mae, Single Family Mortgage Selling and Servicing Contract, Sec. IV.A (2005), available at http://efanniemae.com/sf/guides/ssg/#ssg (follow "Access the Selling and Servicing Guides via AllRegs" hyperlink).

n39. Fannie Mae, Single Family 2007 Selling Guide, Part X (2007), available at http://efanniemae.com/sf/guides/ssg/#ssg (follow "Access the Selling and Servicing Guides via AllRegs" hyperlink).

n40. Id. at Part VII.

n41. For an explanation of the role of MERS, see infra notes 157-59.

n42. Fannie Mae Single Family 2007 Selling Guide, supra note 39, at Part IV.

n43. See, e.g., Seller's Purchase, Warranties, and Interim Servicing Agreement between DLJ Mortgage Capital, Inc., Purchaser, and Premier Financial Services, Inc., Seller and Servicer, §§3.01-.02 (Feb. 1, 2005) [hereinafter DLJ Agreement] (on file with author); Loan Purchase Agreement between Countrywide Home Loans, Inc., Purchaser, and E-Loan, Inc., Seller, § 6 (Sept. 25, 1998) [hereinafter Countrywide Agreement] (on file with au-

37 Pepp. L. Rev. 737, *

thor). The warranties and representations contained in these agreements are far too extensive to set out here, and cover such matters as the absence of any litigation involving the loans being sold, the absence of any necessity of court or governmental approval of the sales, the fact that the sales are not bulk transfers, that the origination and servicing policies followed with respect to each loan are in compliance with applicable laws, regulations, and prudent lending policies, that the seller is solvent and is authorized by Fannie Mae and Freddie Mac to sell mortgages to them, and many other matters.

n44. DLJ Agreement, supra note 43, at Exhibit A-1, Contents of Mortgage File.

n45. Countrywide Agreement, supra note 43, at § 3(b).

n46. DLJ Agreement, supra note 43, at § 3.03; Countrywide Agreement, supra note 43, at § 7. See also G-Mac Steps Up Its "Regifting" Of Bad Loans, http://www.banklawyersblog.com/ 3_bank_lawyers/2009/01/ (Jan. 27, 2009, 21:37 EST) (describing GMAC Residential Funding Company's bringing of roughly twenty lawsuits during 2008 because of failure on the part of mortgage originators to honor their obligations to repurchase nonconforming loans sold to GMAC).

n47. See, e.g., *Am. Bankers Mortgage Corp. v. Fed. Home Loan Mortgage Corp., 75 F.3d 1401, 1411 (9th Cir. 1996)* (Freddie Mac's termination of seller's contract was not unconscionable or a denial of due process); *Union Nat'l Bank of Little Rock v. Fed. Nat'l Mortgage Ass'n, 860 F.2d 847, 858 (8th Cir. 1988)* (Fannie Mae's termination of seller's contract was not tortious or a RICO violation).

n48. See Eggert, supra note 20, at 407-23.

n49. This is accomplished by section 3-102's provision that "this article applies to negotiable instruments," and by section 3-104(b)'s statement that ""instrument' means a negotiable instrument." See *Nagel v. Cronebaugh, 782 So. 2d 436, 439 (Fla. Dist. Ct. App. 2001)* (decision governed by the common law of contracts because the note did not state a principal amount owed, and hence was not negotiable).

n50. The concept of the "holder in due course" is defined in *U.C.C. section 3-302* (1999).

n51. *U.C.C. § 3-306* (1999) ("Unless he has the rights of a holder in due course any person takes the instrument subject to (a) all valid claims to it on the part of any person ... .").

n52. Id. § 3-104(a)(1)-(2).

n53. Id. § 3-104(a)(3)(i).

n54. Id. § 3-104(a)(3)(ii).

n55. Id. § 3-104(a)(3)(iii).

n56. Id. § 3-106(a).

n57. Id. § 3-106(b).

37 Pepp. L. Rev. 737, *

n58. Id. The typical illustration is a nonrecourse clause, which limits the holder's right of collection to the collateral, and not the personal assets of the maker.

n59. The present version was released by the Uniform Laws Commissioners and the American Law Institute in 1990 and has been adopted by all states except New York and South Carolina. See Cornell University Law School, Legal Information Institute, Uniform Commercial Code Locator, http://www.law.cornell.edu/uniform/ucc.html#a3 (last visited Nov. 6, 2009). Additional amendments were released in 2002 but have been adopted by only nine states as of this writing, according to the NCCUSL web site. Uniform Law Commissioners, A Few Facts About the Amendments to Articles 3 and 4 of the U.C.C., http://www.nccusl.org/Update/uniformact_ factsheets/uniformacts-fs-ucca3.asp (last visited Nov. 6, 2009).

n60. Compare *Taylor v. Roeder, 360 S.E.2d 191, 195 (Va. 1987)* (holding that an adjustable rate note could not be negotiable), with *Goss v. Trinity Sav. & Loan Ass'n, 813 P.2d 492, 497 (Okla. 1991)* (holding that an adjustable rate note could be negotiable).

n61. *U.C.C. § 3-112(b)* (1990).

n62. Illustrations of earlier expansions are given in Kurt Eggert's article, supra note 20, at 410-23.

n63. See supra notes 49-58 and accompanying text.

n64. See *United Nat'l Bank of Miami v. Airport Plaza Ltd. P'ship, 537 So. 2d 608, 610 (Fla. Dist. Ct. App. 1988),* see also *U.C.C. § 3-106(b)* (1990) (allowing negotiability even though "payment is limited to resort to a particular fund or source").

n65. See *P & K Marble, Inc. v. La Paglia, 537 N.Y.S.2d 682 (App. Div. 1989),* see also *U.C.C. § 3-104(a)(3)(i)* (1990) (stating that a negotiable note may contain "an undertaking or power to give, maintain, or protect collateral to secure payment... .").

n66. See supra note 60 and accompanying text.

n67. eFannniemae.com, Single Family, Legal Documents, Multistate Fixed Rate Note, Form 3200, available at https://www.efanniemae.com/sf/formsdocs/documents/notes/pdf/320 0.pdf.

n68. Mann, supra note 1, at 971.

n69. *U.C.C. § 3-104(a)(3)* (2005).

n70. Mann, supra note 1, at 971-73.

n71. *U.C.C. § 3-108(b)* (2005).

n72. See Mann, supra note 1, at 973.

n73. Id. at 973.

n74. The promissory note was distributed for educational purposes only, and is on file with the author.

37 Pepp. L. Rev. 737, *

n75. The defeasance clause was the central issue in our class discussion but not the only possible basis on which the note might have been held nonnegotiable. The note also contained a "late fee" clause, and the cases are divided as to whether such a fee negates negotiability by making the amount due uncertain. Compare *All Lease Co. v. Bowen, No. 311, 1975 WL 22864 at 1* (Md.Cir. Ct. Nov. 17, 1975) (late fee clause makes note nonnegotiable), with *In re Apponline.com, Inc., 285 B.R. 805, 821 (Bankr. E.D.N.Y. 2002),* aff'd *321 B.R. 615 (E.D.N.Y. 2003),* aff'd *128 Fed. Appx. 171 (2d Cir. 2004)* (note may be negotiable notwithstanding late fee clause).

n76. *U.C.C. § 3-104(a)(3) (2005).*

n77. Clause 4(b) of the promissory note distributed to my class in Winter 2008 provides that "the borrower may cause the release of the premises ... upon the satisfaction of the following conditions."

n78. *U.C.C. § 3-104(a)(3) (2005).*

n79. Section 3-106(a) provides that a "promise or order is unconditional unless it states ... that the promise or order is subject to or governed by another record ... ." Note the subtle distinction: mere reference to the mortgage in the note, or stating that the note is secured by the mortgage, will not render the note nonnegotiable. *U.C.C. § 3-106(b) (2005)* ("A promise or order is not made conditional (i) by a reference to another record for a statement of rights with respect to collateral, prepayment, or acceleration ... ."); see also *In re AppOnline.com, 285 B.R. at 817; DH Cattle Holdings Co. v. Kuntz, 568 N.Y.S.2d 229, 230 (App. Div. 1991).* On the other hand, incorporating the mortgage or other external document into the note by reference will destroy negotiability. *In re Levine, 24 B.R. 804, 807 (Bankr. S.D.N.Y. 1982),* rev'd on other grounds, *32 B.R. 742 (S.D.N.Y. 1983).*

n80. See infra notes 81-96 and accompanying text.

n81. *865 F. Supp. 1186 (E.D. Va. 1994).*

n82. *Id. at 1189-90.*

n83. *Id. at 1190.*

n84. Id.

n85. Id.

n86. *Id. at 1191.*

n87. *Id. at 1190.*

n88. Id.

n89. *Id. at 1192.*

n90. The Virginia Supreme Court had so held in *Taylor v. Roeder, 360 S.E.2d 191 (Va. 1987).*

37 Pepp. L. Rev. 737, *

n91. *865 F. Supp. at 1190.*

n92. *Id. at 1193.* An "allonge" is defined as:

A slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsement when the original paper is filled with indorsements. Former *UCC § 3-302* required that indorsements be made on the instrument unless there was no space - and only then could an allonge be used. Current *§ 3-204(a)* eliminates that requirement ... .

Black's Law Dictionary 83 (8th ed. 2004). The development of the allonge concept is quite interesting as it was originally defined as "a piece of paper annexed to a negotiable instrument or promissory note, on which to write endorsements for which there is no room on the instrument itself." *SKW Real Estate Ltd. v. Gallicchio, 716 A.2d 903, 906 n.3 (Conn. App. Ct. 1998);* see also *Crossland Sav. Bank FSB v. Constant, 737 S.W.2d 19, 21 (Tex. App. 1987)* (allonge could not properly be used if there was space for endorsement on the original note); V. G. Lewter, Annotation, Indorsement of Negotiable Instrument by Writing Not on Instrument Itself, *19 A.L.R. 3d 1297 (1968).* The current version of Article 3 approves the use of allonges, providing that "for the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is a part of the instrument." *U.C.C. § 3-204(a)* (2005). It also relaxes any requirement that the note itself lack space for the endorsement; Comment one provides, "An indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement." See *Wells Fargo Bank v. Perry, 875 N.Y.S.2d 853,* (Sup. Ct. 2009) (endorsement on allonge is sufficient to transfer ownership of note). This is convenient, because attaching an allonge is mechanically easier than hand-writing or stamping an endorsement on the original note, especially if a large number of notes are to be transferred. However, in recent years, allonges have been increasingly used for purposes other than endorsement. See, e.g., James v. Sec. Nat'l Partners, No. 07-P-1697, *2008 WL 5082899, at 3* (Mass. App. Ct. Dec. 4, 2008) (allonges used to extend maturity date of note and to prohibit negative amortization); *Levesque v. Ojala, No. 20034485, 2005 WL 3721859, at 5* (Mass. Dist. Ct. Dec. 8, 2005) (allonge used to modify allocation of payments to principal and interest); *EA, LLC v. Tarver, No. CV040184901S, 2005 WL 1971367, at 1* (Conn. Super. Ct. July 22, 2005) (allonge used to extend maturity of line of credit); *Prem, Inc. v. Agababian, No. CV040198807S, 2004 WL 2663982, at 1* (Conn. Super. Ct. Oct. 22, 2004) (allonge used to modify terms of note). When used in this way, an allonge is simply a modification agreement that becomes part of the original note. Because the allonge must be attached to the note, there is no evident reason that it should not be considered in assessing the note's negotiability.

n93. *865 F. Supp. at 1192.*

n94. *Taylor, 360 S.E.2d at 194.* The Virginia cases cited by the court for the proposition that the interest rate must be found within the "four corners" of the note did not involve allonges, but rather situations in which reference to external published sources would need to be consulted to determine the rate. See id. (reference to publications of index interest rate); *Salomonsky v. Kelly, 349 S.E.2d 358, 359 (Va. 1986)* (reference to other agreement between the parties).

n95. *865 F. Supp. at 1192.*

n96. Id.

n97. A Westlaw search was performed by seeking all cases between the beginning of 1989 and the end of March, 2009 with the terms "mortgage" and "negotiable" or its cognates in the Westlaw syllabus.

n98. A decision was considered "on the merits" even if it merely constituted a denial of summary judgment or judgment on the pleadings, provided that opinion included some discussion of negotiability or issues dependent on negotiability.

n99. *In re AppOnline.com, Inc., 285 B.R. 805 (Bankr. E.D.N.Y.2002)*, aff'd *321 B.R. 615 (Bankr. E.D.N.Y. 2003)*, aff'd *128 Fed. App'x. 171 (2d Cir. 2004);* Bankers Trust (Delaware) v. 236 Beltway Inv., 865 F. Supp. 1186 (E.D. Va. 1994).

n100. *Barnsley v. Empire Mortgage Ltd. P'ship V, 720 A.2d 63 (N.H. 1998); Carnegie Bank v. Shalleck, 606 A.2d 389 (N.J. Super. Ct. App. Div. 1992); Goss v. Trinity Sav. & Loan Ass'n, 813 P.2d 492 (Okla. 1991).*

n101. *Wilson v. Toussie, 260 F. Supp. 2d 530 (E.D.N.Y. 2003)* (reciting that the notes "were signed, contain an unconditional promise to pay a sum certain in money, and contain no other promise, order, obligation or power," and focusing on the fact that the notes, while referring to the mortgages, were separate from the mortgages and did not incorporate them by reference); *In re Nusor, 123 B.R. 55 (B.A.P. 9th Cir. 1991)* (reciting the requirements for negotiability in Article 3 and focusing on the fact that a minor typographical error in the note did not detract from its negotiability).

n102. About half of the thirty-four opinions failed to mention negotiability at all, while the other half expressly assumed it.

n103. See, e.g., *Swindler v. Swindler, 584 S.E.2d 438, 440 (S.C. Ct. App. 2003)* (noting that "neither party asserts the instrument fails to satisfy the above criteria"); *Thomas v. State Mortgage, Inc., 439 N.W.2d 299, 301 (Mich. Ct. App. 1989)* ("Since plaintiffs do not argue that the note is not a negotiable instrument, we shall assume, without deciding, that it meets the requirements for negotiability ... .").

n104. See supra notes 59-79 and accompanying text.

n105. See supra notes 49-51 and accompanying text; see also *Barnsley, 720 A.2d at 65* ("Because the plaintiff's note was not negotiable, the FDIC could not become a holder in due course.").

n106. *Provident Bank v. Cmty. Home Mortgage Corp., 498 F. Supp. 2d 558, 562 (E.D.N.Y. 2007)* (finding that originating lender obtained two executed "originals" of each note and sold them to two different investors); *Toussie, 260 F. Supp. 2d at 541* (finding that holders in due course were not subject to equitable claims to notes); *Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F. Supp. 1304, 1313-14 (D.S.C. 1994)* (holding that GNMA, as holder in due course, was not subject to claims to notes it held); *Provident Bank v. MorEquity, Inc., 585 S.E.2d 625, 628 (Ga. Ct. App. 2003)* (holding that an investor who was not holder in due course took notes subject to security interest of prior warehouse lender).

n107. See, e.g., *Hays v. Bankers Trust Co. of California, 46 F. Supp. 2d 490, 497 (S.D. W. Va. 1999)* (deciding on summary judgment that holder could not be found to be in due course and was therefore subject to all claims of the borrower, including common law claims, state consumer protection act claims, and claims under Truth in Lending and other federal statutes); *Ballengee v. New Mexico Fed. Sav. & Loan Ass'n, 786 P.2d 37, 40 (N.M. 1990)* (finding that the note holder was not in due course and hence was subject to claim that the note was an improperly unregistered security); *Calaska Partners Ltd. v. Corson, 672 A.2d 1099, 1104 (Me. 1996)* (holding that because the FDIC was not a holder in due course, it was subject to claims under Equal Credit Opportunity Act).

n108. *Bisson v. Eck, 720 N.E.2d 784, 785 (Mass. 1999)* (finding that the holder was not in due course and was subject to a setoff by maker of note against originating mortgagee).

37 Pepp. L. Rev. 737, *

n109. *16 C.F.R. § 433.2 (2009).* See Tommy L. Holland, Holder in Undue Course: The FTC Rule Preserving Consumers' Claims and Defenses, *95 Banking L.J. 789 (1978).* The rule applies to consumer credit sales in which the amount financed is $ 25,000 or less.

n110. *U.C.C. § 3-301* (1990).

n111. Id. § 3-203(a).

n112. See Gretchen Morgenson, Fair Game: Guess What Got Lost in the Loan Pool?, N.Y. Times, Mar. 1, 2009, at BU1, available at http://www.nytimes.com/2009/03/01/business/01gret.html (pointing out that, while no one knows the number of lost notes, it appears to be substantial); see also Bernard Condon, Paper Chase, Forbes.com, June 18, 2007, http://www.forbes.com/forbes/ 2007/0618/040b.html (reporting on the efforts of attorney April Charney to stop foreclosure proceedings for her clients by persuading courts to refuse to recognize illegally purchased pools of securitized loans); Ed Duggan, Legal Feud Shows a Foreclosure Can Take Forever, S. Fla. Bus. J., Jan 4, 2008, available at http://sacramento.bizjournals.com/southflorida/stories/2008/01/ 07/ story2.html (describing a homeowner's five-year battle to avoid foreclosure based on the note-holder's inability to produce the note). For an amusing commentary on the case, and on the generally negligent practices of lenders and investors in keeping track of their notes, see a blog entitled Lost Note Affidavits & Skeletons in the Closet, a Posting of Tanta to Calculated Risk, http://www.calculatedriskblog.com/2008/02/lost-note-affidavits-skeletons-in.html (Feb. 26, 2008, 11:54 EST).

n113. Bob Ivry, Banks Lose to Deadbeat Homeowners as Loans Sold in Bonds Vanish, Feb. 22, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aejJ ZdqodTCM.

n114. Id.

n115. See, e.g., Norwest Bank v. Walker, 2005-1068 (La. App. 4 Cir. 5/24/06); *933 So. 2d 222.* See also *Mortgage Elec. Registration Sys., Inc. v. Badra, 991 So. 2d 1037 (Fla. Dist. Ct. App. 2008); State St. Bank & Trust Co. v. Lord, 851 So. 2d 790, 791 (Fla. Dist. Ct. App. 2003).*

n116. See *Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo. Ct. App. 2009).* In Bellistri, MERS assigned the deed of trust to an assignee, but did not hold or assign the note. *Id. at 621.* The original payee of the note likewise did not assign or transfer the note to the assignee. Id. The court held that the assignee did not hold the note, and consequently had no standing to defend against a tax sale purchaser's quiet title action. *Id. at 623.*

n117. See *Restatement (Third) of Prop.: Mortgages § 5.4(b)* (1997) (providing that a transfer of the mortgage will also transfer the obligation unless the parties agree otherwise). Accord *WM Specialty Mortgage, LLC v. Salomon, 874 So. 2d 680, 682 (Fla. Dist. Ct. App. 2004)* ("Any form of assignment of a mortgage, which transfers the real and beneficial interest in the securities unconditionally to the assignee, will entitle him to maintain an action for foreclosure." (quoting *Johns v. Gillian, 184 So. 140,* (Fla. 1938)); *Felin Assoc., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971)* ("The mortgage assignment, when accepted and recorded, transfers the interest in the note and mortgage by operation of law ... where as here there is no doubt that there is an intent to so transfer the interest in the note and mortgage.") (citation omitted). There is, however, considerable dissent from this view. See *Restatement (Third) of Prop.: Mortgages § 5.4,* Reporter's Note, at 389; LaSalle Bank Nat'l Ass'n v. Lamy, 2006 N.Y. slip op. 51534(U) at 2 (N.Y. Sup. Ct. Aug. 7, 2006) (assignment of the mortgage did not transfer the debt); *Fleet Nat'l Bank v. Nazareth, 818 A.2d 69, 70 (Conn. App. Ct. 2003)* (assignment of mortgage did not transfer the note); *South Carolina Nat'l Bank v. Halter, 359 S.E.2d 74, 77 (S.C. Ct. App. 1987)* (holding that whether assignment of mortgage transfers note is question of intent).

37 Pepp. L. Rev. 737, *

n118. *U.C.C. § 3-309(a)* (1990).

n119. *977 F. Supp. 491 (D.D.C. 1997).* See also *Cadle Co. of Conn. v. Messick, 45 U.C.C. Rep. Serv. 2d 563 (Conn. Super. Ct. 2001)* (reaching the same conclusion); *State St. Bank & Trust Co. v. Lord, 851 So. 2d 790 (Fla. Dist. Ct. App. 2003)* (subsequently reversed by the Florida adoption of amended § 3-309); see also *U.C.C. § 3-309(a)* (1990).

n120. Timothy R. Zinnecker, Extending Enforcement Rights to Assignees of Lost, Destroyed, or Stolen Negotiable Instruments under U.C.C. Article 3: A Proposal for Reform, *50 U. Kan. L. Rev. 111 (2001).* Zinneker's treatment is extremely thorough and thoughtful.

n121. *U.C.C. § 3-203* (2005); see also *NAB Asset Venture II, L.P. v. Lenertz, Inc., No. C4-97-2181, 1998 WL 422207, at 5* (Minn. Ct. App. July 28, 1998).; *Bobby D. Assocs. v. DiMarcantonio, 751 A.2d 673, 676 (Pa. Super. Ct. 2000).*

n122. See, e.g., *Atlantic Nat'l Trust, LLC v. McNamee, 984 So. 2d 375 (Ala. 2007); Beal Bank, S.S.B. v. Caddo Parish-Villas S., Ltd., 218 B.R. 851 (N.D. Tex. 1998),* aff'd, *250 F.3d 300 (5th Cir. 2001); YYY Corp. v. Gazda, 761 A.2d 395, 401 (N.H. 2000).*

n123. *U.C.C. § 1-103* (2002).

n124. Id.

n125. *Ark. Code Ann. § 4-3-309* (1987), amended by 2005 Ark. Acts, No. 856, § 33.

n126. *Fla. Stat. § 673.3091* (2009), amended by 2004 Fla. Laws ch. 2004-3.

n127. *Ky. Rev. Stat. Ann. § 355.3-309* (West 2009), amended by 2006 Ky. Acts ch. 242, § 37.

n128. *Minn. Stat. § 336.3-309* (2009), amended by 2003 Minn. Laws ch.81, Art.1, § 6.

n129. Neb. Uniform Commercial Code § 3-309, amended by 2003 Neb. Laws, LB 128, § 3.

n130. *Nev. Rev. Stat. § 104.3309* (2009), amended by 2005 Nev. Stat. ch. 439, § 6.

n131. *N.H. Rev. Stat. Ann. § 382-A:3-309* (2009), amended by 2003 N.H. Laws 121:1.

n132. *Okla. Stat. tit. 12A, § 3-309* (2009), amended by 2008 Okla. Sess. Laws, ch. 382, § 7.

n133. S.C. Code Ann. § 363-309 (2009), amended by 2008 S.C. Acts, Act No. 204.

n134. Tex. Bus. & Com. Code Ann. § 3-309 (Vernon 2009), amended by 2005 Tex. Gen. Laws, ch. 95, § 6.

n135. *U.C.C. § 3-309(a)* (2002).

n136. Id. § 3-309(b).

37 Pepp. L. Rev. 737, *

n137. See *Huckell v. Matranga, 160 Cal. Rptr. 177, 182 (Ct. App. 1979)* (corporate surety bond, and not merely personal indemnity of the note's holder, is required to comply with U.C.C. Article 3 lost note provisions).

n138. For example, one surety company estimates that the bond is typically for one-and-a-half to two times the amount of the note, at a premium of two percent. For a debt of $ 250,000, the premium could be $ 10,000. See Surety1, Lost Trust Deed/Note Surety Bond, available at http://www.surety1.com/surety_bond.php?id=37 (last visited Nov. 7, 2009).

n139. See, e.g., *North Carolina General Statutes § 47-46.3* Affidavit of Lost Note, OneCLE, available at http://law.onecle.com/north-carolina/47-probate-and-registration/47-46.3.html; Regal Title Agency (New York), Affidavit of Lost Note, available at http://www.regalnyc.com/forms/ aff/lost_note_affidavit.pdf. Not all forms contain the "due diligence" language; other forms merely state that "the original note has been lost, misplaced, or destroyed and cannot be produced." See, e.g., Fairfax Commissioner of Accounts, Affidavit of Lost Original Note Pursuant to *Virginia Code § 55-59.1(B)*, available at http://www.fairfaxcommissionerofaccounts.org/open/docs/Lost%20N ote %20Affidavit.pdf. Even under this language, a court might well insist that the individual executing the affidavit have actual knowledge that the note "cannot be produced."

n140. *U.C.C. § 3-309(a)* (1999).

n141. Ivry, supra note 113 (quoting comments of Jane Raskin of Miami, Florida).

n142. Id.

n143. For a thorough description of nonjudicial foreclosure, which is available in about half of the American states, see Grant S. Nelson & Dale A. Whitman, Reforming Foreclosure: The Uniform Nonjudicial Foreclosure Act, *53 Duke L. J. 1399 (2004).*

n144. In the absence of a proceeding seeking an injunction, the mortgagor may well be held to have waived any defenses to a nonjudicial foreclosure. See *Plein v. Lackey, 67 P.3d 1061 (Wash. 2003)* (en banc).

n145. Under California law, for example, the trustee is not required to have possession of the note in order to pursue a nonjudicial foreclosure. See Quintos v. Decision One Mortgage Co., No. 08-*CV-1757 JM (POR), 2008 WL 5411636* (S.D. Cal. Dec. 29, 2008); Neal v. Juarez, No. 06cv0055 J(JMA), 2007 WL 2140640 (S.D. Cal. July 23, 2007). Both of these recent federal decisions are based on the court's reasoning in *California Trust Co. v. Smead Inv. Co., 44 P.2d 624 (Cal. Ct. App.1935).* One California attorney observed, "In California, if you were to walk into any one of the major title companies offices to ask their "trustee' to foreclose on property secured by note they would ask you for two documents. The note and the reconveyance." Posting of Pamela D. Simmons, Soquel, California, to http://dirt.umkc.edu/(Oct. 20, 2009) (on file with author). She added that, since many trustees are not major title companies, "now it is clear many trustees are not checking this." Id.

n146. *YYY Corp. v. Gazda, 761 A.2d 395 (N.H. 2000)* (nonnegotiable agreement could be enforced despite the fact that party seeking enforcement did not have possession of note).

n147. See *Ocwen Fed. Bank, FSB v. Russell, 53 P.3d 312, 326 (Haw. Ct. App. 2002)* (summary judgment refused because genuine issue of material fact exists as to whether note is negotiable).

n148. See, e.g., *Va. Code Ann. § 55-59.1(B)* (2009) (requiring the lender in a nonjudicial foreclosure to give the debtor notice that the note is unavailable, and authorizing the debtor to petition the circuit court for a order providing adequate protection against double liability). The statute is not dependent on the note's negotiability. See also *New England Sav. Bank v. Bedford Realty Corp., 680 A.2d 301, 310 (Conn. 1996)* (where note is lost, contents of note can be proved by secondary evidence and note can be enforced); *Felin Assoc., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971)* (affidavit found acceptable in place of lost nonnegotiable note); *Hayes v. Bouligny, 420 S.W.2d 800, 802 (Tex. Civ. App. 1967)* (assignee of nonnegotiable note proved its terms by "legally competent evidence" and could enforce it). It is arguable that when the lost note is nonnegotiable, no indemnity in favor of the maker against double enforcement need be required, because if the maker pays the note, she or he will be able to assert the payment as a defense in a second enforcement action. See *Bainbridge Farm Co. v. Bower, 21 S.E.2d 224, 227 (Ga. 1942)*.

n149. *U.C.C. § 3-203(a)* (2005).

n150. See, e.g., *Braut v. Tarabochia, 17 P.3d 1248, 1249 (Wash. Ct. App. 2001)* (court willing to accept a photocopy of the note as evidence that the holder possessed it); *In re Foreclosure Cases, 521 F. Supp. 2d 650, 654 (S.D. Ohio 2007)* (court indicated a willingness to accept a legible photocopy of the promissory note if the assignment of the mortgage was recorded and all other procedural requirements were in order).

n151. *Ingram v. Earthman, 993 S.W.2d 611, 632 (Tenn. Ct. App. 1998)* ("It is the better practice in a suit on a note, negotiable or not, for the plaintiff to produce the original note at trial and introduce it into evidence. Doing so effectively forestalls any issue concerning whether the plaintiff is the holder or owner of the note.").

n152. *McKay v. Capital Res. Co., 940 S.W.2d 869, 870 (Ark. 1997)*.

n153. *Id. at 871.* Note the court's implicit assumption that all notes are negotiable. See also *Fleet Nat'l Bank v. Nazareth, 818 A.2d 69 (Conn. App. Ct. 2003)* (holder of mortgage assignment but not of assignment of note could not maintain foreclosure); *State St. Bank & Trust Co. v. Lord, 851 So. 2d 790, 791 (Fla. Dist. Ct. App. 2003)* ("To maintain a mortgage foreclosure, the plaintiff must either present the original promissory note or give a satisfactory explanation for its failure to do so."). Presumably such a satisfactory explanation would come in the form of a lost note affidavit. But see cases cited supra note 75 (contradictory cases of nonnegotiable notes).

n154. See supra notes 80-96 and accompanying text for an illustration of the widespread failure of the courts to pay attention to negotiability. For another good example, see *SMS Fin., LLC v. ABCO Homes, Inc., 167 F.3d 235 (5th Cir. 1999)* (quoting U.C.C. Article 3 at length and holding that the holder of a note can enforce it even if delivery to the holder was inadvertent, but providing no discussion of whether the note was negotiable or not).

n155. See, e.g., *In re Jacobson, 402 B.R. 359 (Bankr. W.D. Wash. 2009)* (holding that servicer to which the note had not been assigned had no standing to pursue foreclosure); *Bayview Loan Servicing, L.L.C. v. Nelson, 890 N.E.2d 940 (Ill. App. Ct. 2008)* (servicer to which note and mortgage had never been assigned had no standing to pursue foreclosure).

n156. See, e.g., DLJ Mortgage. Capital, Inc. v. Parsons, No. 07-*MA-17*, 2008 WL 697400, at 4 (Ohio Ct. App. Mar. 13, 2008) (finding servicer was not real party in interest at the time foreclosure was ordered by trial court, where holder of note and mortgage did not assign them to servicer until after order was entered); *First Union Nat'l Bank v. Hufford, 767 N.E.2d 1206, 1207 (Ohio Ct. App. 2001)* (holding that where original mortgagee was merged to another institution to form a third institution, which filed foreclosure action, the foreclosing entity was not the real party in interest in the absence of an assignment of the note and mortgage to it; holding also that a letter from Comptroller of the Currency verifying merger was insufficient evidence of foreclosing en-

tity's interest. Cf. *McCray v. Federal Nat'l Mortgage Ass'n, 663 S.E.2d 736 (Ga. Ct. App. 2008)* (both note holder and servicer may be real parties in interest). Furthermore, under Federal Rules of Civil Procedure, "An action must be prosecuted in the name of the real party in interest." *Fed. R. Civ. P. 17.* The federal courts have struggled with the issue of whether a mortgage servicer is a real party in interest. See *In re Woodberry, 383 B.R. 373 (Bankr. D.S.C. 2008)* (where note was endorsed in blank and in possession of servicer, it was a "real party in interest;" no recorded assignment of the mortgage was necessary); *In re Foreclosure Cases, 2007 WL 3232430, at 2* (N.D. Ohio Oct. 31, 2007) (finding no violation of the "real party in interest" rule if the foreclosing servicer had a recorded assignment of the mortgage). Contra, *In re Kang Jin Hwang, 396 B.R. 757 (Bankr. C.D. Cal. 2008)* (when mortgage loan has been securitized, real party in interest is the trustee of the securitized trust, not the servicing agent); *In re Jacobson, 402 B.R. 359 (Bankr. W.D. Wash. 2009)* (same); *In re Sheridan, 2009 WL 631355 (Bankr. D. Idaho 2009)* (MERS as nominee for holder of note was not real party in interest and could not maintain foreclosure action). As the court in Jacobson commented, "This is the flip side of Woody Allen's observation that "Eighty per cent of success is showing up" - if you (or your counsel of record if you are a corporate entity) don't, your chance of success approaches zero." *Jacobson, 402 B.R., at 365.*

n157. MERS is the Mortgage Electronic Registration System created by the major participants in the secondary mortgage market to maintain an electronic, on-line registry of mortgage assignments (and thus avoid the expense and inconvenience of recording assignments in the public records). The mortgage may be originated in the name of MERS as nominee for the actual mortgagee, or the mortgage may be assigned to MERS after origination. However, MERS does not hold or take possession of the corresponding mortgage notes, and custody of the notes is the responsibility of the originating mortgagee and any secondary market purchasers. See Carson Mullen, MERS: Tracking Loans Electronically, Mortgage Banking, May 2000, at 64. MERSCORP, Inc. is a privately held Delaware stock corporation currently owned by twenty-eight companies, including Fannie Mae, Freddie Mac, the Mortgage Bankers Association of America, the American Land Title Association, First American Title, Stewart Title, MGIC, PMI, Merrill Lynch, and various mortgage companies. In some jurisdictions, it has been customary for mortgagees to pursue foreclosure in the name of MERS because it is the holder of record of the mortgage. When this occurs, MERS' standard procedures dictate that the promissory note be assigned and its possession transferred to MERS prior to initiation of the foreclosure. See Mortgage Elec. Registration Sys., Ohio Fed. Court Opinions and Orders in Mortgage Foreclosure Actions (Nov. 28, 2007), available at http://www.mersinc.org/MersProducts/publications.aspx?mpid=1. This was done and upheld by the court, for example, in *Mortgage Electronic Registration Systems, Inc. v. Coakley, 838 N.Y.S.2d 622 (App. Div. 2007).* If these procedures are followed, MERS suggests (evidently correctly) that no problem should arise with the "real party in interest" doctrine. Id.

n158. The argument against MERS' standing stems from the fact that, even if it holds both the note and the mortgage, it is in fact a nominee for the beneficial owner of the note. Most recent state cases have held that this is irrelevant, and that MERS is entitled to pursue the foreclosure on behalf of the beneficial owner. See *In re Huggins, 357 B.R. 180 (Bankr. D. Mass. 2006); Mortgage Elec. Registration Sys., Inc. v. Ventura, No. CV054003168S, 2006 WL 1230265* (Conn. Super. Ct. Apr. 20, 2006); *Mortgage Elec. Registration Sys., Inc. v. Revoredo, 955 So. 2d 33, 34 n.2 (Fla. Dist. Ct. App. 2007)* ("We simply don't think that this [the fact that MERS is not the beneficial owner] makes any difference"); *Mortgage Elec. Registration Sys., Inc. v. Azize, 965 So. 2d 151 (Fla. Dist. Ct. App. 2007);* Green Tree Servicing LLC v. Sanders, No. 2005-*CA-000371-MR, 2006 WL 2033668* (Ky. Ct. App. July 21, 2006); *In re Sina, No. A06-200, 2006 WL 2729544* (Minn. Ct. App. Sept. 26, 2006); *Mortgage Elec. Registration Sys., Inc. v. Coakley, 838 N.Y.S. 2d 622 (App. Div. 2007).* See also *Chase Manhattan Mortgage Corp. v. Smith, No. C-061069, 2007 WL 3225534* (Ohio Ct. App. Nov. 2, 2007) (where both note and mortgage had been assigned to MERS, it was real party in interest and could maintain foreclosure action). Contra *LaSalle Bank v. Lamy, No. 030049/2005, 2006 WL 2251721 (N.Y. Sup. Ct. 2006)* (assignment by MERS to foreclosing servicer was ineffective because MERS was a mere nominee). See also *Landmark Nat'l Bank v. Kesler, 192 P.3d 177 (Kan. Ct. App. 2008)* (as a mere nominee, MERS as holder of second mortgage was not entitled to notice of foreclosure of first mortgage).

n159. See, e.g., *Idaho Code Ann. § 45-1505(1)* (Michie 2009); *Mich. Comp. Laws Ann. § 600.3204(c)(1)* (West 2009); *Minn. Stat. § 580.02(3)* (2009); 46 Okla. Stat. tit.§§12, 13 (2009); *S.D. Codified Laws § 21-48-2* (2009). See also *Family Fin. Servs., Inc. v. Spencer, 677 A.2d 479, 483 (Conn. App. Ct. 1996)* (construing the

37 Pepp. L. Rev. 737, *

Connecticut recording act to deprive a mortgage assignee of standing to foreclose if the assignment is unrecorded); Steve Brandt, Lawsuit Seeks to Block Some Foreclosures, Minneapolis Star-Tribune, Jan. 26, 2008, http://www. startribune.com/templates/Print_This_Story?sid=14 444016 (describing a suit filed in Hennepin County, Minnesota to block foreclosures in the name of MERS because it did not disclose the actual holder of the assigned mortgage, thus arguably violating the Minnesota statute cited above); *Terwin Advisors, LLC v. Balbachan, 15 Misc. 3d 1127*(A) (N.Y. Sup. Ct. 2007) (dismissing a foreclosure complaint because the moving party failed to show any assignment of the mortgage to it).

n160. Lenders often seem resistant to taking (or even understanding) the necessary steps. See In re Schwartz, No. 06-42476-*JBR, 2009 WL 530278 at 1 (Bankr. D. Mass. 2009),* for an example of where the court castigated the foreclosing lender for presenting a "jumble of documents and conclusory statements, some of which are not supported by the documents and indeed even contradicted by them."

n161. Perhaps the most spectacular illustration of the problem was the threatened destruction by bankrupt American Home Mortgage Investment Corp. of 490,000 hard copy home mortgage loan files that it had originated because it did not wish to continue to pay the $ 45,000 per month rental on the storage space. Boston Globe, American Home under Fire over Loan Files, Jan 3, 2008, http:// www.boston.com/business/articles/2008/01/03/american_hom e_under_fire_over_loan_files. The company subsequently relented, agreeing to provide the originals to the current holders of the notes and mortgages for a fee. See Nikki Swartz, AMH Planned to Trash Mortgage Files, Allbusiness.com, May 1, 2008, http://www.allbusiness.com/banking-finance/banking-lending-credit-services/11483889-1.html.

n162. Indeed, U.C.C. Article 9 defines an "instrument" to include both negotiable instruments and "any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment." *U.C.C. § 9-105(1)(i)* (2001). Thus nonnegotiable notes are "instruments" under Article 9. Note that this definition is entirely different than that of U.C.C. Article 3, which limits its coverage to negotiable instruments.

n163. It is universally agreed that a nonnegotiable instrument can be transferred by delivery. See, e.g., *McFarland v. Brier, 850 A.2d 965, 975 (R.I. 2004)* (nonnegotiable certificate of deposit can be transferred by delivery); *Nat'l Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn, 634 N.Y.S.2d 609 (Sup. Ct. 1994)* (same).

n164. See *Sec. Pac. Nat'l Bank v. Chess, 129 Cal. Rptr. 852, 856 (Cal. Ct. App. 1976)* (note may be transferred by separate instrument of assignment); *Means v. Clardy, 735 S.W.2d 6, 10 (Mo. Ct. App. 1987)* (nonnegotiable note may be transferred by pledge or assignment); *Vaughn v. DAP Fin. Servs., Inc., 982 S.W.2d 1, 7 (Tex. App. 1997)* ("A non-negotiable note remains susceptible of assignment, as in the case of any other chose of action."). Cf. *Bonhiver v. State Bank of Clearing, 331 N.E.2d 390, 397 (Ill. App. Ct. 1975)* (nonnegotiable certificate of deposit may not be transferred by separate instrument).

n165. When a mortgage originator enters into such an agreement with a secondary market purchaser, the agreement will often contain, in addition to provisions for the sale of the notes and mortgages, provisions for the originator to continue servicing the mortgages. See, e.g., California Housing Finance Agency, Mortgage Purchase and Servicing Agreement (Nov. 2007), www.calhfa .ca.gov/homeownership/newlenders/MPSA.pdf; Prudential Mortgage Capital Funding, LLC, Mortgage Loan Purchase and Sale Agreement (Mar. 7, 2003), http://consusgroup.com/previews/ 150319.

n166. As noted above, it is also necessary in some jurisdictions to prove a recorded chain of mortgage assignments to the party seeking foreclosure. See supra notes 160-61 and accompanying text.

37 Pepp. L. Rev. 737, *

n167. See supra notes 162-64 and accompanying text.

n168. MERS tracks ownership of mortgages, not notes. Its principal purpose is to avoid the inconvenience and expense of repeated recordation of mortgage assignments in the public records as loans are transferred on the secondary market. See supra note 157; MERSCORP, Inc, Mers Commercial: Legal Primer, in Practicing Law Inst., Commercial Real Estate Financing 2008: What Borrowers & Lenders Need to Know Now (2008) ("MERS does not impact the chain of title to the mortgage promissory note.").

n169. See Walter Wheeler Cook, The Alienability of Choses in Action, *29 Harv. L. Rev. 816 (1916)* (tracing the evolution of assignability of choses in action). The development of assignability in England was completed by the English Judicature Act, 1873, 36 & 37 Vict., c. 66, § 25 (6).

n170. See John Calamari & Joseph Perillo, Contracts § 18.21 (5th ed. 2003) (describing the two principal American strains of authority: the New York rule, under which the first assignee prevails, and the Massachusetts rule, under which the first prevails unless the second qualifies by, inter alia, receiving a symbolic writing). It is generally assumed that a maker who pays one assignee of a nonnegotiable note will be able to raise that payment as a defense in an enforcement action by a competing assignee. See *Felin Assocs., Inc. v. Rogers, 326 N.Y.S.2d 413, 415 (App. Div. 1971); Bainbridge Farm Co. v. Bower, 21 S.E.2d 224, 227 (Ga. 1942).*

n171. See supra notes 110-11 and accompanying text.

n172. See, e.g., *Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F. Supp. 1304, 319-20 (D.S.C. 1994),* aff'd *87 F.3d 1308 (4th Cir. 1996),* (second assignee was found to be a holder in due course and prevailed); *Foster v. Augustanna Coll. & Theological Seminary, 218 P. 335 (Okla. 1923).*

n173. See supra notes 59-79 and accompanying text.

n174. See, e.g., *Impac Warehouse Lending Group v. Credit Suisse First Boston LLC, 270 F. App'x. 570, 2008 WL 731050 (9th Cir. 2008)* (holding that a secondary market investor was not liable for fraudulent double-selling of loans by originator); *Provident Bank v. Cmty. Home Mortgage Corp., 498 F. Supp. 2d 558, 562 (E.D.N.Y. 2007)* (mortgage originator obtained duplicate originals of promissory notes from borrowers and double-pledged them to two competing warehouse lenders); *Midfirst Bank, 893 F. Supp. at 1310* (secondary market investor placed loans in a GNMA pool without paying originator for them); *In re Valentine, 146 B.R. 945 (Bankr. E.D. Va. 1991)* (originator sold loan to one investor and a portion of the remaining payments to another investor); *Am. Bank of the S. v. Rothenberg, 598 So. 2d 289, 289 (Fla. Dist. Ct. App. 1992)* (originator pledged mortgage loan to one party and subsequently sold it to another).

n175. See supra note 92 for an explanation of the allonge.

n176. Unless, of course, the legend was placed on an allonge and a dishonest seller carefully removed it before reselling the note.

n177. See R.K. Arnold, Yes, There Is Life on MERS, *11 Prob. & Prop. 33, 33* (July-Aug. 1997) (describing the negotiations and decisions underlying the creation of MERS). See also notes 157-159 and accompanying text.

n178. Another change in the market that may have a similar result, if it becomes law, is the Mortgage Reform and Anti-Predatory Lending Act, H.R. 1728, 111th Congress (passed by the House at this writing). Section 213 of the bill would require all mortgage originators to retain at least a five percent ownership interest in the

37 Pepp. L. Rev. 737, *

loans they sell other than standard thirty-year fixed rate fully documented loans. This "skin in the game" provision would have the effect of substantially increasing the capital requirements for mortgage bankers, and might drive some weaker mortgage bankers out of the market, in the view of the Mortgage Bankers Association. See The Mortgage Reform and Anti-Predatory Lending Act of 2009: Hearing on H.R. 1728 Before the H. Comm. on Fin. Servs., 111th Cong. 4 (2009) (statement of David G. Kittle, Chairman, Mortgage Bankers Association), available at http://www.house.gov/apps/list/hearing/financialsvcs_dem /mba_-_kittle.pdf.

149TPX

********** Print Completed **********

Time of Request: Thursday, September 27, 2012  14:41:07 EST

Print Number:    2828:372335374
Number of Lines: 1144
Number of Pages:

Send To:  Krawczyk, Andrew
          STAFNE LAW FIRM
          239 N OLYMPIC AVE
          ARLINGTON, WA 98223-1336