THE HON. MARSHA J. PECHMAN

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| TRAVIS MICKELSON, DANIELLE H. MICKELSON, et. ux.<br><br>Plaintiffs,<br><br>vs.<br><br>CHASE HOME FINANCE LLC, et. al.<br><br>Defendants. | NO. 2:11-cv-01445<br><br>DECLARATION OF JOSH AUXIER |

I, Josh Auxier, declare under penalty of perjury under the laws of the State of Washington that the following is true and correct to the best of my knowledge:

1. I am a licensed Real Estate Broker, License # 50366 in Washington State. I am the Designated Broker of ACRES, a licensed Real Estate Firm in Washington State, License # 17489. I am also the founder and owner of the Property Defense Network, a web-site designed to provide information and help to borrowers facing foreclosure.

2. I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime of moral turpitude. I am competent in all respects to make this Declaration. I have personal knowledge of the matters declared herein, and if called to testify, I could and would competently testify to the facts and/or the opinions set forth herein.

3. I have worked in the real estate and mortgage industry as both a Licensed Real Estate Agent/Broker and Loan Officer with The Real Estate Group and Integrated Mortgage since 2005.

4. Since 2007 I have spent more than 5,000 hours negotiating short sales and loan modifications and advising borrowers and investors about foreclosures and the effects of securitization and the MERS system both in default and non-default situations. As part of this work I have consulted with and advised other knowledgeable experts and professionals, including attorneys, legislators, regulatory agencies and consumer groups. Further, I have researched laws, articles, and case authority, relating to real property titles, the negotiation and transfer of promissory notes secured by real property as well as the non-judicial foreclosure upon residential real property as security for defaults related to such promissory notes. I am familiar with the causes and effects of foreclosures; including the effects this has on real property titles and borrowers lives.

5. In addition to research, my knowledge and experience in short sales, loan modifications, and non-judicial foreclosures has been gained from my direct negotiations and interactions with many different mortgage servicers, lenders, trustees, attorneys, investors, and borrowers owning residential real estate.

6. I have accumulated expertise in the effects of mortgage securitization through my personal research from varying legal and governmental resources; such as the Securities and Exchange

Commission's EDGAR database, Regulatory Reports and Bulletins, Freddie Mac and Fannie Mae websites and their rules and regulations. I also have personal and corporate experiences involving this subject matter.

7. I have reviewed the declarations which have been filed in this case related to the cross motions for summary judgment filed on behalf of plaintiff Mickelsons and defendants NWTS, Vonnie McElligott, and Routh, Crabtree, and Olsen. These include the declarations of Danielle Mickelson, Travis Mickelson, Josie Fallgetter, William J. Paatalo, Vonnie McElligott, and Kimberly Raphaeli as well as the exhibits thereto.

8. I have been asked whether I have an opinion based on a more likely than not basis which persons or entities, if any, Routh, Crabtree, and Olsen (RCO) represented in the non-judicial foreclosure by Northwest Trustee Services of the Mickelsons' property based on my review of the pleadings in this case and my experience and expertise with regard to non-judicial foreclosures.

9. I do have an opinion based on my experience and expertise as set forth above and my review of the foregoing described evidence as to the entity or entities RCO represented with regard to the Mickelsons' non-judicial foreclosure.

10. My opinion is that RCO represented Chase Home Finance, LLC, (Chase Home) which was a wholly owned operating subsidiary of JP Morgan Chase Bank, N.A., the party who operated as the servicer of the loan which NWTS non-judicially foreclosed upon, as well as NWTS, RCO's affiliated "full service trustee firm", with regard to the non-judicial foreclosure of the Mickelsons' home.

11. My opinion in this regard is based in part on the fact that NWTS and RCO both publicly identify on their websites that they are affiliated and work in cooperation with each other.

NWTS in fact defines RCO as its "sister law firm" on its website. The following appears on the home page of NWTS's website

> "We conduct foreclosures in Alaska, Arizona, California, Idaho, Montana, Nevada, Oregon and Washington. Our sister law firm, Routh Crabtree Olsen, P.S. conducts judicial foreclosures in our coverage area and RCO Hawaii, L.L.L.C conducts foreclosures in Hawaii."

See http://www.northwesttrustee.com/

12. I also base my opinion on my review of Defendants' motion for summary judgment, which identifies RCO as the attorneys for Northwest Trustee Services, Inc., its employee Vonnie McElligott, and RCO".

13. I also base my opinion on Exhibits 1 and 2 to Kimberly Raphaeli's declaration in support of RCO's motion for summary judgment. These exhibits are letters from RCO to the Mickelsons stating that RCO represents "Chase Home Finance, LLC". The letters identify Chase Home Financial as Mickelsons' "mortgage company". The letter then states RCO has been instructed "to commence foreclosure proceedings against your property".

14. Based on my experience I know Chase Home Finance, LLC was a wholly owned operating subsidiary of JP Morgan Chase Bank, N.A., which operates as a servicer for Freddie Mac who's normal business practice according to Freddie Mac's website is described as follows:

> In our Single-Family business, we use mortgage securitization to fund millions of home loans every year.
>
> Securitization is a process by which we purchase home loans that lenders originate, put these loans into mortgage securities that are sold in global capital markets, and recycle the proceeds back to lenders. This recycling is designed to ensure that lenders have mortgage money to lend.

15. It is my observation that RCO as part of its normal business practices cooperates with and acts alongside NWTS in performing non-judicial foreclosures throughout Washington State, this includes both MERS system non-judicial foreclosures (like that which occurred in the case of the Mickelsons' home) as well as other non-judicial foreclosures which do not involve MERS.

16. In this regard, I would point out that Exhibit D to Danielle Mickelson's declaration is a letter from Chase Home Finance, LLC, which states in pertinent part: "This letter is to tell you that we have forwarded your loan to an attorney/trustee to immediately initiate foreclosure proceedings."

17. This language suggests that either the attorney is the trustee or that the attorney and trustee work together.  This interpretation is bolstered by my experience that NWTS commonly charges for attorney fees performed by RCO as part of its costs.  See Exhibits F and I, which state: "To cure monetary default(s), you must bring your payments current, pay accrued late charges, advances, other costs, trustee's fees and attorneys' fees as set forth below…".

18. My experience suggests it is not possible to tell who RCO primarily represents in this case.  This is because RCO is also "Designated Counsel for Freddie Mac in California and Washington".

19. I have also been asked whether I have an opinion based on my review of the aforementioned materials, my experience and expertise as to whether the Mickelsons were "dual tracked" and, if so, why?

20. I do have an opinion.  The Mickelsons were dual tracked.

DECLARATION OF JOSH AUXIER

STAFNE LAW FIRM

239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

21. I base this opinion on, among other things, the two and a half year time period the modification/foreclosure process was pending and Mrs. Mickelsons description of the process as set out in her declaration.

22. No one disputes that dual tracking routinely occurred in the time period. The 50 state attorney generals' settlement with JPMorgan Chase Bank, N.A. and other large banking institutions specifically calls for its elimination. See e.g. United States v Bank of America, U.S. District Court for the District of Columbia, Cause Number 00361-RMC, Appendix A 17-21.

23. Additionally, the practice of dual tracking borrowers by loan servicers and trustees through pursuing loan modification and foreclosure at the same time is well documented. See e.g. Diane E. Thompson, Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications, 86 Wash. L. Rev. 755 (2011).

24. In my experience the result of dual tracking is to increase the borrower's costs (which include those paid to sub-servicers and trustees during the dual tracking process) to a point where any real modification with the actual owner of the note becomes impossible because the debt has grown so much.

25. Diane E. Thompson explains this process well in Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications, 86 Wash. L. Rev. 755 (2011).

> 3. Dual-Track Provisions in Investor Contracts Hinder Modifications
>
> Many PSAs, as well as the credit rating agencies, require servicers to process both foreclosures and loan modifications at the same time. 187 Servicers face the possibility of noncompliance with the PSA (and legal action by the trust) or a lowered credit rating if they ignore these mandates. These incentives to proceed along a dual track result in many unnecessary and otherwise avoidable foreclosures. The lack of communication within the servicer between the loan modification and the foreclosure department, the piling on of foreclosure fees,

and the often longer time to process a loan modification than a foreclosure, all mean that needless foreclosures are commonplace.

Subprime servicers, in particular, are expected to show "strict adherence to explicit timelines," offer and accept workouts from only a predefined and standardized set of options, and not delay foreclosure while loss mitigation is underway. 188 The speed at which loans are moved from default through foreclosure is "a key driver in the servicer rating process," 189 encouraging servicers to compete for the fastest time to foreclosure.

Servicers process foreclosures and loan modifications through different departments. 190 Communication between the two departments is imperfect. 191 Homeowners assured that they will be receiving a loan modification by one department may nonetheless find themselves facing a foreclosure. 192

In part because loan modifications often require more deviations from the norm, loan modifications often take more time to work out than foreclosures do. Servicers rely heavily on the mechanized production of [*795] form documents in processing both foreclosures and loan modifications. Any variation from the cookie-cutter norm imposed by the form documents causes delay and consternation. But the two-track system pushes the foreclosure forward regardless, with the result that foreclosures frequently occur while homeowners are negotiating a loan modification, sometimes even after they have been approved for a loan modification. 193

Even if a foreclosure never happens, the cost of the modification increases as the servicer imposes various foreclosure-related (and often improper) fees on the homeowner, 194 and the homeowner suffers the financial, credit, and emotional toll of defending a foreclosure. These fees are lucrative to the servicer but can price a modification out of a homeowner's reach. 195 Moreover, where there is little or no equity left in the home, reimbursement for these fees will come out of the investor's pockets at any foreclosure sale. 196

The rules requiring the two-track system were instituted to encourage servicers to minimize delay. 197 In the current market, where the time to sell a property can stretch out for months and losses are severe, the two-track system does not serve even investors well. The two-track system [*796] has allowed servicers to continue to skim costs from the foreclosure process. Worse, because the two-track system does not ensure that homeowners are evaluated for appropriate loan modifications before foreclosure, it has resulted in many unnecessary and expensive foreclosures.

26. My opinion is that the dual tracking of the Mickelsons enriched the servicers and trustees at of expense of the true owners of note and the Mickelsons. I base my opinion on Mrs. Mickelson's declaration regarding payments they made to the Chase Home Finance, which likely would have been kept by it and the trustee, rather than accruing to the benefit of the actual note owner. See Mrs. Mickelson's declaration at Exhibit H, ¶¶ 3.32.17; 3,32.28; 3.32.45.

27. This is because once the loan went into default the servicers are commonly (pursuant to the governing documents of the Freddie Mac Single Family Master Trust Agreement and the associated supplements) entitled to additional fees and costs. These fees and costs financially incentivize a drawn out loan modification process where ultimately foreclosure is the most beneficial result for the servicer and trustee.

28. It is also worth noting that once the loan went into foreclosure the trustees and their legal representatives get paid, sometimes via advancements from the servicer, to be reimbursed upon the completion of a foreclosure. Trustee firms, such as NWTS, often use affiliated entities, for statutorily required processing services, such as publication, posting, legal and title in order to generate fees and costs of which are then charged to the homeowner and paid at the completion of the sale. Sometimes trustees will over charge homeowners for these services as part of dual tracking. See attached bar complaint.

29. Given the above profit points, it is easy to recognize that the longer the dual tracking process can be drawn out, the more fees and costs the servicers and trustees are owed.

> For servicers, the true sweet spot lies in stretching out a delinquency without either a modification or a foreclosure. While financing advances is a large expense for servicers, one they will want to end as soon as possible, late fees and other default-related fees can add significantly to a servicers' bottom line, and the longer a homeowner is in default, the larger those fees can be. The

nether-world status between a foreclosure and a modification also boosts the monthly servicing fee (because monthly payments are not reducing principal) and slows down servicers' largest non-cash expense: the amortization of mortgage servicing rights (because homeowners who are in default are unlikely to prepay via refinancing). Finally, foreclosure or modification, not delinquency by itself, usually triggers loss recognition in the pool under the accounting rules. Waiting to foreclose or modify postpones the day of reckoning for a servicer.

How long a delay in the foreclosure will be profitable depends on the interplay of the servicer's ability to charge additional fees during the foreclosure, the servicer's financing costs for advances, and the time limits for proceeding through foreclosure imposed by the investor contracts and credit rating agencies. If the servicer can juggle the time limits - perhaps by offering short-term workout agreements - the prospect of increased fees may outweigh interim interest costs. Once the servicer's financing costs outweigh the incremental fees that can be extracted by maintaining a borrower in delinquency, the servicer will then choose the faster option - either a foreclosure or a modification - all other things being equal.

Diane E. Thompson, Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications, 86 Wash. L. Rev. 755, at 777-8 (2011).

30. My experience in dealing with distressed homeowners is that dual tracking often prevents borrowers from being able to modify their loans because the servicer and trustee, who appear to be working together to facilitate their own monetary gain, have little incentive to arrive at a settlement modification as this stops their revenues from the loan. By the time dual tracking has gone on for a while the fees and costs associated with the default process, which increase the servicers and trustees' income, are so high that many of the modifications, short sales, or other workout formulas that have been created to assist distressed homeowner simply do not apply and as a result little can be done to save the home.

31. In my opinion if borrower could access the true note holders both would see a common benefit in making a prompt determination regarding a loan modification based on existing

DECLARATION OF JOSH AUXIER

STAFNE LAW FIRM
239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM

economic realities and saving the additional costs imposed on the borrowers and note owners imposed by dual tracking practices.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my information and belief.

DATED this 8th day of October, 2012 at Seattle, WA

*[signature]*
Josh Auxier

DECLARATION OF JOSH AUXIER

STAFNE LAW FIRM
239 NORTH OLYMPIC AVENUE
ARLINGTON, WA 98223
TEL. 360.403.8700 /STAFNELAWFIRM@AOL.COM