THE HON. MARSHA J. PECHMAN

1

2

3

4

5

6

7   **UNITED STATES DISTRICT COURT**
    **FOR THE WESTERN DISTRICT OF WASHINGTON**
8                      **AT SEATTLE**

9

10   TRAVIS MICKELSON, DANIELLE H.
     MICKELSON,   and   the   marital        NO. 2:11-cv-01445
11   community thereof

12                                           DECLARATION OF ATTORNEY
                            Plaintiffs,      AND PROFESSOR SHAWN
13                                           TIMOTHY NEWMAN IN
     vs.                                     SUPPORT OF PLAINTIFFS'
14                                           RESPONSE TO DEFENDANTS'
                                             MOTION FOR SUMMARY
15   CHASE  HOME  FINANCE  LLC,  an          JUDGMENT
     unknown entity; et. al.
16

17                          Defendants.

18

19   1.     My name is Shawn Timothy Newman.  I am an educator and attorney.

20   2.     I am a 1983 graduate of Notre Dame Law School where I was a Fellow with the

21   White Center for Law and Government. I was also legislative research editor for the Notre

22   Dame *Journal of Legislation* and wrote various articles for that journal. I have since served

23   on the editorial board for the *Journal of College and University Law.*

24   3.     In 1984, I was admitted to practice in Washington State and have worked as an

25   Assistant Attorney General (Education Division), College Legal Counsel (The Evergreen
26

State College), Senate Counsel (Senate Committee Services), and am currently general counsel at Saint Martin's University (Lacey, Washington).

4.     I am also an adjunct professor at St. Martins University and South Puget Sound Community College (Olympia, Washington).

5.     Among the courses I've taught over the past 20+ years include Legal Studies, Legal Research, Business Law and Commercial Transactions (MBA).

6.     I also have an active private law practice where I have successfully represented a variety of clients in cases before local and federal courts, including the Washington State Supreme Court, Ninth Circuit Court of Appeals and the United States Supreme Court. See, http://www.newmanlaw.us/. I have the highest rating (10 – "Superb") from Avvo. See, http://www.avvo.com/attorneys/98502-wa-shawn-newman-14808.html?cm_mmc=Avvo-_-Avvo_Badge-_-Large-_-14808 .

7.     I have studied the Mortgage Electronic Registration System (MERS) and how MERS works with associated business partners, including trustees, to perform non-judicial foreclosures in Washington and elsewhere. My familiarity with the MERS non-judicial foreclosure system is based upon my academic interest and research of the foreclosure industry. This includes attempts to utilize the UCC Art. 3 and 9 to promote and protect its system of non-judicial foreclosures.   See, American Law Institute and the National Conference of Commissioners on Uniform State Laws, *Report of the Permanent Editorial Board for the Uniform Commercial Code – Application of the Uniform Commercial Code to Selected Issues relating to Mortgage Notes* (Nov. 14, 2011).

8.     My research includes, among other things, review of MERS's publications and website, including its rules for members, and documents about MERS made available by

MERS and its MERS members.  I am also familiar with legal, academic, and public commentary about the MERS and the MERS non-judicial foreclosure system.

9.      For purposes of my declaration in this case the term "MERS system" refers to a non-judicial foreclosure which is based on a four party deed of trust instrument, which contractually defines MERS as a "beneficiary" and even though MERS never took delivery nor has possession of the promissory note or other obligation.

10.      MERS purports to track the electronic transfer of the note as bailee for the security (Deed of Trust).  However, MERS cannot claim to be a bailee (i.e. "warehouse lender") for anyone when MERS never took delivery or possession of the security or the note. See, e.g. Dale Whitman, *How Negotiability Has Fouled Up the Secondary Mortgage Market, and What To Do About It*, 37 Pepp. L. Rev 738 (2010).

11.      I have also acquired familiarity and expertise with MERS and its related business entities utilized in MERS non-judicial foreclosure system through my representation of homeowners opposing foreclosures.

12.      In addition to studying the MERS system of non-judicial foreclosures, I have also written about MERS and the MERS system.  For example, I authored an amicus brief (pro bono) on behalf of the Organization United for Reform OUR-Washington (OUR-Washington) in the case of Bain v. Metropolitan Mortgage Group, 175 Wn.2d 83, __ P. 2d. __ (2012).  As Bain is the Washington Supreme Court's most recent decision regarding the MERS system's potential compatibility with the Washington Deed of Trust Act, RCW Ch. 61.24,[1] and the Court appears to have adopted several of the arguments made by OUR-

---

[1] In Bain the Court could held it could not determine the legal consequences of defendants' use of the MERS system because the record did not contain sufficient facts regarding its consequences. Bain, at ** 110-114.

Washington, I have attached hereto as exhibit 1 a copy of that amicus brief retrieved from the State Supreme Court's website:

http://www.courts.wa.gov/search/index.cmf?fa=search.start_search

I also have written about the MERS system and how it works (or does not work) when Fannie Mae or Freddie Mac are involved.  My most recent article is entitled "Welcome to Freddie and Fannie's Mortgage Shell Game," which was published on Mandel Matters at http://mandelman.ml-implode.com/2011/12/guest-post-welcome-to-freddie-and-fannies-mortgage-shell-game-by-shawn-t-newman-j-d/. I have attached a copy of that article as exhibit 2 to my declaration.

13.     My research for this article included review of materials produced by both Freddie Mac and Fannie Mae.  For example, Freddie Mac's website states:

> Every day, Freddie Mac provides a continuous flow of funds to mortgage lenders. We do so not by making individual mortgage loans to consumers; instead, we support the U.S. home mortgage market by providing money directly to lenders, ensuring that the system is liquid, stable and affordable. To fulfill this vital mission, Freddie Mac buys residential mortgages and mortgage-related securities and guarantees mortgages made by lenders. We issue debt securities to the global capital markets to fund the purchase of mortgages and mortgage-related securities we hold as an investor. We also create and sell mortgage-related securities to the capital markets, providing a guarantee to investors on those securities.
>
> Freddie Mac pools the mortgages it purchases from lenders across the country and packages them into securities that can be sold to investors. These investors include the lenders themselves, pension funds, insurance companies, securities dealers, commercial and central banks, and others. Freddie Mac also is one of the largest investors in mortgage-related securities, purchasing and holding in portfolio a portion of our own securities and those issued by others.

http://www.freddiemac.com/corporate/company_profile/our_business/securities.html

14.     In "Welcome to Freddie and Fannie's Mortgage Shell Game" I opine that there is a "conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes

representing the loans they were selling" and that "[t]his 'policy' was created by Freddie and Fannie." Because of this policy I advise homeowners and their attorneys in my article:

> If you are in litigation, you should follow up with targeted discovery requests to the servicer confirming the servicer does not "own" your mortgage. Moreover, you should inquire and demand any records showing Freddie or Fannie assigned the mortgage to the servicer. Servicers will point to Freddie or Fannie servicing guidelines which basically provide that the servicer forecloses in its (the servicer's) own name. Given a mortgage is an interest in land and the requirement under the statute of frauds that such contracts be in writing, the servicer's standing to foreclose can be challenged absent some proof that the mortgage was specifically assigned by Freddie or Fannie to the servicer. Legally, Freddie and Fannie must assign back the note to the servicer. In fact, Freddie has a specific form 105 to do so.

> See, http://www.allregs.com/tpl/Main.aspx [Sections 66.17 and 66.54].

> However, Freddie and Fannie's guidelines have evolved over time and you may find that there is no such assignment in most cases. Unless there is a written assignment from the mortgage owner (Freddy or Fannie) to the servicer, the servicer cannot foreclose for the simple reason they are not part of the mortgage contract. Simply put, only the mortgage owner can foreclose on the mortgage contract. Moreover, if the assignment of the mortgage is invalid or fraudulent, then there is a "cloud on title" which should be identified by title and mortgage insurers.

15.     Counsel for the Mickelsons provided me with discovery responses from MERS, Freddie Mac, Northwest Trustee Services, and Routh, Crabtree, and Olson. I have reviewed the discovery and each of the defendants' responses to the discovery requests. Counsel has also provided me with the following declarations submitted by the parties with regard to the instant cross motions for summary judgment currently pending before this Court. These include the declarations of Vonnie McElligott, Kimberly Raphaeli, Danielle Mickelson, Travis Mickelson, and Josie Fallgetter and the exhibits thereto, which I have also reviewed.

16.     Counsel for the Mickelson's have asked me whether based on these discovery responses and declarations I have an opinion on a more likely than not basis based on my

expertise in this area as to whether Freddie Mac owned the Mickelsons' loan on September 7, 2010 (the day the notice of foreclosure was recorded) and on March 25, 2011, (the day the non-home was sold).

17.     I do have an opinion.

18.     First, any homeowner can contact Freddie Mac and Fannie Mae directly to determine if they "own" their mortgage:

http://www.makinghomeaffordable.gov/tools/does-fannie-or-freddie-own-your-

loan/Pages/default.aspx

19.     Second, if Freddie Mac stated they "owned" the promissory note on September 7, 2010, and at the time of the non-judicial foreclosure, then they "owned" it - not as an "investor" but as the "real party in interest."

20.     However, that begs the question: How can Freddie Mac claim to own a promissory note it never received? See, e.g. Dale Whitman, *How Negotiability Has Fouled Up the Secondary Mortgage Market, and What To Do About It*, 37 Pepp. L. Rev 738 (2010).

21.     What did Freddie Mac receive? What did it or its surrogates securitize and sell to those investors in Mortgage Backed Securities (MBS)? See, Nolan Robinson, *The Case Against Allowing Mortgage Electronic Registration Systems, Inc. (MERS) to Initiate Foreclosure Proceedings*, 32 Cardozo Law Review 101, 103 (2011).

22.     My opinion is based on the numerous facts set forth in the above documents and known to me as a result of my expertise. First, Chase Home Finance, LLC was a known sub-servicer for JPMorgan Chase Bank, N.A. at this time.

23.     As I mentioned in my article, attached as exhibit 2, Freddie servicing guidelines provided in 2010 that the servicer should foreclose in its own name (not in the name of the

real party in interest: Freddie Mac). This appears to be what occurred in this case; namely the sub-servicer, Chase Home Financial, LLC (which was not the owner of the note) obtained a MERS system non-judicial foreclosure of the Mickelsons' home without ever disclosing that Freddie Mac was the owner of the instrument or obligation from April, 2006 through the foreclosure sale on March 25, 2011.

24.     McElligott's testimony that she transferred MERS' interest as a beneficiary from MHL Funding Corporation to Chase Home Financial, LLC appears to state a faulty legal conclusion as a fact. Nonetheless, it influences my opinion because the declaration indicates NWTS failed to appreciate that Freddie Mac acquired the note, notwithstanding that Freddie Mac claims it acquired its beneficial interest in the loan in February, 2006.

25.     Both MERS and Freddie Mac discovery responses indicate they will produce documents relating to their ownership or other interests, but I am told that neither has provided these documents.

26.     My opinion is also influenced by the fact that it appears the servicer, Chase Home Finance, LLc, and the trustee were "dual tracking" the Mickelsons during the almost two and a half year modification/foreclosure process. These drawn out processes benefit the servicers and trustees at the expense of those persons entitled to payments under the note, i.e. the "real parties in interest" the note owners, and the borrowers. See *Foreclosing Modifications: How Servicer Incentives Discourage Loan Modifications*, 86 Wash. L. Rev. 755, at 794-6.(December 2011)   Based on Mrs. Michelson's declaration it is difficult to understand why an owner of the note would want to pay accumulated trustee and servicer charges from the inefficient and chaotic modification and foreclosure processes she describes.

27.     Finally, my opinion is also influenced by NWTS' amended and supplemental response to the following interrogatory: "6. "Identify the individual or identity of the Beneficiary at the time of Trustee's sale and state forth how the beneficiary acquired such status."

28.     NWTS' amended and supplemental answer states in pertinent part:

> NWTS amends and supplements its answer to state the following: NWTS contends that Chase Home Finance LLC was the beneficiary at the times of the trustee's sales by virtue of its status as note holder by Federal Home Loan Mortgage Corporation.

29.     This answer appears to me to acknowledge that Chase Home Financial, LLC's interests in the note (to the extent there are any) exists only as a result of Freddie Macs ownership of the note.

30.     My opinion is also based on the fact it appears Freddie Mac made a credit bid at the trustee sale or became the ultimate owner of the Mickelsons' home after the sale. There is no reason Freddie Mac would acquire a home upon foreclosure unless it had an interest in the house as security for a debt owed to it.

31.     I make this declaration without compensation as I am keenly interested in having courts address what I believe to be a pattern and practice of fraudulent practices by financial institutions under the cover of MERS and the imprimatur of Freddie Mac.

I declare that the foregoing is true and correct under penalty of perjury under the laws of the State of Washington.

Dated: 10/8/12

Shawn Timothy Newman
Attorney at Law
Adjunct Professor
Saint Martin's University

EXHIBIT 1

RECEIVED
SUPREME COURT
STATE OF WASHINGTON
Feb 13, 2012, 8:10 am
BY RONALD R. CARPENTER
CLERK

RECEIVED BY E-MAIL

Case No.: 86206-1

## SUPREME COURT
## FOR THE STATE OF WASHINGTON

KRISTIN BAIN

v.

METROPOLITAN MORTGAGE GROUP, INC, ET AL

*AMICUS CURIAE* BRIEF BY
ORGANIZATION UNITED FOR REFORM
OUR - WASHINGTON

Shawn Timothy Newman, WSBA 14193
Attorney at Law, Inc. P.S.
2507 Crestline Dr., N.W.
Olympia, WA 98502
PH: 360.866.2322
FAX: 1.866.800.9941

Attorney for Amicus Curiae Organization United for Reform

OUR – Washington

ORIGINAL

i

<u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................ 1

II.     ISSUES ................................................................ 3

      1.      Did MERS violate the unity of the note and security
          necessary to have standing to foreclose?

      2.      Is MERS the "person entitled to enforce"[1] under its
          limited agency authority and the fact it never held
          or possessed the note?

      3.      Do changes in MERS's foreclosure rules confirm it
          lacks standing to foreclose?

IV.     SUMMARY ARGUMENT ..................................... 4

V.      ARGUMENTS..................................................... 4

      1.      MERS violated the unity of the note and security by
          purporting to negotiate, transfer and securitize notes it
          never held ............................................................ 4

      2.      MERS is not the "person entitled to enforce"[2] the note
          because it never held the note.  MERS's common agency
          authority is limited to registering and tracking transfers in
          mortgage loans.[3]............................................... 5

      3.      Changes in MERS's foreclosure rules confirm it lacks
          standing to foreclose........................................... 11

VI.     CONCLUSION ................................................... 14

---

[1] RCW 62A.3-301
[2] RCW 62A.3-301
[3] *See* MERS Resp. Br. 13.

ii

## TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Carpenter v. Longan,* 83 U.S. 271 (1873) ................................. 4, 10

*In re Allman,* 2010 WL 3366405, U.S. Bkptcy. Ct., Oregon (2010) ... 8-9

*Moore v. MERS,* CV-10-241-JL (D.N.H. Jan. 27, 2012)  ................. 8

**OTHER STATE CASES:**

*Bank of New York v. Silverberg,* 926 N.Y.S.2d 532, 86 A.D.3d 274 (2011) ......................................................................... 12-13

*Bellistri v. Ocwen Loan Servicing, LLC,* 284 S.W.3d 619, 623 (Mo.App. E.D.2009) ............................................................... 4, 8

*Bevilacqua v. Rodriguez,* 460 Mass. 762 (2011) ........................... 10

*Landmark Nat'l Bank v. Kesler,* 289 Kan. 528, 216 P.3d 158, 167 (2009).8

*U.S. Bank National Ass'n v. Ibanez,* 458 Mass. 637 (2011) ................. 2

**STATUTES:**

**WASHINGTON:**

RCW 36.18.010 ...................................................... 1
RCW 36.22.170 ...................................................... 1
RCW 36.22.175 ...................................................... 1
RCW 36.22.178 ...................................................... 1
RCW 36.22.179 ...................................................... 1
RCW 36.22.181 ...................................................... 1
RCW 6.23.020(2) ..................................................... 3
RCW Ch. 61.24 ...................................................... 14
RCW 61.24.005 (2) .............................................. 10, 14
RCW Ch. 62A.3 ................................................... 5, 10
RCW 62A.3-201(a) ................................................... 10
RCW 62A.3-203(a) ................................................... 10
RCW 62A.3-301 ................................................... 5-7

RCW 62A.3-309............................................................... 6
RCW 62A.3-418(d)........................................................... 6

**OTHER AUTHORITIES:**

*About MERS* http://www.mersinc.org/about/index.aspx ........................... 1

American Law Institute and the National Conference
of Commissioners on Uniform State Laws, *Report of the Permanent
Editorial Board for the Uniform Commercial Code – Application of the
Uniform Commercial Code to Selected Issues relating to Mortgage Notes*
(Nov. 14, 2011), provided as Appendix A-2 .............................. 5-7

Black's Law Dictionary (9th ed. 2009) ....................................... 2, 8

Brady Dennis, *MERS morass is hanging up negotiations on foreclosure
settlement*, Washington Post (Aug. 24, 2011) ................................. 2

Christopher L. Peterson, *Predatory Structured Finance*, 28 Cardozo L.
Rev. 2185 (2007)............................................................ 3

Dale Whitman, *How Negotiability Has Fouled Up the Secondary
Mortgage Market, and What To Do About It*, 37 Pepp. L. Rev 738 (2010)
............................................................................ 10

Dale Whitman, *Mortgage Drafting: Lessons from the Restatement of
Mortgages*, 33 Real Prop. Prob. & Tr. J. 415, 439 (1998)..................... 1

Dave Krieger, *Clouded Titles* (Law Bulletin Publishing Co. 2012) .....2, 8

Diane E. Thompson, *Foreclosing Modifications: How Servicer Incentives
Discourage Loan Modifications*, 86 Wash. L. Rev. 755 (2011) ........... 3

Ellen Brown, *Why all the robo-signing?  Securitization and the shadow
banking system*, San Francisco Bay View National Black Newspaper ..... 3

Freddie Mac Bulletin No. 2011-5 (March 23, 2011), provided as Appendix
A-3......................................................................... 11

Gretchen Morgenson, *A Mortgage Tornado Warning, Unheeded*, New
York Times (Feb. 4, 2012) ................................................... 2

I. Opie and P. Opie, *The Oxford Dictionary of Nursery Rhymes* (Oxford: Oxford University Press, 1951, 2nd ed., 1997). ..............................12

MERS website http://www.mersinc ..................................………… 1, 12

MERS website for Mortgage Identification Number [MIN]................. 3

MERSCORP, Inc. Rules of Membership, Rule 8, p. 25 (Feb. 2012), provided as Appendix A-1 ................................................... 1, 11-12

Michelle Conlin and Curt Anderson, *Mortgage system sued over recording fees: Banks accused of cheating counties out of billions* (Nov. 14, 2010) ..........................................................……..………...... 1

Nolan Robinson, *The Case Against Allowing Mortgage Electronic Registration Systems, Inc. (MERS) to Initiate Foreclosure Proceedings,* 32 Cardozo Law Review 101, 103 (2011)............................ 1, 2, 8, 11

OCR 86.720 ........................................................................... 9

Powell on Real Property: Michael Allan Wolf Desk Edition § 37.27 [2] (LexisNexis Matthew Bender 2010)............................................... 4

Restatement (Third) of Property: Mortgages (1997) ........................10

Walter Hamilton and E. Scott Reckard, *Angelo Mozilo, other former Countrywide execs settle fraud charges*, Los Angeles Times (Oct. 26, 2010)...........................................................……...…................. 3

www.merriam-webster.com/dictionary/kafkaesque .............................. 3

## I.  INTRODUCTION

MERS serves as the "nominee"[1] for the mortgagee in the land records for loans registered on the MERS system.[2]  According to MERS's website,

> MERS acts as nominee in the county land records for the lender and servicer. Any loan registered on the MERS® System is inoculated against future assignments because MERS remains the mortgagee no matter how many times servicing is traded.[3]

This claim helped to fuel the mortgage-backed securities (MBS) market[4] by allowing "lenders to circumvent the process or recording assignments and paying recording fees[5] to the county clerk's office."[6]  In so doing,

---

[1] *See* MERS Resp. Br. App. A-5 (Friedman on Cont. & Conv. Real Prop. § 6:1.5) ("sometimes called a 'dummy,' 'straw,' or 'straw man'" or "limited agent."); *see also* MERSCORP, Inc. Rules of Membership, Rule 8, p. 25 (Feb. 2012), provided as Appendix A-1

[2] *See* MERS Resp. Br. App. A-1.

[3] *About MERS,* http://www.mersinc.org/about/index.aspx (last visited Feb. 8, 2012).

[4] Referred to as the "secondary mortgage market" since the sellers and securitizers are not the loan originators. *See* Dale A. Whitman, *Mortgage Drafting: Lessons from the Restatement of Mortgages,* 33 Real Prop. Prob. & Tr. J. 415, 439 (1998).

[5] The "recording fee" in Washington State for a Deed of Trust is $63 for the first page and an additional $1 for every page thereafter.  The $63 includes the following: $5 filing fee (RCW 36.18.010) ; $2 Auditors O&M (RCW 36.22.170); $2 State Centennial (RCW 36.22.170); $1 Commissioner's Preservation (RCW 36.22.170); $2 State Archives - Grants (RCW 36.22.175); $2 State Archives – Regional (RCW 36.22.175); $10 Affordable Housing (RCW 36.22.178); $38 Homeless Prevention 1 & 2 (RCW 36.22.179); and $1 Mortgage Fraud (RCW 36.22.181).  An assignment and a resignation/substitution does not pay the $48 housing surcharge so their price is $14 for the first page and $1 for every page thereafter (but since most are only 1 page, the most common price is $14 per doc).  In reality, the lending industry already gets a $48 break from the State for every transaction that is an assignment or resignation/substitution.

[6] Michelle Conlin and Curt Anderson, *Mortgage system sued over recording fees: Banks accused of cheating counties out of billions* (Nov. 14, 2010), *available at* http://www.knoxnews.com/news/2010/nov/14/mortgage-system-sued-over-recording-fees-recording (last visited Feb. 10, 2012); *see also* Nolan Robinson, *The Case Against*

1

MERS clouded the title[7] and identity of the real party in interest: the owner of the note.[8]

The problem is compounded by the facts that roughly 65 million mortgages have been registered on the MERS system[9] and "over ninety-five percent of residential mortgages are securitized."[10] The problem was identified years ago.[11]

Yet, the "housing shell game"[12] continues. A Kafkaesque[13] game that forces homeowners interested in challenging predatory lending

---

*Allowing Mortgage Electronic Registration Systems, Inc. (MERS) to Initiate Foreclosure Proceedings*, 32 Cardozo L. Rev. 101, 103 (2011).

[7] A "cloud on title" refers to a "defect or potential defect in the owner's title to a piece of land arising from some claim or encumbrance, such as a lien, an easement, or a court order." Black's Law Dictionary 291 (9th ed. 2009); *See generally*, Dave Krieger, *Clouded Titles* (Law Bulletin Publishing Co. 2012) at 90; *see also U.S. Bank National Ass'n v. Ibanez*, 458 Mass. 637 (2011). In *Ibanez*, the court held that a non-judicial foreclosure was void because the foreclosing party did not have a recorded interest in the mortgage.

[8] Robinson, *supra* at 102; *see* Pl.'s Op. Br. 11, 14.

[9] Brady Dennis, *MERS morass is hanging up negotiations on foreclosure settlement*, Washington Post (Aug. 24, 2011), *available at* http://www.washingtonpost.com/business/economy/mers-morass-is-hanging-up-negotiations-on-foreclosure-settlement/2011/08/24/glQAX6jNcJ_story.html (last visited Feb. 10, 2012).

[10] Robinson, *supra* at 114 n. 72. "Securitization" refers to the process of converting assets into securities, such as bonds, "for resale in the financial market, allowing the issuing financial institution to remove assets from its books, and thereby improve its capital ratio and liquidity, and to make new loans with the security proceeds if it so chooses." Black's Law Dictionary 1475 (9th ed. 2009).

[11] Gretchen Morgenson, *A Mortgage Tornado Warning, Unheeded*, New York Times (Feb. 4, 2012), *available at* http://www.nytimes.com/2012/02/05/business/mortgage-tornado-warning-unheeded.htm (last visited Feb. 10, 2012).

[12] "The housing shell game was made possible because it was all concealed behind an electronic smokescreen called MERS (an acronym for Mortgage Electronic Registration Systems, Inc.). MERS allowed houses to be shuffled around among multiple, rapidly changing owners while circumventing local recording laws. Title would be recorded in the name of MERS as a place holder for the investors, and MERS would foreclose on behalf of the investors. Payments would be received by the mortgage servicer, which was

practices,[14] or interested in avoiding foreclosure via direct negotiation with

the lender, to deal with servicers[15] whose interests conflict[16] with the real

beneficiary.[17]

## II.   ISSUES

      1.     Did MERS violate the unity of the note and security
necessary to have standing to foreclose?

---

typically the bank that signed the mortgage with the homeowner. The homeowner usually
thinks the servicer is the lender, but in fact it is an amorphous group of investors."
Ellen Brown, *Why all the robo-signing? Securitization and the shadow banking system*,
San Francisco Bay View National Black Newspaper (last modified Jan. 25, 2012),
*available at* http://sfbayview.com/2012/why-all-the-robosigning (last visited Feb. 10,
2012).

[13] "having a nightmarishly complex, bizarre, or illogical quality." www.merriam-
webster.com/dictionary/kafkaesque

[14] *See, e.g.*, Christopher L. Peterson, *Predatory Structured Finance*, 28 Cardozo L. Rev.
2185, 2266 (2007) ("[A]ll across the country, MERS now brings foreclosure proceedings
in its own name . . . . This is problematic because MERS is not prepared for or equipped
to provide responses to consumers' discovery requests with respect to predatory lending
claims and defenses. In effect, the securitization conduit attempts to use a faceless and
seemingly innocent proxy with no knowledge of predatory origination or servicing
behavior to do the dirty work of seizing the consumer's home."). See, e.g. Walter
Hamilton and E. Scott Reckard, *Angelo Mozilo, other former Countrywide execs settle
fraud charges*, Los Angeles Times (Oct. 26, 2010). *Compare with* MERS Resp. Br. App.
A-7 [Angelo R. Mozilo, *A Century's Milestones in Residential Lending* Mortgage
Banking (Jan. 2000)].

[15] MERS uses an 18-digit Mortgage Identification Number (MIN) to identify servicers,
not the beneficiary or owner. https://www.mers-servicerid.org/sis/

[16] See Diane E. Thompson, *Foreclosing Modifications: How Servicer Incentives
Discourage Loan Modifications*, 86 Wash. L. Rev. 755 (2011).

     [S]ervicer income generally encourages servicers to perform short-term
     workout agreements, to pile on fees, and to delay (but not avoid
     altogether) foreclosures.  Servicer expenditures, on the other hand,
     encourage a quick resolution of default, primarily through foreclosure.

Id., at 814

[17] Plaintiff's Opening Br. at 14  [As U.S. District Court Judge Coughenour noted in his
order, "And the harm Plaintiff may have suffered because of MERS's conduct may
include expending resources to avert an unlawful foreclosure and preventing Plaintiff
from identifying the real beneficiary and negotiating a new arrangement to avoid
foreclosure." (Dkt. 155 p. 11)]; *see also* RCW 6.23.020(2) (borrower's right of
redemption).

2.     Is MERS the "person entitled to enforce"[18] under its limited agency authority and the fact it never held or possessed the note?

3.     Do changes in MERS's foreclosure rules confirm it lacks standing to foreclose?

## III.   SUMMARY ARGUMENT

MERS is not "the person entitled to enforce the note"[19] because it never received, held, or possessed the note.

## IV.   ARGUMENTS:

### 1.   MERS violated the unity of the note and security by purporting to negotiate, transfer and securitize notes it never held.

According to <u>Powell on Real Property</u>,[20]

It must be remembered that the mortgagee has two interests: (1) the debt or obligation which is owned to him, and (2) the security interest in land represented by the mortgage.... In fact, the primary interest is the personalty debt obligation. The interest in land which is available in case security is necessary because of the debtor's default is considered as collateral interest. Much trouble has been caused by mortgagees attempting to transfer only one of these two interests. Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee," having received no interest in the underlying debt or obligation, has a worthless piece of paper.

This maxim was adopted by the U.S. Supreme Court in 1873,[21]

---

[18] RCW 62A.3-301
[19] RCW 62A.3-301
[20] <u>Powell on Real Property</u>: Michael Allan Wolf Desk Edition § 37.27 [2] (LexisNexis Matthew Bender 2010).
[21] *Carpenter v. Longan*, 83 U.S. 271, 274, 21 L. Ed. 313 (1873); *See also, Bellistri v. Ocwen Loan Servicing, LLC*, 284 S.W.3d 619, 623 (Mo.App. E.D.2009);

> The note and mortgage are inseparable; the former as
> essential, the latter as an incident. An assignment of the
> note carries the mortgage with it, while an assignment of
> the latter alone is a nullity.

Thus, unity of interest between the note and the security is necessary for a

party to have standing to foreclose.

      **2.**      **MERS is not the "person entitled to enforce"[22] the note**
              **because it never held the note. MERS's common**
              **agency authority is limited to registering and tracking**
              **transfers in mortgage loans.[23]**

UCC Article 3[24] governs the obligations of parties on a negotiable

mortgage note, "including how to determine who may enforce the

obligations and, thus, to whom those obligations are owed."[25] According

to the American Law Institute and the National Conference of

Commissioners on Uniform State Laws *Report of the Permanent Editorial*

---

> Generally, a mortgage loan consists of a promissory note and security
> instrument, usually a mortgage or a deed of trust, which secure
> payment on the note by giving the lender the ability to foreclose on the
> property. Typically, the same person holds both the note and the deed
> of trust.
> ...
> When the holder of the promissory note assigns or transfers the note,
> the deed of trust is also transferred. An assignment of the deed of trust
> separate from the note has no " force." Effectively, the note and the
> deed of trust are inseparable, and when the promissory note is
> transferred, it vests in the transferee " all the interest, rights, powers and
> security conferred by the deed of trust upon the beneficiary therein and
> the payee in the notes." (internal citations omitted).

[22] RCW 62A.3-301

[23] *See* MERS Resp. Br. 13.

[24] Ch. 62A.3 RCW

[25] American Law Institute and the National Conference of Commissioners on Uniform
State Laws, *Report of the Permanent Editorial Board for the Uniform Commercial Code
– Application of the Uniform Commercial Code to Selected Issues relating to Mortgage
Notes* (Nov. 14, 2011), provided as Appendix A-2 at 4 et seq. (hereinafter "ALI Report")

*Board for the Uniform Commercial Code – Application of the Uniform*

*Commercial Code to Selected Issues relating to Mortgage Notes* (Nov. 14,

2011),[26]

> In the context of mortgage notes that have been sold or used as collateral to secure an obligation, the central concept for making that determination is identification of the "person entitled to enforce" the note. Several issues are resolved by that determination. Most particularly:
>
> (i)    the maker's obligation on the note is to pay the amount of the note to *the person entitled to enforce the note*,
>
> (ii)    the maker's payment to *the person entitled to enforce the note* results in discharge of the maker's obligation, and
>
> (iii)    the maker's failure to pay, when due, the amount of the note to *the person entitled to enforce the note* constitutes dishonor of the note.
>
> Thus, a person seeking to enforce rights based on the failure of the maker to pay a mortgage note must identify the person entitled to enforce the note and establish that that person has not been paid.[27]

UCC Section 3-301[28] defines the *Person entitled to enforce*

*instrument* as:

> (i)    the holder of the instrument,
>
> (ii)    a nonholder in possession of the instrument who has the rights of a holder, or
>
> (iii)    a person not in possession of the instrument who is entitled to enforce the instrument pursuant to RCW 62A.3-309 or 62A.3-418(d). A person may be a person entitled to enforce the instrument even

---

[26] ALI Report, *supra*, at 4, provided as Appendix A-2.
[27] ALI Report, *supra*, at 4, provided as Appendix A-2 [emphasis in original].
[28] RCW 62A.3-301

though the person is not the owner of the instrument
or is in wrongful possession of the instrument.

Each of these are defined and illustrated in the ALI Report.[29]  Illustration

#4[30] explains how an agent *in possession* of the note can enforce it.

> Agent is the agent of Transferee for purposes of possessing
> the note and (ii) it is Agent, rather than Transferee, *to*
> *whom actual physical possession of the note is given by*
> *Payee*. In the facts of Illustration 2, *Transferee is a holder*
> *of the note* and a person entitled to enforce it. In the context
> of Illustration 3, Transferee is a person entitled to enforce
> the note. Whether Agent may enforce the note or mortgage
> on behalf of Transferee depends in part on the law of
> agency and, in the case of the mortgage, real property law.[31]

Unlike this example, MERS never takes actual physical possession of the

note.

MERS operates as the common limited agent for its members.  The

beneficiary member appoints MERS to be its agent to hold the mortgage

lien interest, not to hold any interest in the note itself.  MERS holds

mortgage liens in a "nominee" capacity and, through its electronic

registry, tracks changes in the ownership of mortgage loans and servicing

rights related thereto.  MERS is not the mortgagee.  MERS is not a party

to the note underlying the security instrument.  MERS "lent no money

and received no payments from the borrower,"  MERS does not originate

---

[29] ALI Report, *supra*, at 5-7, provided as Appendix A-2.
[30] ALI Report, *supra*, at 5-7, provided as Appendix A-2.
[31] ALI Report, *supra*, at 7, provided as Appendix A-2.

or claim any independent ownership interest in the note or the mortgage.[32]

MERS has no rights to transfer, assign or collect payments made by the

debtor on such note.[33]   MERS does not process, service, hold, own or sell

the mortgage loans.  MERS never takes possession[34] of the note so is

never the holder.[35]

The U.S. Bankruptcy Court for Oregon summed this up recently in

the case of *In re Allman.*[36]  The threshold question in that case was

whether or not the title insurance company was required to give notice to

---

[32] Robinson, *supra* at 124; *See generally*, Krieger, *Clouded Titles*, *supra* at 67-98.

[33] *Landmark Nat'l Bank v. Kesler*, 289 Kan. 528, 216 P.3d 158, 167 (2009).
    What stake in the outcome of an independent action for foreclosure
    could MERS have? It did not lend the money to Kesler or to anyone
    else involved in this case. Neither Kesler nor anyone else involved in
    the case was required by statute or contract to pay money to MERS on
    the mortgage. See Sheridan, 2009 WL 631355, at *4 (" MERS is not an
    economic ' beneficiary' under the Deed of Trust. It is owed and will
    collect no money from Debtors under the Note, nor will it realize the
    value of the Property through foreclosure of the Deed of Trust in the
    event the Note is not paid." ). If MERS is only the mortgagee, without
    ownership of the mortgage instrument, it does not have an enforceable
    right. See Vargas, 396 B.R. at 517 (" [w]hile the note is ' essential,' the
    mortgage is only ' an incident' to the note" [quoting *Carpenter v.
    Longan*, 16 Wall. 271, 83 U.S. 271, 275, 21 L.Ed. 313 (1872) ] ).

[34] The idiom *Possession is nine-tenths of the law* is based on the fact that "possession
raises a *prima facie* title or a presumption of the right of property in the thing processed."
Black's Law Dictionary (9th ed. 2009).

[35] See, *Bellistri v. Ocwen Loan Servicing*, 284 S.W. 3d 619 (Mo. App. E.D. 2009):
    MERS never held the promissory note, thus its assignment of the deed
    of trust to Ocwen separate from the note had no force. As Ocwen holds
    neither the promissory note, nor the deed of trust, Ocwen lacked a
    legally cognizable interest in the property, and therefore, it has no
    standing to seek relief.

*See also, Moore v. MERS*, CV-10-241-JL (D.N.H. Jan. 27, 2012).  In that case,
the court held "defendants do not possess the note, and it is enforcement of the
note which the Moore's seek to avoid."  The court allowed fraud and other
claims under both the Real Estate Settlement Procedures Act and the Fair Debt
Collection Practices Act to proceed.  *Id.*, at 3.  *See generally*, ALI Report, *supra*,
at 5-7 (provided as Appendix A-2).

[36] 2010 WL 3366405, U.S. Bkptcy. Ct., Oregon (2010)

8

MERS under ORS 86.720(3).[37]   That statute requires that, before a title

insurance company releases a trust deed, notice be given to the lender and

the beneficiary.[38] The court concluded that MERS was not entitled to

notice.

> The relationship of MERS to CIT "is more akin to that of a
> straw man than to a party possessing all the rights given a
> buyer." *See Landmark Nat'l Bank v. Kesler*, 289 Kan. 528,
> 539 (2009) (court considered relationship of MERS to
> parties to a secured real estate transaction).  As in *Kesler*,
> here the trust deed "consistently refers only to rights of the
> lender, including rights to receive notice of litigation, to
> collect payments, and to enforce the debt obligation." *Id.* at
> 539. The trust deed "consistently limits MERS to acting
> 'solely' as the nominee of the lender." *Id.* at 539-540.  It is
> apparent that the listing of MERS as beneficiary in the deed
> of trust is merely to facilitate its ownership tracking
> function.  It is not in any real sense of the word, particularly
> as defined in ORS 86.705(1), the beneficiary of the trust
> deed. *Accord Southwest Homes of Ark.*, 301 S.W.3d at 4
> (MERS was not the beneficiary, even though designated as
> beneficiary in the trust deed). Thus, notice to CIT met the
> statutory requirement that notice be given to the
> beneficiary.[39]

Under the UCC [40] delivery is required to transfer possession of any

negotiable instruments (e.g. promissory note) and become a holder.[41]

---

[37] "OCR 86.720. Reconveyance upon performance; liability for failure to reconvey;
release of trust deed. ... (3) Prior to the issuance and recording of a release pursuant to
this section, the title insurance company or insurance producer shall give notice of the
intention to record a release of trust deed *to the beneficiary of record* and, if different, the
party to whom the full satisfaction payment was made. The notice shall; ...." [Emphasis
added].

[38] ORS 86.720(3) [Emphasis added]

[39] *In Re Allman, supra* [Emphasis added]

[40] 62A.3 (Negotiable instruments).

9

Transfer of the security[42] does not transfer the note.[43]  Since MERS does

not take delivery of the note,[44] it cannot claim to be the beneficiary under

Washington law.[45]  Therefore, MERS cannot pass title to subsequent

transferees.[46]

Professor Dale Whitman addressed the "delivery" issue in his

article, *How Negotiability Has Fouled Up the Secondary Mortgage

Market, and What To Do About It,*[47]

> While delivery of the note might seem a simple matter of
> compliance, experience during the past several years has
> shown that, probably in countless thousands of cases,
> promissory notes were never delivered to secondary market
> investors or securitizers, and, in many cases, cannot
> presently be located at all.  The issue is extremely

---

[41] RCW 62A.3-201(a) ("'Negotiation' means a transfer of possession, whether voluntary or involuntary, of an instrument by a person other than the issuer to a person who thereby becomes its holder."); RCW 62A.3-203(a) ("An instrument is transferred when it is *delivered* by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument.") (emphasis added).

[42] E.g. mortgage, deed of trust or security deed.

[43] "A transfer of the mortgage automatically transfers the obligation, *except when the UCC prevents that result (as it does with a negotiable note)." Restatement (Third) of Property: Mortgages (1997) at sec. 5.4(a) and (b) (emphasis added).

[44] *See* MERS Resp. Br. 3 ("For the reasons set forth below, MERS respectfully requests that the Court hold that MERS is a lawful 'beneficiary' under the Act, even if it never holds the promissory note secured by the deed of trust that it has legal interest in.") MERS argues that it is "indisputably the 'holder' of the Deed of Trust." *Id.*, at 22.  This presumes the Deed of Trust is a negotiable instrument and that the note follows the Deed. This is not correct. See discussion infra and *Carpenter v. Longan*, 83 U.S. 271 (1873).

[45] RCW 61.24.005(2).

[46] *See Bevilacqua v. Rodriguez*, 460 Mass. 762 (2011).  There the plaintiff argued that he had recorded title to the property by virtue of a quitclaim deed granted to him by U.S. Bank as a result of the foreclosure sale. *Id.* at 891.  However, MERS failed to assign the mortgage to U.S. Bank prior to executing foreclosure. *Id.*, at 888.  The Court held that the plaintiff holds no title to real properly and lacks standing to bring a quiet title action where the foreclosure sale was conducted by someone other than the actual mortgagee or its assigns.

[47] 37 Pepp. L. Rev 738, 757-758 (2010)

> widespread, and, in many cases, appears to have been the
> result of a conscious policy on the part of mortgage sellers
> to retain, rather than transfer, the notes representing the
> loans they were selling.

This policy creates fundamental problems with any foreclosure. This

policy is embedded in MERS' Rules of Membership which now require

assignments of the security instrument from MERS to the "note owner or

the note owner's servicer".[48]

### 3. Changes in MERS's foreclosure rules confirm it lacks standing to foreclose.

Until recently, one of the benefits of MERS membership was "the

legal right to foreclose on a defaulting homeowner in MERS's name rather

than the name of the entity who actually owns the mortgage."[49]  However,

"since July 2011 MERS no longer acts as foreclosing entity."[50]  Now

MERS prohibits members from initiating foreclosure proceedings in the

name of MERS and requires assignments for foreclosure and

bankruptcy.[51]  Those new rules mandate:

> The note owner or the note owner's servicer shall cause the
> Certifying Officer to execute the assignment of the Security
> Instrument from MERS to the note owner's servicer, or to
> such other party expressly and specifically designated by
> the note-owner before initiating foreclosure proceedings or

---

[48] A-1 [Rule 8(a)].
[49] Robinson, *supra*, at 104 n. 16.
[50] A-1. In addition, Freddie Mac eliminated the option of servicers to foreclose in the name of MERS. Freddie Mac Bulletin No. 2011-5 (March 23, 2011), provided as Appendix A-3.
[51] A-1 [Rule 8(d)].

> filing Legal Proceedings and promptly send the assignment
> of the Security Instrument (in recordable form) for
> recording in the applicable public land records.[52]

This effort to "put Humpty together again"[53] (i.e. reunite securitized loans

with their corresponding security instruments) would be unnecessary if

MERS was the note owner, holder or assignee.[54]

    In *Bank of New York v. Silverberg*,[55] the court addressed an issue

similar to the certified question before this court[56]:

> This matter involves the enforcement of the rules that
> govern real property and whether such rules should be bent
> to accommodate a system that has taken on a life of its
> own. The issue presented on this appeal is whether a party
> has standing to commence a foreclosure action when that
> party's assignor— in this case, Mortgage Electronic
> Registration Systems, Inc. (hereinafter MERS)— was listed
> in the underlying mortgage instruments as a nominee and
> mortgagee for the purpose of recording, but was never the

---

[52] *Id.* [Rule 8(e)(i)].

[53] I. Opie and P. Opie, The Oxford Dictionary of Nursery Rhymes (Oxford: Oxford University Press, 1951, 2nd ed., 1997). The most common modern text is:

> Humpty Dumpty sat on a wall,
> Humpty Dumpty had a great fall.
> All the king's horses and all the king's men
> Couldn't put Humpty together again

[54] This contradicts how MERS markets itself on its website:

> MERS is an innovative process that simplifies the way mortgage
> ownership and servicing rights are originated, sold and tracked. Created
> by the real estate finance industry, *MERS eliminates the need to
> prepare and record assignments when trading residential and
> commercial mortgage loans.*

*Available at* http://www.mersinc.org (last visited Feb. 10, 2012) (emphasis added).

[55] 926 N.Y.S.2d 532, 86 A.D.3d 274 (2011).

[56] "Whether Mortgage Electronic Registration Systems, Inc., a corporation formed to provide a national electronic registry to track the transfer of ownership interests and servicing rights in mortgage loans, and nominated by many lenders as mortgagee of record and beneficiary under deeds of trust, may lawfully serve as beneficiary under the Washington Deed of Trust Act." Pl.'s Op. Br. 3.

actual holder or assignee of the underlying notes. We
answer this question in the negative.[57]

The *Silverberg* court concluded:

> In sum, because MERS was never the lawful holder or
> assignee of the notes described and identified in the
> consolidation agreement, the corrected assignment of
> mortgage is a nullity, and MERS was without authority to
> assign the power to foreclose to the plaintiff. Consequently,
> the plaintiff failed to show that it had standing to foreclose.

> MERS purportedly holds approximately 60 million
> mortgage loans ( *see* Michael Powell & Gretchen
> Morgenson, *MERS? It May Have Swallowed Your Loan,*
> New York Times, March 5, 2011), and is involved in the
> origination of approximately 60% of all mortgage loans in
> the United States ( *see* Peterson at 1362; Kate Berry,
> *Foreclosures Turn Up Heat on MERS,* Am. Banker, July
> 10, 2007, at 1). This Court is mindful of the impact that this
> decision may have on the mortgage industry in New York,
> and perhaps the nation.  Nonetheless, the law must not
> yield to expediency and the convenience of lending
> institutions.  Proper procedures must be followed to ensure
> the reliability of the chain of ownership, to secure the
> dependable transfer of property, and to assure the
> enforcement of the rules that govern real property.[58]

These same considerations are echoed by Judge Coughenour in his Order:

> A ruling favorable to Plaintiff in this case and others like it
> cannot and should not create a windfall for all homeowners
> to avoid upholding their end of the mortgage bargain –
> paying for their homes.  But a homeowner's failure to make
> payments cannot grant lenders trustees and so-called
> beneficiaries like MERS license to ignore the law and
> foreclose using any means necessary.[59]

---

[57] *Silverberg, supra,* at 533 (emphasis added).
[58] *Id.,* at 539-540 (emphasis added).
[59] Pl.'s Op. Br. 14-15.

## V.    CONCLUSION

Therefore, because MERS was never the lawful holder or assignee

of the notes, it is not the "beneficiary"[60] under the Washington Deed of

Trust Act[61] and cannot initiate any foreclosures or appoint any trustee.

Dated: 2/13/12

Shawn Newman [#14193
Attorney for Amicus Curiae

---

[60] RCW 61.24.005(2) ("'Beneficiary' means the holder of the instrument or document evidencing the obligations secured by the deed of trust, excluding persons holding the same as security for a different obligation.")
[61] 61.24 RCW.

14

## APPENDICES

A-1:   MERSCORP, Inc. Rules of Membership, Rule 8, p. 25
       (Feb. 2012)

A-2:   American Law Institute and the National Conference
       of Commissioners on Uniform State Laws, *Report of the
       Permanent Editorial Board for the Uniform Commercial Code –
       Application of the Uniform Commercial Code to Selected Issues
       relating to Mortgage Notes* (Nov. 14, 2011)

A-3:   Freddie Mac Bulletin No. 2011-5 (March 23, 2011)

Case No.: 86206-1

## SUPREME COURT
## FOR THE STATE OF WASHINGTON

### KRISTIN BAIN

v.

### METROPOLITAN MORTGAGE GROUP, INC. ET AL

## OUR - WASHINGTON AMICUS: APPENDIX A-1

**MERSCORP, Inc. Rules of Membership, Rule 8, p. 25
(Feb. 2012)**

Shawn Timothy Newman, WSBA 14193
Attorney at Law, Inc. P.S.
2507 Crestline Dr., N.W.
Olympia, WA 98502
PH: 360.866.2322
FAX: 1.866.800.9941

**MERSCORP, INC.**
**RULES OF MEMBERSHIP**

### TABLE OF CONTENTS

| RULE 1 | MEMBERSHIP | Page 2 |
|---|---|---|
| RULE 2 | REGISTRATION ON THE MERS® SYSTEM | Page 8 |
| RULE 3 | OBLIGATIONS OF MERS | Page 15 |
| RULE 4 | RULE CHANGES | Page 18 |
| RULE 5 | FEES | Page 19 |
| RULE 6 | PROCEDURES | Page 22 |
| RULE 7 | DISCIPLINARY ACTIONS | Page 23 |
| RULE 8 | REQUIRED ASSIGNMENTS FOR FORECLOSURE & BANKRUPTCY | Page 25 |
| RULE 9 | USE AND OWNERSHIP OF INFORMATION | Page 28 |
| RULE 10 | INTERIM SECURITY INTERESTS | Page 31 |
| RULE 11 | SERVICES | Page 32 |
| RULE 12 | WARRANTIES | Page 33 |
| RULE 13 | INDEMNIFICATION | Page 37 |
| RULE 14 | NOTIFICATION TO MERS OF PENDING LAWSUITS | Page 39 |

## RULE 8

### REQUIRED ASSIGNMENTS FOR FORECLOSURE & BANKRUPTCY

*Section 1.*     (a)     With respect to each mortgage loan, which shall mean a loan secured by a mortgage, deed of trust or security deed (any such instrument is referred to herein as a "Security Instrument"), for which the note owner or the note owner's servicer has decided to: (i) initiate foreclosure proceedings, whether judicial or non-judicial or (ii) file a Proof of Claim or file a Motion for Relief from Stay in a bankruptcy ("Legal Proceedings"); and for which Mortgage Electronic Registration Systems, Inc. ( referred to herein as "MERS") is the mortgagee, beneficiary or grantee of record (as applicable), the note owner or the note owner's servicer shall cause a MERS Certifying Officer (also known as a "Signing Officer")  to execute an assignment of the Security Instrument from MERS to the note owner's servicer, or to such other   party expressly and specifically designated by the note owner.   The Member agrees and acknowledges that MERS has the authority to execute such assignment of the Security Instrument in accordance with the immediately preceding sentence. The assignment of the Security Instrument must be executed, notarized, witnessed (if applicable) and be in recordable form and comply with all applicable laws, regulations and rules.

(b)     The Member agrees and acknowledges that when MERS is identified as nominee (as a limited agent) of the note owner in the Security Instrument, MERS, as nominee, is the mortgagee, beneficiary, or grantee (as applicable), in the Security Instrument on behalf of and for the benefit of the note owner.

(c)     The Member servicing a mortgage loan registered on the MERS® System shall be responsible for processing foreclosures in accordance with the applicable agreements between such Member and the note owner and all applicable laws, regulations and rules.

(d)     The authority to initiate foreclosures and file Legal Proceedings in the name of MERS granted to a Member's Certifying Officers under such Member's MERS Corporate Resolution is revoked for actions initiated on or after July 22, 2011, the effective date of this Rule. (the "Effective Date"). Effective September 1, 2011, the Member whose Certifying Officer initiates a foreclosure in MERS' name could be sanctioned by MERS pursuant to Rule 7, provided however, if the Member voluntarily dismisses such foreclosure or withdraws the filed Legal Proceedings within 21 days of filing the action, no sanction shall be levied.

(e)(i) The note owner or the note owner's servicer shall cause the Certifying Officer to execute the assignment of the Security Instrument from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note-owner before initiating foreclosure proceedings or filing Legal Proceedings and promptly send the assignment of the Security Instrument (in recordable form) for recording in the applicable public land records.

(ii)     Notwithstanding subsection (e)(i), in states in which the law does not require the party initiating foreclosure proceedings or filing Legal Proceedings to also be the mortgagee, beneficiary, or grantee of record (as applicable), the note owner or the note owner's

servicer shall cause the Certifying Officer to execute the assignment of the Security Instrument from MERS to the note owner's servicer or to such other party expressly and specifically designated by the note-owner, either before or promptly after initiating foreclosure proceedings or filing any Legal Proceedings and promptly send the assignment of the Security Instrument (in recordable form) for recording in the applicable land records; provided, however, until MERS has identified and MERSCORP has published  a list of  states that do not require an executed assignment of the Security Instrument from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note owner before initiating foreclosure proceedings or filing Legal Proceedings, the note owner or the note-owner's servicer shall cause the Certifying Officer to execute the assignment from MERS to the note owner's servicer, or to such other party expressly and specifically designated by the note owner before initiating foreclosure or filing Legal Proceedings in all states.

Case No.: 86206-1

---

SUPREME COURT
FOR THE STATE OF WASHINGTON

---

KRISTIN BAIN

v.

METROPOLITAN MORTGAGE GROUP, INC. ET AL

---

### OUR - WASHINGTON AMICUS: APPENDIX A-2

**American Law Institute and the National Conference
of Commissioners on Uniform State Laws,** *Report of the
Permanent Editorial Board for the Uniform Commercial Code –
Application of the Uniform Commercial Code to Selected Issues
relating to Mortgage Notes* **(Nov. 14, 2011)**

---

Shawn Timothy Newman, WSBA 14193
Attorney at Law, Inc. P.S.
2507 Crestline Dr., N.W.
Olympia, WA  98502
PH:  360.866.2322
FAX: 1.866.800.9941

# REPORT OF THE PERMANENT EDITORIAL BOARD
## FOR THE
## UNIFORM COMMERCIAL CODE

# APPLICATION OF THE UNIFORM COMMERCIAL CODE TO SELECTED ISSUES RELATING TO MORTGAGE NOTES

# NOVEMBER 14, 2011

© 2011 by The American Law Institute and
the National Conference of Commissioners on Uniform State Laws.
All rights reserved.

## PERMANENT EDITORIAL BOARD FOR THE UNIFORM COMMERCIAL CODE

**Chair**
John A. Sebert, Chicago, IL
*Executive Director, Uniform Law Commission*

**Members**

*ALI Designees*
E. Carolan Berkley, Philadelphia, PA
Amelia H. Boss, Philadelphia, PA
Stephanie Heller, Brooklyn, NY
Lance Liebman, New York, NY
 *Director, The American Law Institute*
Linda J. Rusch, Spokane, WA
Steven O. Weise, Los Angeles, CA

*ULC Designees*
Boris Auerbach, Indianapolis, IN
Patricia Brumfield Fry, Edgewood, NM
Carlyle C. Ring, Jr., Washington, DC
Edwin E. Smith, Boston, MA
James J. White, Ann Arbor, MI

**Director of Research**
Neil B. Cohen, Brooklyn, NY

**Liaisons**
Carter H. Klein, Chicago, IL
*ABA Business Law Section*
Teresa W. Harmon, Chicago, IL
*ABA Advisor*

**Emeritus Members**
William H. Henning, Tuscaloosa, AL
Fred H. Miller, Minneapolis, MN

**The American Law Institute**
4025 Chestnut Street
Philadelphia, PA 19104
215-243-1600
www.ali.org

**Uniform Law Commission**
111 N. Wabash, Suite 1010
Chicago, IL 60602
312-450-6600
www.uniformlaws.org

i

## PREFACE

In 1961, the American Law Institute and the Uniform Law Commission, the organizations that jointly sponsor the Uniform Commercial Code, established the Permanent Editorial Board for the Uniform Commercial Code (PEB). One of the charges of the PEB is to issue commentaries "and other articulations as appropriate to reflect the correct interpretation of the [Uniform Commercial] Code and issuing the same in a manner and at times best calculated to advance the uniformity and orderly development of commercial law." Such commentaries and other articulations are issued directly by the PEB rather than by action of the American Law Institute and the Uniform Law Commission.

This Report of the Permanent Editorial Board is such an articulation, addressing the application of the Uniform Commercial Code to issues of legal, economic, and social importance arising from the issuance and transfer of mortgage notes. A draft of this Report was made available to the public for comment on March 29, 2011, and the comments that were received have been taken into account in preparing the final Report.

REPORT OF THE PERMANENT EDITORIAL BOARD
FOR THE
UNIFORM COMMERCIAL CODE

APPLICATION OF THE UNIFORM COMMERCIAL CODE TO SELECTED ISSUES
RELATING TO MORTGAGE NOTES

## Introduction

Recent economic developments have brought to the forefront complex legal issues about the enforcement and collection of mortgage debt. Many of these issues are governed by local real property law and local rules of foreclosure procedure, but others are addressed in a uniform way throughout the United States by provisions of the Uniform Commercial Code (UCC).[1] Although the UCC provisions are settled law, it has become apparent that not all courts and attorneys are familiar with them. In addition, the complexity of some of the rules has proved daunting.

The Permanent Editorial Board for the Uniform Commercial Code[2] has prepared this Report in order to further the understanding of this statutory background by identifying and explaining several key rules in the UCC that govern the transfer and enforcement of notes secured by a mortgage[3] on real property. The UCC, of course, does not resolve all issues in this field. Most particularly, as to both substance and procedure, the enforcement of real estate mortgages by foreclosure is primarily the province of a state's real property law (although determinations made

---

[1] The UCC is a uniform law sponsored by the American Law Institute and the Uniform Law Commission. It has been enacted in every state (as well as the District of Columbia, Puerto Rico, and the United States Virgin Islands) in whole or significant part. This Report is based on the current Official Text of the UCC. Some states have enacted some non-uniform provisions that are generally not relevant to the issues discussed in this Report. Of course, the enacted text of the UCC in the state whose law is applicable governs. See note 6, *infra*, regarding the various different versions of Article 3 of the UCC in effect in the states.

[2] In 1961, the American Law Institute and the Uniform Law Commission, the organizations that jointly sponsor the UCC, established the Permanent Editorial Board for the Uniform Commercial Code (PEB). One of the charges of the PEB is to issue commentaries "and other articulations as appropriate to reflect the correct interpretation of the [Uniform Commercial] Code and issuing the same in a manner and at times best calculated to advance the uniformity and orderly development of commercial law."

[3] This Report, like Article 9 of the UCC, uses the term "mortgage" to include a consensual interest in real property to secure an obligation whether created by mortgage, trust deed, or the like. See UCC § 9-102(a)(55) and Official Comment 17 thereto and former UCC § 9-105(1)(j). This Report uses the term "mortgage note" to refer to a note secured by a mortgage, whether or not the note is a negotiable instrument under UCC Article 3.

pursuant to the UCC are typically relevant under that law).  Accordingly, this Report should be understood as providing guidance only as to the issues the Report addresses.[4]

### Background

Issues relating to the transfer, ownership, and enforcement of mortgage notes are primarily governed by two Articles of the UCC:

- In cases in which the mortgage note is a negotiable instrument,[5] Article 3 of the UCC[6] provides rules governing the obligations of parties on the note[7] and the enforcement of those obligations.
- In cases involving either negotiable or non-negotiable notes, Article 9 of the UCC[8] contains important rules governing how ownership of those notes may be transferred, the effect of the transfer of ownership of the notes on the ownership of the mortgages securing those notes, and the right of the transferee, under certain circumstances, to record its interest in the mortgage in the applicable real estate recording office.

This Report explains the application of the rules in both of those UCC Articles to provide guidance in:

- Identifying the person who is entitled to enforce the payment obligation of the maker[9] of a mortgage note, and to whom the maker owes that obligation; and

---

[4] Of course, the application of the UCC rules to particular factual circumstances depends on the nature of those circumstances. Facts raising legal issues other than those addressed in this Report can result in different rights and obligations than would be the case in the absence of those facts. Accordingly, this Report should not be read as a statement of the total legal implications of any factual scenario. Rather, the Report sets out the UCC rules that are common to the transactions discussed so as to provide a common basis for understanding the application of those rules. The impact of non-UCC law that applies to other aspects of such transactions is beyond the scope of this Report.

[5] The requirements that must be satisfied in order for a note to be a negotiable instrument are set out in UCC § 3-104.

[6] Except for New York, every state (as well as the District of Columbia, Puerto Rico, and the United States Virgin Islands) has enacted either the 1990 Official Text of Article 3 or the newer 2002 Official Text (the latter having been adopted in ten states as of the date of this Report). Unless indicated to the contrary all discussions of provisions in Article 3 apply equally to both versions. Much of the analysis of UCC Article 3 in this Report also applies under the older version of Article 3 in effect in New York, although many section numbers differ. The Report does not address those aspects of New York's Article 3 that are different from the 1990 or 2002 texts.

[7] In this Report, such notes are sometimes referred to as "negotiable notes."

[8] Unlike Article 3 (which has not been enacted in its modern form in New York), the current version of Article 9 has been enacted in all 50 states, the District of Columbia, and the United States Virgin Islands. Some states have enacted non-uniform provisions that are generally not relevant to the issues discussed in this Report (but see note 31 with respect to one relevant non-uniformity). A limited set of amendments to Article 9 was approved by the American Law Institute and the Uniform Law Commission in 2010. Except as noted in this Report, those amendments (which provide for a uniform effective date of July 1, 2013) are not germane to the matters addressed in this Report.

[9] A note can have more than one obligor. In some cases, this is because there is more than one maker (in which case they are jointly and severally liable; see UCC § 3-116(a)). In other cases, there may be an indorser. The obligation

- Determining who owns the rights represented by the note and mortgage.

Together, the provisions in Articles 3 and 9 of the UCC (along with general principles that appear in Article 1 and that apply to all transactions governed by the UCC) provide legal rules that apply to these questions.[10] Moreover, these rules displace any inconsistent common law rules that might have otherwise previously governed the same questions.[11]

This Report does not, however, address all of the rules in the UCC relating to enforcement, transfer, and ownership of mortgage notes. Rather, it reviews the rules relating to four specific questions:

- Who is the person entitled to enforce a mortgage note and, correspondingly, to whom is the obligation to pay the note owed?
- How can the owner of a mortgage note effectively transfer ownership of that note to another person or effectively use that note as collateral for an obligation?
- What is the effect of transfer of an interest in a mortgage note on the mortgage securing it?
- May a person to whom an interest in a mortgage note has been transferred, but who has not taken a recordable assignment of the mortgage, take steps to become the assignee of record in the real estate recording system of the mortgage securing the note?[12]

---

of an indorser is different from that of a maker in that the indorser's obligation is triggered by dishonor of the note (see UCC § 3-415) and, unless waived, indorsers have additional procedural protections (such as notice of dishonor; see UCC § 3-503)). These differences do not affect the issues addressed in this Report. For simplicity, this Report uses the term "maker" to refer to both makers and indorsers.

[10] Subject to limitations on the ability to affect the rights of third parties, the effect of these provisions may be varied by agreement. UCC § 1-302. Variation by agreement is not permitted when the variation would disclaim obligations of good faith, diligence, reasonableness, or care prescribed by the UCC or when the UCC otherwise so indicates (see, e.g., UCC § 9-602). But the meaning of the statute itself cannot be varied by agreement. Thus, for example, private parties cannot make a note negotiable unless it complies with UCC § 3-104. See Official Comment 1 to UCC § 1-302. Similarly, parties may not avoid the application of UCC Article 9 to a transaction that falls within its scope. See id. and Official Comment 2 to UCC § 9-109.

[11] UCC § 1-103(b). As noted in Official Comment 2 to UCC § 1-103:

> The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement its provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

[12] The Report does not discuss the application of common law principles, such as the law of agency, that supplement the provisions of the UCC other than to note some situations in which the text or comments of the UCC identify such principles as being relevant. See UCC § 1-103(b).

**Question One – To Whom is the Obligation to Pay a Mortgage Note Owed?**

If the mortgage note is a negotiable instrument,[13] Article 3 of the UCC provides a largely complete set of rules governing the obligations of parties on the note, including how to determine who may enforce those obligations and, thus, to whom those obligations are owed. The following discussion analyzes the application of these rules to that determination in the context of mortgage notes that are negotiable instruments.[14]

In the context of mortgage notes that have been sold or used as collateral to secure an obligation, the central concept for making that determination is identification of the "person entitled to enforce" the note.[15] Several issues are resolved by that determination. Most particularly:

(i)     the maker's obligation on the note is to pay the amount of the note to *the person entitled to enforce the note*,[16]

(ii)    the maker's payment to *the person entitled to enforce the note* results in discharge of the maker's obligation,[17] and

(iii)   the maker's failure to pay, when due, the amount of the note to *the person entitled to enforce the note* constitutes dishonor of the note.[18]

Thus, a person seeking to enforce rights based on the failure of the maker to pay a mortgage note must identify the person entitled to enforce the note and establish that that person has not been paid. This portion of this Report sets out the criteria for qualifying as a "person entitled to enforce" a mortgage note. The discussion of Question Two addresses how ownership of a mortgage note may be effectively transferred from an owner to another person.

---

[13] See UCC § 3-104 for the requirements that must be fulfilled in order for a payment obligation to qualify as a negotiable instrument. It should not be assumed that all mortgage notes are negotiable instruments. The issue of the negotiability of a particular mortgage note, which requires application of the standards in UCC § 3-104 to the words of the particular note, is beyond the scope of this Report.

[14] Law other than Article 3, including contract law, governs this determination for non-negotiable mortgage notes. That law is beyond the scope of this Report.

[15] The concept of "person entitled to enforce" a note is not synonymous with "owner" of the note. See Official Comment 1 to UCC § 3-203. A person need not be the owner of a note to be the person entitled to enforce it, and not all owners will qualify as persons entitled to enforce. Rules that address transfer of ownership of a note are addressed in the discussion of Question 2 below.

[16] UCC § 3-412. (If the note has been dishonored, and an indorser has paid the note to the person entitled to enforce it, the maker's obligation runs to the indorser.)

[17] UCC § 3-602. The law of agency is applicable in determining whether a payment has been made to a person entitled to enforce. See *id.*, Official Comment 3. Note that, in states that have enacted the 2002 Official Text of UCC Article 3, UCC § 3-602(b) provides that a maker is also discharged by paying a person formerly entitled to enforce the note if the maker has not received adequate notification that the note has been transferred and that payment is to be made to the transferee. This amendment aligns the protection afforded to makers of notes that have been assigned with comparable protection afforded to obligors on other payment rights that have been assigned. See, *e.g.*, UCC § 9-406(a); Restatement (Second), Contracts § 338(1).

[18] See UCC § 3-502. See also UCC § 3-602.

4

UCC Section 3-301 provides only three ways in which a person may qualify as the person entitled to enforce a note, two of which require the person to be in possession of the note (which may include possession by a third party that possesses it for the person)[19]:

- The first way that a person may qualify as the person entitled to enforce a note is to be its "holder." This familiar concept, set out in detail in UCC Section 1-201(b)(21)(A), requires that the person be in possession of the note and either (i) the note is payable to that person or (ii) the note is payable to bearer. Determining to whom a note is payable requires examination not only of the face of the note but also of any indorsements. This is because the party to whom a note is payable may be changed by indorsement[20] so that, for example, a note payable to the order of a named payee that is indorsed in blank by that payee becomes payable to bearer.[21]

- The second way that a person may be the person entitled to enforce a note is to be a "nonholder in possession of the [note] who has the rights of a holder."
  - How can a person who is not the holder of a note have the rights of a holder? This can occur by operation of law outside the UCC, such as the law of subrogation or estate administration, by which one person is the successor to or acquires another person's rights.[22] It can also occur if the delivery of the note to that person constitutes a "transfer" (as that term is defined in UCC Section 3-203, see below) because transfer of a note "vests in the transferee any right of the transferor to enforce the instrument."[23] Thus, if a holder (who, as seen above, is a person entitled to enforce a note) transfers the note to another person, that other person (the transferee) obtains from the holder the right to enforce the note even if the transferee does not become the holder (as in the example below). Similarly, a

---

[19] See UCC § 1-103(b) (unless displaced by particular provisions of the UCC, the law of, *inter alia*, principal and agent supplements the provisions of the UCC). See also UCC § 3-420, Comment 1 ("Delivery to an agent [of a payee] is delivery to the payee."). Note that "delivery" of a negotiable instrument is defined in UCC § 1-201(b)(15) as voluntary transfer of possession. This Report does not address the determination of whether a particular person is an agent of another person under the law of agency and the agency law implications of such a determination.

[20] "Indorsement," as defined in UCC § 3-204(a), requires the signature of the indorser. The law of agency determines whether a signature made by a person purporting to act as a representative binds the represented person. UCC § 3-402(a); see note 12, supra. An indorsement may appear either on the instrument or on a separate piece of paper (usually referred to as an *allonge*) affixed to the instrument. See UCC § 3-204(a) and Comment 1, par. 4.

[21] UCC Section 3-205 contains the rules concerning the effect of various types of indorsement on the party to whom a note is payable. Either a "special indorsement" (see UCC § 3-205(a)) or a "blank indorsement" (see UCC § 3-205(b)) can change the identity of the person to whom the note is payable. A special indorsement is an indorsement that identifies the person to whom it makes the note payable, while a blank indorsement is an indorsement that does not identify such a person and results in the instrument becoming payable to bearer. When an instrument is indorsed in blank (and, thus, is payable to bearer), it may be negotiated by transfer of possession alone until specially indorsed. UCC § 3-205(b).

[22] See Official Comment to UCC § 3-301.

[23] UCC § 3-203(b).

subsequent transfer will result in the subsequent transferee being a person entitled to enforce the note.

o Under what circumstances does delivery of a note qualify as a transfer? As stated in UCC Section 3-203(a), a note is transferred "when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument." For example, assume that the payee of a note sells it to an assignee, intending to transfer all of the payee's rights to the note, but delivers the note to the assignee without indorsing it. The assignee will not qualify as a holder (because the note is still payable to the payee) but, because the transaction between the payee and the assignee qualifies as a transfer, the assignee now has all of the payee's rights to enforce the note and thereby qualifies as the person entitled to enforce it. Thus, the failure to obtain the indorsement of the payee does not prevent a person in possession of the note from being the person entitled to enforce it, but demonstrating that status is more difficult. This is because the person in possession of the note must also demonstrate the purpose of the delivery of the note to it in order to qualify as the person entitled to enforce.[24]

- There is a third method of qualifying as a person entitled to enforce a note that, unlike the previous two methods, does not require possession of the note. This method is quite limited – it applies only in cases in which "the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process."[25] In such a case, a person qualifies as a person entitled to enforce the note if the person demonstrates not only that one of those circumstances is present but also demonstrates that the person was formerly in possession of the note and entitled to enforce it when the loss of possession occurred and that the loss of possession was not as a result of transfer (as defined above) or lawful seizure. If the person proves those facts, as well as the terms of the note, the person is a person entitled to enforce the note and may seek to enforce it even though it is not in possession of the note,[26] but the court may not enter judgment in favor of the

---

[24] If the note was transferred for value and the transferee does not qualify as a holder because of the lack of indorsement by the transferor, "the transferee has a specifically enforceable right to the unqualified indorsement of the transferor." See UCC § 3-203(c).

[25] UCC § 3-309(a)(iii) (1990 text), 3-309(a)(3) (2002 text). The 2002 text goes on to provide that a transferee from the person who lost possession of a note may also qualify as a person entitled to enforce it. See UCC § 3-309(a)(1)(B) (2002). This point was thought to be implicit in the 1990 text, but was rejected in some cases in which the issue was raised. The reasoning of those cases was rejected in Official Comment 5 to UCC § 9-109 and the point was made explicit in the 2002 text of Article 3.

[26] To prevail the person must establish not only that the person is a person entitled to enforce the note but also the other elements of the maker's obligation to pay such a person. See generally UCC §§ 3-309(b), 3-412. Moreover, as is the case with respect to the enforcement of all rights under the UCC, the person enforcing the note must act in good faith in enforcing the note. UCC § 1-304.

person unless the court finds that the maker is adequately protected against loss that might occur if the note subsequently reappears.[27]

**Illustrations:**

1. Maker issued a negotiable mortgage note payable to the order of Payee. Payee is in possession of the note, which has not been indorsed. Payee is the holder of the note and, therefore, is the person entitled to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

2. Maker issued a negotiable mortgage note payable to the order of Payee. Payee indorsed the note in blank and gave possession of it to Transferee. Transferee is the holder of the note and, therefore, is the person entitled to enforce it. UCC §§ 1-201(b)(21)(A), 3-301(i).

3. Maker issued a negotiable mortgage note payable to the order of Payee. Payee sold the note to Transferee and gave possession of it to Transferee for the purpose of giving Transferee the right to enforce the note. Payee did not, however, indorse the note. Transferee is not the holder of the note because, while Transferee is in possession of the note, it is payable neither to bearer nor to Transferee. UCC § 1-201(b)(21)(A). Nonetheless, Transferee is a person entitled to enforce the note. This is because the note was transferred to Transferee and the transfer vested in Transferee Payee's right to enforce the note. UCC § 3-203(a)-(b). As a result, Transferee is a nonholder in possession of the note with the rights of a holder and, accordingly, a person entitled to enforce the note. UCC § 3-301(ii).

4. Same facts as Illustrations 2 and 3, except that (i) under the law of agency, Agent is the agent of Transferee for purposes of possessing the note and (ii) it is Agent, rather than Transferee, to whom actual physical possession of the note is given by Payee. In the facts of Illustration 2, Transferee is a holder of the note and a person entitled to enforce it. In the context of Illustration 3, Transferee is a person entitled to enforce the note. Whether Agent may enforce the note or mortgage on behalf of Transferee depends in part on the law of agency and, in the case of the mortgage, real property law.

5. Same facts as Illustration 2, except that after obtaining possession of the note, Transferee lost the note and its whereabouts cannot be determined. Transferee is a person entitled to enforce the note even though Transferee does not have possession of it. UCC § 3-309(a). If Transferee brings an action on the note against Maker, Transferee must establish the terms of the note and the elements of Maker's obligation on it. The court may not enter judgment in favor of Transferee, however, unless the court finds that Maker is adequately protected against loss that might occur by reason of a claim of another person (such as the finder of the note) to enforce the note. UCC § 3-309(b).

---

[27] See *Id.* UCC § 3-309(b) goes on to state that "Adequate protection may be provided by any reasonable means."

**Question Two – What Steps Must be Taken for the Owner of a Mortgage Note to Transfer Ownership of the Note to Another Person or Use the Note as Collateral for an Obligation?**

In the discussion of Question One, this Report addresses identification of the person who is entitled to enforce a note. That discussion does not address who "owns" the note. While, in many cases, the person entitled to enforce a note is also its owner, this need not be the case. The rules that determine whether a person is a person entitled to enforce a note do not require that person to be the owner of the note,[28] and a change in ownership of a note does not necessarily bring about a concomitant change in the identity of the person entitled to enforce the note. This is because the rules that determine who is entitled to enforce a note and the rules that determine whether the note, or an interest in it, have been effectively transferred serve different functions:

- The rules that determine who is entitled to enforce a note are concerned primarily with the maker of the note, providing the maker with a relatively simple way of determining to whom his or her obligation is owed and, thus, whom to pay in order to be discharged.
- The rules concerning transfer of ownership and other interests in a note, on the other hand, primarily relate to who, among competing claimants, is entitled to the economic value of the note.

In a typical transaction, when a note is issued to a payee, the note is initially owned by that payee. If that payee seeks either to use the note as collateral or sell the note outright, Article 9 of the UCC governs that transaction and determines whether the creditor or buyer has obtained a property right in the note. As is generally known, Article 9 governs transactions in which property is used as collateral for an obligation.[29] In addition, however, Article 9 governs the sale of most payment rights, including the sale of both negotiable and non-negotiable notes.[30] With very few exceptions, the same Article 9 rules that apply to transactions in which a payment right is collateral for an obligation also apply to transactions in which a payment right is sold. Rather than contain two parallel sets of rules – one for transactions in which payment rights are collateral and the other for sales of payment rights – Article 9 uses nomenclature conventions to apply one set of rules to both types of transactions. This is accomplished primarily by defining the term "security interest" to include not only an interest in property that secures an obligation

---

[28] See UCC § 3-301, which provides, in relevant part, that "A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument . . . ."

[29] UCC § 9-109(a)(1).

[30] With certain limited exceptions not germane to this Report, Article 9 governs the sale of accounts, chattel paper, payment intangibles, and promissory notes. UCC § 9-109(a)(3). The term "promissory note" includes not only notes that fulfill the requirements of a negotiable instrument under UCC § 3-104 but also notes that do not fulfill those requirements but nonetheless are of a "type that in ordinary business is transferred by delivery with any necessary indorsement or assignment." See UCC §§ 9-102(a)(65) (definition of "promissory note") and 9-102(a)(47) (definition of "instrument" as the term is used in Article 9).

but also the right of a buyer of a payment right in a transaction governed by Article 9.[31] Similarly, definitional conventions denominate the seller of such a payment right as the "debtor," the buyer as the "secured party," and the sold payment right as the "collateral."[32]  As a result, for purposes of Article 9, the buyer of a promissory note is a "secured party" that has acquired a "security interest" in the note from the "debtor," and the rules that apply to security interests that secure an obligation generally also apply to transactions in which a promissory note is sold.

Section 9-203(b) of the Uniform Commercial Code provides that three criteria must be fulfilled in order for the owner of a mortgage note effectively to create a "security interest" (either an interest in the note securing an obligation or the outright sale of the note to a buyer) in it.

- The first two criteria are straightforward – "value" must be given[33] and the debtor/seller must have rights in the note or the power to transfer rights in the note to a third party.[34]
- The third criterion may be fulfilled in either of one of two ways.  Either the debtor/seller must "authenticate"[35] a "security agreement"[36] that describes the note[37] or the secured party must take possession[38] of the note pursuant to the debtor's security agreement.[39]

---

[31] See UCC § 1-201(b)(35) [UCC § 1-201(37) in states that have not yet enacted the 2001 revised text of UCC Article 1].  (For reasons that are not apparent, when South Carolina enacted the 1998 revised text of UCC Article 9, which included an amendment to UCC § 1-201 to expand the definition of "security interest" to include the right of a buyer of a promissory note, it did not enact the amendment to § 1-201.  This Report does not address the effect of that omission.)  The limitation to transactions governed by Article 9 refers to the exclusion, in cases not germane to this Report, of certain assignments of payment rights from the reach of Article 9.

[32] UCC §§ 9-102(a)(28)(B); 9-102(a)(72)(D); 9-102(a)(12)(B).

[33] UCC § 9-203(b)(1).  UCC § 1-204 provides that giving "value" for rights includes not only acquiring them for consideration but also acquiring them in return for a binding commitment to extend credit, as security for or in complete or partial satisfaction of a preexisting claim, or by accepting delivery of them under a preexisting contract for their purchase.

[34] UCC § 9-203(b)(2).  Limited rights that are short of full ownership are sufficient for this purpose.  See Official Comment 6 to UCC § 9-203.

[35] This term is defined to include signing and its electronic equivalent.  See UCC § 9-102(a)(7).

[36] A "security agreement" is an agreement that creates or provides for a security interest (including the rights of a buyer arising upon the outright sale of a payment right).  See UCC § 9-102(a)(73).

[37] Article 9's criteria for descriptions of property in a security agreement are quite flexible.  Generally speaking, any description suffices, whether or not specific, if it reasonably identifies the property.  See UCC § 9-108(a)-(b).  A "supergeneric" description consisting solely of words such as "all of the debtor's assets" or "all of the debtor's personal property" is not sufficient, however.  UCC § 9-108(c).  A narrower description, limiting the property to a particular category or type, such as "all notes," is sufficient.  For example, a description that refers to "all of the debtor's notes" is sufficient.

[38] See UCC § 9-313.  As noted in Official Comment 3 to UCC § 9-313, "in determining whether a particular person has possession, the principles of agency apply."  In addition, UCC § 9-313 also contains two special rules under which possession by a non-agent may constitute possession by the secured party.  First, if a person who is not an agent is in possession of the collateral and the person authenticates a record acknowledging that the person holds the collateral for the secured party's benefit, possession by that person constitutes possession by the secured party.  UCC § 9-313(c).  Second, a secured party that has possession of collateral does not relinquish possession by delivering the collateral to another person (other than the debtor or a lessee of the collateral from the debtor in the ordinary course of the debtor's business) if the delivery is accompanied by instructions to that person to hold possession of the collateral for the benefit of the secured party or redeliver it to the secured party.  UCC § 9-313(h).

- o  Thus, if the secured party (including a buyer) takes possession of the mortgage note pursuant to the security agreement of the debtor (including a seller); this criterion is satisfied even if that agreement is oral or otherwise not evidenced by an authenticated record.
- o  Alternatively, if the debtor authenticates a security agreement describing the note, this criterion is satisfied even if the secured party does *not* take possession of the note. (Note that in this situation, in which the seller of a note may retain possession of it, the owner of a note may be a different person than the person entitled to enforce the note.)[40]

Satisfaction of these three criteria of Section 9-203(b) results in the secured party (including a buyer of the note) obtaining a property right (whether outright ownership or a security interest to secure an obligation) in the note from the debtor (including a seller of the note).[41]

**Illustrations:**

6.  Maker issued a mortgage note payable to the order of Payee.[42]  Payee borrowed money from Funder and, to secure Payee's repayment obligation, Payee and Funder agreed that Funder would have a security interest in the note.  Simultaneously with the funding of the loan, Payee gave possession of the note to Funder.  Funder has an attached and

---

See also Official Comment 9 to UCC § 9-313 ("New subsections (h) and (i) address the practice of mortgage warehouse lenders.")  Possession as contemplated by UCC § 9-313 is also possession for purposes of UCC § 9-203. See UCC § 9-203, Comment 4.

[39] UCC §§ 9-203(b)(3)(A)-(B).

[40] As noted in the discussion of Question One, payment by the maker of a negotiable note to the person entitled to enforce it discharges the maker's obligations on the note.  UCC § 3-602.  This is the case even if the person entitled to enforce the note is not its owner.  As between the person entitled to enforce the note and the owner of the note, the right to the money paid by the maker is determined by the UCC and other applicable law, such as the law of contract and the law of restitution, as well as agency law.  See, e.g., UCC §§ 3-306 and 9-315(a)(2).  As noted in comment 3 to UCC § 3-602, "if the original payee of the note transfers ownership of the note to a third party but continues to service the obligation, the law of agency might treat payments made to the original payee as payments made to the third party."

[41] For cases in which another person claims an interest in the note (whether as a result of another voluntary transfer by the debtor or otherwise), reference to Article 9's rules governing perfection and priority of security interests may be required in order to rank order those claims (and, in some cases, determine whether a party has taken the note free of competing claims to the note).  In the case of notes that are negotiable instruments, the Article 3 concept of "holder in due course" (see UCC § 3-302) should be considered as well, because a holder in due course takes its rights in an instrument free of competing property claims to it (as well as free of most defenses to obligations on it). See UCC §§ 3-305 and 3-306.  With respect to determining whether the owner of a note has effectively transferred a property interest to a transferee, however, the perfection and priority rules are largely irrelevant.  (The application of the perfection and priority rules can result in the rights of the transferee either being subordinate to the rights of a competing claimant or being extinguished by the rights of the competing claimant.  See, e.g., UCC §§ 9-317(b), 9-322(a), 9-330(d), and 9-331(a).)

[42] For this Illustration, as well as Illustrations 7-11, the analysis under UCC Article 9 is the same whether the mortgage note is negotiable or non-negotiable.  This is because, in either case, the mortgage note will qualify as a "promissory note" and, therefore, an "instrument" under UCC Article 9.  See UCC §§ 9-102(a)(47), (65).

10

enforceable security interest in the note. UCC § 9-203(b). This is the case even if Payee's agreement is oral or otherwise not evidenced by an authenticated record. Payee is no longer a person entitled to enforce the note (because Payee is no longer in possession of it and it has not been lost, stolen, or destroyed). UCC § 3-301. Funder is a person entitled to enforce the note if either (i) Payee indorsed the note by blank indorsement or by a special indorsement identifying Funder as the person to whom the indorsement makes the note payable (because, in such cases, Funder would be the holder of the note), or (ii) the delivery of the note from Payee to Funder constitutes a transfer of the note under UCC § 3-203 (because, in such case, Funder would be a nonholder in possession of the note with the rights of a holder). See also UCC §§ 1-201(b)(21)(A), 3-205(a)-(b), and 3-301(i)-(ii).

7. Maker issued a mortgage note payable to the order of Payee. Payee borrowed money from Funder and, in a signed writing that reasonably identified the note (whether specifically or as part of a category or a type of property defined in the UCC), granted Funder a security interest in the note to secure Payee's repayment obligation. Payee, however, retained possession of the note. Funder has an attached and enforceable security interest in the note. UCC § 9-203(b). If the note is negotiable, Payee remains the holder and the person entitled to enforce the note because Payee is in possession of it and it is payable to the order of Payee. UCC §§ 1-201(b)(21)(A), 3-301(i).

8. Maker issued a mortgage note payable to the order of Payee. Payee sold the note to Funder, giving possession of the note to Funder in exchange for the purchase price. The sale of the note is governed by Article 9 and the rights of Funder as buyer constitute a "security interest." UCC §§ 9-109(a)(3), 1-201(b)(35). The security interest is attached and is enforceable. UCC § 9-203(b). This is the case even if the sales agreement was oral or otherwise not evidenced by an authenticated record. If the note is negotiable, Funder is also a person entitled to enforce the note, whether or not Payee indorsed it, because either (i) Funder is a holder of the note (if Payee indorsed it by blank indorsement or by a special indorsement identifying Funder as the person to whom the indorsement makes the note payable) or (ii) Funder is a nonholder in possession of the note (if there is no such indorsement) who has obtained the rights of Payee by transfer of the note pursuant to UCC § 3-203. See also UCC §§ 1-201(b)(21)(A), 3-205(a)-(b), and 3-301(i)-(ii).

9. Maker issued a mortgage note payable to the order of Payee. Pursuant to a signed writing that reasonably identified the note (whether specifically or as part of a category or a type of property defined in the UCC), Payee sold the note to Funder. Payee, however, retained possession of the note. The sale of the note is governed by Article 9 and the rights of Funder as buyer constitute a "security interest." UCC § 1-201(b)(35). The security interest is attached and is enforceable. UCC § 9-203(b). If the note is negotiable, Payee remains the holder and the person entitled to enforce the note (even though, as between Payee and Funder, Funder owns the note) because Payee is in

11

possession of it and it is payable to the order of Payee.  UCC §§ 1-201(b)(21)(A), 3-301(i).

### Question Three – What is the Effect of Transfer of an Interest in a Mortgage Note on the Mortgage Securing It?

What if a note secured by a mortgage is sold (or the note is used as collateral to secure an obligation), but the parties do not take any additional actions to assign the mortgage that secures payment of the note, such as execution of a recordable assignment of the mortgage?  UCC Section 9-203(g) explicitly provides that, in such cases, the assignment of the interest of the seller or other grantor of a security interest in the note automatically transfers a corresponding interest in the mortgage to the assignee: "The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage, or other lien."  (As noted previously, a "security interest" in a note includes the right of a buyer of the note.)

While this question has provoked some uncertainty and has given rise to some judicial analysis that disregards the impact of Article 9,[43] the UCC is unambiguous:  the sale of a mortgage note (or other grant of a security interest in the note) not accompanied by a separate conveyance of the mortgage securing the note does not result in the mortgage being severed from the note.[44]

It is important to note in this regard, however, that UCC Section 9-203(g) addresses only whether, as between the seller of a mortgage note (or a debtor who uses it as collateral) and the buyer or other secured party, the interest of the seller (or debtor) in the mortgage has been correspondingly transferred to the secured party.  UCC Section 9-308(e) goes on to state that, if the secured party's security interest in the note is perfected, the secured party's security interest

---

[43] *See, e.g.,* the discussion of this issue in *U.S. Bank v. Ibanez,* 458 Mass. 637 at 652-53, 941 N.E.2d 40 at 53-54 (2011).  In that discussion, the court cited Massachusetts common law precedents pre-dating the enactment of the current text of Article 9 to the effect that a mortgage does not follow a note in the absence of a separate assignment of the mortgage, but did not address the effect of Massachusetts's subsequent enactment of UCC § 9-203(g) on those precedents.  Under the rule in UCC § 9-203(g), if the holder of the note in question demonstrated that it had an attached security interest (including the interest of a buyer) in the note, the holder of the note in question would also have a security interest in the mortgage securing the note even in the absence of a separate assignment of the mortgage.  (This Report does not address whether, under the facts of the *Ibanez* case, the holder of the note had an attached security interest in the note and, thus, qualified for the application of UCC § 9-203(g).  Moreover, even if the holder had an attached security interest in the note and, thus, had a security interest in the mortgage, this would not, of itself, mean that the holder could enforce the mortgage without a recordable assignment of the mortgage to the holder.  Whatever steps are required in order to enforce a mortgage in the absence of a recordable assignment are the province of real property law.  The matter is addressed, in part, in the discussion of Question 4 below.)

[44] Official Comment 9 to UCC § 9-203 confirms this point:  "Subsection (g) codifies the common-law rule that a transfer of an obligation secured by a security interest or other lien on personal or real property also transfers the security interest or lien."  Pursuant to UCC § 1-302(a), the parties to the transaction may agree that an interest in the mortgage securing the note does not accompany the note, but such an agreement is unlikely.  See, *e.g.,* Restatement (3d), Property (Mortgages) § 5.4, comment *a* ("It is conceivable that on rare occasions a mortgagee will wish to disassociate the obligation and the mortgage, but that result should follow only upon evidence that the parties to the transfer so agreed.").

12

in the mortgage securing the note is also perfected,[45] with result that the right of the secured party is senior to the rights of a person who then or later becomes a lien creditor of the seller of (or other grantor of a security interest in) the note. Neither of these rules, however, determines the ranking of rights in the underlying real property itself, or the effect of recordation or non-recordation in the real property recording system on enforcement of the mortgage.[46]

**Illustration:**

> 10. Same facts as Illustration 9. The signed writing was silent with respect to the mortgage securing the note and the parties made no other agreement with respect to the mortgage. The attachment of Funder's interest in the rights of Payee in the note also constitutes attachment of an interest in the rights of Payee in the mortgage. UCC § 9-203(g).

**Question Four – What Actions May a Person to Whom an Interest in a Mortgage Note Has Been Transferred, but Who Has not Taken a Recordable Assignment of the Mortgage, Take in Order to Become the Assignee of Record of the Mortgage Securing the Note?**

In some states, a party without a recorded interest in a mortgage may not enforce the mortgage non-judicially. In such states, even though the buyer of a mortgage note (or a creditor to whom a security interest in the note has been granted to secure an obligation) automatically obtains corresponding rights in the mortgage,[47] this may be insufficient as a matter of applicable real estate law to enable that buyer or secured creditor to enforce the mortgage upon default of the maker if the buyer or secured creditor does not have a recordable assignment. The buyer or other secured party may attempt to obtain such a recordable assignment from the seller or debtor at the time it seeks to enforce the mortgage, but such an attempt may be unsuccessful.[48]

Article 9 of the UCC provides such a buyer or secured creditor a mechanism by which it can record its interest in the realty records in order to conduct a non-judicial foreclosure. UCC Section 9-607(b) provides that "if necessary to enable a secured party [including the buyer of a mortgage note] to exercise … the right of [its transferor]to enforce a mortgage nonjudicially," the secured party may record in the office in which the mortgage is recorded (i) a copy of the security agreement transferring an interest in the note to the secured party and (ii) the secured

---

[45] See Official Comment 6 to UCC § 9-308, which also observes that "this result helps prevent the separation of the mortgage (or other lien) from the note." Note also that, as explained in Official Comment 7 to UCC § 9-109, "It also follows from [UCC § 9-109(b)] that an attempt to obtain or perfect a security interest in a secured obligation by complying with non-Article 9 law, as by an assignment of record of a real-property mortgage, would be ineffective."

[46] Similarly, Official Comment 6 to UCC § 9-308 states that "this Article does not determine who has the power to release a mortgage of record. That issue is determined by real-property law."

[47] See discussion of Question Three, *supra.*

[48] In some cases, the seller or debtor may no longer be in business. In other cases, it may simply be unresponsive to requests for execution of documents with respect to a transaction in which it no longer has an economic interest. Moreover, in cases in which mortgage note was collateral for an obligation owed to the secured party, the defaulting debtor may simply be unwilling to assist its secured party. See Official Comment 8 to UCC § 9-607.

party's sworn affidavit in recordable form stating that default has occurred[49] and that the secured party is entitled to enforce the mortgage non-judicially.[50]

**Illustration:**

> 11. Same facts as Illustration 10. Maker has defaulted on the note and mortgage and Funder would like to enforce the mortgage non-judicially. In the relevant state, however, only a party with a recorded interest in a mortgage may enforce it non-judicially. Funder may record in the relevant mortgage recording office a copy of the signed writing pursuant to which the note was sold to Funder and a sworn affidavit stating that Maker has defaulted and that Funder is entitled to enforce the mortgage non-judicially. UCC § 9-607(b).

**Summary**

The Uniform Commercial Code provides four sets of rules that determine matters that are important in the context of enforcement of mortgage notes and the mortgages that secure them:

- First, in the case of a mortgage note that is a negotiable instrument, Article 3 of the UCC determines the identity of the person who is entitled to enforce the note and to whom the maker owes its payment obligation; payment to the person entitled to enforce the note discharges the maker's obligation, but failure to pay that party when the note is due constitutes dishonor.
- Second, for both negotiable and non-negotiable mortgage notes, Article 9 of the UCC determines whether a transferee of the note from its owner has obtained an attached property right in the note.
- Third, Article 9 of the UCC provides that a transferee of a mortgage note whose property right in the note has attached also automatically has an attached property right in the mortgage that secures the note.
- Finally, Article 9 of the UCC provides a mechanism by which the owner of a note and the mortgage securing it may, upon default of the maker of the note, record its interest in the mortgage in the realty records in order to conduct a non-judicial foreclosure.

As noted previously, these UCC rules do not resolve all issues in this field. The enforcement of real estate mortgages by foreclosure is primarily the province of a state's real property law, but legal determinations made pursuant to the four sets of UCC rules described in this Report will, in many cases, be central to administration of that law. In such cases, proper application of real property law requires proper application of the UCC rules discussed in this Report.

---

[49] The 2010 amendments to Article 9 (see fn. 8, *supra*) add language to this provision to clarify that "default," in this context, means default with respect to the note or other obligation secured by the mortgage.

[50] UCC § 9-607(b) does not address other conditions that must be satisfied for judicial or non-judicial enforcement of a mortgage.

Case No.: 86206-1

---

SUPREME COURT
FOR THE STATE OF WASHINGTON

---

KRISTIN BAIN

v.

METROPOLITAN MORTGAGE GROUP, INC. ET AL

---

**OUR - WASHINGTON AMICUS: APPENDIX A-3**

**Freddie Mac Bulletin No. 2011-5 (March 23, 2011)**

---

Shawn Timothy Newman, WSBA 14193
Attorney at Law, Inc. P.S.
2507 Crestline Dr., N.W.
Olympia, WA 98502
PH: 360.866.2322
FAX: 1.866.800.9941



**Freddie Mac**
We make home possible

# Bulletin

**NUMBER: 2011-5**

**TO:** Freddie Mac Servicers · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · March 23, 2011

## SUBJECTS

With this *Single-Family Seller/Servicer Guide* ("Guide") Bulletin, we are making the following changes to our **Servicing requirements**:

- Permitting Servicers to postpone foreclosure sales handled by designated counsel as long as the newly scheduled foreclosure sale date is within Freddie Mac's State foreclosure time lines
- Eliminating the option to foreclose in the name of Mortgage Electronic Registration Systems Inc. (MERS)
- Revising our requirements relating to foreclosure and bankruptcy referrals to:
  - ❑ Provide additional details about Servicer's Servicing obligations and expressly prohibit Servicers from charging Freddie Mac, trustees or attorneys for Servicing obligations compensated by the Servicing Spread
  - ❑ Add a requirement that prohibits Servicers from contracting, or making arrangements, with attorneys or trustees whereby the Servicer (or its affiliate, service provider, vendor or outsourcing company) receives any financial or other benefits, directly or indirectly, from the attorneys or trustees
  - ❑ Add a requirement that prohibits Servicers from requiring attorneys or trustees to use specified vendors, services or products, except for connectivity and invoice processing systems used by the Servicer
  - ❑ Prohibit Servicers from allowing service providers, vendors, outsourcing companies, or others to participate in, or influence, the selection of foreclosure counsel and trustees
  - ❑ Add new remedies that Freddie Mac may exercise, in its sole discretion, if a Servicer fails to comply with any of the new requirements relating to foreclosure and bankruptcy referrals
- Announcing that we will reimburse Servicers for limited connectivity and invoice processing fees and introducing new expense codes to facilitate the reimbursement of these new reimbursable expenses
- Revising our property preservation requirements by:
  - ❑ Introducing a new requirement to obtain an interior property inspection once a property has been determined to be abandoned, and again within 30 days prior to a scheduled foreclosure sale
  - ❑ Creating several new expense codes and increasing the expense limits for certain existing expense codes
- Announcing updated requirements for Servicer interaction with state Housing Finance Agencies ("HFAs") regarding unemployment mortgage assistance, subsidy and/or mortgage reinstatement programs

Page 1

- Revising Form 1132, *Authorization for Automatic Transfer of Funds Through the Automated Clearing House (ACH)*, to be a fillable form

In addition, we are reminding Servicers that:

- Freddie Mac updates Guide Exhibit 79, *Designated Counsel/Trustee*, to add or remove attorneys from time to time. Servicers are responsible for periodically checking to ensure that they are utilizing the most current version of Exhibit 79.

- Servicers are required to take appropriate steps to ensure that they receive notification of Bulletin publications

**Effective dates**

All of the changes announced in this Bulletin are effective immediately, unless otherwise noted.

## FORECLOSURE SALE POSTPONEMENTS

In an effort to streamline processes, we have updated the Guide to permit Servicers to postpone foreclosure sales handled by Freddie Mac's designated counsel as long as the newly scheduled foreclosure sale date is within Freddie Mac's State foreclosure time lines specified in Exhibit 83, *Freddie Mac State Foreclosure Time Lines – In Calendar Days*. If, however, the foreclosure sale postponement would result in the Servicer exceeding Freddie Mac's foreclosure time lines, then the Servicer must obtain Freddie Mac's prior written approval to postpone the foreclosure sale. As a result of this change, Servicers will handle foreclosure sale postponements in the same manner, regardless of whether the foreclosure is being handled by designated counsel.

In addition, we have updated the Guide to specify the information we require to evaluate a request to postpone a foreclosure sale.

Guide Section 66.32, *Delays in Completing a Foreclosure*, has been revised to reflect this change.

## CONDUCTING A FORECLOSURE ON A MORTGAGE REGISTERED WITH MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC. (MERS)

We have updated the Guide to eliminate the option for the foreclosure counsel or trustee to conduct a foreclosure in the name of MERS. Effective for Mortgages registered with MERS that are referred to foreclosure on or after **April 1, 2011**, Servicers must prepare an assignment of the Security Instrument from MERS to the Servicer and instruct the foreclosure counsel or trustee to foreclose in the Servicer's name and take title in Freddie Mac's name.

As required in Section 66.17, *Foreclosing in the Servicer's Name*, Servicers must record the prepared assignment where required by State law. State mandated recording fees are not reimbursable by Freddie Mac, are not considered part of the Freddie Mac allowable attorney fees and must not be billed to the Borrower.

Servicers should refer to updated Section 66.17 and Section 66.54, *Vesting the Title and Avoiding Transfer Taxes*, for additional information.

## REVISED REQUIREMENTS RELATING TO FORECLOSURE AND BANKRUPTCY ACTIVITIES

### Servicer's Servicing obligations

We have updated the Guide to provide additional details about foreclosure- and bankruptcy- related activities that are part of the Servicer's Servicing obligations and compensated through the Servicing Spread. We have also added a provision expressly prohibiting Servicers from charging Freddie Mac, trustees or attorneys for Servicing obligations compensated by the Servicing Spread.

Guide Chapter 54, *Servicing Compensation*, has been revised to reflect these changes.

**Prohibitions relating to foreclosure and bankruptcy referrals**

Freddie Mac requires that all foreclosure- and bankruptcy- related Servicing obligations be performed in the most effective, efficient and cost-conscious manner in order to preserve Borrower and Freddie Mac interests. Therefore, Freddie Mac has added new Guide Section 54.5, *Prohibitions Relating to Foreclosure and Bankruptcy Referrals; Freddie Mac Remedies for Non-Compliance*, specifically prohibiting Servicers from contracting, or making arrangements, with attorneys or trustees whereby the Servicer (or its affiliate, service provider, vendor or outsourcing company) receives any financial or other benefits, directly or indirectly, from the attorneys or trustees.

This new Guide Section also prohibits Servicers from requiring attorneys or trustees to use specified vendors, services and/or products. However, a Servicer may require an attorney or trustee to use certain connectivity or invoice processing systems, provided that the attorney or trustee is not required to pay for the use of, or access to, such system.

Servicers are also expressly prohibited from allowing service providers, vendors, outsourcing companies, or others to participate in, or influence, the selection of foreclosure counsel and trustees, as specified in the new Guide Section 54.5.

Freddie Mac, at its sole discretion, may exercise remedies for Servicer non-compliance with these new provisions, including, but not limited to, refusing to reimburse the Servicer for attorney and trustee fees or costs, and requiring the Servicer to reimburse the attorney, trustee or Freddie Mac for any prohibited payments or financial benefits received by the Servicer.

## NEW REIMBURSABLE EXPENSES: CONNECTIVITY AND INVOICING

We acknowledge that Servicers use various systems in managing their default Servicing operations. To help the Servicer more effectively service Freddie Mac Mortgages, Freddie Mac will reimburse Servicers for limited expenses incurred for their attorneys' and trustees' use of connectivity and/or invoice processing systems.

Effective for all new foreclosure or bankruptcy referrals on or after **April 1, 2011**, Freddie Mac will reimburse Servicers for connectivity and invoice processing for the life of default (i.e., the duration of the foreclosure, including any related bankruptcy referral) as follows:

- New expense code 015000 Connectivity Fee – A maximum of $25 for a new foreclosure or bankruptcy referral for charges associated with an attorney or trustee accessing the Servicer's systems

- New expense code 016000 Invoicing Fee – A maximum of $5 for invoicing charges related to a foreclosure referral and an additional maximum of $5 for invoicing charges related to an associated bankruptcy referral

However, Servicers are reminded of the following:

- The vendor must bill these charges directly to the Servicer, rather than the attorney or trustee, and the Servicer must pay the vendor directly for these charges

- No charges for connectivity or invoice processing may be passed on to the Borrower, the attorney or the trustee

Section 66.25, *Providing Information to the Foreclosure Counsel or Trustee; Servicer's System Connectivity and Invoice Processing*, Section 71.19, *Reimbursement of Fees and Costs Incurred during Legal Proceedings*, Exhibit 57, *1- to 4- Unit Property Approved Expense Amounts*, and Exhibit 74, *Expense and Income Codes for Expense Reimbursement Claims*, have been revised to reflect these changes.

**PROPERTY PRESERVATION – PROPERTY INSPECTIONS AND NEW REIMBURSABLE EXPENSES**

We have revised our property preservation requirements and reimbursable expense limits for abandoned properties to allow Servicers to complete additional preservation activities without our prior approval, and to encourage proactive preservation and maintenance of abandoned properties. Specifically, we have updated the Guide to:

- Require that on or after **June 1, 2011**, the Servicer perform an interior property inspection on an abandoned property:

  - Upon confirmation that the property has been abandoned; and

  - Within 30 days prior to a scheduled foreclosure sale

  Interior property inspections are reimbursable up to a maximum amount of $20 for each inspection ($40 maximum aggregate amount per property).

  Although the new interior property inspection requirements are not effective until **June 1, 2011,** Servicers are strongly encouraged to begin implementing these changes as soon as possible. The new expense code for the reimbursement of interior property inspections is available immediately.

- Increase the reimbursable amount for exterior property inspections from a maximum aggregate amount of $16 for all required inspections to a maximum amount of $10 for each required exterior property inspection, provided that such inspections are completed within the State foreclosure time lines listed in Exhibit 83. The maximum number of reimbursable exterior property inspections will be limited to the total number of monthly property inspections that can be completed within the State foreclosure time lines set forth in Exhibit 83, regardless of any exception Freddie Mac provides to exceed the State foreclosure time lines.

- Increase the approved expense limits for certain property preservation expenses

- Provide new expense codes and associated expense limits for additional reimbursable property preservation expenses on abandoned properties, including fence repairs, emergency repairs and pre-foreclosure vacant property registration

The newly increased expense limits for property preservation and property inspection, as well as the new expense codes, are effective immediately.

Chapter 52, *Mortgage File Retention,* Chapter 64, *Delinquencies,* Chapter 65, *Loss Mitigation,* Chapter 67, *Adverse Matters,* Chapter 71, *Reimbursement of Expenses – Reimbursement System,* Chapter A71, *Reimbursement of Expenses – Online Reimbursement System,* Exhibit 57 and Exhibit 74 have been revised to reflect these changes.

**UPDATES TO REQUIREMENTS FOR SERVICER INTERACTION WITH STATE HOUSING FINANCE AGENCIES' ("HFAs") MORTGAGE ASSISTANCE PROGRAMS**

In Bulletin 2010-25, we provided requirements for Servicer interaction with HFAs that provide mortgage assistance to Borrowers through unemployment mortgage assistance, subsidy and/or mortgage reinstatement programs.

With this Bulletin, we are:

- Announcing a revision to documentation requirements

- Providing further guidance on solicitation of Borrowers for participation in HFA mortgage assistance programs

- Revising the timing requirements for Servicer notification of payment changes to HFAs

- Providing a reminder about reporting monthly activity on Mortgages that receive financial assistance through the Innovation Fund for the Hardest Hit Housing Markets or Hardest Hit Fund ("HHF")

■ Reminding Servicers that Freddie Mac may, in its sole discretion, revise requirements relating to Servicer participation in HHF programs

**Documentation requirements**

We have eliminated the requirement for Servicers to obtain from the HFA a copy of any approval letter, note and mortgage or other agreement describing the terms of financial assistance provided to the Borrower. Additionally, Servicers are no longer required to confirm whether the funds provided by the HFA on behalf of the Borrower are in the form of a loan or restricted grant, and whether such loan or grant requires monthly or periodic payments prior to refinance of the Mortgage or sale of the property.

**Borrower solicitation**

We are clarifying that while generally a Servicer must not directly solicit Borrowers for participation in any HHF mortgage assistance program, the Servicer may do so if the Servicer receives express written consent to perform such solicitation from the HFA.

**Servicer notifications to HFA**

Bulletin 2010-25 announced that Servicers must notify the HFA of any changes or adjustments to the Borrower's monthly payment amount at least 45 calendar days prior to the change, if the Borrower is receiving assistance under an unemployment mortgage assistance program. We are revising that requirement to provide that alternatively, the Servicer may notify the HFA of such payment changes in accordance with a time frame that is agreed upon in writing between the HFA and the Servicer, as applicable.

**Reporting to Freddie Mac**

As previously communicated in our Single-Family Advisory e-mail on January 13, 2011, Servicers were required to begin reporting to us by February 1, 2011 on Mortgages receiving assistance under the HHF through the updated *Spreadsheet for Hardest Hit Fund Mortgages* that is located on **http://www.freddiemac.com/singlefamily/service/hfa_relief.html**. The updated spreadsheet provides additional instructions on how and when to use the spreadsheet, including the required format in which the spreadsheet must be submitted.

**Reminder – reservation of rights**

Servicers are reminded that Freddie Mac has the right, in its sole discretion, to add or modify requirements in connection with Freddie Mac Mortgages and Servicer participation in HHF programs.

## CHARGE-OFF RECONCILIATION

Previously, Freddie Mac provided a charge-off form that detailed the amount that Freddie Mac has determined would be charged off in connection with a short payoff, charge-off or third-party sale. As this information is also provided on the Detail Adjustment Report (DAR), we have updated the Guide to direct Servicers to review their DAR for this information. **Effective immediately**, Servicers must report any discrepancies between the DAR and their records to Freddie Mac by submitting new Guide Form 1205, *Charge-off Reconciliation*, within 30 calendar days following Freddie Mac's posting of the amount to the DAR.

Chapter B65, *Workout Options*, Chapter 66, *Foreclosure*, and Directory 5 have been revised to reflect these changes.

**UPDATES TO FORM 1132, *AUTHORIZATION FOR AUTOMATIC TRANSFER OF FUNDS THROUGH THE AUTOMATED CLEARING HOUSE (ACH)***

Form 1132 has been revised to be a fillable form for Seller/Servicer convenience. We are also updating the form to remind Seller/Servicers to verify the bank routing and transit number (Part C). There is no need to complete a new form unless ACH instructions change.

## REMINDER – NOTIFICATION OF GUIDE BULLETIN PUBLICATION FOR SERVICERS

In a Single-Family Advisory e-mail dated February 1, 2011, we announced the launch of Freddie Mac's new Single-Family Business News Subscription Center to improve the way Servicers receive important news and information about our single-family selling and Servicing business. Beginning in **April 2011**, Servicers will start receiving e-mails based on their subscription choices. Unless a Servicer has subscribed through our online subscription center, the Servicer will no longer receive general Freddie Mac e-mail communications, including notices of Guide updates.

The Single-Family Business News Subscription Center can be found at:
**www.freddiemac.com/singlefamily/news/subscribe**.

As announced in Bulletin 2011-4, we have updated Sections 1.2 and 50.2, *Legal Effect of the Single-Family Seller/Servicer Guide*, to remind Servicers that they are required to take appropriate steps to ensure that they receive notification of Bulletin publications. While Servicers with AllRegs® subscriptions may receive notification of Bulletin publications directly from AllRegs, all other Servicers must take steps to ensure that they subscribe to the appropriate Single-Family Update e-mails, which will notify them of Bulletin publications.

A Servicer's failure to take the appropriate steps to receive notices of Bulletins will not relieve the Servicer of its legal obligations to comply with the terms of the Bulletins.

## REVISIONS TO THE GUIDE

The revisions included in this Bulletin impact the following:

- Chapters 52, 54, 64, 65, B65, 66, 67, 71 and A71
- Forms 1132 and 1205
- Exhibits 57 and 74
- Directory 5

## CONCLUSION

If you have any questions about the changes announced in this Bulletin, please contact your Freddie Mac representative or call (800) FREDDIE and select Servicing.

Sincerely,

*Tracy Hagen Mooney*

Tracy Mooney
Senior Vice President
Servicer Relationship & Performance Management

EXHIBIT 2

Case 2:11-cv-01445-MJP   Document 113   Filed 10/08/12   Page 61 of 63

0/8/12                  GUEST POST: Welcome to Freddie and Fannie's Mortgage Shell Game, By Shawn T. Newman, J.D. - M...

Monday 8th October

- 
- Home
- RSS feed
- 



- Home
- Nice Things
- Trusted Attorneys
- Discussions
- State Specific
- Foreclosure Laws by State
- SUBSCRIBE
- CONTACT

Home » GUEST POST: Welcome to Freddie and Fannie's Mortgage Shell Game, By Shawn T. Newman, J.D.

# GUEST POST: Welcome to Freddie and Fannie's Mortgage Shell Game, By Shawn T. Newman, J.D.

Like   102      Tweet  20                    38



**Did you know that Fannie & Freddie had a policy stating that they didn't want to receive "notes?"  I didn't.**

Meet a reader of mine, attorney Shawn T. Newman of Olympia, Washington.  An exceptional and highly experienced lawyer who fights for the rights of homeowners, among others.  A professor at both undergrad and graduate levels, and an exceptionally nice person who is both very knowledgable and very easy to talk to.  Washington State homeowners should know of him, as should the other foreclosure defense attorneys around the country.  As he says, he's not terribly well-connected, so I said I'd would certainly help connect him.  Unquestionably, he's one of "US."

As a public sector lawyer, Shawn has worked as a Washington State Assistant Attorney General (Education Division), Evergreen State College Legal Counsel, Washington State Senate Staff Counsel (Senate Committee Services) and as a Public Defender.  In his private practice, he represents various individuals, community groups, for profit and non-profit organizations and businesses.

Shawn is currently General Counsel to Saint Martin's University and has served on the editorial board of the Journal of College and University Law.  He is a member of the Washington State Bar Association, Washington State Trial Lawyers Association and the National Association of College and University Attorneys.  Mr. Newman also serves as Washington State Director for the Initiative and Referendum Institute, based at the University of Southern California.

0/8/12          GUEST POST: Welcome to Freddie and Fannie's Mortgage Shell Game, By Shawn T. Newman, J.D. - M...

Shawn is a graduate of Notre Dame Law School and Ohio State University. While at Notre Dame, he received a fellowship from the White Center for Law and Government and served as the Legislative Research Editor for the Journal of Legislation.

Shawn's Guest Post follows, but also be sure to look for him in his upcoming Mandelman Matters Podcast. And starting today, you can also find his contact information as the latest addition to my Trusted Attorneys tab. We need a lot more lawyers like Shawn, but I'm sure glad he's with us and representing Washington State homeowners.

*Mandelman out.*


*That's Shawn appearing before the Washington State Supreme Court*

## Welcome to Freddie and Fannie's Mortgage Shell Game

**By Shawn Timothy Newman, J.D.**

**Adjunct Professor**

**Saint Martin's University**

In common parlance, a mortgage (or Deed of Trust) includes the underlying loan (promissory note) and the security on that loan (mortgage or Deed of Trust). This ignores the fact that the note and mortgage (or DOT) are two separate contracts governed by some different laws and legal principals.

As noted in Powell on Real Property, sec. 37.27 [2] (Michael Allan Wolf ed., LexisNexis Matthew Bender 2010)

It must be remembered that the mortgagee has two interests: (1) the debt or obligation which is owned to him, and (2) the security interest in land represented by the mortgage.... In fact, the primary interest is the personalty debt obligation. The interest in land which is available in case security is necessary because of the debtor's default is considered as collateral interest. Much trouble has been caused by mortgagees attempting to transfer only one of these two interests. Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee," having received no interest in the underlying debt or obligation, has a worthless piece of paper.

Regarding #1, the debt is the loan contract (i.e. the promissory note). Promissory notes are governed by the Uniform Commercial Code (UCC) Art. 3 (Negotiable Instruments). The UCC is a uniform law adopted by every state. In addition to promissory notes, negotiable instruments include checks. Like a check, you must negotiate (deliver with proper endorsements) the promissory note to another for claim ownership of the promissory note. Absent proper negotiation of the note, another party cannot claim ownership. So, for example, you find a check made payable to someone else and it is not endorsed to you; you cannot cash it because you are not the owner.

Regarding #2, the security on the debt (i.e. mortgage or deed of trust), is a contractual interest in land with the home buyer designated as the mortgagor and the lender/creditor as the mortgagee. Because a mortgage/DOT is an interest in land, the Statute of Frauds requires such contracts to be in writing and signed to be enforceable. Any assignment of a mortgage or deed of trust must be in writing and signed to be enforceable. Agreements that violate the Statute of Frauds are void and unenforceable as contracts. There are some exceptions to the Statue of Fraud's writing requirement including an admission in court and under oath "by the party to be charged" that there is a contract (this can be done via discovery). So, as is the case with most mortgages, they are sold by the originating bank (or mortgage company) to either Freddy Mac or Fannie Mae. This is known as the "secondary mortgage market" (secondary, since Freddy and Fannie don't originate the loans but buy them up from the banks and mortgage companies that do). According to Freddie Mac's website:

Every day, Freddie Mac provides a continuous flow of funds to mortgage lenders. We do so not by making individual mortgage loans to consumers; instead, we support the U.S. home mortgage market by providing money directly to lenders, ensuring that the system is liquid, stable and affordable. To fulfill this vital mission, Freddie Mac buys residential mortgages and mortgage-related securities and guarantees mortgages made by lenders. We issue debt securities to the global capital markets to fund the purchase of mortgages and mortgage-related securities we hold as an investor. We also create and sell mortgage-related securities to the capital markets, providing a guarantee to investors on those securities.

Freddie Mac pools the mortgages it purchases from lenders across the country and packages them into securities that can be sold to investors. These investors include the lenders themselves, pension funds, insurance companies, securities dealers, commercial and central banks, and others. Freddie Mac also is one of the largest investors in mortgage-related securities, purchasing and holding in portfolio a portion of our own securities and those issued by others.

http://www.freddiemac.com/corporate/company_profile/our_business/securities.html

**If Freddie or Fannie truly "own" your mortgage, they have "legal title" to the property and are the "real party in interest" to foreclose.**

However, this brings me to an issue raised by Professor Dale Whitman in his article, "*How Negotiability Has Fouled Up the Secondary Mortgage Market, and What To Do About It,*" 37 Pepp. L. Rev 738, 757-758 (2010):

While delivery of the note might seem a simple matter of compliance, experience during the past several years has shown that, probably in countless thousands of

cases, promissory notes were never delivered to secondary market investors or securitizers, and, in many cases, cannot presently be located at all. The issue is extremely widespread, and, in many cases, appears to have been the result of a conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes representing the loans they were selling.

**This "policy" was created by Freddie and Fannie and clouds who actually has legal title to the property (i.e. mortgagee) and who "owns" the note.**

First, as noted above, it is important to understand that a mortgage contract is an interest in land and, as such, must be in writing to be enforceable per the Statute of Frauds (or fall within one of the exceptions such as an admission in court). Any "sale" or assignment to Freddy or Fannie must also be in writing per the Statute of Frauds. Some states (like Ohio) require such transfers to be recorded. If you are challenging a foreclosure action, the mortgagor (borrower) should ascertain if a servicer (loan originator or its successor) has sold the mortgage to Freddy or Fannie. This can be done on line at either:

https://www.freddiemac.com/corporate/

http://www.fanniemae.com/loanlookup/

Chances are Fannie or Freddie "own your mortgage." If you are in litigation, you should follow up with targeted discovery requests to the servicer confirming the servicer does not "own" your mortgage. Moreover, you should inquire and demand any records showing Freddie or Fannie assigned the mortgage to the servicer. Servicers will point to Freddie or Fannie servicing guidelines which basically provide that the servicer forecloses in its (the servicer's) own name. Given a mortgage is an interest in land and the requirement under the statute of frauds that such contracts be in writing, the servicer's standing to foreclose can be challenged absent some proof that the mortgage was specifically assigned by Freddie or Fannie to the servicer. Legally, Freddie and Fannie must assign back the note to so the servicer. In fact, Freddie has a specific form 105 to do so.

See: http://www.allregs.com/tpl/Main.aspx [Sections 66.17 and 66.54].

However, Freddie and Fannie's guidelines have evolved over time and you may find that there is no such assignment in most cases. Unless there is a written assignment from the mortgage owner (Freddy or Fannie) to the servicer, the servicer cannot foreclose for the simple reason they are not part of the mortgage contract. Simply put, only the mortgage owner can foreclose on the mortgage contract. Moreover, if the assignment of the mortgage is invalid or fraudulent, then there is a "cloud on title" which should be identified by title and mortgage insurers.

Second, according to Powell on Real Property section 37.27 (quoted above),

It must be remembered that the mortgagee has two interests: (1) the debt or obligation which is owed to him, and (2) the security interest in land represented by the mortgage .... In fact, the primary interest is the personalty debt obligation. The interest in land which is available in case security is necessary because of the debtor's default is considered a collateral interest. Much trouble has been caused by mortgagees attempting to transfer only one of these two interests. Where the mortgagee has "transferred" only the mortgage, the transaction is a nullity and his "assignee," having received no interest in the underlying debt or obligation, has a worthless piece of paper.

Given what Professor Whitman describes as a "conscious policy on the part of mortgage sellers to retain, rather than transfer, the notes representing the loans they were selling," it would appear that any alleged "sale" of the note or mortgage to Freddy and Fannie is a fraud. By analogy, you cannot cash a check that is not in your possession or that is not made payable to or endorsed to you. Not only is the sale of the note a sham where there is no delivery and/or endorsement of the underlying loan/note to Freddie or Fannie, if their records (per the website) "show that Freddie Mac is the owner of your mortgage," then the unity of interest (i.e. loan/note and mortgage/security must be transferred together) is destroyed leaving Freddie and Fannie with nothing.[1]

This begs the question: why would Fannie and Freddy have such a policy given the laws governing mortgage contracts and promissory notes? Consider the fact that Freddie and Fannie are Government Sponsored Entities [GSEs] albeit private corporations owned by the major banks. It seems to me that Freddie and Fannie have been hijacked by the major banks and are being used to buy up bad mortgages and then seek a bailout from the taxpayers.[2]

###

[1] http://stopforeclosurefraud.com/2011/08/17/complaint-knights-of-columbus-v-bank-of-new-york-mellon-did-not-acquire-residential-mortgage-backed-securities-but-instead-acquired-securities-backed-by-nothing-at-all/?utm_source=feedburner&utm_medium=feed&utm_campaign=Feed%3A+ForeclosureFraudByDinsfla+%28FORECLOSURE+FRAUD+%7C+by+DinSFLA%29

[2] Note: Freddie and Fannie are major stockholders in MERS which has some of the same legal problems regarding delivery and possession of the note. http://www.mersinc.org/about/shareholders.aspx

